## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LUCKY BUCKS HOLDINGS LLC, | Case No.  23-10756 (KBO) |
| Debtor. | |

| | |
|---|---|
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of Lucky Bucks Holdings LLC and as assignee, | Adversary Proceeding<br><br>Adv. Proc. No. 24-_____ (KBO) |
| Plaintiff, | |
| v. | |
| TRIVE CAPITAL MANAGEMENT LLC, TRIVE CAPITAL FUND III LP, TRIVE CAPITAL FUND III-A LP, TCFIII LUCK LP, TCFIII LUCK SPV LP, TCFIII LUCK ACQUISITION LLC, SHRAVAN THADANI, LUCKY BUCKS VENTURES, INC., ANIL DAMANI, SOUTHERN STAR GAMING LLC, SHAFIK KASSAM, JAMES BOYDEN, RYAN BOUSKILL, RYAN C BOUSKILL PROFESSIONAL CORPORATION, 2786692 ONTARIO INC., MANU SEKHRI, STEPHANIE LIPPA, and HASSAN IJAZ, | **COMPLAINT** |
| Defendants. | |

QUINN EMANUEL URQUHART
    & SULLIVAN LLP
Susheel Kirpalani
Andrew J. Rossman
Mario O. Gazzola
51 Madison Avenue, 22nd Floor
New York, New York 10010

WHITEFORD TAYLOR
    & PRESTON LLC
Richard W. Riley (DE No.  4052)
600 North King Street, Suite 300
Wilmington, DE 19801

1.      This adversary proceeding is brought on behalf of Lucky Bucks Holdings LLC ("Holdings" or the "Estate") and its stakeholders to avoid and recover distributions unlawfully transferred to Holdings's former insiders and equity-holders, and to remedy the fraud and corporate looting of the Estate by those same insiders and equity-holders. Marc Abrams, solely in his capacity as Holdings's Chapter 7 Trustee and as assignee of causes of action previously belonging to Holdings's creditors, seeks to recover the actual and constructively fraudulent transfers of approximately $250 million as well as damages arising from the sale of notes issued to finance this scheme.

2.      Holdings's former subsidiary, Lucky Bucks LLC ("Lucky Bucks" or the "Company"), was an operator of coin-operated amusement machines ("COAM") in Georgia. COAMs are games of skill that resemble slot machines placed in high-traffic locations such as gas stations and convenience stores. Lucky Bucks was founded in 2011 by Anil Damani, who was the Company's CEO until 2020, when he was banned from working at the Company by its regulator, the Georgia Lottery Corporation (the "GLC"). In the wake of Damani's regulatory ban, a self-proclaimed "long-term value" creator and private equity firm, Trive (as defined below) acquired all the Company's outstanding equity that was not owned by Damani and other insiders in a take-private transaction for approximately $126 million. Trive did not invest that money into the business, it was the price paid to buy out public shareholders in 2020, when the Company's equity was worth approximately $170 million.

3.      Trive was intimately familiar with Lucky Bucks's business, having worked with the Company and its management team as a lender of sorts since 2016. Now in control, in 2020, Trive immediately took a majority position on Lucky Bucks's board of managers, appointing two of three managers. Trive also required extensive approval rights over virtually every aspect of the

business—and all of its appointees to the board had to confirm in writing that they understood those rights. Through his years of collaborating with Lucky Bucks, Trive partner Shravan Thadani became knowledgeable about the Company's operations, regulatory environment, and capital requirements.

4.      Rather than acquire Lucky Bucks to enhance the value of the enterprise for a later sale, Trive looked for ways to "take cash out of the business" at the earliest possible opportunity. Within a year of taking Lucky Bucks private, on or around July 2021, Trive caused Lucky Bucks to increase its leverage to $535 million in order to refinance certain pre-existing obligations and fund a $200 million dividend for itself using additional proceeds from the loans, Damani, and the other insiders who were more than happy to follow Trive's lead.

5.      Trive beneficially owned or controlled just over 58% of Lucky Bucks's equity interests, so its portion of that July 2021 dividend was approximately $110 million. That amount, when combined with other distributions Trive entities received, represented a whopping ████ return on the Trive entities' investment in approximately 12 months.

6.      But Trive was still not satisfied. Rather than wait to obtain dividends from good performance that would generate surplus cash, Trive sought to squeeze more out of Lucky Bucks even as performance declined during the second half of 2021—but before Lucky Bucks would have to report its numbers to investors. Trive moved with urgency so as not to lose what was left of a "white hot" market for financings. But, the amount of debt it could foist on Lucky Bucks was already maxed out under its recently upsized term loan facility, which placed certain limits on leverage that would be exceeded by taking on any new debt. Trive therefore had to find new and creative ways to saddle the Company with additional crushing debt.

7.      So in August 2021—just a month after the Company made its July dividend distributions—Trive devised its "super holdco" plan.  Trive selected attorneys for Lucky Bucks and worked with them to create a new holding company—Holdings—which would sit above Lucky Bucks and Lucky Bucks Holdco LLC (Lucky Bucks's then-existing holding company).  Holdings, on whose behalf this Complaint is brought, was formed and immediately saddled with additional debt to finance even more dividends to Trive entities and other aligned equity holders.  Holdings's only asset would be its ownership of Lucky Bucks shares (via its ownership of Lucky Bucks Holdco LLC shares).

8.      Trive marketed the opportunity to buy debt backed by the Company's purportedly stable earning power while the Holdings entity was still being set up.  The plan was for Holdings to issue $250 million of notes (the "Notes") to investors based on statements about the underlying business' financial health and its supposedly reliable business fundamentals.  Those basic elements of Lucky Bucks's business were of critical importance to Holdings because its only asset was its ownership of Lucky Bucks shares, meaning Holdings's ability to repay the Notes was entirely dependent on the equity value of Lucky Bucks, which needed to be enough to clear the operating subsidiary's own substantial debt.  In support of this scheme, Trive boasted to potential investors about its knowledge of the business.  That part, at least, was true: Trive knew the business, its founder (Damani), and its management team from being the financier of dozens of acquisitions for Lucky Bucks between 2016 and 2018, when Lucky Bucks was headed by defendant Damani as CEO.

9.      The Notes were marketed using an August 2021 confidential information memorandum ("CIM") prepared by Lucky Bucks's advisors (the "Note CIM").  During a road show on or around August 2021-September 2021 to market the Notes, Trive partner Thadani took

the lead on most of the management calls with potential purchasers.  His pitch was bold and confident:  He stated the business was worth over $1 billion, and that Trive had plans to sell it within a few years.  He pointed to the Company's approximately $100 million per year in EBITDA over the last 12 months, which incorporated revenues from locations that Trive had financed.  But Thadani assured his audience that the more relevant figure—the run rate EBITDA[1] when taking into account additional merger and acquisition ("M&A") activity—was approximately $115 million per year.  In support of these statements, Thadani and the Note CIM pointed to "pro forma" EBITDA[2] as of March 31, 2021, instead of presenting the actual recent poor performance, even though the diligence process undertaken by potential investors in the Notes continued into November 2021 (and January 2022 for one investor), by which time the Company and Trive were undeniably aware of those declining results.  Rather than disclose the business's decline, Thadani explained to prospective creditors that Lucky Bucks's earnings were stable because, among other things, the Company enjoyed long-term, standard contracts with location owners (owners of the gas stations and convenience stores where Lucky Bucks placed its COAMs) and GLC regulations that required location owners who switched COAM machines from one company to another to sit out a nine-month "dark period."  These inherent constraints on losing locations were critical pieces of information to prospective creditors because the underlying valuation was directly tied to the number of locations staying (at least) constant over the life of the Notes.  In support of their pitch to investors, Thadani and others touted the supposedly minimal rate of location attrition in support of their claims about the Company's revenue stability.  Without a doubt, Thadani understood the

---

[1]    Run rate EBITDA differs from EBITDA calculations in that it takes into account the EBITDA generated from newly-acquired locations.

[2]    The Note CIM explained that the March 31, 2021 pro forma metrics were "pro forma for acquisitions made on or prior to March 31, 2021 and adjusted for all acquisitions made after March 31, 2021 and on or prior to June 18, 2021."

importance of ensuring prospective debt investors about the Company's long-term, stable revenues, and intended those investors to rely upon and take comfort from his statements.

10.     Thadani and Manu Sekhri (who collaborated during Trive's initial 2016 investment in Lucky Bucks, and who Trive nominated as one of its appointees to the board) also placed significant emphasis on the strength of Lucky Bucks's "farm team"—the team of salespeople that scoped out and assembled valuable locations for acquisitions.  Thadani emphasized that because the business of owning gas stations and convenience stores is prevalent within Georgia's South Asian community, Thadani, Sekhri, and Lucky Bucks management (who shared that heritage) had a competitive advantage in identifying valuable opportunities through their South Asian "network."  Thadani and Sekhri lauded the farm team's professionalism, and Sekhri described Lucky Bucks as a higher moral compass player that would only purchase assets it knew to be credible.

11.     While organic growth in the COAM industry is slow, Lucky Bucks had grown by completing multiple "add-on" acquisitions in which other COAM operators were acquired through financing supplied by Trive.  Thadani assured prospective creditors of Holdings that the investment was sound because Lucky Bucks's farm team and M&A-driven growth would allow Lucky Bucks to soon outgrow its significant leverage and generate strong earnings in the future.

12.     Because the COAM industry is nascent and fragmented, Thadani and Trive understood that investors would be hesitant to provide credit to an entity that operated thousands of machines absent a knowledgeable and capable equity sponsor as well as a good relationship with its regulator.  Thadani trumpeted both Trive's reputation as a formidable middle-market private equity player and his own personal involvement in the operation of the business in order to assure prospective purchasers of Notes that they could rely upon Lucky Bucks's and Holdings's

representations.    Thadani and management also asserted that Lucky Bucks had a strong relationship with the GLC and was a "model COAM operator from the State's perspective."

13.    While trumpeting Trive's reputation and involvement, purported strong relations with the GLC, and the professionalism of the farm team, Thadani privately kept Damani updated on developments and timing even though Trive knew Damani was to have no operational control over Lucky Bucks and had been banned from holding any office at Lucky Bucks by GLC.  Treating the GLC ban as mere window dressing, Thadani and Sekhri relied upon Damani to present acquisition targets to Lucky Bucks, and kept Damani updated behind-the-scenes by forwarding him emails with the Company's investment bankers and the prospective Noteholders.

14.    Per Trive's plan, Holdings, pursuant to written consent of its board of managers (consisting of the Trive and Damani appointees), issued $195 million in Notes in November 2021, and an additional $55 million in Notes in January 2022.

15.    After receiving the proceeds from these Notes, Holdings made distributions (collectively, the "Holdings Distributions") to its insiders, with approximately $120 million going to Trive and entities owned or controlled by Trive; approximately $60 million going to Lucky Bucks Ventures Inc., an entity wholly-owned by Damani; approximately $43.5 million going to Sekhri—one of Trive's appointees to Lucky Bucks and Holdings's boards[3]; and the remaining $14.5 million split between four other Lucky Bucks insiders, including James Boyden—Trive's other appointee to Lucky Bucks's and Holdings's Board—Ryan Bouskill, Stephanie Lippa, Hassan Ijaz, and Shafik "Tony" Kassam.

---

[3]    Both Lucky Bucks and Holdings were governed by three person boards of managers, with the same three managers: Manu Sekhri, James Boyden, and Shafik "Tony" Kassam.

16.     With the November 2021 and January 2022 dividends that Trive pushed through just months after the July 2021 dividend, the Trive entities' return on investment grew to approximately ▆▆▆% in less than eighteen months.

17.     As a result of making these dividends (which by definition provide no value to the maker), Holdings was both rendered insolvent and left with unreasonably small capital to repay the Notes.  When relying on the valuation of Lucky Bucks, net of Lucky Bucks's debt, to justify the distribution to shareholders, a Lucky Bucks's board member rubber-stamped a "solvency certificate" that was, in the CFO's words, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  Indeed, days before issuing said "solvency certificate," upon reviewing the proposed language, the Company's CFO asked the controller, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ The controller replied: ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Indeed, Trive and the other insiders never obtained a solvency opinion or fairness opinion from any independent third party.  Instead, with a slick pitch, Thadani and other representatives of soon-to-be-formed Holdings simply shifted the risk of the instability of Lucky Bucks's future revenue streams to creditors through its leveraged dividend.

18.     In outward statements to potential investors, Thadani touted the Company's stable income and an accelerating M&A pipeline that would purportedly allow Lucky Bucks to quickly outgrow its leverage.  But privately, Thadani recognized a different reality.  For example, on November 9—two weeks before the November 2021 issuance of $195 million of Notes—Thadani told Lucky Bucks management that he ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ And just 10 days after the November 2021 issuance, Thadani told the Company to ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

19.    Thadani was not the only person who realized Lucky Bucks was a house of cards. In a bad sequel to how Trive and management hid the bad numbers from prospective bond investors, in January 2022, Sekhri told his team to █████████████████████████████ ████████████████████████████████████████████████. In particular while preparing a background slide for hiring bankers to sell the company—similar to a slide contained in the Note CIM—Sekhri cautioned Thadani, management, and another Trive employee that ███ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████ This was precisely what Trive and management did in the course of the Note marketing and diligence process.  Sekhri was understandably worried that both existing and new lenders would be taken aback by the actual numbers for the second half of 2021 bearing no resemblance to the fake numbers they were shown during the same period under the guise of "estimates."  And management repeatedly recognized that many of the locations the Company had acquired were severely underperforming their historical pre-acquisition EBITDA (which were being used in pro forma EBITDA calculations).

20.    Within months of Holdings emptying its coffers by paying out the proceeds of the Notes as dividends, the underlying business was in shambles—a fact kept from the Noteholders until a September 2022 call with management.  The Company was massively underperforming as compared to the projections provided to the Noteholders.  The drop was primarily caused by the Company losing locations at a rate that bore no resemblance to the <1% attrition rate Trive and Thadani touted when they induced investors to loan Holdings nearly $250 million.  Moreover, as Thadani had ████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████ For example, Lucky Bucks needed to replace ████████████████████

███████████████████████████████████████████████

████████ When discussing how to pull this off in the wake of making massive dividends, management noted that █████████████████████████████████████

████████████████████████████████

21.     Upon hearing about some problems in September, the Noteholders sought to understand why performance in 2022 bore no resemblance to what they were told. Then came the cover up. Thadani and other insiders hid the facts by providing ever-shifting justifications for Lucky Bucks's decline. At first, it was just another COVID story—the Company attempted to explain away the decline by pointing to the reduction in COVID stimulus spending. Then, the excuse was a purported industry-wide increase in regulatory enforcement by the GLC in shutting down locations that were violating Georgia law. Then, it was inflation, which in turn led to increased interest rates, which supposedly dried up household disposable income. Feeling the pressure, Thadani tried to appease Holdings's concerned creditors by telling them everything was under control and that he was already in the process of negotiating a sale of Lucky Bucks as a going concern to a competitor. But this too was false. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Thadani knew that no such sale process was feasible given that the Company's revenues had so wildly deviated from the information contained in the Note CIM—which was just given to prospective Noteholders—and any buyer would ask questions that he and Lucky Bucks could not answer without toppling the house of cards.

22.     In October 2022, certain Noteholders began cross-checking Thadani's purported justifications for Lucky Bucks's fall from grace. Unbiased sources made clear that there was no industry-wide pattern of increased GLC regulatory enforcement—in fact, no one else was seeing an uptick. When creditors asked about Lucky Bucks on expert network calls, certain experts expressed concerns that Lucky Bucks was a criminal enterprise.

23.     Hearing this, Thadani went into damage control mode. He set up a call with Holdings's Noteholders to discredit the expert networks, and even made the unsubstantiated claim that these neutral third party experts were being influenced by competitors to harm Lucky Bucks's business.

24.     By the end of 2022, Lucky Bucks and Holdings were forced to engage restructuring advisors. By March 2023, these advisors made presentations to the Noteholders in an effort to get them on board with a proposed restructuring plan. That presentation included a historical attrition report, revealing that in just the second half of 2021 (the period when Holdings was borrowing money from the Noteholders based on "pro forma" rather than actual numbers), the Company experienced an overall attrition rate of 11.1% of total machines—proving that the true annual attrition rate was about *20 times higher* than the expected 1.1% annual COAM attrition rate derived from the Note CIM's 2020 data.

25.     On June 8, 2023 (the "Petition Date"), Holdings filed for Chapter 11 bankruptcy protection before this Court, followed by Lucky Bucks on June 9, 2023. As part of the proposed restructuring plan, Holdings installed an independent manager who proposed granting a full release to Trive and all recipients of the Holdings Distributions in return for a $15 million settlement payment, representing a meager 6% of the moneys improperly taken and transferred away from Holdings's creditors. The Noteholders opposed the plan and moved to convert Holdings's Chapter

11 case to Chapter 7. This Court granted their motion on October 24, 2023 promptly after the operating subsidiary emerged.

26.     Holdings's operating subsidiary, Lucky Bucks, emerged under the ownership of Lucky Bucks's lenders.  Three months after emerging, Lucky Bucks—now known as Arc Gaming—filed a sweeping complaint in Georgia state court (the "Georgia Complaint") revealing for the first time the likely reason for Lucky Bucks's demise.  After an extensive internal investigation, the Georgia Complaint alleged that Damani, Kassam, and other insiders engaged in extensive misconduct when running Lucky Bucks starting in 2019.

27.     Specifically, the Georgia Complaint revealed that Damani and Kassam engaged in several rackets to strip Lucky Bucks's assets—including by stealing location contracts, selling back locations to Lucky Bucks at fraudulently inflated values, stealing COAMs, and using Lucky Bucks's employees to service competitor companies owned by Damani.

28.     The focus of the allegations in the Georgia Complaint is the wrongdoing at Lucky Bucks, which applies perforce to Holdings and its creditors, because Holdings's ability to repay its own debts was wholly dependent on the performance of Lucky Bucks as its sole asset.

29.     The Georgia Complaint revealed facts that show Thadani's entire pitch to the Noteholders was a ruse and explains Trive's rush to "take cash out of the business" in late 2021, just 10 months after Trive acquired majority ownership of Lucky Bucks.  Indeed, the foundation of Thadani's pitch—the stability and longevity of the location contracts—was expertly spun to cover up the key pillars of Damani and Kassam's rackets, which involved leeching location contracts from Lucky Bucks, causing Lucky Bucks not to contest and enforce the nine-month dark period, and even selling those locations back at inflated prices to Lucky Bucks over the course of several multi-million dollar transactions prior to the first issuance of the Notes.

30.     The Trustee has carried out his charge to investigate the true history and financial condition of Holdings by using the bankruptcy discovery device available under Federal Rule of Bankruptcy Procedure 2004.    Although parties have not confirmed they have provided all responsive documents in Rule 2004 discovery,[4] the documents obtained thus far by the Trustee illustrate that the financials and accompanying representations made to Noteholders were false. Lucky Bucks was not worth anything close to a billion dollars, as Thadani touted.    That was a fabrication based upon Thadani's, management's, and Trive's misstatements about:

    a.      The purported lack of attrition and stability of Lucky Bucks's location contracts;

    b.      The EBITDA generated by Lucky Bucks's prior M&A activity;

    c.      Lucky Bucks's ability to continue growing after the Note issuance through further M&A activity;

    d.      The accuracy of Lucky Bucks's financial condition and growth projections in light of the active and ongoing looting and poor performance in the second half of 2021 that was hidden through the use of pro forma estimates;

    e.      Representing that Holdings was solvent and that management had conducted an analysis to assess that it was;

    f.      Lucky Bucks's relationship with its regulator—who management recognized ▮▮▮▮▮▮ at the same time as they told investors the relationship was strong; and,

    g.      The strength of Lucky Bucks's "farm team," which turned out to be a sham operation run by certain insiders' family members.

31.     Despite the declining revenues of Lucky Bucks (and thus Holdings, whose sole asset was Lucky Bucks), Holdings distributed nearly $250 million of cash for no value to equity

---

[4] In particular, Trive has produced certain documents to the Trustee pursuant to Rule 2004 but has yet to certify that its production is complete.    As of the time of filing this Complaint, TCM had produced only a fraction of documents that were admittedly responsive to the Trustee's proposed search terms, and it appears that TCM has withheld a material number of internal documents.

holders based on these fanciful pro forma estimates, lies about attrition, silence about underlying looting, and false narratives about the farm team and the Company's relationship with its regulator. Under these facts, the money sent out to shareholders must be returned for Holdings's creditors who were left holding the bag.

32.    Thadani and Trive knew their representations about Lucky Bucks's financials were false and disregarded any information that would jeopardize their pay day. Thadani—a seasoned finance professional—understood that the Company's ability to maintain locations was foundational to Holdings's value equation, and that the loss of locations would negatively impact the value. He was deeply involved with the M&A process of Lucky Bucks, and even negotiated some acquisitions himself. Furthermore, prior to the first issuance of the Notes, Trive employees received and forwarded to Thadani real-time data from Lucky Bucks's regulator regarding upcoming expiring contracts and lost locations that grossly contradicted the attrition rate Thadani was showing to Holdings's prospective creditors. Thadani knew performance was declining and tried to paper over it by showing only pro forma numbers rather than discussing actual performance with prospective Noteholders in the second half of 2021, despite his duty to report actual financial information if it showed the pro forma numbers were unreasonable on their face.

33.    Thus, even if Thadani was not involved in the criminal enterprise of Damani and Kassam alleged in the Georgia Complaint, he and others at Trive were aware something was deeply wrong with the stability of locations at Lucky Bucks, and quickly lined their pockets with the funds of unsuspecting Noteholders. And regardless of Trive's and Thadani's knowledge at the time, Trive and the other Defendants have no basis to keep their ill-gotten gains—taken at the expense of Holdings's creditors. Indeed, at least two out of the three Holdings's board members knew at the time of the distributions that Holdings's financial condition was not what was reported to

lenders: Kassam was directly involved in stripping Lucky Bucks's assets at Damani's direction, while Sekhri cautioned management to ████████████████████████████.

34.    Accordingly, the Trustee brings this action to recover the approximately $250 million in cash dividends that were fraudulently transferred from Holdings to the Trive entities, Damani, Sekhri, and the other insiders, and to hold them responsible pursuant to related causes of action for their fraud and corporate looting.

## II.    PARTIES

### A.    Plaintiff

35.    **Marc Abrams** is the Chapter 7 Trustee of Lucky Bucks Holdings LLC, a Delaware limited liability company.  Abrams was appointed Chapter 7 Trustee of Lucky Bucks Holdings LLC on November 29, 2023, following conversion of Lucky Bucks Holdings LLC's Chapter 11 case to a Chapter 7 case on October 24, 2023.  Abrams is also the assignee of all right, title and interest in claims of the Noteholders against Defendants arising out of or in connection with the Notes, the issuance of the Notes and/or the Note Purchase Agreement.

### B.    Trive Defendants

36.    **Trive Capital Management LLC** ("TCM") is a middle-market private equity fund incorporated in Delaware with a principal place of business in Dallas, Texas.  TCM beneficially owns or controls several entities, including TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and Southern Star Gaming LLC.  Pre-petition, Southern Star Gaming LLC held all shares of Holdings that were not owned by Trive entities TCFIII Luck Acquisition LLC, TCFIII Luck SPV LP, or Damani entity Lucky Bucks Ventures, Inc.  Entities owned or controlled by TCM received a combined approximate $120 million in proceeds from the Holdings Distributions between their

direct ownership of Holdings and their stake in Southern Star Gaming LLC. Trive entities owned or controlled approximately 58.6% of Lucky Bucks and Holdings in the aggregate.[5]

37.     **Trive Capital Fund III LP** ("Trive Fund III") and **Trive Capital Fund III-A LP** ("Trive Fund III-A") are Delaware limited partnerships. Trive Fund III and Trive Fund III-A are funds managed by TCM, and they jointly own TCFIII Luck LP, TCFIII Luck SPV LP, and TCFIII Luck Acquisition LLC.

38.     **TCFIII Luck LP** is a Delaware limited partnership. TCFIII Luck LP owns 100% of Quantum Gaming Corp., which owns 100% of Southern Star Gaming LLC, which owned 70% of Holdings pre-petition. TCFIII Luck LP is controlled by TCM.

39.     **TCFIII Luck SPV LP** is a Delaware limited partnership. TFCIII Luck SPV LP was the direct recipient of approximately $4.2 million of the Holdings Distributions. TCFIII Luck SPV LP is controlled by TCM.

40.     **TCFIII Luck Acquisition LLC** is a Delaware limited liability corporation. TCFIII Luck Acquisition LLC was the direct recipient of approximately $7.6 million of the Holdings Distributions. TCFIII Luck SPV LP is controlled by TCM.

41.     **Southern Star Gaming LLC** is a Delaware limited liability corporation. Southern Star Gaming LLC ("Southern Star") was the direct recipient of approximately $166.5 million of the Holdings Distributions. Entities owned or controlled by TCM owned 72.81% of Southern Star's equity, with Manu Sekhri holding 22.19%, and management holding 5% in options.[6]

42.     **Shravan Thadani** is a Managing Director of TCM and was the lead Trive partner in charge of Trive's investment in Lucky Bucks. Thadani was heavily involved in the day-to-day

---

[5]  Bank Book at 8.

[6]  ARCGaming00346418.

management and operations of Lucky Bucks.  Upon Information and belief, Thadani resides in Texas.

43.     Collectively, TCM, Trive Fund III, Trive Fund III-A, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star, and Thadani shall be referred to as "Trive" or the "Trive Defendants."

> **C.    Damani Defendants**

44.     **Lucky Bucks Ventures, Inc.** ("LBVI") is an entity owned and controlled by Anil Damani, the founder and former owner of Lucky Bucks.  It is, upon information and belief, a Georgia corporation with a principal place of business in Georgia.  Following Trive's take-private transaction, LBVI retained a 25% stake in Lucky Bucks and Lucky Bucks Holdings.  LBVI was the direct recipient of approximately $59 million of the Holdings Distributions.

45.     **Anil Damani** is the founder and former owner of Lucky Bucks and its former corporate affiliates.  On information and belief, Defendant Damani resides in Gwinnett County, Georgia.  From its founding until 2020, Defendant Damani was the CEO of Lucky Bucks and controlled virtually all aspects of its operations.  In June 2020, pursuant to a consent settlement with the GLC (described below in further detail), Defendant Damani was forbidden from having any role in the business operations of Lucky Bucks.  Nevertheless, on information and belief Defendant Damani continued to direct the M&A activity of Lucky Bucks by identifying and presenting M&A opportunities to the Trive Defendants and Management Defendants.

46.     Collectively, LBVI and Damani shall be referred to as the "Damani Defendants."

> **D.    Management Defendants**

47.     **Manu Sekhri** is, upon information and belief, an Ontario resident.  Sekhri was the indirect recipient of approximately $43.5 million in proceeds from the Holdings Distributions via his ownership interest in Southern Star.  Following Trive's acquisition of Lucky Bucks via the

Southern Star take-private transaction, Trive named Sekhri as Lucky Bucks' CEO and designated Sekhri to the Lucky Bucks board.  Once Holdings was formed, Trive designated Sekhri to the Holdings board.

48.     **Shafik "Tony" Kassam** was the Chief Operating Officer of Lucky Bucks until October 11, 2023.  After Defendant Damani was barred by the GLC settlement from being involved in Lucky Bucks's business operations, Defendant Kassam was ultimately responsible for and controlled every aspect of Lucky Bucks's operations.  He was a member of the Lucky Bucks and Lucky Bucks Holdings boards, as a designee for Damani.  On information and belief, Defendant Kassam resides in Gwinnett County.  Kassam was the direct recipient of approximately $750,000 of the Holdings Distributions.

49.     **James Boyden** is, upon information and belief, an Ontario resident.  Boyden was the direct recipient of approximately $3.08 million of the Holdings Distributions.  Trive designated Boyden to the Lucky Bucks and Holdings boards.

50.     **Ryan C. Bouskill Professional Corporation** is an Ontario business corporation owned and controlled by Ryan Bouskill.  Ryan C. Bouskill Professional Corporation was the direct recipient of approximately $5.2 million of the Holdings Distributions.

51.     **Ryan Bouskill** (collectively with Ryan C. Bouskill Professional Corporation, "Bouskill") is an Ontario resident, and the former CFO of Lucky Bucks.  Ryan Bouskill was the indirect recipient of approximately $5.2 million of the Holdings Distributions via his professional corporation.

52.     **Stephanie Lippa** is, upon information and belief, an Ontario resident.  Stephanie Lippa was the direct recipient of approximately $1.32 million of the Holdings Distributions.

53.     **2786692 Ontario Inc.** is, upon information and belief, an Ontario corporation owned and controlled by Hassan Ijaz.  2786692 Ontario Inc. was the direct recipient of approximately $4.2 million of the Holdings Distributions.

54.     **Hassan Ijaz** is, upon information and belief, an Ontario resident.  Ijaz was Lucky Bucks's EVP of Finance.  Upon information and belief, before Lucky Bucks's change of control from its Chapter 11 case, Ijaz deleted his entire inbox from Lucky Bucks's computer system.

55.     Collectively, Sekhri, Kassam, Boyden, Bouskill, Lippa, 2786692 Ontario Inc., and Ijaz shall be referred to as "management" or the "Management Defendants."

## III.    THE NOTEHOLDERS

56.     The Noteholders are funds managed by six asset managers: (1) Hamilton Lane Strategic Opportunities Fund VI (Series 2020) Holdings LP, managed by Hamilton Lane Advisors LLC (collectively, "Hamilton Lane"); (2) First Trust Alternative Opportunities Fund, managed by First Trust Capital Management LP (collectively, "First Trust"); (3) MFI ICAV, managed by Monarch Alternative Capital LP (collectively, "Monarch"); (4) BCP Special Opportunities Fund II Originations LP, Portman Ridge Finance Corporation, Alternative Credit Income Fund, Logan Ridge Finance Corporation, BCP-Window Secondary Credit Opportunities LP, BCP Special Opportunities Fund II GP LP, Blue Sky Credit Fund LP, managed by BC Partners (collectively, "BC Partners"); (5) Marathon Centre Street Partnership, LP, MCSP Sub, LLC, TRS Credit Fund, managed by Marathon Asset Management LP (collectively, "Marathon"); and (6) CION Investment Corporation, managed by CION Investment Management, LLC (collectively, "CION"). Funds managed by BC Partners served as the lead investors on the Notes, and together with funds managed by Hamilton Lane, Marathon, CION, and First Trust, invested in the November 2021 issuance.  Funds managed by Monarch invested in the January 2022 issuance.

57.    On April 8, 2024, this Court approved the Noteholders' assignment of their claims relating to the issuance of the Notes to the Trustee to bring collectively on their behalf.

## IV.    JURISDICTION AND VENUE

58.    This Court has jurisdiction over certain claims brought in this matter pursuant to 28 U.S.C. §§ 157 and 1334, and has supplemental jurisdiction over the related claims pursuant to 28 U.S.C. § 1367.

59.    This is a core proceeding pursuant to 28 U.S.C. § 157(b) with respect to the claims over which the court has original jurisdiction.

60.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

61.    Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, Plaintiff consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## V.    OVERVIEW OF THE COAM BUSINESS IN GEORGIA

62.    Lucky Bucks operated a business premised on ownership of COAM machines strategically placed in gas stations, convenience stores, and similar retail businesses in the state of Georgia.

63.    COAM machines are skill-based amusement machines that somewhat resemble the digital slot machines that can be found in casinos throughout the United States.  Unlike slot machines, however, the players' skill is a determining factor in the outcome of the games.  And unlike slot machines, in Georgia, COAM machines are not gambling devices and cash prizes are illegal.  Instead, COAM machines must be located in businesses that derive the majority of their income from the sale of goods and services, and those businesses are permitted to reward winners

with merchandise from their stores.  Most COAM machines in Georgia are located in gas stations and convenience stores.

64.     The COAM business is regulated by the GLC, which has licenses for two types of machines-Class A and Class B licenses.  Class A licenses apply to traditional arcade games, jukeboxes and the like, whereas the type of COAM machines owned and licensed by Lucky Bucks require Class B COAM licenses to operate.

65.     There are three types of Class B COAM licenses: master licenses, manufacturer's licenses, and location licenses.

66.     Master license holders are permitted to buy, own, and service COAM machines throughout the state of Georgia.  Location license holders are allowed to physically host the COAM machines owned by a master license holder at the specific location that is set forth in the license.

67.     Under Georgia law, every location license holder must operate pursuant to a written, exclusive contract with a master license holder that must have a term longer than one year.

68.     Master license holders are not permitted to hold location licenses or have an ownership interest in a location under contract with it.  *See* O.C.G.A. § 50-27-87(a)(4).

69.     Master licenses and contracts are generally transferable, subject to the approval of the GLC.  Thus, master license holders often acquire "routes" of COAM location license contracts from other master license holders, and they often purchase the other master license itself as part of the transaction.  In other words, a master license holder can and does contract with multiple location license holders and will also acquire other master licenses.  Given the regulated nature of the industry and the limited number of licenses, there can be substantial value in owning a master license and contracting with a location license holder.

70.     Location contracts are typically sold at a multiple of the historical monthly revenue earned by the COAM machines at the location.  So, a contract with a location that generates more revenue per machine (or has more machines) is more valuable than a contract with a location where the machines generate less revenue.

## VI.    FACTUAL ALLEGATIONS

### A.    Lucky Bucks's History

71.     Lucky Bucks and certain of its former corporate affiliates were formed in 2011 by Defendant Anil Damani.  Over the next several years, it grew to be one of the largest master license holders in the state of Georgia.

72.     In 2016, Damani sold 51% of his equity interest in Lucky Bucks' corporate affiliates to Southern Star for $13.5 million.  Southern Star's then-parent, Seven Aces Holdings ULC was a publicly-traded company on the Toronto Stock Exchange.  Trive (or other TCM-controlled entities) partnered with Southern Star to provide debt and equity financing in connection with the acquisition, building on a historical relationship with Seven Aces.  Damani retained a significant minority equity interest in Lucky Bucks via his ownership in Lucky Bucks's former parent company, LBVI, until the bankruptcy.

73.     In 2018, Trive provided additional debt capital to Lucky Bucks in the form of a credit facility that refinanced a structured capital investment provided by Trive in 2016; in the interim, Trive collaborated with Damani and management to pursue and execute on strategic acquisitions for the Company, including spearheading acquisitions of 19 other COAM operators and their associated portfolios.  Trive also owned a portion of Lucky Bucks's parent company's public equity around this time.

74.     Southern Star purchased additional membership interests from LBVI, increasing Southern Star's ownership to 70%.

75.     Lucky Bucks's growth was fueled almost entirely by acquisitions.  As part of these acquisitions, Lucky Bucks often acquired master licenses in addition to the location contracts. Accordingly, by 2020, Lucky Bucks held at least six master licenses.

**B.      Lucky Bucks's Regulator, The GLC, Bans Damani**

76.     In 2020, as a result of allegations that Damani offered illegal inducements to a location license holder by providing that license holder a residence, the GLC notified Lucky Bucks that it intended to revoke its master license on May 8, 2020.  That notification resulted in an administrative proceeding between Lucky Bucks and the GLC.

77.     On June 2, 2020, a GLC hearing officer approved a settlement in the administrative proceeding, and the hearing officer issued an executive order setting forth the terms under which Lucky Bucks would keep its master license.  The hearing officer specifically found that Defendant Damani violated two provisions of Georgia's COAM laws.

78.     The executive order required Defendant Damani to "resign as an officer" and "relinquish all operational control over the business and operations of [Lucky Bucks]."  Damani was permitted to retain his equity ownership in Lucky Bucks's former parent holding company, Lucky Bucks Holdco, but the order required that his shares be converted to non-voting shares.

79.     Damani entered into a 5-year non-compete agreement with Lucky Bucks as part of the overall settlement, meaning that while he still had a substantial ownership interest in Lucky Bucks, he could not operate Lucky Bucks and could not start up or buy a competing business.

80.     After Damani was barred from participating in Lucky Bucks's operations, Damani installed Kassam as one of the three seats on Lucky Bucks's board.

**C.      Trive's Acquisition Of Lucky Bucks**

81.     Prior to 2020, Lucky Bucks's ultimate parent company, Seven Aces Limited, was a public company with shares listed on the Toronto Stock Exchange.

82.    In August 2020, Trive entity TCFIII Luck LP acquired all outstanding equity in Seven Aces Limited—other than shares owned by Manu Sekhri—in a take-private transaction for approximately $126 million.  Through this transaction, it acquired a controlling interest in Seven Aces subsidiary Southern Star, which held a 70% interest in Lucky Bucks.  Defendant Sekhri became CEO of Lucky Bucks and Trive appointed him to the board.  Trive and Sekhri immediately exercised control over the Company.

83.    Trive ensured that in return for its majority equity interest in Lucky Bucks, it would be able to control the Lucky Bucks's board.

84.    For example, in the partnership agreement for TCFIII Luck LP, a Trive affiliate used to acquire Southern Star's shares, Trive caused Southern Star to appoint two individuals to Lucky Bucks's three-person board of managers.  Trive's appointees were Sekhri, the CEO of Southern Star, and Defendant Boyden.

85.    Damani, via LBVI's share of Lucky Bucks, retained the ability to appoint the third manager, who was Defendant Kassam.

86.    In addition to appointing two out of three members of the Board of Managers, Trive retained approval rights for itself over numerous actions of the business.  In particular, by the TCFIII Luck Partnership Agreement, Trive secured agreement that the Lucky Bucks board of managers would not take any of the following actions "without the prior written consent of Trive Holdco":

    a.    Liquidate, dissolve, or wind up the business of Lucky Bucks;

    b.    Amend, alter or repeal any provision of the Lucky Bucks LLC agreement;

    c.    Issue any equity or ownership interests, including convertible debt;

    d.    Declare or make dividends or distributions;

e.  Increase, decrease, or alter the composition of the Lucky Bucks board of managers;

f.  Incur indebtedness over $3,000,000 in aggregate;

g.  Enter into or modify terms of any agreements, arrangements, or transactions with related parties;

h.  Purchase or dispose of any property, rights, or assets with a value of over $500,000 per transaction;

i.  Compromise, settle, or resolve any disputes worth over $3,000,000 in aggregate;

j.  Appoint or remove any executive officer or employee of Lucky Bucks earning more than $350,000;

k.  Modify any cash or equity compensation to any Lucky Bucks executive;

l.  Adopt or approve any annual budget;

m.  Enter into any new line of business;

n.  Change any auditor or change any accounting or tax reporting policies; or

o.  Create any subsidiaries.

87.   TCFIII Luck LP was, itself, controlled by TCM.  It had five board members: TCM Managing Partner Conner Searcy, TCM Partner and Defendant Thadani, TCM Chief Operating Officer Steve Yoost, TCM Chief Compliance Officer Jonathan Nunnaley, and Defendant Sekhri.

88.   In short, other than the most basic day-to-day operations, Trive maintained explicit approval rights over every material aspect of Lucky Bucks's business.

89.   Trive required any of its board appointees to execute an agreement acknowledging their obligation to do Trive's bidding.  In order to facilitate Trive's control, as the Company explained to its ratings agency, ███████████████████████████████████████

████████████████████████████████████████████████████████████

90.   Trive's control over Lucky Bucks was no secret.  In response to diligence questions from a ratings agency, Lucky Bucks explained that ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**D.     Trive And Its Board Appointees Were Intimately Involved With Lucky Bucks's Business**

91.     From 2020 to the Petition Date, in addition to serving as one of Trive's designees to Lucky Bucks's board, Sekhri served as Lucky Bucks's CEO.

92.     And TCM itself—principally through Thadani—remained involved in key business decisions, including the acquisition of new locations.

93.     In particular, Thadani was involved in financing and evaluating potential M&A opportunities for Lucky Bucks, and even on taking the lead on negotiating acquisitions.  It was well known in the Georgia COAM industry that TCM was heavily involved in Lucky Bucks's acquisitions.  Indeed, sellers of location contracts sometimes reached out to TCM directly when trying to sell locations to Lucky Bucks.

94.     For example, on October 31, 2020, representatives of a smaller Georgia COAM business reached out to TCM offering to sell four locations for $5 million.  In order to evaluate the opportunity, Thadani looped in Sekhri, Bouskill, Boyden, Ijaz, and Damani—despite the GLC's ban on Damani's exercise of operational control over the business, which Thadani knew about.

95.     Boyden connected with Damani, discussed the location, and Boyden recommended a cap for the transaction at 36x monthly net revenue.  Thadani then continued negotiating with the seller.  Lucky Bucks ultimately acquired three locations from this seller in June 2021.

96.     ██████████████████████████████████████

██████████████████████████████████████████ And Thadani

assured Searcy, TCM's managing partner, as early as August 2020 that he was ███████████
████████████████████████

97.     Bouskill and Ijaz began to notice in 2020 and 2021 that many locations Lucky Bucks acquired were underperforming the EBITDA and performance numbers Lucky Bucks relied upon to purchase location contracts.

98.     For example, in summer of 2021, Lucky Bucks acquired three locations from another master license holder, Georgia Winners, LLC ("Georgia Winners") for over $5 million.

99.     From 2020 to 2021, Lucky Bucks acquired locations from several other master license holders, almost all of which had purchase prices over $1 million, with some exceeding $10 million.  Just in 2021, Lucky Bucks acquired locations from competitors Lee Caudell Inc., AKS Amusements Inc., Pinball Amusement LLC, and Klass Amusements for over $22 million combined.  ████████████ approved a $14.5 million purchase from Klass Amusements LLC in October 2021.

100.    Many of those acquisitions severely underperformed compared to their purported historical EBITDA. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████

101.    Indeed, many of the acquired locations appeared to have never been operational at all, requiring Lucky Bucks to attempt to claw back money from the sellers, including in November 2021 and February 2022.

█████████████████████████████████████████████████

████████████████████████████████████

**E.    Thadani And The Trive Defendants Orchestrate The First Big Dividend Payment In July 2021 From Lucky Bucks**

109.    In a January 2021 presentation to its limited partners regarding the Lucky Bucks investment, TCM told its limited partners that ████████████████████████████████

████████████████████████████████████

110.    Yet, long before that ████████████ TCM looked for ways to withdraw money from the business.  In the summer of 2021, TCM took an active role in orchestrating a big dividend payment funded by Lucky Bucks's debt obligations.

111.    TCM first identified a banker—Houlihan Lokey—and selected Shearman as counsel for the process.  Houlihan Lokey was selected in part because of its pre-existing personal relationship with TCM and Thadani.

112.    At TCM's direction, on July 30, 2021, Lucky Bucks entered into a senior secured credit agreement in the aggregate amount of approximately $535 million.  That senior secured credit agreement included both a $35 million revolving credit facility due 2026, and a $500 million first-lien term loan due 2027.  The term loan was used to refinance certain existing obligations, as well as to fund a $200 million distribution to aligned shareholders, including the Trive Defendants, Damani, Sekhri, and Kassam.

113.    In July 2021, Lucky Bucks issued a cash dividend of approximately $200 million to Lucky Bucks's shareholders with the proceeds of the financings.  Of that amount, over $100 million was distributed to entities controlled by TCM, more than $50 million was distributed to Defendant Damani, more than $30 million was distributed to Defendant Sekhri, and more than $500,000 was distributed to Defendant Kassam.

114.    After the Lucky Bucks term loan dividend was completed, Sekhri deferred to Thadani on whether the latter's role should be publicized due to Thadani's role in driving the process, and because it was in reality █████████████.

115.    In October 2021, Lucky Bucks increased its term loan facility to $550 million, and the outstanding principal amount under the revolving credit facility to $55 million, for a total of $605 million.

116.    Thus, by October 2021, Lucky Bucks had funded debt of $605 million, numerous contractual obligations to third parties and was facing significant financial pressures resulting from higher-than-projected attrition and underperformance of recently-acquired locations.

**F.    After Maximizing Lucky Bucks's Leverage, Thadani And The Trive Defendants Engineer The Holdings Offering In Order To "Take Cash Out Of The Business"**

117.    Almost immediately following the July dividends, Trive and the other insiders sought more ways to pay themselves even larger distributions.

118.    On August 10, 2021, Connor Anderson, a TCM Vice President, reached out to Shearman requesting the Lucky Bucks Credit Agreement governing the credit facility used to make the July 2021 dividend payment.

119.    Upon receiving it, Anderson informed Shearman that TCM would "like to better understand where the business needs to de-lever in order to start making unrestricted dividends" and "*what ability we have to take cash out of the business*."

**1.    TCM Pushes Lucky Bucks To Form A "Super Holdco": Lucky Bucks Holdings**

120.    In light of Lucky Bucks's level of leverage, there was no way Lucky Bucks could borrow more to fund additional gifts to shareholders.  So TCM instead engineered the formation

of Holdings in order to accomplish its goals. TCM had numerous discussions with Lucky Bucks's company counsel, referring to the opportunity as the "super holdco" opportunity.

121. The "super holdco" structure would entail the creation of a new holding company that would own a 100% indirect stake in Lucky Bucks, with Lucky Bucks Holdco's existing shareholders exchanging into ownership of Holdings. Holdings would have no operations and no assets other than its ownership of Lucky Bucks, and could borrow money without running afoul of Lucky Bucks's existing credit agreement as long as creditors could be convinced there was sufficient value. In effect, the "super holdco" structure was a form of mezzanine financing common in other industries, except that Trive had no intention of using any debt financing to support Lucky Bucks's business operations.

122. Once Holdings was formed, TCM made sure to give itself tight control over the entity in the Holdings LLC agreement.

123. Similar to Lucky Bucks, TCM retained the ability to appoint two out of three members of the Holdings board of managers, and appointed Sekhri and Boyden—its trusted appointees to the Lucky Bucks board of managers.

124. Damani had the right to appoint the third member of the board of managers, although, consistent with its ultimate control, TCM had the right to use three vetoes if it disagreed with Damani's appointment. Damani appointed Kassam as his representative to the Holdings board, once again mirroring the structure of the Lucky Bucks board.

125. Similar to its control over Lucky Bucks, TCM also retained certain approval rights over the conduct of Holdings's business.

126. In particular, TCM retained approval rights over the following Holdings corporate acts: (i) incurring debt over $500,000; (ii) any capital expenditure by Holdings or its subsidiaries

exceeding 1.5% of Holdings's and its subsidiaries' net revenue over any 12-month period; (iii) any alterations to Holdings's corporate status; (iv) altering Holdings's or its subsidiaries' business; (v) any demands for additional capital contributions to Holdings or its subsidiaries; (vi) issuing any equity interests; and (vii) the decision of what to do with net proceeds of any transaction.

127.     Given TCM's extensive approval rights over the capital needs of Holdings, it had control over how much capital could be raised and how it could be used.  Thus, TCM was not merely a passive shareholder who just happened to receive a windfall of doubling its investment within the first seventeen months of owning Lucky Bucks.

### 2.     TCM Takes A Leading Role In Marketing The Notes Together With Houlihan And The Company, And Keeps Damani In The Loop

128.     Simultaneously with the preparation of the Holdings formation documents, TCM took an active role in the Note Issuance.  Lucky Bucks used Houlihan as its banker for the issuance, and used Shearman as its law firm.  Shearman was the same law firm used for the July 2021 distributions.

129.     In the fall of 2021, TCM worked together with Houlihan and certain Lucky Bucks insiders—Ijaz and Bouskill—to prepare offering materials for the Note Issuance.  The marketing process for the notes was led and managed by TCM and Thadani, with Thadani managing the bulk of conversations with the potential investors and Noteholders.

130.     Houlihan prepared the 52-page Note CIM in August 2021 for marketing the Notes that was presented to potential Noteholders, though Houlihan itself did little to vet the financial and operational information, relying exclusively on what it was fed by insiders.

131.     After receipt of the Note CIM, potential Noteholders conducted diligence from September to November 2021.  But, as discussed below, there was no way diligence would have

revealed material adverse information to any investor, including because management, TCM, and Holdings's bankers were attempting to dodge diligence requests and hide harmful information.

132. BC Partners, as the lead investor on the Notes, conducted diligence on the Note opportunity. Certain investors that BC Partners brought in to the process, including First Trust and Hamilton Lane, obtained access to BC Partners's diligence materials, and relied in part on the diligence responses BC Partners had obtained. Other investors, including Marathon, CION, and Monarch, had independent conversations with management in which they separately confirmed the investment opportunity was sound and sensible.

133. Accordingly, BC Partners had several conversations with "management," although the primary speaker on the majority of these calls and the main point of contact for BC Partners was, in fact, TCM's Thadani.

134. In the course of diligence, Thadani made representations to the potential Noteholders that induced them to purchase the Notes.

135. Thadani gave a very aggressive pitch for the company, which was largely focused on two pillars: (1) Lucky Bucks and TCM had a first-in-class "farm team" which would seek out M&A opportunities by which Lucky Bucks could acquire new location contracts in order to continue growing and de-risking the investment; and (2) the contracts with location owners were long term and hard to get out of.

136. For example, Thadani repeatedly emphasized the strength of the "farm team," which he described as a legitimate and experienced sales force.

137. Indeed, while the Note CIM Houlihan provided to potential investors showed a pro forma EBITDA of just over $100 million, Thadani emphasized that the run rate EBITDA—*i.e.*, the EBITDA when taking into account the historical performance of machines recently acquired

in M&A deals—was much closer to $115 million. In short, Thadani was asserting that based on recent acquisitions, the underlying business was already generating more revenue to cover its debt obligations, and that additional acquisitions would only improve Lucky Bucks's financial standing and thereby Holdings's ability to repay the Notes.

138.    Thadani did not just stop at explaining the numbers behind the "farm team"—he also marketed the farm team through a personal pitch. Thadani explained that given that the market of location owners was largely South Asian—and that Thadani and Lucky Bucks management shared that heritage—Thadani and management used their South Asian network to support the Company and identify legitimate and trustworthy locations to acquire. Thadani and management also falsely assured Noteholders in the Note CIM that they had a "strong relationship" with the GLC because they had "proven to be a model COAM operator from the State's perspective."

139.    Sekhri echoed Thadani's representations regarding the "farm team" and marketed Lucky Bucks as a higher moral compass player that would only purchase assets they knew to be credible through, among other things, their South Asian network. And while the projections in the confidential information memorandum assumed the number of COAMs and locations would remain perfectly stable—with virtually no capex projected to replace them—Thadani explained in calls to investors that this was actually conservative, because the M&A activity would continue to drive significant growth.

140.    Thadani essentially explained that Lucky Bucks would soon outgrow its leverage due to the speed at which the "farm team" and resulting M&A process was growing the EBITDA, and asserted that SPACs were calling him every day to try to buy the business, which would create an exit opportunity.

141.    In particular, Thadani stated that Lucky Bucks was worth over $1 billion in light of its purportedly successful ongoing roll-up and M&A strategy.  But, just two years earlier in 2020, Trive's take-private of Southern Star implied an equity value of approximately $170 million and enterprise value of approximately $312 million.   And in June 2023, the company's financial advisor determined that the enterprise value for the reorganized company was $480 million.  This $480 million valuation was before the revelations of fraudulent conduct, and assumed a successful reorganization.  The Company cited a "confluence of macroeconomic challenges" as the impetus for its decline.  But, as described herein, the Company was never worth over $1 billion.  Not even close.  The projections underlying such robust valuations were unreliable and the roll-up strategy upon which Thadani justified the $1 billion valuation had actually reduced the value of the company because Lucky Bucks significantly overpaid for underperforming locations.  For example, those projections assumed a constant COAM and location count, no acquisitions, and no growth capex.  But even in 2021, the company was losing locations rapidly and was not properly reflecting those losses in the projections.

142.    Thadani also emphasized the stability and safety of the location owner contracts due to the length of the contracts, and the fact that the GLC requires a 9-month "dark period" when a location owner switched contracts from one COAM provider to another in which the location owner could not have active COAM machines.  Despite receiving real-time information from the GLC regarding lost locations, Thadani did not disclose that Lucky Bucks in fact would often file "no challenge" notices, allowing location owners to get around the 9-month dark period when they switched to a competitor.

143.    In particular, Thadani and the insiders asserted that COAM machines were only turned off if management thought a particular machine or set of machines could be redeployed into a better location.

144.    In support of these representations, Thadani pointed to the Company's historical renewal numbers.  For example, the Note CIM discussed Lucky Bucks's purportedly "highly predictable revenue stream," and included representations regarding the percentage of contracts expiring each year: with 4% expiring in 2021, 3% expiring in 2022, and 5% expiring in 2023.  The presentation stated that the average contract length was 8.9 years, and that Lucky Bucks had an 86% contract renewal rate.  The 14% non-renewal rate applied to 4% of expiring contracts in 2021 implying that the Company should have lost less than 1% of its machines per year to non-renewal of contracts.

145.    As described below, the representations detailed above were false when made.

146.    While Thadani was the main speaker on these calls, Sekhri—one of Trive's Board designees—and Boyden, were also present and supporting Thadani's narrative.

147.    Trive's participation (with Thadani leading the charge) in the process was significant for the Noteholders.  The COAM industry in general is fragmented and has many unsophisticated actors, so the presence of a reputable equity sponsor professing a deep understanding for the Company and day-to-day involvement was significant to reassure the Noteholders that they were engaging with a serious counterparty.  Certain of the Noteholders would not have entered into a deal without an equity sponsor.  Trive touted the legitimacy it purportedly provided to the process, as exemplified by the fact that the August 2021 confidential information presentation shared with potential Noteholders included an entire section on an overview of Trive and Trive's investment thesis in the business.

148.    Throughout the process of trying to sell the Notes, Thadani ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████

149.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████

### 3.    Trive, Sekhri, and Boyden Make Several Material Misrepresentations Regarding The Notes

150.    Trive and the insiders made a series of material misrepresentations in inducing the Noteholders to invest.  All of the material misrepresentations were strategically made to gussy up the two pillars of the deal that made the Notes an attractive investment to the Noteholders: (1) the longevity and stability of location contracts/COAMs and (2) the strength and legitimacy of the farm team.

151.    **Lack of attrition and stability of the location contracts**.  Given how critical it is to Holdings's ability to repay the Notes, Thadani and the insiders repeatedly represented that the location owner contracts were stable, long-term, and difficult to get out of in light of GLC regulations.  In fact, the Note CIM projected that Lucky Bucks's number of COAMs and locations would remain stable, with virtually no capital expenditure required to replace lost locations because there would hardly be any.  Indeed, Thadani and the insiders repeatedly touted the renewal rate, which, when combined with the percentage of contracts expiring each year, implied an attrition rate of less than 1% per year.  This was false.

152.    Specifically, the Note CIM indicates that Lucky Bucks had a "[h]ighly predictable revenue stream" and showed historical loss of COAMs at a rate of around 1% per year.

153.    The purported attrition rate was a sham.  In a March 2023 presentation provided to the Noteholders in advance of Lucky Bucks's Chapter 11 filing, Lucky Bucks's restructuring advisors included a schedule showing historical attrition of location contracts which contradicted what was represented in the confidential information memorandum.

154.    The March 2023 document shows that the true attrition rate for just *the second half of* 2021 was actually 11.1% of all machines.  Therefore, the implied yearly COAM attrition rate of about 1.1% from the Note CIM underrepresented the actual attrition rate of 2021 by approximately 10 times—and that's assuming that there was zero attrition in the first half of 2021 (the March 2023 document does not show attrition numbers from the first half of 2021).

155.    Even the March 2023 document may have been off by a significant margin.  An investigation into machine attrition performed by Lucky Bucks's creditors suggested that the attrition in the second half of 2021 was actually 16.7%—at least approximately 16 times higher than what the Note CIM implied.

156.    These representations were material because the stability and long-term nature of the contracts, with high renewal rates, were designed to induce the Noteholders to rely on a history of long-term, stable income.

157.    The Note CIM was full of other false statements.  Contrary to its stated historical practices, starting in 2019, at Kassam's direction, Lucky Bucks did not contest the loss of location contracts, rendering the GLC "dark period" immaterial.  Trive knew this due ███████████████

███████████████████████████████████████

158.    Further, to the extent Thadani, Sekhri, and Boyden had questions they did not feel competent to answer, they had easy access to Damani and Kassam.  ███████████████

████████████████████████████████    In any event, Thadani, Sekhri, and

Boyden all knew or were reckless in not knowing that the revenue stream of Lucky Bucks was anything but "highly predictable."

159.    **EBITDA growth from the farm team's prior acquisitions**.  Thadani and the insiders also repeatedly trumpeted the EBITDA growth from the farm team, including by Thadani's repeated references to the run rate EBITDA being higher than actual EBITDA in light of the historical performance of M&A acquisitions.  For example, the Note CIM given to prospective noteholders suggested that "since January 1, 2017, Lucky Bucks has successfully acquired 69 companies at a median TTM revenue multiple of 3.0x."  Additionally, Thadani represented in calls with the Noteholders that Lucky Bucks's M&A pipeline was strong and would continue to drive growth.

160.    In reality, the M&A and EBITDA growth from the farm team was a sham.  This representation was false because, as management was fully aware, the EBITDA growth from the farm team was paltry, and that the run rate EBITDA was materially overstated due to incorporating pre-acquisition EBITDA of locations that failed to perform.  As discussed above, for example, management knew that certain locations Lucky Bucks had acquired were performing between 50%-63% worse than the numbers presented to Lucky Bucks prior to those acquisitions, and management had acquired at least $22 million worth of such locations leading up to the Note issuance.

161.    These representations were material because they suggested that prior M&A had been successful at growing the business, when in reality Lucky Bucks was burning money acquiring low-performing locations.

162.    **Purported continued growth from an active M&A pipeline**.  In addition to discussing the strength of prior acquisitions, Thadani represented in calls that Lucky Bucks's M&A pipeline was strong and would continue to drive growth after the investment.

163.    But Thadani knew the M&A pipeline was ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████

164.    Specifically, Thadani failed to disclose that, ███████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████

165.    Indeed, just 10 days after the first $195 million of Notes were issued, in response to being presented with an M&A opportunity by management, Thadani asked management to wait to ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████

166.    Thadani's representations about continued M&A growth were material because they suggested that even though the corporate stack had a high level of leverage, the M&A activity would enable the business to grow out of the leverage.

167.    **Accuracy of Lucky Bucks's financials, estimates, and projections**.  In marketing the Notes, Thadani and the insiders made clear that Holdings was an entity with no operations, and that the strength of the opportunity was based solely on Lucky Bucks's financials and projections.  The offering materials accordingly included financials and projections for the Lucky Bucks operating entity, which painted a picture of financial strength.  Thus, key to the investment thesis was the credibility of Lucky Bucks's financial condition and projections.  These turned out to be materially misstated.

168.    In particular, while the confidential information memorandum included actual numbers for 2020 and prior, they included only so-called "pro forma" numbers for 2021.  And correspondence between Holdings's bankers and Trive reveal that in response to Noteholders' questions about developments since those "pro forma" numbers, Trive was cautioned that ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████  Of course, as set forth above, the acquisition pipeline was not actually leading to sustainable growth at all, meaning that declining numbers were being covered up with another layer of false information.  The estimated pro forma numbers for 2021 were used intentionally to hide the poor performance in the second half of 2021—undoubtedly material to investors looking to buy hundreds of millions of dollars of notes that fall and winter.  For example, on January 25, 2022—days after the second issuance of Notes—Trive and management were preparing a presentation to send to bankers to help sell the company.  After reviewing an initial

draft of the presentation, which had actual Q4 2021 numbers, Sekhri cautioned Thadani, Bouskill,

Ijaz, and Trive employee Connor Anderson ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ ██

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

169.    Additionally, the numbers presented to the Noteholders were false and misleading

in many ways, including because they presented incorrect attrition figures and thus presented

misleading current information and unrealistic projections in light of the reality on the ground.

170.    These representations were material because any investor focuses on the

fundamental revenue, EBITDA, and growth projections when making a decision to provide debt

or equity financing of any kind.

171.    **Solvency Certificate/Lack Of Any Solvency Or Fairness Opinions**.    On

November 29, 2021, as a condition of the issuance, Defendant Boyden signed and delivered a

solvency certificate asserting that Holdings was solvent and that Holdings and its subsidiaries

would not have unreasonably small capital as a result of the issuance and subsequent Holdings

distributions.  Within the solvency certificate, Boyden certified that he had "made, or ha[d] caused

to be made under my supervision, such examination or investigation as is necessary to enable me

to express an informed opinion as to the matters referred to herein."

172.     Both Boyden's representation regarding Holdings's solvency and capitalization following the Notes issuance in general, and his representation that ███████████████ ████████████████████████, were false.  Days before issuing the solvency certificate, ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████

173.     These representations were material because the Noteholders relied upon the solvency certificate and would not have done so if they realized that the certificate was based on zero analysis and that the Company was thus rendered insolvent or left with unreasonably small capital as a result of the Notes issuance.

174.     **Relationship with GLC**.  Thadani and management, including Sekhri, repeatedly made the point to tout Lucky Bucks's purportedly "strong relationship with the GLC" during the marketing process.  The Note CIM represented the relationship was strong, and that Lucky Bucks "has proven to be a model COAM operator from the State's perspective."  And in diligence calls, Thadani and management expressed that they would welcome increased enforcement from the GLC because Lucky Bucks was the only company in the Georgia COAM industry doing things the right way, and increased enforcement would benefit them by cutting down on competitors' illegal acts.

175.     These representations were false.  ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

176.

177.

178. These misrepresentations about Lucky Bucks's relationship with the GLC were material because Lucky Bucks operated in a heavily regulated industry. A gaming business is only worth as much as the regulatory relationship it has, because a valuation can quickly get zeroed if the business loses its ability to operate due to regulatory actions. Accordingly, assertions that Lucky Bucks's relationship with its regulator were strong put Noteholders at ease and falsely assured them that Lucky Bucks was unlikely to be subject to regulatory risk or enforcement actions.

179. Trive's and Thadani's level of involvement with the business and the sequence of events demonstrate that Thadani and Trive were aware something was deeply wrong with Lucky

Bucks, and were trying to pull their money out and shift all of the risk onto unsuspecting Noteholders. This is reflected in Trive's urgency on finding ways to "take cash out of the business" in early 2021 ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████  At a minimum, Thadani and Trive recklessly disregarded that ██████████████████ which revealed that the attrition numbers Thadani reported on the road-show were between 20 and 30 times lower than reality.

180.    In the alternative, while it flies in the face of logic that Thadani could not have known about Lucky Bucks's declining performance in the second half of 2021 in light of his professed level of involvement, if it turns out that Thadani's day-to-day involvement was so much less than he professed, then his statements regarding his level of involvement were themselves material misrepresentations. They were material because—as Thadani understood as an experienced private equity investor—sophisticated funds are hesitant to invest in deals that do not have an equity sponsor, particularly deals in unsophisticated and nascent industries like the COAM industry in Georgia. If Thadani's representations about his level of involvement were false, Thadani intentionally lent his and Trive's weight to Lucky Bucks in their zeal to draw cash out of the business, thereby misleading the Noteholders into a false sense of security.

181.    Each of the Noteholders relied on Thadani's, Trive's, Sekhri's, and Management's

false statements:

a.    **BC Partners** was the lead investor and had extensive conversations with

management.  BC Partners's main point of contact was Thadani, and BC

Partners asked extensive due diligence questions to evaluate management

and Thadani's claims.  Thadani explained in internal communications that,

as is common in deals where there is a lead investor, other investors would

"piggy back off" of BC Partners's work.  Thadani thus understood that any

information he provided to BC Partners would also be relied upon by other

investors.  BC Partners relied on the numbers that Lucky Bucks provided

and was comforted by Trive's involvement in the deal given Trive's history

with the company.  In particular, BC Partners's investment thesis was based

on Trive's and Lucky Bucks's purported plan to complete their

intermediate-term M&A pipeline and exit within two to three years.

b.    **CION** received responses to diligence questions, including a sample

contract between Lucky Bucks and a location owner from Houlihan, and

also conducted independent checks on those materials through expert

network calls.  CION became comfortable with the credit given the stability

of the revenue base (driven by purported contract length and expiration

waterfall).  CION valued the presence of an institutional equity sponsor in

Trive, and also relied upon Trive's presence.  CION's investment rationale

was based in large part on Lucky Bucks's M&A strategy.

c.     **First Trust** received access to and relied upon the diligence materials exchanged with BC Partners, and also had calls with the team that was marketing the deal. First Trust relied on the presence of Trive as an institutional equity sponsor.

d.     **Hamilton Lane** received access to and relied upon BC Partners's due diligence materials, relied upon the presence of an institutional backer like Trive, and conducted additional diligence by speaking to individuals in the gaming industry to assess the claims made in the marketing process. Hamilton Lane also reviewed a sample location owner contract.

e.     **Marathon** relied on conversations with Thadani, Sekhri, and Bouskill, and also relied upon the due diligence materials prepared by the Company. Marathon was comforted by discussions with Trive and Thadani relating to the M&A operations, and trusted the growth story more due to Trive's involvement.

f.     **Monarch** was brought into the deal process later, in the second issuance, and relied upon the diligence materials that had previously been provided to the other Noteholders. Monarch also participated in calls with Trive and management regarding the opportunity. Monarch's investment thesis included as its pillars Trive's participation and evolution of the business, the stability of the long-term contracts, and Lucky Bucks's M&A strategy.

**4.     Holdings Issues Notes In November 2021 And January 2022 And Then Makes Significant Dividend Payments To Trive And Others**

182.    Following the marketing process, in November 2021 and January 2022, Holdings issued $250 million in aggregate face amount of unsecured 12.5% Notes due 2028 pursuant to a

Note Purchase Agreement, dated as of November 29, 2021 (the "Note Purchase Agreement"). Shearman was counsel to Holdings and Houlihan was Holdings's financial advisor in connection with the Note Purchase Agreement.

183.    Notably, Holdings never obtained (or even sought) a fairness opinion or solvency opinion in connection with raising financing from Noteholders (or when it made the distributions that given rise to fraudulent transfers). No independent third party vetted Holdings's solvency prior to the distributions.

184.    In the November 2021 issuance, BC Partners, CION, First Trust, Hamilton Lane, and Marathon acquired $195 million of Notes. In the January 2022 issuance, Monarch acquired $55 million of additional Notes.

185.    Following the first issuance of the Notes in November 2021, Holdings made a distribution of approximately $185.2 million (the "November Distribution"). Following the second issuance of Notes, in January 2022, Holdings made a distribution of approximately $52.5 million (the "January Distribution," and together with the November Distribution, as previously defined, the "Holdings Distributions").

186.    The Holdings Distributions were made to the following individuals and entities:

| Holdings Distribution Recipient | November 2021 Distribution Amount | January 2022 Distribution Amount | Total Holdings Distribution Amount |
|---|---|---|---|
| Southern Star Gaming LLC | $129,668,376.36 | $36,767,481.07 | $166,435,857.43 |
| TCFIII Luck SPV LP | $3,300,245.42 | $935,784.92 | $4,236,030.34 |
| TCFIII Luck Acquisition LLC | $5,961,781.46 | $1,690,463.73 | $7,652,245.19 |
| Lucky Bucks Ventures, Inc. | $46,310,134.41 | $13,131,243.24 | $59,441,377.65 |

187.    Southern Star subsequently transferred the funds it received from the Holdings Distributions to the following individuals and entities:

| Subsequent Distribution Recipient | November 2021 Distribution Amount | January 2022 Distribution Amount | Total Subsequent Distribution Amount |
|---|---|---|---|
| TCFIII Luck LP | $86,871,305.13 | $21,592,490.80 | $108,463,795.93 |
| Manu Sekhri | $33,293,390.30 | $10,127,696.64 | $43,421,086.94 |
| Shafik "Tony" Kassam | $575,124.09 | $174,645.53 | $749,769.62 |
| James Boyden | $2,059,380.09 | $1,022,306.20 | $3,081,686.29 |
| Ryan C Bouskill Professional Corporation | $3,482,749.69 | $1,719,163.48 | $5,201,913.17 |
| 2786692 Ontario Inc. (Hassan Ijaz) | $2,839,084.88 | $1,358,311.60 | $4,197,396.48 |
| Stephanie Lippa | $885,822.22 | $434,386.78 | $1,320,209.00 |

## G. The Holdings Distributions Rendered Holdings Insolvent And Inadequately Capitalized

188.   Holdings was an entity that was formed concurrently with the marketing of the Notes for the sole purpose of issuing the Notes. Holdings did not have any operations or business of its own; rather, its only asset was its ownership of Lucky Bucks.

189.   Lucky Bucks was itself highly leveraged. Indeed, Holdings was formed pursuant to Trive's "super holdco" plan precisely because Lucky Bucks was unable to issue any additional debt without tripping its existing debt covenants.

190.   Lucky Bucks's financial condition and projections were severely misrepresented by Trive, the insiders, and management. Accordingly, rather than holding shares in a stable business with long term income and growth potential, Holdings held shares in a failing business that was being actively stripped for parts by its own insiders. For example, Lucky Bucks's financials—which incorporated EBITDA from over $22 million worth of acquisitions in 2021— were falsely inflated because those acquisitions were severely underperforming their historical EBITDA—a recurring issue with acquisitions from certain of the companies from which Lucky Bucks routinely acquired locations.

191.    Accordingly, at the time of the Distributions, the value of Holdings's Lucky Bucks shares was minimal, if they had any value at all.[7] Thadani himself recognized that the Company's true financial condition was ███████████ what was presented to the Noteholders on December 9, 2021, when he admitted that he ████████████████████████████████ ████████

192.    Lucky Bucks—upon which Holdings's financial condition relied—did not even have enough cash to make ████████████████. For example, despite the Note CIM's suggestion that Lucky Bucks would require no capital expenditures to maintain a stable level of locations, ████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████

193.    Because Holdings's only asset was worthless or near-worthless, it had no way to pay back the Noteholders once Holdings gifted hundreds of millions of dollars to its shareholders. Accordingly, once Holdings received the proceeds of the Note issuances and then distributed cash to fund Holdings Distributions, Holdings was left with $250 million in debt and little to no assets, with upcoming payments of over $15.95 million each year starting in 2024 up to over $22.4 million in 2028.

---

[7]    Deriving the precise true financial condition of Lucky Bucks is currently difficult because Defendant Ijaz—Lucky Bucks's EVP of Finance who was largely responsible for maintaining financial and accounting data—deleted all of his Lucky Bucks emails prior to Lucky Bucks's change in control following the effective date of the Lucky Bucks Chapter 11 plan.

194.    There was no reasonable prospect of Lucky Bucks generating sufficient cash to pay back its debts and $250 million plus accrued interest by the time the Notes came due.  This was known at the time of the Distributions.

195.    The Lucky Bucks financials that were presented to the Noteholders are unreliable in light of the rampant misconduct and misrepresentations of Damani, Kassam, and Trive, which misrepresented true EBITDA and attrition rates.  Additionally, the solvency certificate signed by Boyden was not worth the paper it was printed on, in light of ████████████████████████ ████████████████████████████████████████████████████████

**H.      It Becomes Clear That Lucky Bucks Is Rapidly Declining, And TCM Seeks To Protect Its Return From The Noteholders' Scrutiny**

196.    Having extracted hundreds of millions of dollars for their own benefit, TCM and other insiders had to deal with the inevitable fallout of their misrepresentations.  As explained below, first they tried to misdirect, and then they disappeared.

197.    Following the Note issuances, the Noteholders received quarterly updates from Lucky Bucks regarding the company's performance. ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

198.    The first release of results after the Noteholders made their investment was for fourth quarter 2021 results, which were not released until March 2022.  The results revealed higher COAM attrition, lower EBITDA, and costlier M&A acquisitions compared with what Holdings's creditors were told just months earlier.  Certain Noteholders spoke to Thadani and Sekhri, who provided a false narrative that results were weaker generally due to potential regulatory/tax environment changes.

199.     Around this time, to the extent management was not already aware, management also started to receive information in writing about Damani's and Kassam's misconduct, explaining *why* the locations Lucky Bucks had been acquiring were severely underperforming. For example, in April 2022, the owner of Georgia Winners—a company from which Lucky Bucks had acquired certain locations in 2020—informed Ijaz that Georgia Winners at Damani's direction

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████

200.     First quarter 2022 results were released in May 2022.  The numbers were even worse than expected, but did not yet suggest a business nose-diving.  During these early stages, Thadani was heavily involved in responding to the Noteholders' requests.

201.     Even when Thadani was not on calls, he made sure to tell members of management to ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████

202.     Thadani was not the only one carefully monitoring what information was shared with lenders regarding Lucky Bucks's true financial woes.  Sekhri ██████████████████████

████████████████████████████████████████

203.     In September 2022, a different Georgia master license holder emailed Kassam, Boyden, and Ijaz explaining that he had ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

204.     Second quarter 2022 results were presented to the Noteholders in September 2022. Results continued to decline, leading the Noteholders to reach out to Thadani and Trive to understand what was going on.  Notwithstanding the evidence coming to light of Damani's and Kassam's fraud, Thadani parroted the company's explanation that there was nothing to worry about and that a perfect storm of decrease in COVID stimulus check spending, interest rates, and GLC enforcement was combining to temporarily decrease results.  Thadani even asserted that there was nothing to worry about because he was in the process of negotiating a sale of Lucky Bucks to a competitor.  But there were no negotiations with any competitors for the sale of Lucky Bucks around this time—while Trive had selected bankers to start a process, they never even completed their confidential information memorandum, and never started a marketing process.  Thadani was instead trying to buy time and deflect the Noteholders from learning the truth.

205.     In September 2022, on a call with certain Noteholders, Thadani continued to tell the GLC enforcement story to justify the company's poor performance.  He attributed the loss of machines to GLC enforcement, and claimed that he had checked industry data and confirmed enforcement was not specific to Lucky Bucks.  The Noteholders would soon learn Thadani was lying.  Indeed, in internal correspondence between Trive and management, management admitted that despite the purported GLC enforcement story they were telling to Noteholders asking questions about the decline, management was in fact ██████████████████████████████

█████████

206. TCM received real-time information from GLC indicating there was no industry-wide crackdown, and instead, knew that contrary to what was represented to Holdings's creditors months earlier, the GLC distrusted Lucky Bucks and if anything, was cracking down on Lucky Bucks specifically due to that distrust. Additionally, based on the information that had come to light in April and September 2022, Trive knew or should have known that the true reasons for the business's decline was Damani's and Kassam's campaign to sell underperforming locations to Lucky Bucks at inflated valuations through other businesses they controlled.

207. In October 2022, the Noteholders grew sufficiently concerned with TCM and the Company's shifting explanations for ongoing poor performance, and started to reach out to other industry players and participate in expert network calls. In those communications, the Noteholders were surprised to learn that TCM's and management's reference to GLC increased industry enforcement was a sham—other industry players were seeing no increase in enforcement. Additionally, in one expert network call, an industry expert asserted that Lucky Bucks was a criminal enterprise.

208. Around this time, Trive and Thadani started to go completely silent. Thadani stopped participating in update calls, and stopped communicating as frequently with Noteholders about the performance of the business. This silence was by design, to give management latitude to punt on difficult questions—as Thadani explained to management, ███████████████ █████████████████████████████████████████

209. On October 14, 2022, having just taken $120 million out of Holdings, bankers had learned that "Trive wants to walk away" whereas "other equity holders or management want to pursue a rescue," and that TCM "may need to contribute cash to protect its return to date."

210.   But instead of contributing cash to protect its return, the Trive defendants attempted to keep their ill-gotten distributions through misdirection and by stalling the Noteholders.

211.   The Trive defendants went right into damage control mode.   While TCM had stopped participating in update calls regarding Lucky Bucks's performance, Thadani nevertheless reached out to certain Noteholders to purportedly provide "context" on the individuals speaking on behalf of the expert network—*i.e.*, to attempt to discredit them.   Thadani asserted that the expert networks were unreliable because they were being used by competitors to unfairly compete with Lucky Bucks and instead drive up their own business.

212.   Even if Thadani and Trive had somehow not been aware of Damani's and Kassam's wrongdoing prior to 2022—despite their deep participation in negotiating M&A, and their receipt of realtime attrition information from the GLC—by October 2022 when Trive asserted that expert networks were unreliable, they were undoubtedly aware of the wrongdoing based on the emails discussed above that were forwarded to TCM.   In particular, Lucky Bucks participated in an arbitration against Georgia Winners, a former B-Side business referenced *supra* in paragraphs 98, 199, which was initiated in February 2022.   By October 2022, discovery had been produced in that action, and in November 2022, Mr. Chisti gave deposition testimony further describing Damani's and Kassam's use of Georgia Winners to steal locations from Lucky Bucks and sell them back at inflated values.

213.   Based on their access to █████████████, and knowledge of Damani's and Kassam's schemes from the Georgia Winners arbitration, Trive and Thadani made intentional misrepresentations to the Noteholders when they asserted that the expert networks were wrong to call Lucky Bucks a criminal conspiracy.

214.    When third quarter 2022 results were presented towards the end of 2022, the Noteholders started to see even more problematic issues.  The number of machines in operation continued to go down, and the Noteholders were unable to get straight answers about why Lucky Bucks was not deploying new machines or adding new locations through the farm team.  The Company's and Holdings's justification at this time was that GLC was just ramping up enforcement around the election.  This too was a lie.

215.    By the end of 2022, facing an accelerating downward spiral and Lucky Bucks's imminent default on its own debt obligations, Lucky Bucks and Holdings engaged restructuring advisors.

216.    In February and March 2023, the Company's restructuring advisors spoke to the Noteholders to try to market the Company's preferred restructuring plan.  In the course of those conversations, Lucky Bucks's advisors presented a deck showing true attrition numbers for the past few quarters.  These presentations were the first time the Noteholders received actual evidence that the marketing materials presented together with the offering memoranda contained misleading statements.  The Noteholders were stunned.

217.    It became clear that Lucky Bucks and Holdings would need to seek insolvency protection.  But despite their clear conflicting interests, initially Lucky Bucks and Holdings remained under the thumb of existing management.

218.    In June 2023, Lucky Bucks and its corporate affiliates filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.  During the pendency of the bankruptcy, Defendant Kassam remained in complete control of Lucky Bucks's operations.

219.    In the Chapter 11 plan set forth by the Company, Trive and the insiders negotiated full releases from Holdings in return for a meager settlement payment of $15 million.   The Noteholders objected to that portion of the plan and moved to convert the Holdings Chapter 11 proceedings into Chapter 7 proceedings.

220.    Lucky Bucks emerged from bankruptcy in October 2023.   Shortly before the plan was approved, Defendant Kassam formally resigned from Lucky Bucks.   Reorganized Lucky Bucks's new owners hired new management to oversee the operations of Lucky Bucks following the emergence from bankruptcy.

221.    The Trustee was appointed on November 29, 2023, and since then has been investigating these claims on behalf of the Estate and the Noteholders.

### I.    Reorganized Lucky Bucks Sues Damani, Kassam, And Others In The Georgia Complaint, Revealing Additional Reasons Behind Lucky Bucks's Demise

222.    On January 2, 2024, reorganized Lucky Bucks—now known as Arc Gaming and Technologies, LLC ("Arc Gaming")—filed a sweeping complaint against Damani, Kassam, and a series of co-conspirators alleging broad-ranging misconduct in which Damani and Kassam stripped Lucky Bucks's assets in several ways starting in 2019.   The Trustee has obtained 2004 Discovery from Arc Gaming, including documents and sworn declarations from Arc Gaming's employees that were filed in the Georgia action.

223.    While the Georgia Complaint details extensive misconduct by Damani, Kassam, and their co-conspirators, the misconduct most relevant to this action was Damani's and Kassam's practice of diverting Lucky Bucks locations to other businesses secretly owned or controlled by Damani, referred to as the "B-Side Businesses," as well as using fake players to sell location contracts back to Lucky Bucks at inflated prices.   These schemes in particular help explain why Lucky Bucks's attrition was so high in the second half of 2021 compared to the rosy numbers

TCM and management touted in the Note CIM, and why those newly-acquired locations were underperforming the EBITDA on which they were acquired by up to 60%.

       **1.**       **Damani And Kassam Undermined Lucky Bucks For the Benefit of Their Competing Businesses**

224.    The Georgia Complaint and the underlying supporting documents the Trustee has obtained in Rule 2004 discovery show that, starting in at least 2019, Damani and Kassam would direct locations with expiring contracts to sign new contracts with B-Side businesses once their contracts with Lucky Bucks expired, rather than renewing with Lucky Bucks. Lucky Bucks technicians who did work for the B-Side businesses would often pick up Lucky Bucks machines on one day, and then they, or another of the techs, would install machines for one of the B-Side businesses at the same location the very next day.

225.    In addition to converting expiring contracts to the B-Side businesses, Damani and Kassam also diverted new opportunities of which they became aware away from Lucky Bucks to the competing B-Side businesses.

226.    An example of both types of misconduct involves the Georgia Winners scheme, which, as described above, started to come out in an arbitration in 2022. Specifically, in 2019, Defendants Damani and Kassam recruited Mohammad Chisti to "purchase" one of the dormant master licenses that Lucky Bucks had acquired through an acquisition. Chisti established Georgia Winners to acquire the master license at the direction of Defendant Damani. Many of Defendant Damani's communications with Chisti were made through WhatsApp, a secure messaging application.

227.    Eventually, Defendant Damani and others caused Lucky Bucks to enter into an agreement to "sell" Georgia Winners a master license in exchange for $400,000.

228.   Chisti and Georgia Winners did not actually pay Lucky Bucks for the master license, however.  Instead, Georgia Winners provided a $400,000 promissory note to Lucky Bucks at the closing of the transaction.

229.   In exchange for lending his name credit to the enterprise, Chisti was told by Defendants Damani and Kassam that he would receive 10% of the revenue, with the remaining 90% being given to Damani, Kassam, and their co-conspirators.

230.   Over the next several months, the two Lucky Bucks salespeople responsible for sourcing locations—Anand Vaswani and Shakeel Haque—secured six location contracts for Georgia Winners.  At least four of those six locations were under contract with Lucky Bucks immediately before they contracted with Georgia Winners.

231.   The operations of Georgia Winners, including for these locations, were managed by Kassam and other Lucky Bucks employees who communicated with each other and Mr. Chisti through a *Signal* group chat about Georgia Winners business.

232.   Additionally, in connection with these schemes, Kassam instructed Lucky Bucks employees to file "no dispute" forms with the GLC when location license holders desired to switch from Lucky Bucks to one of the B-Side businesses.  This enabled the location license holders to switch to a new B-Side master license holder much more quickly than would otherwise have been the case.

233.   These practices, which began in 2019—and which were revealed to the Noteholders and the Trustee for the first time in the Georgia Complaint and ensuing Rule 2004 discovery—help account for the significant attrition in the second half of 2021 that TCM and management hid from the Noteholders in the Note CIM by using pro forma numbers and March 2021 estimates rather than actual results.

### 2. Damani And Kassam Sold Locations Back To Lucky Bucks At Inflated Prices

234.    In addition to diverting location contracts to the B-Side businesses, Damani and Kassam would also orchestrate sales of those locations back to Lucky Bucks at inflated purchase prices.

235.    As discussed above, notwithstanding the GLC's ban on Damani remaining involved in the business, TCM and management relied on Damani to source locations for M&A opportunities.

236.    Damani and Kassam would use the B-Side businesses—which included Georgia Winners, Lee Caudell Inc., AKS Amusements Inc, Pinball Amusement LLC, and Klass Amusements—to sell locations to Lucky Bucks after falsely inflating their EBITDA using fake players.

237.    For example, in 2020, after Georgia Winners operated three locations that were included in Lucky Bucks's sale of a master license to Georgia Winners for $400,000, Georgia Winners sold those locations back to Lucky Bucks for over $5 million.

238.    Approximately 90% of the $5 million purchase price was immediately distributed from Georgia Winners to Defendants Damani and Kassam, and their coconspirators.

239.    From 2020 to 2021, between the $5 million Georgia Winners acquisitions and the over $22 million in acquisitions from B-Side companies Lee Caudell Inc., AKS Amusements Inc, Pinball Amusement LLC, and Klass Amusements discussed *supra* ¶ 99, management caused Lucky Bucks to spend over $27 million on acquiring locations from companies owned or controlled by Damani and Kassam.

240.    On information and belief, the price for all of these locations were based on revenues that were fraudulently inflated by Defendants through the use of sham players, as Chisti had disclosed to Bouskill and Ijaz in April 2022.

241.    The use of sham players disclosed in the Georgia Complaint explains why Ijaz and Bouskill identified that Lucky Bucks had overpaid by between 50% and 63% for acquisitions from certain B-Side companies, including Unique Amusement, LLC.

242.    In addition to diverting locations from Lucky Bucks to B-Side companies, and selling locations from B-Side companies to Lucky Bucks at inflated costs, Damani and Kassam harmed Lucky Bucks's business in other ways, including by simply stealing COAMs from Lucky Bucks for use in the B-Side businesses, using Lucky Bucks employees to perform work for the B-Side businesses, and stealing money from Lucky Bucks through fake invoices from the B-Side businesses, including for example through a $200,000 payment to Klass Entertainment on July 14, 2021.

### J.    The Georgia Complaint Revealed Additional Misrepresentations In The Note CIM And Marketing Process For The Notes

243.    The Georgia Complaint and the underlying documents and affidavits Arc Gaming relied upon to prepare that complaint shed further light on the nature of the misrepresentations in the Note CIM, and revealed an additional category of misrepresentations.

244.    **Lack of attrition and stability of the location contracts.**  As discussed above, even without the revelations of the Georgia Complaint, the March 2023 presentation to Noteholders showing actual attrition numbers for the second half of 2021 already confirmed that the attrition rate implied by the Note CIM was severely misstated.

245.    The Georgia Complaint and underlying documents further confirm that part of the reason the attrition numbers were severely misstated was due to Damani's and Kassam's scheme

to strip assets from Lucky Bucks, and divert locations to the B-Side companies.  And while Damani had no formal role in approving or leading the Note issuance or Holdings Distributions, Kassam, a member of Holdings's board, approved both sets of transactions while knowing that he and Damani were actively looting the Company.

246.    Kassam also approved those transactions while knowing that he was actively directing Lucky Bucks employees not to contest locations lost to B-Side businesses, rendering the GLC 9-month dark period meaningless.

247.    **EBITDA growth from the farm team's prior acquisitions**.  Again, while the results that Ijaz and Bouskill were seeing in 2021 already revealed that Lucky Bucks's M&A activity was not generating the levels of EBITDA Lucky Bucks expected, the Georgia Complaint, together with emails Chisti sent Ijaz and Bouskill in 2022 and the Georgia Winners arbitration, further confirm that those figures were misrepresented through the use of false players.

248.    **Legitimacy and professionalism of the farm team**.  In addition to providing further color on the misrepresentations above, the Georgia Complaint revealed a new category of misrepresentations relating to the farm team.  Throughout the marketing process, Thadani, Trive's board designee Sekhri, and management repeatedly placed a heavy emphasis on the professionalism of the farm team, with Sekhri marketing them as higher moral compass players, and Thadani touting his shared heritage with the farm team and location owners to try to explain why they were so effective at finding good M&A opportunities.

249.    The representations regarding the professionalism and legitimacy of the farm team were material because identifying strong M&A opportunities provided the easiest path to growth for Lucky Bucks.

250.    In reality, as the Georgia Complaint confirms, the "farm team" was not a professional group of legitimate salespeople, but rather related persons consisting of friends and family of Damani (who was supposed to have no involvement in Lucky Bucks) and Company management who were active participants in Damani's and Kassam's misconduct.

251.    The Trustee asserts the following causes of action in order to rectify Trive and management's brazen fraud and looting of Holdings.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Avoidance and Recovery of Intentional Fraudulent Transfers, 11 U.S.C. §§ 544, 548, and 550, 6 *Del. C.* § 1304(a)(1) and O.C.G.A. § 18-2-74 et seq**
*(Against Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Lucky Bucks Ventures, Inc., Southern Star Gaming LLC, Shafik Kassam, James Boyden, Ryan Bouskill, Manu Sekhri, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., Hassan Ijaz, Stephanie Lippa)*

252.    Plaintiff realleges Paragraphs 1 through 251 above.

253.    Under 11 U.S.C. § 548(a)(1)(A), transfers may be avoided if made with intent to hinder, delay, or defraud a past or future creditor.

254.    Under 11 U.S.C. § 544(b), the Trustee may avoid the transfer of an interest of a debtor in property which is avoidable under applicable law by an unsecured creditor of the debtor.

255.    Under the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-74 et seq, the Trustee may avoid any transfer of an interest in property or the incurrence of an obligation that was made with the intent to hinder, delay or defraud creditors.

256.    Under the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1304(a)(1), the Trustee may avoid a transfer made with actual intent to hinder, delay or defraud any creditor of the debtor.

257.    The Trive Defendants, Damani Defendants, Sekhri, Boyden, Bouskill, Ijaz, and Kassam acted with actual intent to hinder, delay, or defraud creditors when they authorized and

approved the Holdings Distributions.  As a result of the Holdings Distributions, Lucky Bucks and its creditors have been harmed.

258.    The Holdings Distributions were made with the intent to hinder, delay, or defraud creditors.  This intent is evidenced by at least the facts that:

a.    the distributions were made to insiders;

b.    the transfer was of substantially all of Holdings's assets (given that the equity in Lucky Bucks was in reality worthless at the time);

c.    Holdings obtained the funds with which it made the distributions through Trive, Thadani, Sekhri, and Boyden's misrepresentations to the Noteholders, including misrepresentations such as: (i) lack of attrition and stability of location contracts; (ii) EBITDA acquired from locations purchased from the B-Side companies; (iii) Lucky Bucks's ability to continue to grow through deals in its M&A pipeline; (iv) hiding the second half of 2021's poor results through use of estimated and pro forma numbers; (v) Holdings's solvency certificate; (vi) Lucky Bucks's relationship with the GLC; and (vii) the legitimacy of the "farm team";

d.    at least two of the three Holdings board members knew that the representations made to Noteholders to fund the distributions were false: Kassam was intimately involved in stripping the Company's assets with Damani, and Sekhri ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;

e.    Trive and Sekhri knew that the Company's second half of 2021 performance was worse than what was represented to the investors, and used pro forma estimates to mask the true issues;

f.    Holdings had no reasonable prospect to make its debt payments as a result of the transfers;

g.    the Holdings Distributions were made shortly after substantial debts were incurred;

h.    there was lack of consideration for the Holdings Distributions as Holdings received nothing in return from the recipients;

i.    after the July 2021 distributions made from Lucky Bucks's existing debt facility, which maxed out Lucky Bucks's indebtedness under its covenants, Trive sought more ways to "take cash out of the business"; and,

j.    the general chronology of events, including, among other things: (i) Trive's sudden focus on taking cash out of the business around when the B-Side racket started to get into full swing despite having previously told its limited

partners in January 2021 that the Lucky Bucks investment had a three to five year horizon; (ii) Trive pushing its "super holdco" plan once Lucky Bucks's debt was maxed out, (iii) Trive and Thadani's misrepresentations which provided spin and covered up the very key aspects of the B-Side racket (the "farm team" and stability of location contracts); (iv) Trive and the insiders' ever shifting explanations for the decline of the business; (v) Thadani's attempts to stall and distract the Noteholders when they began asking more pointed questions by claiming he was negotiating a sale, and later by attempting to discredit the expert networks that were raising alarms; and (vi) Trive and the insiders' attempts to hammer through a de minimis settlement to all recipients of the Holdings Distributions prior to the change in ownership when the truth would likely come out.

259.    The Holdings Distributions were made to Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI.

260.    The Defendants received the distributions for no value.

261.    The  Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI received the Holdings Distributions with knowledge that the distribution rendered Holdings insolvent, and thus, did not take the distribution in good faith.

262.    Southern Star made subsequent transfers of the funds it received from the Holdings Distributions to TCFIII Luck LP, which then made subsequent transfers to Sekhri, Kassam, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., and Lippa.

263.    Upon information and belief, TCFIII Luck LP, TCFIII Luck SPV LP, and TCFIII Luck Acquisition LLP subsequently transferred the funds they received to Trive Fund III and Trive Fund III-A.  Upon information and belief, LBVI subsequently transferred the funds it received to Damani.  Upon information and belief, Ryan C. Bouskill Professional Corporation subsequently transferred the funds it received to Bouskill.  Upon information and belief, 2786692 Ontario Inc. subsequently transferred the funds it received to Ijaz.

264.     As of the Petition Date, there were one or more unsecured creditors of Holdings,

including BC Partners, CION Investments, First Trust, Hamilton Lane, Marathon, and Monarch,

that could avoid under applicable law the Holdings Distributions.

265.     By virtue of the foregoing, Plaintiff is entitled to judgment against Defendants in

the amount of the value they received, directly or indirectly, and any other payments, profits, fees,

benefits, incentives, and other compensation they received, directly or indirectly, in connection

with the Holdings Distributions.

## SECOND CAUSE OF ACTION
**Avoidance and Recovery of Constructive Fraudulent Transfers, 11 U.S.C. §§ 544, 548, and 550, 6 *Del. C.* § 1304(a)(2), and O.C.G.A. § 18-2-74 et seq**
*(Against Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Lucky Bucks Ventures, Inc., Southern Star Gaming LLC, Shafik Kassam, James Boyden, Ryan Bouskill, Manu Sekhri, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., Hassan Ijaz, Stephanie Lippa)*

266.     Plaintiff realleges Paragraphs 1 through 251 above.

267.     Under 11 U.S.C. § 548(a)(1)(B), transfers may be avoided if the debtor received

less than a reasonably equivalent value, and was either (i) insolvent on the date of the transfer or

became insolvent as a result of the transfer; (ii) was engaged or about to engage in business or a

transaction for which any property remaining with the debtor was an unreasonably small capital;

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the

debtor's ability to pay as such debts matured; or (iv) made such transfer to or for the benefit of an

insider under an employment contract and not in the ordinary course of business.

268.     Under 11 U.S.C. § 544(b), the Trustee may avoid the transfer of an interest of a

debtor in property which is avoidable under applicable law by an unsecured creditor of the debtor.

269.     Under the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-74 et seq,

the Trustee may avoid any transfer of an interest in property or the incurrence of an obligation that

was made without receiving a reasonably equivalent value in exchange for the transfer or

obligation, and Holdings was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

270.    Under the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1304(a)(2), the Trustee may avoid a transfer made without receiving a reasonably equivalent value in exchange for the transfer, where the debtor (a) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

271.    Here, Holdings received no equivalent value in return for the Holdings Distributions which were distributions made by Holdings to the recipients in which Holdings received nothing in return.

272.    The Holdings Distributions left Holdings with no cash, and Holdings's only remaining asset were its shares of Lucky Bucks—which were themselves nearly valueless if not entirely worthless—in light of Lucky Bucks's maxed out leverage and stripped assets.

273.    By making the Holdings Distributions, Defendants caused Holdings to engage in a business or transaction for which Holdings's remaining assets were unreasonably small in relation to the Distribution.

274.    Additionally, to the extent the Holdings Distributions were made to Kassam, Boyden, Bouskill, Sekhri, and Lippa—who were all insiders through their executive positions at Holdings or its parent company, Seven Aces—through bonuses or stock grants, they fall under 11 U.S.C. § 548(a)(1)(B)(ii)(IV) because the transactions were made outside the ordinary course of business through an employment contract for the benefit of those insiders.

275.    The Holdings Distributions were made to Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI.

276.    The Defendants received the distributions for no value.

277.    The  Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI received the Holdings Distributions with knowledge that the distribution rendered Holdings insolvent, and thus, did not take the distribution in good faith.

278.    Southern Star made subsequent transfers of the funds it received from the Holdings Distributions to TCFIII Luck LP, which then made subsequent transfers to Sekhri, Kassam, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., and Lippa.

279.    Upon information and belief, TCFIII Luck LP, TCFIII Luck SPV LP, and TCFIII Luck Acquisition LLP subsequently transferred the funds they received to Trive Fund III and Trive Fund III-A.  Upon information and belief, LBVI subsequently transferred the funds it received to Damani.  Upon information and belief, Ryan C. Bouskill Professional Corporation subsequently transferred the funds it received to Bouskill.  Upon information and belief, 2786692 Ontario Inc. subsequently transferred the funds it received to Ijaz.

280.    As of the Petition Date, there were one or more unsecured creditors of Holdings, including BC Partners, CION Investments, First Trust, Hamilton Lane, Marathon, and Monarch, that could avoid under applicable law the Holdings Distributions.

281.    By virtue of the foregoing, Plaintiff is entitled to judgment against Defendants in the amount of the value they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives, and other compensation they received, directly or indirectly, in connection with the Holdings Distributions.

**THIRD CAUSE OF ACTION**
**Avoidance and Recovery of Intentional Fraudulent Transfers, 6 *Del. C.* § 1304(a)(1) and O.C.G.A. § 18-2-74 et seq**
*(Against Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Lucky Bucks Ventures, Inc., Southern Star Gaming LLC, Shafik Kassam, James Boyden, Ryan Bouskill, Manu Sekhri, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., Hassan Ijaz, Stephanie Lippa)*

282.    Plaintiff realleges Paragraphs 1 through 251 above.

283.    The Noteholders each held claims against Holdings on account of their respective Notes as of the time of the transfers to Defendants.

284.    Under the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-74 et seq, a creditor may avoid any transfer of an interest in property or the incurrence of an obligation that was made with the intent to hinder, delay or defraud creditors.

285.    Under the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1304(a)(1), a creditor may avoid a transfer made with actual intent to hinder, delay or defraud any creditor of the debtor.

286.    The Trive Defendants, Damani Defendants, Sekhri, Boyden, and Kassam acted with actual intent to hinder, delay, or defraud creditors when they authorized and approved the Holdings Distributions.  As a result of the Holdings Distributions, Lucky Bucks and its creditors have been harmed.

287.    The Holdings Distributions were made with the intent to hinder, delay, or defraud creditors.  This intent is evidenced by at least the facts that:

       a.    the distributions were made to insiders;

       b.    the transfer was of substantially all of Holdings's assets (given that the equity in Lucky Bucks was in reality worthless at the time);

       c.    Holdings obtained the funds with which it made the distributions through Trive, Thadani, Sekhri, and Boyden's misrepresentations to the Noteholders, including misrepresentations such as: (i) lack of attrition and stability of location contracts; (ii) EBITDA acquired from locations

purchased from the B-Side companies; (iii) Lucky Bucks's ability to continue to grow through deals in its M&A pipeline; (iv) hiding the second half of 2021's poor results through use of estimated and pro forma numbers; (v) Holdings's solvency certificate; (vi) Lucky Bucks's relationship with the GLC; and (vii) the legitimacy of the "farm team";

d.    at least two of the three Holdings board members knew that the representations made to Noteholders to fund the distributions were false: Kassam was intimately involved in stripping the Company's assets with Damani, and Sekhri cautioned ███████████████████████;

e.    Trive and Sekhri knew that the Company's second half of 2021 performance was worse than what was represented to the investors, and used pro forma estimates to mask the true issues;

f.    Holdings had no reasonable prospect to make its debt payments as a result of the transfers;

g.    the Holdings Distributions were made shortly after substantial debts were incurred;

h.    there was lack of consideration for the Holdings Distributions as Holdings received nothing in return from the recipients;

i.    after the July 2021 distributions made from Lucky Bucks's existing debt facility, which maxed out Lucky Bucks's indebtedness under its covenants, Trive sought more ways to "take cash out of the business"; and,

j.    the general chronology of events, including, among other things: (i) Trive's sudden focus on taking cash out of the business around when the B-Side racket started to get into full swing despite having previously told its limited partners in January 2021 that the Lucky Bucks investment had a three to five year horizon; (ii) Trive pushing its "super holdco" plan once Lucky Bucks's debt was maxed out, (iii) Trive and Thadani's misrepresentations which provided spin and covered up the very key aspects of the B-Side racket (the "farm team" and stability of location contracts); (iv) Trive and the insiders' ever shifting explanations for the decline of the business; (v) Thadani's attempts to stall and distract the Noteholders when they began asking more pointed questions by claiming he was negotiating a sale, and later by attempting to discredit the expert networks that were raising alarms; and (vi) Trive and the insiders' attempts to hammer through a de minimis settlement to all recipients of the Holdings Distributions prior to the change in ownership when the truth would likely come out.

288.    The Holdings Distributions were made to Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI.

289.    The Defendants received the distributions for no or inadequate value.

290.    The  Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI received the Holdings Distributions with knowledge that the distribution rendered Holdings insolvent, and thus, did not take the distribution in good faith.

291.    Southern Star made subsequent transfers of the funds it received from the Holdings Distributions to TCFIII Luck LP, which then made subsequent transfers to Sekhri, Kassam, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., and Lippa.

292.    Upon information and belief, TCFIII Luck LP, TCFIII Luck SPV LP, and TCFIII Luck Acquisition LLP subsequently transferred the funds they received to Trive Fund III and Trive Fund III-A.  Upon information and belief, LBVI subsequently transferred the funds it received to Damani.  Upon information and belief, Ryan C. Bouskill Professional Corporation subsequently transferred the funds it received to Bouskill.  Upon information and belief, 2786692 Ontario Inc. subsequently transferred the funds it received to Ijaz.

293.    The Trustee has standing to assert this Cause of Action as the lawful assignee of all right, title, and interest in claims of the Noteholders against Defendants arising out of or in connection with the Notes, the issuance of the Notes, and/or the Note Purchase Agreement.

294.    By virtue of the foregoing, to the extent the Trustee does not avoid and recover the Holdings Distributions pursuant to Bankruptcy Code sections 544 and 548, Plaintiff is entitled as assignee to judgment against Defendants in the amount of the value they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives, and other compensation they received, directly or indirectly, in connection with the Holdings Distributions.

## FOURTH CAUSE OF ACTION

**Avoidance and Recovery of Constructive Fraudulent Transfers, 6 *Del. C.* § 1304(a)(2), and O.C.G.A. § 18-2-74 et seq**

*(Against Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Lucky Bucks Ventures, Inc., Southern Star Gaming LLC, Shafik Kassam, James Boyden, Ryan Bouskill, Manu Sekhri, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., Hassan Ijaz, Stephanie Lippa)*

295.    Plaintiff realleges Paragraphs 1 through 251 above.

296.    The Noteholders each held claims against Holdings on account of their respective Notes as of the time of the transfers to Defendants.

297.    Under the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-74 et seq, a creditor may avoid any transfer of an interest in property or the incurrence of an obligation that was made without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Holdings was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

298.    Under the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1304(a)(2), a creditor may avoid a transfer made without receiving a reasonably equivalent value in exchange for the transfer, where the debtor (a) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

299.    Here, Holdings received no equivalent value in return for the Holdings Distributions which were distributions made by Holdings to the recipients in which Holdings received nothing in return.

300.    The Holdings Distributions left Holdings with no cash, and Holdings's only remaining asset were its shares of Lucky Bucks—which were themselves nearly valueless if not entirely worthless—in light of Lucky Bucks's maxed out leverage and stripped assets.

301.    By making the Holdings Distributions, Defendants caused Holdings to engage in a business or transaction for which Holdings's remaining assets were unreasonably small in relation to the Distribution.

302.    The Holdings Distributions were made to Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI.

303.    The Defendants received the distributions for no or inadequate value.

304.    The  Southern Star Gaming LLC, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, and LBVI received the Holdings Distributions with knowledge that the distribution rendered Holdings insolvent, and thus, did not take the distribution in good faith.

305.    Southern Star made subsequent transfers of the funds it received from the Holdings Distributions to TCFIII Luck LP, which then made subsequent transfers to Sekhri, Kassam, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., and Lippa.

306.    Upon information and belief, TCFIII Luck LP, TCFIII Luck SPV LP, and TCFIII Luck Acquisition LLP subsequently transferred the funds they received to Trive Fund III and Trive Fund III-A.  Upon information and belief, LBVI subsequently transferred the funds it received to Damani.  Upon information and belief, Ryan C. Bouskill Professional Corporation subsequently transferred the funds it received to Bouskill.  Upon information and belief, 2786692 Ontario Inc. subsequently transferred the funds it received to Ijaz.

307.    The Trustee has standing to assert this Cause of Action as the lawful assignee of all right, title, and interest in claims of the Noteholders against Defendants arising out of or in connection with the Notes, the issuance of the Notes, and/or the Note Purchase Agreement.

308.    By virtue of the foregoing, to the extent the Trustee does not avoid and recover the Holdings Distributions pursuant to Bankruptcy Code sections 544 and 548, Plaintiff is entitled as

assignee to judgment against Defendants in the amount of the value they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives, and other compensation they received, directly or indirectly, in connection with the Holdings Distributions.

## FIFTH CAUSE OF ACTION
### Improper Dividends, Del. Code Ann. tit. 6, § 18-607, O.C.G.A. § 14-4-65
*(Against Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Lucky Bucks Ventures, Inc., Southern Star Gaming LLC, Shafik Kassam, James Boyden, Ryan Bouskill, Manu Sekhri, Ryan C. Bouskill Professional Corporation, 2786692 Ontario Inc., Hassan Ijaz, Stephanie Lippa)*

309.    Plaintiff realleges Paragraphs 1 through 251 above.

310.    The Holdings Distributions were issued in violation of O.C.G.A. § 14-4-65 because they were not declared or distributed from the actual legitimate net earnings and increased the debt of Holdings.

311.    Defendants Sekhri, Boyden, and Kassam are liable for double the amount of the illegal dividend because they were directors responsible for the declaration of the Holdings Distributions.

312.    The Holdings Distributions were also issued in violation of Del. Code Ann. tit. 6, § 18-607 because following the distributions, the liabilities of Holdings exceeded the fair value of Holdings's assets.

313.    The Trive Defendants knew that the distribution violated Del. Code Ann. tit. 6, § 18-607 because they received real-time information regarding COAM attrition that revealed that the financials distributed to the Noteholders were false.    Kassam and LBVI knew that the distribution violated Del. Code Ann. tit. 6, § 18-607 because Kassam and Damani, LBVI's beneficial owner, orchestrated the scheme to strip Lucky Bucks's assets.    The Management Defendants also knew that the distribution violated Del. Code Ann. tit. 6, § 18-607 because through

their role as Lucky Bucks insiders, they were aware of significant COAM attrition and Lucky Buck's true poor performance in the second half of 2021.

<div align="center">

**SIXTH CAUSE OF ACTION**
**Securities Fraud, O.C.G.A. § 10-5-1 et seq.**
*(Against the Trive Defendants, Thadani, Sekhri, Bouskill, Boyden, Ijaz, and Kassam)*

</div>

314.    Plaintiff realleges Paragraphs 1 through 251 above.

315.    Pursuant to O.C.G.A. § 10-5-50, it is unlawful for a person, in connection with the offer, sale or purchase of a security, directly or indirectly: (1) to employ a device, scheme, or artifice to defraud; or (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

316.    By their purchase of Notes, the Noteholders purchased a security as defined by O.C.G.A. § 10-5-2(31).

317.    As detailed above, Defendants made numerous misrepresentations to the Noteholders, including false and misleading statements and omissions concerning: (1) lack of attrition and stability of Lucky Bucks's location contracts; (2) the EBITDA generated by Lucky Bucks's prior M&A activity; (3) Lucky Bucks's ability to continue growing after the issuance through M&A activity; (4) the accuracy of Lucky Bucks's financial condition and growth projections, in light of the active and ongoing B-Side Racket and poor performance in 2021 that was hidden through the use of pro forma estimates; (5) representing that Holdings was solvent and that Bouskill had conducted an analysis to assess that it was; (6) Lucky Bucks's relationship with the GLC; and (7) the strength of Lucky Bucks's "farm team," which turned out to be a sham operation run by certain insiders' family members.    In the alternative, Thadani further misrepresented his and Trive's day-to-day involvement in the business.

318.    Defendants made untrue statements of material fact and omitted to state material facts regarding these schemes, and/or made projections concerning the Company that lacked any basis in fact.  Moreover, because they deployed but failed to disclose these abusive and deceptive practices, Defendants made numerous material misrepresentations or omitted facts about the accuracy and effectiveness of Lucky Bucks's internal controls over financial reporting and corporate governance, as well as Lucky Bucks's disclosure controls and procedures.

319.    By their misrepresentations and their fraud and deceit, Defendants engaged in a device, scheme, or artifice to fraud, as well as committed acts, engaged in practices and a course of business which is fraudulent, deceptive or manipulative.  Defendants' statements were made with scienter in that they were made knowing they were not true—and with respect to omissions, Defendants knew that they omitted material facts—or at the very least, they made the statements with severely reckless disregard for their truth.  Defendants intended to defraud the Noteholders by their false statements.

320.    The Noteholders relied on the Defendants' misrepresentations and omissions, and the Noteholders' reliance was justifiable and reasonable.  Indeed, best practices in purchasing Notes of this kind include purchasing Notes only in companies that are backed by an active and reputable equity sponsor, such as Trive.  Trive played up its experience and track record in inducing the Noteholders to purchase the Notes, all while Trive had information contradicting the financial picture presented and were simply seeking a way to "take cash out of the business" as quickly as possible before everything went up in flames.

321.    The Trive Defendants, Thadani, Sekhri, Bouskill, Kassam, Ijaz, and Boyden are liable as control persons of Holdings.  Trive appointed a majority of Holdings's board, retained approval rights over the exercise of Holdings's business, and exercised actual control over

Holdings in forming Holdings, planning the Note Issuance, managing the marketing process, and directing Holdings to make the Holdings Distributions through Trive's board appointees. Damani and LBVI for their part appointed the remaining Holdings board member, and also held certain minority approval rights relevant to the Note Issuance and Holdings Distributions. Kassam, Boyden, and Sekhri were Holdings's board members who approved the issuance and the Holdings Distributions, and Bouskill was Lucky Bucks's CFO who furnished the fraudulent solvency certificate to the Noteholders, and Ijaz was Lucky Bucks's controller, who prepared the data that was furnished to the Noteholders.

322.    As a direct and proximate result of Defendants' violations of the Georgia Uniform Securities Act, the Noteholders have suffered economic loss and other damages in an amount to be proven at trial.

323.    In their violations of the Georgia Uniform Securities Act, Defendants have acted in bad faith and are thereby liable for the Noteholders' attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Georgia RICO, O.C.G.A. § 16-14-4 et seq.
*(Against Damani, Sekhri, and Trive)*

324.    Plaintiff realleges Paragraphs 1 through 251 above.

325.    Defendants are each "persons" within the meaning of O.C.G.A. § 16-14-4.

326.    Holdings was an "enterprise" within the meaning of O.C.G.A. § 16-14-3(6), which affected commerce in the State of Georgia and elsewhere.

327.    The enterprise, Holdings, was incorporated by Sekhri, Trive, and Damani for the specific purpose of issuing the Notes and defrauding the Noteholders into purchasing $250 million of Notes that would be used to line the Defendants' own pockets.

328.    The enterprise, Holdings, was controlled by Damani, Sekhri, and Trive, and regularly carried out its function of perpetrating the fraudulent and illegal schemes of the Insiders and the Trive Defendants.

329.    The enterprise existed or was in the process of being formed at all relevant times.

330.    Damani, Sekhri, and Trive are persons who, through a pattern of racketeering activity, acquired and maintained, directly or indirectly, an interest in or control of personal property including monies paid by the Noteholders for their investments in the Notes.  Such pattern of racketeering activity included at least two acts of "racketeering activity," including multiple instances of securities fraud and material misrepresentations, including in connection with two separate issuances, and wire fraud, which is defined as "racketeering activity" under O.C.G.A. § 16-14-3(9)(A)(xxix) and 18 U.S.C. § 1961(1).

331.    Damani, Sekhri, and Trive knowingly, intentionally, and willfully acquired or maintained an interest in funds belonging to the Noteholders, including monies paid by the Noteholders for their Notes, through a pattern of racketeering activity and for the unlawful purpose of defrauding the Noteholders and stripping Holdings's assets.  Defendants' enterprise existed for the sole improper purpose of furthering a scheme to defraud, steal, and wrongfully and unlawfully acquire the assets of the Noteholders.

332.    Defendants intentionally and willingly devised and participated in a scheme to defraud the Noteholders of funds, and knowingly and intentionally engaged in a racketeering act by using interstate wires, in violation of 18 U.S.C. § 1343, as integral and essential devices to advance, further, and facilitate that scheme.  In particular, Damani, Sekhri, and Trive all used email communications with each other, with Holdings's investment banker, and with the Noteholders to

further their fraudulent scheme. Specifically, Defendants used interstate wires by sending emails in furtherance of the scheme on at least the following dates:

  a.   **Damani**: August 17, 2021; September 16, 2021; September 19, 2021; September 23, 2021; November 16, 2021;

  b.   **Sekhri**: November 1, 2021; November 3, 2021; November 8, 2021; and November 14, 2021; and

  c.   **Trive**: November 1, 2021; November 3, 2021; November 22, 2021; and November 29, 2021.

333.   Additionally, Sekhri, and Trive each made false statements to the Noteholders to induce them in purchasing the notes, including on at least the following dates:

  a.   **Sekhri**: August 27, 2021 call with Noteholders, November 2, 2021 in-person meeting with Noteholders, November 22, 2021 all-hands call with Noteholders; and

  b.   **Trive**: August 24, 2021 call with Noteholders, November 2, 2021 in-person meeting with Noteholders, November 22, 2021 all-hands call with Noteholders.

334.   Damani, Sekhri, and Trive conducted, or participated, directly or indirectly in the racketeering activity. In particular, among other things, Damani was directly involved with the scheme to falsify results of locations purchased by Lucky Bucks, and upon information and belief, directed his board appointee Kassam to approve the Note transaction. Sekhri and Trive, for their part, directly participated in making false material statements to Noteholders, as described above. Trive, upon information and belief, directed its board appointees to approve the Note transaction, and Sekhri did approve the transaction.

335.   The Defendants' criminal enterprise has stolen money from the Noteholders, thereby causing harm to the Noteholders. Specifically, the criminal enterprise has stolen a collective $250 million from the Noteholders.

336.    The Defendants' criminal enterprise has abused the corporate form in order to conceal the enterprise's crimes and to frustrate efforts to detect or remedy those crimes.   In particular, while Damani, Sekhri, and Trive used Holdings to steal money from the Noteholders, they used complex structures and other entities in order to receive and distribute payments, including LBVI, and the Trive entities.

337.    The Defendants' criminal enterprise is currently in possession of property rightfully owned by the Noteholders.

338.    By their acts and omissions alleged herein, and upon information and belief other acts and omissions, Defendants have committed fraud in connection with an offer, sale, and/or purchase of securities to the Noteholders, in violation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 et seq., as amended, by, among other things, (a) employing one or more device, scheme, or artifice to defraud; (b) making untrue statements of material facts or failing to state material facts necessary to make the statements made, in the light of the circumstances under which made, not misleading; or (c) engaging in an act, practice or course of business that operates as a fraud or deceit upon another person.

339.    Each act and omission of Defendants in committing securities fraud in violation of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 et seq., as alleged herein, is an act of racketeering activity within the meaning of O.C.G.A. § 16-15-3(9)(A)(xxi), and collectively said acts and omissions constitute a pattern of racketeering activity within the meaning of O.C.G.A. § 16-14-3(8).

340.    By undertaking the actions alleged in this complaint, the Defendants, and other unknown members of the conspiracy and criminal enterprise, committed, conspired to commit and attempted to commit the following predicate crimes:

a.      Wire fraud in violation of 18 U.S.C. § 1343; and,

b.      Securities fraud in violation of O.C.G.A. § 10-5-1;

341.    The Defendants' actions violated O.C.G.A. §§ 16-14-4(a)-(c), and the Plaintiff, as assignee of the Noteholders' claims, bringing the claims on behalf of the Noteholders for their benefit, is a person aggrieved and was injured by the violations as described in O.C.G.A. §§ 16-14-6(b), (c).

342.    The Trustee has standing to assert this Cause of Action as the lawful assignee of all right, title, and interest in claims of the Noteholders against Defendants arising out of or in connection with the Notes, the issuance of the Notes, and/or the Note Purchase Agreement.

343.    Plaintiff is entitled to an award of actual damages, treble damages, punitive damages, and attorneys' fees against the Defendants pursuant to O.C.G.A. § 16-14-6(c).

<div align="center">

**EIGHTH CAUSE OF ACTION**
**Georgia RICO Conspiracy, O.C.G.A. § 16-14-4(c)**
*(Against Damani, Sekhri, and Trive)*

</div>

344.    Plaintiff realleges Paragraphs 1 through 251 above.

345.    Defendants, in combination with one or more other persons identified herein, agreed and conspired to violate O.C.G.A. § 16-14-4(a) and (b).

346.    In particular, Defendants agreed with each other and with such persons to "take cash out of the business" from Lucky Bucks and the Estate in every possible way, including through stripping Lucky Bucks's assets, committing securities fraud, and executing a series of fraudulent transfers.

347.    Defendants and the persons with whom they conspired knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate O.C.G.A. § 16-14-4(a) and (b) in violation of O.C.G.A. § 16-14-4(c).

348.    Holdings was an "enterprise" within the meaning of O.C.G.A. § 16-14-3(6), which affected commerce in the state of Georgia and elsewhere.

349.    The enterprise was formed as an entity for the specific purpose of issuing the Notes and defrauding the Noteholders into purchasing $250 million of Notes that would be used to line the Defendants' own pockets.

350.    The enterprise existed and exists (to the extent that Defendants have continued to keep their fraudulent schemes a secret) for the improper purpose of furthering a scheme to defraud, steal, and wrongfully and unlawfully acquire the assets of the Noteholders, and the enterprise continues to carry on efforts to conceal its prior activities against the Noteholders.

351.    Indeed, Defendants unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with each other and with other persons to violate O.C.G.A. § 16-14-4(b), by being employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

352.    The improper purpose and common objective of the conspiracy was to acquire for Defendants the Lucky Bucks's, Holdings's, and the Noteholders' assets to use for Defendants' benefit and the benefit of others.

353.    At the inception and during the course of this conspiracy, Defendants and those employed by or associated with the enterprise, each personally agreed to the overall objective of the conspiracy or to commit two racketeering acts.

354.    The pattern of racketeering activity through which Defendants and their coconspirators agreed to conduct and participate in the conduct of the affairs of the enterprise in furtherance of their fraudulent scheme consisted, among other things, wire fraud and violations of the Georgia Uniform Securities Act of 2008, O.C.G.A. § 10-5-1 to 10-5-90.

355.    These activities took place in, among other places, Georgia and affected interstate and foreign commerce.

356.    Each coconspirator aided and abetted and rendered substantial assistance in the accomplishment of the scheme or artifice complained of herein. In taking the actions set forth above, each coconspirator acted deliberately and while aware that the conduct in question would substantially assist the accomplishment of violations of the law. Each coconspirator was aware of making a contribution to the conspiracy, common enterprise, and the common course of conduct complained of above.

357.    Each coconspirator participated in, aided and abetted, and conspired to accomplish the illegal conduct herein alleged in order to obtain the Noteholders assets and to enrich the enterprise and its members at the expense of the Noteholders.

358.    As a direct and proximate result of said conspiracy, the overt acts taken in furtherance thereof, and the violations of O.C.G.A. § 16-14-4(c), the Noteholders been injured in its business and property by reason of the conspiracy in an amount to be proven at trial.

359.    In their conspiracy to violate RICO, Defendants have acted in bad faith and are thereby liable for attorneys' fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### Common Law Fraud
*(Against the Trive Defendants, Thadani, Sekhri, Bouskill, Boyden, Ijaz, and Kassam))*

360.    Plaintiff realleges Paragraphs 1 through 251 above.

361.    The Defendants made material misrepresentations and concealed material facts in their dealings with Lucky Bucks, Holdings, and the Noteholders.

362.    As detailed above, specifically, Defendants made numerous misrepresentations to the Noteholders, including false and misleading statements and omissions concerning: (1) lack of attrition and stability of Lucky Bucks's location contracts; (2) the EBITDA generated by Lucky Bucks's prior M&A activity; (3) Lucky Bucks's ability to continue growing after the issuance through M&A activity; (4) the accuracy of Lucky Bucks's financial condition and growth projections, in light of the active and ongoing B-Side Racket and poor performance in 2021 that was hidden through the use of pro forma estimates; (5) representing that Holdings was solvent and that Bouskill had conducted an analysis to assess that it was; (6) Lucky Bucks's relationship with the GLC; and (7) the strength of Lucky Bucks's "farm team," which turned out to be a sham operation run by certain insiders' family members.    In the alternative, Thadani further misrepresented his and Trive's day-to-day involvement in the business.

363.    The Defendants also continued to make material misrepresentations following the issuance of the Notes in an effort to conceal their crimes.  In particular: (1) the insiders and Thadani provided shifting and false justifications for the decline of Lucky Bucks's business; (2) to placate the Noteholders, Thadani asserted that he was in the process of negotiating a sale of Lucky Bucks to a competitor, which, upon information and belief, was untrue; and (3) Thadani attempted to paint the expert networks as controlled by competitors and unreliable when Noteholders learned from those expert networks that certain industry players suspected criminal activity at Lucky Bucks.

364.    Defendants knew that these statements were false when made or omitted material facts, or at the very least, they made the statements with reckless disregard for their truth.

365.    Defendants knew that the Noteholders would receive and rely upon such representations, and intended that their false and/or misleading statements would induce the

Noteholders to purchase the Notes and/or would induce the Noteholders not to investigate Defendants' wrongdoing once results started to decline.

366.   Defendants' misrepresentations were material because they concerned critical and highly scrutinized information regarding Lucky Bucks's performance, the accuracy of Holdings's reported financial information, Holdings's solvency, and the strength of Lucky Bucks's M&A pipeline.

367.   The Noteholders reasonably and justifiably relied on such misrepresentations and omissions.  The Noteholders would not have purchased Notes at all, or at the prices they paid, had the Noteholders known the true facts regarding Defendants' various schemes.

368.   In addition, the Noteholders were induced by Defendants to forebear from investigating Defendants' various schemes, based on the misrepresentations that were directed to the causes of Lucky Bucks's declining performance.  The Noteholders specifically and actually relied on those misrepresentations in not investigating Lucky Bucks's poor performance earlier.

369.   In committing fraud, Defendants have acted in bad faith and are thereby liable for attorney's fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be determined at trial.

370.   Plaintiff is entitled to recover damages caused by Defendants' fraud pursuant to O.C.G.A. § 51-6-1 and the common law of Georgia.

## TENTH CAUSE OF ACTION
### Negligent Misrepresentation (in the alternative)
*(Against the Trive Defendants, Thadani, Sekhri, Bouskill, Boyden, Ijaz, and Kassam))*

371.   Plaintiff realleges each and every allegation contained above as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or with reckless disregard of the truth.  For the purposes of this claim in

the alternative, Plaintiff asserts only negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

372.    By reason of the conduct described herein, Defendants negligently made misrepresentations and/or concealed or failed to disclose material facts about Holdings's financial performance and business operations, its reported financial information, and internal controls and corporate governance.  These false and misleading statements were made by virtue of Defendants' statements to the Noteholders that purported to provide an accurate and honest reporting of Lucky Bucks's business operations and financial condition.

373.    In making each of the misstatements set forth herein, Defendants failed to act with the prudence required of a reasonable person in each of their respective positions, and each was otherwise careless and/or reckless in making material statements of fact to the Noteholders to induce their investment in $250 million of Notes.

374.    Each of Defendants had a duty of care to, and special relationship with, the Noteholders.

375.    Each Defendant personally induced the Noteholders' investment in Notes by leveraging their senior management positions and their unique knowledge of Lucky Bucks's finances and business operations, due to their access to inside information. Each Defendant developed a special degree of trust with the Noteholders in making their investment decision regarding the purchase of the Notes.

376.    The Noteholders actually read, reviewed and relied on, and were misled by, Defendants' misrepresentations. The Noteholders' reliance was reasonable and justifiable under the circumstances, because they were outside investors in Lucky Bucks and without access to

insider information and the Noteholders had no reason to doubt that Defendants were being truthful and forthcoming in making their representations to them.

377.    In addition, the Noteholders were induced by Defendants to forebear from investigating the true reasons for the decline in Lucky Bucks's business, based on the misrepresentations that were directed to it to its injury.  The Noteholders specifically and actually relied on those misrepresentations.

378.    As a proximate result of Defendants' negligent misrepresentations and omissions, the Noteholders have been harmed in an amount to be proven at trial.

379.    In committing negligent misrepresentation, Defendants have acted in bad faith and are thereby liable for attorney's fees and litigation expenses pursuant to O.C.G.A. § 13-6-11, in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### Attorney's Fees Pursuant to O.C.G.A. § 13-6-11
*(Against All Defendants)*

380.    Plaintiff realleges Paragraphs 1 through 251 above.

381.    As shown by their conduct described above, Defendants have acted in bad faith and have caused Plaintiff unnecessary trouble and expense.

382.    Plaintiff is entitled to an award of attorneys' fees pursuant to O.C.G.A.  § 13-6-11.

## TWELFTH CAUSE OF ACTION
### Punitive Damages Pursuant to O.C.G.A. § 51-12-5.1
*(Against All Defendants)*

383.    Plaintiff realleges Paragraphs 1 through 251 above.

384.    Defendants acted with a specific intent to cause harm to Holdings or the Noteholders who assigned causes of action to the Trustee when undertaking the tortious conduct described above.

385.    Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

386.    Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial pursuant to O.C.G.A. § 51-12-5.1 and the common law of Georgia.

## VIII.   DEMAND FOR RELIEF

387.    Plaintiff demands that the Court:

a.      Order Defendants to pay Plaintiff compensatory, exemplary, treble and punitive damages in an amount to be determined at trial;

b.      Order Defendants to pay Plaintiff's attorneys' fees, costs, and expenses of litigation, pursuant to O.C.G.A. § 13-6-11 and O.C.G.A. § 16-4-6(c);

c.      Order such other relief as the Court deems just and proper.

Dated: September 13, 2024       WHITEFORD TAYLOR & PRESTON LLC
        Wilmington, Delaware    By: /s/ *Richard W. Riley*
                                Richard W. Riley (DE No. 4052)
                                600 North King Street, Suite 300
                                Wilmington, DE 19801
                                Telephone: (302) 353-4144
                                Facsimile: (302) 357-3286

                                -and-

                                QUINN EMANUEL URQUHART
                                & SULLIVAN LLP
                                Susheel Kirpalani
                                Andrew J. Rossman
                                Mario O. Gazzola
                                51 Madison Avenue, 22nd Floor
                                New York, New York 10010
                                Telephone: (212) 849-7000
                                Facsimile: (212) 849-7100

                                *Counsel to the Chapter 7 Trustee*