## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LUCKY BUCKS HOLDINGS LLC,<br><br>*Debtor*. | Chapter 7<br><br>No. 23-10756 (KBO) |
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of Lucky<br>Bucks Holdings LLC and as assignee,<br><br>*Plaintiff*,<br><br>v.<br><br>TRIVE CAPITAL MANAGEMENT LLC,<br>*et al.*,<br><br>*Defendants*. | Adversary Proceeding<br><br>No. 24-50130 (KBO)<br><br><br>**MEMORANDUM OF LAW<br>IN SUPPORT OF TRIVE DEFENDANTS'<br>MOTION TO DISMISS PLAINTIFF'S<br>AMENDED COMPLAINT** |

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400

**WILMER CUTLER PICKERING HALE AND DORR LLP**

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Michael McGuinness (admitted *pro hac vice*)
Josh M. Feinzig (admitted *pro hac vice*)
Samuel E. Weitzman (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363

Dated: March 24, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ...................................................................................................... 4

      A.     Factual Background .................................................................................. 4

             1.     Trive acquires an interest in Lucky Bucks, and Holdings is formed .......... 4

             2.     Lucky Bucks and Houlihan Lokey market and sell the Notes .................... 5

             3.     The Noteholders purchase the Notes ........................................................ 6

             4.     Holdings issues distributions, as required by the CIM and the Note Purchase Agreement ................................................................................... 7

             5.     After a business downturn, Lucky Bucks and Holdings file for bankruptcy .................................................................................................. 8

      B.     Procedural Background ............................................................................ 8

SUMMARY OF ARGUMENT ............................................................................... 9

ARGUMENT ........................................................................................................... 10

    I.     THE FRAUDULENT-TRANSFER CLAIMS SHOULD BE DISMISSED ................................... 11

      A.     The Noteholders Lack Statutory Authority Under The Bankruptcy Code To Bring The Fraudulent-Transfer Claims They Purportedly Assigned To The Trustee (Counts III, IV) .................................................................... 11

      B.     The Noteholders's Agreement To Holdings's Transfer Of The Notes' Proceeds To Pay The Challenged Dividends Bars All The Fraudulent-Transfer Claims Under The Doctrines Of Consent, Estoppel, And Ratification (Counts I-IV) ......................................................................... 12

    II.     THE OTHER STATUTORY AND COMMON-LAW CLAIMS SHOULD BE DISMISSED .......... 17

      A.     The Improper-Dividends Claim Should Be Dismissed (Count V) ........... 17

      B.     The Georgia Statutory Claims Are Impermissibly Extraterritorial (Counts VI-VIII) .................................................................................................... 20

C.    The Delaware Statutory Securities-Fraud Claim Is Impermissibly
Extraterritorial (Count VI) ...................................................................24

D.    The State-Law Statutory And Common-Law Claims Fail For Lack of
Falsity And/Or Justifiable Reliance (Counts VI, VII, VIII, IX, X) ......................25

1.    Most of the alleged misstatements were not false statements of fact
at all......................................................................................26

2.    The remaining alleged misstatements were opinions or future
predictions that are not actionable false statements...................................31

3.    Even if the alleged misrepresentations were actionable, the
Noteholders could not have justifiably relied upon them .........................35

4.    The Trive Defendants cannot be liable for fraud by omission..................36

5.    The negligent misrepresentation claim fails because the Trive
Defendants did not owe any "duty" of care to the Noteholders ...............37

E.    The Claims Sounding In Fraud Lack The Particularity Required By Rule
9(b) (Counts VI-X) .............................................................................38

III.    THE CLAIMS FOR ATTORNEY'S FEES AND PUNITIVE DAMAGES SHOULD BE
DISMISSED ...................................................................................................40

IV.    THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE .................................40

CONCLUSION..................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
 163 F.3d 780 (3d Cir. 1999)..................................................................21, 22, 23

*Aaron v. Caddo Mins., Inc.*,
 2023 WL 5622115 (Tex. App. Aug. 31, 2023)................................................38

*ABB Daimler-Benz Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp.*,
 14 F. Supp. 2d 75 (D.D.C. 1998) ...................................................................23

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
 888 F. Supp. 2d 431 (S.D.N.Y. 2012)..............................................................35

*Allison v. Round Table Inv. Mgmt. Co.*,
 447 F. App'x 274 (2d Cir. 2012) .....................................................................35

*Am. Lumber Corp. v. Nat'l R.R. Passenger Corp.*,
 886 F.2d 50 (3d Cir. 1989)................................................................................12

*Ariz. Corp. Comm'n v. Media Prods., Inc.*,
 763 P.2d 527 (Ariz. Ct. App. 1988) ................................................................22

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)................................................................................ 10-11, 28

*Auld v. Forbes*,
 848 S.E.2d 876 (Ga. 2020)................................................................................21

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
 57 F.3d 146 (2d Cir. 1995)................................................................................37

*Basis Pac-Rim Opportunity Fund v. TCW Asset Mgmt. Co.*,
 2 N.Y.S.3d 105 (App. Div. 2015)....................................................................38

*Bd. of Managers of 147 Waverly Place Condo. v. KMG Waverly, LLC*,
 10 N.Y.S.3d 537 (App. Div. 2015) ..................................................................32

*Bos. Trading Grp., Inc. v. Burnazos*,
 835 F.2d 1504 (1st Cir. 1987)...........................................................................16

*Brittingham v. Nunn*,
 2020 WL 2404776 (D. Del. May 12, 2020)......................................................18

*Celanese Corp. v. Coastal Water Auth.*,
 475 F. Supp. 2d 623 (S.D. Tex. 2007) .............................................................26

*CityTrust v. Mermelstein*,
    1988 WL 243506 (N.Y. Sup. Ct. Dec. 1, 1988) .......................................................20

*Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*,
    500 B.R. 464 (W.D. Tex. 2013).................................................................................14, 17

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230 (2d Cir. 2006)...................................................................................... 35-36

*Daniel Def., LLC v. Tactical Edge, LLC*,
    2024 WL 474192 (S.D. Ga. Feb. 7, 2024) .......................................................................35

*DeStefano v. DeStefano*,
    2013 WL 5951874 (Bankr. D.N.J. Nov. 6, 2013).............................................................40

*DynCorp v. GTE Corp.*,
    215 F. Supp. 2d 308 (S.D.N.Y. 2002).............................................................................36

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008)............................................................................................16

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)........................................................................................................21

*Elliot v. Nelson*,
    301 F. Supp. 2d 284 (S.D.N.Y. 2004).............................................................................26

*FdG Logistics LLC v. A&R Logistics Holdings, Inc.*,
    131 A.3d 842 (Del. Ch.), *aff'd*, 148 A.3d 1171 (Del. 2016)............................................24

*Gardner v. Kinney*,
    498 S.E.2d 312 (Ga. Ct. App. 1998)...............................................................................40

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    58 F. Supp. 2d 228 (S.D.N.Y. 1999)..........................................................................35, 36

*Greenwald v. Odom*,
    723 S.E.2d 305 (Ga. Ct. App. 2012).........................................................................26, 35

*Griffin v. State Bank of Cochran*,
    718 S.E.2d 35 (Ga. Ct. App. 2011)...........................................................................26, 35

*Gutierrez v. Allstate Fire & Cas. Ins. Co.*,
    2017 WL 2378298 (N.D. Tex. June 1, 2017) ...........................................................26, 37

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989)........................................................................................................21

*Higgins v. 120 Riverside Boulevard at Trump Place Condo.*,
    2022 WL 3920044 (S.D.N.Y. Aug. 31, 2022) ................................................. 35

*Hoffman v. AmericaHomeKey, Inc.*,
    23 F. Supp. 3d 734 (N.D. Tex. 2014) ............................................................. 37

*HSH Nordbank AG v. UBS AG*,
    941 N.Y.S.2d 59 (App. Div. 2012) ................................................................. 29

*In re Adelphia Recovery Trust*,
    634 F.3d 678 (2d Cir. 2011) ........................................................................... 14

*In re Adient plc Sec. Litig.*,
    2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020), *aff'd sub nom. Bristol Cnty.*
    *Ret. Sys. v. Adient PLC*, 2022 WL 2824260 (2d Cir. July 20, 2022) ............... 33

*In re Bos. Generating LLC*,
    617 B.R. 442 (Bankr. S.D.N.Y. 2020), *aff'd on other grounds*, 2021 WL
    4150523 (S.D.N.Y. Sept. 13, 2021), *aff'd on other grounds*, 2024 WL
    4234886 (2d Cir. Sept. 19, 2024) ................................................................... 15

*In re Boyd*,
    2025 WL 467922 (Bankr. D. Or. Feb. 11, 2025) ............................................ 11

*In re Cred Inc.*,
    650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024) ......... 10

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019) ........................................................... 16

*In re Evergreen Energy, Inc.*,
    546 B.R. 549 (Bankr. D. Del. 2016) ............................................................... 35

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
    192 B.R. 342 (Bankr. S.D.N.Y. 1994), *aff'd*, 194 B.R. 728 (S.D.N.Y.
    1995) ............................................................................................................. 26

*In re Lottery.com, Inc. Sec. Litig.*,
    715 F. Supp. 3d 506 (S.D.N.Y. 2024) ............................................................ 32

*In re Lyondell Chem. Co.*,
    503 B.R. 348 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In*
    *re Trib. Fraudulent Conv. Litig.*, 818 F.3d 98 (2d Cir. 2016), *vacated and*
    *superseded on other grounds*, 946 F.3d 66 (2d Cir. 2019) ....................... 14, 15, 16

*In re Mallinckrodt PLC*,
    2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ........................................... 13

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
    755 F. Supp. 2d 857 (S.D. Ohio 2010) ............................................................21

*In re NSC Wholesale Holdings LLC*,
    637 B.R. 71 (Bankr. D. Del. 2022) ..........................................................26, 37

*In re Peterson*,
    332 B.R. 678 (Bankr. D. Del. 2005) ..............................................................40

*In re Physiotherapy Holdings, Inc.*,
    2016 WL 3611831 (Bankr. D. Del. June 20, 2016)........................................15

*In re PWS Holding Corp.*,
    303 F.3d 308 (3d Cir. 2002).........................................................................11

*In re Quorum Health Corp.*,
    2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023).......................................12

*In re Refco, Inc. Sec. Litig.*,
    2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009), *R&R adopted*, 2010 WL
    5129072 (S.D.N.Y. Jan. 12, 2010).................................................................17

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005)............................................................................16

*In re Shelton*,
    2014 WL 1576864 (Bankr. S.D. Tex. Apr. 18, 2014) ....................................38

*In re SRC Liquidation LLC*,
    581 B.R. 78 (D. Del. 2017), *aff'd*, 765 F. App'x 726 (3d Cir. 2019) ..............40

*In re Trib. Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019)................................................................11, 12, 14

*In re Trinsum Grp., Inc.*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ...........................................................19

*In re Wilton Armetale, Inc.*,
    968 F.3d 273 (3d Cir. 2020)....................................................................11, 12

*In re Zohar III, Corp.*,
    2021 WL 3124298 (Bankr. D. Del. July 23, 2021) ..................................18, 39

*In re Zohar III, Corp.*,
    631 B.R. 133 (Bankr. D. Del. 2021) ..............................................................13

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)..........................................................................32

*Ironwoods Troy, LLC v. OptiGolf Troy, LLC,*
    166 N.Y.S.3d 730 (App. Div. 2022) ...................................................31, 35

*Jaurequi v. John Deere Co.,*
    986 F.2d 170 (7th Cir. 1993) ........................................................................23

*JP Morgan Chase Bank v. Winnick,*
    350 F. Supp. 2d 393 (S.D.N.Y. 2004) .........................................................38

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P.,*
    546 S.W.3d 648 (Tex. 2018) ........................................................................35

*Kerusa Co. v. W10Z/515 Real Est. Ltd. P'ship,*
    906 N.E.2d 1049 (N.Y. 2009) ......................................................................20

*Knudsen v. MetLife Grp., Inc.,*
    117 F.4th 570 (3d Cir. 2024) .........................................................................5

*Kolar v. Preferred Real Est. Invs., Inc.,*
    361 F. App'x 354 (3d Cir. 2010) .................................................................39

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
    108 F.3d 1531 (2d Cir. 1997) ......................................................................36

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC,*
    10 F. Supp. 3d 504 (S.D.N.Y. 2014) ...........................................................37

*Leday v. CarMax Bus. Servs., LLC,*
    2024 WL 3626511 (S.D. Tex. July 1, 2024) ................................................20

*Longo v. Butler Equities II, L.P.,*
    718 N.Y.S.2d 30 (App. Div. 2000) ..............................................................32

*Lopez v. CTPartners Exec. Search, Inc.,*
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ...........................................................33

*Lutz v. Portfolio Recovery Assocs., LLC,*
    49 F.4th 323 (3d Cir. 2022) .........................................................................11

*Marquis Towers, Inc. v. Highland Grp.,*
    593 S.E.2d 903 (Ga. Ct. App. 2004) ...........................................................37

*Matrix Parent, Inc. v. Audax Mgmt. Co.,*
    319 A.3d 909 (Del. Super. Ct. 2024) ...........................................................26

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,*
    928 N.Y.S.2d 229 (App. Div. 2011) ............................................................38

*McCullough v. Leede Oil & Gas, Inc.*,
617 F. Supp. 384 (W.D. Okla. 1985) ...........................................................22

*Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*,
187 F.3d 439 (4th Cir. 1999) ......................................................................11

*Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*,
710 F. Supp. 2d 458 (D. Del. 2010) ....................................................... 25-26

*Parker v. Learn The Skills Corp.*,
219 F. App'x 187 (3d Cir. 2007) ................................................................35

*Pashsa & Sina, Inc. v. Travelers Home & Marine Ins. Co.*,
2022 WL 9497141 (N.D. Tex. Oct. 14, 2022), *vacated in part*, 2022 WL
15089513 (N.D. Tex. Oct. 26, 2022) ..........................................................38

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
998 F.2d 1192 (3d Cir. 1993) .......................................................................5

*PHL Variable Ins. Co. v. Town of Oyster Bay*,
929 F.3d 79 (2d Cir. 2019) .........................................................................35

*Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.*,
117 F. Supp. 2d 1357 (N.D. Ga. 2000) .......................................................26

*Rapaport v. Strategic Fin. Sols., LLC*,
140 N.Y.S.3d 508 (App. Div. 2021) ...........................................................35

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) .........................................................................6

*Schwartzco Enters. LLC v. TMH Mgmt., LLC*,
60 F. Supp. 3d 331 (E.D.N.Y. 2014) ..........................................................38

*Scott v. PNC Bank, Nat'l Ass'n*,
785 F. App'x 916 (3d Cir. 2019) ................................................................35

*Shea v. Best Buy Homes, LLC*,
533 F. Supp. 3d 1321 (N.D. Ga. 2021) .......................................................37

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994) .......................................................................32

*Shuker v. Smith & Nephew, PLC*,
885 F.3d 760 (3d Cir. 2018) .......................................................................38

*Singer v. Magnavox Co.*,
    380 A.2d 969 (Del. 1977), *overruled on other grounds by Weinberger v.*
    *UOP, Inc.*, 457 A.2d 701 (Del. 1983) ................................................................24

*Smith v. BCE Inc.*,
    225 F. App'x 212 (5th Cir. 2007) ....................................................................37

*Solutia Inc. v. FMC Corp.*,
    456 F. Supp. 2d 429 (S.D.N.Y. 2006).............................................................37

*Stanley Black & Decker, Inc. v. Gulian*,
    70 F. Supp. 3d 719 (D. Del. 2014)...................................................................25

*State v. Wang*,
    2020 WL 1873377 (Del. Sup. Ct. Apr. 15, 2020)...........................................20

*Stuart Lipsky, P.C. v. Price*,
    625 N.Y.S.2d 563 (App. Div. 1995) ................................................................29

*Subramanian v. Lupin Inc.*,
    2020 WL 7029273 (S.D.N.Y. Aug. 21, 2020), *R&R adopted*, 2020 WL
    6075523 (S.D.N.Y. Oct. 15, 2020) ..................................................................36

*Thysis, Inc. v. Chemron Corp.*,
    2011 WL 13162410 (N.D. Ga. Aug. 25, 2011) ...............................................40

*Tredennick v. Bone*,
    323 F. App'x 103 (3d Cir. 2008) .....................................................................39

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007)....................27

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
    479 B.R. 405 (N.D. Tex. 2012).................................................................14, 15

*Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*,
    319 F. App'x 137 (3d Cir. 2009) .....................................................................25

*United States ex rel. Pilecki-Simko v. Chubb Inst.*,
    443 F. App'x 754 (3d Cir. 2011) .....................................................................18

*Vichi v. Koninklijke Philips Elecs., N.V.*,
    85 A.3d 725 (Del. Ch. 2014)...........................................................................35

*Victory Med. Ctr. Beaumont, L.P. v. Conn. Gen. Life Ins. Co.*,
    2018 WL 3467915 (E.D. Tex. July 17, 2018) .................................................14

*Walworth Invs.-LG, LLC v. Mu Sigma, Inc.*,
    215 N.E.3d 843 (Ill. 2022) ...................................................................... 37

*Wang v. Zymergen Inc.*,
    744 F. Supp. 3d 995 (N.D. Cal. 2024) ................................................... 30

*Woori Bank v. RBS Sec., Inc.*,
    910 F. Supp. 2d 697 (S.D.N.Y. 2012) .................................................... 36

*Wynn v. AC Rochester*,
    273 F.3d 153 (2d Cir. 2001) ................................................................... 26

*Xia Bi v. McAuliffe*,
    927 F.3d 177 (4th Cir. 2019) ................................................................. 32

*Zohar CDO 2003-1 Ltd. v. Xinhua Sports & Ent. Ltd.*,
    975 N.Y.S.2d 663 (App. Div. 2013) ....................................................... 38

## STATUTES

11 U.S.C. § 544 ............................................................... 9, 11, 12, 13, 14, 16, 17

11 U.S.C. § 546 ............................................................................................... 12

11 U.S.C. § 548 ......................................................................................... 16, 17

11 U.S.C. § 550 ............................................................................................... 17

Del. Code Ann. tit. 6, § 18-607 ..................................................................... 18

Del. Code Ann. tit. 6, § 73-101 *et seq.* ........................................................ 24

Ga. Code Ann. § 13-6-11 .............................................................................. 40

Ga. Code Ann. § 51-12-5.1 ........................................................................... 40

N.Y. C.P.L.R. § 1353 .................................................................................... 20

Tex. Civ. Prac. & Rem. Code Ann. § 140A.101 .......................................... 20

## RULES

Fed. R. Bankr. P. 2004 ......................................................................... 8, 9, 33

Fed. R. Civ. P. 8 ............................................................................................ 28

Fed. R. Civ. P. 9 ............................................................................... 10, 38, 39

**OTHER AUTHORITIES**

5 Collier on Bankruptcy ¶ 544.06 ................................................................................................13

Callie Malvik, *30 Basic Accounting Terms, Acronyms and Abbreviations Students Should Know*, RASMUSSEN UNIV.: BUS. BLOG (July 20, 2020), https://www.rasmussen.edu/degrees/business/blog/basic-accounting-terms-acronyms-and-abbreviations-students-should/#:~:text=6.,equity%2C%20at%20a%20given%20time ..........................................3

*Common Accounting Acronyms & What They Mean*, CHAMPLAIN COLL. ONLINE: BLOG (Feb. 12, 2024), https://online.champlain.edu/blog/accounting-acronyms ....................................................................................................................3

Restatement (Second) of Conflict of Laws § 188 (Am. L. Inst. 1971) .........................................25

xi

Defendants Trive Capital Management LLC, Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star Gaming, LLC, and Shravan Thadani ("<u>Trive Defendants</u>") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint [D.I. 58][1] ("<u>Compl.</u>").

## PRELIMINARY STATEMENT

1.      This is a lawsuit brought on behalf of a handful of "sophisticated" (Compl. ¶ 189) Wall Street investors ("<u>Noteholders</u>") whose investment in structurally subordinated notes ("<u>Notes</u>") did not pan out and who are now looking to blame others for their own losses.  Although the plaintiff is nominally Marc Abrams ("<u>Trustee</u>" or "<u>Plaintiff</u>"), the trustee for the estate of Lucky Bucks Holdings LLC ("<u>Holdings</u>"), Mr. Abrams brings most of the claims as assignee of those Noteholders.  And even the few estate causes of action he brings are for the sole benefit of those same Noteholders, who are the only creditors of the Holdings estate.

2.      As its name suggests, Holdings was a holding company.  The Noteholders knew full well that Holdings's only asset was its indirect equity interest in Lucky Bucks, LLC ("<u>Lucky Bucks</u>").  Before making their investment, the Noteholders were informed that Lucky Bucks operated in a "nascent," "fragmented," and "unsophisticated" business.  Compl. ¶¶ 12, 189.  They were told that Lucky Bucks had already incurred so much debt that it could not borrow any more under its loan agreements; that as a result, a new holding company—Holdings—had to be created on top of Lucky Bucks to issue the Notes on a subordinated basis; and that the proceeds of the Notes would not be invested in Lucky Bucks, but instead would be paid to Holdings's shareholders.  The offering materials for the Notes advised the Noteholders that they needed to conduct their own due diligence and should not rely on any supposed representations by anyone.

---

[1] References to filings (i) in this adversary proceeding are cited as "D.I.", (ii) in the bankruptcy case, Case No. 23-10756, as "Bankr. D.I.", and (iii) on unrelated dockets as "ECF No.".

Knowing all this, they purchased the Notes anyway, for a simple reason: Reflecting the Notes' inherent investment risk, the Notes provided a correspondingly high potential reward, paying annual interest of 12.5% to 14.0%, as well as an up-front discount of 2% to the Notes' purchase price.

3.      Under these circumstances, the Noteholders's efforts to shift responsibility for their losses from themselves, or from Lucky Bucks's management, to the Trive Defendants crumble. Although the Noteholders claim to have been misled by false or misleading statements made in their diligence process, the statements they cite were either not false at all, or were mere puffery or forward-looking projections that, as a matter of law, are not actionable.  The Complaint also conflates different groups of defendants through impermissible group pleading.  It alleges that members of Lucky Bucks management engaged in schemes to defraud and loot Lucky Bucks.  But the Complaint (¶ 33) all but admits that the Trive Defendants were "not involved in the criminal enterprise" allegedly conducted by Lucky Bucks's management.  If there are any malefactors from whom the Trustee and the Noteholders can seek to recover, they are not the Trive Defendants.

4.      The Trustee's claims against the Trive Defendants should be dismissed.  Some of the Trustee's fraudulent-transfer claims fail because the Noteholders who assigned them lack statutory authority to bring them in bankruptcy; all of them fail, in any event, because the Noteholders explicitly consented to Holdings's shareholder distributions that the Trustee now seeks to avoid and recover.  His other statutory claims suffer from numerous substantive and pleading defects, including that he relies on Georgia and Delaware statutes that apply only to activity that occurred in those states; yet, the alleged events of the Trive Defendants that gave rise to the claims against them occurred outside of those states.  The Trustee's common-law claims fail too, principally because the alleged statements on which they are based are not actionable and the

Noteholders cannot, in any event, establish that they justifiably relied on them or should be excused from failing, through due diligence, to uncover the facts they now claim they did not know.

5.    The Trustee evidently recognized that his original complaint was deficient.  Rather than defend it in response to the Trive Defendants' motion to dismiss, the Trustee amended his pleading.  Yet, despite receiving voluminous discovery from the Trive Defendants and others, the Amended Complaint contains virtually no new factual allegations about the Trive Defendants.  It does nothing to address the fatal defects requiring dismissal of the fraudulent-transfer claims.  And, as to the other claims, the few new allegations are conclusory and demonstrably inadequate.

6.    An example—one the Trustee adds in an obvious effort to color the Court's judgment—illustrates the point.  The Amended Complaint notes that a Trive employee, "TCM senior associate Connor Anderson," wrote an email regarding "Lucky Bucks Pages," in which the abbreviation "(*bs*)" appeared after the term "[c]urrent financiels" [sic].  The Trustee says that this shows that Trive "knew the [Lucky Bucks] financials were 'bullshit.'"  Compl. ¶ 175.  The email, which this Court may consider on this motion because the Amended Complaint relies on it (*see infra* Background A.2 n.4), makes clear that this conclusion is implausible—indeed, demonstrably false.  The email consists of a short to-do list that Mr. Anderson wrote to himself in which he listed four items under the subject line "Lucky Bucks Pages":  (1) "current financieals (bs)," (2) "[p]ipeline," (3) "[o]verview of why we need to put capital in," and  (4) "[g]et it in front of the partners on Wednesday of next week."  *See* Ex. T.[2]  As the Trustee and his sophisticated counsel no doubt know, the term "bs" is a standard abbreviation in finance for "balance sheet."[3]  That the

---

[2] "Ex.__" citations refer to exhibits to the Declaration of Ross E. Firsenbaum, filed herewith.
[3] *See, e.g.*, *Common Accounting Acronyms & What They Mean*, CHAMPLAIN COLL. ONLINE: BLOG (Feb. 12, 2024), https://online.champlain.edu/blog/accounting-acronyms; Callie Malvik, *30 Basic Accounting Terms, Acronyms and Abbreviations Students Should Know*, RASMUSSEN UNIV.: BUS. BLOG (July 20, 2020), https://www.rasmussen.edu/degrees/business/blog/basic-accounting-terms-acronyms-and-abbreviations-students-should/#:~:text=6.,equity%2C%20at%20a%20given%20time.

Complaint recklessly suggests otherwise speaks volumes.  The Complaint's supposed "smoking gun" was, in fact, simply an email memorializing that Mr. Anderson should provide to Trive's partners in the ordinary course a balance sheet, together with an overview of why Trive should consider investing ***more capital*** in Lucky Bucks, not that Mr. Anderson was planning to give Trive's own partners fraudulent financial statements.

7.     At bottom, this is a suit brought on behalf of the Noteholders to hold the Trive Defendants liable because they did not uncover a supposed fraud that the Noteholders, among the most sophisticated parties in the financial markets, apparently did not themselves uncover through their own, allegedly "extensive" diligence.  Compl. ¶ 190(a).  There is no basis for such liability.  The Trustee has now had two chances to plead a plausible claim against the Trive Defendants.  But even with the benefit of extensive discovery and a round of motions to dismiss, he has still failed to do so.  The Court should dismiss the Amended Complaint with prejudice.

## BACKGROUND

### A.     Factual Background

#### 1.     Trive acquires an interest in Lucky Bucks, and Holdings is formed

8.     Lucky Bucks was a Georgia company that owned coin-operated amusement machines ("COAMs") placed in gas stations and convenience stores.  Compl. ¶¶ 2, 62-63, 71.  The Georgia Lottery Corporation ("GLC") restricts ownership of COAMs to a limited number of "master license" holders.  *Id.* ¶¶ 64-69.  Lucky Bucks grew to become one of the largest COAM master license holders in Georgia.  *Id.* ¶ 71.

9.     Defendant Trive Capital Management LLC ("TCM") is a private equity firm based in Texas.  Compl. ¶ 36.  In August 2020, Trive acquired an indirect, majority equity interest in Lucky Bucks by investing some $126 million.  *Id.* ¶¶ 2, 82.  At the time, Lucky Bucks was doing well; its "equity was worth approximately $170 million."  *Id.* ¶ 2.

10.    Lucky Bucks historically borrowed money both to finance its operations and to fund the payment of dividends to its shareholders.  Compl. ¶¶ 4, 8.  By 2021, however, Lucky Bucks was "maxed out under its recently upsized term loan facility, which placed certain limits on leverage that would be exceeded by taking on any new debt."  *Id.* ¶¶ 6, 121.  But the appetite of investors like the Noteholders to provide financings remained "white hot."  *Id.* ¶ 6.  Accordingly, a new "super" holding company, Holdings, was created.  *Id.* ¶¶ 7, 121-122.  Holdings would have no operations, and no assets other than its indirect equity in Lucky Bucks.  *Id.* ¶ 122.  As a newly formed parent company with no debt, Holdings "could borrow money without running afoul of Lucky Bucks's existing credit agreement."  *Id.*

### 2.    Lucky Bucks and Houlihan Lokey market and sell the Notes

11.    Lucky Bucks retained a leading financial-advisory firm, Houlihan Lokey (along with a leading law firm, Shearman & Sterling), to market Holdings's issuance of $250 million of notes ("Notes").  Compl. ¶¶ 129-130.  Holdings "was formed concurrently with the marketing of the Notes for the sole purpose of issuing the Notes."  *Id.* ¶ 204.  Houlihan Lokey prepared a confidential information memorandum ("CIM").  *Id.* ¶¶ 9, 130-131.  The CIM made clear that the proceeds of the Notes would not be invested in Lucky Bucks or retained as working capital.  *See* Ex. A at 6-7.[4]  Rather, the proceeds would be used to "finance a one-time distribution to existing equity holders."  Lucky Bucks was "seeking to raise up to $250 million … representing ~7.5x total leverage, in order to fund a distribution to shareholders."  *Id.*

12.    The CIM advised potential investors to conduct their own due diligence.  It began with a "Disclaimer" cautioning that "prospective lenders must rely on their own examination of

---

[4]  Because the Complaint discusses and quotes the CIM, Compl. ¶¶ 9, 130-131, 140-141, 148, 156-157, 162, 164, 173, 182, the Court may consider the CIM on this motion.  *See Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 576 n.33 (3d Cir. 2024); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

the Company and the terms of the Securities, including the merits and risks involved and not on any representation made or alleged to have been made by Houlihan Lokey or the Company." Ex. A at 3.  The Disclaimer further warned that many statements in the CIM were "forward-looking" and cautioned "[p]rospective lenders … not to place undue reliance on these forward looking statements," which "involve numerous risks and uncertainties that could cause actual results to differ materially from expected results."  *Id.*

### 3.    The Noteholders purchase the Notes

13.    Prospective investors "conducted diligence on the Note opportunity."  Compl. ¶ 133; *see also id.* ¶¶ 134-137, 190.  This process included conversations with Lucky Bucks management and Mr. Thadani, a managing director of TCM—though the Complaint provides little detail regarding the substance of those conversations.  *Id.* ¶¶ 133-134.

14.    Ultimately, six "sophisticated" asset managers (Compl. ¶ 189), all based outside of Georgia, purchased the Notes for funds they managed: (1) Hamilton Lane Advisors LLC (headquartered in Pennsylvania), (2) First Trust Capital Management LP (Illinois), (3) Monarch Alternative Capital LP (New York), (4) BC Partners (New York), (5) Marathon Asset Management LP (New York), and (6) CION Investment Management, LLC (New York) (collectively, "Noteholders").  *Id.* ¶¶ 56, 190, 192, 200; *see* Exs. C-H.  Each manages billions of dollars in assets and touts its expertise and data-driven approach to investing.[5]  For example, Marathon, which manages $23 billion and has over 190 professionals with "deep expertise," emphasizes its use of "comprehensive real-time data, fundamental analysis, and nuanced insights." Ex. I at 2.  Similarly, Monarch, "a $15.5 billion global opportunistic credit investment firm," Ex. J at 2, boasts of "[n]early three decades of successful investing," *id.* at 9.

---

[5]  *See* Exs. C-H.  The Noteholders's Forms ADV, as SEC filings, "are matters of public record of which the court can take judicial notice."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

15.     Investing in the Notes entailed obvious risks that should have been apparent to highly knowledgeable investors like the Noteholders. Holdings's "only asset was its ownership of Lucky Bucks shares, meaning Holdings's ability to repay the Notes was entirely dependent on the equity value of Lucky Bucks, which needed to be enough to clear the operating subsidiary's own substantial debt." Compl. ¶ 8. Lucky Bucks had already leveraged itself as much as it could, and it operated in an industry that was "nascent," "fragmented," and "unsophisticated." *Id.* ¶¶ 6-7, 12, 189, 205. Moreover, the Notes' proceeds would be paid to shareholders and unavailable to repay the Notes. *See* Ex. A at 6-7; Ex. B § 6.11. None of this was hidden from the Noteholders; the CIM and Note Purchase Agreement[6] spelled it all out in detail. *See id.*; Compl. ¶ 172. But reflecting the "white hot" market at the time for financings, the Noteholders agreed to buy the Notes. They presumably did so because they expected to be well compensated for the risks they took: the Notes paid high interest rates of 12.5% to 14% and were sold at a 2% discount to face value. Ex. B §§ 2.01(d), 2.08(a).

4.     <u>Holdings issues distributions, as required by the CIM and the Note Purchase Agreement</u>

16.     Consistent with the CIM, the Note Purchase Agreement included a "Use of Proceeds" covenant providing that Holdings "shall" "[u]se the proceeds of the Notes … to fund a Restricted Payment to the holders of [Holdings'] Capital Stock." Ex. B § 6.11. Complying with that requirement, Holdings used the Notes proceeds to fund distributions in November 2021 and January 2022 of approximately $185.2 million and $52.5 million, respectively, to its shareholders ("<u>Holdings Distributions</u>"), including certain entities owned or controlled by TCM. Compl. ¶¶ 201-203, 279-280, 295-296, 308-309, 322-323.

---

[6] The Court may consider the Note Purchase Agreement because it is integral to the Complaint (¶¶ 192-198). *See supra* Background A.2 n.4.

5.       <u>After a business downturn, Lucky Bucks and Holdings file for bankruptcy</u>

17.      After purchasing the Notes, "the Noteholders received quarterly updates" on Lucky Bucks's performance. Compl. ¶ 213. That performance became disappointing; the fourth quarter 2021 results, for example, "revealed higher COAM attrition, lower EBITDA, and costlier M&A acquisitions" than had been expected. *Id.* ¶ 214.

18.      Ultimately, it came to light that the "reason[]" for Lucky Bucks's decline was a series of supposed "rackets" that had been orchestrated by Lucky Bucks's senior management team, Mr. Damani and Mr. Kassam, *e.g.*, "sell[ing] underperforming locations to Lucky Bucks at inflated valuations through other businesses they controlled," Compl. ¶¶ 27, 206, 222, "stealing location contracts" and COAMs, and using Lucky Bucks employees "to service competitor companies" owned by Mr. Damani, *id.* ¶ 27; *id.* ¶¶ 215, 222, 238-259. In contrast to the management team's alleged fraud, the Complaint all but admits that Mr. Thadani and the Trive Defendants were "*not* involved in the criminal enterprise of Damani and Kassam," *id.* ¶ 33 (emphasis added), but suggests that, at the time Holdings sold the Notes, Mr. Thadani or Trive were supposedly aware that "something" was "wrong." *Id.* The Complaint nowhere specifies what that "something" was.

**B.       Procedural Background**

19.      Lucky Bucks and Holdings filed Chapter 11 petitions in June 2023. Compl. ¶¶ 25, 234. Lucky Bucks emerged from bankruptcy in October 2023, renamed Arc Gaming and Technologies, LLC ("<u>Arc Gaming</u>"). This Court converted Holdings's Chapter 11 case to Chapter 7, and Plaintiff was appointed as Holdings's trustee. *Id.* ¶¶ 25-26, 35, 235-237.

20.      On March 7, 2024, the Trive Defendants agreed to produce documents in response to the Trustee's Rule 2004 subpoena (the "<u>Subpoena</u>"). Bankr. D.I. 53. Thereafter, between June 24 and August 27, 2024, the Trive Defendants produced 11,576 documents (totaling 85,430

pages).  *See* Exs. K-N.  The Trustee also received Rule 2004 discovery from Arc Gaming, Houlihan

Lokey, Anil Damani, and Lucky Bucks Ventures, Inc.  *See* Bankr. D.I. 52, 69, 71.

21.    With the benefit of this Rule 2004 discovery, Plaintiff filed his initial complaint on

September 13, 2024.  D.I. 2.  The Trive Defendants moved to dismiss the complaint on November

22, 2024.  D.I. 28, 29.  Rather than oppose that motion, the Trustee filed the current, Amended

Complaint on January 21, 2025.  D.I. 57, 58.  By then, the Trustee had received five more

document productions from the Trive Defendants, bringing the total number of documents

produced by the Trive Defendants in response to the Subpoena to 20,319 documents (totaling

195,756 pages).  *See* Exs. O-S.

22.    As before, Plaintiff brings all claims for the benefit of the Noteholders—certain of

them (Counts I-II, V) nominally as trustee, on behalf of the Holdings estate, but the Noteholders

are the estate's only creditors, and the rest (Counts III-IV, VI-X) as assignee of any claims of the

Noteholders arising out of the Notes.  Compl. ¶ 35; *id.* ¶¶ 1, 57, 281, 297, 310, 324, 364.

### SUMMARY OF ARGUMENT

23.    The Court should dismiss the fraudulent-transfer claims (Counts I-IV).  Counts III

and IV fail because the Noteholders who assigned those state-law claims lacked statutory authority

to bring them in light of Holdings's bankruptcy, 11 U.S.C. § 544(b), and hence their claims also

cannot proceed in the hands of their assignee, the Trustee.  In addition, all four fraudulent-transfer

claims (Counts I-IV) fail for the independent reason that the Noteholders, Holdings's only

creditors, consented to and ratified the Holdings Distributions by entering into the Note Purchase

Agreement, which  required Holdings to use the Notes proceeds to fund distributions to Holdings's

equity holders.  That ratification estops the Trustee, either as trustee or as assignee, from seeking

to avoid and recover those distributions as alleged fraudulent transfers.

24.    The Court should also dismiss the remaining claims brought under state statutes (Counts V-VIII) or common law (Counts IX-X). *First*, the improper-dividends claim (Count V) fails because the Complaint does not allege facts creating an inference that any of the three Trive Defendants that received the dividends was aware that the Holdings Distributions caused Holdings to become insolvent (if it truly was then insolvent). *Second*, the Georgia-law and Delaware-law securities-fraud claims (Count VI) and Georgia-law RICO claims (Counts VII-VIII) against the Trive Defendants fail for a variety of reasons, including that they are based on events that occurred outside of Georgia and Delaware and the relevant statutes may not be applied extraterritorially— both under those States' laws and the U.S. Constitution's Dormant Commerce Clause. *Third*, the common-law claims of fraud (Count IX) and negligent misrepresentation (Count X), as well as the securities-fraud claim brought under the laws of any state (including Texas), cannot proceed for multiple reasons, including (i) because they are premised on statements that were not false or that were inactionable puffery, opinions, or forward-looking projections, (ii) because the Trustee, standing in the Noteholders's shoes, cannot establish the required element of justifiable reliance on the supposed misstatements, or (iii) both. *Fourth*, all of Plaintiff's claims sounding in fraud or misrepresentation (Counts I, III, VI-X) fall short of the heightened Rule 9(b) pleading standard for such claims. *Finally*, the Court should dismiss the claims purportedly brought under Georgia law for attorney's fees and punitive damages (Counts XI-XII). Both claims are requests for relief, not standalone claims, and Plaintiff has no viable Georgia-law claim on which to base such relief.

## ARGUMENT

25.    "To survive a motion to dismiss," a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Cred Inc.*, 650 B.R. 803, 812 (Bankr. D. Del. 2023) (quotation marks omitted), *aff'd*, 658 B.R. 783 (D. Del. 2024). Mere "legal conclusions" and "conclusory statements" do not suffice, *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009), nor do "threadbare or speculative" allegations, *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 328 (3d Cir. 2022) (quotation marks omitted).

## I.   THE FRAUDULENT-TRANSFER CLAIMS SHOULD BE DISMISSED

26.     The Trive Defendants previously moved to dismiss the Trustee's fraudulent-transfer claims. The Amended Complaint does nothing to cure their fatal defects.

### A.     The Noteholders Lack Statutory Authority Under The Bankruptcy Code To Bring The Fraudulent-Transfer Claims They Purportedly Assigned To The Trustee (Counts III, IV)

27.     The fraudulent-transfer claims in Counts III and IV fail because the Noteholders who purport to have assigned those claims to the Trustee lacked statutory authority to bring them—and hence their assignee, the Trustee, does as well standing in the Noteholders's shoes.  Once Holdings filed for bankruptcy, the Trustee obtained standing to pursue any fraudulent-transfer claims that the Noteholders could have previously asserted under state law.  *See* 11 U.S.C. § 544(b).  A bankruptcy trustee's authority to bring such fraudulent-transfer claims is *exclusive*; once the debtor files for bankruptcy, creditors can no longer pursue their own fraudulent-transfer claims. *See In re Wilton Armetale, Inc.*, 968 F.3d 273, 282-85 (3d Cir. 2020) (creditor's fraudulent-transfer claims became "the exclusive province of the trustee, not a creditor," "to prosecute" because "[t]he bankruptcy … deprived [the creditor] of the statutory authority to bring those claims, transferring that power to the trustee"); *In re PWS Holding Corp.*, 303 F.3d 308, 314-15 (3d Cir. 2002) (Chapter 11 plan's release of fraudulent-transfer claims extinguished noteholder's fraudulent-transfer suit).[7]

28.     While the Noteholders's claims would be barred even if the Trustee had not also

---

[7] *Accord In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 86 (2d Cir. 2019) ("All the caselaw agrees that the trustee et al.'s powers under [§] 544 are exclusive …."); *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441-42 (4th Cir. 1999) (creditors lacked standing to assert claims with the same focus as fraudulent-transfer claims, which "the trustee alone has standing to bring"); *In re Boyd*, 2025 WL 467922, at *4 (Bankr. D. Or. Feb. 11, 2025) ("[W]here both a creditor and the trustee have fraudulent transfer claims relating to property transferred by the debtor, the trustee has the exclusive right to pursue the fraudulent transfer claims and the creditor may not.").

sued as representative of the estate, the Trustee has in fact brought fraudulent-transfer claims under § 544(b). *See* Compl. ¶¶ 271-273, 281, 285-287, 297 (Counts I, II). The Noteholders cannot bring such claims at the same time, and hence the Trustee, in his capacity as assignee, cannot either. *See Am. Lumber Corp. v. Nat'l R.R. Passenger Corp.*, 886 F.2d 50, 55 (3d Cir. 1989) (assignee "takes [assigned claim] subject to all defenses" against assignor (quotation marks omitted)).

29.     Although the law requires their dismissal in any event, there are practical reasons too for dismissing the assigned claims. Doing so will avoid any potential disputes that could arise if the Trustee sought to circumvent the Bankruptcy Code's limitations on § 544 claims by purporting to bring fraudulent-transfer claims as the Noteholders's assignee under state law, supposedly free of the Code's limitations. *See Trib.*, 946 F.3d at 90-97 (rejecting creditors' attempt to circumvent § 546(e)'s safe harbor; holding that § 546(e) preempted creditors' claims to the extent § 546(e) would bar the trustee from bringing them under § 544(b)); *In re Quorum Health Corp.*, 2023 WL 2552399, at *8-11 (Bankr. D. Del. Mar. 16, 2023) (§ 546(e) barred trustee's fraudulent-transfer claims under § 544 and preempted noteholders's state-law fraudulent-transfer claims that trustee brought as noteholders's assignee).[8]

**B.    The Noteholders's Agreement To Holdings's Transfer Of The Notes' Proceeds To Pay The Challenged Dividends Bars All The Fraudulent-Transfer Claims Under The Doctrines Of Consent, Estoppel, And Ratification (Counts I-IV)**

30.     All four fraudulent-transfer claims—both those brought as estate representative under § 544 (Counts I, II) and those brought as the Noteholders's assignee (Counts III, IV)—fail, because the Noteholders (Holdings's only creditors) consented to and ratified the Holdings

---

[8] In *Quorum*, the court read the confirmed Chapter 11 plan to permit the trustee to assert state-law fraudulent-transfer claims under both § 544 and as the noteholders's assignee. But *Quorum* acknowledged that where, as here, there is no such confirmed plan, Third Circuit precedent requires that "the trustee must overtly abandon an estate cause of action during the bankruptcy case before the right to pursue that action would revert to a creditor." *Id.* at *8 n.47 (citing *Wilton Armetale*). That controlling, Circuit-level case law requires dismissal of Counts III-IV here.

Distributions.  The Noteholders expressly agreed—indeed, required—that Holdings use the Notes proceeds to fund the Holdings Distributions.  That consent now estops the Trustee, standing in the Noteholders's shoes and suing for their exclusive benefit, from seeking to recover as supposed fraudulent transfers the very distributions the Noteholders agreed should be made.

31.    The Noteholders's consent to the distributions is clear.  The Note Purchase Agreement's "Use of Proceeds" covenant required Holdings to use the Notes' proceeds "to fund a Restricted Payment to the holders of the Issuer's Capital Stock."  Ex. B § 6.11.  And the CIM prominently disclosed that the purpose of the financing was "to raise up to $250 million of HoldCo PIK Notes … to fund a distribution to shareholders."  Ex. A at 6.

32.    This matters because the Trustee stands in the Noteholders's shoes not only as their purported assignee, but also when he sues under § 544(b).  In both capacities, the Trustee is subject to the same defenses that would apply to the Noteholders.  It is black-letter law that an assignee has no greater rights than its assignor.  *See supra* Argument I.A.  And the Trustee can avoid a transfer under § 544(b) only if a "triggering creditor" could have done so outside bankruptcy. Here, Holdings's *only* creditors are the Noteholders,[9] so the Trustee has "no greater rights of avoidance" than the Noteholders would have had under state law.   5 Collier on Bankruptcy ¶ 544.06[3]; *In re Mallinckrodt PLC*, 2024 WL 206682, at *17 (Bankr. D. Del. Jan. 18, 2024); *In re Zohar III, Corp.*, 631 B.R. 133, 160 (Bankr. D. Del. 2021) (Owens, J.).

33.    Courts have dismissed fraudulent-transfer claims where the debtor transferred the funds in question precisely as the lenders intended.  "[C]reditors who are participants in an alleged

---

[9] The Amended Complaint does not allege that Holdings had any creditors other than the Noteholders.  *See* Compl. ¶¶ 281, 297, 310, 324.  The Trustee has acknowledged that "other than an alleged unliquidated, intercompany claim by Lucky Bucks, LLC, the PIK Noteholders are the only creditors of the Debtors."  *Mot. Ch. 7 Tr. Obtain Post-Petition Secured Fin.*, Bankr. D.I. 47 ¶ 7; *Holdings Schedules of Assets & Liabs.*, Bankr. D.I. 14, Scheds. D & E/F (listing only $300.2 million claim by Noteholders's administrative agent Alter Domus and $7.3 million claim by Lucky Bucks, LLC); *Holdings Claims Register* (listing only 14 claims by Alter Domus and the Noteholders).

fraudulent transfer, or who have ratified it, cannot then seek to have that transfer avoided." *In re Lyondell Chem. Co.*, 503 B.R. 348, 383 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Trib. Fraudulent Conv. Litig.*, 818 F.3d 98 (2d Cir. 2016), *vacated and superseded on other grounds*, 946 F.3d 66 (2d Cir. 2019). Whether labeled "'ratification,' 'consent,' 'estoppel,' or 'material participation in the transaction,'" "the underlying point is the same: Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it." *Id.* at 383-84 (brackets omitted). In *Lyondell*, the court dismissed fraudulent-transfer claims brought by the lenders' assignee because the lenders knew they were "lending for the purpose of financing an LBO, and that LBO proceeds would then go to stockholders—especially since … the loan documents required loan proceeds to be used for that purpose." *Id.* at 384-85.

34.     Similarly, in another leading case, lenders had "made loans to [the debtor] Idearc for the express purpose of financing Idearc's acquisition of Verizon's yellow pages business." *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 410 (N.D. Tex. 2012). "Under the terms of the spin-off agreement, these lenders 'required' that their loans to Idearc be used to pay Verizon for the yellow pages business." *Id.* The court accordingly held that the trustee could not sue in the lenders' shoes under § 544(b) to avoid the payment, explaining that fraudulent transfers are "not voidable where the benefit would run to a creditor that ratified the transfer" or "voluntarily assented to it." *Id.* at 411 (quotation marks omitted).[10]

---

[10]  Several other cases are in accord. *See, e.g.*, *Victory Med. Ctr. Beaumont, L.P. v. Conn. Gen. Life Ins. Co.*, 2018 WL 3467915, at *5-7 (E.D. Tex. July 17, 2018) (creditor's agreed settlement of claim estopped it from avoiding the settlement as a fraudulent transfer); *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 478-480 (W.D. Tex. 2013) (litigation trust could not sue under § 544(b) in lenders' shoes to avoid payment of loan proceeds as a shareholder dividend where the lenders' loan and offering documents disclosed and required the payment); *see also In re Adelphia Recovery Trust*, 634 F.3d 678, 691 (2d Cir. 2011) ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." (quotation marks omitted)).

35.     To be sure, a few decisions have held that a trustee may sue on behalf of lenders to avoid transfers that those lenders authorized where the lenders were allegedly misled about the debtor's ability to repay their loans and therefore purportedly did not have "full knowledge of all material facts." *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *12-13 (Bankr. D. Del. June 20, 2016) (quotation marks omitted); *In re Bos. Generating LLC*, 617 B.R. 442, 450-51, 493-95 (Bankr. S.D.N.Y. 2020), *aff'd on other grounds*, 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021), *aff'd on other grounds*, 2024 WL 4234886 (2d Cir. Sept. 19, 2024).  But that reasoning conflates the law of fraudulent *inducement* with the law of fraudulent *transfer*.  A borrower's misrepresentations regarding its creditworthiness may support a claim of fraudulent *inducement* that the lender was misled into making the *loan*, even if the lender knew that the borrower would use the loan proceeds to pay its shareholders.  On a claim of fraudulent *transfer*, however, the only knowledge the lender must have possessed to have consented to or ratified the borrower's *transfer* of the loan proceeds is that the borrower was going to *transfer*, not retain, the proceeds.

36.     Thus, in *Verizon*, it did not matter that the trustee alleged that the lenders had been "duped" or "tricked" by supposedly false representations about the debtor Idearc's creditworthiness; the lenders knew the only material fact that they needed to know for purposes of a fraudulent-transfer claim—that the funds would not be available to repay them in the event of Idearc's bankruptcy.  479 B.R. at 411 ("The plaintiff's claims are for fraudulent transfers, not for fraud"; "[b]ecause Idearc's lenders and bondholders had full knowledge of the transfers from Idearc to Verizon, they could not have brought fraudulent transfer claims").  So, too, in *Lyondell*, in which the trustee similarly alleged that the lenders were given false financial information,[11] the court explained:  "While more nuanced knowledge might be necessary to establish ratification in

---

[11]  *See* Second Am. Compl. ¶¶ 110, 151-152, *Weisfelner v. Fund 1*, Adv. Proc. No. 10-04609 (Bankr. S.D.N.Y. Dec. 19, 2011), ECF No. 253 (alleging borrower's projections were "inflated," "concocted," and "pulled from a hat").

other contexts, it is more than sufficient here for the LBO lenders to have known—as the documents themselves establish—that they were lending for the purposes of an LBO, and that the proceeds of their loans were going to stockholders." 503 B.R. at 385.[12]

37.     This conclusion accords with the purpose of fraudulent-transfer law—to prevent a debtor from *transferring* assets that creditors expected to be available to repay their claims. *See Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008). That rationale has no application to creditors who authorized the debtor to transfer the assets at issue.

38.     If the Noteholders believe they were misled into lending to Holdings, their remedy is to bring a fraudulent-*inducement* claim. The Trustee, acting as the Noteholders's assignee, has done just that; he has brought claims for statutory securities fraud and common-law fraud (Counts VI, IX). But to prevail on those claims, the Trustee must adequately allege and ultimately prove each element of the claims—including misrepresentation, scienter, and justifiable reliance. *See infra* Argument II.D. The Trustee cannot circumvent these basic legal requirements by asserting a fraudulent-*inducement* claim in the guise of a fraudulent-*transfer* claim.

39.     The Noteholders's consent to the transfers also precludes the same fraudulent-transfer claims asserted under § 548 in Counts I and II. Although § 548 differs slightly from § 544, the end result is the same: While a claim under § 548 is brought by the trustee on behalf of the estate, rather than in the shoes of a particular creditor, courts have held that a trustee may not use

---

[12]     In an analogous context, courts have dismissed intentional-fraudulent-transfer claims on the merits where the plaintiff merely alleged fraudulent *inducement* to invest in the debtor, not a fraudulent *transfer* of the proceeds. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("The fraud alleged … relates to the manner in which [the debtor] obtained new funding from the Noteholders, not [the debtor's] subsequent payment of … the proceeds to [the defendant]."); *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1510 (1st Cir. 1987) (Breyer, J.) ("Fraudulent conveyance law is basically concerned with *transfers* that 'hinder, delay or defraud' creditors; it is not ordinarily concerned with how such debts were created."); *In re Direct Access Partners, LLC*, 602 B.R. 495, 543 (Bankr. S.D.N.Y. 2019) ("[E]ven if the Trustee had proved that Headwaters and MC Holdings were defrauded into making additional investments [in the debtor], that would be a 'fraud' that is different from the one that the Trustee is required to prove here. … [T]he Trustee's claims need to focus on the intent with which transfers were made, not the manner in which money was raised.").

the Bankruptcy Code's avoidance and recovery powers where none of the estate's creditors who would benefit can legitimately claim to be harmed by the transfer—as is true here.

40.     Thus, in *Refco*, the court held that a trustee could not bring a § 548 fraudulent-transfer claim if the only beneficiary was the lender that knowingly funded the very payment that the trustee sought to recover.  *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *8-11 (S.D.N.Y. Nov. 13, 2009) (debtor's payment for shares with loan proceeds was required by lender's credit agreement), *R&R adopted*, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010).  "The avoidance power of a trustee depends on whether there is a legitimate creditor to take advantage of the recovery," but the lender's "intimate involvement in the transaction … [was] more than enough to disqualify" the lender.  *Id.* at *9, *11.  Similarly, in *Crescent Resources*, the court held that a trustee could not recover fraudulent transfers under § 550—which permits recovery of transfers avoided under §§ 544 and 548, but only "for the benefit of the estate"—to the extent that a recovery would benefit the very lenders that had authorized those transfers.  *See* 500 B.R. at 478-83.

41.     The same principle governs here.  The Trustee's § 548 claim, like the § 544 claim, is brought solely to benefit the Noteholders—sophisticated lenders that made their loans knowing that Holdings would use the proceeds to pay its shareholders so that the funds would not be available to repay the Noteholders.  A fraudulent-transfer claim cannot lie in these circumstances.

## II.    THE OTHER STATUTORY AND COMMON-LAW CLAIMS SHOULD BE DISMISSED

### A.    The Improper-Dividends Claim Should Be Dismissed (Count V)

42.     The Amended Complaint fails to cure the defects of the improper-dividends claim identified in the Trive Defendants' prior motion to dismiss.  Indeed, the Amended Complaint effectively concedes that the prior motion was correct in two respects:  (i) the claim was improperly asserted against three Trive Defendants that were not members of Holdings and did not receive distributions, and therefore were improper defendants; and (ii) the claim was improperly asserted

17

under Georgia law.  *See* Mem. Law Supp. Trive Defs.' Mot. Dismiss [D.I. 29] ("MTD") ¶¶ 45-48.
The Amended Complaint accordingly drops the claims against the three improper Trive
Defendants and under the Georgia statute.  Compl. ¶¶ 326-328; Ex. U (redline) (Count V).

43.    But the Amended Complaint still fails to cure the other, central legal defect
requiring dismissal of the claim.  The Trustee must plead facts plausibly establishing that each
Trive Defendant "knew at the time" that Holdings would be insolvent "after giving effect to" the
Holdings Distributions.  Del. Code Ann. tit. 6, § 18-607(a)-(b); *United States ex rel. Pilecki-Simko
v. Chubb Inst.*, 443 F. App'x 754, 759 (3d Cir. 2011) (knowledge must be alleged as to each
defendant).  The Amended Complaint fails to do so.

44.    To start, "group pleading" is prohibited, and each defendant "is entitled … to
receive notice of" the specific part it allegedly played.  *In re Zohar III, Corp.*, 2021 WL 3124298,
at *12 (Bankr. D. Del. July 23, 2021) (Owens, J.).  As the Trive Defendants argued in their prior
motion to dismiss (¶ 51), alleging that an undifferentiated group comprised of "Trive, Lucky
Bucks's managers, and the Management Defendants" knew that Lucky Bucks was supposedly
struggling financially, Compl. ¶ 206, does not suffice.  Nor does the allegation, stated in the passive
voice, that it "was known" that Holdings could not repay the Noteholders, *id.* ¶ 210—without
alleging *who* supposedly knew that, *see Brittingham v. Nunn*, 2020 WL 2404776, at *5 (D. Del.
May 12, 2020), another point the Trive Defendants previously argued (MTD ¶ 51).  If the Trustee
could have used the active voice to allege that the Trive Defendants so knew, he surely would
have.  His failure to do so, again, underscores his inability to do so.

45.    Nothing in the Amended Complaint plausibly suggests that the Trive Defendants
knew that the dividend payments would render Holdings insolvent.  It still alleges only that Mr.
Thadani and TCM "received real-time information regarding COAM attrition that revealed that

the financials distributed to the Noteholders were false."  Compl. ¶ 328; *id.* ¶¶ 32, 104-108, 146, 162, 188, 229.  It does not logically follow from that conclusory allegation that Holdings was *insolvent* at the time, let alone that the Trive Defendants *knew* that to be the case:  that Lucky Bucks's true financial condition was so much worse than what had been reported that its equity was worthless.  *Cf. In re Trinsum Grp., Inc.*, 460 B.R. 379, 392-93 (Bankr. S.D.N.Y. 2011) (alleging decreasing revenues and increasing debt "insufficient … to determine whether the Debtors were insolvent").[13]

46.    Indeed, aside from conclusory allegations, the Amended Complaint alleges only two instances of Trive's supposed receipt of "real-time information," both received long before the Notes were issued:  (1) a notice one year earlier, on November 20, 2020, that certain COAMs were up for renewal in the next ten days, and (2) a notice a few months later, on February 25, 2021, that COAMs at "a specific location" were being cancelled.  Compl. ¶¶ 104-108.  No facts are alleged suggesting that these isolated instances had any material effect on the attrition rate.  And the Amended Complaint all but admits that TCM and Mr. Thadani may "not have known about Lucky Bucks's declining performance in the second half of 2021."  *Id.* ¶¶ 162-163, 188-189.  The Trustee thus fails to allege facts plausibly suggesting that the Trive Defendants "knew" that Lucky Bucks was losing COAMs at any significant rate, much less that they "knew" that Holdings was insolvent.  To the contrary, the "bs" email now highlighted by the Trustee shows that a few months before the dividends were paid the Trive Defendants were discussing investing more "capital" into Lucky Bucks.  Compl. ¶ 175; Ex. T.  And the very valuation that the Complaint itself touts shows

---

[13]   For the same reasons, the Amended Complaint fails to plead facts permitting an inference that Holdings was insolvent merely by alleging that its reported EBITDA was allegedly inflated in some unquantified way; that Mr. Thadani allegedly suggested postponing one acquisition until after a lender call given the "temporary" financial profile after the Notes issuance in November; or that months after the Holdings Distributions, the company paid for some COAMs over two months instead of one.  Compl. ¶¶ 170, 180, 206-210.

that TCM valued Lucky Bucks's equity at over $352 million, which strongly undercuts any allegation that the Trive Defendants believed Lucky Bucks was insolvent.  *See infra* ¶ 74.

B.    **The Georgia Statutory Claims Are Impermissibly Extraterritorial (Counts VI-VIII)**

47.    The three Georgia statutory claims should be dismissed because, under both Georgia law and the U.S. Constitution's Dormant Commerce Clause, Georgia's securities-fraud and anti-racketeering statutes may not be applied extraterritorially, and the alleged transactions involving the Trive Defendants did not take place in, or involve parties from, Georgia.  The Trive Defendants also raised these deficiencies in their prior motion to dismiss.  *See* MTD ¶¶ 54-60.  But the Trustee still cannot make any meaningful allegations tying the Trive Defendants to Georgia.

48.    The Trustee's resort to Georgia law is especially inappropriate because no such claims are available in the other states whose law might govern—such as New York (where many of the Noteholders are located, and whose law the parties chose to govern the Notes) or Texas (where the Trive Defendants are located).  Unlike Georgia's statute, New York's anti-racketeering statute does not "provide a private right of action … for those injured by criminal enterprise." *CityTrust v. Mermelstein*, 1988 WL 243506, at *1 (N.Y. Sup. Ct. Dec. 1, 1988) (citing N.Y. C.P.L.R. § 1353).  New York's securities-fraud statute likewise does not provide for a private right of action.  *Kerusa Co. v. W10Z/515 Real Est. Ltd. P'ship*, 906 N.E.2d 1049, 1054 (N.Y. 2009). Texas's anti-racketeering statute similarly "does not authorize suit by a person or enterprise that sustains injury as a result of racketeering." Tex. Civ. Prac. & Rem. Code Ann. § 140A.101(b); *Leday v. CarMax Bus. Servs., LLC*, 2024 WL 3626511, at *4 (S.D. Tex. July 1, 2024).  While, as discussed below, no relevant events occurred in Delaware, Delaware's anti-racketeering statute provides no private cause of action where, as here, the defendant has not been criminally convicted. *State v. Wang*, 2020 WL 1873377, at *4 (Del. Sup. Ct. Apr. 15, 2020).

49.     Applying Georgia's statutes here would accordingly displace the statutory regimes of other, more relevant states—which would otherwise foreclose Plaintiff's claims.  That puts the Dormant Commerce Clause problem into particular focus, considering that—as discussed below— the Clause protects against "the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336-37 (1989).

50.     The lack of any basis under Georgia law to apply the Georgia statute is plain. "Georgia statutes have a presumption against extraterritorial application.  Thus, absent a clear statement to the contrary, the Georgia courts refrain from applying statutes extraterritorially." *Auld v. Forbes*, 848 S.E.2d 876, 881 (Ga. 2020) (quotation marks omitted).  Neither the Georgia securities-fraud nor anti-racketeering statute includes a clear statement of legislative intent to apply extraterritorially.

51.     Furthermore, construing Georgia's securities-fraud and anti-racketeering statutes to reach the out-of-state transactions at issue would violate the Dormant Commerce Clause.  That Clause bars states from regulating commercial transactions that occur "'wholly outside' the boundaries of the state." *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999); *see Healy*, 491 U.S. at 336-37 (state law violates Dormant Commerce Clause if its "practical effect … is to control conduct beyond the boundaries of the State").  The mere fact that an out-of-state transaction may "ha[ve] effects within the State" does not mean that it has occurred "within" the state for purposes of the Clause.  *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality).

52.     Given the Dormant Commerce Clause, courts routinely dismiss claims brought under state securities statutes directed to out-of-state transactions.  *See, e.g.*, *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 755 F. Supp. 2d 857, 875-88 (S.D. Ohio 2010) (dismissing Ohio securities-law claims brought by purchasers of securities distributed by Ohio licensee because

relevant transactions took place outside Ohio).[14]  This is not to say that *all aspects* of a transaction must occur within the regulating state to be consistent with the Clause.  Occasionally, states have been permitted to regulate cross-border transactions where a substantial portion of the transaction occurs in-state (*e.g.*, the offeror is a resident of the state).  *See A.S. Goldmen*, 163 F.3d at 786-89 (rejecting constitutional challenge to New Jersey's application of its securities law to block transaction between brokers in New Jersey and buyers in New York); *McCullough v. Leede Oil & Gas, Inc.*, 617 F. Supp. 384, 389 (W.D. Okla. 1985) (Oklahoma securities statute can apply when an offer to sell is made or accepted in Oklahoma).  But those are not the facts here, according to the Trustee's own Amended Complaint.

53.    The Georgia statutory claims are premised on transactions that were executed outside, and did not involve entities that conducted business in, Georgia.  The Notes were issued by Holdings—a Delaware LLC—to Noteholders, all of which are located outside Georgia.  And, critically, none of the Trive Defendants is alleged to have been based *in* Georgia or to have made a single supposed misrepresentation *from* Georgia.  Just the opposite, the Trustee alleges that Mr. Thadani lives and works in Texas; that the other Trive Defendants are Delaware corporations; that TCM is based in Texas; and that the other Trive entities are "managed" or "controlled" by TCM, with no alleged Georgia operations.  Compl. ¶¶ 36-43, 340.  Tellingly, the Trustee does not allege that the Trive Defendants were ever even present in Georgia when the alleged misstatements were made—in contrast to certain management defendants who allegedly "were frequently conducting business from Lucky Bucks's headquarters in Georgia."  *Id.* ¶¶ 154, 339.  The Trustee merely alleges that other parties—Ontario residents Mr. Boyden and Mr. Ijaz—took a few short trips to

---

[14]  *See also Ariz. Corp. Comm'n v. Media Prods., Inc.*, 763 P.2d 527, 528, 531-34 (Ariz. Ct. App. 1988) (Arizona's securities statute could not be constitutionally applied to Delaware corporation with principal office in Arizona because the securities were sold from Washington to residents of states other than Arizona).

Georgia that "coincided" with calls between Trive and the Noteholders.  *Id.* ¶¶ 49, 54, 154.

54.     That Holdings's indirect subsidiary, Lucky Bucks, operated in Georgia makes no difference.  This case is brought on behalf of Holdings and the Noteholders, and Plaintiff asserts claims based on Holdings's issuance of the Notes and payment of the proceeds to its shareholders.  The location of an operating subsidy has little, if anything, to do with where "an offer [by a separate parent entity] is made … and accepted" and thus is irrelevant to determining where "th[e] elements of the transaction have occurred."  *A.S. Goldmen*, 163 F.3d at 787.

55.     Evidently recognizing these deficiencies, the Trustee added a few new allegations in the Amended Complaint to attempt to tie *other defendants* to Georgia.  But all the Trustee could muster as to the Trive Defendants was that they allegedly "directed the activities of Lucky Bucks's Georgia-based employees in compiling written materials and responses to diligence questions."  Compl. ¶ 340.  There is no allegation that those unspecified responses were false, much less that the Trive Defendants "directed" anyone to misrepresent anything.   And in any event, there continues to be no allegation that the Trive Defendants gave any directions to anyone *from* Georgia.  Instead, the complaint alleges only that the Trive Defendants "made misstatements to the Noteholders from Texas," not Georgia.  *Id.*  That matters; to assert claims under Georgia law against the Trive Defendants (as opposed to other defendants), the Trustee must tie the Trive Defendants themselves (not merely other defendants) to Georgia, and he has failed to do so.[15]  Also insufficient is the new group-pleading allegation that the Trive Defendants, Mr. Thadani, and the management defendants collectively directed Holdings to enter into the Notes transaction and make representations in the Note Purchase Agreement.   The Trustee does not allege that the

---

[15] *See ABB Daimler-Benz Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp.*, 14 F. Supp. 2d 75, 88 (D.D.C. 1998) ("The law of different states may be applied to different defendants."); *see also Jaurequi v. John Deere Co.*, 986 F.2d 170, 173 (7th Cir. 1993) (agreeing district court failed to conduct a "separate conflicts analysis as to each defendant's conduct").

Agreement was executed in Georgia or that Mr. Boyden, who signed the Agreement on behalf of Holdings, or any of the Noteholders were in Georgia at the time.  Compl. ¶¶ 49, 154, 192, 339-341 (alleging only that Toronto-based Mr. Boyden signed a term sheet for the Agreement on a trip to Georgia and that he made two other trips to Georgia, neither occurring when the Agreement was executed on November 29, 2021).

## C.    The Delaware Statutory Securities-Fraud Claim Is Impermissibly Extraterritorial (Count VI)

56.    Evidently recognizing that his Georgia statutory claims are problematic, the Trustee amended the complaint to add statutory securities-fraud claims under Texas and Delaware law. But the Delaware claim fails because the Delaware Securities Act, like the Georgia statutes, does not extend extraterritorially to the alleged conduct, which occurred outside of Delaware.  (The Texas claims against the Trive Defendants may not be impermissibly extraterritorial, but they fail for other reasons discussed below.)

57.    The Delaware Securities Act (Del. Code Ann. tit. 6, § 73-101 *et seq.*) "does not apply to a Delaware corporation [like Holdings] simply by virtue of the act of incorporating in Delaware." *FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 853 (Del. Ch.), *aff'd*, 148 A.3d 1171 (Del. 2016).  The statute does not "introduce Delaware commercial law into the internal affairs of corporations merely because they are chartered" in Delaware.  *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701, 703-04 (Del. 1983).

58.    The Trustee does not allege that any misrepresentations that the Trive Defendants allegedly made (or directed Holdings to make) "occurred in Delaware," and thus cannot establish "the requisite nexus" between the Trive Defendants (or Holdings) and Delaware.  *FdG*, 131 A.3d at 854.  Indeed, the Amended Complaint does not allege that any of Holdings's directors or the

other management defendants, or any of the Trive Defendants, were ever in Delaware, or that any of them made any misrepresentations from Delaware. Nor does it allege that any of the Noteholders were in Delaware. Compl. ¶¶ 154, 339-341. The *sole* connection to Delaware is that Holdings was incorporated there. *Id.* ¶ 341. That is legally insufficient under both Delaware's extraterritoriality principle and the Dormant Commerce Clause (*supra* Argument II.B).

### D. The State-Law Statutory And Common-Law Claims Fail For Lack of Falsity And/Or Justifiable Reliance (Counts VI, VII, VIII, IX, X)

59.     In addition to the statutory securities-fraud and racketeering claims (Counts VI-VIII), the Amended Complaint asserts two common-law claims: fraud (Count IX) and negligent misrepresentation (Count X). All of these claims fail because they rely on statements by the Trive Defendants that either were demonstrably true, or were future, subjective forecasts or mere "puffery" that, under well-established law, cannot support a claim of misrepresentation. The Trustee also has not adequately pleaded justifiable reliance on any such misrepresentation, which is a required element of all of the common-law (and Georgia statutory) claims. And the negligent misrepresentation claim fails for the further reasons that the Trive Defendants did not owe any "duty" of care to the Noteholders, and, at least in Texas, the claim is time-barred.

60.     The Court can resolve this motion without deciding which state's law governs the common-law claims.[16] The two states potentially having the "most significant relationship" to Plaintiff's claims against the Trive Defendants are New York, where the Note Purchase Agreement was executed (and whose laws govern that agreement; *see* Ex. B § 10.14(a)) and several Noteholders are based, or Texas, where TCM is headquartered.[17] However, with respect to both

---

[16] A choice-of-law determination is unnecessary unless the competing jurisdictions' laws conflict on a relevant point. *Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*, 319 F. App'x 137, 140 (3d Cir. 2009). If a conflict exists, Delaware employs the "most significant relationship" test drawn from the Restatement (Second) of Conflict of Laws. *Id.* at 141; Restatement (Second) of Conflict of Laws § 188 (Am. L. Inst. 1971).

[17] *See Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 733-34 (D. Del. 2014) (state where plaintiff relied on misrepresentations and was based had most significant relationship); *Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*,

fraud[18] and negligent misrepresentation,[19] there is no material difference in the law of those two states (or even of Georgia or Delaware, whose law should not apply in any event).

### 1. Most of the alleged misstatements were not false statements of fact at all

61.    To plead fraud or negligent misrepresentation, the Trustee must allege, among other things, that the defendant made a false statement of fact.[20]  The Trustee's claims fail to the extent that the underlying "misstatements" either are not alleged to have been false, or were demonstrably not false as made clear by the key documents incorporated in the Amended Complaint.  The Trive Defendants raised these deficiencies in their prior motion to dismiss.  *See* MTD ¶¶ 63-67.  Yet, the Amended Complaint adds virtually no new substantive allegations with respect to the Trive Defendants.  *See* Ex. U (redline of complaints).

62.    ***CIM's "implied" attrition rate.***  Plaintiff asserts that the CIM misrepresented attrition—*i.e.*, the number of COAM locations Lucky Bucks was losing—by implying a *projected* "attrition rate of less than 1% per year." Compl. ¶ 156; *id.* ¶¶ 20, 24, 148, 156-157, 261.  That was allegedly false because the actual attrition rate for the second half of 2021 later turned out to be 11.1%.  *See id.* ¶¶ 24, 158-159.  As a threshold matter, the Amended Complaint alleges that *Houlihan Lokey* prepared the CIM, and thus even if there were a false statement, it was not made by the Trive Defendants.  *Id.* ¶ 131.  Presumably recognizing as much, the Amended Complaint

---

710 F. Supp. 2d 458, 467-72, 475 (D. Del. 2010) (same).

[18]  *See, e.g.*, *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam) (New York law); *Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 636 (S.D. Tex. 2007) (Texas law); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 192 B.R. 342, 354 (Bankr. S.D.N.Y. 1994) (Georgia law), *aff'd*, 194 B.R. 728 (S.D.N.Y. 1995); *Matrix Parent, Inc. v. Audax Mgmt. Co.*, 319 A.3d 909, 932 (Del. Super. Ct. 2024) (Delaware law).

[19]  *See, e.g.*, *In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 81 (Bankr. D. Del. 2022) (New York, Delaware); *Elliot v. Nelson*, 301 F. Supp. 2d 284, 287 (S.D.N.Y. 2004) (New York); *Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.*, 117 F. Supp. 2d 1357, 1360 (N.D. Ga. 2000) (Georgia); *Gutierrez v. Allstate Fire & Cas. Ins. Co.*, 2017 WL 2378298, at *5 (N.D. Tex. June 1, 2017) (Texas).

[20]  *See supra* Argument II.D nn.18 (fraud), 19 (negligent misrepresentation). The Texas statutory securities-fraud claim (and the Georgia and Delaware statutory securities-fraud and RICO claims premised on securities-fraud and wire-fraud violations) similarly require a false statement of material fact by the defendant (or omission of material fact rendering the statements made misleading, discussed *infra* Argument II.D.4-5).  *See, e.g.*, *Greenwald v. Odom*, 723 S.E.2d 305, 312 (Ga. Ct. App. 2012); *Griffin v. State Bank of Cochran*, 718 S.E.2d 35, 41 (Ga. Ct. App. 2011).

adds the conclusory assertion that the CIM was "prepared by Lucky Bucks's advisors *at the direction and with the assistance of* the Trive entities, [Mr.] Thadani, and the Management Defendants." *Id.* ¶ 9 (emphasis added).  But Plaintiff does not allege that the Trive Defendants' unspecified "direction" or "assistance" resulted in this (or any other) alleged misrepresentation in the CIM.  Indeed, the notion that the Trive Defendants (or management defendants) could compel Houlihan Lokey to commit fraud (*see id.* ¶¶ 9, 131)—at grave risk to its own reputation as a leading investment bank[21]—is implausible and unsupported by any factual allegations.

63.     In any event, the CIM nowhere stated an actual rate of attrition for 2021; it stated merely that 20 contracts would expire in 2021 and that the contract renewal rate in 2020 had been 86%.  Ex. A at 36.  The Amended Complaint does not allege that either of these historical data points was false.  Instead, Plaintiff alleges that the 2020 renewal rate, if applied mechanically to "the percentage of contracts expiring each year," "*implied*" a future "attrition rate of less than 1%" per year.  Compl. ¶ 148 (emphasis added).  The CIM made no such statement.  And to the extent this conclusion was somehow "implied," *id.*, it was, at most, a *prediction about the future*, extrapolated from accurate present-day data—not an actionably false statement of historical fact, *see Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006) ("opinions and predictions" are "generally not actionable"), *aff'd*, 931 A.2d 438 (Del. 2007); *infra* II.D.2.

64.     In an apparent effort to cure these deficiencies, which the Trive Defendants raised before (MTD ¶¶ 64-65), the Trustee amended the complaint to allege that the CIM's revenue and EBITDA projections "*implied*" less than 1% attrition by "assum[ing] a constant number of 500 locations through 2027."  Compl. ¶ 148 (emphasis added).  But assuming a constant level of 500

---

[21]  On its homepage, Houlihan Lokey states that it is the "Most Active Advisor to Private Equity—Globally," "No. 1 Investment Bank for All Global M&A Transactions," and "No. 1 Global Investment Banking Restructuring Advisor." Houlihan Lokey, https://hl.com/ (last visited Mar. 17, 2025).

locations did not imply anything about the future level of attrition.  It merely assumed that the loss of any existing contracts would be replaced by an equivalent number of newly acquired contracts. This was a reasonable, *if not conservative*, assumption given the company's M&A strategy at the time and its long history of growth through acquisitions.  *See* Ex. A at 38, 44.  And, critically, this too was a forward-looking prediction about the future, not an actionably false statement of historical fact.

65.     ***CIM's pro forma numbers.***  Plaintiff alleges that Mr. Thadani and the CIM pointed to Lucky Bucks's projected "'pro forma' EBITDA" for the 12 months ending on March 31, 2021, instead of presenting the company's supposed "recent poor performance."  Compl. ¶¶ 9, 173, 249. But the 12-month pro forma EBITDA was clearly labeled as such, *see* Ex. at A at 13, 39, 45, and the Amended Complaint nowhere alleges that Mr. Thadani represented it to be anything other than what it was.  The Noteholders recognized as much, as evidenced by their "questions about developments" for periods after the 12 months covered by the pro forma numbers.  Compl. ¶ 173.

66.     Here, again, the Trustee's efforts to cure the original complaint's inadequacies fail. The principal new factual allegation the Trustee added was the Trive Defendants' supposed recognition that Lucky Bucks's financials were "bullshit"—an obvious mischaracterization of a reference to a "balance sheet" that does nothing to help the Trustee, as discussed above.  *See supra* at 3-4.  Indeed, the email plainly shows Trive's interest in investing *more* of its own capital with Lucky Bucks, thus rendering implausible any allegation that the Trive Defendants knew that Lucky Bucks was failing.  *See* Ex. T; *Iqbal*, 556 U.S. at 677-78 (even under the lesser Rule 8 pleading standard, a complaint must allege sufficient facts to "state a claim to relief that is plausible on its face" (quotation marks omitted)).

67.     The Amended Complaint also adds an allegation regarding inquiries that the

Noteholders supposedly made about developments after the 12-month period covered by the "pro forma" numbers.  In an email to various management defendants and Mr. Thadani, Houlihan allegedly urged that the response provide context showing that the decline in EBITDA since the end of the 12-month period had been accompanied by "offsetting" "growth" from the "acquisition pipeline."  For his part, Mr. Thadani requested that the management defendants "put together materials to share with the prospective Noteholders," and allegedly observed that if certain information were volunteered, the Noteholders might request monthly financials.  Compl. ¶ 173. But far from misrepresenting anything, these allegations indicate that Houlihan merely suggested including the offsetting growth along with the decline, which would provide a more complete picture of Lucky Bucks's financial prospects.  *See id.*  And there is no allegation that Mr. Thadani requested that the management defendants provide any false information. As for the alleged omission of certain details in the information provided, the Noteholders were experienced investors who conducted their own diligence and who could have requested whatever data they believed they needed to evaluate the investment opportunity.  The Amended Complaint does not allege that the Noteholders ever requested monthly financials, or that, if they did, the Trive Defendants or anyone else refused those requests or gave any false information in response.  That is fatal to the Trustee's claims of fraud.  *See HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 68 (App. Div. 2012) (dismissing fraud claim; "[i]n the context of arm's length dealing between sophisticated parties," defendant "had no obligation to disclose internal analyses for which [plaintiff] made no request"); *Stuart Lipsky, P.C. v. Price*, 625 N.Y.S.2d 563, 564 (App. Div. 1995) (affirming dismissal of fraud claim where plaintiffs "chose to rely solely upon the alleged oral representations without any effort to verify that information via financial statements").

68.     ***Solvency certificate from management.***   The Amended Complaint alleges that Mr. Boyden made false statements in Holdings's solvency certificate.  Compl. ¶¶ 179-180.  But, as noted, the Trustee does not plead facts permitting an inference that the Trive Defendants knew that Holdings was, in fact, insolvent at the time.  *See supra* Argument II.A.  And Mr. Boyden is not alleged to have represented that any particular form of solvency investigation had been performed; rather, he merely stated that he had made, or caused to be made, "such examination or investigation as [wa]s necessary to enable [him] to express an informed opinion."  Compl. ¶ 179.  Plaintiff alleges no facts showing that this statement was false.  Finally, while the Amended Complaint alleges that the Trive Defendants designated Mr. Boyden to the boards of Holdings and Lucky Bucks, *id.* ¶ 49, it does not allege that they employed (or otherwise controlled) him.  Thus, even if his statement were false, it cannot be attributed to Trive.  *See Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995, 1012 (N.D. Cal. 2024) (dismissing securities-fraud claim against shareholder whose board appointee allegedly made misrepresentations because appointee was not an employee of the shareholder or controlled by it).

69.     ***Compliance with GLC orders.***   The Trustee asserts that "Trive and the Management Defendants" caused Lucky Bucks to misrepresent that the company was "in compliance with all GLC orders and regulations, including the GLC's ban of Damani's participation in the management of the business."  Compl. ¶ 183.  That was allegedly false because "Damani was still directing the Company's M&A strategy and still had the ability to nominate a manager to the Company's board of managers."  *Id.* ¶ 184.  But the Trustee alleges that the GLC's order only prohibited Mr. Damani from serving as an "officer" of Lucky Bucks or exercising "operational control" over its business, *id.* ¶ 78, and the Amended Complaint does not allege that Mr. Damani remained an officer or continued to exercise any such control.  Rather, it alleges only

that Mr. Damani "identif[ied] and present[ed] M&A opportunities," which the management defendants (or Mr. Thadani) then evaluated and pursued on behalf of Lucky Bucks. *Id.* ¶¶ 45, 78, 94-95. And Mr. Damani was able to nominate a director because his company, LBVI, remained a shareholder, a fact that is not alleged to have been hidden from anyone. *Id.* ¶ 85; Ex. A at 8 & n.3.

70. ***Representations in the Note Purchase Agreement.*** Evidently recognizing that the original complaint was inadequate, the Trustee added the conclusory assertion in the Amended Complaint that "[t]he Trive Defendants and Management Defendants, through their control of Holdings, caused Holdings" to make alleged misrepresentations in the Note Purchase Agreement that Lucky Bucks' financial statements were accurate, and that Lucky Bucks was in compliance with gaming laws. Compl. ¶¶ 193-197 (citing NPA ¶¶ 5.01, 5.05, 5.13, 5.20). But the Trustee does not allege that Lucky Bucks's historical financial statements were, in fact, false, let alone materially so. And to the extent that the Agreement's representations were supposedly false due to the supposed misstatements regarding the "implied" attrition rate, pro forma EBITDA, and compliance with GLC orders, those allegations fail for the reasons discussed above (or *infra* Argument II.D.2). *Cf.* Ex. B (NPA) ¶¶ 5.05, 5.13 (representing merely that the financial statements were "materially" correct "*provided* that, with respect to projected financial information," "such projections" are "subject to significant uncertainties" and "actual results … may differ significantly from the projected results" in "material" ways).

2. The remaining alleged misstatements were opinions or future predictions that are not actionable false statements

71. The Trustee's claims likewise fail as to the remaining alleged misstatements ascribed to the Trive Defendants. Those statements are not actionable because, at most, they amount to "puffery," subjective statements of opinion, or forward-looking statements. *See Ironwoods Troy, LLC v. OptiGolf Troy, LLC*, 166 N.Y.S.3d 730, 734 (App. Div. 2022) ("mere

puffery, opinions of value or future expectations, rather than false statements of value" are not actionable (quotation marks omitted)); *Xia Bi v. McAuliffe*, 927 F.3d 177, 183 (4th Cir. 2019) (forward-looking projections and puffery "rarely qualify as material misstatements under federal and state law"). These forms of statements are often used to convey confidence without implying factual guarantees—and thus are not actionable. *See, e.g.*, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).

72.     Here, the alleged statements that Lucky Bucks had a strong "farm team" of sales personnel, Compl. ¶¶ 138-142, 265, and that Lucky Bucks had a strong relationship with the GLC, *see id.* ¶¶ 12, 141, 182, were inactionable puffery—*i.e.*, subjective, optimistic statements used to convey confidence, rather than materially or verifiably false statements of fact. *See Longo v. Butler Equities II, L.P.*, 718 N.Y.S.2d 30, 31 (App. Div. 2000) (fraud allegations "deficient" because "alleged misrepresentations that the target company was seriously undervalued … can only be understood as nonactionable expressions of opinion, mere puffing"). Similarly, Mr. Thadani's alleged explanations to the Noteholders in 2022 for Lucky Bucks's disappointing results, *id.* ¶¶ 22, 220-221, amounted to nothing more than his own subjective perspective.

73.     Other alleged misrepresentations attributed to the Trive Defendants fall squarely within the category of forward-looking statements and projections of future value, which are inherently non-actionable. *See Bd. of Managers of 147 Waverly Place Condo. v. KMG Waverly, LLC*, 10 N.Y.S.3d 537, 537 (App. Div. 2015) ("[P]redictions of future events … cannot sustain an action for fraud."); *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 538-539 (S.D.N.Y. 2024) (revenue, EBITDA, and profit projections accompanied by cautionary language were inactionable forward-looking statements).[22] Mr. Thadani's alleged statements in the fall of 2021

---

[22] *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) ("A forward-looking statement accompanied by sufficient cautionary language is not actionable [as securities fraud] because no reasonable investor

that he believed that Lucky Bucks's business was worth more than $1 billion, Compl. ¶ 144, and

that its "run rate EBITDA" was close to $115 million, *id.* ¶ 140, as well as his confidence that

Lucky Bucks's M&A pipeline was strong and would allow Lucky Bucks to outgrow its significant

leverage, *id.* ¶¶ 18, 142, 164, 167, 169, were subjective assessments and projections (based upon

Mr. Thadani's analysis and conversations with management, investment bankers, and potential

buyers) rooted in predictions about future revenues—not concrete, actionable assertions of

historical fact.[23]  The run-rate EBITDA simply acknowledged that additional acquisitions would

likely enhance the company's financial standing.  The Amended Complaint does not allege that

Mr. Thadani described the run-rate EBITDA (or the CIM's pro forma EBITDA) as anything other

than a forward-looking projection informed by the past performance of newly acquired locations.

Nor does it allege that Mr. Thadani misrepresented any of the historical data underpinning any of

these projections.

74.     Furthermore, Plaintiff's allegation that the Trive Defendants' own valuation of

Lucky Bucks never approached the $1 billion valuation that Mr. Thadani allegedly communicated

to the Noteholders, *see* Compl. ¶ 145, misconstrues the documents integral to the Amended

Complaint.  Citing a May 2021 "Portfolio Company Valuation" by Trive, the Amended Complaint

claims that Trive valued Lucky Bucks's business as worth only $352 million, "barely over a third

_____

could have found the statement materially misleading."); *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12,
39-40 (S.D.N.Y. 2016) (statements of preliminary earnings results were forward-looking).  The CIM included
disclaimers warning investors that "forward-looking" statements involved risks that could cause actual results to differ
materially from such predictions.  *See supra* Background A.2; *Lopez*, 173 F. Supp. 3d at 39 (press release identifying
"various risks and uncertainties" that could cause "actual results [to] vary materially from those indicated in these
statements" was a "meaningful cautionary statement[]" (second alteration added)); *In re Adient plc Sec. Litig.*, 2020
WL 1644018, at *20 (S.D.N.Y. Apr. 2, 2020) (similar), *aff'd sub nom. Bristol Cnty. Ret. Sys. v. Adient PLC*, 2022 WL
2824260 (2d Cir. July 20, 2022).

[23] While this Court must accept for purposes of this Motion any well-pleaded allegations in the Amended Complaint,
Plaintiff also has an obligation to make only those allegations for which he has a reasonable basis.  The Rule 2004
discovery provided to Plaintiff includes detailed decks and other analyses prepared in early 2022 by leading investment
bankers and potential buyers suggesting that, even after taking account of the Holdings Distributions, Lucky Bucks
was, indeed, worth more than $1 billion.  If any aspect of this case survives this motion, the Trive Defendants look
forward to presenting that evidence to the Court.

of the false valuation [of $1 billion] [Mr.] Thadani shared with [the] Noteholders." *Id.*  But, in fact, that valuation, which the Court may consider on this motion, *see supra* note 4, was *not* a valuation of the overall company, but rather only of the company's *equity* (its shares).  *Id.* ¶ 145 (Trive valuation "indicated that Trive's 56% full *equity ownership* in Lucky Bucks was worth $197.5 million—implying an overall valuation [*of all Lucky Bucks equity*] of approximately $352 million.") (emphasis added); Ex. V (Trive Valuation) at 18.  The $1 billion figure that Mr. Thadani allegedly touted, by contrast, was of Lucky Bucks's *enterprise value*, the overall value of the company's assets, without any deduction for its debts.  The Trustee is thus comparing apples to oranges.  The value of a company's equity is naturally less than its enterprise value—often much smaller—because the equity has value only to the extent that the company's enterprise value exceeds its debt.  *Cf.* Compl. ¶ 144 (distinguishing between Lucky Bucks's "equity value" and "enterprise value").  Moreover, the fact that Trive believed that Lucky Bucks's equity—alone—was worth hundreds of millions of dollars, in early 2021, hardly implies that it did not believe that the overall enterprise value of the company was much higher, later, when the Notes were being marketed in the fall of 2021.  Indeed, Trive performed its own internal valuation of the equity when Lucky Bucks's EBITDA was materially smaller ($79 million).  *See* Ex. V at 19.  By the time the Notes were marketed and Mr. Thadani allegedly stated the $1 billion valuation, Lucky Bucks had acquired many new COAM locations that had increased its pro forma EBITDA to $100 million.  *See* Ex. A at 13.

75.    The Trustee's allegation that the CIM falsely claimed that Lucky Bucks "would require virtually no capital expenditures to maintain a stable level of locations," Compl. ¶ 208, fares no better. The CIM simply made forward-looking projections of "low annual maintenance capital expenditures primarily related to machine upgrades."  Ex. A at 50.  The Trustee does not

  
allege that the statements regarding past years' capital expenditures, which ranged from $1.4 to $4.3 million between 2017 and 2021, *id.*, were in any respect false.

3.    Even if the alleged misrepresentations were actionable, the Noteholders could not have justifiably relied upon them

76.    To plead fraud or negligent misrepresentation, Plaintiff must allege that the Noteholders "reasonably or justifiably relied on" the alleged misrepresentations. *PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3d 79, 94 (2d Cir. 2019) (New York law).[24] Courts regularly dismiss claims at the pleading stage where, as here, the allegations do not support an inference of reasonable or justifiable reliance.[25]

77.    The Trustee's own allegations show that the Noteholders could have discovered through due diligence all the facts that the Amended Complaint alleges they did not know. *See Ironwoods Troy*, 166 N.Y.S.3d at 734; *Rapaport v. Strategic Fin. Sols., LLC*, 140 N.Y.S.3d 508, 509 (App. Div. 2021) ("The element of justifiable reliance is lacking where a sophisticated party enters into an arms-length transaction and, with the exercise of ordinary intelligence, could have protected itself through due diligence concerning the transaction." (quotation marks omitted)). Justifiable reliance "entails a duty to investigate the legitimacy of an investment opportunity," especially where the plaintiff is on notice of facts indicating potential risks. *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 444-45 (S.D.N.Y. 2012) (quotation marks omitted). And "the greater the sophistication of the investor, the more inquiry that is required." *Crigger v.*

---

[24]    Justifiable reliance is also an element of fraud and negligent misrepresentation claims under Texas law, *see JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018); Delaware law, *see Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014); Georgia common law, *see Daniel Def., LLC v. Tactical Edge, LLC*, 2024 WL 474192, at *6 (S.D. Ga. Feb. 7, 2024); and the Georgia securities-fraud statute, *see Greenwald*, 723 S.E.2d at 312; *Griffin*, 718 S.E.2d at 41.

[25]    *See, e.g.*, *Allison v. Round Table Inv. Mgmt. Co.*, 447 F. App'x 274, 275 (2d Cir. 2012); *Higgins v. 120 Riverside Boulevard at Trump Place Condo.*, 2022 WL 3920044, at *34 (S.D.N.Y. Aug. 31, 2022); *Scott v. PNC Bank, Nat'l Ass'n*, 785 F. App'x 916, 921 (3d Cir. 2019); *In re Evergreen Energy, Inc.*, 546 B.R. 549, 560 (Bankr. D. Del. 2016); *Parker v. Learn The Skills Corp.*, 219 F. App'x 187, 190 (3d Cir. 2007) (per curiam); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 260 (S.D.N.Y. 1999).

*Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006).

78.     Here, the CIM included multiple disclaimers making absolutely clear that the information provided was far from exhaustive and urging prospective investors to conduct their own due diligence.  The Noteholders were highly "sophisticated" investors who knew that Lucky Bucks operated in a "nascent" industry, Compl. ¶ 189; that they were investing in a "super holdco" structure that subordinated the Notes to Lucky Bucks's creditors, *id.* ¶ 7; and that the proceeds of the Notes would be paid to Holdings's shareholders, *id.* ¶ 172; *supra* Background A.2.  The Amended Complaint admits that the Noteholders "asked extensive due diligence questions to evaluate management and Thadani's claims," Compl. ¶ 190(a), and that the management defendants responded to those requests with information that is not alleged to have been false, *id.* ¶¶ 136-137.  Yet, the Noteholders apparently never sought or obtained the "weekly updates" and "real-time information" that the Trive Defendants allegedly sought and obtained—that would allegedly have shown the supposed "poor results" and "attrition" in Lucky Bucks's operations.  *Id.* ¶ 188.  In light of all of this, the Noteholders's reliance on the supposed misstatements was not justifiable.  *Granite Partners*, 58 F. Supp. 2d at 260-61 ("sophisticated" parties are held to higher standard "in terms of the type and amount of diligence" required (quotation marks omitted)); *accord Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997).[26]  The Noteholders have no one to blame but themselves for not bothering to seek the information the Trustee, as their assignee, now claims was so critical.

4.     <u>The Trive Defendants cannot be liable for fraud by omission</u>

79.     The Trustee alleges that the supposed misrepresentations were also accompanied

---

[26] *See also Subramanian v. Lupin Inc.*, 2020 WL 7029273, at *16 (S.D.N.Y. Aug. 21, 2020) (same), *R&R adopted*, 2020 WL 6075523 (S.D.N.Y. Oct. 15, 2020); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 322 (S.D.N.Y. 2002) (same); *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 706-07 (S.D.N.Y. 2012) (similar, finding in part the sophistication of plaintiffs rendered justifiable reliance on counterparty's statements implausible).

by "omissions" of material facts.  *See* Compl. ¶ 384.  But the Trustee fails to plead with particularity what any of those supposed "omissions" were.

80.     In any event, fraud by omission is not actionable absent a duty to disclose, and the Trive Defendants did not have any such duty.  *See LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 515 (S.D.N.Y. 2014) ("[W]here fraud is allegedly perpetrated by omission, Defendant must have had a duty to disclose the relevant fact.").[27]  A duty to disclose arises only in narrow circumstances, not alleged here, where "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe*, 57 F.3d at 155.  No such duty arises where, as in this case, sophisticated parties deal at arm's length.  *See Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 456 (S.D.N.Y. 2006).  This is fatal to the Trustee's omission-based claims.

5.     The negligent misrepresentation claim fails because the Trive Defendants did not owe any "duty" of care to the Noteholders

81.     The Trustee's negligent misrepresentation claim fails for the same reason: negligent misrepresentations are inactionable, as a matter of law, where, as here, the Trive Defendants did not owe any "duty" of care to the Noteholders.  Such a duty arises only where the defendant has a "special relationship" with the plaintiff (e.g., fiduciary) or is in the "business" (or a transaction) of providing "information for the guidance of others" (e.g., an auditor or advisor). *NSC Wholesale*, 637 B.R. at 81 (New York, Delaware law); *Gutierrez*, 2017 WL 2378298, at *5 (Texas law); *Marquis Towers, Inc. v. Highland Grp.*, 593 S.E.2d 903, 907 (Ga. Ct. App. 2004).

---

[27]  That is true under both New York and Texas law (and Delaware and Georgia law, which are inapplicable in any event, as discussed above).  *See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (New York law); *Smith v. BCE Inc.*, 225 F. App'x 212, 217-18 (5th Cir. 2007) (per curiam) (Texas law); *Hoffman v. AmericaHomeKey, Inc.*, 23 F. Supp. 3d 734, 744 (N.D. Tex. 2014) (same); *Shea v. Best Buy Homes, LLC*, 533 F. Supp. 3d 1321, 1336-37 (N.D. Ga. 2021) (Georgia law); *Walworth Invs.-LG, LLC v. Mu Sigma, Inc.*, 215 N.E.3d 843, 862 (Ill. 2022) (Delaware law).

No such duty arises between "sophisticated parties" that "entered into an arm's length transaction." *Basis Pac-Rim Opportunity Fund v. TCW Asset Mgmt. Co.*, 2 N.Y.S.3d 105, 106 (App. Div. 2015); *Zohar CDO 2003-1 Ltd. v. Xinhua Sports & Ent. Ltd.*, 975 N.Y.S.2d 663, 664 (App. Div. 2013).[28]

82.    Furthermore, if Texas law applies, the claim is time-barred under Texas' two-year statute of limitation.  *See Aaron v. Caddo Mins., Inc.*, 2023 WL 5622115, at *7 (Tex. App. Aug. 31, 2023).  The negligent misrepresentation claims expired, at the latest, two years after the Notes were issued—i.e., in November 2023 and January 2024, before the Trustee filed this action.

**E.    The Claims Sounding In Fraud Lack The Particularity Required By Rule 9(b) (Counts VI-X)**

83.    Plaintiff's securities-fraud, RICO, and common-law-fraud claims (Counts VI-VIII, IX) are all subject to dismissal for an additional, independent reason: their underlying allegations lack the factual particularity required by Rule 9(b).  "[A] party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The negligent-misrepresentation claim (Count X) is also subject to Rule 9(b) where, as here, it arises from the same factual allegations as the fraud claims.[29]

84.    Under Rule 9(b), the Trustee "must allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation" sufficient to put each defendant "on notice of the precise misconduct with which [the defendant is] charged."  *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (quotation marks omitted).  Plaintiff's fraud-related allegations run afoul of Rule 9(b) in multiple ways.

---

[28] *See also MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 235 (App. Div. 2011); *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401-02 (S.D.N.Y. 2004) (defendants' "knowledge of … the company's business—and of the true situation underlying the misrepresentations pertaining to that business … [is] not … the type of 'specialized knowledge'" that "impose[s] a duty of care in the commercial context").

[29] *In re Shelton*, 2014 WL 1576864, at *9 (Bankr. S.D. Tex. Apr. 18, 2014); *see also Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 350 (E.D.N.Y. 2014) (applying Rule 9(b) to negligent misrepresentation claim); *Pashsa & Sina, Inc. v. Travelers Home & Marine Ins. Co.*, 2022 WL 9497141, at *2 (N.D. Tex. Oct. 14, 2022), *vacated in part*, 2022 WL 15089513 (N.D. Tex. Oct. 26, 2022) (same).

85.     *First*, Plaintiff relies on impermissible group pleading. Because "multiple defendants are involved," the Trustee must "inform each defendant of the nature of his alleged participation in the fraud." *Tredennick v. Bone*, 323 F. App'x 103, 105 (3d Cir. 2008). Yet, the Amended Complaint repeatedly attributes alleged misstatements to "Trive" and "management," collectively. *E.g.*, Compl. ¶¶ 12, 141, 182, 190, 223, 239, 249, 265. This approach is especially problematic given the allegations that "management" was engaged in a scheme, without Trive's involvement, to defraud Lucky Bucks. *See supra* Background A.5. The Trustee's repeated failure—in both his original and amended pleadings—to properly attribute challenged conduct to the Trive Defendants requires dismissal of his claims as to these defendants. *See In re Zohar III, Corp.*, 2021 WL 3124298, at *12.

86.     *Second*, the Amended Complaint alleges a number of supposed misrepresentations made at unspecified times or to an unspecified audience. The Trustee amended the complaint to add dates for a few of the "calls" in which Mr. Thadani allegedly made misrepresentations, but the Amended Complaint still fails to identify who was in the audience on these calls, including whether any Noteholder participated (as opposed to other prospective investors). *See, e.g.*, Compl. ¶¶ 138-141. These allegations fail to satisfy Rule 9(b)'s pleading standard.

87.     *Third*, the alleged wire-fraud on which the Georgia RICO counts are predicated "must be particularly scrutinized." *Kolar v. Preferred Real Est. Invs., Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010) (quotation marks omitted). Here, the Amended Complaint cites only four emails from "Trive," Compl. ¶ 352(c), without specifying the contents of those emails, to whom the emails were sent, or how the Noteholders supposedly relied on those emails to their detriment. Similarly, the Amended Complaint cites only two calls between "Trive" and the Noteholders, *id.* ¶ 355(b), without alleging who was on the calls or what representations were made. Ultimately,

the only alleged misstatements that the Amended Complaint arguably identifies with sufficient particularity are those in the CIM itself, which fail for separate reasons, as already discussed.

## III.    THE CLAIMS FOR ATTORNEY'S FEES AND PUNITIVE DAMAGES SHOULD BE DISMISSED

88.    The purported claims for attorney's fees and punitive damages under Ga. Code Ann. §§ 13-6-11, 51-12-5.1 (Counts XI-XII) should be dismissed.  *First*, neither statute creates an independent cause of action, but merely provides additional relief for an underlying substantive claim, and the Trustee has no such claim under Georgia law against the Trive Defendants.  *See Gardner v. Kinney*, 498 S.E.2d 312, 313 (Ga. Ct. App. 1998); *Thysis, Inc. v. Chemron Corp.*, 2011 WL 13162410, at *5 (N.D. Ga. Aug. 25, 2011).  *Second*, those statutes apply only if the underlying *substantive* cause of action arose under Georgia law, and for the reasons discussed above, they did not.  *See DeStefano v. DeStefano*, 2013 WL 5951874, at *7 (Bankr. D.N.J. Nov. 6, 2013) (attorneys' fees award turns on applicable state law); *In re Peterson*, 332 B.R. 678, 684 n.6 (Bankr. D. Del. 2005) (same, as to punitive damages).  *Third*, neither attorney's fees nor punitive damages are available for the negligent misrepresentation claim, which does not allege "bad faith," Ga. Code Ann. § 13-6-11, or "willful misconduct," *id.* § 51-12-5.1(b), as required for any such award.

## IV.    THE CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

89.    Even with the benefit of discovery and the Trive Defendants' prior motion to dismiss, the Trustee has failed to plead a plausible claim against the Trive Defendants after two attempts.  A third attempt would be futile.  *See In re SRC Liquidation LLC*, 581 B.R. 78, 94-95 (D. Del. 2017) (affirming dismissal, with prejudice, of trustee's claims where trustee had amended complaint and had discovery), *aff'd*, 765 F. App'x 726 (3d Cir. 2019).

## CONCLUSION

90.    The Court should dismiss the claims against the Trive Defendants with prejudice.

Dated: March 24, 2025
      Wilmington, Delaware

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Michael McGuinness (admitted *pro hac vice*)
Josh M. Feinzig (admitted *pro hac vice*)
Samuel E. Weitzman (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
philip.anker@wilmerhale.com
ross.firsenbaum@wilmerhale.com
mike.mcguinness@wilmerhale.com
josh.feinzig@wilmerhale.com
samuel.weitzman@wilmerhale.com

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363
joel.millar@wilmerhale.com

*Attorneys for Defendants Trive Capital Management LLC, Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII LUCK LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star Gaming, LLC, and Shravan Thadani*

**PACHULSKI STANG ZIEHL & JONES LLP**

By: */s/ Laura Davis Jones*

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400
ljones@pszjlaw.com
pkeane@pszjlaw.com

*Attorneys for Defendants Trive Capital Management LLC, Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII LUCK LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star Gaming, LLC, and Shravan Thadani*