**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| LUCKY BUCKS HOLDINGS LLC, | Case No. 23-10756 (KBO) |
| *Debtor.* | |
| MARC ABRAMS, <br> In his capacity as Chapter 7 Trustee of Lucky Bucks Holdings LLC and as assignee, | Adversary Proceeding <br><br> Adv. Proc. No. 24-50130 (KBO) |
| *Plaintiff,* | |
| v. | |
| TRIVE CAPITAL MANAGEMENT LLC, TRIVE CAPITAL FUND III LP, TRIVE CAPITAL FUND III-A LP, TCFIII LUCK LP, TCFIII LUCK SPV LP, TCFIII LUCK ACQUISITION LLC, SHRAVAN THADANI, LUCKY BUCKS VENTURES, INC., ANIL DAMANI, SOUTHERN STAR GAMING LLC, SHAFIK KASSAM, JAMES BOYDEN, RYAN BOUSKILL, RYAN C BOUSKILL PROFESSIONAL CORPORATION, 2786692 ONTARIO INC., MANU SEKHRI, STEPHANIE LIPPA, and HASSAN IJAZ, | |
| *Defendants.* | |

**BRIEF IN SUPPORT OF MANAGEMENT**
**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

POTTER ANDERSON & CORROON LLP
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone: (302) 984-6026

ALLEN OVERY SHEARMAN STERLING US LLP
C. Luckey McDowell (*pro hac vice*)
Ian E. Roberts (*pro hac vice*)
Jacob Fields (*pro hac vice*)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone: (214) 271-5777

-and-

Samuel Cooper (*pro hac vice*)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone: (713) 354-4838

Dated: March 24, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... II

PRELIMINARY STATEMENT .............................................................................. 1

FACTUAL BACKGROUND ................................................................................... 4

      A.    Lucky Bucks Is Acquired by a Publicly Traded Company Overseen by the Management Defendants.................................................................. 4

      B.    Trive Takes Lucky Bucks Private and Spearheads the Leveraged Distributions................................................................................................ 5

      C.    Trive Arranges the Creation of Holdings and the Notes Offering............... 6

      D.    Trive and Thadani Market the Notes to Potential Investors. ...................... 8

      E.    The Noteholders Purchase the Notes, and Holdings Distributes Proceeds to Shareholders. ........................................................................... 9

      F.    Eighteen Months Later, After Business Declines, Lucky Bucks and Holdings File for Bankruptcy. .................................................................. 10

      G.    Once Lucky Bucks Emerges from Bankruptcy, Litigation Abounds. ....... 11

      H.    The Trustee Files this Adversary Proceeding. ........................................... 12

ARGUMENT ......................................................................................................... 13

    I.    The Fraudulent Transfer Claims Should Be Dismissed (Counts 1-4) ................... 14

    II.    The Other Statutory and Common Law Claims Should Be Dismissed ................ 18

      A.    The Georgia Statutory Claims Are Impermissibly Extraterritorial (Counts 6-8) ............................................................................................... 18

      B.    The Common Law Fraud Claims Fail for Lack of Any Misstatements by the Management Defendants (Counts 9 & 10) ..................................... 20

      C.    The Claims for Attorney's Fees and Punitive Damages Should Be Dismissed (Counts 11 & 12)...................................................................... 30

CONCLUSION ...................................................................................................... 30

**TABLE OF AUTHORITIES**

Page

**Cases**

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
  163 F.3d 780 (3d Cir. 1999)........................................................................................19

*In re Adelphia Recovery Trust*,
  634 F.3d 678 (2d Cir. 2011)........................................................................................15

*Artesanias Hacienda Real S.A. de C.V. v. N. Mill Cap., LLC (In re Wilton Armetale, Inc.)*,
  968 F.3d 273 (3d Cir. 2020)........................................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................13

*In re Best Prods. Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994)..........................................................................15

*Bond v. Rosen (In re NSC Wholesale Holdings LLC)*,
  637 B.R. 71 (Bankr. D. Del. 2022) .............................................................................20

*Boston Trading Grp., Inc. v. Burnazos*,
  835 F.2d 1504 (1st Cir. 1987).....................................................................................16

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997)......................................................................................24

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)........................................................................................26

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020).........................................................................27

*In re Cred Inc.*,
  650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024) ................18

*Davis v. Abington Mem'l Hosp.*,
  765 F.3d 236 (3d Cir. 2014)........................................................................................13

*In re Dunn*,
  No. ADV. SV-04-01343-KT, 2006 WL 6810930 (B.A.P. 9th Cir. Oct. 31, 2006)................15

*In re Fedders N. Am., Inc.*,
  405 B.R 527 (Bankr. D. Del. 2009). ...........................................................................17

*In re Fruehauf Trailer Corp.*,
    44 F.3d 203 (3d Cir. 2006) ................................................................................ 15

*Glock v. Glock*,
    247 F. Supp. 3d. 1307 (N.D. Ga. 2017) ............................................................ 20

*Husky Int'l Elecs., Inc. v. Ritz*,
    578 U.S. 356 (2016) ............................................................................................ 16

*J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*,
    644 S.E.2d 440 (Ga. Ct. App. 2007) ................................................................. 30

*Joseph v. Frank (In re Troll Commc'ns, LLC)*,
    385 B.R. 110 (Bankr. D. Del. 2008) .................................................................. 22

*Knudsen v. MetLife Grp., Inc*.,
    117 F.4th 570 (3d Cir. 2024) ........................................................................... 7, 8

*Lane v. Eggleston,*
    284 F. 743 (5th Cir. 1922) .................................................................................. 15

*In re Lyondell Chem. Co.*,
    503 B.R. 348 (Bankr. S.D.N.Y. 2014) .............................................................. 15

*Manzo v. Rite Aid Corp*.,
    2002 WL 31926606 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003) .................. 21

*Matrix Parent, Inc. v. Audax Mgmt. Co.*,
    319 A.3d 909 (Del. Super. Ct. 2024) ............................................................ 20, 21

*MBIA Ins. Corp. v. Tilton (In re Zohar III, Corp.)*,
    No. 18-10512 (KBO), 2021 WL 3124298 (Bankr. D. Del. July 23, 2021) (Owens, J.) .......... 22

*In re Menser*,
    No. 18-65681-JWC, 2021 WL 4484894 (Bankr. N.D. Ga. Sept. 30, 2021) ............................ 17

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.,*
    910 F. Supp. 913, 935 (S.D.N.Y. 1995) ............................................................ 18

*Miller v. Bradley (In re W.J. Bradley Mortg. Cap., LLC)*,
    598 B.R. 150 (Bankr. D. Del. 2019) .............................................................. 17, 18

*Mosiman v. Madison Cos., LLC,*
    No. 17-1517-CFC, 2019 WL 203126 (D. Del. Jan. 15, 2019) ............................ 14

*Ohio S. Express Co. v. Beeler*,
    140 S.E.2d 235 (Ga. Ct. App. 1965) ................................................................. 20

*In re Opus East, LLC*,
   528 B.R. 30 (Bankr. D. Del. 2015), *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016) .........17

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000).................................................................................................11

*Organ v. Byron*,
   435 F. Supp. 2d 388 (D. Del. 2006).....................................................................................20

*PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*,
   No. 13-12956(KG), 2016 WL 3611831 (Bankr. D. Del. June 20, 2016) ..........................7, 16

*Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.*,
   117 F. Supp. 2d 1357 (N.D. Ga. 2000) ................................................................................20

*Ret. Sys. Of Gov't of V.I. v. Morgan Stanley & Co., Inc.*,
   814 F. Supp. 2d 344 (S.D.N.Y. 2011)..................................................................................21

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
   311 F.3d 198 (3d Cir. 2002)................................................................................................13

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
   No. 12-cv-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015).........................................27

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005)..................................................................................................16

*Shea v. Best Buy Homes, LLC*,
   533 F. Supp. 3d 1321 (N.D. Ga. 2021) ...........................................................................28, 30

*In re SRC Liquidation LLC*,
   581 B.R. 78 (D. Del. 2017), *aff'd*, 765 F. App'x 726 (3d Cir. Del. 2019) .............................17

*Stanziale v. Khan (In re Evergreen Energy, Inc.)*,
   546 B.R. 549 (Bankr. D. Del. 2016) ....................................................................................24

*Stephen A. Wheat Tr. v. Sparks*,
   754 S.E.2d 640 (Ga. Ct. App. 2014) ....................................................................................30

*In re Syntax-Brillian Corp.*,
   2011 WL 3101809 (Bankr. D. Del. July 25, 2011)...............................................................14

*Travelers Indem. Co. v. Lake*,
   594 A.2d 38 (Del. 1991) ......................................................................................................19

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  MDL No. 11-md-2296, 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F4th 147
  2d Cir. 2021 ......................................................................................................................15, 17

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
  No. 07-cv-3994(LTS)(AJP), 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) ...........................27

*Zucker v. Quasha*,
  891 F. Supp. 1010 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996)......................................24

**Statutes**

6 Del. C. § 1304(a)............................................................................................................14, 17

11 U.S.C. § 544(b) ....................................................................................................................14

11 U.S.C. § 548(a)(1)(A) ...............................................................................................14, 16, 17

Del. Code Ann. tit. 6, § 73-201(b) ...........................................................................................20

Ga. Code Ann. §§ 10-5-1 ..........................................................................................................18

O.C.G.A. § 18-2-74....................................................................................................................14

Tex. Gov't Code Ann. § 4008.055(a).........................................................................................20

Defendants Manu Sekhri, James Boyden, Ryan Bouskill, Ryan C. Bouskill Professional Corporation, Hassan Ijaz, 2786692 Ontario Inc., and Stephanie Lippa (collectively, the "Management Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint [D.I. 58] ("Amended Complaint" or "FAC") pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b) ("Motion").

## PRELIMINARY STATEMENT

1.  In a textbook example of artful pleading, the Amended Complaint—drafted in response to motions to dismiss filed by each party to this action—purports to sue everyone for everything. The Trustee recounts a variety of supposed "frauds" and misstatements surrounding the Holdings Notes Issuance and the underlying business, but it purposefully conflates time periods, omits relevant context, and relies on improper group pleading to blur what in reality are core distinctions among the "managers," "insiders" and equity owners. These issues were highlighted in prior motion practice, but the Amended Complaint does not remedy these shortcomings with additional facts. Instead, the Trustee simply doubles down on this obfuscation strategy.

2.  The apparent aim is to color the Court's view toward anyone who received any portion of the Holdings distributions, no matter their role—or lack thereof—in the process. But when the pleading is parsed, there are virtually no relevant allegations against Defendants Sekhri, Boyden, Bouskill, Ijaz, or Lippa. Their only plausible connections to this dispute are the facts that they performed their limited roles responsibly and shared in distributions that the FAC itself makes clear were conceived and effectuated by others.

3.  This lack of actionable allegations against the Management Defendants is unsurprising. As the FAC makes clear, Lucky Bucks was run by its founder and former CEO, Mr. Damani, until he was required to resign in 2020. After that, the FAC admits that his close associate,

Defendant Tony Kassam, stepped in to "control[] every aspect of Lucky Bucks's operations." FAC ¶ 48. The Trustee alleges that Messrs. Damani and Kassam developed a scheme—which, by all accounts, was hidden from the other defendants—that would eventually drive the Company into bankruptcy. Messrs. Damani and Kassam were ultimately supplanted by Trive—the Texas-based PE firm that bought the Company in 2020 and spearheaded the leveraged distributions.

4.      The Management Defendants are part of neither group. There has been no accusation that they were involved in, or even aware of, Mr. Damani's alleged misconduct. Nor can the Trustee plausibly dispute that the Management Defendants were subordinate to Trive, which the FAC contends "maintained explicit approval rights over every material aspect of Lucky Bucks's business," "engineered the formation of Holdings," and "led and managed" the Notes' issuance and marketing process. FAC ¶¶ 88, 121, 130. In this setting, even if the Trustee could plausibly allege any misconduct surrounding the Holdings Notes or the Holding Distribution (which he does not), there can be no inference that the Management Defendants are responsible.

5.      To paper over these fatal deficiencies, the FAC alleges that the Management Defendants—who indisputably ran Lucky Bucks effectively for years when it was owned by its publicly traded parent—were involved in evaluating certain of Lucky Bucks's acquisitions, finances, and regulatory matters. What the FAC *does not* do is plead any misstatements by any of the Management Defendants vis-à-vis the Noteholders, nor any other conduct that could be actionable across the Trustee's range of claims. In fact, other than Messrs. Sekhri and Boyden, the Management Defendants are not alleged to have had *any* direct interactions with Noteholders whatsoever. As to Defendants Bouskill and Ijaz, the FAC offers only murky allegations that they were involved in preparing marketing materials and collecting data for Trive to relay to Noteholders in response to diligence requests. Especially egregious are the Trustee's fraud claims

against Stephanie Lippa—Defendant Sekhri's assistant—based on the single allegation that she was part of a group that "tried to organize a call with Georgia's governor's office to express their concerns about selective enforcement" by the GLC.  FAC ¶ 185.

6.       The Court should also see this broader dispute for what it is: a baseless claim for fraudulent inducement by a group of sophisticated Wall Street investors who have a classic case of buyer's remorse.  Each of the Noteholders knew from the outset that the Note proceeds were specifically intended to fund a disbursement to shareholders.  There was never an understanding that the Note proceeds would be held for the Noteholders' benefit.  In short, the Noteholders spotted a business opportunity, conducted the diligence they wanted, fully understood the mechanics surrounding their investment, and took on the risks all the while expressly disclaiming any reliance on any statements by the Company.  Now, they want to hide behind the Trustee, but that effort cannot succeed.  The Trustee cannot plead with requisite particularity the elements of fraud required to state a claim.  And he should not be allowed to circumvent those requirements by bringing his claims under the guise of "fraudulent transfers," when the only creditors he represents are the very same parties that consented to those transfers in the first place.

7.       In sum, the claims against the Management Defendants should be dismissed for several reasons:

- *Avoidance of Fraudulent Transfers (Counts 1-4):*  these claims fail as a matter of law because the Noteholders explicitly consented in advance to the shareholder distributions the Trustee now seeks to avoid and recover; the claims also fail because the Noteholders who assigned them lack statutory authority to bring them in bankruptcy, and because the FAC does not plead fraudulent intent.

- *Securities Fraud and RICO (Counts 6-8)*:  these Georgia statutory claims can apply only to activity occurring in Georgia.  Yet the events underlying the Trustee's claims all occurred outside of that state.  To the extent the FAC pleads claims for securities fraud under Delaware law, those also fail for lack of an alleged misrepresentation by any Management Defendant.

- ***Common Law Claims (Counts 9 & 10):*** the remaining fraud-based claims fail no matter which state's law applies because none of the Management Defendants is alleged to have made any specific misstatements to Noteholders. Even if they had, the Noteholders do not (and cannot) plausibly plead justifiable reliance or fraudulent intent.

## FACTUAL BACKGROUND

8.     Lucky Bucks, LLC ("Lucky Bucks" or the "Company") was an owner/operator of coin-operated amusement machines ("COAMs") in Georgia. FAC ¶¶ 2, 62-63. The Company was founded in 2011 by Defendant Anil Damani. *Id*. ¶ 2, 71.

9.     COAMs are games of skill, similar to slot or video poker machines, placed in businesses throughout the state of Georgia and made available to the public for play for non-cash prizes. *Id.* ¶ 2. The Georgia Lottery Corporation ("GLC") regulates the state's COAM industry and restricts ownership of COAMs to a limited number of "master license" holders. *Id.* ¶¶ 2, 64-66.

10.     In carrying out its operations, Lucky Bucks contracted with owners of high traffic sites, such as convenience stores and gas stations, to place COAM devices owned by Lucky Bucks on premises. *Id.* ¶ 9. Under Georgia law, the location owners must also hold a valid COAM license issued by the GLC. *Id.* ¶¶ 64-68. Lucky Bucks eventually grew into one of the largest COAM master license holders in Georgia, largely by acquiring other master licenses and location contracts. *Id.* ¶ 71.

A.     Lucky Bucks Is Acquired by a Publicly Traded Company Overseen by the Management Defendants.

11.     In October 2016, Damani sold a 51% stake in Lucky Bucks to Southern Star Gaming LLC ("Southern Star"), a wholly owned subsidiary of Seven Aces Limited ("Seven Aces"), a public company then listed on Canada's TSX Venture Exchange. *Id.* ¶¶ 72, 81.

12.     At that time, Defendant Manu Sekhri was the chief executive of Southern Star and a minority owner of Seven Aces (*id*. ¶¶ 82-84), and the other Management Defendants formed the core of Sekhri's Canada-based management team.  From Ontario, this group managed Southern Star's investments, including Lucky Bucks, advising on strategic, financial, and accounting matters, and generally ensured the business followed all reporting requirements and other obligations of a publicly listed company.  *See id*. ¶¶ 47, 49, 51-54.  Damani continued as CEO and ran the day-to-day business with his long-time associate, Defendant Tony Kassam.  *Id*. ¶¶ 45, 48.

13.     In May 2020, the GLC notified Lucky Bucks that it intended to revoke its master license status due to alleged regulatory violations by Mr. Damani.  *Id*. ¶ 76.  Following a June administrative proceeding, Lucky Bucks and GLC entered a settlement that required Damani to "resign as an officer" and "relinquish all operational control over the business and operations of [Lucky Bucks]," but Damani was permitted to retain his equity ownership.  *Id*. ¶¶ 2, 76-80.

14.     As part of the settlement, Damani also entered a 5-year non-compete agreement with Lucky Bucks, which prohibited him from starting or buying any competing business.  *Id*. ¶ 79.  After Damani resigned as CEO, Kassam assumed operational control.  *Id*. ¶¶ 45, 48.

B.     <u>Trive Takes Lucky Bucks Private and Spearheads the Leveraged Distributions.</u>

15.     Defendant Trive Capital Management LLC is a Texas-based private-equity firm that manages or advises various funds (collectively, "<u>Trive</u>").  *Id*. ¶ 36.  In August 2020, just weeks after Damani resigned as CEO, Trive purchased a majority stake in Lucky Bucks in a take-private transaction.  *Id*. ¶¶ 2, 82.  Trive acquired all of the outstanding public equity of Seven Aces (other than shares held by Mr. Sekhri) and, as a result, obtained a controlling interest in Southern Star, which indirectly owned a 70% interest in Lucky Bucks.  *Id*. ¶ 82.

16.     Trive was already "intimately familiar with Lucky Bucks's business," having worked with the Company in numerous financings since 2016.  *Id*. ¶¶ 3, 8, 72-73.  In particular,

Defendant Shravan Thadani, a Trive managing director, "became knowledgeable about the Company's operations, regulatory environment, and capital requirements" though years of collaborating with Lucky Bucks.  *Id.* ¶ 3.  Thadani "was the lead Trive partner in charge of Trive's investment in Lucky Bucks."  *Id.* ¶ 42.

17.    "Trive immediately took a majority position on Lucky Bucks's board of managers," appointing Defendants Sekhri and Boyden to serve as two of the Company's three-person board. Trive also appointed Mr. Sekhri to serve as the new CEO, (*id.* ¶¶ 3, 82-84), and Mr. Kassam as Chief Operating Officer, (*id.* ¶ 48).  In that role Mr. Kassam "was ultimately responsible for and controlled every aspect of Lucky Bucks's operations."  *Id.*  Mr. Damani also appointed Mr. Kassam as his designee to sit on the Lucky Bucks board.  *Id.* ¶ 85.

18.    Despite these appointments, there was no confusion that Trive was in control.  As part of the take-private transaction, Trive required "extensive approval rights over virtually ***every*** aspect of the business," and "all of its appointees to the board … had to confirm in writing that they understood those rights."  *Id.* ¶¶ 3, 86 (emphasis added).  Within a year of taking Lucky Bucks private, on or around July 2021, Trive caused Lucky Bucks to increase its leverage to $535 million under a senior secured credit agreement.  *Id.* ¶ 112.  The proceeds were used to refinance certain pre-existing obligations and to fund a $200 million dividend to equity holders.  *Id.*

19.    As alleged in the FAC, the July 2021 dividend was issued entirely "at [Trive's] direction."  *Id.* ¶ 112.  Indeed, the FAC describes how Mr. Sekhri acknowledged "Thadani's role in driving the process" and that the dividend was "100% a Trive decision."  *Id.* ¶ 114.  Lucky Bucks was soon "maxed out under its recently upsized term loan facility" and could not take on additional debt.  *Id.* ¶ 6.

C.    Trive Arranges the Creation of Holdings and the Notes Offering.

20.    One month later, in August 2021, Trive moved to establish a new holding company

("Holdings"), for the purpose of financing more dividends.  *Id.* ¶¶ 7, 122.[1]  Unlike Lucky Bucks, which had reached its borrowing limit, Holdings had no debt obligations "and could borrow money without running afoul of Lucky Bucks's existing credit agreement."  *Id.* ¶ 122.  Trive designated Messrs. Sekhri and Boyden as its Holdings board appointees, and Mr. Damani designated Mr. Kassam, mirroring the structure of the Lucky Bucks Board.  *Id.* ¶¶ 124-25.

21.     Based on its pre-existing relationship with Trive and Thadani, Houlihan Lokey was hired to market the issuance by Holdings of $250 million in notes ("Notes").  *Id.* ¶¶ 8, 111, 129-30.  In August 2021, Houlihan Lokey prepared a Confidential Information Memorandum ("CIM") for prospective purchasers, which made clear that the proceeds of the Notes would not be invested in Lucky Bucks or retained as working capital but would instead be used to "finance a one-time distribution to existing equity holders."  *Id.* ¶¶ 9, 130-31; Ex. A at 6-7:[2]



22.     The CIM contained historical financial information through March 31, 2021, projected revenues based on certain stated assumptions, and numerous disclosures warning investors of risks to the business, including that nothing in the CIM "is, or should be relied on as,

---

[1] As they must for purposes of this Motion, the Management Defendants do not challenge the well pled allegations in the FAC, which are accepted as true at the pleading stage.  However, nothing in this Motion should be construed as a concession that any defendant named in this action acted improperly.

[2] "Ex. __" citations refer to exhibits to the declaration of Jacob Fields filed with this Motion.  Because the FAC extensively cites to the CIM and Note Purchase Agreement, the Court may consider their full contents for purposes of Rule 12(b)(6).  *See Knudsen v. MetLife Grp., Inc*., 117 F.4th 570, 576 n.33 (3d Cir. 2024).

a promise or representation as to the future performance of the company." *Id*. at 3.[3]

      D.    <u>Trive and Thadani Market the Notes to Potential Investors.</u>

    23.    From August to September of 2021, "Trive marketed the opportunity" to potential investors, and "Trive partner Shravan Thadani took the lead on most of the management calls with potential purchasers." FAC ¶ 8, 9. Through "the lead investor," BC Partners, prospective investors conducted diligence on the Note opportunity. *Id*. ¶ 133. This allegedly included "several conversations with 'management,'" but the "primary speaker on the majority of these calls and the main point of contact" was Thadani. *Id.* ¶ 134.[4]

    24.    According to the Trustee, "Thadani touted the Company's stable income and an accelerating M&A pipeline that would purportedly allow Lucky Bucks to quickly outgrow its leverage." *Id*. ¶ 18. Indeed, Trive's participation as a "capable equity sponsor" was a central reason the investors were interested in purchasing the Notes in the first place, and "[c]ertain Noteholders would not have entered into a deal without an equity sponsor." *Id*. ¶¶ 12, 151.

    25.    As for the Management Defendants, the FAC does not specifically allege that anyone except Defendant Sekhri communicated with potential investors during the marketing process. And as to Mr. Sekhri's purported statements, the Trustee vaguely lumps him with unnamed others who said that Lucky Bucks had a good relationship with regulators: "Thadani and management, including Sekhri, repeatedly made the point to tout Lucky Bucks's purportedly

---

[3] The CIM further stated that: (1) each prospective lender "must conduct and rely on its own evaluation of the company" and "not on any representation made or alleged to have been made by Houlihan Lokey or the Company;" (2) the Company expressly disclaimed "any oral statements not contained in the CIM" itself; and (3) "actual results may differ materially from expected results" reflected in any forward-looking statements. Ex. A at 3.

[4] *See also id*. ¶ 8 ("Trive boasted to potential investors about its knowledge of the business."); *id*. ¶ 9 (Thadani "stated the business was worth over $1 billion, and that Trive had plans to sell it within a few years."); *id*. ("Thadani explained to prospective creditors that Lucky Bucks's earnings were stable"); *id*. ("Thadani and others touted the supposedly minimal rate of location attrition in support of their claims about the Company's revenue stability").

'strong relationship with the GLC' during the marketing process." *Id.* ¶ 182.  The FAC also states:

> Thadani and Manu Sekhri . . . also placed significant emphasis on
> the strength of Lucky Bucks's 'farm team'—the team of salespeople
> that scoped out and assembled valuable locations for acquisitions. .
> . . Thadani and Sekhri lauded the farm team's professionalism, and
> Sekhri described Lucky Bucks as a higher moral compass player that
> would purchase only assets it knew to be credible.

*Id.* ¶ 10.  The FAC does not say when these statements occurred, whether they were by phone or

in person, or which, if any, Noteholders were present to hear them.

E.   <u>The Noteholders Purchase the Notes, and Holdings Distributes Proceeds to
Shareholders.</u>

26.   Ultimately, six "sophisticated" asset managers (FAC ¶ 189), all based outside of

Georgia, purchased the Notes (collectively, "<u>Noteholders</u>").  *Id.* ¶¶ 56, 190-93.  In the November

2021 issuance, BC Partners, CION, First Trust, Hamilton Lane, and Marathon acquired $195

million of Notes.  *Id.* ¶ 200.  In the January 2022 issuance, Monarch acquired $55 million of

additional Notes.  *Id.*

27.   On November 29, 2021, as a condition of the issuance, Defendant Boyden signed

a solvency certificate stating that Holdings was solvent and that Holdings and its subsidiaries

would not have unreasonably small capital as a result of the issuance and subsequent Holdings

distributions.  *Id.* ¶ 179.  Within the solvency certificate, Boyden certified that he had "made, or

ha[d] caused to be made under my supervision, such examination or investigation as is necessary

to enable me to express an informed opinion as to the matters referred to herein."  *Id.*

28.   As the FAC repeatedly acknowledges, investing in the Notes entailed obvious risks

because Holdings' "only asset was its ownership of Lucky Bucks shares, meaning Holdings'

ability to repay the Notes was entirely dependent on the equity value of Lucky Bucks, which

needed to be enough to clear the operating subsidiary's own substantial debt."  *Id.* ¶ 8.  Moreover,

the Notes proceeds would be paid to shareholders and unavailable to finance other activities or repay the Notes.  Consistent with the CIM, the Note Purchase Agreement included a "Use of Proceeds" covenant providing that Holdings "shall" "[u]se the proceeds of the Notes . . . to fund a Restricted Payment to the holders of [Holdings'] Capital Stock."  Ex. B at § 6.11.

29.     Complying with that requirement, Holdings used the Notes proceeds to fund two distributions to shareholders ("<u>Holdings Distributions</u>").  In November 2021 and January 2022, Holdings made distributions of approximately $185.2 million and $52.5 million, respectively, to its direct shareholders, including Southern Star, other Trive affiliates, and Lucky Bucks Ventures, Inc. ("<u>LBVI</u>").  *Id.* ¶¶ 201-02.  As alleged, Southern Star made subsequent transfers to TCFIII Luck LP, which then made transfers to Sekhri, Boyden, Bouskill, Ijaz, and Lippa.  *Id.* ¶ 279.[5]

F.     <u>Eighteen Months Later, After Business Declines, Lucky Bucks and Holdings File for Bankruptcy.</u>

30.     After purchasing the Notes, "the Noteholders received quarterly updates" on Lucky Bucks's performance, including audited year-end financials.  FAC ¶ 213; Ex. B at § 6.01(a).  That performance was allegedly disappointing to the Noteholders.  *Id.* ¶ 214.

31.     The Company's performance allegedly declined throughout 2022, and the FAC states that Thadani and "management" blamed the slowdown on macroeconomic factors and increased regulatory pressures.  *Id.* ¶¶ 212-20.

32.     Lucky Bucks and Holdings filed Chapter 11 petitions in June 2023.  *Id.* ¶¶ 25, 234.  Lucky Bucks—now known as Arc Gaming and Technologies, LLC ("<u>Arc Gaming</u>")—emerged from bankruptcy in October 2023.  *Id.* ¶¶ 26, 236-38.  The Court converted the Holdings Chapter 11 case to Chapter 7, and Plaintiff was appointed as Holdings' trustee.  *Id.* ¶¶ 235-37.

---

[5] Messrs. Bouskill and Ijaz allegedly received distributions via their respective incorporated entities, Defendants Ryan C Bouskill Professional Corporation and 2786692 Ontario Inc.  FAC ¶ 280.

G.     Once Lucky Bucks Emerges from Bankruptcy, Litigation Abounds.

33.     On January 2, 2024, reorganized Lucky Bucks filed a lawsuit in Georgia state court asserting fraud and state RICO claims against Messrs. Damani, Kassam, and their alleged co-conspirators for supposedly engaging in an "organized criminal conspiracy" that damaged the Company.  FAC ¶ 238; *see Arc Gaming and Technologies, LLC v. Anil Damani, et al*., No. 24-cv-131 (Super. Ct. Gwinnett County Jan. 2, 2024) (the "Georgia Lawsuit").[6]

34.     The Georgia Lawsuit, which Plaintiff asserts was the product of "extensive internal investigation" (*id.* ¶ 26), asserts no claims against any of the Management Defendants.  To the contrary, it specifically states that the Management Defendants were neither aware of nor involved in Messrs. Damani's and Kassam's alleged scheme.[7]

35.     On January 23, 2024, the Trustee filed an adversary proceeding against Arc Gaming seeking to unwind the Chapter 11 Plan on the grounds that the Debtor had failed to disclose the existence of the claims now being pursued in the Georgia Lawsuit.  *See* Complaint for Revocation Or, In the Alternative, Equitable Relief, *In re Lucky Bucks, LLC, et al*., No. 23-10758 (KBO) (Bankr. D. Del. Jan. 23, 2024) [D.I. 339] (the "Revocation Complaint").  According to the Trustee, the alleged actions of Messrs. Damani and Kassam as detailed in the Georgia Lawsuit "explain

---

[6] On a motion to dismiss, a court may take judicial notice of public records  "not to prove the truth of their contents but only to determine what the documents stated" *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (quotation omitted).

[7] *E.g.*, Georgia Lawsuit ¶ 58 ("there is currently ***no evidence that the other board members [e.g., Sekhri and Boyden] were informed*** about the activities alleged in this Complaint, which were actively concealed by the [Damani] Defendants") (emphasis added); *id*. ¶ 70 ("***Unbeknownst to Lucky Bucks' board or lenders***, at some point, the Defendants set up and/or conspired with what they called the B-Side businesses to steal Lucky Bucks' location contracts and opportunities") (emphasis added); *id*. ¶ 126 (Damani and Kassam "***did not disclose to Lucky Bucks' honest employees, its board***, or its lenders that they beneficially owned or controlled the counterparties" to the fraudulent purchase agreements) (emphasis added).

why Lucky Bucks's attrition was so high in the second half of 2021 . . . and why those newly-acquired locations were underperforming the EBITDA on which they were acquired . . . ." *Id*. ¶ 239.

36.     On August 16, 2024, the Trustee and Arc Gaming reached a settlement resolving the Revocation Complaint.  Revocation Settlement Agreement, *In re Lucky Bucks Holdings LLC*, No. 23-10756 (KBO) (Bankr. D. Del. Mar. 22, 2024) [D.I. 68].  In the settlement, the parties agreed that the Holdings estate would receive 40 percent of any money damages recovered in the Georgia Lawsuit and reserved the right to share in money damages recovered in "Dividend Litigation" brought by either party.  *Id*.  Since then, the Trustee and Arc Gaming have been cooperating under a common interest agreement.  *See id*.

        H.      The Trustee Files this Adversary Proceeding.

37.     After receiving Rule 2004 discovery,[8] the Trustee filed his original Complaint on September 13, 2024.  D.I. 2.  On January 21, 2025, following motions filed by all defendants, the Trustee filed the FAC.  [D.I. 58].  The FAC alleges that the Noteholders were fraudulently induced to purchase the Notes based on Thadani's, Trive's, and "management's" misstatements during the August 2021 marketing process about several matters, including:

- the CIM's "implied [ ] attrition rate" which purportedly overstated the stability of Lucky Bucks's location contracts;

- the EBITDA generated by Lucky Bucks's prior M&A activity;

- the accuracy of Lucky Bucks's growth projections in light of Mr. Damani's alleged activities, and poor performance in the second half of 2021 that Holdings allegedly "hid" by using pro forma estimates;

- representing that Holdings was solvent and that management had conducted an analysis to assess that it was;

---

[8] In early 2024, the Holdings Trustee informally requested documents from the Management Defendants.  The Management Defendants voluntarily produced over 60,000 documents subject to a stipulation.  Stipulation Pursuant to Local Bankruptcy Rule 2004-1(a), *In re Lucky Bucks Holdings LLC*, No. 23-10756 (KBO) (Bankr. D. Del. Mar. Apr. 4, 2024) [D.I. 72].

- Lucky Bucks's relationship with its regulator; and
- the strength of Lucky Bucks's "farm team."

*See* FAC ¶¶ 156-89.

38.     The FAC asserts claims against all Management Defendants for avoidance and recovery of intentional fraudulent transfers (Counts 1, 2) and avoidance and recovery of constructive fraudulent transfers (Count 3, 4).  Against Defendants Sekhri, Boyden, Bouskill, and Ijaz, the Trustee asserts claims for securities fraud under Georgia, Texas, and Delaware law (Count 6), common law fraud (Count 9), and negligent misrepresentation (Count 10).  Against Defendant Sekhri, the Trustee also asserts claims for violations of Georgia's RICO statute (Counts 7, 8). Finally, the Trustee seeks to recover attorney's fees and punitive damages, which he lists as separate causes of action against all Defendants (Counts 11, 12).

## ARGUMENT

39.     "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 240 (3d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 241 (quoting *Iqbal*, 556 U.S. at 678).  The Court is "not required to," and, indeed, cannot "credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).

40.     For fraud-based claims, the heightened pleading standard of Rule 9(b) applies and requires plaintiffs to "plead with particularity the circumstances of the alleged fraud" so as to "place the defendants on notice of the precise misconduct [alleged]." *In re Syntax-Brillian Corp.*, 2011 WL 3101809, at *7 (Bankr. D. Del. July 25, 2011) (citation omitted).  To state a claim under

Rule 9(b), a pleading must state "the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Mosiman v. Madison Cos., LLC*, No. 17-1517-CFC, 2019 WL 203126, at *3 (D. Del. Jan. 15, 2019) (citation omitted).

## I.   The Fraudulent Transfer Claims Should Be Dismissed (Counts 1-4)

41.     *First*, the Noteholders lack statutory authority under the Bankruptcy Code to bring the fraudulent transfer claims they purportedly assigned to the Trustee (Counts 3 & 4).  Section 544(b) authorizes Trustee to pursue any fraudulent-transfer claims that the Noteholders could have previously asserted under state law.  But once Holdings filed for bankruptcy, its creditors lost the ability to pursue their own state-law fraudulent transfer claims, which became "the exclusive province of the trustee." *Artesanias Hacienda Real S.A. de C.V. v. N. Mill Cap., LLC (In re Wilton Armetale, Inc.)*, 968 F.3d 273, 282-285 (3d Cir. 2020) ("[t]he bankruptcy … deprived [the creditor] of the statutory authority to bring those [fraudulent-transfer and related] claims, transferring that power to the trustee").  Because the Noteholders lack standing to bring state law claims—which are simultaneously being brought by the Trustee (Counts 1 & 2)—those claims must be dismissed.

42.     *Second*, all four fraudulent-transfer claims (Counts 1-4)[9] fail as a matter of law because the Noteholders consented to the transfers when made.  As such, they cannot be avoided as "fraudulent."  The purpose of fraudulent-conveyance law is to prevent a debtor from wrongfully transferring its assets out of the estate to defraud creditors who otherwise could look to those assets for repayment on their claims. *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (such laws "aim[] to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away").  But "[c]reditors who

---

[9] Count 1 is brought on behalf of Holdings pursuant to section 548 (a)(1)(A) of the Bankruptcy Code, and, pursuant to his authority in 11 U.S.C. § 544(b), the fraudulent transfer acts of Delaware ("DUFTA"), 6 *Del. C.* § 1304(a)(1), and  Georgia ("GUVTA"), O.C.G.A. § 18-2-74 *et seq*.  In Count 3, the Trustee asserts the same claims under the DUFTA and the GUVTA on behalf of the Noteholders as assignee.

authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim

to have been defrauded by [the transfer]," and fraudulent transfer law may not be invoked for their

benefit. *In re Lyondell Chem. Co.*, 503 B.R. 348, 383-84 (Bankr. S.D.N.Y. 2014).

43.     Thus, creditors who have authorized, consented to, participated in, or ratified a

transfer cannot then avoid that transfer as fraudulent because " [a] fraudulent transfer is not void,

but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance."

*In re Adelphia Recovery Trust*, 634 F.3d 678, 691 (2d Cir. 2011) (quoting *In re Best Prods. Co.,*

168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994)); *see also Lane v. Eggleston,* 284 F. 743, 745 (5th Cir.

1922) (a creditor cannot "avoid [a transfer], after he has voluntarily assented to it"); *In re Dunn*,

No. ADV. SV-04-01343-KT, 2006 WL 6810930, at *8 (B.A.P. 9th Cir. Oct. 31, 2006) ("A creditor

who ratifies or participates in a fraudulent transfer may be estopped from attacking the transfer.").

44.     That principal squarely applies here despite the Noteholders' wish to disclaim the

effects of a transaction they fully evaluated, understood, and consented to undertake.  The sole

purpose of the Notes, and only permitted use of proceeds, was to fund the Holdings Distribution.

This was known and agreed to by the Noteholders from the outset, which precludes any inference

of "fraud."  *See, e.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.*, MDL No. 11-md-2296,

2017 WL 82391, at *15 (S.D.N.Y. Jan. 6, 2017) (no inference of fraud where LBO transaction

involved "sophisticated parties" and "received widespread publicity").[10]

45.     Some courts have allowed a trustee to sue to avoid transfers where the lenders were

allegedly misled about the debtor's ability to repay their loans, despite consenting to the transfer

at issue.  *See, e.g.*, *PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy*

---

[10] The Management Defendants further incorporate by reference the arguments and authorities raised by the Trive
Defendants and Damani Defendants in their respective motions to dismiss, to the extent they are applicable to claims
against the Management Defendants.

*Holdings, Inc.)*, 2016 WL 3611831, at *12-13 (Bankr. D. Del. June 20, 2016).  But, as other courts have rightly observed, that conflates the concept of fraudulent transfer with fraudulent *inducement*. *See, e.g.*, *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1510-11 (1st Cir. 1987) ("Fraudulent conveyance law is basically concerned with transfers that 'hinder, delay or defraud' creditors; it is not ordinarily concerned with how such debts were created.") (emphasis omitted); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (affirming dismissal of complaint that "inadequately allege[d] fraud *with respect to the transaction that [plaintiff] seeks to [a]void . . . .* [because] the fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds") (emphasis added); *see also Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 361 (2016) ("As a basic point, fraudulent conveyances are not an inducement-based fraud," and "the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt.").

46.    *Third*, even if the fraudulent transfer claims were not precluded due to the Noteholders' consent, the Court should still dismiss Counts 1 and 3 (asserting claims for intentional fraudulent transfer) because the Trustee does not come close to pleading fraudulent intent.  Under Section 548 of the Bankruptcy Code, the Trustee may avoid a transfer if it was incurred "with actual intent to hinder, delay, or defraud" a creditor.[11]   Whether Delaware or Georgia law is applied, the analysis is substantially the same.  *In re Opus East, LLC*, 528 B.R. 30, 82 (Bankr. D. Del. 2015), *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016); *In re Menser*, No. 18-65681-JWC, 2021 WL 4484894, at *3 (Bankr. N.D. Ga. Sept. 30, 2021).  To survive a motion to

---

[11] 11 U.S.C. § 548(a)(1)(A) provides that "[t]he trustee may avoid any transfer ... of an interest of the debtor in property, or an obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the [petition date] ... if the debtor ... made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud ... " a creditor.  6 Del. C. § 1304(a)(1) provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay or defraud any creditor of the debtor ... ."

dismiss, the Trustee must "do more" than identify the alleged fraudulent transfer. He must plead facts that allow the Court to "reasonably infer actual fraud." *Miller v. Bradley (In re W.J. Bradley Mortg. Cap., LLC)*, 598 B.R. 150, 162 (Bankr. D. Del. 2019). And because the Trustee's fraudulent transfer claims are rooted in actual fraud, the heightened pleading requirements of Rule 9(b) apply.[12] *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).

47.     While plaintiffs are given some leeway in pleading a defendant's intent, "this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *In re Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *4 (quotations omitted). Rather, "a complaint alleging an actual fraudulent conveyance must allege facts that give rise to a *strong inference* of fraudulent intent." *Id.* (emphasis added and quotations omitted). Moreover, this leeway typically arises in pre-discovery suits and should be minimized here because the Trustee received over 60,000 documents in pre-suit discovery pursuant to Rule 2004.

48.     Here, the so-called badges of fraud all concern the relationship between Holdings and the transferees vis-à-vis alleged misrepresentations made to the Noteholders to induce their purchase of the Notes. *See* FAC ¶ 275(c)-(e), (i), (j). But, again, allegations that investors were fraudulently *induced* to acquire the Notes are irrelevant to the fraudulent *transfer* claims because the Trustee is seeking to avoid Holdings transfers to the Defendants—not the transfer of the Notes. *See, e.g.*, *In re Cred Inc.*, 650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024) (dismissing actual fraudulent transfer claim for failure to plead intent to defraud); *In re W.J. Bradley Mortgage Capital, LLC*, 598 B.R. at 169 (dismissing under 12(b)(6) where "[t]he Trustee

---

[12] Trustees are not absolved of this requirement where they have had access to pre-suit discovery. *See In re SRC Liquidation LLC*, 581 B.R. 78, 86–87 (D. Del. 2017) ("Courts sometimes relax the heightened standard for bankruptcy trustees . . . *where the trustee has not been afforded any discovery prior to filing a complaint*.") (emphasis added), *aff'd*, 765 F. App'x 726 (3d Cir. Del. 2019); *In re Fedders N. Am., Inc.*, 405 B.R. 527 at 544 (relaxation of Rule 9(b) is based on "the trustee's inevitable lack of knowledge concerning acts of fraud previously committed against the debtor, a third party") (quotations omitted).

provides no facts that these transfers were made with the requisite actual fraudulent intent");

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935

(S.D.N.Y. 1995) (rejecting actual fraudulent conveyance claim involving LBO that "was not

secretive, nor . . . structured in a manner unusual for an LBO").

## II.   The Other Statutory and Common Law Claims Should Be Dismissed

### A.   The Georgia Statutory Claims Are Impermissibly Extraterritorial (Counts 6-8)

49.   The Trustee asserts claims against Messrs. Bouskill, Ijaz, Boyden, and Sekhri for

violations of Georgia's securities-fraud statute, Ga. Code Ann. §§ 10-5-1 *et seq*  Each claim fails

because these statutes may not be applied to regulate out-of-state activity.

50.   The relevant conduct underlying the Trustee's claims occurred outside of Georgia.

Holdings is a Delaware LLC with no operations, employees, or presence in Georgia.  FAC ¶ 35.

The Noteholders likewise were each located outside of Georgia (*id*. ¶ 56), and there is no allegation

that any roadshows or meetings between Holdings and the Noteholders occurred there.  To the

contrary, virtually all of the communications to Noteholders are alleged to have been conducted

by Thadani (who lives and works in Texas) and Trive (a Delaware entity managed from Texas).

Further, each of the Management Defendants lives and works in Canada (*id*. ¶¶ 47-55), and none

is alleged to have made a single misrepresentation to or from Georgia.

51.   The only Georgia connection is the fact that Holdings' indirect subsidiary, Lucky

Bucks, operated there.  But Lucky Bucks is a separate corporate entity and not party to this case

or any of the transactions at issue.  Its location has little, if anything, to do with where "an offer

[by a separate parent entity] is made … and accepted" and thus is irrelevant to determining where

"the elements of the transaction have occurred."  *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163

F.3d 780, 787 (3d Cir. 1999); *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 44–47 (Del. 1991) (in

applying the "most significant relationship test," in tort cases, Delaware courts place considerable

emphasis on "the place where the injury occurred" and "the place where the conduct causing the injury occurred").

52.     The Trustee recovers no ground in the FAC by alleging for the first time that "[t]he Management Defendants, while primarily based in Toronto, routinely traveled in and out of Georgia in order to manage the business, including during key periods of negotiating the transaction." FAC ¶ 154. First, even these cursory allegations allege travel only by Defendants Boyden and Ijaz. Second, the FAC noticeably does not allege that either Messrs. Boyden or Ijaz made any misrepresentations or committed other tortious acts during these purported trips. To the contrary, the FAC explicitly states that the trips to Georgia were made "in order to manage the business" of the operating company and, in each case, merely "coincided" with calls between Trive and the Noteholders. *Id.* (alleging four trips by Mr. Boyden, including one that "coincided" with a diligence call in which he did not participate); *id.* (alleging four trips by Mr. Ijaz, including one that "coincided" with a diligence call in which he did not participate). The sole allegation that is remotely relevant to the Notes is that Mr. Boyden "executed a term sheet in advance of the [Note Purchase Agreement] from Georgia, while he was there on business." *Id.* ¶ 339. But the FAC does not allege that the term sheet contained any misrepresentations (it does not describe its contents at all), and the Trustee's claims are not otherwise based on the term sheet's execution.

53.     Georgia statutes have a strong "presumption against extraterritorial application," and "absent a clear statement to the contrary, the Georgia courts refrain from applying statutes extraterritorially." *Glock v. Glock*, 247 F. Supp. 3d. 1307, 1318 (N.D. Ga. 2017); *see also Ohio S. Express Co. v. Beeler*, 140 S.E.2d 235, 236 (Ga. Ct. App. 1965) ("It is not presumed that the statutory law of a foreign state is the same as ours, as our statutory law has no extra-territorial operation."). Because neither the securities-fraud nor the anti-racketeering statute includes a clear

statement that the legislature intended it to apply extraterritorially, neither reaches the extraterritorial conduct alleged here; accordingly, those claims must be dismissed. *C.f., Organ v. Byron*, 435 F. Supp. 2d 388 (D. Del. 2006) (dismissing a securities claim under Illinois law after determining that applying Delaware law would not undermine Illinois public policy).[13]

B.   The Common Law Fraud Claims Fail for Lack of Any Misstatements by the Management Defendants (Counts 9 & 10)

54.   Against Defendants Bouskill, Ijaz, Boyden, and Sekhri, the FAC asserts claims of common law fraud (Count 9) and, in the alternative, negligent misrepresentation (Count 10).[14]

55.   To plead either claim, a plaintiff must present facts that plausibly show a defendant made a "false representation of fact" that was "actually and justifiably relie[d] on" by the plaintiff. *See, e.g.*, *Manzo v. Rite Aid Corp*., 2002 WL 31926606, at *3 (Del. Ch. Dec. 19, 2002) (defining elements of both common law fraud and negligent misrepresentation), *aff'd*, 825 A.2d 239 (Del. 2003). Further, a plaintiff must show that "the defendant *knew or believed* the representation was false" and intended that the plaintiff rely upon it. *Matrix Parent*, 319 A.3d at 932.[15]

56.   As applied here, the Trustee must plead with specificity that each Management

---

[13] Apparently aware that Georgia law should not apply, the Trustee in the FAC expanded Count 6 to allege securities violations under the Texas Securities Act (Tex. Gov't Code Ann. § 4008.055(a) and the Delaware Securities Act (6 *Del. C.* § 73-201). Those claims also fail. As to Texas, there is no allegation of any connection between that state and the Management Defendants that would support applying Texas law. As to Delaware, the FAC fails to plead a claim because, as explained in Section II.B., the Trustee fails to allege that any Management Defendant made any misrepresentations relied upon by any Noteholder. *See See* 6 *Del. C.* § 73-201(b).

[14] Delaware and Georgia law are substantively similar with respect to both claims. *See Matrix Parent, Inc. v. Audax Mgmt. Co.*, 319 A.3d 909, 932 (Del. Super. Ct. 2024) (fraud); *Bond v. Rosen (In re NSC Wholesale Holdings LLC)*, 637 B.R. 71, 81 (Bankr. D. Del. 2022) (negligent misrepresentation); *Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc*., 117 F. Supp. 2d 1357, 1360 (N.D. Ga. 2000) (fraud and negligent misrepresentation). While the Management Defendants do not concede that either necessarily applies, this motion addresses the sufficiency of the FAC's claims under both Delaware and Georgia law, which are the two state-law regimes pleaded by the Trustee.

[15] To the extent any of Trustee's claims could be read to plead fraud by omission, those claims would also fail. A plaintiff can state a claim for fraud by omission only if the defendant had a duty to disclose that information in the first place, such as a duty stemming from a fiduciary relationship. *See Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658, 2009 WL 1124451, at *11 (Del. Ch. Apr. 20, 2009). Here, there is no such relationship or duty alleged as between the Management Defendants and Noteholders.

Defendant *individually* made a specific misrepresentation to a Noteholder, with fraudulent intent, that was justifiably relied on by the Noteholder. *See Emps.' Ret. Sys. Of Gov't of V.I. v. Morgan Stanley & Co., Inc.*, 814 F. Supp. 2d 344, 353 (S.D.N.Y. 2011) ("To be liable for fraud . . . *the defendant* must actually make a materially false statement *to the plaintiff*.") (emphases added).

57.     The FAC fails to plead any one of these core elements.  As explained below, there is not a single allegation that any Management Defendant made any misstatement of fact to any Noteholder (or in most cases, ever interacted with any Noteholders at all), much less that any did so with fraudulent intent.

>     i.     *Virtually all alleged misstatements to Noteholders are attributed to Trive and "insiders."*

58.     By August 2021, when Trive formed Holdings and structured the Note offering (FAC ¶ 121), it had been in complete control of Lucky Bucks for a year.  *Id.* ¶ 88.  The marketing process "was led and managed by [Trive] and Thadani, with Thadani managing the bulk of conversations with the potential investors and Noteholders" (*id.* ¶ 130), so it is no surprise that the only *specific* alleged misstatements to the Noteholders are attributed to Trive—not the Management Defendants.[16]  *See, e.g.*, *id.* ¶ 20 ("*Trive and Thadani* . . . induced investors to loan Holdings nearly $250 million" by touting a <1% attrition rate); *id.* ¶ 164 (describing "*Thadani's* repeated references to the run rate EBITDA…") (emphases added).

59.     And in places where the FAC does try to implicate others in Trive's purported statements to Noteholders, it continues to rely on impermissible group-pleading, citing broadly to "insiders" or "managers," without tying particular representations to any specific dates, locations,

---

[16] *See also, e.g.*, FAC ¶ 9 ("*Thadani* took the lead on most of the management calls with potential purchasers") (emphasis added); *id.* ¶ 18 ("*Thadani* touted the Company's stable income and an accelerating M&A pipeline that would purportedly allow Lucky Bucks to quickly outgrow its leverage") (emphasis added).

recipients, or other contextual clues that could remotely explain which non-Trive defendant supposedly said what to any particular Noteholder. *See, e.g.*, *id*. ¶ 156. ("Thadani *and the insiders* repeatedly touted the renewal rate") (emphasis added); *id*. ¶ 172 ("Thadani *and the insiders* made clear that Holdings was an entity with no operations") (emphasis added). These issues were identified in the Management Defendants' original motion but remain unaddressed by the FAC.

60. Thus, for almost all of the statements allegedly made to the Noteholders, defendants are simply left to guess whether any allegation applies to them. This falls far short of Rule 9(b). *See, e.g.*, *MBIA Ins. Corp. v. Tilton (In re Zohar III, Corp.)*, 2021 WL 3124298, at *12 (Bankr. D. Del. July 23, 2021) (Owens, J.) (each defendant is entitled to receive notice of the specific part they allegedly played); *Joseph v. Frank (In re Troll Commc'ns, LLC)*, 385 B.R. 110, 120-21 (Bankr. D. Del. 2008) (dismissing complaint that failed to specify which defendants participated in the alleged wrongful actions).

61. The FAC's only attempt to remedy these deficiencies is to tack on rote parentheticals stating that the alleged statements by "insiders" "includ[es] Sekhri and Boyden on calls, and Ijaz and Bouskill in preparing and directing preparation of written materials" (*id*. ¶¶ 147, 156, 164). But, as explained below, these allusions to "calls" and "written materials" are just smoke and mirrors—no actual misrepresentation to Noteholders is ever alleged.

> ii. *Of the few "misstatements" attributed to the Management Defendants, the Complaint fails to plead falsity, intent, or reliance.*

62. Aside from the group-based allegations above, the FAC is full of selected quotes from certain Management Defendants' emails to each other (although always without context and in many cases totally unrelated to the Notes or Noteholders, as explained below). But it contains almost no purported statements by the Management Defendants *to the Noteholders*, and certainly none that is actionable as fraud:

63. **_Defendant Lippa._** There is not a single allegation of any statement made by Ms. Lippa whatsoever, nor is she alleged to have played any role in the offering materials, marketing of the Notes, or even to have been involved in managing the Company's business.

64. **_Defendants Bouskill and Ijaz._** As for Messrs. Bouskill and Ijaz (alleged to be the Company's former "CFO" and "controller," respectively (FAC ¶ 338)), the Trustee does not cite a single meeting, phone call, email, or other communication between either Messrs. Bouskill or Ijaz and any Noteholder. Instead, the FAC posits that Messrs. Bouskill and Ijaz—along with Trive, Houlihan "and certain Lucky Bucks insiders"—provided (unspecified) input to be used in the CIM (_id_. ¶¶ 130-31, 148) and by Trive to respond to diligence requests from Noteholders (_id_. ¶¶ 136, 149). But these cryptic statements do not come close to supporting a claim.

65. As to the CIM, the FAC admits that Houlihan Lokey prepared it (which is the only "offering material" identified), so even if it contained a false statement, it would not be attributable to Messrs. Bouskill and Ijaz. _Id._ ¶ 131; _see also id._ ¶ 9 (the CIM was "prepared by Lucky Bucks's advisors"). Relatedly, the Complaint never identifies what specific "input" within the 52-page CIM was supposedly provided by Messrs. Bouskill and Ijaz—much less that it was false or misleading, or that it was ever even viewed by any Noteholders. Courts may dismiss claims at the pleading stage where, as here, the allegations do not support an inference of reasonable or justifiable reliance. _Stanziale v. Khan (In re Evergreen Energy, Inc.)_, 546 B.R. 549, 560 (Bankr. D. Del. 2016) (dismissing fraud and negligent misrepresentation claims for lack of plausible reliance allegations). In any case, upon closer reading, the Complaint does not actually plead that any statements in the CIM were false.[17]

---

[17] Contrary to the Trustee's allegations, the CIM did not purport to provide an "actual rate of attrition" for 2021; it merely reported the number of contracts expiring in 2021 and stated that the contract renewal rate _in 2020_ had been 86%. Ex. A at 36. Neither data point is alleged to be false. Likewise, the Trustee complains that the CIM cited to Lucky Bucks's "'pro forma' EBITDA" for the 12 months ending on March 31, 2021, instead of showing more "recent

66.     Apparently recognizing the deficiencies in his CIM pleading, the Trustee now alleges that, during the diligence process, Messrs. Bouskill and Ijaz "would help prepare talking points and compile information to be presented to the Noteholders at Thadani's and Sekhri's request." FAC ¶ 150. But, as with the CIM, the Trustee never actually identifies any such "talking points" or "information," explains how that information was false, or that it was reviewed and relied upon. Similarly, the FAC states that Messrs. Bouskill and Ijaz were copied on emails containing diligence questions from potential Noteholders and "worked together to field diligence inquiries regarding Lucky Bucks's COAM machine count, M&A pipeline, and EBITDA margin" and provided information to Trive for use in responding to those requests. *Id.* ¶¶ 136-37. But, again, the Trustee does not close the loop by specifically identifying what "information" he is describing—much less that it was false or even relied upon by Noteholders.

67.     Finally, all of these allegations fail for lack of pleading intent. Even assuming that Messrs. Bouskill and Ijaz did provide some specific piece of information that wound up in a Noteholder's hands and was detrimentally relied upon (none of which is actually pleaded), the claims against them would still fail because there is not a single allegation remotely suggesting that either defendant provided any false information *knowingly* or with fraudulent intent. That failure alone is fatal.

68.     ***Defendant Boyden.*** The Complaint cites a single instance in which Mr. Boyden

---

poor performance" (FAC ¶ 9), but acknowledges those pro forma projections were clearly labeled as such. The Company was not required to disclose every single business development in real time. *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1432 (3d Cir. 1997) (noting the "well settled []principle that an accurate report of past successes does not contain an implicit representation that the trend is going to continue" and does not "obligate the company to update [investors]" on current conditions); *see also Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D.N.J. 1995) (rejecting notion that company "had a duty to disclose a negative trend in returns for the quarter that was in progress"), *aff'd*, 82 F.3d 408 (3d Cir. 1996). That the Noteholders now wish they had sought more recent data does not support a fraud claim.

made an allegedly false statement to Noteholders: the November 29, 2021, Holdings' solvency certification, in which Mr. Boyden represented that Holdings was solvent and that a solvency investigation had occurred.  *E.g.*, FAC ¶¶ 179-180.  For several reasons, this does not come close to supporting a fraud claim.  First, the Trustee does not plausibly show that Holdings was insolvent when it paid the dividends, so he cannot plausibly show the certification was false to begin with.

69.     Second, even assuming the solvency certificate was somehow "false" when made, it still would not amount to fraud because the Trustee alleges no facts even suggesting that Mr. Boyden *knew* it was false when made.  In fact, the Trustee's sole basis for challenging the veracity of the solvency certificate rests on his bald mischaracterization of a single email between *two other* Defendants sent weeks before the certification was even signed.  Specifically, the Complaint states that, upon reviewing the certification's proposed language, Mr. Bouskill asked Mr. Ijaz, "[d]idn't we run a calculation to make sure we're ok here?"  Mr. Ijaz replied: "Not that I can recall, I checked my emails as well."  *Id.* ¶¶ 17, 180.[18]  According to the FAC, this single exchange (quoted without any context) somehow amounts to a "concession that [the Company] had not performed a solvency analysis" before Mr. Boyden signed the certificate and that Mr. Boyden knew that.  *Id.* ¶ 211.  There is no justification for that leap of logic, especially when Mr. Boyden was not even a participant in that exchange, and the FAC pleads no other facts that remotely give context to these comments.  If anything, it is more plausible to conclude there *was* such an analysis, given Messrs. Bouskill and Ijaz's early focus on the matter.  In any event, it makes no difference whether they themselves "ran a calculation" because neither Mr. Bouskill nor Mr. Ijaz signed the certificate.

---

[18] While the Trustee bemoans that the Company did not obtain an independent solvency analysis (FAC ¶ 199) (again, with no factual support), that is irrelevant because Mr. Boyden's certification did not represent otherwise.  He merely stated that he had made, or caused to be made, "such examination or investigation as [wa]s necessary to enable [him] to express an informed opinion."  *Id.* ¶ 179.

The Trustee's insinuation of both intent and falsity is further undermined by the fact that only a few months later the Noteholders received audited financial statements for 2021, and—noticeably—there is no allegation that the Company's independent auditor booked any impairments or otherwise raised solvency concerns when assessing the Company's balance sheet. *See* Ex. B at § 6.01 (requiring Company to provide audited annual financial statements as of December 31, 2021).

70.     In sum, the FAC does not come close to satisfying Rule 9(b)'s requirement to allege *how* and *why* Mr. Boyden's solvency certification was purportedly fraudulent—much less that he knew it to be so.  *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 142 (3d Cir. 2004) (affirming dismissal where plaintiff "failed to plead with particularity . . . *how* or *why* those statements are false") (emphasis in original).

71.     ***Defendant Sekhri.***  Regarding Mr. Sekhri, the FAC generally alleges that he joined Thadani during three telephone calls with unidentified potential investors, but attributes only two statements to Mr. Sekhri during the marketing process, neither of which is actionable.

72.     First, the Complaint states that "Thadani and management, including Sekhri," touted Lucky Bucks's "strong relationship with the GLC" to unspecified Noteholders during the marketing process, which "falsely assured [Noteholders] that Lucky Bucks was unlikely to be subject to regulatory risk or enforcement actions."  FAC ¶¶ 182-87. Second, together with Thadani, Mr. Sekhri allegedly touted "the strength of Lucky Bucks's 'farm team'"—the team of salespeople that scoped out and assembled valuable locations for acquisitions (*id*. ¶10) and described Lucky Bucks as "a higher moral compass player" (*id*. ¶¶ 142, 265).

73.     The FAC claims these statements were made "in calls" on August 27, November 21, and November 22, 2021.  *Id*. ¶ 142.  Yet it noticeably does not identify which (if any) Noteholders were present, how either statement was relied upon, or a basis to suggest that Mr. Sekhri believed they were false.  And, even if these required elements were remotely pleaded, none of the statements attributed to Mr. Sekhri could support a claim because they are classic examples of subjective opinions and beliefs, or "puffery," that are not susceptible to proof and cannot be relied upon as a matter of law.  *See, e.g.*, *In re Xinhua Fin. Media, Ltd. Sec. Litig*., 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("soft adjectives" such as "strong," "experienced," and "capable," were "nothing more than puffery, which is not actionable."); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp*., 450 F. Supp. 3d 379, 400 (S.D.N.Y. 2020) ("experienced management team with proven operational capabilities" is puffery; statements were "general, delivered in corporate jargon, and relate to future expectations") (citation omitted); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc*., 2015 WL 3833849, at *30 (M.D. Pa. June 22, 2015) (statements that management was "'deep and experienced,' 'strong,' and [had a] 'proven track record'" were non-actionable).

74.     All other Noteholder communications attributed to Mr. Sekhri occurred *after* the Notes were issued.  Specifically, the FAC alleges that, after they began to see the Company's worsening financial results in 2022, "[c]ertain Noteholders spoke to Thadani and Sekhri, who provided a false narrative that results were weaker generally due to potential regulatory/tax environment changes."  *Id*. ¶ 214.  But the Notes were purchased in November 2021 and January 2022.  Thus, even if the Court accepts this conclusory statement as true, it would not be actionable because the Noteholders could not have relied on it in purchasing the Notes.  *See, e.g*., *Shea v. Best Buy Homes, LLC*, 533 F. Supp. 3d 1321, 1338 (N.D. Ga. 2021) (dismissing fraud claim under Rule

12 (b)(6) and noting that "some of the allegedly false statements that the Complaint identifies were made after Plaintiff had accepted the offer and signed the Contract.").

> iii.   *The remaining allegations against the Management Defendants reflect routine business matters with no connection to the Notes Issuance.*

75.     To camouflage the utter lack of alleged misstatements or other misconduct by any of the Management Defendants, the Trustee stuffs the pleading with irrelevant facts that merely show these individuals were responsibly performing their roles.

76.     These allegations reflect mundane internal email exchanges or routine business matters, none of which are related to the Notes or Noteholders.  In each case, the FAC seems to suggest that the one or more of the Management Defendants knew or should have known that Trive was making false representations to Noteholders regarding the Company's financial performance, its relationship with the GLC, and the existence of Mr. Damani's alleged looting scheme.  But in none of these instances does the FAC actually connect the dots between any supposed "knowledge" by Management Defendants and any supposedly inaccurate statements made to Noteholders.

77.     For example, the FAC states that Lucky Bucks was marketed as having a "strong relationship" with GLC.  The Trustee alleges this was "false" because "Ijaz and Bouskill discussed in February 2021 that the GLC regulatory attorney responsible for overseeing Lucky Bucks disliked the company" (*id.* ¶ 184), and, nine months later, Ijaz told Bouskill, "I think [the GLC regulatory attorney] just hates us given the history" and that her "tone shows the GLC is not happy with us." *Id*. ¶ 186.  The Complaint does not explain how these two internal emails reflecting Mr. Ijaz's own beliefs about *a particular GLC official* could somehow render as "false" Trive's alleged statements that the Company in general had a "strong relationship" with regulators.  And, even assuming Mr. Ijaz's opinion was inconsistent with Trive's alleged statements to Noteholders, that

would be irrelevant because there is no allegation that Mr. Ijaz made any such a statement himself, or that he was even aware of Trive's statements. The FAC makes similar allegations as to other Management Defendants regarding the Company's financial performance,[19] interactions with GLC,[20] or reports of Mr. Damani's alleged activities,[21] but in each case fails to connect any "knowledge" of any Management Defendant to any statements that were allegedly made to Noteholders.

78.    Elsewhere the Trustee simply resorts to bald mischaracterizations. For example, the Complaint repeatedly cites a January 25, 2022, email in which Mr. Sekhri sent comments to Trive on a presentation to bankers regarding a potential sale of the Company. *Id*. ¶¶ 19, 176. After reviewing an initial draft of the presentation, which had actual Q4 2021 numbers, Mr. Sekhri recommended that "we should somehow just show Yearly numbers on slide 11 with the last bar simply being an Estimate for PF2021," such that "[n]o one will see the split out Q4," because Mr. Sekhri did not want to "telegraph [actual Q4 2021] numbers ahead of what has been given to our lenders." *Id*. According to the Trustee, this comment somehow reflects Mr. Sekhri's "recognition" that the CIM given to Noteholders "had similarly papered over poor 2021 performance . . . ." *Id*. That is baseless—if anything, Mr. Sekhri's comments merely reflect a concern that the Company should not disclose quarterly figures to third parties in advance of its upcoming reporting

---

[19] *See, e.g.*, FAC ¶ 97 ("Bouskill and Ijaz began to notice in 2020 and 2021 that many locations Lucky Bucks acquired were underperforming . . . ."); *id*. ¶ 100 ("[I]n February 2021, Ijaz identified that Lucky Bucks had overpaid by about 63% for certain locations . . . ."); *id*. ¶ 102 ("[I]n October 2021, Ijaz and Bouskill discussed how a purchase from another master license holder experienced a decline of over 50% revenue . . . .").

[20] *See, e.g.*, FAC ¶ 103 ("Sekhri, Bouskill, and Boyden were aware that GLC inspectors were investigating transactions with Unique Amusement, LLC and Klass Amusements LLC as of early November 2021"); *id*. ¶ 185 ("On November 12, 2021, Defendants Sekhri, Boyden, Bouskill, Lippa, and Damani tried to organize a call with the Georgia's governor's office to express their concerns about selective enforcement against Lucky Bucks by the GLC.").

[21] *See, e.g.*, FAC ¶ 215 ("in April 2022, the owner of Georgia Winners . . . informed Ijaz" that Georgia Winners was defrauding the Company at Damani's direction); *id*. ¶ 219 ("In September 2022, a different Georgia master license holder emailed Kassam, Boyden, and Ijaz explaining that he had 'become aware of an elaborate scheme'" regarding inflated COAM sales).

obligations to its bank lenders.  Moreover, this email has nothing to do with the Notes or Noteholders, and there is no other allegation in the FAC that ties these comments to any discussion about the CIM.  And, putting the Trustee's mischaracterization aside, the statement by Mr. Sekhri would not be actionable in any event because it was made "after the second issuance of Notes" (*id.*) and was not made to any Noteholders (or even related to them).[22]

79.     In sum, there is no actionable misstatement alleged by any of the Management Defendants.  The common law claims against them must be dismissed.

C.     <u>The Claims for Attorney's Fees and Punitive Damages Should Be Dismissed (Counts 11 & 12)</u>

80.     Finally, the Trustee's claims for attorney's fees and punitive damages under Georgia law must also fail.  "An award of attorney fees, costs, or punitive damages is derivative of plaintiff's substantive claims."  *Stephen A. Wheat Tr. v. Sparks*, 754 S.E.2d 640, 681-82 (Ga. Ct. App. 2014).  Because the Trustee has failed to plausibly plead any substantive claims, these ancillary remedies are precluded as a matter of law.  *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 644 S.E.2d 440, 449 (Ga. Ct. App. 2007) ("[L]itigation costs[] and punitive damages . . . are not recoverable since [plaintiff's] substantive claims have failed.").

## CONCLUSION

For the reasons above, the Management Defendants respectfully request that the Court dismiss the claims against them with prejudice.

---

[22] In a similar vein, the FAC describes how, in response to a different lender's July 2021 request that Lucky Bucks's auditor show revenue build "on a full twelve-month basis," Mr. Ijaz told Messrs. Sekhri and Bouskill that they "cannot go down this path," and Sekhri described the having to "hide behind the availability of the [GLC] portal data."  FAC ¶ 174.  But the only plausible inference from these comments is that Messrs. Ijaz and Sekhri viewed this last-minute request to be impossible or unreasonable in light of information available, but there is no suggestion (or allegation) that any mistatements were made.  More importantly, this allegation—like the ones above—are irrelevant to the FAC's claims because they have no relation to Holdints, the Holdings Note, or any Noteholders.

Dated: March 24, 2025
       Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ M. Blake Cleary*
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone:  (302) 984-6026
Email:  bcleary@potteranderson.com
       jnoa@potteranderson.com
       jrisener@potteranderson.com

-and-

**ALLEN OVERY SHEARMAN STERLING US LLP**
C. Luckey McDowell (*pro hac vice* application pending)
Ian E. Roberts (*pro hac vice* application pending)
Jacob Fields (*pro hac vice* application pending)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone:  (214) 271-5777
Email:  luckey.mcdowell@aoshearman.com
       ian.roberts@aoshearman.com
       jacob.fields@aoshearman.com

-and-

Samuel Cooper (*pro hac vice* application pending)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone:  (713) 354-4838
Email:   samuel.cooper@aoshearman.com

*Counsel for Manu Sekhri, James Boyden, Ryan Bouskill,*
*Stephanie Lippa, and Hassan Ijaz*