## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LUCKY BUCKS HOLDINGS LLC, | Case No. 23-10756 (KBO) |
| Debtor. | |
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of<br>Lucky Bucks Holdings LLC and as<br>assignee, | Adversary Proceeding<br><br>Adv. Proc. No. 24-50130 (KBO) |
| Plaintiff, | |
| v. | |
| TRIVE CAPITAL MANAGEMENT LLC,<br>TRIVE CAPITAL FUND III LP, TRIVE<br>CAPITAL FUND III-A LP, TCFIII LUCK LP,<br>TCFIII LUCK SPV LP, TCFIII LUCK<br>ACQUISITION LLC, SHRAVAN THADANI,<br>LUCKY BUCKS VENTURES, INC., ANIL<br>DAMANI, SOUTHERN STAR GAMING<br>LLC, SHAFIK KASSAM, JAMES BOYDEN,<br>RYAN BOUSKILL, RYAN C BOUSKILL<br>PROFESSIONAL CORPORATION, 2786692<br>ONTARIO INC., MANU SEKHRI,<br>STEPHANIE LIPPA, and HASSAN IJAZ, | |
| Defendants. | |

## BRIEF IN SUPPORT OF DEFENDANTS LUCKY BUCKS VENTURES, INC. AND ANIL DAMANI'S MOTON TO DISMISS FIRST AMENDED COMPLAINT

BAYARD, P.A.
Ericka Johnson
Steven D. Adler
600 N. King Street, Suite 400
Wilmington, DE 19801

Dated:  March 24, 2025
         Wilmington, Delaware

CHILIVIS GRUBMAN
Lauren A. Warner
Scott R. Grubman
Brittany M. Cambre
1834 Independence Square
Atlanta, Georgia 30338
*Counsel for Defendants Lucky Bucks*
*Ventures, Inc. and Anil Damani*

# TABLE OF CONTENTS

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS** .......................... 1

**SUMMARY OF THE ARGUMENT** ................................................................................. 1

**STATEMENT OF FACTS** ............................................................................................... 2

**ARGUMENT** ................................................................................................................... 5

   I.    Legal Standard for Failure to Sate a Claim. .................................................... 5

   II.   The FAC Fails to State a Claim for Intentional Fraudulent Transfers. ........... 7

       *A.   The Alleged Misrepresentations Were Not Made by LBVI or Mr. Damani.* ................. 8

       *B.   The Insolvency Allegations Are Insufficient and Contradictory.* ................................ 10

       *C.   The FAC Fails to Sufficiently Plead the Remaining Equity Was Worthless.* ............... 14

   III.  The FAC Fails to State a Claim for Constructive Fraudulent Transfers. ....................... 15

       *A.   The FAC Fails to Plead Less than Reasonably Equivalent Value.* .............................. 16

       *B.   The FAC Fails to Plead that Holdings Was Insolvent.* ................................................ 17

   IV.  The FAC Fails to State a Claim for Improper Dividends. ............................................ 18

   V.   The FAC Fails to State a Claim Under Georgia's RICO Statute. ................................. 19

       *A.   The FAC Fails to Adequately Allege Predicate Acts.* .................................................. 21

           1.   There are no allegations that link Mr. Damani to securities fraud. ...................... 21

           2.   The FAC fails to plead wire fraud with specificity. ............................................. 23

       *B.   The FAC Fails to Allege Proximate Cause.* ................................................................ 25

       *C.   The FAC Fails to Adequately Allege A Georgia RICO Claim Under Subsection (b).* 27

       *D.   The FAC Fails to Adequately Allege a Conspiracy Claim Under Subsection (c).* ....... 28

   VI.  The Claims for Attorney's Fees and Punitive Damages Should Be Dismissed. ............ 30

**CONCLUSION** .............................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Benevolent Lodge No. 3 v. Davis*,
   365 Ga. App. 564 (2022) ........................................................................................... 29

*Bonavitacola Elec. Contractor, Inc. v. Boro Devs., Inc.*,
   87 F. App'x 227 (3d Cir. 2003) .................................................................................. 24

*Chambers Dev. Co., Inc. v. Browing-Ferris Indus.*,
   590 F. Supp. 1528 (W.D. Pa. 1984) .................................................................... 28, 29

*Cobb Cnty. v. Jones Grp. P.L.C.*,
   218 Ga. App. 149 (Ga. Ct. App. 1995) ..................................................................... 21

*Faillace v. Columbus Bank & Tr. Co.*,
   269 Ga. App. 866 (2004) ........................................................................................... 21

*Glock v. Glock*,
   247 F. Supp. 3d 1307 (N.D. Ga. 2017) ..................................................................... 26

*Holmes v. Secs. Inv. Protection Corp.*,
   503 U.S. 258 (1992) .................................................................................................. 25

*In re Am. Remanufacturers, Inc.*,
   2007 WL 2376723 (Bankr. D. Del. Aug. 16, 2007) ................................................... 7

*In re Aspect Software Parent, Inc.*,
   578 B.R. 718 (Bankr. D. Del. 2017) ........................................................................... 6

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   804 F.3d 633 (3d Cir. 2015) ...................................................................................... 25

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ......................................................................... 6, 19, 23

*In re Chomakos*,
   69 F.3d 769 (6th Cir. 1995) ...................................................................................... 17

*In re CL H Winddown LLC*,
   2023 WL 5740195 (Bankr. D. Del. Sept. 5, 2023) .................................................... 16

*In re Coated Sales, Inc.*,
    144 B.R. 663 (Bankr. S.D.N.Y. 1992) ...................................................... 12

*In re Edgewater Med. Ctr.*,
    373 B.R. 845 (Bankr. N.D. Ill. 2007) ...................................................... 12

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...................................................... 7, 8

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006) ...................................................... 16

*In re Hechinger Inv. Co. of Del.*,
    327 B.R. 537 (D.Del.2005) ...................................................... 7

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ...................................................... 27

*In re Liquid Holdings Grp., Inc.*,
    2018 WL 2759301 (Bankr. D. Del. 2018) ...................................................... 6

*In re Menser*,
    2021 WL 4484894 (Bankr. N.D. Ga. Sept. 30, 2021) ...................................................... 8, 16

*In re Opus East, LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015) ...................................................... 8

*In re Our Alchemy, LLC*,
    2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) ...................................................... 17

*In re R.M.L., Inc.*,
    92 F.3d 139 (3d Cir. 1996) ...................................................... 16

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002) ...................................................... 6, 23

*In re SemCrude L.P.*,
    648 F. Appx. 205 (3d Cir. 2016) ...................................................... 13

*In re: Liberty State Benefits of Delaware, Inc.*,
    541 B.R. 219 (Bankr. D. Del. 2015) ...................................................... 28

*J. Kinson Cook of Ga., Inc. v. Heery/Mitchell,*
284 Ga. App. 552 (2007) ........................................................................... 30

*Kolar v. Preferred Real Estate Invests., Inc.,*
361 Fed. App'x 354 (3d Cir. 2010) ........................................................... 24

*Kost v. Kozakiewicz,*
1 F.3d 176 (3d Cir. 1993) ........................................................................... 5

*Lum v. Bank of America,*
361 F.3d 217 (3d Cir. 2004) .......................................................... 6, 14, 24, 25

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.,*
945 F.2d 635 (3d Cir. 1991) ............................................................10, 11, 16

*Mosiman v. Madison Cos., LLC,*
2019 WL 203126 (D. Del. Jan. 15, 2019) ............................................ 6, 14

*Parm v. Nat'l Bank of Ca.,*
242 F. Supp. 3d 1321 (N.D. Ga. 2017) ................................................... 27

*Pollman v. Swan,*
314 Ga. App. 5 (Ga. Ct. App. 2011) ....................................................... 25

*Recovery Fund II USA LLC v. Rabobank, Nat'l Ass'n,*
2020 WL 509166 (D. Del. Jan. 31, 2020) .............................................. 26

*Reves v. Ernst & Young,*
507 U.S. 170 (1993) .................................................................................. 27

*Stephen A. Wheat Tr. v. Sparks,* 3
25 Ga. App. 673 (2014) ............................................................................ 30

*Thompson v. State,*
211 Ga. App. 887 (Ga. Ct. App. 1994) ................................................... 21

*United States v. Pearlstein,*
576 F.2d 531 (3d Cir. 1978) ..................................................................... 24

*Warden v. McLelland,*
288 F. 3d 105 (3d Cir. 2002) ................................................................... 25

*Wylie v. Denton*,
   323 Ga. App. 161 (Ga. Ct. App. 2013) ........................................................ 20, 25, 28

*Zazzali v. Hirschler Fleischer, P.C.*,
   482 B.R. 495 (D. Del. 2012) ........................................................ 24, 27, 29

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ........................................................ 29, 30

*Z-Space, Inc. v. Dantanna's CNN Ctr, LLC*,
   349 Ga. App. 248 (Ga. Ct. App. 2019) ........................................................ 23, 29

## Statutes

11 U.S.C. § 544(b) ........................................................ 7, 15

11 U.S.C. § 548(a)(1)(A) ........................................................ 7, 11

11 U.S.C. § 548(a)(1)(B) ........................................................ 15, 16

18 U.S.C. §1341 ........................................................ 23

18 U.S.C. § 1343 ........................................................ 21, 23

18 U.S.C §1961(1) ........................................................ 23

6 Del. C. § 1304(a)(1) ........................................................ 7

6 Del. C. § 1304(a)(2) ........................................................ 15

6 Del. C. § 18-607(a) ........................................................ 18

6 Del. C. § 18-607(b) ........................................................ 18

O.C.G.A. §10-5-1 ........................................................ 21

O.C.G.A. § 16-14-3(4)(A) ........................................................ 21

O.C.G.A. §16-14-3(5)(A) ........................................................ 22

O.C.G.A. §16-14-3(5)(C) ........................................................ 23

O.C.G.A. § 16-14-3(8)(A) ........................................................ 20

O.C.G.A. § 16-14-4(a) ............................................................................................... 20

O.C.G.A. §16-14-4(b) ............................................................................................... 20

O.C.G.A. §16-14-4(c) ................................................................................................ 20

O.C.G.A. § 16-14-6(c) ............................................................................................... 25

O.C.G.A. § 18-2-74 *et seq*. ................................................................................... 7, 15

O.C.G.A. § 50-27-4.................................................................................................... 14

**<u>Rules</u>**

Federal Rule of Bankruptcy Procedure. 7012(b) .......................................................... 6

Federal Rule of Civil Procedure 8……………………………..…………………….7, 21, 22

Federal Rule of Civil Procedure 9(b)....…………………………………………….passim

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 1, 5

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On September 13, 2024, Marc Abrams ("Trustee") in his capacity as Chapter 7 Trustee of Lucky Bucks Holdings, LLC ("Holdings") and as assignee for the Noteholders (as defined below), initiated this Adversary Proceeding against 17 Defendants, including Lucky Bucks Ventures, Inc. ("LBVI") and Anil Damani. (Compl., Doc. 2.) The Trustee filed a First Amended Complaint ("FAC") on January 21, 2025, after the Defendants moved to dismiss the initial Complaint, purportedly adding additional facts in support of his allegations and to address the myriad pleading and legal deficiencies. (Doc. 57, 58.) The central allegations in the FAC remain largely unchanged. The Trustee alleges that Defendants made fraudulent misrepresentations to the Noteholders that caused them to invest in Holdings, after which the Defendants received $250 million in cash dividends in November 2021 and January 2022. Now the Trustee, on behalf of Holdings and as assignee for the Noteholders, who are sophisticated Wall Street investors and Holdings' only creditors, wants that money back. To that end, the Trustee asserts claims against LBVI for intentional fraudulent transfers (Counts 1, 3), constructive fraudulent transfers (Count 2, 4), and improper dividends (Count 5). The Trustee asserts claims against Mr. Damani for violations of Georgia's RICO law (Counts 7, 8). The Trustee also seeks to recover attorney's fees and punitive damages under Georgia law against all Defendants (Counts 11, 12).

## SUMMARY OF THE ARGUMENT

LBVI moves to dismiss Counts 1-5 pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Trustee fails to properly plead a claim for intentional fraudulent transfer because there are insufficient allegations to link LBVI to the badges of fraud, which include material misrepresentations to the Noteholders, insolvency, and allegations that the remaining equity was worthless. Furthermore, the Trustee fails to state claim for constructive

fraudulent transfer because he fails to plead the distributions were for less than reasonably equivalent value or that Holdings was insolvent. LBVI moves to dismiss the claim for improper dividends because the Trustee fails to adequately allege facts showing a violation of Delaware law. Mr. Damani moves to dismiss Counts 7-8 for failure to state a Georgia RICO claim. The FAC fails to link Mr. Damani to securities fraud, and wire fraud is not pled with the requisite specificity. The RICO conspiracy claim is conclusory and fails to satisfy the requisite pleading standard. Lastly, because the Trustee's substantive claims fail, so too do his claims for attorneys' fees and punitive damages. The FAC does nothing to salvage the Trustee's claims.

## **STATEMENT OF FACTS**

The Debtor is Holdings, a Delaware limited liability company formed in the fall of 2021. (FAC ¶¶35, 119, 121-23.) On June 9, 2023 (the "Petition Date"), Holdings initiated the above-captioned bankruptcy proceedings seeking relief under chapter 11 of the Bankruptcy Code. Holdings' sole asset was its ownership of shares in Lucky Bucks, LLC ("Lucky Bucks"). (*Id.* ¶7.)

Lucky Bucks was formed in 2011 by Mr. Damani and grew to become the largest member of the Coin Operated Amusement Machine ("COAM") industry in Georgia, which is heavily regulated by the Georgia Lottery Corporation ("GLC"). (*Id.* ¶¶64, 71.) COAM machines are skills-based amusement machines, most of which are placed in gas stations and convenience stores, that allow players to accumulate points that they can use towards in-store credit for things like gas, merchandise, other lottery games, or more game play. (*Id.* ¶63.) The machines resemble slot machines, but there are no cash prizes. (*Id.*) Lucky Bucks was a Class B master licensee, legally authorized to own and place COAM machines at licensed locations in Georgia. (*Id.* ¶¶64, 66.) A master license holder cannot also have a location license, nor can it have an ownership interest in a location where its machines are placed. Instead, a master licensee contracts with a location

licensee. (*Id.* ¶68.) Both master and location licenses, and the requisite location contracts, are issued by the GLC and carry substantial monetary value. (*Id.* ¶69.) Under Mr. Damani's stewardship, Lucky Bucks became the largest master license holder in Georgia based in part on acquiring other master licenses and location contracts. (*Id.* ¶71.)

In 2016, Mr. Damani sold 51% of his equity interest in Lucky Bucks, retaining his remaining equity through Lucky Bucks' former parent company, LBVI. Following a subsequent sale that further reduced his equity to 30%, the majority 70% ownership rested with an entity whose then-parent was a publicly traded company on the Toronto Stock Exchange. (*Id.* ¶¶72, 74.) In August 2020, one of the Trive[1] entities purchased all outstanding equity in Lucky Bucks' parent company, except the shares owned by Manu Sekhri, in a take-private transaction for $126 million. (*Id.* ¶¶81-82.) At that point, the Trustee alleges that Trive took control of Lucky Bucks, installed its own leadership and board members, and began directing Lucky Bucks' business. (*Id.* ¶¶82-90.) LBVI was able to install one board member, Tony Kassam. (*Id.* ¶85.) In July 2021, Lucky Bucks at TCM's direction entered into a senior secured credit agreement for $535 million in part to fund distributions to its shareholders. Lucky Bucks subsequently issued a cash dividend of $200 million with the financing proceeds. (*Id.* ¶¶112-13.) Trive retained Houlihan Lockey as the banker and Shearman as legal counsel for this transaction. (*Id.* ¶111.)

After that July 2021 distribution, the Trustee alleges that TCM "engineered the formation of Holdings" to enable Lucky Bucks to borrow money without running afoul of its credit agreements. (*Id.* ¶¶121-22.) Holdings had no operations, and its only asset was its ownership of Lucky Bucks. The Trustee admits this type of holding company structure is common in industries

---

[1]  "Trive" or "Trive Defendants" refers collectively to Defendants Trive Capital Management, LLC ("TCM"), Trive Fund III LP, Trive Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star Gaming LLC, and Shravan Thadani. (FAC ¶¶36-43.)

that use mezzanine financing, but claims no such intention existed here. (*Id.* ¶122.) The plan was for Holdings to issue $250 million of notes (the "Notes") to investors based on Lucky Bucks' financial health. (*Id.* ¶8.) TCM "took an active role in Note Issuance," once again engaging Houlihan Lockey and Shearman for this transaction. (*Id.* ¶129.) TCM and Thadani then began actively marketing the Notes to potential investors. (*Id.* ¶130.)

Then, the Trustee alleges that Trive and the "insiders" – a group he fails to define at any point and indeed uses to refer to different people at different times – made misrepresentations about Lucky Bucks' financial strength, stability, future growth, solvency, and regulatory environment to sell Notes. (*Id.* ¶¶155-88.) Notably, the Trustee claims that, despite the involvement of several reputable and well-known professionals in these transactions, including Trive, Houlihan Lockey, Shearman, and the six "sophisticated" funds that purchased Notes, no one vetted Holdings' solvency before handing over $250 million. (*Id.* ¶¶189, 199.) Nevertheless, upon issuing the Notes in November 2021 and January 2022, Holdings distributed a total of $237.7 million to four Defendant entities that then distributed the funds to the other Defendants. (*Id.* ¶¶202-03.) After that, Lucky Bucks's value declined and it filed for bankruptcy in June 2023. (*Id.* ¶234.)

The Trustee portrays Mr. Damani as lurking in the background, ever-present but admittedly not directly involved in the marketing or sale of the Notes. (*Id.* ¶262.) Nevertheless, the Trustee alleges that Mr. Damani "looted" Lucky Bucks based on allegations made by Lucky Bucks' new owner, Arc Gaming, in a lawsuit filed in Georgia state court ("Georgia Action"). Without any direct tie between Mr. Damani's purported conduct in the internal affairs of Lucky Bucks and the alleged misrepresentations made to the Noteholders, the Trustee alleges that Mr. Damani is implicated in this case by virtue of the fact that Thadani and others kept him in the loop via emails (*id.* ¶¶152-53) and he appointed a board member of Holdings pursuant to his ownership of LBVI (*id.* ¶125).

The FAC is 22 paragraphs and 6 pages longer than the initial Complaint.[2] The only additional language in the FAC regarding LBVI or Mr. Damani is minimal and does not resolve or otherwise address the arguments set forth in LBVI and Mr. Damani's motion to dismiss the initial Complaint. There are 5 revisions to the FAC that mention LVBI or Damani, none of which add anything new: "on information and belief" Kassam acted at Mr. Damani's request when he told Lucky Buck's employees to file "no challenge" notices for location owners who wanted to switch to a new master licensee (FAC ¶146); Mr. Damani was a Georgia resident at the time of the marketing and diligence process for the Notes (*id.* ¶154); email communications between Ijaz, Sekhri, and Bouskill mention walking Mr. Damani through the need to slow down acquisitions in order to increase distributions (*id.* ¶168); Trive and the Management Defendants represented that Lucky Bucks was in compliance with GLC orders and regulations, which was not true because Mr. Damani was "still directing the Company's M&A strategy" and had the ability to nominate a manager to the board (*id.* ¶¶183-84); and additional, but not new, language that Mr. Damani directed fake players to inflate location results so those locations could be sold to Lucky Bucks at higher prices (*id.* ¶¶328, 353).

## **ARGUMENT**

### **I.     Legal Standard for Failure to Sate a Claim.**

A motion to dismiss is designed to test the sufficiency of the allegations in a complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The purpose of Rule 12(b)(6) "is to allow the court to eliminate actions that are *fatally flawed in their legal premises and destined to fail*,

---

[2]     The Trustee added information to existing paragraphs, deleted some paragraphs, and added new paragraphs to the FAC. The following FAC paragraphs were not part of the initial Complaint: FAC ¶¶115, 136-37, 145, 154, 174-75, 183, 191, 193-98, 256, 331-32, 339-41, 353-54. Only three of these paragraphs reference LBVI or Mr. Damani, and all relate to allegations that were included in the initial Complaint. (*Id.* ¶¶154, 183, 353.) LBVI and Mr. Damani incorporate by reference all applicable arguments and authorities raised in the Trive Defendants and Management Defendants' respective motions to dismiss the FAC.

and thus to spare litigants the burdens of unnecessary pretrial and trial activity." *In re Aspect Software Parent, Inc.*, 578 B.R. 718 (Bankr. D. Del. 2017) (emphasis added). "To survive a motion to dismiss, a complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id*. The Court's review of a motion to dismiss is limited to the allegations in the complaint, any attached exhibits, any documents incorporated by reference, other documents that are referenced in the complaint or that form the basis of a claim, anything subject to judicial notice, and matters of public record. *Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004), *abrogated on other grounds recognized by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010); *Mosiman v. Madison Cos., LLC*, 2019 WL 203126 (D. Del. Jan. 15, 2019). Rule 12(b)(6) applies in adversary proceedings. F. R. Bank. P. 7012(b).

The Trustee's claims for intentional fraudulent transfer (Counts 1, 3), improper dividends (Count 5), and Georgia RICO (Counts 7, 8) are subject to the heightened pleading standard of Rule 9(b). *See In re Liquid Holdings Grp., Inc.*, 2018 WL 2759301, at *12 (Bankr. D. Del. 2018). "A pleading is sufficient under Rule 9(b) if it states the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Mosiman*, 2019 WL 203126, at *3; *accord In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (Rule 9(b) requires plaintiffs to "support their allegations of . . . fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' . . . the 'who, what, when, where and how' of the events at issue"). In addition, "boilerplate and conclusory allegations will not suffice," and plaintiffs have an obligation to "accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Pleadings like the instant FAC, in which multiple parties are collectively lumped together as targets of otherwise vague allegations, constitute "shotgun pleadings." *In re Am. Remanufacturers, Inc.*, No. 05-20022 PJW, 2007 WL 2376723, at \*4 (Bankr. D. Del. Aug. 16, 2007). Here, the Trustee pleads using one of two extremes – he either identifies certain Defendants by name or refers to the action of collective "insiders," and sometimes he does both at same time.[3] The 17 Defendants are left to guess whether each reference to "insider" applies to them, which does not provide adequate notice of the claims that Rules 8 and 9(b) require.

## II.    The FAC Fails to State a Claim for Intentional Fraudulent Transfers.

The Trustee asserts two claims for intentional fraudulent transfer against LBVI. Count 1 is made on behalf of Holdings under the federal Bankruptcy Code, 11 U.S.C. §548(a)(1)(A), and, pursuant to his authority in 11 U.S.C. §544(b), the Delaware Uniform Fraudulent Transfer Act ("DUFTA"), 6 Del. C. §1304(a)(1), and the Georgia Uniform Voidable Transactions Act ("GUVTA"), O.C.G.A. §18-2-74 *et seq*. In Count 3, the Trustee asserts the same claims under the DUFTA and the GUVTA on behalf of the Noteholders as assignee. The Trustee fails to properly plead these claims as to LBVI, and both should be dismissed.

To avoid a transaction under Bankruptcy Code Section 548(a)(1)(A), the Trustee "must show that the transaction was made 'with actual intent to hinder, delay or defraud'" creditors. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (citing *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550 (D. Del. 2005)). Recognizing the difficulty a trustee may have pleading intent, the court may infer intent from the existence of certain "badges of fraud," including "(1)

---

[3]    *Compare* FAC §VI.F.3, p.40 ("Trive and the Management Defendants") *with* ¶¶1, 2, 4, 15, 30.g., 206, 275.a. (collective "insiders") *and* ¶15 ("insiders" includes Boyden, Bouskill, Lippa, Ijaz, and Kassam), ¶¶17, 118, 235, 275.j. ("Trive and the other insiders"), ¶¶21, 156, 172 ("Thadani and other insiders"), ¶26 ("Damani, Kassam, and other insiders"), ¶131 ("insiders" includes Thadani, Sekhri, Ijaz, Bouskill, Boyden, and Kassam), ¶291 ("insiders" includes Kassam, Boyden, Bouskill, Sekhri, and Lippa); ¶348 ("Insiders").

the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction." *Id.* at 545. The analysis of fraudulent transfer claims under both DUFTA and GUVTA are substantially similar to Section 548 of the Bankruptcy Code. *In re Opus East, LLC*, 528 B.R. 30, 82 (Bankr. D. Del. 2015); *In re Menser*, No. 18-65681-JWC, 2021 WL 4484894, at *3 (Bankr. N.D. Ga. Sept. 30, 2021).

The Trustee alleges that the Damani Defendants (defined as LBVI and Mr. Damani (FAC ¶¶ 44-46)) acted with actual intent when they authorized and approved the Holdings Distributions. (*Id.* ¶¶ 274, 303.) The Trustee concludes that multiple badges of fraud are present, but his apparent focus is the relationship between the debtor and the transferee vis-à-vis alleged misrepresentations made to the Noteholders to get them to purchase the Notes, Holdings' alleged insolvency when the distributions were made, and the purported transfer of substantially all of Holdings' assets. (*Id.* ¶¶ 275, 304.) The FAC lacks sufficient factual allegations connecting LBVI or Mr. Damani to any of these badges of fraud, let alone to create a plausible inference of actual intent.

### A. The Alleged Misrepresentations Were Not Made by LBVI or Mr. Damani.

The Trustee claims that intent may be inferred from alleged material misrepresentations that Trive, which includes Thadani, and the Management Defendants, which includes Sekhri, Kassam, Boyden, Bouskill, Lippa, and Ijaz, made to the Noteholders. (FAC ¶¶43, 55, 275.c, 304.c, 155-89.) Those allegations say nothing about LBVI and include few tenuous mentions of Mr. Damani in an attempt to support a claim against LBVI. Indeed, the Trustee admits that Mr. Damani "had no formal role in approving or leading the Note issuance or Holdings Distributions." (*Id.* ¶ 262.) The alleged misrepresentations were:

1) Lucky Bucks' location contracts were stable, long-term, and difficult to get out of. The Trustee alleges that was not true because the restructuring advisors ran the numbers in March 2023 and found that the attrition rate in November 2021 was 11% instead of 1% and Kassam directed Lucky Bucks not to contest location owners who wanted to switch to new master licensees. (*Id.* ¶¶156-63.)

2) Lucky Bucks' "farm team" increased its acquisition of new locations, which caused the EBITDA to grow. The Trustee alleges EBITDA growth was overstated. (*Id.* ¶¶164-66.)

3) Lucky Bucks would continue to grow because it had a strong pipeline of location contracts to acquire. (*Id.* ¶167.) The Trustee alleges this was false because the pipeline was dry. (*Id.* ¶168.) Thadani reportedly was "skittish" about the financial profile and how lenders and investors would respond. (*Id.* ¶170.)

4) Lucky Bucks' financials were accurate. The Trustee admits that Thadani and the "insiders" made clear when marketing the Notes that "Holdings was an entity with no operations, and that the strength of the opportunity was based solely on Lucky Bucks's financials and projections." (*Id.* ¶172.) However, the Trustee alleges the numbers showed a decline. (*Id.* ¶173, 176.)

5) The solvency certificate, signed by Boyden on November 29, 2021, certified that an examination and investigation was made under his supervision to enable him to express the opinion in the certificate. (*Id.* ¶179.) The Trustee alleges there was no investigation because, in an email sent days before, Ijaz could not recall running a "calculation." (*Id.* ¶180.)

6) Lucky Bucks was marketed as having a strong relationship with GLC in 2021. The Trustee alleges that was not true because of Mr. Damani's 2020 settlement with the GLC. He also alleges there were concerns that GLC's attorney did not like Lucky Bucks and would take action at renewal time. (*Id.* ¶182.)

The only factual allegations regarding Mr. Damani and the Note Issuance are: he was "kept in the loop" and could answer questions (*id.* ¶163); Thadani suggested that Mr. Damani should participate in a call and allegedly understood that Mr. Damani introduced acquisition opportunities (*id.* ¶169); and Lucky Bucks was not in compliance with the 2020 GLC settlement because Mr. Damani was directing M&A and had the ability to and did nominate Mr. Kassam to the board (*id.* ¶184). The remaining allegations plead conduct by other Defendants. (*See, e.g., id.* ¶¶81-90, 119, 123, 128, 130-31, 135-46, 150.)

The facts specific to LBVI and Mr. Damani do not constitute or support the presence of any badge of fraud and are plainly insufficient to allege *actual fraudulent intent* by LBVI or Mr.

Damani. The crux of the FAC is that "Trive and the insiders" made material misrepresentations to induce the Noteholders to invest, but there are no facts connecting LBVI or Mr. Damani to those misrepresentations. The allegations also fall far short of Rule 9(b)'s requisite specificity.

### B.   *The Insolvency Allegations Are Insufficient and Contradictory.*

The Trustee alleges that the distributions in November 2021 and January 2022 rendered Holdings insolvent with unreasonably small capital left to repay the Notes, which supports an inference of actual fraud. (FAC ¶¶17, 181.) What the Trustee pleads, however, belies and contradicts any such claim of insolvency. Insolvency is a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991), as amended (Oct. 28, 1991) (holding leveraged buyout was not an avoidable fraudulent transfer). "Under section 548, insolvency is to be measured at the time the debtor transferred value or incurred an obligation." *Id.* In support of his claim, the Trustee points to allegedly inflated financials, declining revenue in 2021, and the solvency certificate Boyden signed on November 29, 2021 as a condition for issuance of the Notes.

Holdings was formed to issue and market the Notes; its only asset was ownership of Lucky Bucks' shares. (FAC ¶¶204-05.) The Trustee admits that Thadani and the "insiders" made clear when marketing the Notes that "Holdings was an entity with no operations, and that the strength of the opportunity was based solely on Lucky Bucks's financials and projections." (*Id.* ¶172.) However, the Trustee claims that Lucky Bucks' financials were "unreliable in light of the rampant misconduct and misrepresentations of Damani, Kassam, and Trive, which misrepresented true EBITDA and attrition rates." (*Id.* ¶211.) Notwithstanding that the allegations were deemed insufficient to assert a claim of fraud in the Georgia case as set forth in greater detail below, there are no *facts* in the FAC to support that contention. The Trustee claims that Trive and its team seized

10

control of Lucky Bucks in August 2020 via a take-private transaction. (*Id.* ¶82.) In support of his claim that Lucky Bucks' financial condition was "much worse" than what was presented to the Noteholders, the Trustee cites one statement by Thadani on December 9, 2021 that he was "skittish" about its "current/temporary financial profile." (*Id.* ¶207.) Although the Trustee alleges that the value of Holdings' shares was minimal, he admittedly does not have the documentation needed to calculate that value.[4] (*Id.* ¶207 and n. 6.) None of this relates to LBVI or Mr. Damani.

The Trustee alleges that Boyden signed a worthless solvency certificate for which he and Ijaz "conce[ded] that they had not performed a solvency analysis." (*Id.* ¶211.) This purported concession is based solely on Ijaz's response to an email from Bouskill days before the certificate was signed in which he did not recall running a calculation. (*Id.* ¶¶179-80.) There are no factual allegations as to what happened in the interim, yet the Trustee simply concludes no one did anything else and "[n]o independent third party vetted Holdings' solvency prior to the distributions." (*Id.* ¶199.) Holdings then "shifted" the risk of its unstable future revenue streams to creditors through a leveraged dividend. (*Id.* ¶17.) Although Section 548 applies to leveraged transactions, a key feature of which is equity in exchange for debt, they are not inherently fraudulent. *Mellon Bank*, 945 F.2d at 645. In fact, the Trustee admits that the structure on which Holdings is based is a form of mezzanine financing that is "common in other industries." (FAC ¶122.) He offers no facts to support his conclusion that the structure here was improper other than an investment that failed to deliver the expected returns.

The Trustee's other allegations of Lucky Buck's underperformance all arise *after* the two distributions he seeks to recover. Indeed, the Trustee admitted that the numbers in first quarter

---

[4]    The Trustee blames this missing documentation on Ijaz's alleged deletion of his Lucky Bucks' emails before the change in control after its Chapter 11 plan. However, the Trustee does not allege that Mr. Damani directed, participated in, or was even aware of any such act.

2022, which were released in May 2022 months after the Holdings Distributions, "were even worse than expected, but did not yet suggest a business nose-diving." (*Id.* ¶216.) The Trustee points to statements by Ijaz around that same time regarding the need to spread out the purchase of 61 replacement COAM machines over two months because Lucky Bucks did not "have the cash" as somehow indicative of insolvency (*Id.* ¶208.) And the Trustee alleges that two master license holders contacted Lucky Bucks – the owner of Georgia Winners in April 2022 and a different unnamed master license holder in September 2022 – about a "scheme" to inflate the revenue of COAM locations to get a higher sales price. (*Id.* ¶¶215, 219.) The owner of Georgia Winners claimed to have engaged in such a scheme at Mr. Damani's direction back in 2020 and the email from an unidentified master licensee does not refer to Mr. Damani at all. (*Id.* ¶¶215, 219.) According to the Trustee, based on the information received in April and September 2022, Trive should have known "the true reason" for Lucky Bucks' decline at the time of the distributions back in November 2021 and January 2022. (*Id.* ¶222.)

This post-distribution conduct is inapposite to the insolvency inquiry, which requires a company's assets to "be valued at the time of the alleged transfer." *In re Edgewater Med. Ctr.*, 373 B.R. 845, 854 (Bankr. N.D. Ill. 2007) (citation omitted). More importantly, "Courts should refrain from using impermissible hindsight when determining fair value." *Id.* In fact, even where a company is subsequently alleged to have engaged in fraudulent activities pre-transfer, insolvency is not presumed. *Id.* at 855 ("to reach a finding of insolvency . . . the court would have to disregard the large amounts of cash the debtor had on hand and speculate on what the [government] would have done if it had discovered [debtor's] Medicare fraud").[5] The same is true for claims where a

---

[5]    Note that the court may consider information "originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date (transfer date)." *In re Coated Sales, Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992).

company engages in strategic conduct that leads to undercapitalization; courts cannot speculate as to what options would have been available to lenders. *See In re SemCrude L.P.*, 648 F. Appx. 205, 210 (3d Cir. 2016) (rejecting trustee's argument that debtor's risky strategy vis-à-vis its lenders left it undercapitalized, and declining to impermissibly speculate on "multiple levels of forecasting" given the "broad range of options" available to the lenders).

What *facts* does the Trustee actually plead regarding insolvency? Holdings received $195 million from the Noteholders in November 2021, of which it distributed $185.2 million. Holdings received another $55 million in January 2022, of which it distributed $52.5 million. (FAC ¶185.) Therefore, Holdings retained $9.8 million in November and another $2.5 million in January, for a total of $12.3 million after the last distribution in January 2022. According to the Trustee, Holdings was to start making payments on the Notes in 2024 of $15.95 million per year. (*Id.* ¶209.) The Trustee offers no explanation for why Lucky Bucks would not be able to increase the $12.3 million it had in cash in January 2022 such that it could make the first payment two years later in 2024. In fact, the Trustee makes clear that Holdings has no operations (*id.* ¶122), so the remaining funds were not even at risk of being used. Moreover, the alleged discrepancy in attrition rates and related revenue decreases (from a March 2023 presentation), which the Trustee identifies as between 11% and 16% in 2021 (*id.* ¶¶158-60), likewise is not consistent with a claim of insolvency in the absence of any financial records given the amount of money retained after the distributions and the two-year period before the first payment was due. Accepting as true that "certain locations" were underperforming (*id.* ¶165) does not equate to insolvency.

Simply put, the Trustee overcomes his own conclusion that Holdings was insolvent when the distributions were made. And the dearth of *any* allegations, let alone specific allegations, regarding LBVI or Mr. Damani further destroys this claim.

### C. The FAC Fails to Sufficiently Plead the Remaining Equity Was Worthless.

The Trustee alleges that the distributions at issue constituted a transfer of all of Holdings'
assets because the equity in Lucky Bucks was worthless. (FAC ¶¶275.b, 304.b.) That argument too
is unsupported by the Trustee's own FAC. Holdings' only asset was its ownership of Lucky Bucks.
(*Id.* ¶¶204-05.) In 2020, the value of Lucky Bucks' equity not owned by "Damani and other
insiders" was $170 million, which is the price Trive paid to buy out public shareholders. According
to the Trustee, that implied an enterprise value of $312 million. (*Id.* ¶¶2, 144.) While the Trustee
alleges the attrition rate for location contracts was underreported by anywhere from 10-15% in
2021, that does not render Lucky Bucks's equity worthless. There are no allegations as to what
percentage of Lucky Bucks' overall revenue was from renewal of existing contracts, and therefore
potentially impacted by attrition. In fact, there are no allegations at all about Lucky Bucks's
balance sheets, financial statements, or revenue other than the Trustee's description of them as
false. The only direct reference is to purportedly inflated EBITDA, with no factual allegations of
the actual numbers. In fact, the Trustee claims he does not have the documentation needed to
calculate the value. (*Id.* ¶¶207 and n. 6.)

The Trustee's allegations of a decreased value in 2021 and a worthless value by January
2022 are also inconsistent with GLC's reported COAM revenues for 2021.[6] The GLC reported an
increase in COAM contributions to the Georgia Lottery for Education Account in 2021 of 59.1%
over 2020.[7] As one of the largest COAM operators in Georgia (*id.* ¶71), Lucky Bucks' numbers

---

[6]    The GLC is a public corporation and instrumentality of the state. O.C.G.A. §50-27-4. The Court make take
judicial notice of matters of public record on a motion to dismiss. *Lum*, 361 F.3d at, 221 n.3; *Mosiman*, 2019 WL
203126, at *2.

[7]    GLC proceeds, including from COAM, are used to fund specific educational programs in Georgia. *See* Where
the Money Goes, *at*  https://www.galottery.com/en-us/benefitting-georgia/where-the-money-goes.html (last visited
Nov. 18, 2024). The GLC reported in 2021 that "COAM returned $145.0 million to the Lottery for Education Account
in fiscal year 2021, an increase of $53.9 million or 59.1% over 2020." *See* Independent Auditor's Report to the Board
of   Directors   of   the   Georgia   Lottery   Corporation,   at   3   (Sept.   27,   2021),   *available   at*

would likewise demonstrate a concomitant increase in 2021. The same is true for 2022, where GLC reported a 4.9% decrease in contributions in 2022 over 2021 and Lucky Bucks also saw a purported decline in revenue.[8] More importantly, none of these allegations directly connect LBVI or Mr. Damani to the alleged worthless value. At best, the Trustee needs several additional links in the proverbial chain to do so, and he pleads no facts to make any such connections plausible.

The Trustee fails to plead sufficient facts as to LBVI to support his avoidance claim based on intentional fraudulent misrepresentation, both in his capacity as Trustee and as assignee of the Noteholders. Counts 1 and 3 should be dismissed in toto.

## III.    The FAC Fails to State a Claim for Constructive Fraudulent Transfers.

The Trustee asserts Counts 2 and 4 against LBVI for avoidance and recovery of constructive fraudulent transfers. Count 2 is made on behalf of Holdings under the Bankruptcy Code, 11 U.S.C. §548(a)(1)(B), and, pursuant to his authority in 11 U.S.C. §544(b), under DUFTA, 6 Del. C. §1304(a)(2), and GUVTA, O.C.G.A. §18-2-74 *et seq*. Here too, the Trustee in Count 4 asserts a claim for constructive fraudulent transfer under the DUFTA and the GUVTA on behalf of the Noteholders as assignee. The Trustee fails to properly plead these claims as to LBVI, and both should be dismissed.

The elements of a constructive fraud claim are: (1) the debtor had an interest in property; (2) a transfer of that interest occurred within one year of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the

---

https://d1gszp1bmamha.cloudfront.net/content/dam/portal/pdfs/georgia-benefits/20220217-GeorgiaLotteryCorporation2021AuditReportFinal.pdf (last visited Nov. 18, 2024).

[8]    The GLC reported in 2022 that "COAM returned $140.7 million to the Lottery for Education Account in fiscal year 2022, a decrease of $4.2 million or 2.9% below 2021." *See* Independent Auditor's Report to the Board of Directors of the Georgia Lottery Corporation, at 4 (Oct. 13, 2022), *available at* https://d1gszp1bmamha.cloudfront.net/content/dam/portal/pdfs/about-us/20221205-georgia-lottery-corporation-2022-annual-audit-report.pdf (last visited Nov. 18, 2024).

transfer resulted in no value for the debtor or the value received was not "reasonably equivalent" to the value of the relinquished property interest. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210-11 (3d Cir. 2006); 11 U.S.C. §548(a)(1)(B). "At the motion to dismiss stage, a claim for constructive fraudulent transfer needs only to plead that there was a transfer for less than reasonably equivalent when the debtors were insolvent." *In re CL H Winddown LLC*, No. 21-10527 (JTD), 2023 WL 5740195, at *3 (Bankr. D. Del. Sept. 5, 2023). The analysis under both DUFTA and GUVTA are substantially similar to Section 548 of the Bankruptcy Code. *In re Opus East, LLC*, 528 B.R. at 82; *In re Menser*, 2021 WL 4484894, at *3. The FAC fails on reasonably equivalent value.

### A. The FAC Fails to Plead Less than Reasonably Equivalent Value.

The term "reasonably equivalent value" is not defined in the Bankruptcy Code. The Third Circuit describes a two-part inquiry. *In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996). First, ask whether the debtor received any value at all. *Id.* at 152. Second, if the debtor received some value, apply the "totality of the circumstances" analysis to determine reasonably equivalent value, taking into account "the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arms length." *Id*. at 153. Importantly, "money spent on investments that fail to stabilize or improve the debtor's condition (i.e., 'losing' investments) can confer value within the meaning of §548(a)(2) of the Code, [] so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer." *Id.* at 152.

Courts recognize that reasonably equivalent value can be intangible or indirect. It can come from potential synergies with a new company or the ability to obtain a line of credit. *Mellon Bank,* 945 F.2d at 648 (no evidence that debtor failed to receive reasonably equivalent value for guaranty and security interest in acquisition loan that rendered it insolvent). Courts have even found that

potential future returns from gambling constitute property rights that confer reasonably equivalent value in exchange for a bet:

> The property is not unlike futures contracts purchased on margin. The investor in futures may win big, or his position may be wiped out, but the contractual right to a payoff if the market happens to move the right way at the right time constitutes a value reasonably equivalent to the money at risk.

> The time that counts is not the time when the bet is won or lost, but the time when the bet is placed. The "investment" may turn out badly, but unless and until it does, the contractual right to receive payment in the event that it turns out well is obviously worth something.

*In re Chomakos*, 69 F.3d 769, 771 (6th Cir. 1995), *cert. denied*, 517 U.S. 1168 (1996).

The same concepts of potential value and risk apply here, where the Noteholders invested in the COAM industry in Georgia, which is not gambling but rests on the same customer experience, the ability to win, and the risk of loss. The Trustee acknowledges that "[g]iven the regulated nature of the industry and the limited number of licenses, there can be substantial value in owning a master license and contracting with a location license holder." (FAC ¶69.) He fails to acknowledge the inverse, which is that such heavy regulation and scarcity can also lead to decreased value. The opportunity to make money and repay the Notes was present and of value at the time of the distributions. That opportunity is even more plausible when considering the 59.1% increase of COAM contributions into the Lottery for Education Account in 2021 over 2020, the subsequent 4.9% decrease in 2022, and the concomitant effect on Lucky Bucks as one of the largest master license holders in Georgia. (*Id.* ¶71; n.6-8 *supra* and accompanying text.)

### B. The FAC Fails to Plead that Holdings Was Insolvent.

The analysis set forth above regarding the insolvency badge of fraud applies equally to a claim of constructive fraud. *In re Our Alchemy, LLC*, 2019 WL 4447545, at *9 (Bankr. D. Del. Sept. 16, 2019). The Trustee does not and cannot plead that Holdings was insolvent when the distributions were made. Accordingly, the Trustee fails to plead sufficient facts as to LBVI (or Mr.

Damani to the extent his conduct is imputed to LBVI) to support his avoidance claim based on constructive fraudulent transfers, both in his capacity as Trustee and as assignee of the Noteholders. Counts 2 and 4 should be dismissed.

## IV. The FAC Fails to State a Claim for Improper Dividends.

In Count 5, the Trustee contends that the Holdings Distributions were improper dividends under Delaware law and seeks to recover against LBVI. (FAC ¶¶326-28.) Delaware law, 6 Del. C. §18-607(a), provides that an LLC shall not make a distribution to a member if, "after giving effect to the distribution, all liabilities of the [LLC] . . . exceed the fair value of the [LLC's] assets." Delaware specifically permits recovery of improper dividends against a recipient of the dividend, *but only if* the recipient knew at the time of the distribution that the LLC's liabilities exceeded the fair value of the LLC's assets. *Id.* §18-607(b).

The FAC fails to allege any plausible facts that LBVI knew, at the time the Holdings Distributions were made, that the distributions would cause *Holdings'* liabilities to exceed the fair value of its assets. Indeed, the FAC is largely silent as to LBVI's – and its owner, Mr. Damani's – role in formulating and executing the "super holdco" plan, marketing notes to the Noteholders, approving the Holdings Distributions, and the subsequent justifications for the Holdings Distributions to the Noteholders. Instead, the FAC alleges that Holdings was formed pursuant to Trive's "super Holdco" plan (FAC ¶205), that Lucky Bucks' financial conditions and projections were severely misrepresented *by Trive, Lucky Bucks' managers, and the Management Defendants* (*id.* ¶206), that it was Thadani and Trive's level of involvement at Lucky Bucks that caused them to be "aware that something was deeply wrong with Lucky Bucks" (*id.* ¶188), and that Thadani himself recognized that, at the time of the Holdings Distributions, the value of Holdings' Lucky Bucks' shares was minimal (*id.* ¶207).

There are no factual allegations in the FAC to support the Trustee's generalized and conclusory allegations as to LBVI's involvement in or knowledge of Holdings' business generally or the distributions specifically. Rather, the FAC generally alleges that "Damani, LBVI's beneficial owner, orchestrated the scheme to strip Lucky Bucks's assets" (*id.* ¶328), "knew that much of the EBITDA of the locations they sold back to Lucky Bucks at inflated prices . . . were not going to generate the same levels of income as they did when Kassam and Damani were directing fake players to inflate those locations' results" (*id.*), and Thadani and Sekhri kept Damani in the loop about prospective Noteholders (*id.* ¶¶152-53). These facts do not establish LBVI's knowledge about Holdings' overall financial position, the total Notes issued, the amounts of the Holdings Distributions, or whether the Holdings Distributions could cause Holdings' liabilities to exceed the fair value of its assets. Indeed, the Trustee admits that "Damani [LBVI's owner] had no formal role in approving or leading the Note Issuance or Holdings Distributions." (*Id.* ¶262.) There is also no plausible allegation that Mr. Damani knew Holdings would be rendered insolvent as a result of the distributions. Thus, any conclusion that LBVI knew its distributions were improper under Delaware law is not a plausible inference, nor a conclusion the Court need accept as a fact. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418.

## V.     The FAC Fails to State a Claim Under Georgia's RICO Statute.

In Count 7, the Trustee asserts that Mr. Damani, in conjunction with Sekhri and Trive, violated Georgia's RICO statute, O.C.G.A. §16-4-4 *et seq,* when they defrauded the Noteholders into purchasing $250 million of Notes. (FAC ¶¶366-81.) Yet the FAC lacks any plausible allegation that Mr. Damani made, participated in, or was even aware of any misrepresentations being made to the Noteholders, much less that he intended to defraud the Noteholders. The Court

should once again reject the Trustee's attempt to inculpate Mr. Damani in what is really a dispute between the Noteholders and the Trive Defendants.

Under Georgia's RICO statute, there are three types of prohibited conduct. O.C.G.A. §16-14-4. Subsection (a) makes it "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire, maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. §16-14-4(a). Subsection (b) makes it "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering. O.C.G.A. §16-14-4(b). And, subsection (c), makes it unlawful to conspire to violate either subsection (a) or subsection (b). O.C.G.A. §16-14-4(c). Although the Trustee asserts claims under each of the 3 subsections of Georgia RICO (*see* FAC ¶¶363), he fails to specifically articulate the elements of any of the three subsections.

An essential element of any RICO claim is a "pattern of racketeering activity." "'Racketeering activity', also known as a 'predicate act,' is the commission of, the attempt to commit, or the solicitation or coercing of another to commit, a crime which is chargeable by indictment under one of forty categories of offenses [enumerated by statute.]" *Wylie v. Denton*, 323 Ga. App. 161, 164 (Ga. Ct. App. 2013). And "a pattern of racketeering activity means that there have been at least two acts of racketeering activity that are interrelated and that were done in furtherance of one or more incidents, schemes, or transactions." *Id.* at 164-65 (citing O.C.G.A. §16-14-3(8)(A)).

To allege a pattern of racketeering activity, the Trustee must allege "at least two acts… in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by

distinguishing characteristics and are not isolated incidents." O.C.G.A. §16-14-3(4)(A). "To establish that defendant engaged in racketeering activity, a plaintiff must show that the defendant committed predicate offenses (set forth in OCGA §16–14–3(9)) at least twice." *Cobb Cnty. v. Jones Grp. P.L.C.*, 218 Ga. App. 149, 154 (Ga. Ct. App. 1995); *accord Thompson v. State*, 211 Ga. App. 887, 890 (Ga. Ct. App. 1994) ("[T]o find a defendant guilty of the RICO count, the jury must find that each defendant committed at least two predicate acts"). More specifically, Georgia RICO requires the Trustee to show that *each* Defendant had "some participation in the racketeering activity." *Faillace v. Columbus Bank & Tr. Co.*, 269 Ga. App. 866, 869 (2004). Fatally, the Trustee has failed to sufficiently allege that Mr. Damani engaged in single act of racketeering, much less a pattern of such activity.

As an initial matter, the FAC, which alleges that Defendants, collectively, engaged in the predicate acts of (1) wire fraud, in violation of 18 U.S.C. §1343, and (2) securities fraud, in violation of O.C.G.A. §10-5-1 (FAC ¶362), is a shotgun pleading that fails to satisfy the basic notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2). *In re Am. Remanufacturers, Inc.*, 2007 WL 2376723, at *4. The Court must reject the Trustee's attempt to lump Defendants together and assert that their collective conduct satisfies the requirements of pleading predicate acts necessary to establish a pattern of racketeering activity.

> **A.    The FAC Fails to Adequately Allege Predicate Acts.**

> **1.    There are no allegations that link Mr. Damani to securities fraud.**

The Trustee alleges, *upon information and belief,* that "Defendants have committed fraud in connection with an offer, sale, and/or purchase of securities to the Noteholders, in violation of the Georgia Uniform Securities Act." (FAC ¶360.) He further alleges this securities fraud was perpetrated by "(a) employing one or more device, scheme, or artifice to defraud, (b) making untrue statements of material facts . . . or (c) engaging in an act, practice or course of business that

operates as a fraud or deceit upon another person." (*Id.*) This language simply tracks the statutory language and is not a factual averment.[9]

Notably, the Trustee asserts an independent cause of action for securities fraud. (*Id.* ¶¶329-43.) This cause of action is explicitly *not* alleged against Mr. Damani, nor could it when taking the FAC as a whole. Specifically, the Trustee alleges that securities fraud was perpetrated by "numerous misrepresentations to the Noteholders," via false and misleading statements regarding myriad aspects of Lucky Bucks' operations.[10] (*Id.* ¶334.) But the Defendants alleged to have made those misrepresentations were Defendants other than Mr. Damani.[11] The FAC is replete with allegations about misrepresentations made by other Defendants, but there is *not one* allegation that Mr. Damani made any misrepresentation to the Noteholders. In fact, the FAC alleges that Mr. Damani had no formal role in approving or leading the Note Issuance. (*Id.* ¶262.)

Despite declining to bring a Georgia securities fraud claim against Mr. Damani, the Trustee concludes, without a factual basis, that Mr. Damani and others collectively committed the predicate act of securities fraud. The conclusory assertion fails to satisfy Rule 8(a)'s liberal

---

[9]    The Trustee also asserts securities fraud claims under Texas and Delaware law, but similarly merely tracks the statutory language of the statutes without making factual averments. (FAC ¶¶331-32.) Moreover, violations of Texas and Delaware securities fraud laws is irrelevant to the Georgia RICO claim as those statutes are not one of the enumerated predicate acts under O.C.G.A. §16-14-3(5)(A).

[10]    FAC ¶334 alleges "false and misleading statements and omissions concerning: (1) lack of attrition and stability of Lucky Bucks' location contracts; (2) the EBITDA generated by Lucky Bucks' prior M&A activity; (3) Lucky Bucks' ability to continue growing after the issuance through M&A activity; (4) the accuracy of Lucky Buck's financial condition and growth projections. . . (5) representing that Holdings was solvent . . . (6) Lucky Bucks' relationship with the GLC; and (7) the strength of Lucky Bucks' 'farm team.'" The Trustee further alleges, in the alternative, that "Thadani further misrepresented his and Trive's day-to-day involvement in the business." *Id.*

[11]    *See e.g.*, FAC ¶9 (explaining the marketing of the notes and alleging "Trive partner Thadani took the lead on most of the management calls with potential purchasers," and describing Thadani's various misrepresentations); ¶10 ("Thadani and Manu Sekhri . . . placed significant interest on the strength of Lucky Bucks's 'farm team'"); ¶11 ("Thadani assured prospective creditors of Holdings that the investment was sound"); ¶12 ("Thadani . . . asserted that [Lucky Bucks] had a strong relationship with the GLC"); ¶30 (describing the misstatements that purportedly constitute securities fraud as "Trive's misstatements"); ¶32 ("Thadani and Trive knew their representations about Luck Bucks's financials were false . . ."); ¶130 ("The marketing process for the notes was led and managed by TCM and Thadani, with Thadani managing the bulk of conversations with potential investors."); ¶135 ("Thadani, Sekhri, Ijaz, Bouskill, Boyden, and Kassam made representations . . . to the potential Noteholders that induced them to purchase the Notes"); ¶¶138-41, 142-51, 155-76 (describing *Thadani's* and others misrepresentations).

pleading standard, much less the heightened standard of Rule 9(b) for allegations that sound in fraud. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 217.[12]

The only "factual" allegation that arguably relates Mr. Damani to the securities fraud predicate act is that he "was directly involved with the scheme to falsify results of locations purchased by Lucky Bucks." (FAC ¶356.) The specific facts constituting this "scheme" are not alleged, in contravention of Rule 9(b), and how this scheme resulted in Mr. Damani engaging in securities fraud is simply never alleged. *See Z-Space, Inc. v. Dantanna's CNN Ctr, LLC*, 349 Ga. App. 248, 254 (Ga. Ct. App. 2019) ("A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."). The Court need not accept as true the Trustee's speculative allegations and legal conclusions. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418. Indeed, the entire theory of securities fraud fails as to Mr. Damani in that the FAC does not allege a single misrepresentation or fraudulent act by Mr. Damani towards the Noteholders.

## 2. The FAC fails to plead wire fraud with specificity.

The Trustee also alleges that Defendants committed the predicate act of wire fraud in violation of 18 U.S.C. §1343. (FAC ¶350.) The FAC fails to adequately allege a wire fraud violation; thus, it cannot form a Georgia RICO predicate act.

The federal wire fraud statute prohibits the use of "interstate wires for the purposes of carrying out any scheme or artifice to defraud." *See* 18 U.S.C. §§1341, 1343; O.C.G.A. §16-14-3(5)(C) (citing 18 U.S.C §1961(1), defining racketeering activity to include federal wire fraud). A

---

[12]    The Georgia RICO claim also fails because it requires the extraterritorial application of Georgia law. The conduct alleged to have constituted securities fraud occurred outside of the state of Georgia and injured Noteholders who were not located in Georgia. The only nexus to Georgia is that Lucky Bucks is a Georgia entity (but it is not a party to this lawsuit) and that Mr. Damani resided here (but his only conduct was with respect to the operations of Lucky Bucks and did not involve any misrepresentations to the Noteholders or participation in the alleged securities fraud). Mr. Damani and LBVI incorporate herein the arguments raised in the Memorandum of Law in Support of Trive Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. (Doc. 69 at ¶¶47-55.)

claim for wire fraud requires "(1) the defendant's *knowing and willful participation* in a scheme or artifice to defraud, [and] (2) with the specific intent to defraud." *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 515 (D. Del. 2012). "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Lum*, 361 F.3d at 223.

Under Federal Rule of Civil Procedure 9(b), the circumstances constituting fraud must be pled with particularity. More specifically,

> In the context of RICO mail fraud allegations, this means that the complaint must "identify the purpose of the mailing within the defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentation. Put another way, the "who, what, when and where details of the alleged fraud" are required.

*Bonavitacola Elec. Contractor, Inc. v. Boro Devs., Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003). The Third Circuit Court of Appeals has cautioned that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Kolar v. Preferred Real Estate Invests., Inc.*, 361 Fed. App'x 354, 363 (3d Cir. 2010). Moreover, to adequately allege wire fraud against Mr. Damani, the Trustee must allege with particularity "culpable participation" by Mr. Damani. *United States v. Pearlstein*, 576 F.2d 531, 534 (3d Cir. 1978).

The FAC fails to allege that Mr. Damani committed wire fraud. The FAC makes the conclusory assertion that Mr. Damani "used email communications . . . to further [the] fraudulent scheme," and then alleges that Mr. Damani sent emails on 5 separate days. (FAC ¶352.a.) The contents of those emails, the fraudulent misstatements contained therein, to whom they were sent, and how the Noteholders relied on those emails to their detriment is never alleged. The Trustee purportedly attempts to cure this defect in the FAC by summarizing the contents of Mr. Damani's

emails as relating to the scheme "causing Lucky Bucks to acquire locations at inflated prices." (*Id.* ¶353.) This summary still fails to satisfy the requisite pleading standard in that it does not identify the specific misrepresentation made by Mr. Damani and to whom he made it. The wire fraud claim cannot withstand a motion to dismiss where it is alleged other Defendants made misrepresentations to the Noteholders and Mr. Damani sent 5 emails during a 3-month period. *See e.g.*, *Warden v. McLelland*, 288 F. 3d 105, 114 (3d Cir. 2002) (finding complaint failed to state clearly how communications were false or contributed to the alleged fraudulent scheme); *Lum* 361 F. 3d at 224 (To satisfy Rule 9(b), "Plaintiffs must allege who made a misrepresentation to whom and the general content of the misrepresentation.").

### B.    The FAC Fails to Allege Proximate Cause.

The Trustee and the Noteholders do not, and cannot, allege facts to show that Mr. Damani's purported racketeering activity was the proximate cause of their injuries.

Georgia RICO affords a civil remedy to "any person who is injured *by reason of* any violation of [subsections a, b, or c]." O.C.G.A. §16-14-6(c) (emphasis added). The Supreme Court has analyzed the "by reason of" statutory language and concluded that a RICO plaintiff must show proximate cause. *Holmes v. Secs. Inv. Protection Corp.*, 503 U.S. 258, 265-268 (1992); *accord Wylie*, 323 Ga. App. at 165; *Pollman v. Swan*, 314 Ga. App. 5, 6-7 (Ga. Ct. App. 2011) (affirmatively citing *Holmes*). "[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 642 (3d Cir. 2015). More specifically, this analysis requires a showing that Mr. Damani's alleged RICO violations led *directly* to the Noteholders' injury. *Pollman*, 314 Ga. App. at 7.

The FAC's allegations as to Mr. Damani relate exclusively to his management and operation of Lucky Bucks, which the Trustee claims eventually caused harm to the Noteholders

because Holdings was not able to pay back the Notes. (FAC ¶353.) However, "losses suffered by a company's stakeholders as a result of racketeering activity *against the company* do not give them standing under RICO because such an injury is too indirect or derivative to confer RICO standing." *Glock v. Glock*, 247 F. Supp. 3d 1307, 1318 (N.D. Ga. 2017), *aff'd* 714 F. App'x 987 (11th Cir. 2018). A creditor of a company may only recover under RICO if it alleges an injury proximately cause by a defendants' acts of racketeering that target the creditor, that is whether the creditor "suffered a harm that stands separate and distinct from the harm suffered by the corporation." *Id.*

The Trustee alleges that Mr. Damani's misconduct affected the financial stability of Lucky Bucks, a subsidiary of Holdings (the bankruptcy estate). To the extent there was any injury stemming from Mr. Damani's actions, it was to Lucky Bucks, not Holdings, and certainly not the Noteholders. In *Recovery Fund II USA LLC v. Rabobank, Nat'l Ass'n*, No. 18-2039-MN-JLH, 2020 WL 509166, at *7 (D. Del. Jan. 31, 2020), the Delaware District Court dismissed a creditor to a bankruptcy estate's RICO claim because the "sole injury stems from the fact that the funds in the bankruptcy estate were decreased as a result of Defendants' actions." This case is even one step further removed than *Recovery Fund* because the alleged injury by Mr. Damani was not even to the bankruptcy estate, but rather a separate entity. *See also Glock*, 247 F. Supp. 3d at 1319 (dismissing RICO claim where Parent Company was alleged to have been deprived of funds through Defendants' scheme of fraudulent transactions, but Plaintiff's only injury was "the depreciation of her 1% share in the Parent Company").

Moreover, even if the Court were to assume as true that Mr. Damani engaged in some misconduct that negatively affected the value of Lucky Bucks, the FAC's allegations are conclusory and not entitled to any deference. Threadbare recitals that Mr. Damani participated in a scheme to defraud the Noteholders (FAC ¶332) are insufficient to state a claim. *Zazzali*, 482 B.R.

26

at 515 (dismissing RICO claim where Trustee did not "adequately plead knowing and willful participation in the underlying racketeering activities" because the "Complaint does not contain factual allegations from which Defendant's knowing participation in the fraudulent scheme can be inferred"). This is particularly true here, where the FAC's affirmative allegations demonstrate Mr. Damani had no formal role in the marketing of the Notes. (FAC ¶262.)

### C.    *The FAC Fails to Adequately Allege Georgia RICO Claim Under Subsection (b).*

Notwithstanding the Trustee's failure to adequately allege a pattern of racketeering activity, the FAC's claim under O.C.G.A. §16-14-4(b) fails. Subsection (b) makes it "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. §16-14-4(b). As the Supreme Court has explained, "to participate, directly or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The Third Circuit's explanation of *Reves* is instructive.

> Mere association with an enterprise does not violate this [subsection of RICO]….More precisely, one is not liable under [this subsection] unless one has participated in the management or operation of the enterprise itself….Simply pleading that a defendant 'participated in the operation or management' of an enterprise, however, is not enough to make out a violation of [this subsection.] The defendant must have done so 'through a pattern of racketeering activity.' In other words, there must be not only a nexus between the defendant and the conduct of the affairs of an enterprise, but also a nexus between the conduct of those affairs and the pattern of racketeering activity.

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) (internal citations omitted). This test is very difficult to satisfy. *Parm v. Nat'l Bank of Ca.*, 242 F. Supp. 3d 1321, 1348 (N.D. Ga. 2017).

The FAC alleges that Holdings is the enterprise. (FAC ¶346.) However, Mr. Damani is never alleged to have had any control or management of the affairs of Holdings. Indeed, the FAC alleges the contrary – "[o]nce Holdings was formed TCM made sure to give itself tight control

over the [Holdings]." (*Id.* ¶121.) And, although Mr. Damani had the right to appoint a board member, "TCM had the right to use three vetoes if it disagreed with Damani's appointment." (*Id.* ¶124.) It was Trive's idea to form Holdings (*id.* ¶7), and although the Notes were issued pursuant to written consent by Holdings board, it was not Mr. Damani that approved the issuance, but rather his appointee (*id.* ¶14). Mr. Damani did not have any formal role in approving or leading the Note issuance. (*Id.* ¶262.) Thus, any argument that Mr. Damani violated subsection (b) of Georgia RICO is clearly belied by the Trustee's own allegations.

### D. The FAC Fails to Adequately Allege a Claim Conspiracy Under Subsection (c).

In Count 8, the Trustee alleges that Trive, Mr. Damani, and Mr. Sekhri conspired to violate Georgia's RICO law. (FAC ¶¶366-81.) In Georgia, a RICO conspiracy exists if a person "knowingly and willingly join[s] a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts." *Wylie*, 323 Ga. App. at 165. "The essence of a conspiracy is the existence of an agreement." *In re: Liberty State Benefits of Delaware, Inc.*, 541 B.R. 219, 247–48 (Bankr. D. Del. 2015). The participants of the conspiracy "must agree to pursue the same criminal objective." *Id.* "To survive a motion to dismiss, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose[, as well as] allege specific facts which support an inference that the defendant knowingly agreed to participate in the affairs of the conspiracy." *Id.*; *see also Chambers Dev. Co., Inc. v. Browing-Ferris Indus.*, 590 F. Supp. 1528, 1538 (W.D. Pa. 1984) ("[To properly allege a conspiracy [under RICO], the plaintiff must assert that *each* defendant by his words or actions objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the *commission of two or more predicate acts*.").

The Trustee makes a single conclusory assertion in support of its conspiracy claims, that "Defendants agreed with each other . . . to take cash out of the business . . . through stripping

Lucky Bucks' assets, committing securities fraud, and executing a series of fraudulent transfers." (FAC ¶368.) The FAC's conclusory allegation regarding an agreement is not sufficient to state a claim for a RICO conspiracy. "The law does not authorize a finding that a conspiracy exists merely because of some speculative suspicion." *Benevolent Lodge No. 3 v. Davis*, 365 Ga. App. 564, 572 (2022). Yet, the Trustee does nothing more than speculate that such a conspiracy exists. The FAC does not delineate among the Defendants, nor does it specifically identify Mr. Damani's "participation in or responsibility for making the statements [or performing the acts] which are the subject of the suit." *Chambers Dev.*, 590 F. Supp. at 1538.

Moreover, because the Trustee fails to allege a predicate act, the RICO conspiracy claim also must fail. *Z-Space, Inc.*, 349 Ga. App. at 254 (requiring dismissal of RICO conspiracy claim where complaint failed to allege a predicate act); *Zazzali*, 482 B.R. at 516-17 (where "Complaint fails to adequately state a claim for [state RICO violations], it follows that the Complaint also fails to state a claim for conspiracy to violate [the state RICO statute]"). The Trustee seemingly alleges that a conspiracy to violate RICO was formed when Defendants agreed to make fraudulent transfers. (FAC ¶368.) However, "[f]raudulent transfer is not an enumerated predicate offense under the Georgia RICO statute." *Z-Space, Inc.*, 349 Ga. App. at 252 (rejecting attempts to shoehorn fraudulent transfer claim into a Georgia RICO predicate act).

Lastly, the intracorporate conspiracy doctrine bars the RICO conspiracy claim. As the Supreme Court has held "there is no unlawful conspiracy when officers within a single corporate entity consult among themselves and then adopt a policy for the entity." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). "Conspiracy requires an agreement . . . [but] when two agents of the same legal entity make an agreement in the course of their official duties, . . . as a practical and legal matter their acts are attributed to their principal." *Id.* Here, it is alleged that Mr. Damani, Sekhri, and

Trive, collectively managed and operated both Lucky Bucks and Holdings. (FAC ¶¶44-45, 81-86, 123-28.) Accordingly, all of the individuals were officers and insiders of a single corporate entity and could not, as a matter of law, conspire with each other.

## VI.   The Claims for Attorney's Fees and Punitive Damages Should Be Dismissed.

The Trustee's claims for attorney's fees (Count 11) and punitive damages (Count 12) under Georgia law must fail without any valid substantive claim. "An award of attorney fees, costs, or punitive damages is derivative of plaintiff's substantive claims." *Stephen A. Wheat Tr. v. Sparks*, 325 Ga. App. 673, 682 (2014). The Trustee's claims for attorney's fees and punitive damages are wholly derivative of its substantive claims, and because those must be dismissed for failure to state a claim so to must the ancillary claims for attorney's fees and punitive damages. *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 284 Ga. App. 552, 560–61 (2007).

## CONCLUSION

For the foregoing reasons, LBVI and Mr. Damani respectfully request the FAC be dismissed with prejudice.


[Signature Page Follows]


30

Dated:  March 24, 2025
        Wilmington, Delaware

BAYARD, P.A.

/s/ Steven D. Adler
Ericka F. Johnson (Del. Bar No. 5024)
Steven D. Adler (Del Bar No. 6257)
600 N. King Street, Suite 400
Wilmington, DE 19801
Tel: (302) 655-5000
Fax: (302) 658-6395
ejohnson@bayardlaw.com
sadler@bayardlaw.com

-and-

CHILIVIS GRUBMAN
Lauren A. Warner (GA 425769)
Scott R. Grubman (GA 317011)
Brittany M. Cambre (GA 350793)
1834 Independence Square
Atlanta, Georgia 30338
Telephone: (404) 233 4171
Facsimile: (404) 261 2842
lwarner@cglawfirm.com
sgrubman@cglawfirm.com
bcambre@cglawfirm.com

*Counsel for Defendants Lucky Bucks
Ventures, Inc. and Anil Damani*