# **<u>EXHIBIT B</u>**

**EXECUTION VERSION**

THE NOTES ISSUED PURSUANT TO THIS NOTE PURCHASE AGREEMENT HAVE BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT (AS DEFINED IN SECTION 1273(a) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, AND U.S. TREASURY REGULATION SECTION 1.1273-1 PROMULGATED THEREUNDER).

$250,000,000

## NOTE PURCHASE AGREEMENT

dated as of November 29, 2021

by and among

Lucky Bucks Holdings LLC,
as Issuer,

the Purchasers

and

Alter Domus (US) LLC,
as Administrative Agent and Collateral Agent

AMERICAS/2022770253.18

Table of Contents

Page

# ARTICLE I

## Definitions and Accounting Terms

Section 1.01    Defined Terms ........................................................................................................ 1
Section 1.02    Other Interpretive Provisions ............................................................................... 66
Section 1.03    Accounting Terms ................................................................................................. 66
Section 1.04    Rounding .............................................................................................................. 67
Section 1.05    References to Agreements, Laws, Etc. .................................................................. 67
Section 1.06    Times of Day ........................................................................................................ 67
Section 1.07    Timing of Payment or Performance ...................................................................... 67
Section 1.08    Currency Equivalents Generally ........................................................................... 67
Section 1.09    Certain Calculations and Tests ............................................................................. 67
Section 1.10    Divisions ............................................................................................................... 70

# ARTICLE II

## The Commitments and Notes

Section 2.01    The Notes .............................................................................................................. 70
Section 2.02    Issuance of Notes ................................................................................................. 71
Section 2.03    Restricted Notes ................................................................................................... 72
Section 2.04    Restrictive Legend ............................................................................................... 72
Section 2.05    Redemption ........................................................................................................... 72
Section 2.06    Termination or Reduction of Commitments .......................................................... 74
Section 2.07    Repayment of Notes .............................................................................................. 74
Section 2.08    Interest .................................................................................................................. 74
Section 2.09    Fees ....................................................................................................................... 75
Section 2.10    Computation of Interest and Fees ......................................................................... 75
Section 2.11    Evidence of Indebtedness ..................................................................................... 76
Section 2.12    Payments Generally .............................................................................................. 76
Section 2.13    [Reserved] ............................................................................................................. 77
Section 2.14    Mutilated, Destroyed, Lost and Stolen Notes ....................................................... 77
Section 2.15    Persons Deemed Owners ...................................................................................... 78
Section 2.16    Defaulting Purchasers ........................................................................................... 78

# ARTICLE III

## Taxes, Protection and Illegality

Section 3.01    Taxes ..................................................................................................................... 79
Section 3.02    Matters Applicable to Requests for Compensation ............................................... 83
Section 3.03    Survival ................................................................................................................. 83

CONFIDENTIAL                                    Trive_00042915

# ARTICLE IV

## Conditions Precedent to Issuances

| | | |
|---|---|---|
| Section 4.01 | Conditions to Initial Issuance | 83 |
| Section 4.02 | Conditions to Delayed Issuances | 85 |

# ARTICLE V

## Representations and Warranties

| | | |
|---|---|---|
| Section 5.01 | Existence, Qualification and Power; Compliance with Laws | 86 |
| Section 5.02 | Authorization; No Contravention | 87 |
| Section 5.03 | Governmental Authorization; Other Consents | 87 |
| Section 5.04 | Binding Effect | 87 |
| Section 5.05 | Financial Statements; No Material Adverse Effect | 87 |
| Section 5.06 | Litigation | 88 |
| Section 5.07 | Ownership of Property; Liens | 88 |
| Section 5.08 | Environmental Compliance | 88 |
| Section 5.09 | Taxes | 89 |
| Section 5.10 | Compliance with ERISA | 89 |
| Section 5.11 | Subsidiaries; Capital Stock | 89 |
| Section 5.12 | Margin Regulations; Investment Company Act | 89 |
| Section 5.13 | Disclosure | 90 |
| Section 5.14 | Intellectual Property; Licenses, Etc. | 90 |
| Section 5.15 | Solvency | 90 |
| Section 5.16 | Collateral Documents | 90 |
| Section 5.17 | Use of Proceeds | 91 |
| Section 5.18 | Sanctions and Anti-Corruption Laws | 91 |
| Section 5.19 | Labor Matters | 91 |
| Section 5.20 | Gaming Matters | 91 |
| Section 5.21 | No Default | 92 |
| Section 5.22 | Real Property | 92 |
| Section 5.23 | Private Offering by the Issuer | 92 |

# ARTICLE VI

## Affirmative Covenants

| | | |
|---|---|---|
| Section 6.01 | Financial Statements | 92 |
| Section 6.02 | Certificates; Other Information | 93 |
| Section 6.03 | Notices | 95 |
| Section 6.04 | Maintenance of Existence | 95 |
| Section 6.05 | Maintenance of Properties | 96 |
| Section 6.06 | Maintenance of Insurance | 96 |
| Section 6.07 | Compliance with Laws | 96 |
| Section 6.08 | Books and Records | 96 |
| Section 6.09 | Inspection Rights | 96 |
| Section 6.10 | Covenant to Give Security | 97 |
| Section 6.11 | Use of Proceeds | 97 |

CONFIDENTIAL    Trive_00042916

Section 6.12    Further Assurances ................................................................................ 97
Section 6.13    Payment of Taxes ................................................................................... 97
Section 6.14    Lender Calls ........................................................................................... 97
Section 6.15    Anti-Terrorism; Sanctions; Anti-Corruption ........................................ 98
Section 6.16    Changes in Fiscal Year .......................................................................... 98
Section 6.17    Preemptive Rights .................................................................................. 98
Section 6.18    Intended Tax Treatment ......................................................................... 98

## ARTICLE VII

### Negative Covenants

Section 7.01    Liens ....................................................................................................... 99
Section 7.02    [Reserved] .............................................................................................. 99
Section 7.03    Indebtedness ........................................................................................... 99
Section 7.04    Merger and Consolidation .................................................................... 107
Section 7.05    Limitation on Sales of Assets and Subsidiary Stock ............................ 109
Section 7.06    Restricted Payments & Modification of Subordinated Indebtedness
                Documents ............................................................................................. 111
Section 7.07    Holding Company Status ...................................................................... 117
Section 7.08    Limitation on Restrictions on Distributions from Subsidiaries and
                Negative Pledges .................................................................................. 118
Section 7.09    Investment Structuring ......................................................................... 121
Section 7.10    Affiliate Transactions ........................................................................... 121
Section 7.11    Amendments of Material Documents .................................................... 124

## ARTICLE VIII

### Events of Default and Remedies

Section 8.01    Events of Default .................................................................................. 125
Section 8.02    Remedies Upon Event of Default ......................................................... 127
Section 8.03    Exclusion of Immaterial Subsidiaries .................................................. 128
Section 8.04    Application of Funds ............................................................................. 128
Section 8.05    [Reserved] ............................................................................................. 128
Section 8.06    Gaming Requirements ........................................................................... 128
Section 8.07    Restrictions Under Gaming Laws ......................................................... 129
Section 8.08    Make-Whole Amount Payable Upon Acceleration .............................. 130

## ARTICLE IX

### Administrative Agent and Other Agents

Section 9.01    Appointment and Authorization of Agents ........................................... 130
Section 9.02    Delegation of Duties ............................................................................. 131
Section 9.03    Liability of Agents. ............................................................................... 131
Section 9.04    Reliance by Agents ............................................................................... 133
Section 9.05    Notice of Default ................................................................................... 133
Section 9.06    Credit Decision; Disclosure of Information by Agents .......................... 134
Section 9.07    Indemnification of Agents ..................................................................... 134
Section 9.08    Agents in their Individual Capacities ................................................... 135

CONFIDENTIAL                                                                    Trive_00042917

Section 9.09    Successor Agents ................................................................................ 135
Section 9.10    Administrative Agent May File Proofs of Claim ............................... 136
Section 9.11    Collateral Matters .............................................................................. 136
Section 9.12    Other Purchasers ............................................................................... 137
Section 9.13    Appointment of Supplemental Agents ............................................... 137
Section 9.14    Withholding Tax ................................................................................. 138
Section 9.15    Purchaser Direction ........................................................................... 138
Section 9.16    Certain ERISA Matters ...................................................................... 139
Section 9.17    Additional Exculpations ..................................................................... 139
Section 9.18    Erroneous Payments .......................................................................... 140
Section 9.19    Survival .............................................................................................. 141

## ARTICLE X

### Miscellaneous

Section 10.01    Amendments, Etc. ............................................................................. 141
Section 10.02    Notices and Other Communications; Facsimile Copies .................... 144
Section 10.03    No Waiver; Cumulative Remedies ..................................................... 147
Section 10.04    Attorney Costs and Expenses ............................................................ 147
Section 10.05    Indemnification by the Issuer ............................................................ 147
Section 10.06    Payments Set Aside ........................................................................... 149
Section 10.07    Successors and Transferees ............................................................... 149
Section 10.08    Confidentiality ................................................................................... 154
Section 10.09    Setoff .................................................................................................. 155
Section 10.10    Counterparts ...................................................................................... 155
Section 10.11    Integration ......................................................................................... 155
Section 10.12    Survival of Representations and Warranties ...................................... 156
Section 10.13    Severability ........................................................................................ 156
Section 10.14    GOVERNING LAW, JURISDICTION, SERVICE OF PROCESS ......... 156
Section 10.15    WAIVER OF RIGHT TO TRIAL BY JURY ....................................... 157
Section 10.16    Binding Effect .................................................................................... 157
Section 10.17    Judgment Currency ............................................................................ 157
Section 10.18    Purchaser Action ............................................................................... 157
Section 10.19    USA PATRIOT Act ............................................................................. 158
Section 10.20    Obligations Absolute ......................................................................... 158
Section 10.21    No Advisory or Fiduciary Responsibility .......................................... 158
Section 10.22    Acknowledgment and Consent to Bail-In of Affected Financial
                 Institutions ........................................................................................ 159
Section 10.23    [Reserved] .......................................................................................... 159
Section 10.24    [Reserved]. ......................................................................................... 159
Section 10.25    Gaming Matters .................................................................................. 159
Section 10.26    Purchaser Representations ................................................................. 159

CONFIDENTIAL                                                            Trive_00042918

## SCHEDULES

Schedule 1.01A    —    Note Documents
Schedule 1.01B    —    Existing Investments
Schedule 1.01C    —    Existing Liens
Schedule 2.01    —    Commitments
Schedule 5.06    —    Litigation
Schedule 5.11    —    Subsidiaries
Schedule 5.22    —    Material Real Property
Schedule 7.03    —    Existing Indebtedness
Schedule 7.05(a)    —    Asset Dispositions
Schedule 7.07(a)    —    Permitted Issuer Contracts
Schedule 7.07(b)    —    Permitted HoldCo Contracts
Schedule 7.10    —    Affiliate Transactions
Schedule 10.02    —    Administrative Agent's Office, Certain Addresses for Notices

## EXHIBITS

Form of

Exhibit A    —    Purchase Notice
Exhibit C    —    Note
Exhibit D    —    Closing Date Certificate
Exhibit E    —    Transfer and Acceptance
Exhibit F    —    Joinder of Additional Purchaser
Exhibit G    —    Pledge Agreement
Exhibit L    —    United States Tax Compliance Certificates
Exhibit N    —    Solvency Certificate
Exhibit O    —    Key Performance Indicator Report

CONFIDENTIAL        Trive_00042919

## NOTE PURCHASE AGREEMENT

This NOTE PURCHASE AGREEMENT, dated as of November 29, 2021 (this "Agreement"), is made by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent (each as defined below), and each purchaser from time to time party hereto (collectively, the "Purchasers" and individually, a "Purchaser").

## PRELIMINARY STATEMENTS

WHEREAS, the Issuer will issue hereunder, and has requested that the Purchasers purchase, the Notes (as hereinafter defined) in an aggregate principal amount of up to $250,000,000;

WHEREAS, the applicable Purchasers have indicated their willingness to purchase the Notes on the terms and subject to the conditions set forth herein; and

Whereas, the Notes will be offered and sold directly to the applicable Purchasers in a private placement without being registered under the Securities Act, in reliance upon exemptions provided by Section 4(a)(2) and Regulation D ("Regulation D") of the Securities Act;

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

### Definitions and Accounting Terms

Section 1.01    Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Accounting Changes" has the meaning specified in the definition of "IFRS."

"Acquired Indebtedness" means with respect to any Person (x) Indebtedness (1) of any other Person or any of its Subsidiaries existing at the time such other Person becomes a Subsidiary, or (2) assumed in connection with the acquisition of assets from such other Person, in each case whether or not Incurred by such other Person in connection with such other Person becoming a Subsidiary of the Issuer or such acquisition or (3) of a Person at the time such Person merges with or into or consolidates or otherwise combines with the Issuer or any Subsidiary and (y) Indebtedness secured by a Lien encumbering any asset acquired by such Person. Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (x)(1) of the preceding sentence, on the date such Person becomes a Subsidiary and, with respect to clause (x)(2) of the preceding sentence, on the date of consummation of such acquisition of assets and, with respect to clause (x)(3) of the preceding sentence, on the date of the relevant merger, amalgamation, consolidation or other combination.

"Additional Assets" means:

(1)    any property or assets (other than Capital Stock) used or to be used by the Issuer, a Subsidiary or otherwise useful in a Similar Business (it being understood that capital expenditures on property or assets already used in a Similar Business or to replace any property or assets that are the subject of such Asset Disposition shall be deemed an investment in Additional Assets);

*LB Holdings NPA*

CONFIDENTIAL                                                                    Trive_00042920

(2)    the Capital Stock of a Person that is engaged in a Similar Business and becomes a Subsidiary as a result of the acquisition of such Capital Stock by the Issuer or a Subsidiary; or

(3)    Capital Stock constituting a minority interest in any Person that at such time is a Subsidiary.

"Administrative Agent" means, subject to Section 9.13, Alter Domus (US) LLC, in its capacity as administrative agent under the Note Documents, or any successor administrative agent appointed in accordance with Section 9.09.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Issuer and the Purchasers.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to any specified Person, any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this Agreement, "control" or "controls", when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Affiliate Transaction" has the meaning specified in Section 7.10(a).

"Affiliated Purchaser" means, at any time, any Purchaser that is an Affiliate of the Issuer (other than the Issuer or any of its Subsidiaries).

"Agency Fee Letter" means that certain Agency Fee Letter, dated as of the date hereof, made by and among the Issuer, Lucky Bucks, the Administrative Agent, and the Collateral Agent.

"Agent-Related Persons" means the Agents (and any co-agents, sub-agents and attorneys-in-fact of the Agents), together with their respective Affiliates, and the partners, managers, members, officers, directors, employees, agents, representatives, trustees, attorneys, advisors, and attorneys-in-fact of the foregoing.

"Agents" means, collectively, the Administrative Agent, the Collateral Agent, and the Supplemental Agents (if any).

"Aggregate Commitments" means the Commitments of all the Purchasers.

"Agreement" means this Note Purchase Agreement.

"Agreement Currency" has the meaning specified in Section 10.16.

CONFIDENTIAL                                                    Trive_00042921

"Anti-Corruption Laws" means the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA") and any other laws, rules or regulations relating to the prohibition of bribery or corruption issued, administered or enforced by any Governmental Authority having jurisdiction over the Issuer or any of the Subsidiaries.

"Anti-Terrorism Laws" means all applicable laws and regulations or ordinances relating to terrorism or money laundering in any jurisdiction in which the Issuer or any of the Subsidiaries is located or is doing business, including Executive Order No. 13224, the USA PATRIOT Act, the Bank Secrecy Act of 1970, and the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957).

"Applicable Lending Office" means for any Purchaser, such Purchaser's office, branch or affiliate designated as such Purchaser's office, as notified to the Administrative Agent, any of which offices may be changed by such Purchaser.

"Applicable Percentage" means, at any time (a) with respect to any Purchaser with a Commitment, the percentage equal to a fraction the numerator of which is the amount of such Purchaser's Commitment  at such time and the denominator of which is the aggregate amount of all Commitments of all Purchasers and (b) with respect to the Notes, a percentage equal to a fraction the numerator of which is such Purchaser's Outstanding Amount of the Notes and the denominator of which is the aggregate Outstanding Amount of all Notes.

"Applicable Proceeds" has the meaning specified in Section 7.05(c).

"Approved Foreign Bank" has the meaning specified in the definition of "Cash Equivalents."

"Approved Fund" means, with respect to any Purchaser, any Fund that is administered, advised or managed by (a) such Purchaser, (b) an Affiliate of such Purchaser or (c) an entity or an Affiliate of an entity that administers, advises or manages such Purchaser.

"Asset Disposition" means:

(a)        the voluntary sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Leaseback Transaction) of the Issuer or any of its Subsidiaries (each referred to in this definition as a "disposition"); or

(b)        the issuance or sale of Capital Stock of any Subsidiary (other than Preferred Stock or Disqualified Stock of Subsidiaries issued in compliance with Section 7.03 hereof or directors' qualifying shares and shares issued to foreign nationals as required under applicable law), whether in a single transaction or a series of related transactions;

in each case, other than:

(1)        a disposition by the Issuer or a Subsidiary to the Issuer or a Subsidiary, including pursuant to any Intercompany License Agreement ("Intercompany Dispositions");

(2)        a disposition of cash, Cash Equivalents or Investment Grade Securities, including any marketable securities portfolio owned by the Issuer and its Subsidiaries on

CONFIDENTIAL                                                                          Trive_00042922

the Closing Date; *provided* that, for the avoidance of doubt, such dispositions shall be set forth on Schedule 7.05(a) to the extent required under Section 7.05(a);

(3)     a disposition of inventory, goods or other assets (including Settlement Assets) in the ordinary course of business or consistent with past practice or held for sale or no longer used in the ordinary course of business, including any disposition of disposed, abandoned or discontinued operations;

(4)     a disposition of obsolete, worn-out, uneconomical, negligible, immaterial, damaged, non-core or surplus property, equipment or other assets or property, equipment or other assets that are no longer economically practical or commercially desirable to maintain or used or useful in the business of the Issuer and the Subsidiaries whether now or hereafter owned or leased or acquired in connection with an acquisition or used or useful in the conduct of the business of the Issuer and the Subsidiaries (including by conveying, selling, assigning, transferring, licensing or sublicensing, ceasing to enforce, allowing the lapse, abandonment or invalidation of or discontinuing the use, prosecution or maintenance of, putting into the public domain or other disposition of any IP Rights that are, in the reasonable judgment of the Issuer or the Subsidiaries, no longer used or useful, or economically practicable to maintain, or in respect of which the Issuer or any Subsidiary determines in its reasonable judgment that such action or inaction is desirable);

(5)     transactions permitted under Sections 7.04(a) or (b) hereof or a transaction that constitutes a Change of Control;

(6)     an issuance of Capital Stock by a Subsidiary to the Issuer or to another Subsidiary or as part of or pursuant to an equity incentive or compensation plan approved by the Board of Directors;

(7)     any dispositions of Capital Stock, properties or assets in a single transaction or series of related transactions with a fair market value (as determined in good faith by the Issuer) of less than the greater of $14,000,000 and 10.0% of LTM EBITDA;

(8)     any Restricted Payment that is permitted to be made, and is made, under Section 7.06 and the making of any Permitted Payment or Permitted Investment;

(9)     dispositions in connection with Permitted Liens, Permitted Intercompany Activities, Permitted IPO Reorganization and Permitted Tax Restructuring;

(10)     dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or consistent with past practice or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(11)     conveyances, sales, assignments, transfers, licenses, sublicenses, cross-licenses or other dispositions of any IP Rights or other general intangibles and licenses, sublicenses, cross-licenses, leases or subleases of other property, in each case, in the ordinary course of business or consistent with past practice or pursuant to a services, research or development agreement in which the counterparty to such agreement receives a license in any IP Rights that result from such agreement;

(12)     the lease, assignment, license, sublease or sublicense of any real or personal property in the ordinary course of business or consistent with industry practice;

CONFIDENTIAL                                                                    Trive_00042923

(13)    foreclosure, condemnation, expropriation, forced disposition or any similar action with respect to any property or other assets or the granting of Liens not prohibited by this Agreement;

(14)    the sale, discount or other disposition (with or without recourse, and on customary or commercially reasonable terms and for credit management purposes) of inventory, accounts receivable or notes receivable arising in the ordinary course of business or consistent with past practice, or the conversion or exchange of accounts receivable for notes receivable;

(15)    [reserved];

(16)    any disposition of Capital Stock of a Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Issuer or a Subsidiary) from whom such Subsidiary was acquired, or from whom such Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(17)    (i) dispositions of property to the extent that such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased, or other assets of comparable or greater value or usefulness to the business (as determined by the Issuer), (ii) dispositions of property to the extent that the proceeds of such disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased) and (iii) to the extent allowable under Section 1031 of the Code or comparable law or regulation, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(18)    (i) any disposition of Securitization Assets or Receivables Assets, or participations therein, in connection with any Qualified Securitization Financing or Receivables Facility permitted hereunder or (ii) the disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with past practice;

(19)    any financing transaction with respect to property constructed, acquired, leased, renewed, relocated, expanded, replaced, repaired, maintained, upgraded or improved (including any reconstruction, refurbishment, renovation and/or development of real property) by the Issuer or any Subsidiary after the Closing Date, including Sale and Leaseback Transactions and asset securitizations, permitted by this Agreement;

(20)    sales, transfers or other dispositions of Investments in joint ventures or similar entities, to the extent required by, or made pursuant to customary buy/sell arrangements between the parties set forth in the joint venture arrangements or other similar binding arrangements;

(21)    any surrender or waiver of contractual rights or the settlement, release, surrender or waiver of contractual, tort, litigation or other claims of any kind;

(22)    the unwinding of any Cash Management Obligations or Hedging Obligations (each as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document);

CONFIDENTIAL                                                    Trive_00042924

(23)    transfers of property or assets subject to Casualty Events upon receipt of the net proceeds of such Casualty Event;

(24)    any sale of property or assets, if the acquisition of such property or assets was financed with Excluded Contributions and the proceeds of such sale are used to make a Restricted Payment pursuant to Section 7.06(b)(xii)(b) hereof;

(25)    dispositions of (i) assets (including Capital Stock) acquired in a transaction after the Closing Date, which assets are not useful in the core or principal business of the Issuer and the Subsidiaries or (ii) assets (including Capital Stock) made in connection with the approval of any applicable antitrust authority or otherwise necessary or advisable in the reasonable determination of the Issuer to consummate any acquisition, *provided* that, in each case, such disposition shall have been consummated within 365 days of such acquisition;

(26)    any disposition in connection with the LB Transactions or the Transactions;

(27)    any disposition of non-revenue producing assets to a Person who is providing services related to such assets, the provision of which have been or are to be outsourced by the Issuer or any Subsidiary to such Person;

(28)    any Sale and Leaseback Transactions not prohibited under Section 7.03 hereof;

(29)    dispositions of non-core assets or lines of business acquired in connection with a Permitted Acquisition or other Permitted Investment or disposition required to obtain anti-trust approval made to obtain the approval of an anti-trust authority of a Permitted Acquisition or other Permitted Investment to the extent applicable, and any other disposition to comply with any order of an agency, authority or other regulatory body or any applicable law or regulation; and

(30)    any disposition of assets not constituting Collateral of less than the greater of $35,000,000 and 25.0% of LTM EBITDA.

"Asset Disposition Percentage" has the meaning specified in Section 7.05(c).

"Attorney Costs" means and includes all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"Available Amount" has the meaning specified in Section 7.06(a)(v).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment

CONFIDENTIAL

Trive_00042925

firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Event" means, with respect to any Person, such Person or its parent entity becomes (other than via an Undisclosed Administration) the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Required Purchasers, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, *provided* that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, *provided, further*, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person or its parent entity.

"BCP" means BC Partners Advisors, L.P.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"Board of Directors" means (1) with respect to the Issuer or any corporation, the board of directors or managers, as applicable, of the Issuer or such corporation, or any duly authorized committee thereof; (2) with respect to any partnership, the board of directors or other governing body of the general partner, as applicable, of the partnership or any duly authorized committee thereof; (3) with respect to a limited liability company, the managing member or members or any duly authorized controlling committee thereof; and (4) with respect to any other Person, the board or any duly authorized committee of such Person serving a similar function. Whenever any provision requires any action or determination to be made by, or any approval of, a Board of Directors, such action, determination or approval shall be deemed to have been taken or made if approved by a majority of the directors on any such Board of Directors (whether or not such action or approval is taken as part of a formal board meeting or as a formal board approval). Unless the context requires otherwise, Board of Directors means the Board of Directors of the Issuer.

"Business Combination" means (i) a merger or consolidation of the Issuer into or with another entity after which the stockholders of the Issuer immediately prior to such transaction do not own, immediately following the consummation of the transaction by virtue of their shares in the Issuer or securities received in exchange for such shares in connection with the transaction, a majority of the voting power of the surviving entity in proportions substantially identical to those that existed immediately prior to such transaction and with substantially the same rights, preferences, privileges and restrictions as the shares they held immediately prior to the transaction, or (ii) the sale or transfer by the Issuer or its stockholders of more than 50% of the voting power of the Issuer in a transaction or series of related transactions other than in a transaction or series of transactions effected by the Issuer primarily for financing purposes.

CONFIDENTIAL     Trive_00042926

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Business Successor" means (i) any former Subsidiary of Issuer and (ii) any Person that, after the Closing Date, has acquired, merged or consolidated with a Subsidiary of Issuer (that results in such Subsidiary ceasing to be a Subsidiary of Issuer), or acquired (in one transaction or a series of transactions) all or substantially all of the property and assets or business of a Subsidiary or assets constituting a business unit, line of business or division of a Subsidiary of Issuer.

"can pay their Stated Liabilities and Identified Contingent Liabilities as they mature" has the meaning specified in the definitions of "Solvent" and "Solvency."

"Capital Stock" of any Person means any and all shares of, rights to purchase or acquire, warrants, options or depositary receipts for, or other equivalents of, limited liability company, partnership or other interests in (however designated), equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into, or exchangeable for, such equity.

"Capitalized Lease Obligation" means an obligation that is required to be classified and accounted for as a capitalized lease (and, for the avoidance of doubt, not a straight-line or operating lease) for financial reporting purposes in accordance with IFRS. The amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined in accordance with IFRS, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with IFRS, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Subsidiaries.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by Issuer or any Subsidiary:

    (1)    U.S. Dollars or any other foreign currency held by Issuer and its Subsidiaries from time to time in the ordinary course of business or consistent with past practice;

    (2)    securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (*provided* that the full faith and credit obligation of the United States is pledged in support thereof), with maturities of thirty-six (36) months or less from the date of acquisition;

    (3)    certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits, demand deposits or bankers' acceptances having maturities of not more than two years from the date of acquisition thereof issued by any lender or by any bank, trust company or any other financial institution (a) whose commercial paper is rated at least "A-2" or the equivalent thereof by S&P or at least "P-2" or the equivalent thereof by Moody's (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization

CONFIDENTIAL        Trive_00042927

selected by the Issuer) or (b) having combined capital and surplus in excess of $100,000,000;

(4)    repurchase obligations for underlying securities of the types described in clauses (2), (3), (7) and (8) entered into with any bank meeting the qualifications specified in clause (3) above;

(5)    securities with maturities of two years or less from the date of acquisition backed by standby letters of credit issued by any Person meeting the qualifications in clause (3) above;

(6)    commercial paper and variable or fixed rate notes issued by any Person meeting the qualifications specified in clause (3) above (or by the parent company thereof) maturing within two years after the date of creation thereof, or if no rating is available in respect of the commercial paper or variable or fixed rate notes, the issuer of which has an equivalent rating in respect of its long-term debt;

(7)    marketable short-term money market and similar securities, having a rating of at least "P-2" or "A-2" from either S&P or Moody's, respectively, (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Issuer);

(8)    readily marketable direct obligations issued by any state, province, commonwealth or territory of the United States of America or any political subdivision, taxing authority or any agency or instrumentality thereof, rated BBB- (or the equivalent) or better by S&P or Baa3 (or the equivalent) or better by Moody's(or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Issuer) with maturities of not more than two years from the date of acquisition;

(9)    readily marketable direct obligations issued by any foreign government or any political subdivision, taxing authority or agency or instrumentality thereof, with a rating of "BBB-" or higher from S&P or "Baa3" or higher by Moody's or the equivalent of such rating by such rating organization (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Issuer) with maturities of not more than two years from the date of acquisition;

(10)    Investments with average maturities of twenty-four (24) months or less from the date of acquisition in money market funds with a rating of "A" or higher from S&P or "A-2" or higher by Moody's or the equivalent of such rating by such rating organization (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Issuer);

(11)    with respect to any Foreign Subsidiary:  (i) obligations of the national government of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers' acceptance of, or time deposits with, any commercial bank which is organized and existing

CONFIDENTIAL                                                                    Trive_00042928

under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 270 days from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(12)    Indebtedness or Preferred Stock issued by Persons with a rating of "BBB-" or higher from S&P or "Baa3" or higher from Moody's (or, if at the time, neither S&P nor Moody's is rating such obligations, then a comparable rating from another Nationally Recognized Statistical Rating Organization selected by the Issuer) with maturities of twenty-four (24) months or less from the date of acquisition;

(13)    bills of exchange issued in the United States of America, Canada, the United Kingdom, Japan or a member state of the European Union eligible for rediscount at the relevant central bank and accepted by a bank (or any dematerialized equivalent);

(14)    investments in industrial development revenue bonds that (i) "re-set" interest rates not less frequently than quarterly, (ii) are entitled to the benefit of a remarketing arrangement with an established broker dealer and (iii) are supported by a direct pay letter of credit covering principal and accrued interest that is issued by any bank meeting the qualifications specified in clause (3) above;

(15)    Cash Equivalents or instruments similar to those referred to in the clauses above denominated in U.S. Dollars;

(16)    any investment company, money market, enhanced high yield, pooled or other investment fund investing 90.0% or more of its assets in instruments of the types specified in the clauses above;

(17)    for purposes of clause (2) of the definition of "Asset Disposition," any marketable securities portfolio owned by Issuer and its Subsidiaries on the Closing Date; and

(18)    credit card receivables and debit card receivables in the ordinary course of business or consistent with past practice, so long as such are considered cash equivalents under IFRS and are so reflected on Issuer's balance sheet.

In the case of Investments by any Foreign Subsidiary that is a Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents shall also include (a) investments of the type and maturity described in the clauses above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (b) other short-term investments utilized by Foreign Subsidiaries that are Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in the clauses above and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (1) above, *provided* that such amounts are converted into any currency listed in clause (1) as promptly as practicable and in any event within 10 Business Days following

CONFIDENTIAL                                                                    Trive_00042929

the receipt of such amounts. For the avoidance of doubt, any items identified as Cash Equivalents under this definition (other than clause (17) above) will be deemed to be Cash Equivalents for all purposes under this Agreement regardless of the treatment of such items under IFRS.

"Casualty Event" means any event that gives rise to the receipt by Issuer or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, assets or real property (including any improvements thereon) to replace or repair such equipment, assets or real property.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means:

(1)     at any time prior to the consummation of an IPO, the Permitted Holders shall cease to control and own, directly or indirectly, of record and beneficially (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act or any successor provisions) more than 50.0% of the voting interests (for the election of directors) in the outstanding voting securities having ordinary voting power for the election of directors of Issuer;

(2)     at any time following the consummation of an IPO, Issuer becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) any "person" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act as in effect on the Closing Date), other than one or more Permitted Holders or a Parent Entity, that is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) of more than 50.0% of the total voting power of the Voting Stock of Issuer; *provided* that (x) so long as Issuer is a Subsidiary of any Parent Entity (and such Parent Entity shall have provided "know your customer" information reasonably requested by each Agent and the Purchasers and such Parent Entity is not a Sanctioned Person), no Person shall be deemed to be or become a beneficial owner of more than 50.0% of the total voting power of the Voting Stock of Issuer unless such Person shall be or become a beneficial owner of more than 50.0% of the total voting power of the Voting Stock of such Parent Entity (other than a Parent Entity that is a Subsidiary of another Parent Entity) and (y) any Voting Stock of which any Permitted Holder is the beneficial owner shall not in any case be included in any Voting Stock of which any such Person is the beneficial owner;

(3)     HoldCo shall fail to beneficially own, directly, 100% of the issued and outstanding Capital Stock of Lucky Bucks; or

CONFIDENTIAL                                                                    Trive_00042930

        (4)     Issuer shall fail to beneficially own, directly, 100% of the issued and outstanding Capital Stock of HoldCo.

Notwithstanding the foregoing, a Change in Control shall be deemed not to have occurred pursuant to clauses (1) or (2) above at any time if the Permitted Holders have, at such time, directly or indirectly, the right or the ability, by voting power, contract or otherwise, to elect or designate for election at least a majority of the Board of Directors of Issuer.

        Notwithstanding the preceding or any provision of Section 13d-3 of the Exchange Act, (i) a Person or group shall not be deemed to beneficially own Voting Stock subject to a stock or asset purchase agreement, merger agreement, option agreement, warrant agreement or similar agreement (or voting or option or similar agreement related thereto) until the consummation of the acquisition of the Voting Stock in connection with the transactions contemplated by such agreement, (ii) if any group includes one or more Permitted Holders, the issued and outstanding Voting Stock of Issuer owned, directly or indirectly, by any Permitted Holders that are part of such group shall not be treated as being beneficially owned by such group or any other member of such group for purposes of determining whether a Change of Control has occurred, (iii) a Person or group will not be deemed to beneficially own the Voting Stock of another Person as a result of its ownership of Voting Stock or other securities of such other Person's parent entity (or related contractual rights) unless it owns 50.0% or more of the total voting power of the Voting Stock entitled to vote for the election of directors of such parent entity having a majority of the aggregate votes on the board of directors (or similar body) of such parent entity and (iv) the right to acquire Voting Stock (so long as such Person does not have the right to direct the voting of the Voting Stock subject to such right) or any veto power in connection with the acquisition or disposition of Voting Stock will not cause a party to be a beneficial owner.

        "Charges" has the meaning provided in the definition of "Consolidated EBITDA."

        "CION" means CION Investment Corporation.

        "CION Fee Letter" means the letter agreement, dated as of the Closing Date, by and between the Issuer and CION.

        "Closing Date" means the date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

        "Closing Date Audited Financial Statements" means the audited financial statements of Lucky Bucks and its Subsidiaries, consisting of the consolidated balance sheet of Lucky Bucks and the related statements of income and retained earnings, stockholders' equity and cash flow for the year then ended as of December 31, 2020.

        "Closing Date Certificate" means a certificate of a Responsible Officer of the Issuer substantially in the form attached as Exhibit D hereto.

        "Closing Date Unaudited Financial Statements" means the unaudited consolidated financial statements of Lucky Bucks and its Subsidiaries consisting of the balance sheet of Lucky Bucks and the related statements of income for the fiscal quarter ended June 30, 2021.

        "COAM Location" means each location at which any coin operated amusement machine, video gaming terminal or similar distributed gaming machine, including any bona fide coin operated amusement "Class B machine" as defined in O.C.G.A. Title 50, Chapter 27, Article 3, is located. "Code" means the U.S. Internal Revenue Code of 1986, as amended.

CONFIDENTIAL        Trive_00042931

"Collateral" means all the "Collateral" as defined in the Collateral Documents and all other property of whatever kind and nature pledged or charged as collateral under any Collateral Document.

"Collateral Agent" means, subject to Section 9.13, Alter Domus (US) LLC, in its capacity as collateral agent under any of the Note Documents, or any successor collateral agent appointed in accordance with Section 9.09.

"Collateral Documents" means, collectively, the Pledge Agreement, collateral assignments, security agreements, pledge agreements or other similar agreements or documents delivered to the Collateral Agent and the Purchasers pursuant to Section 4.01(a)(ii), Section 6.10 or Section 6.12, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"Collateral Requirement" means, at any time, the requirement that:

(a)        the Collateral Agent shall have received each Collateral Document required to be delivered (i) on the Closing Date pursuant to Section 4.01(a)(ii) or (ii) thereafter pursuant to Section 6.10, Section 6.12 or the Collateral Documents, in each case, duly executed by the Issuer; and

(b)        the Secured Obligations shall have been secured, pursuant to the Pledge Agreement, by a valid and perfected security interest, subject to no other Liens (other than Permitted Liens), in all Capital Stock and other equity interests of HoldCo held directly by the Issuer, in each case, subject to no Liens other than Permitted Liens.

The Required Purchasers may grant extensions of time for the perfection of security interests in or the obtaining of title insurance with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Issuer on such date) where such Required Purchasers reasonably determine, in consultation with the Issuer, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Note Document to the contrary:

(A)        Liens required to be granted from time to time pursuant to the Collateral Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents and, to the extent appropriate in the applicable jurisdiction, as agreed between the Required Purchasers and the Issuer; and

(B)        no actions in any jurisdiction other than the Covered Jurisdictions or that are necessary to comply with the Laws of any jurisdiction other than the Covered Jurisdictions shall be required in order to create any security interests in assets located, titled, registered or filed outside of the Covered Jurisdictions (it being understood that there shall be no security agreements, pledge agreements, or share charge agreements governed under the Laws of any jurisdiction other than the Covered Jurisdictions).

"Commitment" means, as to each Purchaser, its respective obligation to purchase a Note from the Issuer pursuant to Section 2.01, in an aggregate principal amount not to exceed the amount set forth (i) opposite such Purchaser's name on Schedule 2.01 under the caption "Commitment" at the purchase price set forth in such Schedule 2.01, or (ii) as separately agreed in a Joinder made between such Purchaser and the Issuer after the Closing Date, providing for a Delayed Issuance on or prior to the 90th day following

CONFIDENTIAL                                                                                    Trive_00042932

the Closing Date, at the purchase price set forth in such Joinder, in each case, as such amount may be adjusted from time to time in accordance with this Agreement. The total principal amount of all Notes issued on and after the Closing Date pursuant to Commitments under this Agreement shall not exceed $250,000,000.

"Consolidated Cash Interest Expense" shall mean, for any period, the Consolidated Interest Expense excluding any non-cash interest expense of Lucky Bucks and its Subsidiaries for such period, determined on a consolidated basis in accordance with IFRS.

"Consolidated Depreciation and Amortization Expense" means, with respect to any Person for any period, the total amount of depreciation and amortization expense and capitalized fees, including amortization or write-off of (i) goodwill, software and intangible assets and non-cash organization costs, (ii) deferred financing and debt issuance fees, costs and expenses, (iii) capitalized expenditures (including Capitalized Software Expenditures), customer acquisition costs and incentive payments, media development costs, conversion costs and contract acquisition costs, the amortization of original issue discount resulting from the issuance of Indebtedness at less than par and amortization of favorable or unfavorable lease assets or liabilities and (iv) capitalized fees related to any Qualified Securitization Financing or Receivables Facility, of such Person and its Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with IFRS and any write down of assets or asset value carried on the balance sheet.

"Consolidated EBITDA" means, with respect to any Person for any period, the Consolidated Net Income of such Person and its Subsidiaries for such period (determined in accordance with the applicable provisions of Section 1.09 hereof):

    (1)    increased (without duplication) by:

        (a)    Fixed Charges of such Person and its Subsidiaries for such period (including (w) non-cash rent expense, (x) net losses or any obligations on any "Hedging Obligations" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) or other derivative instruments, (y) bank, letter of credit and other financing fees and (z) costs of surety bonds in connection with financing activities, plus amounts excluded from the definition of "Consolidated Interest Expense" and any non-cash interest expense), to the extent deducted (and not added back) in computing Consolidated Net Income; plus

        (b)    (x) income Taxes and similar tax expenses (including, without limitation, foreign, federal, state, local, provincial, territorial, local, unitary, franchise, excise, withholding and similar taxes (including any future taxes or other levies which replace or are intended to be in lieu of such taxes) paid or accrued during such period, including penalties and interest related thereto or arising from any tax examination), (y) without duplication, any distributions made to a Parent Entity with respect to the foregoing in accordance with Section 7.06(b)(xxiv) and (z) the net tax expense associated with any adjustments made pursuant to the definition of "Consolidated Net Income" in each case, to the extent deducted (and not added back) in computing Consolidated Net Income; plus

        (c)    Consolidated Depreciation and Amortization Expense of such Person and its Subsidiaries for such period to the extent deducted (and not added back) in computing Consolidated Net Income; plus

CONFIDENTIAL                                                                                    Trive_00042933

(d)    any (x) Transaction Expenses and LB Transaction Expenses and (y) fees, costs, expenses or charges (other than Consolidated Depreciation and Amortization Expense, but including, but not limited to rationalization, tax, legal and other expenses) related to any actual, proposed or contemplated Equity Offering (including any expense relating to enhanced accounting functions or other transaction costs associated with becoming a public company, including Public Company Costs), Permitted Acquisition, Permitted Investment, IPO, Restricted Payment, acquisition, disposition, consolidation, restructuring, recapitalization or the incurrence or repayment of Indebtedness, subsidiary designation, or investment, whether consummated or not and whether or not permitted to be incurred by this Agreement (including a refinancing thereof) (whether or not successful and including any such transaction consummated prior to the Credit Agreement Closing Date), including (i) without limitation, such legal, accounting and other professional fees, travel expenses or other expenses or charges (including rating agency fees, consulting fees and other related expenses and/or letter of credit or similar fees) related to the foregoing and offering or incurrence of, or ongoing administration of this Agreement, the Facilities, and other note purchase agreements or credit facilities, any Securitization Fees, any other Indebtedness permitted to be Incurred under this Agreement or any Equity Offering, and (ii) any amendment, waiver or other modification of this Agreement, Receivables Facilities, Securitization Facilities, any other credit facilities, any Securitization Fees, any other Indebtedness or any Equity Offering, in each case, whether or not consummated, to the extent deducted (and not added back) in computing Consolidated Net Income; plus

(e)    the amount of any charge, expense, cost, accrual, reserve or loss of any kind (collectively, "Charges") attributable to or associated with any (x) restructuring, integration, strategic or new initiatives, business optimization activities or other operating improvements, cost savings, cost rationalization programs, operating expense reductions, synergies and/or similar initiatives, and (y) retention, recruiting, relocation, signing bonuses, Charges in connection with a single or one-time event (including without limitation, in connection with facility openings, pre-openings, closings, reconfigurations and/or consolidations), contract termination Charges, stock option and other equity-based compensation expenses, any Charges associated with any stock subscription or shareholder agreement or any employee benefit trust, severance costs, any Charges associated with any modification of any pension or post-retirement employee benefit plan, indemnities and expenses, including, without limitation, any one time expense relating to enhanced accounting function or other transaction costs, including those associated with becoming a standalone entity or a public company (including, for the avoidance of doubt, Public Company Costs); *provided* that the amount added to Consolidated EBITDA pursuant to clause (e)(x) and clause (g) shall not exceed 35.0% of Consolidated EBITDA (calculated after giving effect to the addbacks made pursuant to clause (e)(x) and clause (g)); plus

(f)    any other non-cash charges, write-downs, write-offs, expenses, losses, increase in expenses or items reducing Consolidated Net Income for such period including (i) deferred revenue and related deferred costs and deferred compensation, (ii) non-cash losses on non-cash asset retirement costs, non-cash expense relating to the vesting of warrants, the sale of assets and any write-offs or write-downs, deferred revenue or impairment charges, including such charges, write-downs, write-offs,

CONFIDENTIAL                                                                    Trive_00042934

expenses, losses or other items pushed down to the Issuer and its Subsidiaries), (iii) impairment charges, amortization (or write offs) of financing costs (including debt discount, debt issuance costs and commissions and other fees associated with Indebtedness, including this Agreement) of such Person and its Subsidiaries and/or (iv) the impact of acquisition method accounting adjustment and any non-cash write-up, write-down or write-off with respect to re-valuing assets, inventory (including any impact of changes to inventory valuation policy methods) or other inventory adjustments and liabilities in connection with the LB Transactions or any Investment, deferred revenue or any effects of adjustments resulting from the application of purchase accounting, purchase price accounting (including any step-up in inventory and loss of profit on the acquired inventory) (*provided* that if any such non-cash charge, write-down, expense, loss or item represents an accrual or reserve for potential cash items in any future period, (A) the Issuer may elect not to add back such non-cash charge, expense or loss in the current period and (B) to the extent the Issuer elects to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA when paid), or other items classified by the Issuer as special items less other non-cash items of income increasing Consolidated Net Income (excluding any amortization of a prepaid cash item that was paid in a prior period or such non-cash item of income to the extent it represents a receipt of cash in any future period); plus

(g)    (i) *pro forma* adjustments, including *pro forma* "run rate" synergies, cost savings, operating improvements and initiatives, operating expense reductions and other synergies (in each case, net of amounts actually realized) related to the LB Transactions that are reasonably identifiable, factually supportable and projected by the Issuer in good faith to result from actions that have been either taken or initiated, with respect to which substantial steps have been taken or initiated within twenty-four (24) months after the Closing Date and (ii) *pro forma* adjustments, including *pro forma* "run rate" cost savings, operating improvements and initiatives, operating expense reductions, and other synergies (in each case net of amounts actually realized) related to acquisitions (including the commencement of activities constituting a business), investments, strategic or new initiatives or related to restructuring initiatives, cost savings initiatives and other initiatives and actions that are reasonably identifiable and projected by the Issuer in good faith to result from actions that have either been taken or initiated, with respect to which substantial steps have been taken or are that are expected to be taken or initiated within twenty-four (24) months after the date of consummation of such acquisition, investment, strategic or new initiatives or the initiation of such restructuring initiative, cost savings initiative or other initiatives, in both cases; *provided* that the amount added to Consolidated EBITDA pursuant to this clause (g) and clause (e)(x) shall not exceed 35.0% of Consolidated EBITDA (calculated after giving effect to the addbacks made pursuant to this clause (g) and clause (e)(x)); plus

(h)    any costs or expenses incurred by the Issuer or a Subsidiary or a Parent Entity pursuant to any management equity plan, stock option plan, phantom equity plan, profits interests or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement, and any costs or expenses in connection with the roll-over, acceleration or payout of Capital Stock held by management, in each case to the extent that

CONFIDENTIAL    Trive_00042935

such costs or expenses are non-cash or otherwise funded with cash proceeds contributed to the capital of the Issuer or net cash proceeds of an issuance of Capital Stock (other than Disqualified Stock) of the Issuer; plus

(i)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to clause (2) below for any previous period and not added back; plus

(j)    any net loss included in the Consolidated Net Income attributable to non-controlling or minority interests pursuant to the application of IFRS 10; plus

(k)    the amount of any non-controlling or minority interest Charges; plus

(l)    unrealized or realized losses due to foreign exchange adjustments including, without limitation, losses and expenses in connection with currency and exchange rate fluctuations, and unrealized or realized losses or other obligations from hedging activities or other derivative instruments; plus

(m)    with respect to any joint venture, an amount equal to the proportion of those items described in clauses (b) and (c) above relating to such joint venture corresponding to the Issuer's and the Subsidiaries' proportionate share of such joint venture's Consolidated Net Income (determined as if such joint venture were a Subsidiary) to the extent deducted (and not added back) in computing Consolidated Net Income; plus

(n)    the amount of any costs or expenses relating to payments made to stock appreciation or similar rights, stock option, restricted stock, phantom equity, profits interests or other interests or rights holders of the Issuer or any of its Subsidiaries or any Parent Entity in connection with, or as a result of, any distribution being made to equityholders of such Person or any of its Subsidiaries or any Parent Entities, which payments are being made to compensate such holders as though they were equityholders at the time of, and entitled to share in, such distribution; plus

(o)    (i) adjustments and add backs (x) as set forth in the historical financial information and projections provided to the Initial Purchasers prior to the Closing Date, and (y) set forth in any quality of earnings analysis prepared by independent registered public accountants of recognized national standing (or any other accounting firm reasonably acceptable to the Required Purchasers) and delivered to the Administrative Agent in connection with any Permitted Acquisition or Permitted Investment and (ii) adjustments and add backs consistent with Regulation S-X; plus

(p)    the amount of any management, monitoring, consulting, transaction, deal or advisory fees payable and related indemnities, charges and expenses pursuant to any Sponsor management agreement and payments made to the Sponsor for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and payments to outside directors of the Issuer

CONFIDENTIAL

Trive_00042936

(or its direct or indirect parent companies), in each case, to the extent permitted to be paid under this Agreement: plus

(q)    to the extent deducted in the calculation of Consolidated Net Income, earn-out obligations and other post-closing obligations to sellers (including deferred purchase price, transaction tax benefit payments or to the extent accounted for as bonuses or otherwise) incurred in connection any of the LB Transactions and/or any acquisition or other investment (including any acquisition or other investment consummated prior to the Credit Agreement Closing Date) or adjustments thereof, which is paid or accrued during the applicable period; plus

(r)    fees, costs and expenses associated with litigation and settlement thereof, in each case, whether or not consummated, to the extent deducted (and not added back) in computing Consolidated Net Income; plus

(s)    the aggregate amount of "run rate" profits pursuant to contracts entered into on or after the first date of the applicable Test Period projected by the Issuer, in good faith, as if such contracted pricing (including any "scheduled" or "fixed" pricing) was applicable (at the contracted rate and calculated based on an assumed margin determined by the Issuer to be a reasonable good faith estimate of the actual costs (including increased overhead costs) associated with such recurring contracts) during the entire Test Period; plus

(t)    *pro forma* adjustment resulting from the application of IFRS 15 or any comparable regulation and costs and expenses in connection therewith; plus

(u)    to the extent not otherwise included in Consolidated Net Income, proceeds of business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace (whether or not then received so long as the Issuer in good faith expects to receive such proceeds within the next four (4) fiscal quarters, and net of any amount so added back in a prior period to the extent not so reimbursed within the applicable four (4)-quarter period); plus

(v)    charges attributable to, and payments of, legal settlements, fines, judgments or orders (in each case, except to the extent reflecting any amounts not paid in prior periods that would not have been added back to Consolidated EBITDA pursuant to the definition thereof at such time if appropriately paid);

and

(2)    decreased (without duplication) by non-cash gains increasing Consolidated Net Income of such Person and its Subsidiaries for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period (other than non-cash gains relating to the application of IFRS 16) and unrealized or realized gains due to foreign exchange adjustments including, without limitation, gains in connection with currency and exchange rate fluctuations, and unrealized or realized gains or other obligations from hedging activities or other derivative instruments.

"Consolidated First Lien Indebtedness" means the Consolidated Total Indebtedness of Lucky Bucks that is secured by a first-priority Lien on any assets of Lucky Bucks and its Subsidiaries.

CONFIDENTIAL                                                        Trive_00042937

"Consolidated First Lien Secured Leverage Ratio" means, as of any date of determination, the ratio of (x) the Consolidated First Lien Indebtedness as of such date to (y) LTM EBITDA (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof).

"Consolidated Interest Expense" means, with respect to any Person for any period, without duplication, the total interest expense (including that attributable to capital leases) of such Person and its Subsidiaries for such period, determined on a consolidated basis net of any interest income, which shall be determined on a cash basis only and solely in respect of Indebtedness of the type described in the definition of "Consolidated Total Indebtedness" (and including commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net cash costs (less net cash payments) under Swap Contracts (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) and excluding, for the avoidance of doubt, (a) any non-cash interest expense and any capitalized interest, whether paid or accrued, (b) the amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (c) amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses, (d) any expenses resulting from discounting of indebtedness in connection with the application of recapitalization accounting or purchase accounting, (e) penalties or interest related to taxes and any other amounts of non-cash interest resulting from the effects of acquisition method accounting or pushdown accounting, (f) the accretion or accrual of, or accrued interest on, discounted liabilities (other than Indebtedness) during such period, (g) non-cash interest expense attributable to the movement of the mark-to-market valuation of obligations under hedging agreements or other derivative instruments pursuant to IFRS 9, (h) any one-time cash costs associated with breakage in respect of Swap Contracts (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) for interest rates, (i) any payments with respect to make whole premiums or other breakage costs of any Indebtedness, (j) all non-recurring interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations, all as calculated on a consolidated basis in accordance with IFRS, (k) expensing of bridge, arrangement, structuring, commitment or other financing fees, and any expenses and fees in connection with any modification of Indebtedness, (l) fees and expenses (including any penalties and interest relating to Taxes but excluding any bona fide interest expense) associated with the consummation of the LB Transactions or the Transactions, (m) agency fees paid to the administrative agents and collateral agents under any credit facilities or other debt instruments or documents, (n) fees (including any ticking fees) and expenses (including any penalties and interest relating to Taxes) associated with any Investment not prohibited by this Agreement or the issuance of equity interests or Indebtedness (in each case excluding any bona fide interest expense), and (o) any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto, all as calculated on a consolidated basis in accordance with IFRS.

"Consolidated Net Income" means, with respect to any Person for any period, the net income (loss) of such Person and its Subsidiaries for such period determined on a consolidated basis in accordance with IFRS; *provided, however*, that there will not be included in such Consolidated Net Income (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof):

(1)     any net income (loss) of any Person if such Person is not a Subsidiary (including any net income (loss) from investments recorded in such Person under the equity method of accounting), except that the Issuer's receipts from any such Person for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash Equivalents actually distributed (or to the extent converted into cash or Cash Equivalents) by such Person during such period to the Issuer or a Subsidiary as a dividend or other distribution or return on investment;

CONFIDENTIAL                                                                                    Trive_00042938

(2)     solely for the purpose of determining the amount available for Restricted Payments under Section 7.06(a) hereof, any net income (loss) of any Subsidiary if such Subsidiary is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions by such Subsidiary, directly or indirectly, to the Issuer by operation of the terms of such Subsidiary's articles, charter or any agreement, instrument, judgment, decree, order, statute or governmental rule or regulation applicable to such Subsidiary or its stockholders (other than (a) restrictions that have been waived or otherwise released (or such Person reasonably believes such restriction could be waived or released and is using commercially reasonable efforts to pursue such waiver or release), (b) restrictions pursuant to this Agreement or other similar indebtedness, and (c) restrictions specified in Section 7.08(b)(xiii)(i)), except that Issuer's equity in the net income of any such Subsidiary for such period will be included in such Consolidated Net Income up to the aggregate amount of cash or Cash Equivalents actually distributed (or to the extent converted, or having the ability to be converted, into cash or Cash Equivalents) by such Subsidiary during such period to the Issuer or another Subsidiary as a dividend or other distribution (subject, in the case of a dividend to another Subsidiary, to the limitation contained in this clause);

(3)     any gain (or loss) (a) in respect of facilities no longer used or useful in the conduct of the business of the Issuer or the Subsidiaries, abandoned, closed, disposed or discontinued operations (excluding held for sale discontinued operations until actually disposed of) other than in the ordinary course of business, (b) on disposal, abandonment or discontinuance of disposed, abandoned, closed or discontinued operations, and (c) attributable to asset dispositions, abandonments, sales or other dispositions of any asset (including pursuant to any Sale and Leaseback Transaction) or the sale of other dispositions of any equity interests of any Person (other than in the ordinary course of business, as determined in good faith by a Responsible Officer) other than in the ordinary course of business;

(4)     (a) any extraordinary, exceptional, unusual or nonrecurring loss, charge or expense, Transaction Expenses, LB Transaction Expenses, Public Company Costs, restructuring and duplicative running costs, restructuring charges or reserves (whether or not classified as restructuring expense on the consolidated financial statements), relocation costs, start-up or initial costs for any project or new production line, division or new line of business, integration and facilities' or bases' opening costs, facility consolidation and closing costs, severance costs and expenses, one-time charges (including compensation charges), payments made pursuant to the terms of change in control agreements that the Issuer or a Subsidiary or a Parent Entity had entered into with employees of the Issuer, any of its Subsidiaries or a Parent Entity, costs relating to pre-opening, opening and conversion costs for facilities, losses, costs related to facility or property disruptions or shutdowns, signing, retention and completion bonuses (including management bonus pools), recruiting costs, costs incurred in connection with any strategic or cost savings initiatives, transition costs, contract terminations, litigation and arbitration fees, costs and charges, expenses in connection with one-time rate changes, costs incurred with acquisitions, investments and dispositions (including travel and out-of-pocket costs, human resources costs (including relocation bonuses), litigation and arbitration costs, charges, fees and expenses (including payments of legal settlements, fines, judgements or orders), management transition costs, advertising costs, losses associated with temporary decreases in work volume and expenses related to maintain underutilized personnel) and non-recurring product and intellectual property development, other business optimization expenses or reserves (including costs and expenses relating to business optimization programs and new systems design and costs or reserves associated with improvements to IT and accounting functions), retention

CONFIDENTIAL                                                                      Trive_00042939

charges (including charges or expenses in respect of incentive plans), system establishment costs and implementation costs) and operating expenses attributable to the implementation of strategic or cost-savings initiatives, and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities and charges resulting from changes in estimates, valuations and judgments) and professional, legal, accounting, consulting and other service fees incurred with any of the foregoing and (b) any charge, expense, cost, accrual or reserve of any kind associated with acquisition related litigation and settlements thereof;

(5)    (a) at the election of the Issuer with respect to any quarterly period, the cumulative effect of a change in law, regulation or accounting principles and changes as a result of the adoption or modification of accounting policies, (b) subject to the last sentence of the definition of "IFRS," the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period (including any impact resulting from accounting changes) and (c) any costs, charges, losses, fees or expenses in connection with the implementation or tracking of such changes or modifications specified in the foregoing clauses (a) and (b);

(6)    (a) any equity-based or non-cash compensation or similar charge, cost or expense or reduction of revenue, including any such charge, cost, expense or reduction arising from any grant of stock, stock appreciation or similar rights, stock options, restricted stock, phantom equity, profits interests or other interests, or other rights or equity- or equity based incentive programs ("equity incentives"), any income (loss) associated with the equity incentives or other long-term incentive compensation plans (including under deferred compensation arrangements of the Issuer or any Parent Entity or Subsidiary and any positive investment income with respect to funded deferred compensation account balances), roll-over, acceleration or payout of Capital Stock by employees, directors, officers, managers, contractors, consultants, advisors or business partners (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer or any Parent Entity or Subsidiary, and any cash awards granted to employees of the Issuer and its Subsidiaries in replacement for forfeited awards, (b) any non-cash losses realized in such period in connection with adjustments to any employee benefit plan due to changes in estimates, actuarial assumptions, valuations, studies or judgments or non-cash compensation expense resulting from the application of IFRS 2 and (c) any net pension or post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, amortization of such amounts arising in prior periods, amortization of the unrecognized obligation (and loss or cost) existing at the date of initial application of IAS 19, and any other item of a similar nature;

(7)    any income (loss) from the extinguishment, conversion or cancellation of Indebtedness, Hedging Obligations or other derivative instruments (including deferred financing costs written off, premiums paid or other expenses incurred);

(8)    any unrealized or realized gains or losses in respect of any Hedging Obligations (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) or any ineffectiveness recognized in earnings related to hedge transactions or the fair value of changes therein recognized in earnings for derivatives that do not qualify as hedge transactions;

(9)    any fees, losses, costs, expenses or charges incurred during such period (including any transaction, retention bonus or similar payment and earn outs), or any amortization thereof

CONFIDENTIAL                                                                    Trive_00042940

for such period, in connection with (a) any acquisition, recapitalization, Investment, Asset Disposition, disposition, dividend, issuance or repayment of Indebtedness (including such fees, expense or charges related to the offering, issuance and rating of the Notes, other securities and any of the Facilities), issuance of Capital Stock, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Notes, other securities and any of the Facilities), in each case, including the LB Transactions and the Transactions, any such transaction consummated prior to, on or after the Closing Date and any such transaction undertaken but not completed, and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful (including, for the avoidance of doubt, the effects of expensing all transaction-related expenses in accordance with IFRS 3 and any adjustments resulting from the application of IFRS 9) and (b) complying with the requirements under, or making elections permitted by, the documentation governing any Indebtedness;

(10)     any unrealized or realized gain or loss resulting in such period from currency translation increases or decreases or transaction gains or losses, including those related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) for currency risk), intercompany balances, other balance sheet items, Hedging Obligations (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) or other obligations of the Issuer or any Subsidiary owing to the Issuer or any Subsidiary and any other realized or unrealized foreign exchange gains or losses relating to the translation of assets and liabilities denominated in foreign currencies;

(11)     any unrealized or realized income (loss) or non-cash expense attributable to movement in mark-to-market valuation of foreign currencies, Indebtedness or derivative instruments pursuant to IFRS;

(12)     any non-cash increase in expenses (including expenses pushed down to the Issuer and its Subsidiaries) (a) resulting from the revaluation of inventory (including any impact of changes to inventory valuation policy methods) or other inventory adjustments or (b) due to recapitalization accounting or to purchase accounting associated with the LB Transactions or the Transactions or any other acquisition or the amortization or write-off of any amounts thereof (including, without limitation, with respect to inventory, property and equipment, leases, software, goodwill, intangible assets, in-process research and development, deferred revenue (including deferred costs related thereto and deferred rent) and debt line items thereof, resulting from the application of acquisition method accounting, recapitalization accounting or purchase accounting, as the case may be, in relation to the LB Transactions or the Transactions or any consummated acquisition (by merger, consolidation, amalgamation or otherwise), joint venture investment or other Investment or the amortization or write-off or write-down of any amounts thereof;

(13)     any impairment charge, write-off or write-down, including impairment charges, write-offs or write-downs related to bad debt expense, intangible assets, long-lived assets, goodwill, investments in debt or equity securities (including any losses with respect to the foregoing in bankruptcy, insolvency or similar proceedings) and investments recorded using the equity method or as a result of a change in law or regulation and the amortization of intangibles arising pursuant to IFRS;

CONFIDENTIAL                                                                                      Trive_00042941

(14)     (a) accruals and reserves (including contingent liabilities) that are established or adjusted in connection with the LB Transactions or the Transactions or within eighteen (18) months after the closing of any acquisition or disposition that are so required to be established or adjusted as a result of such acquisition or disposition in accordance with IFRS, or changes as a result of adoption or modification of accounting policies and (b) earn-out, non-compete and contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) and adjustments thereof and purchase price adjustments;

(15)     any income (loss) related to any realized or unrealized gains and losses resulting from Hedging Obligations (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) or embedded derivatives that require similar accounting treatment (including embedded derivatives in customer contracts), and the application of IFRS 9 and its related pronouncements or mark to market movement of other financial instruments;

(16)     any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures and any deferred tax expense associated with tax deductions or net operating losses arising as a result of the LB Transactions or the Transactions, or the release of any valuation allowances related to such item;

(17)     the amount of loss or discount on sale of Securitization Assets, Receivables Assets and related assets in connection with a Qualified Securitization Financing or Receivables Facility; and

(18)     (i) payments to third parties in respect of research and development, including amounts paid upon signing, success, completion and other milestones and other progress payments, to the extent expensed, (ii) at the election of the Issuer with respect to any quarterly period, effects of adjustments to accruals and reserves during a period relating to any change in the methodology of calculating reserves for returns, rebates and other chargebacks (including government program rebates), and (iii) at the election of the Issuer with respect to any quarterly period, an amount equal to the net change in deferred revenue at the end of such period from the deferred revenue at the end of the previous period.

In addition, to the extent not already excluded (or included, as applicable) in the Consolidated Net Income of such Person and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall be increased by the amount of: (i) any expenses, charges or losses that are reimbursed by indemnification or other reimbursement provisions in connection with any investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder, or, so long as the Issuer has made a determination that it reasonably expects that such amount will in fact be paid or reimbursed within 365 days of the date of such evidence (net of any amount so added back in a prior period to the extent not so reimbursed within the applicable 365-day period), (ii) to the extent covered by insurance (including business interruption insurance) and actually reimbursed, or, so long as the Issuer has made a determination that it reasonably expects that such amount will in fact be paid or reimbursed by the insurer and only to the extent that such amount is in fact reimbursed within 365 days of the date of such evidence (net of any amount so added back in a prior period to the extent not so reimbursed within the applicable 365-day period), expenses, charges or losses with respect to liability or Casualty Events or business interruption and (iii) the amount of distributions actually made to any Parent Entity of such Person in respect of such period in accordance with Section 7.06(b)(xxiv) as though such amounts had been paid as taxes directly by such Person for such periods.

CONFIDENTIAL     Trive_00042942

"Consolidated Secured Indebtedness" means the Consolidated Total Indebtedness that is secured by a Lien on any assets of Lucky Bucks or its Subsidiaries.

"Consolidated Total Indebtedness" means, with respect to any Person and its Subsidiaries, as of any date of determination, an amount equal to, on a consolidated basis and determined in accordance with IFRS, (a) the aggregate principal amount of outstanding third-party Indebtedness for borrowed money (excluding Indebtedness with respect to "Cash Management Obligations" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) and intercompany Indebtedness as of such date), *plus* (b) Capitalized Lease Obligations and the aggregate principal amount of Purchase Money Obligations (but excluding therefrom outstanding COAM vendor financings in an aggregate principal amount of up to $7.5 million), *plus* (c) unreimbursed drawings under letters of credit of such Person and its Subsidiaries outstanding on such date to the extent not reimbursed within three (3) Business Days of the drawing thereof (*provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Indebtedness until five (5) Business Days after such amount is drawn), *plus* (d) the undrawn Reserved Indebtedness Amount (to the extent included in clause (a) above), *minus* (e) the aggregate amount of Unrestricted Cash included on the consolidated balance sheet of such Person and its Subsidiaries as of the end of the most recent fiscal period for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b), which shall not be less than $0 (*provided* that the cash proceeds of any proposed incurrence of Indebtedness shall not be included in this clause (e) for purposes of calculating the Interest Coverage Ratio, the Consolidated Total Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated First Lien Secured Leverage Ratio, as applicable) with such *pro forma* adjustments as are consistent with the *pro forma* adjustments set forth in Section 1.09. For the avoidance of doubt, Consolidated Total Indebtedness shall exclude Indebtedness in respect of any Hedging Obligations (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document), operating leases, undrawn letters of credit, any earnout, contingent obligation, holdback or similar deferred purchase price consideration to the extent such earnout, contingent obligation, holdback or similar deferred purchase price obligations are no more than five (5) Business Days past due and payable and if not recognized as debt on the consolidated balance sheet of such Person in accordance with IFRS and any Receivables Facility or Securitization Facility.

"Consolidated Total Leverage Ratio" means, as of any date of determination, the ratio of (x) Consolidated Total Indebtedness of Lucky Bucks and its Subsidiaries as of such date to (y) LTM EBITDA (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof).

"Consolidated Total Senior Secured Leverage Ratio" means, as of any date of determination, the ratio of (x) the Consolidated Secured Indebtedness as of such date to (y) LTM EBITDA (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof).

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing in any manner, whether directly or indirectly, any Non-Financing Lease Obligation, dividend or other obligation that does not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor"), including any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)     to advance or supply funds:

(a)     for the purchase or payment of any such primary obligation; or

CONFIDENTIAL                                                                                                    Trive_00042943

          (b)     to maintain the working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

     (3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"control," "controls," "controlling" and "controlled" have the meanings specified in the definition of "Affiliate."

"Controlled Investment Affiliate" means, as to any Person, any other Person, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in Lucky Bucks, the Issuer and/or other companies.

"Covered Jurisdiction" means the United States (and each State thereof and the District of Columbia).

"Credit Agreement" means that certain Credit Agreement, dated as of July 30, 2021, by and among Lucky Bucks, Macquarie Capital Funding LLC, as the administrative agent, the collateral agent, a letter of credit issuer and the swing line lender, the lenders and the other parties party thereto from time to time (as amended by that certain Incremental Facility Amendment No. 1, dated as of October 12, 2021, by that certain Incremental Facility Amendment No. 2, dated as of October 27, 2021), as in effect on the Closing Date and without giving effect to any amendment, supplement or other modification.

"Credit Agreement Closing Date" means July 30, 2021.

"Cumulative Consolidated Net Income" means, for any period, Consolidated Net Income for such period, taken as a single accounting period. Cumulative Consolidated Net Income shall not be less than $0.

"Customary Intercreditor Agreement" means (a) to the extent executed in connection with any incurrence of Indebtedness secured by Liens on the Collateral that are intended to rank equal in priority to the Liens on the Collateral securing the Secured Obligations (but without regard to the control of remedies), a customary intercreditor agreement (which may take the form of a "waterfall" or similar provision) in form and substance reasonably acceptable to the Agents, the Required Purchasers, and the Issuer, which agreement shall provide, *inter alia*, that the Liens on the Collateral securing such other Indebtedness to the extent validly perfected and not subject to other Liens ranking senior to the Liens securing such Indebtedness but junior to the Liens securing the Secured Obligations shall rank equal in priority to the Liens on the Collateral securing the Secured Obligations (but without regard to the control of remedies) and (b) to the extent executed in connection with the incurrence of Indebtedness secured by Liens on the Collateral which are intended to rank junior to the Liens on the Collateral securing the Secured Obligations, a customary intercreditor agreement in form and substance reasonably acceptable to the Agents, the Required Purchasers, and the Issuer, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Secured Obligations.

CONFIDENTIAL     Trive_00042944

"Debt Fund Affiliate" means an Affiliated Purchaser that is a bona fide debt fund or investment vehicle that is primarily engaged in, or advises funds or other investment vehicles that are primarily engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its business, and whose managers have fiduciary duties to the investors in such fund or investment vehicle independent of or in addition to, their fiduciary duties to the Issuer or any of its Subsidiaries.

"Debtor Relief Laws" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Declined Proceeds" has the meaning specified in Section 2.05(b)(ii).

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Defaulting Purchaser" means any Purchaser that has failed, within two (2) Business Days of the Closing Date (or of such other later date when such Purchaser is required to fund its respective applicable Commitment hereunder) to satisfy its Commitments under this Agreement (including, if applicable, as set forth on Schedule 2.01), unless such Purchaser has notified the Issuer and the Administrative Agent in writing that it does not intend or expect to comply with any of its funding obligations under this Agreement and such writing indicates that such position is based on such Purchaser's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to such funding cannot be satisfied.

"Delayed Issuance" has the meaning specified in Section 2.01(b).

"Delayed Issuance Date" has the meaning specified in Section 2.01(b).

"Delayed Issuance Notes" has the meaning specified in Section 2.01(b).

"Designated Non-Cash Consideration" means the fair market value (as determined in good faith by the Issuer) of non-cash consideration received by the Issuer or any of its Subsidiaries in connection with an Asset Disposition that is so designated as Designated Non-Cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of cash or Cash Equivalents received in connection with a subsequent payment, redemption, retirement, sale or other disposition of such Designated Non-Cash Consideration. A particular item of Designated Non-Cash Consideration will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 7.05 hereof.

"Designated Preferred Stock" means Preferred Stock of the Issuer or a Parent Entity (other than Disqualified Stock) (a) that is issued for cash (other than to the Issuer or a Subsidiary of the Issuer or an employee stock ownership plan or trust established by the Issuer or any such Subsidiary for the benefit of their employees to the extent funded by the Issuer or such Subsidiary) and (b) that is designated as "Designated Preferred Stock" pursuant to an Officer's Certificate of the Issuer at or prior to the issuance thereof, the Net Cash Proceeds of which are excluded from the calculation set forth in Section 7.06(a) hereof.

"Disinterested Director" means, with respect to any Affiliate Transaction, a member of the Board of Directors having no material direct or indirect financial interest in or with respect to such Affiliate

CONFIDENTIAL                                                   Trive_00042945

Transaction. A member of the Board of Directors shall be deemed not to have such a financial interest by reason of such member's holding Capital Stock of the Issuer or any options, warrants or other rights in respect of such Capital Stock.

"Disqualification Event" means, with respect to any Purchaser:

(a)    the failure of such Purchaser to timely file (i) any application requested of such Purchaser by the Georgia Lottery Corporation in writing in connection with any licensing required by the Gaming Laws for such Purchaser to be a purchaser of the Notes issued by the Issuer hereunder, or (ii) any application or other papers required by the Gaming Laws in connection with the determination of suitability of such Purchaser as a purchaser of the Notes issued by the Issuer hereunder;

(b)    the withdrawal by such Purchaser (except where requested or permitted by the Georgia Lottery Corporation or permitted by the Gaming Laws) of any such application or other papers required by the Gaming Laws, unless such withdrawal occurs prior to the applicable deadline to timely file any such application or other papers; or

(c)    any final determination by the Georgia Lottery Corporation pursuant to the Gaming Laws, as the case may be, (i) that such Purchaser is "unsuitable" as a purchaser of the Notes issued by the Issuer hereunder, (ii) that such Purchaser shall be "disqualified" as a purchaser of the Notes issued by the Issuer hereunder, or (iii) denying the issuance of the Notes to such Purchaser of any license or other approval required under the Gaming Laws to be held by such Purchaser as a result of such Purchaser being a party to this Agreement.

"Disqualified Purchasers" means (i) such Persons separately identified in writing by the Issuer or the Sponsor to the Administrative Agent on or prior to the date of this Agreement, (ii) competitors of the Issuer or any of its Subsidiaries identified in writing from time to time from the Issuer or the Sponsor to the Administrative Agent, (iii) in the case of clauses (i) and (ii), any of their affiliates (other than affiliates of persons referenced in clause (ii) above that are bona fide debt investment funds primarily engaged in, or that advise funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, notes, bonds or similar extensions of credit or securities in the ordinary course of its business and whose managers have fiduciary duties to the investors therein independent of or in addition to their duties to such bank, financial institution, other institutional lender or competitor, as applicable) that are (A) identified by the Issuer or the Sponsor to the Administrative Agent in writing from time to time or (B) reasonably identifiable on the basis of such affiliates' name and (iv) the Issuer or any of its Subsidiaries; *provided* that any additional designation permitted by the foregoing shall not become effective until three (3) Business Days following delivery of an updated list of Disqualified Purchasers to the Administrative Agent as set forth below; *provided, further*, that in no event shall any additional designation pursuant to this definition apply to retroactively disqualify any Person who previously acquired Notes prior to the Administrative Agent's receipt of such updated list. For the avoidance of doubt, no Agent shall be responsible or have any liability for or in connection with, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Purchasers and no Agent shall be obligated to ascertain, monitor or inquire as to whether any Purchaser or prospective Purchaser is a Disqualified Purchaser or have any liability with respect to or arising out of a transfer to, or disclosure of confidential information to, a Disqualified Purchaser. The Issuer or the Sponsor shall provide the list of Disqualified Purchasers to the Administrative Agent and the Initial Purchasers on the date of this Agreement and may update such list from time to time by delivering such updated list to the Administrative Agent. The Administrative Agent shall be permitted, upon request of any Purchaser, to make available the list of Disqualified Purchasers to such inquiring Purchaser or disclose to such inquiring Purchaser whether such specific potential Transferee is on the list of Disqualified Purchaser.

CONFIDENTIAL                                                                    Trive_00042946

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

(1)    matures or is mandatorily redeemable for cash or in exchange for Indebtedness pursuant to a sinking fund obligation or otherwise; or

(2)    is or may become (in accordance with its terms) upon the occurrence of certain events or otherwise redeemable or repurchasable for cash or in exchange for Indebtedness at the option of the holder of the Capital Stock in whole or in part,

in each case on or prior to the earlier of (a) the Stated Maturity of the Notes or (b) the date on which there are no Notes outstanding; *provided, however*, that (i) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock and (ii) any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Issuer to repurchase such Capital Stock upon the occurrence of a change of control or asset sale (howsoever defined or referred to) shall not constitute Disqualified Stock if any such redemption or repurchase obligation is subject to compliance by the relevant Person with Section 7.06 hereof; *provided, however*, that if such Capital Stock is issued to any future, current or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) (excluding the Permitted Holders (but not excluding any future, current or former employee, director, officer, manager, contractor, consultant or advisor) or Immediate Family Members), of the Issuer, any of its Subsidiaries, any Parent Entity or any other entity in which the Issuer or a Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors (or the compensation committee thereof) or any other plan for the benefit of current, former or future employees (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer or its Subsidiaries or by any such plan to such employees (or their respective Controlled Investment Affiliates or Immediate Family Members), such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"do not have Unreasonably Small Capital" has the meaning specified in the definitions of "Solvent" and "Solvency."

"Dollar" and "$" mean lawful money of the United States.

"Dollar Equivalent" means, on any date of determination, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount in any other currency, the equivalent in Dollars of such amount, determined as set forth in Section 1.08 using the Exchange Rate with respect to such currency at the time in effect under the provisions of such Section.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway,

CONFIDENTIAL                                                Trive_00042947

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" means, with respect to any Indebtedness, as of any date of determination, the sum of (a) the higher of (i) the interest rate and (ii) the interest rate floor, if any, with respect thereto as of such date, (b) the "Applicable Rate" or "Applicable Margin" (or other applicable margin) as of such date for loans that accrue interest by reference to a floating reference rate reference rate) without giving effect to any pricing step-downs (if any) and without duplication of any amount included in the preceding clause (a), and (c) the amount of original issue discount and upfront fees paid and payable (which shall be deemed to constitute like amounts of original issue discount) thereon (converted to yield assuming a four-year average life and without any present value discount or, if less, the remaining life to maturity, and assuming that the commitments under any such facility that is a revolving facility are fully drawn), but excluding the effect of any amendment, arrangement, structuring, commitment, underwriting, syndication and any similar fees payable to any lead arranger (or its Affiliates) in connection with the commitment or syndication of such Indebtedness, consent fees paid to consenting lenders, prepayment premiums, ticking or commitment fees on undrawn commitments, call protection and any other fees not paid or payable generally to all lenders by the Issuer or its Subsidiaries in the primary syndication (if any) of such Indebtedness or other term loans; *provided*, that the amounts set forth in clauses (a) and/or (b) above for any Indebtedness shall be based on the stated interest rate basis for such Indebtedness.

"Eligible Transferee" means any Transferee permitted by and consented to in accordance with Section 10.07(b).

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means any and all applicable Laws relating to pollution, the protection of the environment, natural resources or to the generation, transport, storage, use, treatment, Release or threat of Release of any Hazardous Materials or, relating to human health and safety with respect to exposure to Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of Environmental remediation, fines, penalties or indemnities) of the Issuer or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure of any Person to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement to the extent liability is assumed or imposed with respect to any of the foregoing.

"Equity Offering" means (x) a sale of Capital Stock (other than through the issuance of Disqualified Stock or Designated Preferred Stock or an Excluded Contribution) other than (a) offerings registered on Form S-8 (or any successor form) under the Securities Act or any similar offering in other jurisdictions or other equity securities of the Issuer or any Parent Entity and (b) issuances of Capital Stock to any Subsidiary of the Issuer or the Issuer or (y) a cash equity contribution to the Issuer or any of its Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

CONFIDENTIAL                    Trive_00042948

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with the Issuer and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Issuer or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA with respect to a Pension Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (d) a complete or partial withdrawal by the Issuer or any ERISA Affiliate from a Multiemployer Plan, notification of the Issuer or ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA or in endangered or critical status, within the meaning of Section 305 of ERISA; (e) the filing of a notice of intent to terminate, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Issuer or any ERISA Affiliate; (h) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); or (i) the occurrence of a non-exempt prohibited transaction with respect to any Pension Plan maintained or contributed to by the Issuer (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to the Issuer.

"Erroneous Payment" has the meaning assigned to it in Section 9.18.

"Erroneous Payment Notice" has the meaning assigned to it in Section 9.18.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

"Exchange Rate" means, on any day, for purposes of determining the Dollar Equivalent of any currency other than Dollars, the rate at which such other currency may be exchanged into Dollars at the time of determination on such day on the Reuters WRLD Page for such currency. In the event that such rate does not appear on any Reuters WRLD Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Issuer, or, in the absence of such an agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of three major banks in the market where their foreign currency exchange operations in respect of such currency are then being conducted, as determined by the Administrative Agent, at or about such time as the Administrative Agent shall elect after determining that such rates shall be the basis for determining the Exchange Rate, on such date for the purchase of Dollars for delivery two Business Days later, *provided* that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

CONFIDENTIAL                                                                   Trive_00042949

"Excluded Contribution" means Net Cash Proceeds or property or assets received by the Issuer as capital contributions to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock) of the Issuer after the Closing Date or from the issuance or sale (other than to a Subsidiary or an employee stock ownership plan or trust established by the Issuer or any Subsidiary of the Issuer for the benefit of their employees to the extent funded by the Issuer or any Subsidiary) of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Issuer.

"Excluded Taxes" means any of the following Taxes imposed on or, with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient's being organized under the laws of, or having its principal office or, in the case of any Purchaser, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Purchaser, any U.S. federal withholding Tax that is imposed on amounts payable to such Purchaser with respect to an applicable interest in a Note or Commitment pursuant to a law in effect at the time such Purchaser acquires such interest in the Note or Commitment (or designates a new lending office), in each case of such acquisition or designation, except to the extent that such Purchaser (or its transferor, if any) was entitled, immediately before the designation of a new lending office (or assignment), to receive additional amounts or indemnity from the Issuer with respect to such withholding Tax pursuant to Section 3.01, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(f) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Fair Value" has the meaning specified in the definitions of "Solvent" and "Solvency."

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" has the meaning specified in the definition of "Anti-Corruption Laws."

"Federal Funds Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; *provided* that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Fixed Charges" means, with respect to any Person for any period, the sum of: (without duplication):

 (a) Consolidated Interest Expense of such Person for such period; plus

 (b) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock of any Subsidiary of such Person during such period; plus

CONFIDENTIAL  Trive_00042950

(c)    all cash dividends, or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock of such Person during such period. "Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to or by, or entered into with, the Issuer or any Subsidiary with respect to employees outside the United States.

"Foreign Purchaser" has the meaning specified in Section 3.01(f)(ii).

"Foreign Subsidiary" means a Subsidiary (which may be a corporation, limited liability company, partnership or other legal entity) organized under the laws of a jurisdiction outside the United States, other than any such entity that is (whether as a matter of law, pursuant to an election by such entity or otherwise) treated as a partnership in which the Issuer or any Subsidiary is a partner or as a branch of the Issuer or any Subsidiary for United States income tax purposes.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"FSHCO" means any direct or indirect Subsidiary of the Issuer that has no material assets other than (x) Capital Stock or (y) Capital Stock and Indebtedness, in each case of one or more direct or indirect CFCs or other entities described in this definition.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities. "Gaming Authority" means, in any jurisdiction in which Lucky Bucks or any of its Subsidiaries manages or conducts any gaming or gambling business or activities, the applicable gaming board, commission, or other governmental gaming regulatory body or agency (including the Georgia Lottery Corporation) which (a) has, or may at any time after the Closing Date have, jurisdiction over the gaming businesses or gaming activities of the Issuer, Holdco, or Lucky Bucks or any of its Subsidiaries or (b) is, or may at any time after the Closing Date be, responsible for interpreting, administering and enforcing the Gaming Laws.

"Gaming Laws" means all applicable constitutions, treaties, laws, rates, regulations and orders and statutes pursuant to which any Gaming Authority possesses regulatory, licensing or permit authority over gaming, gambling or casino activities and all rules, rulings, orders, ordinances and regulations of any Gaming Authority applicable to the gambling and gaming businesses or activities of the Issuer, Holdco, or Lucky Bucks or any of its Subsidiaries in any jurisdiction, as in effect from time to time (including, without limitation, (a) O.C.G.A. Title 50, Chapter 27, Article 3, (b) all rules and regulations adopted or promulgated thereunder, including Georgia Lottery Corporation Rules 13.1 and 13.2 and (c) any successor statute or other laws relating to gaming in the State of Georgia) and the policies, interpretations and administration thereof by the Gaming Authorities.

"Governmental Authority" means the government of the United States, any other nation or government, any state, provincial, country, territorial or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (includes any supra-national bodies such as the European Union or the European Central Bank).

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with any Governmental Authority. "Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly

CONFIDENTIAL                                                                              Trive_00042951

guaranteeing any Indebtedness of any other Person, including any such obligation, direct or indirect, contingent or otherwise, of such Person:

(1)     to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

(2)     entered into primarily for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part);

*provided, however*, that the term "Guarantee" will not include (x) endorsements for collection or deposit in the ordinary course of business or consistent with past practice and (y) standard contractual indemnities or product warranties provided in the ordinary course of business, and *provided, further*, that the amount of any Guarantee shall be deemed to be the lower of (i) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (ii) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee or, if such Guarantee is not an unconditional guarantee of the entire amount of the primary obligation and such maximum amount is not stated or determinable, the amount of such guaranteeing Person's maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith. The term "Guarantee" used as a verb has a corresponding meaning.

"Hazardous Materials" means all explosive or radioactive substances or wastes, and all other chemicals, pollutants, contaminants, substances or wastes of any nature regulated pursuant to any Environmental Law due to their dangerous or deleterious properties or characteristics, including petroleum or petroleum distillates, friable asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, per- or polyflouroalkyl substances and toxic mold.

"HoldCo" means Lucky Bucks HoldCo, LLC, a Delaware limited liability company.

"Identified Contingent Liabilities" has the meaning specified in the definitions of "Solvent" and "Solvency."

"IFRS" means the body of pronouncements issued by the International Accounting Standards Board, including International Financial Reporting Standards and interpretations approved by the IASB, as in effect from time to time (except as may be specifically set forth herein), applied on a basis consistent with the past accounting practices and procedures of the Issuer. If there occurs a change in IFRS and such change would cause a change in the method of calculation of any standards, terms or measures (including all computations of amounts and ratios) used in this Agreement (an "Accounting Change"), then the Issuer may elect that such standards, terms or measures shall be calculated as if such Accounting Change had not occurred.

"Immaterial Subsidiary" means, at any date of determination, each Subsidiary of the Issuer that (i) has not guaranteed any other Indebtedness of the Issuer, HoldCo or Lucky Bucks and (ii) together with all other Immaterial Subsidiaries (as determined in accordance with IFRS), has Total Assets and attributable LTM EBITDA of less than 5.0% of Total Assets and Consolidated EBITDA, respectively, in each case measured at the end of the most recent fiscal period for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b) on a *pro forma* basis giving effect to any acquisitions or dispositions of companies, division or lines of business since such financial

CONFIDENTIAL                                                                   Trive_00042952

statement date or the start of such four quarter period, as applicable, and on or prior to the date of acquisition of such Subsidiary.

"Immediate Family Members" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships, the estate of such individual and such other individuals above) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Increased Amount" has the meaning specified in Section 7.01(b).

"Incur" means issue, create, assume, enter into any Guarantee of, incur, extend or otherwise become liable for; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) will be deemed to be Incurred by such Subsidiary at the time it becomes a Subsidiary and the terms "Incurred," "Incurring" and "Incurrence" have meanings correlative to the foregoing and any Indebtedness pursuant to any revolving credit or similar facility shall only be "Incurred" at the time any funds are borrowed thereunder.

"Indebtedness" means, with respect to any Person on any date of determination (without duplication):

(1)    the principal of indebtedness of such Person for borrowed money;

(2)    the principal of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)    all reimbursement obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (the amount of such obligations being equal at any time to the aggregate then undrawn and unexpired amount of such letters of credit or other instruments plus the aggregate amount of drawings thereunder that have not been reimbursed) (except to the extent such reimbursement obligations relate to trade payables and such obligations are satisfied within 30 days of Incurrence);

(4)    the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (except trade payables or similar obligations, including accrued expenses owed, to a trade creditor), which purchase price is due more than one year after the date of placing such property in service or taking final delivery and title thereto;

(5)    Capitalized Lease Obligations of such Person;

(6)    the principal component of all obligations, or liquidation preference, of such Person with respect to any Disqualified Stock or, with respect to any Subsidiary, any Preferred Stock (but excluding, in each case, any accrued dividends);

(7)    the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided, however*, that the amount of such Indebtedness will be the lesser of (a) the fair market value of such

CONFIDENTIAL                                                                    Trive_00042953

asset at such date of determination (as determined in good faith by the Issuer) and (b) the amount of such Indebtedness of such other Persons;

(8)     Guarantees by such Person of the principal component of Indebtedness of the type referred to in clauses (1), (2), (3), (4), (5) and (9) hereof of other Persons to the extent guaranteed by such Person; and

(9)     to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amount of any such obligations to be equal at any time to the net payments under such agreement or arrangement giving rise to such obligation that would be payable by such Person at the termination of such agreement or arrangement);

with respect to clauses (1), (2), (3), (4), (5) and (9) above, if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with IFRS.

The amount of Indebtedness of any Person at any time in the case of a revolving credit or similar facility shall be the total amount of funds borrowed and then outstanding.  The amount of any Indebtedness outstanding as of any date shall be (a) the accreted value thereof in the case of any Indebtedness issued with original issue discount and (b) the principal amount of Indebtedness, or liquidation preference thereof, in the case of any other Indebtedness.  Indebtedness shall be calculated without giving effect to the effects of IFRS 9 and related pronouncements to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.

Notwithstanding the foregoing, in no event shall the following constitute Indebtedness:

(i)     Contingent Obligations Incurred in the ordinary course of business or consistent with past practice, other than Guarantees or other assumptions of Indebtedness;

(ii)     Cash Management Obligations;

(iii)     any lease, concession or license of property (or Guarantee thereof) which would be considered an operating lease under IFRS, Non-Financing Lease Obligations, Sale and Leaseback Transactions or any prepayments of deposits received from clients or customers in the ordinary course of business or consistent with past practice;

(iv)     obligations under any license, permit or other approval (or Guarantees given in respect of such obligations) incurred prior to the Closing Date or in the ordinary course of business or consistent with past practice;

(v)     in connection with the purchase by the Issuer or any Subsidiary of any business, any deferred or prepaid revenue, post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing; *provided, however*, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid in a timely manner;

(vi)     for the avoidance of doubt, any obligations in respect of workers' compensation claims, early retirement or termination obligations, pension fund obligations or contributions or similar claims, obligations or contributions or social security or wage Taxes;

CONFIDENTIAL                                                        Trive_00042954

(vii)    obligations under or in respect of Qualified Securitization Financing or Receivables Facilities;

(viii)    deferred obligations owing to the Permitted Holders pursuant to management agreements in effect on the Closing Date;

(ix)    Indebtedness of any Parent Entity appearing on the balance sheet of the Issuer solely by reason of push down accounting under IFRS;

(x)    Capital Stock (other than in the case of clause (6) above, Disqualified Stock or Preferred Stock of a Subsidiary); or

(xi)    amounts owed to dissenting stockholders (including in connection with, or as a result of, exercise of dissenters' or appraisal rights and the settlement of any claims or action (whether actual, contingent or potential)), pursuant to or in connection with a consolidation, amalgamation, merger or transfer of assets that complies with Section 7.04 hereof.

"Indemnified Liabilities" has the meaning specified in Section 10.05.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or in respect of any payment made by or on account of the Issuer under any Note Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.05.

"Independent Financial Advisor" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing; *provided, however*, that such firm or appraiser is not an Affiliate of the Issuer.

"Information" has the meaning specified in Section 10.08.

"Initial Agreement" has the meaning specified in Section 7.08(b)(xv).

"Initial Issuance" has the meaning specified in Section 2.01(a).

"Initial Notes" has the meaning specified in Section 2.01(a).

"Initial Purchasers" shall mean the Purchasers that acquire their respective Notes from the Issuer on the Closing Date, pursuant to this Agreement.

"Intellectual Property" means all U.S. and non-U.S. (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress, and other source identifiers, designs and domain names, (c) copyrights, (d) design rights, inventions, original works of authorship, trade secrets, confidential information, know-how and all other intellectual property rights and interests, whether registered or unregistered and (e) all registrations and applications for registration therefor.

"Intercompany Dispositions" has the meaning assigned to it in clause (b)(1) of the definition of "Asset Disposition."

"Intercompany Investments" has the meaning assigned to it in clause (a) of the definition of "Permitted Investments."

CONFIDENTIAL

Trive_00042955

"Intercompany License Agreement" means any cost sharing agreement, commission or royalty agreement, license or sublicense agreement, distribution agreement, services agreement, IP Rights assignment or transfer agreement, any related agreements or similar agreements, in each case where all parties to such agreement are one or more of the Issuer or a Subsidiary.

"Interest Coverage Ratio" means the ratio of (a) LTM EBITDA as of such date to (b) Consolidated Cash Interest Expense as of such date (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof).

"Interest Payment Date" means (a) the last Business Day of each March, June, September and December of each year occurring after the Closing Date and prior to the Maturity Date, and (b) the Maturity Date.

"Investment" means, with respect to any Person, (a) all investments by such Person in other Persons (including Affiliates) in the form of any advances, loans or other extensions of credit (excluding (i) accounts receivable, trade credit, advances or extensions of credit to customers, suppliers, future, present or former employees, directors, officers, managers, contractors, consultants or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of any Person in the ordinary course of business or consistent with past practice, (ii) any debt or extension of credit represented by a bank deposit other than a time deposit, (iii) intercompany advances arising from cash management, tax and accounting operations and (iv) intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms)) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or the Incurrence of a Guarantee of any obligation of, or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such other Persons and all other items that are or would be classified as investments on a balance sheet prepared in accordance with IFRS and (b) any purchase or other acquisition (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business and capital expenditures), of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; *provided* that endorsements of negotiable instruments and documents in the ordinary course of business or consistent with past practice will not be deemed to be an Investment.

The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in cash and Cash Equivalents by the Issuer or a Subsidiary in respect of such Investment to the extent such amounts do not increase any other baskets under this Agreement.

"Investment Grade Securities" means:

(1)    securities issued or directly and fully Guaranteed or insured by the United States or Canadian government or any agency or instrumentality thereof (other than Cash Equivalents);

(2)    securities issued or directly and fully guaranteed or insured by the Canadian, United Kingdom or Japanese governments, a member state of the European Union, or any agency or instrumentality thereof (other than Cash Equivalents);

(3)    debt securities or debt instruments with a rating of "BBB-" or higher from S&P or "Baa3" or higher by Moody's or the equivalent of such rating by such rating organization or, if no rating of Moody's or S&P then exists, the equivalent of such rating by any other Nationally Recognized Statistical Rating Organization, but excluding any debt securities or instruments constituting loans or advances among the Issuer and its Subsidiaries;

CONFIDENTIAL                                                              Trive_00042956

(4)     investments in any fund that invests exclusively in investments of the type described in clauses (1), (2) and (3) above which fund may also hold cash and Cash Equivalents pending investment or distribution; and

(5)     corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"IP Rights" has the meaning specified in Section 5.14.

"IPO" means any transaction whereby, or upon the consummation of which, a Parent Entity of the Issuer's or the Issuer's common equity interests are, or may thereafter be, offered or sold (whether through an initial primary underwritten public offering or otherwise) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act, or to the equivalent registration documents filed with the equivalent authority in the applicable foreign jurisdiction.

"IRS" means the United States Internal Revenue Service.

"Issuance" has the meaning specified in Section 2.01(b).

"Issuance Date" has the meaning specified in Section 2.01(b).

"Issuer" has the meaning specified in the introductory paragraph to this Agreement.

"Issuer Consolidated Total Leverage Ratio" means, as of any date of determination, the ratio of (x) Consolidated Total Indebtedness of Issuer and its Subsidiaries as of such date to (y) LTM Issuer EBITDA of (in each case, determined in accordance with the applicable provisions of Section 1.09 hereof).

"Issuer Materials" has the meaning specified in Section 6.02.

"Joinder" means each Joinder of Additional Purchaser, providing for a Delayed Issuance to be made at any time after the Closing Date and on or before the 90th day following the Closing Date, by and among the Issuer, the Administrative Agent, and a Person who joins this Agreement as an additional Purchaser, in substantially the form attached as Exhibit F hereto.

"Judgment Currency" has the meaning specified in Section 10.17.

"JV Entity" means any joint venture of the Issuer or any Subsidiary that is not a Subsidiary.

"Key Performance Indicator Report" means a report substantially the form of Exhibit O hereto.

"Key Performance Indicators" has the meaning specified in the Key Performance Indicator Report.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

CONFIDENTIAL     Trive_00042957

"LB Transaction Expenses" means any fees, costs and expenses (including (x) all legal, accounting and other professional fees, costs and expenses and (y) underwriting fees, costs and expenses (including original issue discount, upfront fees or similar fees)) incurred or paid by any Subsidiaries of the Issuer in connection with the LB Transactions.

"LB Transactions" means the execution, delivery and initial borrowings under the Credit Agreement, the making of certain equity distributions from proceeds of such borrowings, the refinancing of the prior indebtedness of Lucky Bucks on the Credit Agreement Closing Date, and the consummation of any other transaction in connection with the foregoing.

"LCT Election" has the meaning specified in Section 1.09(a).

"LCT Public Offer" has the meaning specified in Section 1.09(a).

"LCT Test Date" has the meaning specified in Section 1.09(a).

"Lien" means any mortgage, pledge, security interest, encumbrance, lien, hypothecation or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof); *provided* that in no event shall Non-Financing Lease Obligations be deemed to constitute a Lien.

"Limited Condition Transaction" means (1) any Investment or acquisition (whether by merger, amalgamation, consolidation or other business combination or the acquisition of Capital Stock, assets or otherwise and which may include, for the avoidance of doubt, a transaction that may constitute a Change of Control), whose consummation is not conditioned on the availability of, or on obtaining, third party financing; (2) any redemption, repurchase, defeasance, satisfaction and discharge or repayment of Indebtedness, Disqualified Stock or Preferred Stock requiring irrevocable notice in advance of such redemption, repurchase, defeasance, satisfaction and discharge or repayment; and (3) any dividend or distribution declared by the Issuer or any of its Subsidiaries following an initial public offering of such entity.

"Local Time" means local time in New York City, with respect to the times for (i) the determination of "Dollar Equivalent" and (ii) the receipt and sending of notices by and to and the disbursement by or payment to the Administrative Agent or Purchaser with respect to Notes denominated in Dollars.

"LTM EBITDA" means Consolidated EBITDA of Lucky Bucks and its Subsidiaries measured for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b), in each case with such *pro forma* adjustments giving effect to such Indebtedness, acquisition or Investment, as applicable, since the start of such four quarter period and as are consistent with the *pro forma* adjustments set forth in Section 1.09.

"LTM Issuer EBITDA" means Consolidated EBITDA of the Issuer and its Subsidiaries measured for the period of the most recent four consecutive fiscal quarters ending prior to the date of such determination for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b), in each case with such *pro forma* adjustments giving effect to such Indebtedness, acquisition or Investment, as applicable, since the start of such four quarter period and as are consistent with the *pro forma* adjustments set forth in Section 1.09.

"Lucky Bucks" means Lucky Bucks, LLC, a Georgia limited liability company.

CONFIDENTIAL                                                                 Trive_00042958

"Make-Whole Amount" means, with respect to any Note, an amount equal to the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such Note over the amount of such Called Principal; *provided* that the Make-Whole Amount may in no event be less than zero. For the purposes of determining the Make-Whole Amount and Section 2.05, the following terms have the following meanings:

"*Called Principal*" means, with respect to any Note, the principal of such Note that is to be redeemed pursuant to Section 2.05(a) or 2.05(b) or accelerated pursuant to Sections 8.02 and 8.08.

"*Discounted Value*" means, with respect to the Called Principal of any Note, the amount obtained by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respective scheduled due dates to the Settlement Date with respect to such Called Principal, in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal.

"*Reinvestment Yield*" means, with respect to the Called Principal of any Note, the sum of (a) 0.50% *plus* (b) the yield to maturity implied by the U.S. Treasury constant maturity yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Settlement Date with respect to such Called Principal, in Federal Reserve Statistical Release H.15 (or any comparable successor publication) for the U.S. Treasury constant maturity having a term equal to the Remaining Average Life of such Called Principal as of such Settlement Date. If there is no such U.S. Treasury constant maturity having a term equal to such Remaining Average Life, such implied yield to maturity will be determined by interpolating linearly between (A) the U.S. Treasury constant maturity so reported with the term closest to and greater than such Remaining Average Life and (B) the U.S. Treasury constant maturity so reported with the term closest to and less than such Remaining Average Life. The Reinvestment Yield shall be rounded to the number of decimal places as appears in the interest rate of the applicable Note.

"*Remaining Average Life*" means, with respect to any Called Principal, the number of years obtained by dividing (a) such Called Principal into (b) the sum of the products obtained by multiplying (i) the principal component of each Remaining Scheduled Payment with respect to such Called Principal by (ii) the number of years, computed on the basis of a 360-day year comprised of twelve 30-day months and calculated to two decimal places, that will elapse between the Settlement Date with respect to such Called Principal and the scheduled due date of such Remaining Scheduled Payment.

"*Remaining Scheduled Payments*" means, with respect to the Called Principal of any Note, all payments of such Called Principal and interest thereon that would be due after the Settlement Date with respect to such Called Principal if no payment of such Called Principal were made prior to its scheduled due date; *provided* that, if such Settlement Date is not a date on which interest payments are due to be made under the Notes, then the amount of the next succeeding scheduled interest payment will be reduced by the amount of interest accrued to such Settlement Date and required to be paid on such Settlement Date pursuant to Section 2.05; and *provided, further*, that First Year Interest Payments (as defined in Section 2.05(a)(iii)) shall not be included in the Remaining Scheduled Payments to the extent included in the calculation pursuant to Section 2.05(a)(iii)(B)(x).

CONFIDENTIAL                                                                        Trive_00042959

"*Settlement Date*" means, with respect to the Called Principal of any Note, the date on which such Called Principal is to be prepaid pursuant to Section 2.05.

"Management Advances" means loans or advances made to, or Guarantees with respect to loans or advances made to, future, present or former employees, directors, officers, managers, contractors, consultants or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of any Parent Entity, the Issuer or any Subsidiary not exceeding the greater of $5,000,000 and 5.0% of LTM EBITDA in the aggregate outstanding at the time of incurrence.

"Management Stockholders" means the members of management of the Issuer (or any Parent Entity) or its Subsidiaries who are holders of Capital Stock of the Issuer or of any Parent Entity on the Closing Date or become holders of such Capital Stock.

"Mandatory Redemption Event" means (a) the consummation of a SPAC Transaction, (b) the effectiveness of the registration statement in connection with the initial listing of the common stock (or other equity interests) of the Issuer or any Subsidiary on the Nasdaq Stock Market, the New York Stock Exchange or another exchange or marketplace approved by the Board of Directors by means of an effective registration statement filed by the Issuer with the Securities and Exchange Commission, without a related underwritten offering of such common stock (or other equity interests) (a "Direct Listing") or (c) the consummation of an IPO; provided that any such transaction shall not constitute a Mandatory Redemption Event if (x) such transaction is consummated with respect to the Capital Stock of a Parent Entity and would not constitute a Change of Control and (y) the Sponsor shall, after giving pro forma effect to such transaction, continue to hold, directly or indirectly, Capital Stock representing more than 50% of the outstanding common equity interests of the Issuer. "Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations or condition (financial or otherwise) of the Issuer, (b) the business, assets, operations or condition (financial or otherwise) of the Issuer and its Subsidiaries, taken as a whole, (c) the material rights and remedies (taken as a whole) of the Administrative Agent, the Collateral Agent or the Purchasers under the Note Documents (other than due to the action or inaction of the Administrative Agent, the Collateral Agent or the Purchasers) or (d) the ability of the Issuer to perform its payment obligations under the Note Documents.

"Material Real Property" means (a) any fee interest in real property owned by the Issuer or any of its Subsidiaries as of the Closing Date, having a fair market value (determined as of the Closing Date) equal to or in excess of $2,500,000, as set forth on Schedule 5.22 and (b) any fee interest in real property acquired by the Issuer or any of its Subsidiaries following the Closing Date located in the United States with a fair market value (determined as of the date such real property is acquired (or the date of substantial completion or any material improvement thereon or new construction thereof)) equal to or in excess of $5,000,000.

"Material Subsidiary" means, at any date of determination, each Subsidiary of the Issuer that is not an Immaterial Subsidiary (but including, in any case, any Subsidiary that has been designated as a Material Subsidiary as provided in, or has been designated as an Immaterial Subsidiary in a manner that does not comply with, the definition of "Immaterial Subsidiary").

"Maturity Date" means May 29, 2028; *provided* that if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately preceding such day.

"Moody's" means Moody's Investors Service, Inc. or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

CONFIDENTIAL                                                                    Trive_00042960

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Issuer or any ERISA Affiliate makes or is obligated to make contributions, or during the immediately preceding six (6) years, has made or been obligated to make contributions.

"Nationally Recognized Statistical Rating Organization" means a nationally recognized statistical rating organization within the meaning of Rule 436 under the Securities Act.

"Net Available Cash" with respect to any Asset Disposition or Casualty Event (as applicable) means cash proceeds received (including any cash proceeds received from the sale or other disposition of any non-cash consideration received in any Asset Disposition, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Asset Disposition or received in any other non-cash form) therefrom, in each case net of:

(1)    all legal, accounting, consulting, investment banking, survey costs, title and recording expenses, title insurance premiums, payments made in order to obtain a necessary consent or required by applicable law, brokerage and sales commissions, relocation expenses, commissions, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such transaction;

(2)    all Taxes paid, reasonably estimated to be payable, Tax reserves set aside or payable or accrued as a liability under IFRS (including, for the avoidance of doubt, any income, withholding and other Taxes payable as a result of the distribution or deemed distribution of such proceeds to Lucky Bucks or any of its Subsidiaries, transfer taxes, deed or mortgage recording taxes and Taxes that would be payable in connection with any repatriation of such proceeds), as a consequence of such transaction, including distributions made in accordance with Section 7.06(b)(xxiv) or any transactions occurring or deemed to occur to effectuate a payment under this Agreement;

(3)    in the case of any Asset Disposition of assets that do not constitute Collateral, all payments made on any Indebtedness which is secured by any assets subject to such transaction, in accordance with the terms of any Lien upon such assets, or which by applicable law is required to be repaid out of the proceeds from such transaction;

(4)    all distributions and other payments required to be made to non-controlling interest or minority interest holders (other than any direct or indirect parent of Lucky Bucks, Lucky Bucks or any of its respective Subsidiaries) in Subsidiaries or joint ventures as a result of such transaction;

(5)    all costs associated with unwinding any related Hedging Obligations (as defined in the Credit Agreement) in connection with such transaction;

(6)    the deduction of appropriate amounts required to be provided by the seller as a reserve, in accordance with IFRS, against any liabilities associated with the assets disposed of in such transaction and retained by Lucky Bucks or any of its Subsidiaries after such transaction, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction;

(7)    any portion of the purchase price from such transaction placed in escrow, whether for the satisfaction of any indemnification obligations in respect of such transaction, as a reserve

CONFIDENTIAL                                                        Trive_00042961

for adjustments to the purchase price associated with any such transaction or otherwise in connection with such transaction; and

(8)     the amount of any liabilities (other than Indebtedness in respect of this Agreement and any other Indebtedness secured on an equal or junior priority basis with the foregoing) directly associated with such asset being sold and retained by Lucky Bucks or any of its Subsidiaries.

"Net Cash Proceeds," with respect to any issuance or sale of Capital Stock, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and charges actually Incurred in connection with such issuance or sale and net of Taxes paid or reasonably estimated to be actually payable as a result of such issuance or sale (including, for the avoidance of doubt, any income, withholding and other Taxes payable as a result of the distribution of such proceeds to the Issuer and after taking into account any available tax credit or deductions and any tax sharing agreements, and including any distributions made in accordance with Section 7.06(b)(xxiv)).

"Net Short Purchaser" has the meaning specified in Section 10.01.

"Non-Financing Lease Obligation" means any other lease obligation that is not required to be accounted for as a financing or capital lease in accordance with IFRS. For the avoidance of doubt, an operating lease shall be considered a Non-Financing Lease Obligation.

"Note" means a promissory note of the Issuer payable to any Purchaser or its registered assigns, in substantially the form of Exhibit C hereto with appropriate insertions, evidencing the aggregate Indebtedness of the Issuer to such Purchaser resulting from the Notes purchased by such Purchaser.

"Note Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Agency Fee Letter, and (iv) the Collateral Documents.

"NYFRB" means the Federal Reserve Bank of New York.

"Obligations" means any principal, interest (including Post-Petition Interest and fees accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Issuer whether or not a claim for Post-Petition Interest or fees is allowed in such proceedings), penalties, fees, expenses, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness.

"Officer" means, with respect to any Person, (1) the Chairman of the Board of Directors, any Manager, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, any Assistant Treasurer, any Managing Director, the Secretary or any Assistant Secretary (a) of such Person or (b) if such Person is owned or managed by a single entity, of such entity, or (2) any other individual designated as an "Officer" for the purposes of this Agreement by the Board of Directors of such Person.

"Officer's Certificate" means, with respect to any Person, a certificate signed by one Officer of such Person.

"Organization Documents" means (a) with respect to any corporation or company, the certificate or articles of incorporation, the memorandum and articles of association, any certificates of change of name and/or the bylaws; (b) with respect to any limited liability company, the certificate or

CONFIDENTIAL                                                                                    Trive_00042962

articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity. "Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Note Document, or sold or assigned an interest in any Note or Note Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Note Document, except any such Taxes that are Other Connection Taxes imposed with respect to a transfer.

"Outstanding Amount" means, with respect to any Note on any date, the outstanding principal amount thereof after giving effect to any prepayments or repayments thereof and any increase in the principal amount as a result of the capitalization of the interest occurring on such date.

"Parent Entity" means any direct or indirect parent of the Issuer.

"Parent Entity Expenses" means:

(1)     fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) Incurred or paid by any Parent Entity in connection with reporting obligations under or otherwise Incurred or paid in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Agreement or any other agreement or instrument relating to the Notes, the Guarantees or any other Indebtedness of any Subsidiary of the Issuer, including in respect of any reports filed or delivered with respect to the Securities Act, Exchange Act or the rules and regulations promulgated thereunder;

(2)     customary salary, bonus, severance, indemnity, insurance (including premiums therefor) and other benefits payable to any employee, director, officer, manager, contractor, consultant or advisor of any Parent Entity or other Persons under its articles, charter, by-laws, partnership agreement or other organizational documents or pursuant to written agreements with any such Person (including payments substantially consistent with those being made prior to the Closing Date);

(3)     obligations of any Parent Entity in respect of director and officer insurance (including premiums therefor) to the extent relating to the Issuer and its Subsidiaries;

(4)     (x) general corporate operating and overhead fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) and following the first public offering of the Issuer's Capital Stock or the Capital Stock of any Parent Entity, listing fees and other costs and expenses attributable to being a publicly traded company of any Parent Entity and (y) other operational expenses of any Parent Entity related to the ownership or operation of the

CONFIDENTIAL                                                                                                          Trive_00042963

business of the Issuer or any of its Subsidiaries in an aggregate amount not to exceed the greater of (I) $5,000,000 and (II) 5.0% of LTM EBITDA in any fiscal year;

(5)      expenses Incurred by any Parent Entity in connection with (i) any offering, sale, conversion or exchange of Capital Stock or Indebtedness (whether or not consummated or successful) and, after the consummation of an initial public offering, any Public Company Costs and (ii) any related compensation paid to employees, directors, officers, managers, contractors, consultants or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of such Parent Entity;

(6)      amounts payable pursuant to any management services or similar agreements or the management services provisions in an investor rights agreement or other equityholders' agreement (including any amendment thereto or replacement thereof so long as any such amendment or replacement is not materially disadvantageous in the reasonable determination of the Issuer to the Purchasers when taken as a whole, as compared to the management services or similar agreements as in effect immediately prior to such amendment or replacement), solely to the extent such amounts are not paid directly by the Issuer or its Subsidiaries;

(7)      amounts required to permit any Parent Entity to pay franchise and similar taxes, and other fees and expenses of such Parent Entity, in each case, required to maintain the corporate or other organizational existence of such Parent Entity; and

(8)      amounts to finance Investments that would otherwise be permitted to be made pursuant to Section 7.06 hereof if made by the Issuer or a Subsidiary; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment, (B) such Parent Entity shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or equity interests) to be contributed to the capital of the Issuer or one of its Subsidiaries or (2) the merger, consolidation or amalgamation of the Person formed or acquired into the Issuer or one of its Subsidiaries (to the extent not prohibited by Section 7.04 hereof) in order to consummate such Investment, (C) such Parent Entity and its Affiliates (other than the Issuer or a Subsidiary) receives no consideration or other payment in connection with such transaction except to the extent the Issuer or a Subsidiary could have given such consideration or made such payment in compliance with this Agreement and such consideration or other payment is included as a Restricted Payment under this Agreement, (D) any property received by the Issuer shall not increase amounts available for Restricted Payments pursuant to Section 7.06(a) hereof and (E) such Investment shall be deemed to be made by the Issuer or such Subsidiary pursuant to a provision of Section 7.06 hereof or pursuant to the definition of "Permitted Investments."

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Issuer or any ERISA Affiliate or to which the Issuer or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding six (6) years.

"Permitted Acquisition" means the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, or equity interests in a Person that, upon the consummation thereof, will be a Subsidiary of the Issuer (including as a result of a merger or consolidation); *provided* that (i) except in the case of a Limited

CONFIDENTIAL                                                                                    Trive_00042964

Condition Transaction (in which case, compliance with this clause (i) shall be determined in accordance with Section 1.09(a)), immediately before and immediately after giving *pro forma* effect to any such purchase or other acquisition, no Event of Default shall have occurred and be continuing, and (ii) after giving effect to any such purchase or other acquisition, the Issuer shall be in compliance with the covenant in Section 6.16.

"Permitted Asset Swap" means the concurrent purchase and sale or exchange of assets used or useful in a Similar Business or a combination of such assets and cash, Cash Equivalents between any of the Subsidiaries of the Issuer and another Person; *provided* that any cash or Cash Equivalents received in excess of the value of any cash or Cash Equivalents sold or exchanged must be applied in accordance with Section 7.05 hereof.

"Permitted Holders" means, collectively, (i) the Sponsor, (ii) the Management Stockholders (including any Management Stockholders holding Capital Stock through an equityholding vehicle) and rollover equity investors, (iii) any heirs, executors, administrators, testamentary trustees, legatees or beneficiaries of a person identified in clause (ii) above, (iv) any trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only a person identified in clause (ii) above, his or her spouse, parents, siblings, members of his or her immediate family (including adopted children and step children) and/or direct lineal descendants), (v) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing, any Permitted Plan or any Person or group that becomes a Permitted Holder specified in the last sentence of this definition are members and any member of such group; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, Persons referred to in subclauses (i) through (iv), collectively, have beneficial ownership of more than 50.0% of the total voting power of the Voting Stock of the Issuer or any Parent Entity held by such group and (vi) any Permitted Plan. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control, the Event of Default resulting from which is waived in accordance with the requirements of this Agreement, will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"Permitted Intercompany Activities" means any transactions between or among the Issuer and the Subsidiaries that are entered into in the ordinary course of business or consistent with past practice of the Issuer and the Subsidiaries and, in the reasonable determination of the Issuer are necessary or advisable in connection with the ownership or operation of the business of the Issuer and the Subsidiaries, including (i) payroll, cash management, purchasing, insurance and hedging arrangements; (ii) management, technology and licensing arrangements; and (iii) customary loyalty and rewards programs.

"Permitted Investments" means (in each case, by the Issuer or any of the Subsidiaries):

(a)     Investments in (i) a Subsidiary (including the Capital Stock of, or guarantees of obligations of, a Subsidiary) or the Issuer or (ii) a Person (including the Capital Stock of any such Person) that will, upon the making of such Investment, become a Subsidiary (collectively, "Intercompany Investments");

(b)     Investments in another Person if such Person is engaged, directly or through entities that will be Subsidiaries, in any Similar Business and as a result of such Investment such other Person, in one transaction or a series of transactions, is merged, amalgamated, consolidated or otherwise combined with or into, or transfers or conveys all or substantially all its assets (or such division, business unit, product line or business) to, or is liquidated into, the Issuer or a Subsidiary, and any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, amalgamation, consolidation, combination, transfer or conveyance;

CONFIDENTIAL                                                    Trive_00042965

(c)      (i) Permitted Acquisitions and (ii) any Investment held by a Subsidiary acquired pursuant to a Permitted Acquisition at the time of such Permitted Acquisition; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, amalgamation, consolidation, combination, transfer or conveyance;

(d)      Investments in cash, Cash Equivalents or Investment Grade Securities;

(e)      Investments in receivables owing to the Issuer or any Subsidiary created or acquired in the ordinary course of business or consistent with past practice;

(f)      Investments in payroll, travel, entertainment, relocation, moving related and similar advances that are made in the ordinary course of business or consistent with past practice;

(g)      Management Advances;

(h)      Investments (including debt obligations and equity interests) (a) received in settlement, compromise or resolution of debts created in the ordinary course of business or consistent with past practice, (b) in exchange for any other Investment or accounts receivable, endorsements for collection or deposit and trade arrangements, (c) as a result of foreclosure, perfection or enforcement of any Lien, (d) in satisfaction of judgments or (e) pursuant to any plan of reorganization or similar arrangement including upon the bankruptcy or insolvency of a debtor or litigation, arbitration or other disputes or otherwise with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(i)      Investments made as a result of the receipt of promissory notes or other non-cash consideration (including earn-outs) from a sale or other disposition of property or assets, including an Asset Disposition;

(j)      Investments existing or pursuant to binding commitments, agreements or arrangements in effect on the Credit Agreement Closing Date; *provided* that any such Investment in an outstanding amount in excess of $2,500,000 shall be listed on Schedule 1.01B and (b) any modification, replacement, renewal, reinvestment or extension of Investments existing on the Credit Agreement Closing Date; *provided* that the amount of any such Investment may not be increased except (i) as required by the terms of such Investment or binding commitment as in existence on the Credit Agreement Closing Date (including in respect of any unused commitment), plus any accrued but unpaid interest (including any accretion of interest, original issue discount or the issuance of pay-in-kind securities) and premium payable by the terms of such Indebtedness thereon and fees and expenses associated therewith as of the Credit Agreement Closing Date or (ii) as otherwise permitted under this Agreement;

(k)      Hedging Obligations (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document), including any terminations or unwinding thereof, which transactions or obligations are not prohibited by Section 7.03 hereof;

(l)      pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business or Liens otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under Section 7.01 hereof;

(m)      any Investment to the extent made using Capital Stock of the Issuer (other than Disqualified Stock) or Capital Stock of any Parent Entity as consideration;

(n)      [reserved];

CONFIDENTIAL                                                                    Trive_00042966

(o)    Investments consisting of (i) asset purchases (including acquisitions of inventory, supplies, materials, equipment and similar assets) or (ii) licenses, sublicenses, cross-licenses, leases, subleases, assignments, transfers, contributions or other Investments of IP Rights or other intangibles or services in the ordinary course of business pursuant to any joint research or development, joint venture, strategic alliance or marketing arrangements with other Persons or any Intercompany License Agreement and any other Investments made in connection therewith;

(p)    (i) Guarantees of Indebtedness not prohibited by Section 7.03 hereof and (other than with respect to Indebtedness) guarantees, keepwells and similar arrangements in the ordinary course of business or consistent with past practice, and (ii) performance guarantees and Contingent Obligations with respect to obligations that are permitted by this Agreement;

(q)    Investments consisting of earnest money deposits required in connection with a purchase agreement, or letter of intent, or other acquisitions to the extent not otherwise prohibited by this Agreement;

(r)    Investments of a Subsidiary acquired after the Closing Date or of an entity merged or amalgamated into or consolidated with the Issuer or merged or amalgamated into or consolidated with a Subsidiary after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation, or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)    contributions to a "rabbi" trust for the benefit of any employee, director, officer, manager, contractor, consultant, advisor or other service providers or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Issuer, and Investments relating to non-qualified deferred payment plans in the ordinary course of business or consistent with past practice;

(t)    Investments in joint ventures and similar entities having a fair market value, when taken together with all other Investments made pursuant to this clause (t) that are at that time outstanding, not to exceed the greater of $25,000,000 and 25.0% of LTM EBITDA at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value), plus the amount of any returns (including dividends, payments, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) in respect of such Investments received by the Issuer or a Subsidiary (without duplication for purposes of Section 7.06 of any amounts applied pursuant to Section 7.06(a)) with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value; *provided, however,* that if any Investment pursuant to this clause (t) is made in any Person that is not the Issuer or a Subsidiary at the date of the making of such Investment and such person becomes the Issuer or a Subsidiary after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (a)(i) or (a)(ii) above and shall cease to have been made pursuant to this clause (t);

(u)    additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (u) that are at that time outstanding, not to exceed the greater of $40,000,000 and 40.0% of LTM EBITDA (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value) plus unused amounts pursuant to Section 7.06(b)(xvi)(i) and Section 7.06(b)(xxi), plus the amount of any returns (including dividends, payments, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) in respect of such Investments received by the Issuer or a Subsidiary (without duplication for purposes of Section 7.06 of any amounts applied pursuant to Section 7.06(a)); *provided* that if such Investment is in Capital Stock of a Person that subsequently becomes the Issuer or a Subsidiary, such

CONFIDENTIAL    Trive_00042967

Investment shall thereafter be deemed permitted under clauses (c)(i) or (c)(ii) above and shall not be included as having been made pursuant to this clause (u);

(v)      Investments in connection with a Qualified Securitization Financing or a Receivables Facility;

(w)      [reserved];

(x)      Investments consisting of commissions advances to producers that may not be earned through personal production and that may be earned over time or written off by the Issuer or any Subsidiary as unearned salary;

(y)      guaranty and indemnification obligations arising in connection with surety bonds issued in the ordinary course of business or consistent with past practice;

(z)      Investments (a) consisting of purchases and acquisitions of assets or services in the ordinary course of business or consistent with past practice, (b) made in the ordinary course of business or consistent with past practice in connection with obtaining, maintaining or renewing client, franchisee and customer contacts and loans, (c)(i) advances, loans, extensions of credit (including the creation of receivables) or (ii) prepayments made to, and guarantees with respect to obligations of, franchisees, distributors, suppliers, lessors, licensors and licensees, in each case in the ordinary course of business or consistent with past practice or (d) received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business or consistent with past practice;

(aa)      Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business or consistent with past practice;

(bb)      Investments consisting of endorsements for collection or deposit and trade arrangements with customers (or any comparable or similar provisions in other applicable jurisdictions) in the ordinary course of business or consistent with past practice;

(cc)      non-cash Investments in connection with tax planning and reorganization activities, Investments in connection with any Permitted Intercompany Activities and related transactions;

(dd)      Investments made from casualty insurance proceeds in connection with the replacement, substitution, restoration or repair of assets on account of a Casualty Event; and

(ee)      so long as no Default or Event of Default shall have occurred and is continuing or would result therefrom, any other Investment so long as, immediately after giving pro forma effect to the Investment and the incurrence of any Indebtedness the net proceeds of which are used to make such Investment, the Consolidated Total Leverage Ratio shall be no greater than 3.75:1.00.

"Permitted IPO Reorganization" means any transaction taken by the Issuer or any of its Subsidiaries in connection with and reasonably related to consummating an initial public offering, so long as, after giving effect thereto, there is no material adverse impact on the value of the Collateral, taken as a whole.

"Permitted Liens" means with respect to any Person:

CONFIDENTIAL                                          Trive_00042968

(a)    Liens on assets or property of a Subsidiary of Lucky Bucks that is not a "Guarantor" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) securing Indebtedness and other Obligations of such Subsidiary;

(b)    pledges, deposits or Liens (a) in connection with workmen's compensation laws, payroll taxes, unemployment insurance laws, employers' health tax and other social security laws or similar legislation or other insurance related obligations (including in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto), (b) securing liability, reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instruments) for the benefit of insurance carriers under insurance or self-insurance arrangements or otherwise supporting the payments of items set forth in the foregoing clause (a), or (c) in connection with bids, tenders, completion guarantees, contracts, leases, utilities, licenses, public or statutory obligations, or to secure the performance of bids, trade contracts, government contracts and leases, statutory obligations, surety, stay, indemnity, warranty, release, judgment, customs, appeal, performance bonds, guarantees of government contracts, return of money bonds, bankers' acceptance facilities and obligations of a similar nature (including those to secure health, safety and Environmental obligations), and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, or as security for contested taxes or import or customs duties or for the payment of rent, or other obligations of like nature, in each case incurred in the ordinary course of business or consistent with past practice;

(c)    Liens with respect to outstanding motor vehicle fines and Liens imposed by law or regulation, including carriers', warehousemen's, mechanics', landlords', suppliers', materialmen's, repairmen's, architects', construction contractors' or other similar Liens, in each case (i) for amounts not overdue for a period of more than 60 days or, if more than 60 days overdue, are unfiled (or if filed have been discharged or stayed) and no other action has been taken to enforce such Liens or (ii) that are bonded or being contested in good faith by appropriate proceedings;

(d)    Liens for Taxes, assessments or other governmental charges which are not yet due and payable or which are being contested in good faith by appropriate proceedings; *provided* that appropriate reserves to the extent required pursuant to IFRS (or other applicable accounting principles) have been made in respect thereof; or for property Taxes on property of the Issuer or one of its Subsidiaries has determined to abandon if such abandonment is otherwise permitted hereunder, and the sole recourse for such Tax is to such property;

(e)    encumbrances, charges, ground leases, easements (including reciprocal easement agreements), survey exceptions, restrictions, encroachments, protrusions, by-law, regulation, zoning restrictions or reservations of, or rights of others for, licenses, rights of way, servitudes, sewers, electric lines, drains, telegraph, telephone and cable television lines and other similar purposes, or zoning, building codes or other restrictions (including minor defects and irregularities in title and similar encumbrances) as to the use of real properties, exceptions shown on any Mortgage Policy (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document), or Liens incidental to the conduct of the business of such Person or to the ownership of its properties, including servicing agreements, development agreements, site plan agreements, subdivision agreements, facilities sharing agreements, cost sharing agreements and other similar agreements, charges or encumbrances, which do not in the aggregate materially interfere with the ordinary course conduct of the business of the Issuer and the Subsidiaries, taken as a whole;

(f)    Liens (a) securing Hedging Obligations or Cash Management Obligations (each as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) and the costs thereof; (b) that are rights of set-off, rights of pledge or other bankers' Liens (i) relating to treasury, depository and cash management services or any automated clearing house transfers of funds in

CONFIDENTIAL                                                    Trive_00042969

the ordinary course of business or consistent with past practice, (ii) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer or any of its Subsidiaries or consistent with past practice or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any Subsidiary in the ordinary course of business or consistent with past practice; (c) on cash accounts securing Indebtedness and other Obligations permitted to be Incurred under Section 7.03(b)(viii)(v) with financial institutions; (d) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business or consistent with past practice and not for speculative purposes; and/or (e) (i) of a collection bank arising under Section 4-210 of the UCC or any comparable or successor provision on items in the course of collection and (ii) in favor of a banking or other financial institution or electronic payment service providers arising as a matter of law encumbering deposits (including the right of set-off) arising in the ordinary course of business in connection with the maintenance of such accounts and (iii) arising under customary general terms and conditions of the account bank in relation to any bank account maintained with such bank and attaching only to such account and the products and proceeds thereof, which Liens, in any event, do not secure any Indebtedness;

(g)     leases, licenses, subleases and sublicenses and Liens on the property covered thereby (including real property and IP Rights) entered into in the ordinary course of business, consistent with past practice or which do not (x) interfere in any material respect with the business of the Issuer or any Subsidiary, taken as a whole or (y) secure any Indebtedness;

(h)     Liens securing or otherwise arising out of judgments, decrees, attachments, orders or awards not giving rise to an Event of Default under Section 8.01(g) hereof;

(i)     Liens (i) securing Capitalized Lease Obligations, or Purchase Money Obligations, or securing the payment of all or a part of the purchase price of, or securing Indebtedness or other Obligations Incurred to finance or refinance the acquisition, improvement or construction of, assets or property acquired or constructed in the ordinary course of business; *provided* that (a) the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be Incurred under this Agreement and (b) any such Liens may not extend to any assets or property of the Issuer or any Subsidiary other than assets and property affixed or appurtenant thereto and accessions, additions, improvements, proceeds, dividends or distributions thereof, including after-acquired property that is (A) affixed or incorporated into the property or assets covered by such Lien, (B) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (C) the proceeds and products thereof and customary security deposits; *provided* that individual financings of equipment provided by one lender may be cross-collateralized to other financings of equipment provided by such lender; and (ii) any interest or title of a lessor, sublessor, franchisor's, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under any Capitalized Lease Obligations or Non-Financing Lease Obligations;

(j)     Liens arising from UCC financing statements, including precautionary financing statements (or similar filings) regarding operating leases or consignments entered into by the Issuer and the Subsidiaries;

(k)     Liens existing on the Closing Date, including any Liens securing any Refinancing Indebtedness of any Indebtedness secured by such Liens; *provided* that any Lien securing Indebtedness or other obligations in excess of $2,500,000 shall be listed on Schedule 1.01C;

(l)     Liens on property, other assets or shares of stock of a Person at the time such Person becomes a Subsidiary (or at the time the Issuer or a Subsidiary acquires such property, other assets or shares of stock, including any acquisition by means of a merger, amalgamation, consolidation or other

CONFIDENTIAL

Trive_00042970

business combination transaction with or into the Issuer or any Subsidiary); *provided, however,* that such Liens are not created, Incurred or assumed in anticipation of or in connection with such other Person becoming a Subsidiary (or such acquisition of such property, other assets or stock); *provided, further,* that such Liens are limited to all or part of the same property, other assets or stock (plus property and assets affixed or appurtenant thereto and additions, improvements, accessions, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof) that secured (or, under the written arrangements under which such Liens arose, could secure) the Obligations relating to any Indebtedness or other obligations to which such Liens relate;

(m)     Liens securing Obligations relating to any Indebtedness or other Obligations of the Issuer or such Subsidiary owing to the Issuer or another Subsidiary, or Liens in favor of the Issuer or any Subsidiary or the Collateral Agent;

(n)     Liens securing Refinancing Indebtedness Incurred to refinance Indebtedness that was previously so secured, and permitted to be secured under this Agreement; *provided* that any such Lien is limited to all or part of the same property or assets (plus property and assets affixed or appurtenant thereto and additions, improvements, accessions, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof) that secured (or, under the written arrangements under which the original Lien arose, could secure) the Obligations relating to the Indebtedness or other obligations being refinanced or is in respect of property or assets that is or could be the security for or subject to a Permitted Lien hereunder and such Liens have equal or lesser priority than the Liens in respect of the Indebtedness being refinanced;

(o)     (a) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any government, statutory or regulatory authority, developer, landlord or other third party on property which the Issuer or any Subsidiary does not own in fee, but has easement rights over, or on any leased property and subordination or similar arrangements relating thereto and (b) any condemnation or eminent domain proceedings affecting any real property;

(p)     any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture securing financing arrangement, joint venture or similar arrangement pursuant to any joint venture securing financing arrangement, joint venture or similar agreement;

(q)     Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(r)     Liens arising out of conditional sale, title retention, hire purchase, consignment or similar arrangements for the sale or purchase of goods entered into in the ordinary course of business or consistent with past practice;

(s)     Liens securing the Secured Obligations pursuant hereto, and Liens securing the Indebtedness incurred pursuant to Section 7.03(b)(i)(B);

(t)     Liens securing Indebtedness and other Obligations under Section 7.03(b)(v) hereof; *provided* that if such Indebtedness is assumed, such Liens shall only be permitted if such Liens are

CONFIDENTIAL                                                                                     Trive_00042971

(1) limited to all or part of the same property or assets, including Capital Stock (plus property and assets affixed or appurtenant thereto and additions, improvements, accessions, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof) acquired, or of any Person acquired or merged, consolidated or amalgamated with or into the Issuer or any Subsidiary, in any transaction to which such Indebtedness or other Obligation relates, and (2) solely in the case of Acquired Indebtedness, not created in contemplation of any such transaction to which such Indebtedness relates;

(u)  Liens securing Indebtedness and other Obligations under Section 7.03(a) or Sections 7.03(b)(vii)(i), (xi), (xiv) or (xx) hereof (*provided* that, (w) in the case of Section 7.03(b)(vii)(i), the related Indebtedness represented by such Capitalized Lease Obligations, Purchase Money Obligations or other obligations shall not be secured by any property, equipment or assets of the Issuer or any Subsidiary other than the property, equipment or assets so acquired, leased, expanded, constructed, installed, replaced, repaired or improved and any proceeds therefrom and other than assets and property affixed or appurtenant thereto and accessions, additions, improvements, proceeds, dividends or distributions thereof, including after-acquired property that is (i) affixed or incorporated into the property or assets covered by such Lien, (ii) after-acquired property or assets subject to a Lien securing such Indebtedness, the terms of which Indebtedness require or include a pledge of after-acquired property or assets and (iii) the proceeds and products thereof, (x) in the case of Section 7.03(b)(xi), such Liens cover only the assets of such Subsidiary or assets that do not constitute Collateral and (y) in each case, only to the extent permitted to be secured thereby; *provided, further*, that, in the event that the Liens granted pursuant to this clause (u) with respect to Indebtedness incurred pursuant to Section 7.03(b)(xiv) and Section 7.03(b)(xx) are Liens on the Collateral, then the holders of the obligations secured by such Liens, or their duly appointed agent, shall become party to a Customary Intercreditor Agreement;

(v)  Liens on "Excluded Property" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) of the Issuer or any Subsidiary securing Indebtedness or other Obligations of the Issuer and/or any Subsidiary in an aggregate amount not in excess of $5,000,000;

(w)  [Reserved];

(x)  Liens deemed to exist in connection with Investments permitted under clause (4) of the definition of "Cash Equivalents";

(y)  Liens on (i) goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Issuer or any Subsidiary or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments and (ii) specific items of inventory of other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or documentary letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(z)  Liens on vehicles or equipment of the Issuer or any Subsidiary in the ordinary course of business or consistent with past practice;

(aa)  Liens on assets or securities deemed to arise in connection with and solely as a result of the execution, delivery or performance of contracts to sell such assets or securities if such sale is otherwise permitted by this Agreement;

CONFIDENTIAL                                                                                    Trive_00042972

(bb)    (a) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto, and (b) Liens, pledges, deposits made or other security provided to secure liabilities to, or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefits of), insurance carriers in the ordinary course of business or consistent with past practice;

(cc)    Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted under this Agreement;

(dd)    Liens (i) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted under this Agreement to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment (including any letter of intent or purchase agreement with respect to such Investment), and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in an asset sale, in each case, solely to the extent such Investment or sale, transfer, lease or other disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ee)    Liens securing Indebtedness and other Obligations in an aggregate principal amount not to exceed the greater of (a) $40,000,000 and (b) 40.0% of LTM EBITDA at the time Incurred; *provided, further*, that, in the event that the Liens granted pursuant to this clause (ee) are Liens on the Collateral, then such Liens shall rank junior in priority to the Liens on the Collateral securing the Secured Obligations (unless such Indebtedness is otherwise permitted under the terms of this Agreement to be secured by Liens ranking *pari passu* to the Liens on Collateral securing the Secured Obligations) and the holders of the obligations secured by such Liens, or their duly appointed agent, shall become party to a Customary Intercreditor Agreement;

(ff)    [Reserved];

(gg)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 7.03 hereof; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreement;

(hh)    Liens arising in connection with a Qualified Securitization Financing or a Receivables Facility;

(ii)    Settlement Liens;

(jj)    rights of recapture of unused real property in favor of the seller of such property set forth in customary purchase agreements and related arrangements with any government, statutory or regulatory authority;

(kk)    the rights reserved to or vested in any Person or government, statutory or regulatory authority by the terms of any lease, license, grant or permit held by the Issuer or any Subsidiary or by a statutory provision, to terminate any such lease, license, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(ll)    restrictive covenants affecting the use to which real property may be put and Liens or covenants restricting or prohibiting access to or from lands abutting on controlled access highways or covenants affecting the use to which lands may be put; *provided* that such Liens or covenants do not interfere with the ordinary conduct of the business of the Issuer or any Subsidiary;

CONFIDENTIAL                                                              Trive_00042973

(mm)    Liens on property, assets or Permitted Investments used to defease or to satisfy or discharge Indebtedness; *provided* that such defeasance, satisfaction or discharge is not prohibited by this Agreement;

(nn)    Liens relating to escrow arrangements securing Indebtedness, including (i) Liens on escrowed proceeds from the issuance of Indebtedness for the benefit of the related holders of debt securities or other Indebtedness (or the underwriters, arrangers, trustee or collateral agent thereof) and (ii) Liens on cash or Cash Equivalents set aside at the time of the incurrence of any Indebtedness, in either case to the extent such cash or Cash Equivalents prefund the payment of interest or premium or discount on such Indebtedness (or any costs related to the issuance of such Indebtedness) and are held in an escrow account or similar arrangement to be applied for such purpose;

(oo)    Liens arising in connection with any Permitted Intercompany Activities;

(pp)    Liens incurred to cash collateralize letters of credit incurred in the ordinary course of business or consistent with past practice;

(qq)    Liens arising in connection with a permitted Sale and Leaseback Transaction; *provided* that such Liens extend only to the assets sold and leased back thereunder; and

(rr)    with respect to any Foreign Subsidiary, other Liens and privileges arising mandatorily by law.

For purposes of this definition, the term Indebtedness shall be deemed to include interest on such Indebtedness including interest which increases the principal amount of such Indebtedness. In the event that a Permitted Lien meets the criteria of more than one of the types of Permitted Liens (at the time of incurrence or at a later date), the Issuer in its sole discretion may divide, classify or from time to time reclassify all or any portion of such Permitted Lien in any manner that complies with Section 7.01 hereof and such Permitted Lien shall be treated as having been made pursuant only to the clause or clauses of this definition to which such Permitted Lien has been classified or reclassified; *provided* that Liens incurred pursuant to clause (s) of this definition may not be reclassified.

"Permitted Payments" has the meaning specified in Section 7.06(b).

"Permitted Plan" means any employee benefits plan of the Issuer or any of its Affiliates and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

"Permitted Tax Restructuring" means any reorganizations, intercompany investments and other activities related to Tax planning and reorganization (as determined by the Issuer in good faith) entered into prior to, on or after the Closing Date so long as, in each case, after giving effect thereto, the security interest of the Purchasers in the Collateral, taken as a whole, is not impaired in any material respect and such Permitted Tax Restructuring is not otherwise materially adverse to the Purchasers; *provided* that, in each case, after giving effect to such Permitted Tax Restructuring, the Issuer and the Subsidiaries otherwise comply with Section 6.10.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision thereof or any other entity.

CONFIDENTIAL                                                            Trive_00042974

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) other than a Foreign Plan, established or maintained by the Issuer or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"Platform" has the meaning specified in Section 6.02.

"Pledge Agreement" means, collectively, the Pledge Agreement executed by the Issuer and the Collateral Agent on or before the Closing Date substantially in the form of Exhibit G.

"Post-Petition Interest" means any interest or entitlement to fees or expenses or other charges that accrue after the commencement of any bankruptcy or insolvency proceeding, whether or not a claim therefor is allowed or allowable in any such bankruptcy or insolvency proceeding.

"Preferred Stock" as applied to the Capital Stock of any Person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Present Fair Salable Value" has the meaning specified in the definitions of "Solvent" and "Solvency."

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Company Costs" means, as to any Person, costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and costs relating to compliance with the provisions of the Securities Act and the Exchange Act or other comparable body of laws, rules or regulations, as companies with listed equity, directors' compensation, fees and expense reimbursement, costs relating to enhanced accounting functions and investor relations, stockholder meetings and reports to stockholders, directors' and officers' insurance and other executive costs, legal and other professional fees, listing fees and other transaction costs, in each case to the extent arising solely by virtue of the listing of such Person's equity securities on a national securities exchange or issuance of public debt securities.

"Public Purchaser" has the meaning specified in Section 6.02.

"Purchase Money Obligations" means any Indebtedness Incurred to finance or refinance the acquisition, leasing, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or assets (including Capital Stock), and whether acquired through the direct acquisition of such property or assets or the acquisition of the Capital Stock of any Person owning such property or assets, or otherwise.

"Purchase Notice" means a written notice of an Issuance pursuant to Section 2.02(a), which shall be in substantially the form of Exhibit A, appropriately completed and signed by a Responsible Officer of the Issuer.

CONFIDENTIAL                                                          Trive_00042975

"Purchaser" has the meaning specified in the introductory paragraph to this Agreement and, as the context requires, includes their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Purchaser".

"Qualified Capital Stock" means any Capital Stock of the Issuer that is not Disqualified Stock.

"Qualified Person" means any Person that is reasonably acceptable to the Administrative Agent or the Collateral Agent, as applicable, other than (a) to the extent required by applicable Gaming Laws, any Purchaser that is the subject of a Disqualification Event, (b) any Defaulting Purchaser, or (c) any Disqualified Purchaser.

"Qualified Securitization Financing" means any Securitization Facility that meets the following conditions: (i) the Board of Directors shall have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Issuer and its Subsidiaries, (ii) all sales of Securitization Assets by the Issuer or any Subsidiary to the Securitization Subsidiary or, in the case of a Securitization Subsidiary, to any other Person are made for fair consideration (as determined in good faith by the Issuer) and (iii) the financing terms, covenants, termination events and other provisions thereof shall be fair and reasonable terms (as determined in good faith by the Issuer) and (iv) the obligations under the Securitization Facility are non-recourse to the Issuer and its Subsidiaries but may include Standard Securitization Undertakings.

"Ratio Debt" has the meaning specified in Section 7.03(a).

"Ratio Debt Starter Amount" has the meaning specified in Section 7.03(a).

"Receivables Assets" means (a) any accounts receivable owed to the Issuer or a Subsidiary subject to a Receivables Facility and the proceeds thereof and (b) all collateral securing such accounts receivable, all contracts and contract rights, guarantees or other obligations in respect of such accounts receivable, all records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in connection with a non-recourse accounts receivable factoring arrangement.

"Receivables Facility" means an arrangement between Lucky Bucks or its Subsidiary and a commercial bank, an asset based lender or other financial institution or an Affiliate thereof pursuant to which (a) Lucky Bucks or such Subsidiary, as applicable, sells (directly or indirectly) to such commercial bank, asset based lender or other financial institution (or such Affiliate) Receivables Assets and (b) the obligations of Lucky Bucks or such Subsidiary, as applicable, thereunder are non-recourse (except for Securitization Repurchase Obligations) to Lucky Bucks and such Subsidiary and (c) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by Lucky Bucks) and may include Standard Securitization Undertakings, and shall include any guaranty in respect of such arrangements.

"Recipient" means (a) any Agent and (b) any Purchaser, as applicable.

"refinance" means refinance, refund, replace, renew, repay, modify, restate, defer, substitute, supplement, reissue, resell, extend or increase (including pursuant to any defeasance or discharge mechanism) and the terms "refinances," "refinanced" and "refinancing" as used for any purpose in this Agreement shall have a correlative meaning.

CONFIDENTIAL                                                                                  Trive_00042976

"Refinancing Indebtedness" means Indebtedness that is Incurred to refund, refinance, replace, exchange, renew, repay or extend (including pursuant to any defeasance or discharge mechanism) any Indebtedness (or unutilized commitment in respect of Indebtedness) existing on the Closing Date or Incurred (or established) in compliance with this Agreement (including Indebtedness of Lucky Bucks that refinances Indebtedness of any Subsidiary of Lucky Bucks, and Indebtedness of any Subsidiary that refinances Indebtedness of Lucky Bucks or another Subsidiary of Lucky Bucks) including Indebtedness that refinances Refinancing Indebtedness, and Indebtedness incurred pursuant to a commitment that refinances any Indebtedness or unutilized commitment; *provided, however*, that:

(1)    (a) such Refinancing Indebtedness does not mature prior to, and has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the remaining Weighted Average Life to Maturity of, the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced, replaced, exchanged, renewed, repaid or extended (or requires no or nominal payments in cash (other than interest payments) prior to the date that is 91 days after the maturity date of the Notes); and (b) to the extent such Refinancing Indebtedness refinances Subordinated Indebtedness, such Refinancing Indebtedness is Subordinated Indebtedness, and is subordinated to the Secured Obligations on terms at least as favorable to the Purchasers as those contained in the documentation governing the Indebtedness being refinanced;

(2)    Refinancing Indebtedness shall not include Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or HoldCo;

(3)    such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum of (x) the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) of the Indebtedness being refinanced plus (y) an amount equal to any unutilized commitment relating to the Indebtedness being refinanced or otherwise then outstanding under a facility or other financing arrangement being refinanced to the extent the unutilized commitment being refinanced could be drawn in compliance with Section 7.03 hereof immediately prior to such refinancing, plus (z) accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing; and

(4)    if the Indebtedness being refunded, refinanced, replace, exchanged, renewed, repaid or extended is secured by a Lien on the "Collateral" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) such Refinancing Indebtedness may be unsecured or secured by a Lien on the same collateral as such Indebtedness (pursuant to substantially similar collateral documentation), (a) in the case of any such Indebtedness being so refinanced that is secured by a Lien on such "Collateral" that ranks *pari passu* with the Lien securing the Secured Obligations, that is *pari passu* with or junior to the Lien securing the Secured Obligations and (b) in the case of any such Indebtedness being so refinanced that is secured by a Lien ranking junior to the lien securing such "Collateral", that is junior to the Lien securing the Secured Obligations, in each case provided that the holders of the obligations secured by such Liens, or their duly appointed agent, shall become party to a Customary Intercreditor Agreement.

"Register" has the meaning specified in Section 10.07(d).

"Regulation D" has the meaning specified in the preliminary statements to this Agreement.

"Regulation S-X" means Regulation S-X under the Securities Act.

CONFIDENTIAL                                                              Trive_00042977

"Rejection Notice" has the meaning specified in Section 2.05(b)(ii).

"Release" means any release, spill, emission, discharge, disposal, leaking, pumping, pouring, dumping, emptying, injection, or leaching into the Environment.

"Reportable Event" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"Required Purchasers" means, as of any date of determination, Purchasers holding more than 50.0% of the sum of the Total Outstandings; *provided*, that the portion of the Total Outstandings held or deemed held by any Defaulting Purchaser or Disqualified Purchaser shall be excluded for all purposes of making a determination of Required Purchasers; *provided, further*, that as long as BCP and/or any of its Affiliates or funds or accounts managed or controlled by BCP or its Affiliates (any such Purchasers, collectively, "BCP Purchasers") and/or certain other Purchasers designated in writing to the Administrative Agent and the Issuer by BCP on or before the date of this Agreement (collectively, "Designated Purchasers") shall hold Notes with an original aggregate principal amount equal to at least 75% of the original aggregate principal amount of Notes purchased by all BCP Purchasers and/or Designated Purchasers from the Issuer pursuant hereto, then "Required Purchasers" shall include (and shall require the consent of) BCP Special Opportunities Fund II Originations LP; *provided, further*, that "Required Purchasers" shall at all times also include at least two Purchasers that are not Affiliates of each other (solely for this purpose, the Designated Purchasers shall be considered to be Affiliates of BCP). On the Closing Date, the BCP Purchasers (or their counsel) shall provide the list of BCP Purchasers and Designated Purchasers to the Administrative Agent and the Issuer. Upon request by any Agent at any time, each Purchaser shall confirm whether it is a BCP Purchaser or Designated Purchaser in writing to such Agent, upon which each Agent may conclusively rely without further inquiry.

"Reserved Indebtedness Amount" has the meaning specified in Section 7.03(c)(ix).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer or other similar officer or manager of the Issuer and, as to any document delivered on or prior to the Closing Date, any manager, secretary or assistant secretary of the Issuer. Any document delivered hereunder that is signed by a Responsible Officer of the Issuer shall be conclusively presumed to have been authorized by all necessary corporate, partnership, limited liability company and/or other action on the part of the Issuer and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Issuer.

"Restricted Investment" means any Investment other than a Permitted Investment.

"Restricted Payment" has the meaning specified in Section 7.06(a)(v).

"Retained Declined Proceeds" has the meaning specified in Section 2.05(b)(ii).

"S&P" means Standard & Poor's Investors Ratings Services or any of its successors or assigns that is a Nationally Recognized Statistical Rating Organization.

-59-                    *LB Holdings NBA*

CONFIDENTIAL                                                          Trive_00042978

"Sale and Leaseback Transaction" means any arrangement providing for the leasing by the Issuer or any of its Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Subsidiary to a third Person in contemplation of such leasing.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any comprehensive economic Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union or its member states, or Her Majesty's Treasury of the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned 50.0% or more, or where relevant under Sanctions, Controlled, by any such Person or Persons described in clauses (a) or (b), directly or indirectly.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union or its member states, or Her Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, the Issuer or any Subsidiary arising under any Note Document or otherwise with respect to any Note, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, expenses, indemnities and other amounts that accrue after the commencement by or against the Issuer or any Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, expenses, indemnities and other amounts are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Secured Obligations of the Issuer under the Note Documents (and of any of its Subsidiaries to the extent they have obligations under the Note Documents) include (a) the obligation to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts, in each case, payable by the Issuer or any Subsidiary under any Note Document and (b) the obligation of the Issuer or any Subsidiary to reimburse any amount in respect of any of the foregoing that the Administrative Agent, the Collateral Agent, or any Purchaser, in its sole discretion, may elect to pay or advance on behalf of the Issuer or such Subsidiary.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent, the Purchasers, any Supplemental Agent and each co-agent or sub-agent appointed by any Agent from time to time pursuant to Section 9.01(c).

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Securitization Asset" means (a) any accounts receivable, mortgage receivables, loan receivables, royalty, franchise fee, license fee, patent or other revenue streams and other rights to payment or related assets and the proceeds thereof and (b) all collateral securing such receivable or asset, all contracts and contract rights, guarantees or other obligations in respect of such receivable or asset, lockbox accounts and records with respect to such account or asset and any other assets customarily transferred (or in respect

CONFIDENTIAL                                                                                   Trive_00042979

of which security interests are customarily granted) together with accounts or assets in connection with a securitization, factoring or receivable sale transaction.

"Securitization Facility" means any of one or more securitization, financing, factoring or sales transactions, as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, pursuant to which the Issuer or any of the Subsidiaries sells, transfers, pledges or otherwise conveys any Securitization Assets (whether now existing or arising in the future) to a Securitization Subsidiary or any other Person.

"Securitization Fees" means distributions or payments made directly or by means of discounts with respect to any Securitization Asset or Receivables Asset or participation interest therein issued or sold in connection with, and other fees, expenses and charges (including commissions, yield, interest expense and fees and expenses of legal counsel) paid in connection with, any Qualified Securitization Financing or Receivables Facility.

"Securitization Repurchase Obligation" means any obligation of a seller of Securitization Assets or Receivables Assets in a Qualified Securitization Financing or a Receivables Facility to repurchase or otherwise make payments with respect to Securitization Assets or Receivables Assets arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Securitization Subsidiary" means any Subsidiary of the Issuer in each case formed for the purpose of and that solely engages in one or more Qualified Securitization Financings or Receivables Facilities and other activities reasonably related thereto or another Person formed for this purpose.

"Settlement" means the transfer of cash or other property with respect to any credit or debit card charge, check or other instrument, electronic funds transfer, or other type of paper-based or electronic payment, transfer, or charge transaction for which a Person acts as a processor, remitter, funds recipient or funds transmitter in the ordinary course of its business.

"Settlement Asset" means any cash, receivable or other property, including a Settlement Receivable, due or conveyed to a Person in consideration for a Settlement made or arranged, or to be made or arranged, by such Person or an Affiliate of such Person.

"Settlement Indebtedness" means any payment or reimbursement obligation in respect of a Settlement Payment.

"Settlement Lien" means any Lien relating to any Settlement or Settlement Indebtedness (and may include, for the avoidance of doubt, the grant of a Lien in or other assignment of a Settlement Asset in consideration of a Settlement Payment, Liens securing intraday and overnight overdraft and automated clearing house exposure, and similar Liens).

"Settlement Payment" means the transfer, or contractual undertaking (including by automated clearing house transaction) to effect a transfer, of cash or other property to effect a Settlement.

"Settlement Receivable" means any general intangible, payment intangible, or instrument representing or reflecting an obligation to make payments to or for the benefit of a Person in consideration for a Settlement made or arranged, or to be made or arranged, by such Person.

CONFIDENTIAL                                                                    Trive_00042980

"Similar Business" means (a) any businesses, services or activities engaged in by Lucky Bucks or any of its Subsidiaries on the Closing Date, (b) any businesses, services and activities engaged in by Lucky Bucks or any of its Subsidiaries that are related, complementary, incidental, ancillary or similar to any of the foregoing or are extensions or developments of any thereof and (c) a Person conducting a business, service or activity specified in clauses (a) and (b), and any Subsidiary thereof. For the avoidance of doubt, any Person that invests in or owns Capital Stock or Indebtedness of another Person that is engaged in a Similar Business shall be deemed to be engaged in a Similar Business.

"Solvent" and "Solvency" means with respect to any Person on any date of determination, that on such date (a) the Fair Value and the Present Fair Salable Value of the assets of such Person and its Subsidiaries taken as a whole exceed their Stated Liabilities and Identified Contingent Liabilities; (b) such Person and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (c) such Person and its Subsidiaries taken as a whole can pay their Stated Liabilities and Identified Contingent Liabilities as they mature. For purposes of the foregoing, (i) "Fair Value" means the amount at which the assets (both tangible and intangible), in their entirety, of a Person and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act; (ii) "Present Fair Salable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets (both tangible and intangible) of a Person and its Subsidiaries taken as a whole are sold on a going concern basis with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated; (iii) "Stated Liabilities" means the recorded liabilities (including contingent liabilities that would be recorded in accordance with IFRS) of a Person and its Subsidiaries taken as a whole, determined in accordance with IFRS consistently applied; (iv) "Identified Contingent Liabilities" means the maximum estimated amount of liabilities reasonably likely to result from pending litigation, asserted claims and assessments, guaranties, uninsured risks and other contingent liabilities of a Person and its Subsidiaries taken as a whole (including all fees and expenses related thereto but exclusive of such contingent liabilities to the extent reflected in Stated Liabilities), as identified and explained in terms of their nature and estimated magnitude by responsible officers of such Person; (v) "can pay their Stated Liabilities and Identified Contingent Liabilities as they mature" means a Person and its Subsidiaries taken as a whole have sufficient assets and cash flow to pay their respective Stated Liabilities and Identified Contingent Liabilities as those liabilities mature or (in the case of contingent liabilities) otherwise become payable; and (vi) "do not have Unreasonably Small Capital" means a Person and its Subsidiaries taken as a whole have sufficient capital to ensure that it is a going concern.

"SPAC Transaction" means the consummation of a merger or other business combination between the Issuer and a special purpose acquisition company (a "SPAC"), or a subsidiary of a SPAC, following which, shares of the Issuer's, or an Affiliate's, Capital Stock, or, as the case may be, share capital of the SPAC or its successor entity, are listed for trading on the Nasdaq Stock Market, the New York Stock Exchange or another exchange or marketplace approved by the Board of Directors.

"Specified Default" means the occurrence of an Event of Default under Section 8.01(a) or Section 8.01(f).

"Specified Indebtedness" means Indebtedness of Lucky Bucks or any of its Subsidiaries that (a) has an Effective Yield that exceeds the Effective Yield of the Notes immediately prior to the incurrence of such Indebtedness or (b) has terms that are (including with respect to Effective Yield, but excluding the scope, extent or content of any collateral), when taken as a whole, materially more favorable to holders of such Indebtedness than the terms applicable to the Notes.

CONFIDENTIAL                                        Trive_00042981

"Sponsor" means, individually or collectively, any fund, partnership, co-investment vehicles and/or similar vehicles or accounts, in each case managed or advised by Trive Capital Management, LLC or its Affiliates or any of their respective successors, but not including any portfolio operating companies of any of the foregoing.

"Standard Securitization Undertakings" means representations, warranties, covenants, guarantees and indemnities entered into by Lucky Bucks or any Subsidiary of Lucky Bucks which Lucky Bucks has determined in good faith to be customary in a Securitization Facility or Receivables Facility, including those relating to the servicing of the assets of a Securitization Subsidiary, it being understood that any Securitization Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking or, in the case of a Receivables Facility, a non-credit related recourse accounts receivable factoring arrangement.

"Stated Liabilities" has the meaning specified in the definitions of "Solvent" and "Solvency."

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Subordinated Indebtedness" means, with respect to any person, any Indebtedness (whether outstanding on the Closing Date or thereafter Incurred), which is expressly subordinated in right of payment to the Secured Obligations pursuant to a written agreement.

"Subsidiary" means, with respect to any Person:

(1)    any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; or

(2)    any partnership, joint venture, limited liability company or similar entity of which:

(a)    more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership interests or otherwise; and

(b)    such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or

(3)    at the election of the Issuer, any partnership, joint venture, limited liability company or similar entity of which such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

Unless otherwise specified, "Subsidiary" shall mean any Subsidiary of the Issuer.

CONFIDENTIAL                                                                    Trive_00042982

"Successor Company" has the meaning specified in Section 7.04(a)(ii)(A).

"Supplemental Agent" has the meaning specified in Section 9.13(a) and "Supplemental Agents" shall have the corresponding meaning.

"Taxes" means any and all present or future taxes, levies, imposts, deductions, charges, duties, assessments, fees and withholdings and any charges of a similar nature (including backup withholding, interest, additions to tax, penalties and other liabilities with respect thereto) that are imposed by any Governmental Authority or other taxing authority.

"Test Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Issuer ending on or prior to such date for which financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b); or, if earlier, are internally available to the Issuer; *provided* that with respect to the calculation of compliance with Section 7.09, in each case, internally available financial statements shall be disregarded with respect to this definition and such calculations shall instead be based on the financial statements for the most recent period of four consecutive fiscal quarters for which financial statements have been or are required to have been delivered pursuant to Section 6.01(a) or (b), as applicable.

"Threshold Amount" means the greater of $20,000,000 and 20.0% of LTM EBITDA.

"Total Assets" means, as of any date, the total consolidated assets of the Issuer and its Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of the Issuer and its Subsidiaries, determined on a *pro forma* basis.

"Total Outstandings" means the aggregate Outstanding Amount of all Notes.

"Transaction Expenses" means any fees, costs and expenses (including (x) all legal, accounting and other professional fees, costs and expenses and (y) underwriting fees, costs and expenses (including original issue discount, upfront fees or similar fees)) incurred or paid by the Issuer or any Subsidiary in connection with the Transactions.

"Transactions" means the execution, delivery and issuance of Notes under this Agreement and the consummation of any other transaction in connection with the foregoing.

"Transfer and Acceptance" means a Transfer and Acceptance substantially in the form of Exhibit E or any other form (including electronic documentation generated by MarkitClear, ClearPar or other electronic platform) approved by the Administrative Agent.

"Transferees" has the meaning specified in Section 10.07(b).

"Undisclosed Administration" means in relation to a Purchaser or its parent company the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Purchaser or such parent company is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

CONFIDENTIAL                                                                    Trive_00042983

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" and "U.S." mean the United States of America.

"United States Tax Compliance Certificate" has the meaning specified in Section 3.01(f)(ii)(C).

"Unrestricted Cash" means an amount equal to the greater of (a) the cash and Cash Equivalents of the Issuer and its Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Issuer and its Subsidiaries and (b) zero; *provided* that the amount described in this definition shall exclude Vault Cash.

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"Vault Cash" means any cash that is (a) maintained in any coin operated amusement machine, video game terminal, redemption machine and/or any cash cartridge associated therewith, (b) in any locked cash cartridge while in transit between operating locations of the Issuer and/or any Subsidiary and/or any coin operated amusement machine or video game terminal location and/or (c) in any cash vault at any operating location of the Issuer and/or any Subsidiary.

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors.

"Weighted Average Life to Maturity" when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient (in number of years) obtained by dividing: (1) the sum of the products obtained by multiplying (a) the number of years (calculated to the nearest one-twelfth) from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock, by (b) the amount of such payment, by (2) the sum of all such payments; *provided* that, for purposes of determining the Weighted Average Life to Maturity of any Indebtedness, the effects of any prepayments or amortization made on such Indebtedness prior to the date of such determination will be disregarded.

"Wholly Owned Subsidiary" of any specified Person means a Subsidiary of such Person, all of the Capital Stock of which (other than directors' qualifying shares or shares required by any applicable law or regulation to be held by a Person other than such Person) is owned by such Person.

"Withdrawal Liability" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

CONFIDENTIAL                                                          Trive_00042984

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Note Document, unless otherwise specified herein or in such other Note Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Note Document shall refer to such Note Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Note Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)    Section headings herein and in the other Note Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Note Document.

Section 1.03    Accounting Terms. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with IFRS except as otherwise specifically prescribed herein. Notwithstanding anything to the contrary above or elsewhere in this Agreement, all obligations of any Person that are required to be treated as operating leases for purposes of IFRS shall be accounted for as operating leases (and not be treated as financing or capital lease obligations or Indebtedness) for purposes of all financial definitions, calculations and deliverables under this Agreement or any other Note Document (including the calculation of Capitalized Lease Obligation, Consolidated Cash Interest Expense, Consolidated EBITDA, Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio, LTM EBITDA and Indebtedness) (whether or not such operating lease obligations were in effect on such date).

CONFIDENTIAL    Trive_00042985

Section 1.04    Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Note Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Note Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment or Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.08    Currency Equivalents Generally.

(a)    For purposes of determining compliance with Sections 7.01, 7.03 and 7.06 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Lien, Indebtedness or Investment is incurred; provided that for the avoidance of doubt, the foregoing provisions of this Section 1.08 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

(b)    For purposes of determining compliance under Sections 7.05 and 7.06, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Issuer's annual financial statements delivered pursuant to Section 6.01(a); provided that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness.

(c)    For purposes of determining compliance with any restriction on the incurrence of Indebtedness, the Dollar Equivalent of the principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the Exchange Rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

Section 1.09    Certain Calculations and Tests.

CONFIDENTIAL                                    Trive_00042986

(a)        When calculating the availability under any basket or ratio under this Agreement or compliance with any provision of this Agreement in connection with any Limited Condition Transaction and any actions or transactions related thereto (including acquisitions, Investments, the incurrence, issuance or assumption of Indebtedness and the use of proceeds thereof, the incurrence or creation of Liens, repayments, Restricted Payments and Asset Dispositions), in each case, at the option of the Issuer (the Issuer's election to exercise such option, an "LCT Election"), the date of determination for availability under any such basket or ratio and whether any such action or transaction is permitted (or any requirement or condition therefor is complied with or satisfied (including as to the absence of any continuing Default or Event of Default)) under this Agreement shall be deemed to be the date (the "LCT Test Date") either (a) the definitive agreement for such Limited Condition Transaction is entered into (or, if applicable, the date of delivery of an irrevocable declaration of a Restricted Payment or similar event), or (b) solely in connection with an acquisition to which the United Kingdom City Code on Takeovers and Mergers applies, the date on which a "Rule 2.7 announcement" of a firm intention to make an offer (or equivalent announcement in another jurisdiction) (an "LCT Public Offer") in respect of a target of a Limited Condition Transaction and, in each case, if, after giving *pro forma* effect to the Limited Condition Transaction and any actions or transactions related thereto (including acquisitions, Investments, the incurrence, issuance or assumption of Indebtedness and the use of proceeds thereof, the incurrence or creation of Liens, repayments, Restricted Payments and Asset Dispositions) and any related *pro forma* adjustments, the Issuer or any of its Subsidiaries would have been permitted to take such actions or consummate such transactions on the relevant LCT Test Date in compliance with such ratio, test or basket (and any related requirements and conditions), such ratio, test or basket (and any related requirements and conditions) shall be deemed to have been complied with (or satisfied) for all purposes (in the case of Indebtedness, for example, whether such Indebtedness is committed, issued, assumed or incurred at the LCT Test Date or at any time thereafter); *provided* that (a) if financial statements for one or more subsequent fiscal quarters shall have become available, the Issuer may elect, in its sole discretion, to redetermine all such ratios, tests or baskets on the basis of such financial statements, in which case, such date of redetermination shall thereafter be the applicable LCT Test Date for purposes of such ratios, tests or baskets, (b) except as contemplated in the foregoing clause (a), compliance with such ratios, test or baskets (and any related requirements and conditions) shall not be determined or tested at any time after the applicable LCT Test Date for such Limited Condition Transaction and any actions or transaction related thereto (including acquisitions, Investments, the incurrence, issuance or assumption of Indebtedness and the use of proceeds thereof, the incurrence or creation of Liens, repayments, Restricted Payments and Asset Dispositions) and (c) Consolidated Interest Expense for purposes of the Interest Coverage Ratio will be calculated using an assumed interest rate as reasonably determined by the Issuer.

For the avoidance of doubt, if the Issuer has made an LCT Election, (1) if any of the ratios, tests or baskets for which compliance was determined or tested as of the LCT Test Date would at any time after the LCT Test Date have been exceeded or otherwise failed to have been complied with as a result of fluctuations in any such ratio, test or basket, including due to fluctuations in EBITDA or total assets of the Issuer or the Person subject to such Limited Condition Transaction, such baskets, tests or ratios will not be deemed to have been exceeded or failed to have been complied with as a result of such fluctuations; (2) if any related requirements and conditions (including as to the absence of any continuing Default or Event of Default) for which compliance or satisfaction was determined or tested as of the LCT Test Date would at any time after the LCT Test Date not have been complied with or satisfied (including due to the occurrence or continuation of an Default or Event of Default), such requirements and conditions will not be deemed to have been failed to be complied with or satisfied (and such Default or Event of Default shall be deemed not to have occurred or be continuing); and (3) in calculating the availability under any ratio, test or basket in connection with any action or transaction unrelated to such Limited Condition Transaction following the relevant LCT Test Date and prior to the earlier of the date on which such Limited Condition Transaction is consummated or the date that the definitive agreement or date for redemption, purchase or repayment specified in an irrevocable notice for such Limited Condition Transaction is terminated, expires or passes

CONFIDENTIAL                                                                                        Trive_00042987

(or, if applicable, the irrevocable notice is terminated, expires or passes or, as applicable, the offer in respect of an LCT Public Offer for, such acquisition is terminated), as applicable, without consummation of such Limited Condition Transaction, any such ratio, test or basket shall be determined or tested giving *pro forma* effect to such Limited Condition Transaction.

(b)     Notwithstanding anything to the contrary herein, in the event that any Indebtedness (or any portion thereof) is incurred or issued, any Lien is incurred or other transaction is undertaken in reliance on a ratio basket based exceptions, thresholds and baskets, such ratio(s) shall be calculated with respect to such incurrence, issuance or other transaction without giving effect to amounts being utilized under any other basket under the same covenant (other than a ratio basket based on the Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio) on the same date. Each item of Indebtedness that is incurred or issued, each Lien incurred and each other transaction undertaken will be deemed to have been incurred, issued or taken first, to the extent available, pursuant to the relevant Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio test.

(c)     Notwithstanding anything to the contrary herein, (i) in the event an item of Indebtedness (or any portion thereof) is incurred or issued, any Lien is incurred or other transaction is undertaken in reliance on a ratio basket based on an Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio or Consolidated Total Leverage Ratio, such ratio(s) shall be calculated without regard to the incurrence of any "Revolving Credit Loan" or "Letter of Credit" (each as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) Incurred or issued, as applicable, immediately prior to or in connection therewith; and (ii) any calculation or measure that is determined with reference to the Issuer's financial statements (including Consolidated EBITDA, Consolidated Interest Expense, Consolidated Net Income, Interest Coverage Ratio, Consolidated First Lien Secured Leverage Ratio, Consolidated Total Senior Secured Leverage Ratio and Consolidated Total Leverage Ratio) may be determined with reference to the financial statements of a Parent Entity delivered in accordance with the requirements set forth in the penultimate paragraph of Section 6.01.

(d)     For purposes of making the computations and determinations referred to in this Agreement that are based on, or incorporate, a determination of Consolidated Net Income, Consolidated EBITDA, LTM EBITDA and/or Consolidated Total Indebtedness, any Investments, acquisitions, dispositions, mergers, consolidations, operational changes, business expansions and disposed or discontinued operations that have been made by the Issuer or any of its Subsidiaries, during the reference period (or subsequent to the reference period and on or prior to or simultaneously with the date of such computation) shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations, operational changes, business expansions and disposed or discontinued operations (and the change in any associated fixed charge obligations and the change in Consolidated Net Income and/or Consolidated EBITDA (or any respective component thereof) resulting therefrom) had occurred on the first day of the reference period. If since the beginning of such period any Person that subsequently became a Subsidiary or was merged with or into the Issuer or any of its Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, operational change, business expansion or disposed or discontinued operation that would have required adjustment pursuant to this definition, then the applicable computations shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable reference period.

CONFIDENTIAL                                                                      Trive_00042988

(e)     For purposes of this Agreement, whenever *pro forma* effect is to be given to a transaction (including the LB Transactions and the Transactions), the *pro forma* calculations shall be made in good faith by a manager, responsible financial or chief accounting officer of the Issuer (and may include, for the avoidance of doubt, cost savings, operating expense reductions and synergies resulting from such transaction which is being given *pro forma* effect, subject to and without duplication of the applicable limitations and other terms of the definition of "Consolidated EBITDA"). If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect), the interest on such Indebtedness shall be calculated as if the rate in effect on the date such Indebtedness was incurred had been the applicable rate for the reference period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a manager, responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with IFRS. For purposes of making the computations referred to in the preceding paragraphs, interest on any Indebtedness under a revolving credit facility computed with a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the reference period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Issuer may designate.

(f)     Notwithstanding anything to the contrary herein, for purposes of the covenants described in Article VII, if any Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness (or a portion thereof) would be permitted pursuant to one or more provisions described in each applicable Section, the Issuer may divide and classify such Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness (or a portion thereof) in any manner that complies with the covenants set forth in such Section, and may later divide and reclassify any such Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness so long as the Indebtedness, Lien, Investment, Disposition, Restricted Payment or payment of Subordinated Indebtedness (as so redivided and/or reclassified) would be permitted to be made in reliance on the applicable exception as of the date of such redivision or reclassification.

Section 1.10    Divisions.  For all purposes under the Note Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to be a disposition of such asset, right, obligation or liability from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II

### The Commitments and Notes

Section 2.01    The Notes.

(a)     Subject to the terms and conditions set forth herein, each Purchaser party hereto on the date hereof severally agrees to purchase Notes denominated in Dollars from the Issuer on the Closing Date, in a principal amount equal to such Purchaser's Commitment on the Closing Date (such Notes, the "Initial Notes"). The Initial Notes shall be purchased in a single issuance (the "Initial Issuance") on the Closing Date.

CONFIDENTIAL                                                                    Trive_00042989

(b)        Subject to the terms and conditions set forth herein, each Purchaser that becomes a Purchaser hereunder pursuant to a Joinder executed and delivered after the Closing Date severally agrees to purchase Notes denominated in Dollars from the Issuer during the period commencing on the Closing Date and ending on the date that is ninety (90) days after the Closing Date, in a principal amount equal to such Purchaser's Commitment, as separately agreed between such Purchaser and the Issuer and set forth in the applicable Joinder (such Notes, "Delayed Issuance Notes"). The Delayed Issuance Notes shall be purchased in one or more issuances (each a "Delayed Issuance" and, together with the Initial Issuance, collectively, the "Issuances" and, each, an "Issuance") on a date that the conditions set forth in Section 4.02 with respect to such Delayed Issuance shall have been satisfied (or waived by the applicable Purchaser) (such date, a "Delayed Issuance Date" and, together with the Closing Date, each, an "Issuance Date"); *provided* that any offer in connection with a Delayed Issuance must be on terms that are the same as the terms offered to the Initial Purchasers.

(c)        Amounts repaid or prepaid on any Note issued under this Section 2.01 may not be reborrowed.

(d)        Original Issue Discount. For U.S. federal income tax purposes, the parties agree that the amounts described in Schedule 2.01 shall be treated as "original issue discount" within the meaning of Section 1273(a)(1) of the Code and shall be utilized for purposes of determining the "issue price" of the Notes under Treasury Regulations section 1.1273-2(a)(1).

Section 2.02    Issuance of Notes.

(a)        Subject to satisfaction or waiver of the conditions set forth in Section 4.01 or 4.02, as applicable, each Issuance of Notes shall occur upon the Issuer's irrevocable written notice to the Administrative Agent and the applicable Purchasers. Such notice must be received by the Administrative Agent and the applicable Purchasers substantially in the form attached hereto as Exhibit A, not later than (i) in the case of the Initial Issuance, 12:00 p.m., Local Time, on the date of such Issuance and (ii) in the case of any Delayed Issuance, 2:00 p.m., Local Time, one (1) Business Day before the date of such Delayed Issuance, and in each case must be by hand delivery, telecopy or electronic transmission to the Administrative Agent and the applicable Purchasers of a written Purchase Notice, appropriately completed and signed by a Responsible Officer of the Issuer. Each Purchase Notice shall specify (i) the requested date of the Issuance (which shall be a Business Day), (ii) the aggregate principal amount of Notes to be issued, which shall be (A) in the case of the Initial Notes, $195,000,000, and (B) in the case of each Delayed Issuance Note, up to the difference between (x) $250,000,000 *minus* (y) the aggregate initial principal amount of all Notes then-previously issued under this Agreement, (iii) the applicable Purchasers participating in such Issuance, and (iv) the location and number of the Issuer's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.02(b).

(b)        Following receipt of a Purchase Notice, the Administrative Agent shall promptly notify each Purchaser of the amount of its Applicable Percentage of the Notes. Each Purchaser shall make (or cause its Applicable Lending Office to make) the amount of its Note available to the Administrative Agent by wire transfer in immediately available funds at the Administrative Agent's Office (or, at such Purchaser's option, directly to the Issuer by wire transfer of such funds in accordance with the wire instructions for the Issuer set forth in the Purchase Notice) not later than 2:00 p.m., Local Time on the Business Day specified in the Purchase Notice. Upon satisfaction of the applicable conditions set forth in Section 4.01 or 4.02, as applicable, the Administrative Agent shall make all requested funds received from those Purchasers funding through the Administrative Agent available to the Issuer in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with the wire instructions for the Issuer set forth in the Purchase Notice.

CONFIDENTIAL                                                                                                    Trive_00042990

(c)        On each Issuance Date, the Issuer will deliver to each Purchaser purchasing Notes on such Issuance Date the Notes so purchased by such Purchaser in the form of a single Note (or such greater number of Notes of each such Series in denominations of at least $100,000 as such Purchaser may request), dated as of the date of such Issuance and registered in such Purchaser's name (or in the name of its nominee), against delivery by such Purchaser of the full amount of immediately available funds delivered pursuant to Section 2.02(b). If on the applicable Issuance Date, the Issuer shall fail to tender such Notes to any applicable Purchaser, as provided above in this Section 2.02, or any of the conditions specified in Section 4.01, or Section 4.02, as applicable, shall not have been fulfilled to the reasonable satisfaction of any applicable Purchaser, such Purchaser shall, at its election, be relieved of all further obligations under this Agreement, without thereby waiving any rights such Purchaser may have by reason of such failure by the Issuer to tender such Notes or any of the conditions specified in Section 4.01, or Section 4.02, as applicable, not having been fulfilled to such Purchaser's reasonable satisfaction.

(d)        The Closing Date shall occur within one (1) Business Day after the date of this Agreement.

Section 2.03    Restricted Notes. Each Purchaser acknowledges that (i) the Notes have not been and will not be registered under the Securities Act or any state securities laws, and may be resold only: (A) pursuant to an effective registration statement under the Securities Act; (B) to the Issuer; (C) outside the United States in accordance with Regulation S under the Securities Act and in compliance with local laws; or (D) within the United States (1) in accordance with an exemption from registration under the Securities Act and in compliance with any applicable state securities laws, or (2) in a transaction that does not require registration under the Securities Act or applicable state securities laws; and (ii) the Notes and this Agreement have not been and will not be qualified under the Trust Indenture Act of 1939, as amended.

Section 2.04    Restrictive Legend. Each Note shall bear a legend in substantially the following form:

"THIS NOTE WAS ISSUED IN A PRIVATE PLACEMENT, WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED (A) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING THE TRANSFER OR PURSUANT TO AN EXEMPTION FROM REGISTRATION AND (B) EXCEPT IN COMPLIANCE WITH SECTION 10.07 OF THAT CERTAIN NOTE PURCHASE AGREEMENT DATED AS OF NOVEMBER 29, 2021, BY AND AMONG THE ISSUER, THE PURCHASERS, THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT (EACH AS DEFINED THEREIN)."

"THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE ISSUER AT 2021 MCKINNEY AVE, STE 1200, DALLAS TX 75201, ATTN: SHRAVAN THADANI, TELEPHONE NO. 214-451-0162."

Section 2.05    Redemption.

(a)        Optional Redemption.

(i)        The Issuer may, upon written notice to the Administrative Agent by the Issuer, at any time or from time to time, voluntarily redeem Notes in whole or in part without premium or penalty (except as set forth in Section 2.05(a)(iii)); *provided* that such notice must be

CONFIDENTIAL                                                                                    Trive_00042991

received by the Administrative Agent not later than 12:00 p.m., Local Time, one (1) Business Day prior to any date of redemption. Each such notice shall specify the date (which shall be a Business Day) and provide a reasonably detailed calculation of the amount of such redemption (including the amount of any premium required by Section 2.05(a)(iii)). The Administrative Agent will promptly notify each Purchaser of its receipt of each such notice, and of the amount of such Purchaser's Applicable Percentage of such redemption. If such notice is given by the Issuer, the Issuer shall make such redemption and the redemption amount specified in such notice (including any premium required by Section 2.05(a)(iii)), together with all accrued interest thereon in accordance with Section 2.05(c), shall be due and payable on the date specified therein; *provided*, that such notice may be conditional with respect to the consummation of a transaction that is the source of funds for such redemption (and if conditional, such notice shall state such conditions). Each redemption of the Notes pursuant to this Section 2.05(a) shall be paid to the Purchasers in accordance with their respective Applicable Percentages.

        (ii)    Notwithstanding anything to the contrary contained in this Agreement, the Issuer may rescind any notice of redemption under this Section 2.05(a) if such redemption would have resulted from a refinancing of all of the Notes, which refinancing shall not be consummated or shall otherwise be delayed.

        (iii)    In the event that the Issuer makes any redemption of any Notes (A) on or after the first (1st) anniversary of the Closing Date (the "First Call Date") and prior to the Maturity Date and on any date falling during a period specified in the table below, the Issuer shall pay, to the Administrative Agent for the ratable account of each Purchaser and in addition to the then-outstanding principal amount of the Notes being redeemed, a premium in an amount equal to (x) the principal amount of such Notes being redeemed *multiplied by* (y) the percentage set forth in the column opposite such period (the "Redemption Premium Percentage") or (B) prior to the First Call Date, the Issuer shall pay, to the Administrative Agent for the ratable account of each Purchaser, a redemption price in an amount equal to the sum of (x) 105.00% of the principal amount of such Notes that would be outstanding as of the First Call Date assuming all scheduled, but not yet actually capitalized, interest payments prior to the First Call Date ("First Year Interest Payments") have been capitalized and added to the then-outstanding principal amount of such Notes in accordance with Section 2.08, discounted from the First Call Date to the Settlement Date in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal and (y) the applicable Make-Whole Amount.

| **Time Period** | **Redemption Premium Percentage** |
|---|---|
| From the first (1st) anniversary of the Closing Date through and including the date immediately prior to the second (2nd) anniversary of the Closing Date | 5.00% |
| From the second (2nd) anniversary of the Closing Date through and including the date immediately prior to the third (3rd) anniversary of the Closing Date | 2.00% |
| From the third (3rd) anniversary of the Closing Date and thereafter | 0.00% |

CONFIDENTIAL

Trive_00042992

(b)     Mandatory Redemption.

(i)     Upon the occurrence of any Mandatory Redemption Event, the Issuer shall cause (x) the Notes to be redeemed in full on or prior to the date of such Mandatory Redemption Event, together with all accrued interest thereon in accordance with Section 2.05(c), and (y) to be paid the applicable amounts set forth in Section 2.05(a)(iii).

(ii)     The Issuer shall notify the Administrative Agent in writing of any mandatory redemption of Notes required to be made pursuant to clause (i) of this Section 2.05(b) prior to 2:00 p.m., Local Time, at least three (3) Business Day prior to the date of such redemption. Each such notice shall specify the date of such redemption and provide a reasonably detailed calculation of the amount of such redemption (including the amount of any premium required by Section 2.05(a)(iii)). The Administrative Agent will promptly notify each Purchaser of the contents of the Issuer's redemption notice and of such Purchaser's Applicable Percentage of the redemption with respect to any Notes. Each Purchaser may reject all or a portion of its Applicable Percentage of any mandatory redemption (such declined amounts, the "Declined Proceeds") of Notes required to be made pursuant to clause (i) of this Section 2.05(b) by providing written notice (each, a "Rejection Notice") to the Administrative Agent and the Issuer no later than 5:00 p.m., Local Time, one (1) Business Day prior to the date of such redemption. Each Rejection Notice from a given Purchaser shall specify the principal amount of the mandatory redemption of Notes to be rejected by such Purchaser. If a Purchaser fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Notes to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory redemption of Notes. Any Declined Proceeds shall be retained by the Issuer ("Retained Declined Proceeds").

(c)     Interest. All redemptions under this Section 2.05 shall be accompanied by all accrued interest thereon in the currency in which such Note is denominated (without duplication of any interest already capitalized and added to the outstanding principal amount).

Section 2.06     Termination or Reduction of Commitments. The Commitment of each Purchaser shall be automatically and permanently reduced to $0 upon the issuance of such Purchaser's Notes pursuant to Section 2.01.

Section 2.07     Repayment of Notes. The Issuer shall repay to the Administrative Agent for the ratable account of the Purchasers holding Notes on the Maturity Date, the aggregate principal amount of all Notes outstanding on such date.

Section 2.08     Interest.

(a)     Subject to the provisions of Section 2.08(b), each Note shall bear interest on the outstanding principal amount thereof as follows:

(i)     from the applicable Issuance Date, through and including the Interest Payment Date occurring on or immediately prior to the date that is thirty (30) months following the Closing Date, at a rate *per annum* equal to 12.5%, which shall be paid by capitalizing such interest and adding such capitalized interest to the then-outstanding principal amount of the Notes on each Interest Payment Date;

(ii)     after the Interest Payment Date occurring on or immediately prior to the date that is thirty (30) months following the Closing Date, through and including the Interest

CONFIDENTIAL                                                                    Trive_00042993

Payment Date occurring on or immediately prior to the fifth (5th) anniversary of the Closing Date, at a rate *per annum* equal to 12.5%, of which (x) 6.25% of which shall be paid by capitalizing such interest and adding such capitalized interest to the then-outstanding principal amount of the Notes and (y) the remaining 6.25% of which shall be due and payable in cash, in arrears, on each Interest Payment Date (commencing on the first Interest Payment Date following the date that is thirty (30) months following the Closing Date); and

(iii)    after the Interest Payment Date occurring on or immediately prior to the fifth (5th) anniversary of the Closing Date, through and including the Maturity Date, at a rate *per annum* equal to 14.0%, which shall be due and payable in cash, in arrears, on each Interest Payment Date (commencing on the first Interest Payment Date following the fifth (5th) anniversary of the Closing Date).

(b)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand at the interest rate then-applicable to the Notes to the fullest extent permitted by and subject to applicable Laws.

(c)    Interest on each Note shall be due and payable in the currency in which such Note is denominated in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Any interest to be capitalized pursuant to Sections 2.08(a)(i) or 2.08(a)(ii) shall be capitalized on each Interest Payment Date and added to the then-outstanding principal amount of the Notes and, thereafter shall bear interest as provided hereunder as if it had originally been part of the outstanding principal of the Notes. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09    Fees.

(a)    The Issuer shall pay to the Agents such fees as shall have been separately agreed upon in writing in the Agency Fee Letter in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Issuer and the applicable Agent).

(b)    The Issuer shall pay to CION such fees as shall have been separately agreed upon in writing in the CION Fee Letter in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Issuer and CION).

Section 2.10    Computation of Interest and Fees.

(a)    All computations of interest for Notes shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. Interest shall accrue on each Note for the day on which such Note is made, and shall not accrue on such Note, or any portion thereof, for the day on which such Note or such portion is paid; *provided* that any such Note that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)    [Reserved].

CONFIDENTIAL                                              Trive_00042994

(c)       The parties acknowledge and agree that all calculations of interest under the Note Documents are to be made on the basis of the nominal interest rate described herein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest.  The parties acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest.

Section 2.11    Evidence of Indebtedness.  The Notes issued to each Purchaser shall be evidenced by one or more accounts or records maintained by such Purchaser and by one or more entries in the Register.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Issuer hereunder to pay any amount owing with respect to the Secured Obligations.  In the event of any conflict between the accounts and records maintained by any Purchaser and the Register, the Register shall be conclusive in the absence of demonstrable error.  Upon the request of any Purchaser, the Issuer shall execute and deliver to such Purchaser a Note payable to such Purchaser or its registered assigns, which shall evidence such Purchaser's Notes in addition to such accounts or records.  Each Purchaser may attach schedules to its Note and endorse thereon the date, amount and maturity of its Notes and payments with respect thereto.

Section 2.12    Payments Generally.

(a)       All payments to be made by the Issuer shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Issuer hereunder shall be made to the Administrative Agent, for the account of the respective Purchasers to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 12:00 p.m., Local Time, on the date specified herein.  The Administrative Agent will promptly distribute to each Purchaser its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Purchaser's Applicable Lending Office.  All payments received by the Administrative Agent after 12:00 p.m., Local Time, may (in the sole discretion of the Administrative Agent) be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  All payments under each Note Document of principal or interest in respect of any Note (or of any breakage indemnity in respect of any Note) shall be made in the currency of such Note, and, except as otherwise expressly set forth in any Note Document, all other payments under each Note Document shall be made in Dollars.

(b)       If any payment to be made by the Issuer shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)       Unless the Issuer has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Issuer will not make such payment, the Administrative Agent may assume that the Issuer, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then if the Issuer failed to make such payment, then the applicable Purchaser agrees to pay to the Administrative Agent forthwith on demand the portion of such assumed payment that was made available to such Purchaser in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Purchaser to the date such amount is repaid to the Administrative Agent in immediately available funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, it being understood that nothing herein shall be deemed to relieve any Purchaser from its obligation to fulfill its

CONFIDENTIAL                                                                    Trive_00042995

Commitment or to prejudice any rights which the Administrative Agent or the Issuer may have against any Purchaser as a result of any default by such Purchaser hereunder. A notice of the Administrative Agent to any Purchaser or the Issuer with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent demonstrable error.

(d)     If any Purchaser makes available to the Administrative Agent funds for any Note to be made by such Purchaser as provided in the foregoing provisions of this Article II, and such funds are not made available to the Issuer by the Administrative Agent because the conditions to the issuance of Notes set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Purchaser) to such Purchaser, without interest.

(e)     The obligations of the Purchasers hereunder to purchase the Notes are several and not joint. The failure of any Purchaser to purchase any Note on any date required hereunder shall not relieve any other Purchaser of its corresponding obligation to do so on such date, and no Purchaser shall be responsible for the failure of any other Purchaser to so purchase its Note.

(f)     Nothing herein shall be deemed to obligate any Purchaser to obtain the funds to purchase any Note in any particular place or manner or to constitute a representation by any Purchaser that it has obtained or will obtain the funds for any Note in any particular place or manner.

(g)     Whenever any payment received by any Agent under this Agreement or any of the other Note Documents is insufficient to pay in full all amounts due and payable to the Agents and the Purchasers under or in respect of this Agreement and the other Note Documents on any date, such payment shall be distributed by such Agent and applied by such Agent and the Purchasers in the order of priority set forth in Section 8.04. If the Administrative Agent receives funds for application to the Secured Obligations of the Issuer under or in respect of the Note Documents under circumstances for which the Note Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Purchasers in accordance with such Purchaser's Applicable Percentage of the Outstanding Amount of all Notes outstanding at such time and, in repayment or redemption of such of the outstanding Notes or other Secured Obligations then owing to such Purchaser.

Section 2.13    [Reserved].

Section 2.14    Mutilated, Destroyed, Lost and Stolen Notes.

(a)     If any Note is mutilated and is surrendered to the Issuer, the Issuer shall execute and deliver in exchange therefore a new Note of like tenor and maximum principal amount and bearing a new number. If there shall be delivered to the Issuer (i) evidence of the destruction, loss or theft of such Note and (ii) such security or indemnity as may be reasonably required by the Issuer to hold the Issuer and any of its agents harmless, then the Issuer shall execute and deliver, in lieu of any such destroyed, lost or stolen Note, a new Note of the same series and of like tenor and principal amount and maximum principal amount and bearing a number not contemporaneously outstanding.

(b)     Every new Note issued pursuant to this Section 2.14 in lieu of any destroyed, lost or stolen Note shall be the valid obligation of the Issuer, and entitled to the same benefits under this Agreement to which the destroyed, lost or stolen Note was entitled, and references to "Note" shall be deemed to be references to the replacement Note.

CONFIDENTIAL                                                                 Trive_00042996

(c)     The provisions of this Section 2.14 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of any Note if it is mutilated, destroyed, lost or stolen.

Section 2.15     Persons Deemed Owners.    Prior to due presentment of a Note for registration of transfer, the Issuer, the applicable Purchaser and any agent of the Issuer or the applicable Purchaser may treat the Person in whose name such Note is registered in the Register as the absolute owner of such Note for the purpose of receiving payment on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and neither the Issuer, the applicable Purchaser nor any agent of the Issuer or the applicable Purchaser shall be affected by notice to the contrary.

Section 2.16     Defaulting Purchasers.

(a)     Notwithstanding any provision of this Agreement to the contrary, if any Purchaser becomes a Defaulting Purchaser, then, until such time as such Purchaser is no longer a Defaulting Purchaser, to the extent permitted by applicable law:

(i)     Waivers and Amendments. Such Defaulting Purchaser's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of "Required Purchasers" and in Section 10.01.

(ii)     Defaulting Purchaser Waterfall. Any payment of principal, interest, fees or other amounts received by any Agent for the account of such Defaulting Purchaser (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by any Agent from a Defaulting Purchaser pursuant to Section 10.09 shall be applied at such time or times as may be determined by such Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Purchaser to the Agents hereunder; *second*, as the Issuer may request (so long as no Default or Event of Default exists), to the funding of any Note in respect of which such Defaulting Purchaser has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Issuer, to be held in a deposit account and released *pro rata* in order to satisfy such Defaulting Purchaser's potential future funding obligations with respect to Notes under this Agreement; *fourth*, to the payment of any amounts owing to the Purchasers as a result of any judgment of a court of competent jurisdiction obtained by any Purchaser against such Defaulting Purchaser as a result of such Defaulting Purchaser's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Issuer as a result of any judgment of a court of competent jurisdiction obtained by the Issuer against such Defaulting Purchaser as a result of such Defaulting Purchaser's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Purchaser or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Notes in respect of which such Defaulting Purchaser has not fully funded its appropriate share, and (y) such Notes were issued at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Notes of all Purchasers that are not Defaulting Purchasers on a *pro rata* basis prior to being applied to the payment of any Notes of such Defaulting Purchaser until such time as all Notes are held by the Purchasers *pro rata*. Any payments, prepayments or other amounts paid or payable to a Defaulting Purchaser that are applied (or held) to pay amounts owed by a Defaulting Purchaser pursuant to this Section 2.16 shall be deemed paid to and redirected by such Defaulting Purchaser, and each Purchaser irrevocably consents hereto.

CONFIDENTIAL                                                                    Trive_00042997

(b)     Defaulting Purchaser Cure.  If the Issuer and the Administrative Agent agree in writing that a Purchaser is no longer a Defaulting Purchaser, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Purchaser will, to the extent applicable, purchase at par that portion of outstanding Notes of the other Purchaser or take such other actions as the Administrative Agent may determine to be necessary to cause the Notes to be held *pro rata* by the Purchaser, whereupon such Purchaser will cease to be a Defaulting Purchaser; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Issuer while that Purchaser was a Defaulting Purchaser; and *provided, further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Purchaser to Purchaser will constitute a waiver or release of any claim of any party hereunder arising from that Purchaser's having been a Defaulting Purchaser.

## ARTICLE III

### Taxes, Protection and Illegality

Section 3.01     Taxes.

(a)     Except as required by applicable law, any and all payments by or with respect to any obligation of the Issuer to or for the account of any Agent or any Purchaser under any Note Document shall be made free and clear of and without deduction or withholding for any Taxes; *provided* that if any applicable law (as determined in the good faith discretion of the applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent then (i) if such Tax is an Indemnified Tax, the sum payable by the Issuer shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 3.01) any Recipient receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions and withholdings, and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. In addition, and without duplication of any amounts payable pursuant to this Section 3.01(a), the Issuer agrees to pay, or at the option of any Agent timely reimburse it for, all Other Taxes.

(b)     Without duplication of any amounts payable pursuant to Section 3.01(a), the Issuer agrees to indemnify each Agent and each Purchaser, within 10 Business Days after written demand therefor, for (i) the full amount of any Indemnified Taxes (including any Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Agent and such Purchaser or required to be withheld or deducted from a payment to such Recipient and (ii) any reasonable out-of-pocket expenses arising therefrom or with respect thereto, in each case, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; *provided, however*, that the Issuer shall not be required to indemnify any Agent or Purchaser pursuant to this Section 3.01(b) for any interest, penalties or expenses to the extent resulting from such Agent's or such Purchaser's failure to notify the Issuer of such possible indemnification claim within one hundred and eighty (180) days after such Agent or such Purchaser, as applicable, receives written notice from the applicable Governmental Authority of the specific Tax assessment or deficiency claim giving rise to such indemnification claim.  A copy of a receipt or any other document evidencing payment delivered to the Issuer by a Recipient, or by any Agent on its own behalf or on behalf of a Recipient, shall be conclusive absent manifest error. If any Purchaser or Agent determines, in its reasonable discretion, that it has received a refund in respect of any Indemnified Taxes as to which indemnification or additional amounts have been paid to it by the Issuer pursuant to this Section 3.01, it shall reasonably promptly pay an amount equal to such refund after it is determined that such refund pertains to Indemnified Taxes (but only to the extent of indemnity payments made, or additional amounts paid, by the Issuer under this Section 3.01 with respect

CONFIDENTIAL                                                                    Trive_00042998

to the Indemnified Taxes giving rise to such refund plus any interest included in such refund by the relevant taxing authority attributable thereto) to the Issuer, net of all reasonable out-of-pocket expenses (including Taxes) of such Purchaser or Agent, as the case may be and without interest (other than any interest paid by the relevant taxing authority with respect to such refund); *provided* that the Issuer, upon the request of the Purchaser or Agent, as the case may be, agrees promptly to return an amount equal to the amount paid over pursuant to this sentence (plus any applicable interest, additions to Tax or penalties) to such party in the event such party is required to repay such refund to the relevant taxing authority. Such Purchaser or Agent, as the case may be, shall, at the Issuer's request, provide the Issuer with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (*provided* that such Purchaser or Agent may delete any information therein that such Purchaser or Agent deems confidential). Notwithstanding anything to the contrary in this paragraph (b), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (b) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. Nothing herein contained shall oblige any Purchaser or Agent to claim any Tax refund or to make available its Tax returns or disclose any information relating to its Tax affairs or any computations in respect thereof.

(c)        As soon as practicable after any payment of Taxes by the Issuer to a Governmental Authority pursuant to this Section 3.01, the Issuer shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)        Each Purchaser agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (b) with respect to such Purchaser it will, if requested by the Issuer, use reasonable efforts (subject to legal and regulatory restrictions), at the Issuer's expense, to designate another Applicable Lending Office for any Note affected by such event; *provided* that such efforts are made on terms that, in the judgment of such Purchaser, cause such Purchaser and its Applicable Lending Office(s) to suffer no material economic, Taxes, legal or regulatory disadvantage, and *provided, further*, that nothing in this Section 3.01(d) shall affect or postpone any of the Secured Obligations of the Issuer or the rights of such Purchaser pursuant to Section 3.01(a) or (b).

(e)        Each Purchaser shall severally indemnify each Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Purchaser (but only to the extent that the Issuer has not already indemnified such Agent for such Indemnified Taxes and without limiting the obligation of the Issuer to do so), (ii) [reserved], (iii) any Excluded Taxes attributable to such Purchaser, in each case, that are payable or paid by such Agent in connection with any Note Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Purchaser by any Agent shall be conclusive absent manifest error. Each Purchaser hereby authorizes each Agent to set off and apply any and all amounts at any time owing to such Purchaser under any Note Document or otherwise payable by such Agent to the Purchaser from any other source against any amount due to such Agent under this paragraph (e).

(f)        Status of the Purchasers. (i) Each Purchaser shall, at such times as are reasonably requested by the Issuer or the Administrative Agent, provide the Issuer and the Administrative Agent with any documentation prescribed by Law, or reasonably requested by the Issuer or the Administrative Agent, certifying as to any entitlement of such Purchaser to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Purchaser under any Note Document. In addition,

CONFIDENTIAL                                                                    Trive_00042999

any Purchaser, if reasonably requested by the Issuer or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Issuer or the Administrative Agent as will enable the Issuer or the Administrative Agent to determine whether or not such Purchaser is subject to backup withholding or information reporting requirements. Each such Purchaser shall, whenever a lapse in time or change in circumstances renders such documentation (including any documentation specifically referenced below) expired, obsolete or inaccurate in any respect, deliver reasonably promptly to the Issuer and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or reasonably promptly notify the Issuer and the Administrative Agent in writing of its legal inability to do so.

(ii) Without limiting the generality of the foregoing, each Purchaser that is a "United States person" (as defined in Section 7701(a)(30) of the Code) shall deliver to the Issuer and the Administrative Agent, and if applicable, the transferring Purchaser on or before the date on which it becomes a party to this Agreement (or, in the case of a transferee, on or before the effective date of such transfer), on or before the date on which it becomes a party to this Agreement two properly completed and duly signed copies of IRS Form W-9 (or any successor form) certifying that such Purchaser is exempt from U.S. federal backup withholding. Each Purchaser that is not a "United States person" as defined in Section 7701(a)(30) of the Code (a "Foreign Purchaser") shall, to the extent it is legally able to do so, deliver to the Issuer and the Administrative Agent, and if applicable, the transferring Purchaser on or before the date on which it becomes a party to this Agreement (or, in the case of a transferee, on or before the effective date of such transfer), and from time to time thereafter when required by Law or upon the reasonable request of the Issuer or the Administrative Agent, two properly completed and duly signed copies of whichever of the following is applicable:

(A) an executed copy of IRS Form W-8BEN or W-8BEN-E, as applicable (with respect to eligibility for benefits under any income tax treaty), or successor and related applicable forms, as the case may be, certifying to such Foreign Purchaser's entitlement as of such date to an exemption from or reduction of United States withholding tax with respect to payments to be made under any Note Document,

(B) IRS Form W-8ECI (or any successor forms),

(C) in the case of a Purchaser claiming the benefits of the exemption for portfolio interest under Section 881(c) or the Code, (x) a certificate, in substantially the applicable form of Exhibit L (any such certificate a "United States Tax Compliance Certificate"), or any other form approved by the Administrative Agent and Issuer, to the effect that such Purchaser is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Issuer within the meaning of Section 881(c)(3)(B) of the Code or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) two properly completed and duly executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D) to the extent a Purchaser is not the beneficial owner (for example, where the Purchaser is a partnership), two properly completed and duly executed copies of IRS Form W-8IMY (or any successor forms) of the Purchaser, accompanied by IRS Form W-8ECI, W-8BEN or W-8BEN-E, as applicable (or any successor forms), a United States Tax Compliance Certificate, IRS Form W-9, Form W-8IMY (or other successor forms) and/or any other required information from each beneficial owner, as applicable (*provided* that, if the Purchaser is a partnership and one or more direct or indirect partners are

CONFIDENTIAL                                                                            Trive_00043000

claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Purchaser on behalf of such direct or indirect partner(s)), or

(E)     any other form prescribed by applicable U.S. federal income tax Laws (including the United States Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, U.S. federal withholding tax on any payments to such Purchaser under the Note Documents.

(F)     Further, each Foreign Purchaser agrees, (i) to the extent legally able to do so, to deliver to the Issuer and the Administrative Agent, and if applicable, the transferring Purchaser, from time to time, an executed copy of the applicable Form W-8 or successor and related applicable forms or certificates, on or before the date that any such form or certificate, as the case may be, expires or becomes obsolete or invalid in accordance with applicable U.S. laws and regulations, and (ii) to notify promptly the Issuer and the Administrative Agent if it is no longer able to deliver, or if it is required to withdraw or cancel, any form or certificate previously delivered by it pursuant to this Section 3.01(f).

(iii)     In addition, but without duplication of the covenant as to United States withholding tax contained in Section 3.01(f)(i) and (ii), any Purchaser that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction(s) in which the Issuer is organized, or any treaty to which any such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Issuer and the Administrative Agent, at the time or times prescribed by applicable law, such properly completed and executed original documentation prescribed by applicable law or reasonably requested by the Issuer or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate; *provided* that the completion, execution and submission of such documentation shall not be required if in the Purchaser's reasonable judgment such completion, execution or submission would subject such Purchaser to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Purchaser.

(iv)     If a payment made to a Purchaser under any Note Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Purchaser were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Purchaser shall deliver to the Issuer and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Issuer or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Issuer or the Administrative Agent as may be necessary for the Issuer and the Administrative Agent to comply with their FATCA obligations, to determine whether such Purchaser has or has not complied with such Purchaser's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (f), a Purchaser shall not be required to deliver any documentation that such Purchaser is not legally eligible to deliver. Each Purchaser authorizes the Administrative Agent to deliver to the Issuer and to any successor Agent any documentation provided by the Purchaser to the Agent pursuant to this Section 3.01(f).

(g)     The Administrative Agent shall provide the Issuer with two properly completed and duly executed copies of, if it is a United States person (as defined in Section 7701(a)(30) of the Code),

CONFIDENTIAL                                                Trive_00043001

IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding, and, if it is not a United States person, (1) IRS Form W-8ECI with respect to payments to be received by it as a beneficial owner and (2) IRS Form W-8IMY (together with any required accompanying documentation) with respect to payments to be received by it on behalf of the Purchasers, and shall update such forms periodically upon the reasonable request of the Issuer, and whenever a lapse in time or change in circumstances renders any such form or documentation expired, obsolete or inaccurate in any material respect, or promptly notify the Issuer in writing of its legal ineligibility to do so.  Notwithstanding any other provision of this clause (g), the Administrative Agent shall not be required to deliver any form that such Administrative Agent is not legally eligible to deliver.

(h)    For the purposes of this Section 3.01, the term "applicable law" includes FATCA.

Section 3.02    Matters Applicable to Requests for Compensation.  Any Agent or any Purchaser claiming compensation under this Article III shall deliver a certificate to the Issuer setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of demonstrable error.  In determining such amount, such Agent or such Purchaser may use any reasonable averaging and attribution methods.

Section 3.03    Survival.  All of the Issuer's obligations under this Article III and the Purchasers' obligations under Section 3.01(e) shall survive the resignation or replacement of any Agent, the termination of the Aggregate Commitments, the repayment, satisfaction or discharge of all Secured Obligations, the termination of this Agreement or any other Note Document and any transfer of rights by or substitution of a Purchaser.

## ARTICLE IV

### Conditions Precedent to Issuances

Section 4.01    Conditions to Initial Issuance.  The effectiveness of this Agreement and the obligation of each Initial Purchaser to purchase Notes hereunder on the Closing Date shall be subject to satisfaction or waiver by the Agents and the Required Purchasers of the following conditions precedent:

(a)    Note Documents.  The Administrative Agent (or its counsel) and the Initial Purchasers shall have received counterparts of each of the following, in each case properly executed by a Responsible Officer of the Issuer, and each in form and substance reasonably satisfactory to the Administrative Agent and the Required Purchasers:

(i)    this Agreement, duly executed by each of the parties listed on the signature pages hereto; and

(ii)    each Collateral Document and other Note Document set forth on Schedule 1.01A required to be executed on or prior to the Closing Date, duly executed by the Issuer and each of the other parties listed on the signature pages thereto;

(b)    Notes.  Each Initial Purchaser shall have received a Note executed by the Issuer in favor of such Initial Purchaser.

(c)    Issuer's Certificate.  The Administrative Agent and each Initial Purchaser shall have received on the date of this Agreement, (i) a certificate from the Issuer, signed by a Responsible Officer of the Issuer, and attested to by another Responsible Officer of the Issuer, together with (x) copies of the certificate of formation and the limited liability company agreement (or other equivalent

CONFIDENTIAL    Trive_00043002

organizational documents) of the Issuer, (y) the resolutions (or unanimous written consent in lieu thereof) of the Issuer authorizing the Transactions, as referred to in such certificate, and (z) a signature and incumbency certificate to the authorized representatives of such persons executing the Note Documents, in each case, in form and substance reasonably satisfactory to the Administrative Agent and BCP; and (ii) on the date of this Agreement and on the Closing Date a certificate of good standing or status from the secretary of state of the jurisdiction of incorporation, organization or formation of the Issuer, HoldCo and Lucky Bucks.

(d)     Fees and Expenses.  All fees required to be paid on or prior to the Closing Date pursuant to the Agency Fee Letter, and all expenses of the Agents and BCP (on behalf of the Initial Purchasers), to the extent invoiced at least one (1) Business Day prior to the Closing Date (except as otherwise reasonably agreed by the Issuer), shall, upon the Initial Issuance of the Notes, have been, or will be substantially therewith simultaneously, paid by the Issuer.

(e)     Purchase Notice.  Each Initial Purchaser shall have received a Purchase Notice relating to the Initial Issuance, duly executed by the Issuer (with copies provided to the Administrative Agent).

(f)     Legal Opinion.  A customary legal opinion from Shearman & Sterling LLP, counsel to the Issuer, addressed to the Agents and the Initial Purchasers on the Closing Date and in form and substance reasonably satisfactory to the Agents and BCP.

(g)     KYC; USA PATRIOT Act.  Each Agent and the Initial Purchasers shall have received, prior to the Closing Date, all documentation and other information about the Issuer as has been reasonably requested by such Agent or the Initial Purchasers in writing prior to the date of this Agreement and that such Agent or the Purchasers reasonably determine is required by United States regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(h)     Representations and Warranties.  The representations and warranties of the Issuer contained in Article V or any other Note Document shall be true and correct in all material respects, in each case, on the Closing Date; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided, further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on the Closing Date.

(i)     Collateral Requirement.  The Collateral Agent and the Required Purchasers shall have received evidence that all other actions, recordings and filings that the Administrative Agent, the Collateral Agent, or the Required Purchasers may deem reasonably necessary to satisfy the Collateral Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent, the Collateral Agent, and the Required Purchasers.   Each document (including any UCC-1 (or similar) financing statement required by any Collateral Document or under applicable Law to be filed, registered or recorded in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral required to be delivered pursuant to such Collateral Document) shall have been executed and delivered and, if applicable, be in proper form for filing, registration or recordation.

(j)     Closing Date Certificate.  The Initial Purchasers and the Administrative Agent shall have received a Closing Date Certificate.

CONFIDENTIAL                                                           Trive_00043003

(k)     No Material Adverse Effect. Since December 31, 2020, there shall have been no Material Adverse Effect.

(l)     Solvency Certificate. The Initial Purchasers shall have received a certificate from a manager or officer with equivalent duties of the Issuer substantially in the form of Exhibit N hereto (or, at the option of the Issuer, a third-party opinion as to the solvency of the Issuer and its Subsidiaries on a consolidated basis issued by a nationally recognized firm) and dated as of the Closing Date.

(m)     Financial Statements. Each Initial Purchaser shall have received the Closing Date Audited Financial Statements and the Closing Date Unaudited Financial Statements.

(n)     No Default or Event of Default. No Default or Event of Default shall exist, or would result from the issuance of the Notes or the application of the proceeds therefrom.

(o)     Funding Instructions. On or prior to the Closing Date, each Purchaser shall have received written instructions signed by a Responsible Officer on letterhead of the Issuer specifying (i) the name and address of the transferee bank, (ii) such transferee bank's ABA number and (iii) the account name and number into which the purchase price for the Notes to be issued on the Closing Date is to be deposited.

(p)     Closing Date. The Closing Date must occur within one (1) Business Day after the date of this Agreement.

For purposes of determining whether the Closing Date has occurred, each Purchaser that has executed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to such Purchaser, unless the Administrative Agent shall have received written notice from such Purchaser prior to the proposed Closing Date specifying its objection thereto.

Section 4.02     Conditions to Delayed Issuances. The obligation of each Purchaser to honor its Commitment and purchase any Notes on a Delayed Issuance Date is subject to the satisfaction (or waiver by such Purchaser and the Agents) of the following conditions precedent:

(a)     Closing Date. The Closing Date shall have previously occurred.

(b)     Joinders. The Issuer, the Administrative Agent and such Purchaser shall have duly executed and delivered a Joinder.

(c)     Notes. Such Purchaser shall have received a Note executed by the Issuer in favor of such Purchaser.

(d)     Fees and Expenses. All then duly invoiced and outstanding fees and expenses required to be paid to the Agents at such time shall have been paid by the Issuer.

(e)     Purchase Notice. Each such Purchaser shall have received a Purchase Notice relating to such Delayed Issuance, duly executed by the Issuer (with a copy provided to the Administrative Agent). Each Purchase Notice submitted by the Issuer shall be deemed to be a representation and warranty that the applicable conditions specified in Sections 4.02(g) and (h) have been satisfied on and as of the date of such Delayed Issuance.

(f)     KYC; USA PATRIOT Act. Such Purchaser shall have received, prior to such Delayed Issuance Date, all documentation and other information about the Issuer as has been reasonably

CONFIDENTIAL                                                            Trive_00043004

requested by such Purchaser in writing prior to such Delayed Issuance Date and that such Purchaser reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(g)     Representations and Warranties.  The representations and warranties of the Issuer contained in Article V or any other Note Document shall be true and correct in all material respects on and as of the date of such Delayed Issuance; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided, further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(h)     No Default or Event of Default.  No Default or Event of Default shall exist, or would result from such proposed Delayed Issuance or from the application of the proceeds therefrom.

(i)     No Material Adverse Effect.  Since December 31, 2020, there shall have been no Material Adverse Effect.

(j)     Funding Date.  Each Delayed Issuance shall occur on or prior to the 90th day following the Closing Date.

(k)     Funding Instructions.  At least two (2) Business Days prior to such Delayed Issuance Date, such Purchaser shall have received written instructions signed by a Responsible Officer on letterhead of the Issuer specifying (i) the name and address of the transferee bank, (ii) such transferee bank's ABA number and (iii) the account name and number into which the purchase price for the Notes to be issued on such Delayed Issuance Date is to be deposited.

(l)     Required Purchaser Consent.  The Required Purchasers shall have consented in writing (which may be by electronic mail, and which consent may not be unreasonably withheld, conditioned or delayed) to the selection of such Purchasers.

For purposes of determining whether a Delayed Issuance Date has occurred, each Purchaser purchasing a Delayed Issuance Note shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to such Purchaser, unless the Administrative Agent shall have received written notice from such Purchaser prior to the proposed Delayed Issuance Date specifying its objection thereto.

## ARTICLE V

### Representations and Warranties

The Issuer represents and warrants to the Agents and the Purchasers that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws.  The Issuer and each Subsidiary (a) is a Person duly incorporated, organized or formed, and validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Note Documents to which it is a party, (c) is duly qualified and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or

CONFIDENTIAL                                                                                      Trive_00043005

operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws (including the USA PATRIOT Act, Anti-Corruption Laws, Anti-Terrorism Laws, anti-money laundering laws and Sanctions), orders, writs, injunctions, decrees and orders applicable to it or its properties, except in such instances in which such Laws or orders, writs, injunctions, decrees or orders are being contested in good faith by appropriate proceedings and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (a) (other than with respect to the Issuer, Lucky Bucks and HoldCo), (b)(i), (c), (d) or (e), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention.  The execution, delivery and performance by the Issuer of each Note Document to which it is a party, and the consummation of the Transactions, (a) have been duly authorized by all necessary corporate or other organizational action and (b) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries (including, for the avoidance of doubt, the Credit Agreement) or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, (iii) result in the creation of any Lien (other than under the Note Documents) or (iv) violate any material Law; except (in the case of clauses (b)(ii) and (b)(iv)), to the extent that such conflict, breach, contravention, payment or violation could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.03    Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, the Issuer of this Agreement or any other Note Document, or for the consummation of the Transactions, (b) the grant by the Issuer of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by any Agent or any Purchaser of its rights under the Note Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Issuer in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04    Binding Effect.  This Agreement and each other Note Document has been duly executed and delivered by the Issuer.  This Agreement and each other Note Document constitutes a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

Section 5.05    Financial Statements; No Material Adverse Effect.

(a)    The Closing Date Audited Financial Statements and the Closing Date Unaudited Financial Statements fairly and accurately present in all material respects the financial condition of the Persons set forth therein, in accordance with IFRS subject, in the case of the Closing Date Unaudited Financial Statements, to normal and recurring year-end adjustments and the absence of notes (none of which are material, individually or in the aggregate).

CONFIDENTIAL                                                                  Trive_00043006

(b)    Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Each Purchaser hereby acknowledges and agrees and directs the Administrative Agent to acknowledge and agree that the Issuer and/or its Subsidiaries may be required to restate historical financial statements as the result of the implementation of changes in IFRS or the interpretation thereof, and that such restatements will not result in a Default under the Note Documents.

Section 5.06    Litigation.    Except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Issuer, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Issuer or any Subsidiary or against any of their properties or revenues that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07    Ownership of Property; Liens.    The Issuer and each of its Subsidiaries has good and valid title to, or valid leasehold interests in, or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes, Permitted Liens and any Liens and privileges arising mandatorily by Law and, in each case, except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08    Environmental Compliance.    Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    there are no pending or, to the knowledge of the Issuer, threatened claims, actions, suits, notices of violation, notices of potential responsibility or proceedings by or against the Issuer or any Subsidiary alleging potential liability or responsibility for violation of, or otherwise relating to, any Environmental Law;

(b)    (i) there is no asbestos or asbestos-containing material on any property currently owned or operated by the Issuer or any Subsidiary; and (ii) there has been no Release of Hazardous Materials by the Issuer or any Subsidiary at, on, under or from any location in a manner which would reasonably be expected to give rise to any remediation obligation or liability under Environmental Laws;

(c)    neither the Issuer nor any of its Subsidiaries is undertaking, or has completed, either individually or together with other persons, any investigation, remediation obligation or response action relating to any actual or threatened Release of Hazardous Materials at any location, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law;

(d)    all Hazardous Materials transported from any property currently or, to the knowledge of the Issuer or its Subsidiaries, formerly owned or operated by the Issuer or any Subsidiary for off-site disposal have been disposed of in compliance with all Environmental Laws;

(e)    none of the Issuer or any Subsidiary has contractually assumed any liability or obligation under or relating to any Environmental Law;

(f)    none of the Issuer or any Subsidiary is subject to any remediation obligation or Environmental Liability; and

CONFIDENTIAL                                                                                        Trive_00043007

(g)     the Issuer and each Subsidiary and their respective businesses, operations and properties are and have been in compliance with all Environmental Laws.

Section 5.09     Taxes.  The Issuer and each Subsidiary have timely filed all federal, provincial, state, municipal, foreign and other Tax returns and reports required to be filed, and have timely paid all federal, provincial, state, municipal, foreign and other Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with IFRS and, except for failures to file or pay as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.10     Compliance with ERISA.

(a)     Except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws and applicable foreign laws, respectively.

(b)     (i) No ERISA Event or similar event with respect to a Foreign Plan has occurred or is reasonably expected to occur; (ii) neither the Issuer nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 *et seq.* or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) neither the Issuer nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.10, as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.11     Subsidiaries; Capital Stock.

(a)     As of the Closing Date, the Issuer does not have any Subsidiaries other than those direct and indirect Subsidiaries specifically disclosed in Schedule 5.11, and all of the outstanding Capital Stock in the Issuer and its Subsidiaries have been validly issued, are fully paid and, in the case of Capital Stock representing corporate interests, nonassessable and, on the Closing Date, all Capital Stock owned directly or indirectly by the Issuer are owned free and clear of all Liens except (i) those created under the Collateral Documents, and (ii) those Liens permitted under Section 7.01.

(b)     As of the Closing Date, Schedule 5.11 (a) sets forth the name and jurisdiction of organization or incorporation of each Subsidiary, (b) sets forth the ownership interest of the Issuer and any of its Subsidiaries in each of their respective Subsidiaries, including the percentage of such ownership, and (c) identifies each Person the Capital Stock of which are required to be pledged on the Closing Date pursuant to the Collateral Requirement.

Section 5.12     Margin Regulations; Investment Company Act.

(a)     The Issuer is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Issuances will be used for any purpose that violates Regulation U or Regulation X of the FRB.

CONFIDENTIAL                                                                                                   Trive_00043008

(b)     None of the Issuer, any Person controlling the Issuer or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

Section 5.13     Disclosure. No report, financial statement, certificate or other written information furnished by or on behalf of the Issuer to any Agent or any Purchaser in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Note Document (as modified or supplemented by other information so furnished) when taken as a whole is incorrect in any material respect when furnished or contains, when furnished any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates thereto); *provided* that, with respect to projected financial information, the Issuer represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such information was furnished; it being understood that (i) such projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Issuer, (ii) no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and (iii) such differences may be material.

Section 5.14     Intellectual Property; Licenses, Etc. Each of the Issuer and each of its Subsidiaries owns, or has a license or possesses a valid and enforceable right to use, all of the trademarks, service marks, trade names, domain names, together with the goodwill associated with the foregoing, copyrights, patents, patent rights, technology, software, know-how, data, database rights, design rights and other intellectual property rights (collectively, "IP Rights") that are used in or necessary for the operation of their respective businesses as currently conducted, and, to the knowledge of the Issuer, without violation of the rights of any Person, except to the extent such failures or violations, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Issuer, the conduct of the respective business of the Issuer or any Subsidiary as currently conducted does not infringe, misappropriate or otherwise violate any IP Rights held by any other Person, except to the extent such infringements, misappropriations or violations which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No written claim or litigation regarding any IP Rights is pending or, to the knowledge of Issuer, threatened in writing against the Issuer or any Subsidiary, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Each of the Issuer and each of the Subsidiaries has complied with all applicable Laws relating to the privacy and security of personal information or personal data, except to the extent any non-compliance, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. There has been no security breach or incident, unauthorized access or disclosure, or other compromise of the Issuer's or the Subsidiaries' information technology assets and equipment, computers, information technology systems, networks, hardware, software, websites, applications, data and databases, including the data and information of their respective customers and employees or collected, maintained, processed or stored by or on behalf of the Issuer or the Subsidiaries, except to the extent any such incident, access, disclosure or other compromise, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.15     Solvency. On the Closing Date after giving effect to the Transactions, the Issuer and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.16     Collateral Documents. The Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties legal, valid and enforceable Liens on and security interests in, the Collateral described therein and to the extent intended to be created thereby, except

CONFIDENTIAL                                                                 Trive_00043009

as such enforceability may be limited by Debtor Relief Laws and by general principles of equity, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable Laws (which filings or recordings shall be made to the extent required by any Collateral Document) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent required by any Collateral Document), the Liens created by such Collateral Documents will constitute so far as possible under relevant Law and to the extent required by any Collateral Document fully perfected first-priority Liens on, and security interests in, all right, title and interest of the Issuer in such Collateral, in each case subject to no Liens other than Permitted Liens.

Section 5.17    Use of Proceeds. The proceeds of the Notes will be used in accordance with Section 6.11.

Section 5.18    Sanctions and Anti-Corruption Laws.

(a)    The Issuer will maintain in effect and enforce policies and procedures that are reasonably designed to promote compliance by the Issuer and its Subsidiaries, and their respective directors, officers, employees and agents with the FCPA and other applicable Anti-Corruption Laws.

(b)    Each of the Issuer and its Subsidiaries is in compliance, in all material respects, with all applicable Sanctions. No Notes, or direct or, to the knowledge of the Issuer, indirect use of proceeds of the Notes, will be used to fund any activities or business of or with any Sanctioned Person or in any Sanctioned Country, or in any other manner that would violate or result in the violation by the Issuer or any of its Subsidiaries of any Sanctions applicable to any party hereto.

(c)    None of (I) the Issuer and (II) the Subsidiaries or any director, manager, officer, employee or, to the knowledge of the Issuer, agent of the Issuer or any of its Subsidiaries, in each case, is a Sanctioned Person or operating from, organized, or resident in a Sanctioned Country.

(d)    No part of the proceeds of any Note will be used for any improper payments, directly or, to the knowledge of the Issuer, indirectly, to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, or any other party (if applicable) in order to obtain, retain or direct business or obtain any improper advantage, in violation of applicable Anti-Corruption Laws.

Section 5.19    Labor Matters. Except those that, in the aggregate, would not reasonably be expected to have a Material Adverse Effect, as of the Closing Date, (i) there are no strikes, lockouts or other labor disputes against the Issuer or any Subsidiary pending or, to the knowledge of the Issuer, threatened and (ii) the hours worked by and payments made to employees of the Issuer and the Subsidiaries have not violated the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. The execution, delivery and performance by the Issuer of the Note Documents to which it is a party and the consummation of the financing contemplated by the Note Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement by which the Issuer or any of its Subsidiaries is bound.

Section 5.20    Gaming Matters. Each of the Issuer and each of its Subsidiaries is in compliance in all material respects with all Gaming Laws, the rules and regulations promulgated thereunder and all written policies of all Gaming Authorities, in each case to the extent applicable to such Person. Lucky Bucks holds at least one valid Class B Master License, issued by the Georgia Lottery Corporation (each, a "Master License", and collectively, the "Master Licenses"), and the Issuer and its Subsidiaries hold all other

CONFIDENTIAL                                                      Trive_00043010

licenses and permits that are necessary to their respective businesses. The Master Licenses are in good standing with the Georgia Lottery Corporation.

Section 5.21    No Default. No event or condition has occurred and is continuing that is a Default or an Event of Default.

Section 5.22    Real Property. Schedule 5.22 sets forth a true, complete and correct list of all Material Real Property owned by the Issuer or any of its Subsidiaries as of the Closing Date, including a brief description thereof.

Section 5.23    Private Offering by the Issuer. Assuming the accuracy of the representations of each Purchaser set forth in this Agreement, the Notes will be issued in one or more transactions exempt from the registration requirements of the Securities Act. Neither the Issuer nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to the registration requirements of section 5 of the Securities Act or to the registration requirements of any Securities or blue sky laws of any applicable jurisdiction.

## ARTICLE VI

### Affirmative Covenants

From and after the Closing Date and for so long as any Purchaser shall have any Commitment hereunder, any Note or other Secured Obligation shall remain unpaid or unsatisfied (other than contingent indemnification obligations not yet due and payable), the Issuer shall and shall cause each Subsidiary to:

Section 6.01    Financial Statements. Deliver to the Administrative Agent for prompt further distribution to each Purchaser:

(a)    Annual Financials. Commencing with the fiscal year ending December 31, 2021, within one hundred and twenty (120) days after the end of each fiscal year of Lucky Bucks (and within one hundred and fifty (150) days of the end of the fiscal year ending December 31, 2021), a consolidated balance sheet of Lucky Bucks and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flow for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with IFRS, audited and accompanied by (i) a report and opinion of an independent registered public accounting firm of nationally recognized standing or other accounting firm reasonably acceptable to the Required Purchasers (it being understood that RSM US LLP is reasonably acceptable to the Required Purchasers), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification (for the avoidance of doubt, excluding an emphasis of the matter or explanatory paragraph) as to "going concern" (other than any "going concern" qualification with respect to or as a result of (x) an upcoming maturity date under any Indebtedness or (y) actual or prospective breach of any financial covenant in the documentation evidencing any Indebtedness) or any qualification or exception as to the scope of such audit, and (ii) a customary management discussion and analysis (in form reasonably acceptable to the Required Purchasers) of the financial performance of Lucky Bucks and its Subsidiaries; and

(b)    Quarterly Financials. Commencing with the fiscal quarter ending September 30, 2021, within sixty (60) days after the end of each of the first three (3) fiscal quarters of each fiscal year of Lucky Bucks, a consolidated balance sheet of Lucky Bucks and its Subsidiaries as at the end of such fiscal quarter, and the related (i) consolidated statements of income or operations for such fiscal quarter and for

CONFIDENTIAL                                                                                        Trive_00043011

the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of Lucky Bucks as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of Lucky Bucks and its Subsidiaries in accordance with IFRS, subject only to normal year-end adjustments and the absence of footnotes.

(c)     Comparison. Contemporaneously with the delivery of each set of consolidated financial statements referred to in Section 6.01(a) or (b) above, a reasonably detailed description of the differences between such financial statements, and the financial results and conditions of the Issuer, and that of its Subsidiaries (if any).

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of Lucky Bucks and its Subsidiaries by furnishing (A) the applicable consolidated financial statements of any direct or indirect parent of Lucky Bucks that, directly or indirectly, holds all of the Capital Stock of Lucky Bucks or (B) Lucky Bucks' (or any direct or indirect parent thereof, as applicable) Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, to the extent such information relates to a parent of Lucky Bucks, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Lucky Bucks (or such parent), on the one hand, and the information relating to Lucky Bucks and its Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion an independent registered public accounting firm of nationally recognized standing, which report and opinion, subject to the same exceptions set forth above in Section 6.01, shall be prepared in accordance with generally accepted auditing standards.

Any information required to be delivered pursuant to Section 6.01(a) or 6.01(b) shall not be required to include acquisition method accounting adjustments relating to the Transactions (if applicable) or any Permitted Investment to the extent it is not practicable to include any such adjustments in such financial statement.

Section 6.02     Certificates: Other Information. Deliver to the Administrative Agent for prompt further distribution to each Purchaser:

(a)     Compliance Certificate. No later than five (5) Business Days after the delivery of the financial statements referred to in Section 6.01(a) and (b), a copy of the duly completed "Compliance Certificate" (delivered pursuant to, and as defined in, the Credit Agreement, or as substantially similarly defined in any successor credit document) signed by a Responsible Officer of Lucky Bucks;

(b)     SEC Filings. Promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Issuer files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)     Material Notices. Promptly after the furnishing thereof, copies of any material requests or material notices received by the Issuer or any of its Subsidiaries (other than in the ordinary course of business) that could reasonably be expected to result in a Material Adverse Effect;

CONFIDENTIAL

Trive_00043012

(d)      Other Required Information.  Together with the delivery of the financial statements pursuant to Section 6.01(a), a list of Subsidiaries that identifies each Subsidiary as a Material Subsidiary or an Immaterial Subsidiary as of the date of delivery of such financial statements or a confirmation that there is no change in such information since the later of the Closing Date or the date of the last such list;

(e)      Annual Budget.  Prior to the consummation of an IPO, concurrently with the delivery of any financial statements under Section 6.01(a) above, an annual budget for such fiscal year in form customarily prepared Lucky Bucks;

(f)      Monthly Key Performance Indicator Reports.  Commencing with the calendar month ending on January 31, 2022, no later than the last day of each calendar month, a Key Performance Indicator Report for the immediately preceding month;

(g)      Credit Agreement Information.  Concurrently with delivery to the Administrative Agent and/or the Lenders under and as defined in the Credit Agreement, any financial statements, notices, information and other documents delivered pursuant to Sections 6.01, 6.02 and 6.03 of the Credit Agreement (or any substantially similar provisions of any successor credit document);

(h)      Additional Information.  Promptly, such additional information regarding the business, legal, financial or corporate affairs of the Issuer or any Material Subsidiary, or compliance with the terms of the Note Documents, as the Administrative Agent or any Purchaser through the Administrative Agent may from time to time reasonably request; *provided* that neither the Issuer nor any Subsidiary will be required to disclose or permit the inspection or discussion of any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Purchaser (or their respective contractors) is prohibited by law, or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product;

(i)      Mandatory Redemption Event Agreements.  Promptly after entry by the Issuer or any Affiliate into any definitive and binding agreement that would, if or when consummated, constitute or result in a Mandatory Redemption Event, notice of entry into such definitive and binding agreement; and

(j)      Amendments.  Any document amending or modifying this Agreement and/or the Notes.

Documents required to be delivered pursuant to Section 6.01(a), (b) and (c), Section 6.02(a), Section 6.02(c) or Section 6.02(f) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Issuer's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Purchaser and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that the Issuer shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Each Purchaser shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Issuer hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Purchasers notices, documents, materials and/or information provided by or on behalf of the Issuer hereunder (collectively, "Issuer Materials") by posting the Issuer Materials on IntraLinks, DebtDomain, SyndTrak or another similar electronic system selected by the Administrative Agent (the "Platform") and (b) certain of the Purchasers (each, a "Public Purchaser") may have personnel

CONFIDENTIAL                                                                                      Trive_00043013

who do not wish to receive material non-public information with respect to the Issuer or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Issuer hereby agrees that it shall use commercially reasonable efforts to identify that portion of the Issuer Materials that may be distributed to the Public Purchasers and that (w) all such Issuer Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Issuer Materials "PUBLIC," the Issuer shall be deemed to have authorized the Agents and the Purchasers to treat such Issuer Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Issuer or its Affiliates or any of their respective securities for purposes of United States Federal and state securities laws (*provided, however*, that to the extent such Issuer Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Issuer Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Issuer Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

Each Purchaser hereby agrees that notice to it (as provided in the next sentence) specifying that Issuer Materials have been posted to the Platform shall constitute effective delivery of the Issuer Materials to such Purchaser for purposes of the Note Documents. Each Purchaser agrees (i) to notify the Administrative Agent in writing (which may be in the form of electronic communication) from time to time of such Purchaser's email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address. Each of the Purchasers and the Issuer hereby agrees that each Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Issuer Materials on the Platform in accordance with such Agent's generally applicable document retention procedures and policies. Nothing herein shall prejudice the right of any Agent to give any notice or other communication pursuant to any Note Document in any other manner specified in such Note Document.

Section 6.03    Notices.    Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent for prompt further distribution to each Purchaser:

(a)    of the occurrence of any Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Issuer proposes to take with respect thereto;

(b)    any litigation or governmental proceeding (including, without limitation, pursuant to any Environmental Laws) pending against the Issuer or any of the Subsidiaries that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect;

(c)    of the occurrence of any ERISA Event or similar event with respect to a Foreign Plan that could reasonably be expected to have a Material Adverse Effect; and

(d)    of receipt by the Issuer or any of its Subsidiaries of any material adverse communications from any Governmental Authority with respect to the Issuer or any of its Subsidiaries (including but not limited to (w) any written communication to such Person from any Gaming Authority advising it of any material violation or material non-compliance with any Gaming Law, (y) any written notice of the Georgia Lottery Corporation's intention to revoke or not renew any Master License and (z) any other written communication received from the Georgia Lottery Corporation or other Governmental Authority that could reasonably be expected to have a Material Adverse Effect).

Section 6.04    Maintenance of Existence.    (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization or incorporation and (b) take all

CONFIDENTIAL                                    Trive_00043014

reasonable action to maintain all rights, privileges (including its good standing), permits, corporate franchises and licenses necessary or desirable in the normal conduct of its business, except in the case of clauses (a) (other than with respect to the Issuer, HoldCo or Lucky Bucks) and (b), (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or Section 7.05.

Section 6.05    Maintenance of Properties.   Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, (b) maintain, protect, preserve and renew all of its IP Rights and (c) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto with respect to tangible properties in accordance with prudent industry practice.

Section 6.06    Maintenance of Insurance.   Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Issuer and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons.

Section 6.07    Compliance with Laws.

        (a)    Comply in all respects with the requirements of all Laws (including all Gaming Laws) and all orders, writs, injunctions, decrees and judgments applicable to the Issuer, the Subsidiaries or to their business or property (including without limitation Environmental Laws, ERISA, Anti-Corruption Laws and Sanctions), except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

        (b)    Without limiting the foregoing, maintain and keep in full force and effect all licenses or permits necessary or material to the operation of the businesses of the Issuer and its Subsidiaries (including, for the avoidance of doubt, any Master License or other material gaming licenses), and upon request of the Administrative Agent or the Required Purchasers, furnish to the Administrative Agent evidence of renewal of any and all material licenses and permits on the date of or prior to the expiration thereof.

Section 6.08    Books and Records.   Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with IFRS consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Issuer or such Subsidiary, as the case may be.

Section 6.09    Inspection Rights.   Permit representatives and independent contractors of the Administrative Agent and each Purchaser to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, managers, officers, and independent public accountants, all at the reasonable expense of the Issuer and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Issuer; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Purchasers may exercise rights of the Administrative Agent and the Purchasers under this Section 6.09 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Issuer's expense; *provided, further*, that when an Event of Default exists, the Administrative Agent or

CONFIDENTIAL                                                                   Trive_00043015

any Purchaser (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Issuer at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Purchasers shall give the Issuer the opportunity to participate in any discussions with the Issuer's independent public accountants. Notwithstanding anything to the contrary in this Section 6.09, none of the Issuer or any Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Purchaser (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product. In no event shall any Agent be required to bear any cost or expense hereunder.

Section 6.10    Covenant to Give Security. At the Issuer's expense, take all action necessary or reasonably requested by the Collateral Agent or the Required Purchasers to ensure that the Collateral Requirement continues to be satisfied.

Section 6.11    Use of Proceeds. Use the proceeds of the Notes on the Closing Date to fund a Restricted Payment to the holders of the Issuer's Capital Stock, and to pay costs, fees and expenses incurred in connection with the Transactions.

Section 6.12    Further Assurances.

(a)    Promptly upon reasonable request by the Administrative Agent, the Collateral Agent, or the Required Purchasers, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) subject to the limitations set forth in the Collateral Requirement, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, certificates, assurances and other instruments as the Administrative Agent, the Collateral Agent, or the Required Purchasers may reasonably request from time to time in order to carry out more effectively the purposes of this Agreement and the Collateral Documents.

(b)    [Reserved].

Section 6.13    Payment of Taxes. Pay and discharge or cause to paid and discharged all Taxes imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, and all lawful claims which, if unpaid, may reasonably be expected to become a lien or charge upon any properties of the Issuer or any of the Subsidiaries not otherwise permitted under this Agreement; *provided* that neither the Issuer nor any of the Subsidiaries shall be required to pay or cause to be paid any such Tax or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with IFRS, or which would not reasonably be expected, individually or in the aggregate, to constitute a Material Adverse Effect.

Section 6.14    Lender Calls. If requested by a Purchaser, the Issuer shall hold a conference call (at a time mutually agreed upon by the Issuer and such Purchaser) with all Purchasers who choose to attend such conference call to discuss the results of the previous fiscal quarter; *provided* that the Issuer shall not be required to hold more than one such conference call (for all Purchasers in the aggregate) per fiscal quarter; *provided, further,* that, notwithstanding the foregoing, the requirement set forth in this Section 6.14 will be satisfied if the Issuer permits the Purchasers to attend any conference call held for the benefit of the lenders under the Credit Agreement, or any other syndicated Indebtedness of Lucky Bucks or its Subsidiaries, with respect to such fiscal quarter.

CONFIDENTIAL                                                                                Trive_00043016

Section 6.15    Anti-Terrorism; Sanctions; Anti-Corruption. Comply in all material respects with all applicable Sanctions, Anti-Corruption Laws and Anti-Terrorism Laws, and not (i) repay the Notes, or make any other payment to any Purchaser, using funds or properties of the Issuer or any Subsidiaries that are, to the knowledge of the Issuer, the property of any Person that is the subject or target of applicable Sanctions or that are, to the knowledge of the Issuer, beneficially owned, directly or indirectly, by any Person that is the subject or target of applicable Sanctions, in each case, that would cause a violation of Anti-Terrorism Laws or applicable Sanctions or any other applicable Law by any Purchaser, or (ii) to the knowledge of the Issuer, permit any Person that is the subject or target of Sanctions to have any direct or indirect interest in the Issuer or any of the Subsidiaries, with the result that the investment in the Issuer or any of the Subsidiaries (whether directly or knowingly indirectly) or the Notes made by the Purchasers would be in violation of any applicable Sanctions.

Section 6.16    Changes in Fiscal Year. Maintain its fiscal year, except with the consent of the Required Purchasers and subject to such amendments to this Agreement as the Issuer and Required Purchasers shall reasonably agree are necessary or appropriate in connection with such change (and the parties hereto hereby authorize the Issuer and the Required Purchasers to make any such amendments to this Agreement as they jointly deem necessary to give effect to the foregoing).

Section 6.17    Preemptive Rights. The Issuer shall cause Lucky Bucks and/or any Subsidiary to first offer the Purchasers the opportunity to provide any Specified Indebtedness in full in a manner and on terms that are the same as those offered to any third party lenders or noteholders, as the case may be, and the Purchasers shall have not more than five (5) Business Days (or such longer period as mutually agreed by the Issuer and the Required Purchasers, each in their respective sole discretion) after the date of receipt of such offer to either enter into a binding agreement to provide or decline (and shall be deemed to have declined to provide such Specified Indebtedness to the extent that no Purchaser, or group of Purchasers, delivers such binding agreement within such period of five (5) Business Days (or such longer period as mutually agreed by the Issuer and the Required Purchasers, each in their respective sole discretion)). If the Purchasers decline (or are deemed to have declined) to participate in such Specified Indebtedness, Lucky Bucks or such Subsidiary may then offer such opportunity to provide such Specified Indebtedness to any other Person on terms no better, taken as a whole, to such Person than the terms offered to the Purchasers. Notwithstanding anything to the contrary in the foregoing, this Section 6.17 shall not apply to any Specified Indebtedness to the extent that, substantially concurrently with the incurrence of such Specified Indebtedness, all Secured Obligations shall be repaid and satisfied in full (other than contingent indemnification obligations not yet due and payable).

Section 6.18    Intended Tax Treatment. Each of the Issuer and the Purchasers intends (a) that the Notes are treated as indebtedness for U.S. federal and other applicable income tax purposes and (b) that the Notes are not governed by the rules set forth in U.S. Treasury Regulations Section 1.1275-4. Each of the Issuer and the Purchasers agrees not to take any action or file any tax return, report or declaration inconsistent with the intended tax treatment described in this Section 6.18 unless a change in applicable law or official interpretation thereof that is binding on the Issuer (including, for the avoidance of doubt and without limitation, pronouncements by the applicable taxing authorities that are binding on taxpayers, a proposed adjustment by a taxing authority to the Issuer if the Issuer reasonably believes in good faith that the taxing authority is more likely than not to succeed on such proposed adjustment and rulings by courts of applicable jurisdiction) occurs after the date hereof that require the Notes to be treated in some other manner. This Section 6.18 is not an admission by any Purchaser that it is subject to U.S. taxation.

CONFIDENTIAL

Trive_00043017

## ARTICLE VII

### Negative Covenants

From and after the Closing Date and for so long as any Note or other Secured Obligation shall remain unpaid or unsatisfied (other than contingent indemnification obligations not yet due and payable):

Section 7.01    Liens.

(a)    The Issuer shall not, and shall not permit any Subsidiary to, directly or indirectly, create, Incur or permit to exist any Lien on any asset or property of the Issuer or any Subsidiary, unless such Lien is a Permitted Lien.

(b)    With respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the Incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness. The "Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness.

(c)    Notwithstanding any of the forgoing, the Issuer will not be permitted to incur any Liens other than (i) Liens to secure the Notes and (ii) Liens permitted under clauses (d), (f) (other than with respect to Hedging Obligations), (h) and (bb) of the definition of "Permitted Liens".

(d)    Notwithstanding any of the forgoing, HoldCo will not be permitted to incur any Liens other than (i) Liens on Equity Interests of Lucky Bucks to secure Indebtedness of Lucky Bucks permitted by this Agreement and (ii) Liens permitted under clauses (d), (f) (other than with respect to Hedging Obligations), (h) and (bb) of the definition of "Permitted Liens".

Section 7.02    [Reserved].

Section 7.03    Indebtedness.

(a)    The Issuer shall not, and shall not permit any of the Subsidiaries to, Incur any Indebtedness (including Acquired Indebtedness); *provided, however,* that Lucky Bucks and any of its Subsidiaries may Incur additional senior, senior subordinated, unsecured or subordinated Indebtedness (including Acquired Indebtedness) (the Indebtedness incurred pursuant to this Section 7.03(a), "Ratio Debt") for any purpose, in an aggregate principal amount equal to the sum of (1) any unused portion of the Incremental Starter Amount (the "Ratio Debt Starter Amount") and (2) additional unlimited amounts, if on the date of such Incurrence and after giving *pro forma* effect thereto (including *pro forma* application of the proceeds thereof) and after giving effect to any Permitted Acquisition or other Permitted Investment consummated in connection therewith, any Indebtedness repaid with the proceeds thereof and any other acquisition, disposition, debt incurrence, debt retirement and other appropriate *pro forma* adjustments and all other appropriate *pro forma* adjustments (but excluding the cash proceeds of any such Indebtedness and without giving effect to any amount incurred simultaneously under (x) the "Incremental Starter Amount" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document), (y) any other fixed dollar incurrence basket hereunder or (z) the "Revolving Credit Facility" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document)), (A) if such

CONFIDENTIAL                                                                    Trive_00043018

Indebtedness is secured by a Lien on the Collateral that is *pari passu* with the Liens securing the "Initial Term Loans" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document, in each case without giving effect to any increase in the amount permitted to be incurred thereunder), the Consolidated First Lien Secured Leverage Ratio for the most recently ended Test Period does not exceed the greater of (x) 4.75:1.00 or, (y) to the extent such Indebtedness is incurred in connection with any Permitted Acquisition or other Permitted Investment, the Consolidated First Lien Secured Leverage Ratio immediately prior to such Permitted Acquisition or other Permitted Investment, (B) if such Indebtedness is secured by a Lien on the Collateral that is junior to the Liens securing the "Initial Term Loans" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document, in each case without giving effect to any increase in the amount permitted to be incurred thereunder), the Consolidated Total Senior Secured Leverage Ratio for the most recently ended Test Period does not exceed the greater of (x) 5.00:1.00 and, to the extent such Indebtedness is incurred in connection with any Permitted Acquisition or other Permitted Investment, the Consolidated Total Senior Secured Leverage Ratio immediately prior to such Permitted Acquisition or other Permitted Investment, or (C) if such Indebtedness is secured by assets not constituting "Collateral" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) or is unsecured, the Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed the greater of 5.00:1.00 and, to the extent such Indebtedness is incurred in connection with any Permitted Acquisition or other Permitted Investment, the Consolidated Total Leverage Ratio immediately prior to such Permitted Acquisition or other Permitted Investment and the incurrence of such Indebtedness on a *pro forma* basis; *provided, further,* that to the extent so utilized, such incurrence pursuant to clause (1) under this Section 7.03(a) shall reduce, dollar for dollar, the availability under the Incremental Starter Amount for all other purposes; *provided, further,* that (w) Lucky Bucks may elect to incur Ratio Debt pursuant to clause (2) under this Section 7.03(a) prior to utilization of the Ratio Debt Starter Amount and regardless of whether there is capacity under the Ratio Debt Starter Amount in its sole discretion, and if both the Ratio Debt Starter Amount and clause (2) under this Section 7.03(a) are available and Lucky Bucks does not make an election, Lucky Bucks will be deemed to have elected clause (2) under this Section 7.03(a), (x) any amounts incurred under the Ratio Debt Starter Amount, concurrently with, or in a single transaction or series of related transactions with, amounts incurred under clause (2) under this Section 7.03(a) will not count as Indebtedness for the purposes of calculating the applicable ratio in clause (2) under this Section 7.03(a), (y) any portion of any Ratio Debt incurred in reliance on the Ratio Debt Starter Amount shall be automatically reclassified as incurred under clause (2) under this Section 7.03(a) at such time as Lucky Bucks meets the applicable Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated Total Leverage Ratio, as applicable, and (z) Ratio Debt may be incurred without giving effect to any amount incurred substantially simultaneously or contemporaneously therewith under the "Revolving Credit Facility" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document); *provided, further,* that (A) the terms and conditions of such Indebtedness (excluding pricing, interest rate margins, rate floors, discounts, premiums, fees, and optional prepayment or redemption terms and provisions which shall be determined by Lucky Bucks) either, at the option of Lucky Bucks, (x) reflect market terms and conditions (taken as a whole) at the time of incurrence, issuance or effectiveness, as the case may be, of such Indebtedness (as determined by Lucky Bucks in good faith) or (y) are not materially more restrictive on Lucky Bucks and its Subsidiaries (taken as a whole) than the terms and conditions of this Agreement (taken as a whole) (except, in the case of each of clauses (x) and (y) under this Section 7.03(a) for covenants, terms and conditions or other provisions applicable only to periods after the Maturity Date) (it being understood that to the extent that any covenant is added for the benefit of any such Indebtedness, the terms and conditions of such Indebtedness will be deemed not to be more restrictive than the terms and conditions of this Agreement if such covenant is also added for the benefit of all applicable initial Facilities extended on the Closing Date), and (B) if such Indebtedness is secured by the Collateral, such Indebtedness shall be subject to a Customary Intercreditor Agreement (which, to the extent such Indebtedness is funded into escrow, may be effective (or entered into) only immediately after the proceeds thereof are released from such escrow).

CONFIDENTIAL                                                                                     Trive_00043019

(b)     Section 7.03(a) shall not prohibit the Incurrence of the following Indebtedness:

(i)     Indebtedness (A) of Issuer under the Note Documents, (B) in an aggregate principal amount not to exceed $610,000,000, in each case to the extent permitted under the "Loan Documents" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document, in each case without giving effect to any increase in the amount permitted to be incurred thereunder), plus (C) in an aggregate principal amount not to exceed the amount then-available under the "Incremental Starter Amount" (as defined in the Credit Agreement, as in effect on the date hereof), in each case to the extent permitted under the "Loan Documents" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document, in each case without giving effect to any increase in the amount permitted to be incurred thereunder), and in each case under this Section 7.03(b)(i), any Refinancing Indebtedness thereof (or successive Refinancing Indebtedness thereof);

(ii)     Guarantees by HoldCo or any Subsidiary of HoldCo of Indebtedness or other obligations of HoldCo or any Subsidiary so long as the Incurrence of such Indebtedness or other obligations is not prohibited by the terms of this Agreement;

(iii)     Indebtedness of Lucky Bucks to any Subsidiary of Lucky Bucks or Indebtedness of a Subsidiary of Lucky Bucks to Lucky Bucks or any other Subsidiary of Lucky Bucks; *provided*, *further*, that:

(A)     any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than the Issuer or a Subsidiary; and

(B)     any sale or other transfer of any such Indebtedness to a Person other than the Issuer or a Subsidiary,

shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Issuer or such Subsidiary, as the case may be;

(iv)     Indebtedness represented by (i) any Indebtedness outstanding on the Closing Date; *provided* that any such Indebtedness in a principal amount in excess of $2,500,000 is set forth on Schedule 7.03, (ii) Refinancing Indebtedness Incurred in respect of any Indebtedness described in clause (iv)(i) and (iii) Management Advances;

(v)     Indebtedness of (x) Lucky Bucks or any Subsidiary of Lucky Bucks incurred or issued to finance a Permitted Acquisition or other similar Investment permitted under this Agreement or (y) Persons that are acquired by Lucky Bucks or any Subsidiary of Lucky Bucks in accordance with the terms of this Agreement or merged into, amalgamated or consolidated with Lucky Bucks or any Subsidiary of Lucky Bucks in accordance with the terms of this Agreement; *provided* that (x) subject to the Limited Condition Transaction provisions hereunder, immediately before and after giving effect to such incurrence, issuance or assumption, no Default or Event of Default has occurred and is continuing, (y) if such Indebtedness is Acquired Indebtedness, such Indebtedness is only the obligation of the Person being acquired or such Person's Subsidiaries and such Indebtedness was not created in contemplation of such acquisition, and (z) with respect to such Indebtedness under clause (x), (1) Lucky Bucks is in compliance with the terms under clauses (A) and (B) of the last proviso in Section 7.03(a), and (2) after giving *pro forma* effect to such acquisition, merger, amalgamation or consolidation, Lucky Bucks would be permitted to incur such Indebtedness pursuant to clause (2) of the first proviso in Section 7.03(a), in each case of clauses

CONFIDENTIAL                                                                                                    Trive_00043020

(1) and (2) above, as if such Indebtedness consisted of Ratio Debt incurred pursuant to Section 7.03(a);

(vi)    Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes) (each as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) of Lucky Bucks or any Subsidiary of Lucky Bucks;

(vii)    the incurrence by Lucky Bucks or any Subsidiary of Lucky Bucks of (i) Indebtedness (including Indebtedness represented by Capitalized Lease Obligations or Purchase Money Obligations) Incurred to finance the purchase, lease, expansion, construction, installation, replacement, repair or improvement of property (real or personal), equipment or other assets, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this subclause (i) and then outstanding, does not exceed the greater of (x) $25,000,000 and (y) 25.0% of LTM EBITDA at the time of Incurrence and any Refinancing Indebtedness in respect thereof and (ii) arising out of Sale and Leaseback Transactions in an aggregate outstanding principal amount, which does not exceed the greater of (a) $10,000,000 and (b) 10.0% of LTM EBITDA at the time of incurrence, and any Refinancing Indebtedness in respect thereof;

(viii)    Indebtedness in respect of (i) workers' compensation claims, health, disability or other employee benefits, property, casualty or liability insurance, self-insurance obligations, customer guarantees, performance, indemnity, surety, judgment, bid, appeal, advance payment (including progress premiums), customs, value added or other tax or other guarantees or other similar bonds, instruments or obligations and completion guarantees and warranties or relating to liabilities, obligations or guarantees Incurred in the ordinary course of business or consistent with past practice; (ii) the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or consistent with past practice; (iii) customer deposits and advance payments (including progress premiums) received from customers for goods or services purchased in the ordinary course of business or consistent with past practice; (iv) letters of credit, bankers' acceptances, discounted bills of exchange, discounting or factoring of receivables or payables for credit management purposes, warehouse receipts, guarantees or other similar instruments or obligations issued or entered into, or relating to liabilities or obligations Incurred in the ordinary course of business or consistent with past practice; (v) Cash Management Obligations (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) and (vi) Settlement Indebtedness;

(ix)    Indebtedness of Lucky Bucks or any Subsidiary of Lucky Bucks arising from agreements providing for guarantees, indemnification, obligations in respect of earn-outs, deferred purchase price or other adjustments of purchase price or, in each case, similar obligations, in each case, Incurred or assumed in connection with the acquisition or disposition of any business, assets, a Person (including any Capital Stock of a Subsidiary) or Investment (other than Guarantees of Indebtedness Incurred by any Person acquiring or disposing of such business, assets, Person or Investment for the purpose of financing such acquisition or disposition);

(x)    Indebtedness Lucky Bucks or any Subsidiary of Lucky Bucks in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (x) and then outstanding, will not exceed 100.0% of the Net Cash Proceeds received by Lucky Bucks from the issuance or sale (other than to a Subsidiary) of its Capital Stock or otherwise contributed to the equity (in each case, other than

CONFIDENTIAL        Trive_00043021

through the issuance of Disqualified Stock, Designated Preferred Stock or an Excluded Contribution or Cure Amount, and without duplication with any amount of such contributed equity added to the Available Amount) of Lucky Bucks, in each case, subsequent to the Credit Agreement Closing Date, and any Refinancing Indebtedness in respect thereof; *provided, however*, that (i) any such Net Cash Proceeds that are so received or contributed shall not increase the amount available for making Restricted Payments to the extent Lucky Bucks and its Subsidiaries Incur Indebtedness in reliance thereon and (ii) any Net Cash Proceeds that are so received or contributed shall be excluded for purposes of Incurring Indebtedness pursuant to this clause (x) to the extent such Net Cash Proceeds or cash have been applied to make Restricted Payments;

(xi)    Indebtedness of (i) Subsidiaries of Lucky Bucks that are not "Guarantors" under the Credit Agreement (or under any successor credit document) in an aggregate principal amount not to exceed the greater of (x) $30,000,000 and (y) 30.0% of LTM EBITDA at the time of incurrence, and any Refinancing Indebtedness in respect thereof and (ii) joint ventures in an aggregate principal amount not to exceed the greater of (x) $25,000,000 and (y) 25.0% of LTM EBITDA at the time of incurrence, and any Refinancing Indebtedness in respect thereof;

(xii)    (i) Indebtedness issued by Issuer or any of its Subsidiaries to any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer, any of its Subsidiaries or any Parent Entity (or permitted transferees, assigns, estates, or heirs of such employee, director, contractor or consultant), in each case to finance the purchase or redemption of Capital Stock of the Issuer or any Parent Entity that is permitted by Section 7.06 hereof and (ii) Indebtedness consisting of obligations under deferred compensation or any other similar arrangements incurred in the ordinary course of business, consistent with past practice or in connection with the Transactions, any Investment or any acquisition (by merger, consolidation, amalgamation or otherwise);

(xiii)    Indebtedness of Lucky Bucks or any of its Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case Incurred in the ordinary course of business or consistent with past practice;

(xiv)    Indebtedness of Lucky Bucks or any of its Subsidiaries in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (xiv) and then outstanding, will not exceed the greater of (a) $40,000,000 and (b) 40.0% of LTM EBITDA and, any Refinancing Indebtedness in respect thereof;

(xv)    Indebtedness of Lucky Bucks or any of its Subsidiaries in respect of any Qualified Securitization Financing or any Receivables Facility;

(xvi)    any obligation, or guaranty of any obligation, of Lucky or any Subsidiary of Lucky Bucks to reimburse or indemnify a Person extending credit to customers of Lucky Bucks or a Subsidiary of Lucky Bucks incurred in the ordinary course of business or consistent with past practice for all or any portion of the amounts payable by such customers to the Person extending such credit;

(xvii)    Indebtedness to a customer of Lucky Bucks or any of its Subsidiaries to finance the acquisition of any equipment necessary to perform services for such customer; *provided* that the terms of such Indebtedness are consistent with those entered into with respect to similar

CONFIDENTIAL                                                                      Trive_00043022

Indebtedness prior to the Closing Date, including, if so consistent, that (1) the repayment of such Indebtedness is conditional upon such customer ordering a specific amount of goods or services and (2) such Indebtedness does not bear interest or provide for scheduled amortization or maturity;

(xviii) Indebtedness of Issuer or any of the Subsidiaries arising pursuant to any Permitted Intercompany Activities, Permitted IPO Reorganization and Permitted Tax Restructuring or related transaction;

(xix) [reserved];

(xx) [reserved];

(xxi) seller paper or other indebtedness of Lucky Bucks or any of its Subsidiaries incurred to finance the payment of earn-out obligations with respect to Permitted Acquisitions or other Permitted Investments in an amount not to exceed the greater of (a) $10,000,000 and (b) 10.0% of LTM EBITDA;

(xxii) trade letters of credit in an amount not to exceed the greater of (a) $5,000,000 and (b) 5.0% of LTM EBITDA at any one time outstanding; and

(xxiii) Disqualified Stock so long as (x) any such Disqualified Stock issued by HoldCo or any of its Subsidiaries is held, directly or indirectly, by the Issuer, and (y) on a *pro forma* basis either (a) the Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed the greater of 5.50:1.00 or (b) the Interest Coverage Ratio is greater than or equal to 2.00 to 1.00.

(c)     For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Section 7.03:

(i)     in the event that all or any portion of any item of Indebtedness meets the criteria of more than one of the types of Indebtedness described in Sections 7.03(a) and (b), the Issuer, in its sole discretion, will classify, and may from time to time reclassify, such item of Indebtedness (or any portion thereof) and only be required to include the amount and type of such Indebtedness in Section 7.03(a) or in one of the clauses of Section 7.03(b);

(ii)     additionally, all or any portion of any item of Indebtedness may later be reclassified as having been Incurred pursuant to any type of Indebtedness described in Sections 7.03(a) and (b) so long as such Indebtedness is permitted to be Incurred pursuant to such provision and any related Liens are permitted to be incurred at the time of reclassification (it being understood that any Indebtedness incurred pursuant to one of the clauses of Section 7.03(b) shall cease to be deemed incurred or outstanding for purposes of such clause but shall be deemed incurred for the purposes of Section 7.03(a) from and after the first date on which the Issuer or the Subsidiaries could have incurred such Indebtedness under Section 7.03(a) without reliance on such clause);

(iii)     all Indebtedness under this Agreement and the Notes shall be deemed to have been incurred under Section 7.03(b)(i)(A) and such Indebtedness shall at all times be deemed incurred under such clause and shall not be reclassified;

(iv)     in the case of any Refinancing Indebtedness, when measuring the outstanding amount of such Indebtedness, such amount shall not include the aggregate amount of accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs,

CONFIDENTIAL                                                          Trive_00043023

underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing;

(v)     Guarantees of, or obligations in respect of letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included;

(vi)     all Indebtedness incurred under the Credit Agreement and outstanding on the Closing Date shall be deemed to have been incurred under Section 7.03(b)(i)(B) and such Indebtedness shall at all times be deemed incurred under such clause and shall not be reclassified;

(vii)     the principal amount of any Disqualified Stock of Issuer or a Subsidiary, or Preferred Stock of a Subsidiary, will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof;

(viii)     Indebtedness permitted by this Section 7.03 need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this Section 7.03 permitting such Indebtedness;

(ix)     for all purposes under this Agreement, including for purposes of calculating the Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio or the Consolidated Total Leverage Ratio, as applicable, in connection with the incurrence, issuance or assumption of any Indebtedness pursuant to Sections 7.03(a) or (b) or the incurrence or creation of any Lien pursuant to the definition of "Permitted Liens," Lucky Bucks, as applicable, may elect, at its option, to treat all or any portion of the committed amount of any Indebtedness (and the issuance and creation of letters of credit and bankers' acceptances thereunder) which is to be incurred (or any commitment in respect thereof) or secured by such Lien, as the case may be (any such committed amount elected until revoked as described below, the "Reserved Indebtedness Amount"), as being incurred as of such election date, and, if such Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Leverage Ratio or other provision of this Agreement, as applicable, is complied with (or satisfied) with respect thereto on such election date, any subsequent borrowing or reborrowing thereunder (and the issuance and creation of letters of credit and bankers' acceptances thereunder) will be deemed to be permitted under this Section 7.03 or the definition of "Permitted Liens," as applicable, whether or not the Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio, the Consolidated Total Leverage Ratio or other provision of this Agreement, as applicable, at the actual time of any subsequent borrowing or reborrowing (or issuance or creation of letters of credit or bankers' acceptances thereunder) is complied with (or satisfied) for all purposes (including as to the absence of any continuing Default or Event of Default); *provided* that for purposes of subsequent calculations of the Interest Coverage Ratio, the Consolidated First Lien Secured Leverage Ratio, the Consolidated Total Senior Secured Leverage Ratio, the Consolidated Total Leverage Ratio or other provision of this Agreement, as applicable, the Reserved Indebtedness Amount shall be deemed to be outstanding, whether or not such amount is actually outstanding, for so long as such commitments are outstanding or until Lucky Bucks revokes an election of a Reserved Indebtedness Amount;

(x)     [reserved];

CONFIDENTIAL                                                                                 Trive_00043024

(xi) notwithstanding anything in this Section 7.03 to the contrary, in the case of any Indebtedness incurred to refinance Indebtedness initially incurred in reliance on a clause of Section 7.03(b) measured by reference to a percentage of LTM EBITDA at the time of incurrence, if such refinancing would cause the percentage of LTM EBITDA restriction to be exceeded if calculated based on the percentage of LTM EBITDA on the date of such refinancing, such percentage of LTM EBITDA restriction shall not be deemed to be exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced, plus accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing; and

(xii) the amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined in accordance with IFRS.

(d) Accrual of interest, accrual of dividends, the accretion of accreted value, the accretion or amortization of original issue discount, the payment of interest in the form of additional Indebtedness, the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock or the reclassification of commitments or obligations not treated as Indebtedness due to a change in IFRS, will not be deemed to be an Incurrence of Indebtedness for purposes of this Section 7.03.

(e) [Reserved].

(f) For purposes of determining compliance with any U.S. Dollar-denominated restriction on the incurrence of Indebtedness, the U.S. Dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (a) the principal amount of such Indebtedness being refinanced plus (b) the aggregate amount of accrued and unpaid interest, dividends, premiums (including tender premiums), defeasance costs, underwriting discounts, fees, costs and expenses (including original issue discount, upfront fees or similar fees) in connection with such refinancing.

(g) Notwithstanding any other provision of this Section 7.03, the maximum amount of Indebtedness that the Issuer or a Subsidiary may Incur pursuant to this Section 7.03 shall not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

(h) Notwithstanding the foregoing, the Issuer shall not Incur any Indebtedness other than (i) the Notes, (ii) Indebtedness to Wholly-Owned Subsidiaries incurred pursuant to Section 7.03(b)(iii) and (iii) Indebtedness to any equity owner of the Issuer; *provided* that, in the case of clauses (ii) and (iii), such Indebtedness shall be expressly subordinated in right of payment to the Secured Obligations.

CONFIDENTIAL    Trive_00043025

(i)        Notwithstanding the forgoing, Holdco will not be permitted to incur any Indebtedness other than guarantees of Indebtedness of Lucky Bucks and its Subsidiaries permitted by the terms of the Notes and a pledge of HoldCo's equity to secure such Indebtedness.

(j)        Notwithstanding any of the foregoing in this Section 7.03, Lucky Bucks and its Subsidiaries shall not issue Preferred Stock and/or Disqualified Stock other than to HoldCo or Wholly-Owned Subsidiaries of HoldCo.

(k)        Notwithstanding any of the foregoing in this Section 7.03, the Issuer shall not permit any of its Subsidiaries to Incur additional Indebtedness under Section 7.03(a), or under clauses (i)(C), (v), (x), (xi), (xiv), (xxi) and (xxiii) of Section 7.03(b), unless the Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed 6.00:1.00 after giving *pro forma* effect to such Incurrence and any related transactions.

(l)        Notwithstanding any of the foregoing in this Section 7.03, the Issuer shall not permit any of its Subsidiaries to incur any Indebtedness that has an Effective Yield that exceeds the Effective Yield of the Notes immediately prior to the incurrence of such Indebtedness.

Section 7.04    Merger and Consolidation:

(a)        The Issuer will not consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person, unless either:

(i)        the Issuer is the surviving Person, or

(ii)        if the Issuer is not the surviving Person,

(A)        the resulting, surviving or transferee Person (a "Successor Company") will be a Person organized or existing under the laws of the jurisdiction of the Issuer or the United States of America, any State of the United States or the District of Columbia or any territory thereof and the Successor Company will expressly assume all obligations of the Issuer hereunder;

(B)        immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the applicable Successor Company or any Subsidiary of the applicable Successor Company as a result of such transaction as having been incurred by the applicable Successor Company or such Subsidiary at the time of such transaction), no Event of Default shall have occurred and be continuing

(C)        immediately after giving *pro forma* effect to such transaction, either (a) the Issuer Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed 7.50:1.00 or (b) the Consolidated Total Leverage Ratio would not be higher than it was immediately prior to giving effect to such transaction;

(D)        each of the Agents and the Purchasers shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act, reasonably requested by such Agents and Purchasers; and

CONFIDENTIAL                                                                    Trive_00043026

(E)     each Agent and the Required Purchasers shall have received all other documentation, deliverables and other information as such Agent and the Required Purchasers may reasonably request.

(b)     Lucky Bucks will not consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person, unless either:

(i)     Lucky Bucks is the surviving Person, or

(ii)    if Lucky Bucks is not the surviving Person,

(A)     the Successor Company will be a Person organized or existing under the laws of the jurisdiction of the Issuer or the United States of America, any State of the United States or the District of Columbia or any territory thereof and the Successor Company will expressly assume all obligations of Lucky Bucks hereunder;

(B)     immediately after giving effect to such transaction (and treating any Indebtedness that becomes an obligation of the applicable Successor Company or any Subsidiary of the applicable Successor Company as a result of such transaction as having been incurred by the applicable Successor Company or such Subsidiary at the time of such transaction), no Event of Default shall have occurred and be continuing

(C)     immediately after giving *pro forma* effect to such transaction, either (a) the Consolidated Total Leverage Ratio for the most recently ended Test Period does not exceed 5.00:1.00 or (b) the Consolidated Total Leverage Ratio would not be higher than it was immediately prior to giving effect to such transaction;

(D)     each of the Agents and the Purchasers shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act reasonably requested by such Agents and Purchasers; and

(E)     each Agent and the Required Purchasers shall have received all other documentation, deliverables and other information as such Agent and the Required Purchasers may reasonably request.

(c)     For purposes of this Section 7.04, the sale, lease, conveyance, assignment, transfer or other disposition of all or substantially all of the properties and assets of one or more Subsidiaries of Lucky Bucks, which properties and assets, if held by Lucky Bucks instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of Lucky Bucks on a consolidated basis, shall be deemed to be a transfer of all or substantially all of the properties and assets of the Issuer.

(d)     Notwithstanding any other provision of this Section 7.04, Permitted Acquisitions or other similar Investments permitted under this Agreement, in each case, consummated as mergers, acquisitions, consolidations or other forms of combination are permitted.

(e)     Notwithstanding any other provision of this Section 7.04, (i) any Subsidiary (other than HoldCo or Lucky Bucks) may consolidate, amalgamate or otherwise combine with, merge into or transfer all or part of its properties and assets to Lucky Bucks or to a Subsidiary of Lucky Bucks, (ii) any Subsidiary of Lucky Bucks may consolidate, amalgamate or otherwise combine with, merge into or transfer

CONFIDENTIAL                                                      Trive_00043027

all or part of its properties and assets to any other Subsidiary of Lucky Bucks, and (iii) the Issuer and its Subsidiaries may complete any disposition permitted under this Agreement, Permitted Investment, Permitted IPO Reorganization or Permitted Tax Restructuring.

(f)     The foregoing provisions (other than the requirements of Section 7.04(c)) shall not apply to the creation of a new Subsidiary as a Subsidiary of Lucky Bucks.

(g)     No Subsidiary of Lucky Bucks may consolidate with or merge or amalgamate with or into, or convey, transfer or lease all or substantially all its assets, in one or a series of related transactions, to any Person, unless:

(i)     the other Person is Lucky Bucks or any other Subsidiary of Lucky Bucks; or

(ii)     (A) Lucky Bucks or any other Subsidiary of Lucky Bucks is the continuing Person; and (B) immediately after giving effect to the transaction, no Event of Default shall have occurred and be continuing; or

(iii)     the transaction constitutes a sale, disposition (including by way of consolidation, merger or amalgamation) or transfer of such Subsidiary of Lucky Bucks or the sale, disposition, conveyance, transfer or lease of all or substantially all of the assets of such Subsidiary (in each case other than to the Issuer or a Subsidiary) otherwise permitted by this Agreement.

(h)     Notwithstanding any other provision of this Section 7.04, any Subsidiary of Lucky Bucks may (a) consolidate, amalgamate or otherwise combine with, merge into or transfer all or part of its properties and assets to Lucky Bucks or any other Subsidiary of Lucky Bucks, (b) consolidate, amalgamate or otherwise combine with or merge into an Affiliate incorporated or organized for the purpose of changing the legal domicile of such Subsidiary, reincorporating such Subsidiary in another jurisdiction, or changing the legal form of such Subsidiary, (c) convert into a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of such Subsidiary, (d) liquidate or dissolve or change its legal form if the Issuer determines in good faith that such action is in the best interests of the Issuer and (e) complete any disposition permitted under this Agreement, Permitted Acquisition, Permitted Investment, Permitted IPO Reorganization or Permitted Tax Restructuring.  Notwithstanding anything to the contrary in this Section 7.04, the Issuer may contribute Capital Stock of any or all of its Subsidiaries to any other Subsidiary.

(i)     Any reference herein to a merger, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, limited partnership or trust, or an allocation of assets to a series of a limited liability company, limited partnership or trust (or the unwinding of such a division or allocation), as if it were a merger, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company, limited partnership or trust shall constitute a separate Person hereunder (and each division of any limited liability company, limited partnership or trust that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 7.05     Limitation on Sales of Assets and Subsidiary Stock.

(a)     The Issuer shall not, and shall not permit any of the Subsidiaries to, make any Asset Disposition other than dispositions contemplated on the Closing Date unless (*provided* that any such dispositions in a principal amount in excess of $2,500,000 is set forth on Schedule 7.05(a)):

CONFIDENTIAL                                                        Trive_00043028

(i)     The Issuer or such Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) at least equal to the fair market value (such fair market value to be determined on the date of contractually agreeing to such Asset Disposition), as determined in good faith by the Issuer, of the shares and assets subject to such Asset Disposition (including, for the avoidance of doubt, if such Asset Disposition is a Permitted Asset Swap);

(ii)    any such Asset Disposition, or series of related Asset Dispositions (except to the extent the Asset Disposition is a Permitted Asset Swap) with a purchase price in excess of the greater of $10,000,000 and 10.0% of LTM EBITDA, at least 75.0% of the consideration from such Asset Disposition, together with all other Asset Dispositions since the Credit Agreement Closing Date (on a cumulative basis), (including by way of relief from, or by any other Person assuming responsibility for, any liabilities, contingent or otherwise) received by the Issuer or such Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; and

(iii)   the Issuer complies with Section 7.05(c).

(b)     For the purposes of Section 7.05(a)(ii) hereof, the following shall be deemed to be cash:

(i)     the assumption by the transferee of Indebtedness or other liabilities contingent or otherwise of the Issuer or a Subsidiary (other than Subordinated Indebtedness of the Issuer) and the release of the Issuer or such Subsidiary from all liability on such Indebtedness or other liability in connection with such Asset Disposition;

(ii)    securities, notes or other obligations received by the Issuer or any Subsidiary from the transferee that are converted by the Issuer or such Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash and Cash Equivalents (to the extent of the cash or Cash Equivalents received), in each case, within 270 days following the closing of such Asset Disposition;

(iii)   any Capital Stock or assets of the kind referred to in Section 2.05(b)(ii)(B)(i) and (ii) of the Credit Agreement (as in effect on the date hereof);

(iv)    Indebtedness of any Subsidiary that is no longer a Subsidiary as a result of such Asset Disposition, to the extent that the Issuer and each Subsidiary are released from any guarantee of payment of such Indebtedness in connection with such Asset Disposition;

(v)     consideration consisting of Indebtedness of Lucky Bucks (other than Disqualified Stock or Subordinated Indebtedness) received after the Credit Agreement Closing Date from Persons who are not Lucky Bucks or any Subsidiary; and

(vi)    any Designated Non-Cash Consideration received by the Issuer or any Subsidiary in such Asset Dispositions having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this Section 7.05 that is at that time outstanding, not to exceed the greater of $10,000,000 and 10.0% of LTM EBITDA (with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value).

(c)     (i) If following the Closing Date (x) Lucky Bucks or any of its Subsidiaries consummates any non-ordinary course sale, transfer or other disposition of property or assets permitted by

CONFIDENTIAL                                        Trive_00043029

Section 7.05(a) and clauses (7) though (28) of the definition of "Asset Disposition," or (y) any Casualty Event occurs, which in the aggregate results in the realization or receipt by Lucky Bucks or such Subsidiary of Net Available Cash in excess of $5,000,000 in any given fiscal year in the case of each of a single Asset Disposition or Casualty Event or series of related Asset Dispositions or Casualty Events, the Issuer shall cause Lucky Bucks to make a prepayment of an aggregate principal amount of Indebtedness of Lucky Bucks or its Subsidiaries equal to 100.0% (such percentage as it may be reduced as described below, the "Asset Disposition Percentage") of such Net Available Cash (the "Applicable Proceeds") realized or received (only to the extent of the amount in excess of $5,000,000 in such fiscal year); provided that no such prepayment shall be required pursuant to this Section 7.05(c)(i) (I) with respect to such portion of such Net Available Cash that Lucky Bucks intends to reinvest in accordance with Section 7.07(c)(ii) or (II) until the aggregate amount of Net Available Cash is reinvested in accordance with Section 7.07(c)(ii) within the time periods set forth therein.

(ii)    With respect to any Applicable Proceeds realized or received with respect to any Asset Disposition or any Casualty Event, at the option of Lucky Bucks, (x) Lucky Bucks and its Subsidiaries may reinvest (including capital expenditures) an amount equal to all or any portion of such Applicable Proceeds in (i) Additional Assets (including by means of an investment in Additional Assets by a Subsidiary) or (ii) in any one or more businesses (provided such business will be a Subsidiary) within eighteen (18) months (or six (6) months after the eighteen (18) month period following receipt of such Applicable Proceeds if a contractual commitment to reinvest is entered into within eighteen (18) months, so long as such reinvestment is actually completed within six (6) months after the end of such reinvestment period) following receipt of such Applicable Proceeds, (y) such Applicable Proceeds shall be deemed to have been reinvested in assets used or useful in the business of the Lucky Bucks or any Subsidiary (including pursuant to a Permitted Acquisition, Investment or capital expenditure) pursuant to any such investment occurring in the sixty (60) days preceding the date of receipt of such Applicable Proceeds or (z) to the extent the property or assets subject to such Asset Disposition or Casualty Event are the property or assets of any Subsidiary that is not a Loan Party (as defined in the Credit Agreement), use any Applicable Proceeds to permanently repay Indebtedness of any Subsidiaries that are not Loan Parties (as defined in the Credit Agreement); *provided* that in the case of clause (x) or (y) above, if any Applicable Proceeds are not so reinvested by the deadline specified in clause (x) or (y) above, or if in the case of clause (x), (y) or (z) above any such Applicable Proceeds are no longer intended to be or cannot be so reinvested or used to repay Indebtedness at any time after delivery of a notice of reinvestment election, as applicable, an amount equal to such Applicable Proceeds shall be applied in accordance with Section 7.05(c)(i).

Section 7.06    Restricted Payments & Modification of Subordinated Indebtedness Documents.

(a)    The Issuer shall not, and shall not permit any of its Subsidiaries, directly or indirectly, to:

(i)    declare or pay any dividend or make any distribution on or in respect of the Issuer or any Subsidiary's Capital Stock (including any such payment in connection with any merger, amalgamation or consolidation involving the Issuer or any of its Subsidiaries) except:

(A)    dividends, payments or distributions payable in Capital Stock of the Issuer (other than Disqualified Stock) or in options, warrants or other rights to purchase such Capital Stock of the Issuer; and

(B)    dividends, payments or distributions payable to the Issuer or a Subsidiary (and, in the case of any such Subsidiary making such dividend or distribution,

CONFIDENTIAL                                                                Trive_00043030

to holders of its Capital Stock other than the Issuer or another Subsidiary on no more than a *pro rata* basis);

(ii)     purchase, repurchase, redeem, retire or otherwise acquire or retire for value any Capital Stock of the Issuer or any Parent Entity held by Persons other than the Issuer or a Subsidiary;

(iii)     purchase, repurchase, redeem, defease or otherwise acquire or retire for value, or make any scheduled repayment (other than regularly scheduled payments of interest and fees) or scheduled sinking fund payment with respect to, any Subordinated Indebtedness;

(iv)     make any Investment in any Parent Entity or owner of Equity Interests in the Issuer; or

(v)     make any Restricted Investment (any such dividend, distribution, payment, purchase, redemption, repurchase, defeasance, other acquisition, retirement or Restricted Investment referred to in clauses (i) through (iv) above are referred to herein as a "Restricted Payment"), unless at the time of such Restricted Payment, the aggregate amount of such Restricted Payment and all other Restricted Payments made subsequent to the Closing Date (and not returned or rescinded) (including Permitted Payments made pursuant to Section 7.06(b)(i) (without duplication) and (vii), but excluding all other Restricted Payments permitted by Section 7.06(b)) is less than the sum of (without duplication) (the sum of the amounts in clauses (1) through (7) below, the "Available Amount"); *provided* that subject to the Limited Condition Transaction provisions, (1) immediately after giving *pro forma* effect to such transaction, no Event of Default shall have occurred and be continuing, and (2) in the case of Restricted Payments (other than an Restricted Investment), immediately after giving *pro forma* effect to the payment of any such Restricted Payment, the Issuer Consolidated Total Leverage Ratio shall be no greater than 2.00:1.00:

(1)     50.0% of Cumulative Consolidated Net Income of the Issuer and the Subsidiaries for the period from the first day of the first full fiscal quarter commencing after the Closing Date until the last day of the then-most recent fiscal quarter or fiscal year of the Issuer, as applicable, for which financial statements have been delivered pursuant to Section 6.01 (such amount, the "Growth Amount");

(2)     100.0% of the aggregate amount of cash, and the fair market value of property or assets or marketable securities, received by the Issuer from the issue or sale of its Capital Stock (other than Disqualified Stock or Designated Preferred Stock) or as a result of a merger or consolidation with another Person subsequent to the Closing Date or otherwise contributed to the equity (other than through the issuance of Disqualified Stock or Designated Preferred Stock) of the Issuer or a Subsidiary (including the aggregate principal amount of any Indebtedness of the Issuer or a Subsidiary contributed to the Issuer or a Subsidiary for cancellation) or that becomes part of the capital of the Issuer or a Subsidiary through consolidation or merger subsequent to the Closing Date and, in each case, contributed to the Issuer (other than (w) Net Cash Proceeds or property or assets or marketable securities received from an issuance or sale of such Capital Stock to a Subsidiary or an employee stock ownership plan or trust established by the Issuer or any Subsidiary of the Issuer for the benefit of its employees to the extent funded by the Issuer or any Subsidiary, (x) cash or property or assets or marketable securities to the extent that any Restricted Payment has been made from such proceeds in

CONFIDENTIAL                                                                    Trive_00043031

reliance on Section 7.06(b)(vi) hereof, and (y) Excluded Contributions and Cure Amounts);

(3)   100.0% of the aggregate amount of cash, and the fair market value of property or assets or marketable securities, received by the Issuer or any Subsidiary from the issuance or sale (other than to the Issuer or a Subsidiary or an employee stock ownership plan or trust established by the Issuer or any Subsidiary of the Issuer for the benefit of their employees to the extent funded by the Issuer or any Subsidiary) by the Issuer or any Subsidiary subsequent to Closing Date of any Indebtedness or Disqualified Stock or Designated Preferred Stock that has been converted into or exchanged for Capital Stock of the Issuer (other than Disqualified Stock or Designated Preferred Stock) plus, without duplication, the amount of any cash, and the fair market value of property or assets or marketable securities, received by the Issuer or any Subsidiary upon such conversion or exchange and, in each case, contributed to the Issuer;

(4)   100.0% of the aggregate amount received in cash and the fair market value of marketable securities or other property received by means of: (i) the sale or other disposition (other than to the Issuer or a Subsidiary) of, or other returns, profits, distributions and similar amounts on Investments from, Restricted Investments made by the Issuer or its Subsidiaries and repurchases and redemptions of, or cash distributions or cash interest received in respect of, such Investments from the Issuer or its Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Issuer or its Subsidiaries, in each case after the Closing Date; or (ii) the sale or other disposition (other than to the Issuer or a Subsidiary) of the Capital Stock of a JV Entity or a dividend, payment or distribution from a JV Entity (other than to the extent of the amount of the Investment that constituted a Permitted Investment and will increase the amount available under the applicable clause of the definition of "Permitted Investment") or a dividend, payment or distribution from a Person that is not a Subsidiary after the Closing Date (other than to the extent of the amount of the Investment that constituted a Permitted Investment and will increase the amount available under the applicable clause of the definition of "Permitted Investment"), in each case of clause (i) and clause (ii), only to the extent such Investments were originally made using the Available Amount;

(5)   [reserved];

(6)   the greater of $35,000,000 and 35.0% of LTM EBITDA; and

(7)   Retained Declined Proceeds.

(b)   Section 7.06(a) will not prohibit any of the following (collectively, "Permitted Payments"):

(i)   the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement or the redemption, repurchase or retirement of Indebtedness if, at the date of any redemption notice, such payment would have complied with the provisions of this Agreement as if it were and is deemed at such time to be a Restricted Payment at the time of such notice;

CONFIDENTIAL                                                           Trive_00043032

(ii)     any prepayment, purchase, repurchase, redemption, defeasance, discharge or other acquisition or retirement of Subordinated Indebtedness made by exchange (including any such exchange pursuant to the exercise of a conversion right or privilege in connection with which cash is paid in lieu of the issuance of fractional shares) for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Issuer (other than Disqualified Stock or Designated Preferred Stock) or a contribution to the equity of the Issuer (other than through the issuance of Disqualified Stock or Designated Preferred Stock or through an Excluded Contribution or Cure Amount);

(iii)    any prepayment, purchase, repurchase, exchange, redemption, defeasance, discharge or other acquisition or retirement of Subordinated Indebtedness made by exchange for, or out of the proceeds of the substantially concurrent sale of, Refinancing Indebtedness permitted to be Incurred pursuant to Section 7.03 hereof; *provided* that such Refinancing Indebtedness is also Subordinated Indebtedness;

(iv)     [reserved];

(v)      any prepayment, purchase, repurchase, redemption, defeasance, discharge or other acquisition or retirement of Subordinated Indebtedness of the Issuer or a Subsidiary:

(A)     to the extent required by the agreement governing such Subordinated Indebtedness, following the occurrence of (A) a Change of Control (or other similar event described therein as a "change of control") or (B) an Asset Disposition (or other similar event described therein as an "asset disposition" or "asset sale") but only if the Issuer shall not be in default of Section 8.01(i) hereof, as applicable; or

(B)     consisting of Acquired Indebtedness (other than Indebtedness Incurred (x) to provide all or any portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which such Person became a Subsidiary or was otherwise acquired by the Issuer or a Subsidiary or (y) otherwise in connection with or contemplation of such acquisition);

(vi)     a Restricted Payment to pay for the full cost of prepayment, purchase, repurchase, redemption, defeasance, discharge, retirement or other acquisition of Capital Stock (other than Disqualified Stock) of the Issuer or of any Parent Entity held by any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliate or Immediate Family Members) of the Issuer, any of its Subsidiaries or of any Parent Entity (or permitted transferees, assigns, estates, trusts or heirs of such employee, director, officer, manager, contractor, consultant or advisor or their respective Controlled Investment Affiliates or Immediate Family Members) either pursuant to any management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement (including, for the avoidance of doubt, any principal and interest payable on any Indebtedness issued by the Issuer or any Parent Entity in connection with such prepayment, purchase, repurchase, redemption, defeasance, discharge, retirement or other acquisition), including any Capital Stock rolled over, accelerated or paid out by or to any employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer, any of its Subsidiaries or any Parent Entity in connection with any transaction; *provided, however*, that the aggregate Restricted Payments made under this clause (vi) do not exceed the greater of $2,500,000 and 2.5% of LTM EBITDA in

CONFIDENTIAL                                                                    Trive_00043033

any calendar year (with unused amounts in any calendar year being carried over to succeeding calendar years); *provided, further,* that such amount in any calendar year may be increased by an amount not to exceed:

> (A)   the cash proceeds from the sale of Capital Stock (other than Disqualified Stock, Designated Preferred Stock, Excluded Contributions or Cure Amounts) of the Issuer and, to the extent contributed to the capital of the Issuer, the cash proceeds from the sale of Capital Stock of any Parent Entity, in each case to any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer, any of its Subsidiaries or any Parent Entity that occurred after the Closing Date, to the extent the cash proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments by virtue of Section 7.06(a) hereof; *plus*

> (B)   the cash proceeds of key man life insurance policies received by the Issuer or any of its Subsidiaries after the Credit Agreement Closing Date (or any Parent Entity to the extent contributed to the Issuer); *less*

> (C)   the amount of any Restricted Payments made in previous calendar years pursuant to clauses (A) and (B) of this Section 7.06(b)(vi);

and *provided, further,* that (i) cancellation of Indebtedness owing to the Issuer or any Subsidiary from any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer or its Subsidiaries or any Parent Entity in connection with a repurchase of Capital Stock of the Issuer or any Parent Entity and (ii) the repurchase of Capital Stock deemed to occur upon the exercise of options, warrants or similar instruments if such Capital Stock represents all or a portion of the exercise price thereof and payments, in lieu of the issuance of fractional shares of such Capital Stock or withholding to pay other taxes payable in connection therewith, in the case of each of clauses (i) and (ii), will not be deemed to constitute a Restricted Payment for purposes of this Section 7.06 or any other provision of this Agreement;

> (vii)   [reserved];

> (viii)   payments made or expected to be made by the Issuer or any Subsidiary in respect of withholding or similar taxes payable in connection with the exercise or vesting of Capital Stock or any other equity award by any future, present or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer or any Subsidiary or any Parent Entity and purchases, repurchases, redemptions, defeasances or other acquisitions or retirements of Capital Stock deemed to occur upon the exercise, conversion or exchange of stock options, warrants, equity-based awards or other rights in respect thereof if such Capital Stock represents a portion of the exercise price thereof or payments in respect of withholding or similar taxes payable upon exercise or vesting thereof;

> (ix)   dividends, loans, advances or distributions to any Parent Entity or other payments by the Issuer or any Subsidiary in amounts equal to (without duplication):

> > (A)   the amounts required for any Parent Entity to pay any Parent Entity Expenses;

-115-                          *LB Holdings NPA*

CONFIDENTIAL                                                                              Trive_00043034

(B)    amounts constituting or to be used for purposes of making payments to the extent specified in Sections 7.10(b)(ii), (iv), (x), (xi), (xii), (xiv) and (xviii); or

    (x)    [reserved];

    (xi)    payments by the Issuer, or loans, advances, dividends or distributions to any Parent Entity to make payments, to holders of Capital Stock of the Issuer or any Parent Entity in lieu of the issuance of fractional shares of such Capital Stock, *provided, however,* that any such payment, loan, advance, dividend or distribution shall not be for the purpose of evading any limitation of this Section 7.06 or otherwise to facilitate any dividend or other return of capital to the holders of such Capital Stock (as determined in good faith by the Issuer);

    (xii)    [reserved];

    (xiii)    [reserved];

    (xiv)    distributions or payments of Securitization Fees, sales contributions and other transfers of Securitization Assets or Receivables Assets and purchases of Securitization Assets or Receivables Assets pursuant to a Securitization Repurchase Obligation, in each case in connection with a Qualified Securitization Financing or Receivables Facility;

    (xv)    [reserved];

    (xvi)    so long as no Default or Event of Default has occurred and is continuing (or would result therefrom), any Restricted Payments, so long as, immediately after giving pro forma effect to the payment of any such Restricted Payment and the incurrence of any Indebtedness the net proceeds of which are used to make such Restricted Payment, the Issuer Consolidated Total Leverage Ratio shall be no greater than 2.00:1.00;

    (xvii)    [reserved];

    (xviii)    so long as no Default or Event of Default has occurred and is continuing (or would result therefrom), the prepayment, purchase, redemption, defeasance, repurchase, exchange or other acquisition or retirement of Subordinated Indebtedness, so long as, immediately after giving *pro forma* effect to the payment of any such Restricted Payment and the incurrence of any Indebtedness the net proceeds of which are used to make such Restricted Payment, the Consolidated Total Leverage Ratio shall be no greater than 3.75:1.00;

    (xix)    [reserved];

    (xx)    [reserved];

    (xxi)    so long as no Event of Default has occurred and is continuing, prepayments, purchases or redemptions of Subordinated Indebtedness in an aggregate amount outstanding at the time made not to exceed the greater of $25,000,000 and 25.0% of LTM EBITDA at such time minus amounts reallocated to clause (u) of the definition of "Permitted Investments";

    (xxii)    conversions of Subordinated Indebtedness into common stock or other Qualified Capital Stock;

CONFIDENTIAL

Trive_00043035

(xxiii)  refinancing or exchanges of any Subordinated Indebtedness (including Subordinated Indebtedness assumed in connection with a Permitted Acquisition or other similar Investment permitted under this Agreement (and not incurred in contemplation thereof)) for like or other Subordinated Indebtedness;

(xxiv)  payments or distributions to enable the direct and indirect equity owners of Issuer to pay their respective income or similar Tax liabilities attributable to the Issuer and its Subsidiaries (taking into account any adjustments under Section 734 or 743 of the Code) in respect of any taxable period for which the Issuer is a partnership, a disregarded entity or other pass-through entity for U.S. federal income tax purposes (other than any such entity that is directly or indirectly wholly-owned by a C-corporation for U.S. federal income tax and/or applicable state or local income tax purposes), the income or similar Tax liabilities of any direct or indirect owner of the Issuer arising from its direct or indirect interest in the Issuer and its Subsidiaries, computed by multiplying the net overall taxable income of the Issuer and its Subsidiaries with a composite rate calculated as the sum total of (x) the highest marginal combined federal, state, and local tax rate of a corporation organized in New York, New York, multiplied by 71.7816% (or, other percentage of the Issuer at such time directly or indirectly owned by Quantum Gaming Corp. and other "blocker" entities treated as C-corporations for U.S. tax purposes) and (y) the highest marginal combined federal, state, and local tax rate of an individual residing in New York, New York multiplied by 28.2184% (or, other percentage of the Issuer directly or indirectly owned by entities other than Quantum Gaming Corp. or other entities that are not "blocker" entities treated as C-corporations for U.S. tax purposes), taking into account the character of the income and the deductibility of state and local income taxes and taking into account any loss carryovers, *provided* that any amounts so distributed shall be without duplication of any such taxes paid or withheld (e.g., under Section 1446 of the Code) by the Issuer or its Subsidiaries with respect to the same taxable income; and

(xxv)  Restricted Payments made with the proceeds of the Notes (A) made on or immediately following the Closing Date and (B) made on or immediately following each Delayed Issuance Date.

(c)  The Issuer shall not, and shall not permit any of the Subsidiaries, directly or indirectly, to amend, modify or change any term or condition of documents evidencing Subordinated Indebtedness in a manner that violates the applicable subordination agreement or such document evidencing Subordinated Indebtedness in a manner that is material and adverse to the Purchasers.

(d)  [Reserved].

(e)  The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred or issued by the Issuer or such Subsidiary, as the case may be, pursuant to such Restricted Payment. The fair market value of any cash Restricted Payment shall be its face amount, and the fair market value of any non-cash Restricted Payment, property or assets other than cash shall be determined conclusively by the Issuer acting in good faith.

Section 7.07    Holding Company Status.

(a)  The Issuer shall not engage in any business activities other than (i) direct ownership of the Capital Stock of HoldCo, (ii) activities incidental to the maintenance of its organizational existence (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities relating to its officers, directors, managers and employees and those of its Subsidiaries), (iii) entry into, delivery and performance of its obligations under the Note Documents and

CONFIDENTIAL                                                                           Trive_00043036

the performance of the other Transactions (including making a Restricted Payment to the holders of the Issuer's Capital Stock with the proceeds of the issuance of the Notes), (iv) the participation in tax, accounting, cash management and other administrative matters as a member of a consolidated group of companies including its Subsidiaries, (v) the performance of obligations under and compliance with its Organization Documents and the Organization Documents of any of its Subsidiaries (including, without limitation, as a manager thereof or thereunder) or any applicable Law, (vi) the incurrence and payment of its operating and business expenses and any Taxes for which it may be liable, (vii) the issuance, sale or repurchase of its Capital Stock and the receipt of capital contributions as and to the extent permitted by this Agreement, (viii) making capital contributions, (ix) activities otherwise permitted by this Agreement, (x) Investments existing as of the Closing Date and pursuant to binding commitments, agreements or arrangements in effect on the Closing Date which, to the extent in an amount in excess of $25,000, are listed on Schedule 7.07(a), and (xi) activities incidental to the businesses or activities described in clauses (i) through (x) above.

(b)     The Issuer shall cause HoldCo not to engage in any business activities other than (i) direct ownership of the Capital Stock of Lucky Bucks, (ii) activities incidental to the maintenance of its organizational existence (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities relating to its officers, directors, managers and employees and those of its Subsidiaries), (iii) entry into, delivery and performance of its obligations (A) under the "Loan Documents" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document) and (B) under the Note Documents (if applicable), (iv) the participation in tax, accounting, cash management and other administrative matters as a member of a consolidated group of companies including the Issuer and its Subsidiaries, (v) the performance of obligations under and compliance with its Organization Documents and the Organization Documents of any of its Subsidiaries (including, without limitation, as a manager thereof or thereunder) or any applicable Law, (vi) the incurrence and payment of its operating and business expenses and any Taxes for which it may be liable, (vii) the issuance, sale or repurchase of its Capital Stock and the receipt of capital contributions as and to the extent permitted by this Agreement, (viii) making capital contributions, (ix) activities otherwise permitted by this Agreement, (x) Investments existing as of the Closing Date and pursuant to binding commitments, agreements or arrangements in effect on the Closing Date which, to the extent in an amount in excess of $25,000, are listed on Schedule 7.07(b), and (xi) activities incidental to the businesses or activities described in clauses (i) through (x) above; *provided*, for the avoidance of doubt, that for purposes of clause (vii) of this Section 7.07(b), HoldCo shall not be permitted to issue any Capital Stock other than to the Issuer.

Section 7.08     Limitation on Restrictions on Distributions from Subsidiaries and Negative Pledges.

(a)     The Issuer shall not, and shall not permit any Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Subsidiary to:

(i)     to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation;

(ii)     pay dividends or make any other distributions in cash or otherwise on its Capital Stock or pay any Indebtedness or other obligations owed to the Issuer or any Subsidiary;

(iii)     make any loans or advances to the Issuer or any Subsidiary; or

CONFIDENTIAL                                                                Trive_00043037

Subsidiary;

(iv)     sell, lease or transfer any of its property or assets to the Issuer or any

*provided,* that (x) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill requirements to) loans or advances made to the Issuer or any Subsidiary to other Indebtedness Incurred by the Issuer or any Subsidiary shall not be deemed to constitute such an encumbrance or restriction.

(b)     Section 7.08(a) shall not prohibit:

(i)     any encumbrance or restriction pursuant to any agreement or instrument, in each case, in effect at or entered into on the Closing Date in connection with the Transactions;

(ii)     any encumbrance or restriction pursuant to this Agreement, the Collateral Documents, the Credit Agreement, the "Collateral Documents" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document), and the "Guaranty" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document);

(iii)     any encumbrance or restriction pursuant to an agreement or instrument of a Person or relating to any Capital Stock or Indebtedness of a Person, entered into on or before the date on which such Person was acquired by or merged, amalgamated, consolidated or otherwise combined with or into the Issuer or any Subsidiary or on which such agreement or instrument is assumed by the Issuer or any Subsidiary in connection with an acquisition of assets (other than Capital Stock or Indebtedness Incurred as consideration in, or to provide all or any portion of the funds utilized to consummate, the transaction or series of related transactions pursuant to which such Person became a Subsidiary or was acquired by the Issuer or was merged, amalgamated, consolidated or otherwise combined with or into the Issuer or any Subsidiary or entered into in contemplation of or in connection with such transaction) and outstanding on such date; *provided* that, for the purposes of this clause (iii), if another Person is the Successor Company, any Subsidiary thereof or agreement or instrument of such Person or any such Subsidiary shall be deemed acquired or assumed by the Issuer or any Subsidiary when such Person becomes the Successor Company;

(iv)     any encumbrance or restriction:

(A)     that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract or agreement, or the assignment or transfer of any lease, license or other contract or agreement;

(B)     contained in mortgages, pledges, charges or other security agreements permitted under this Agreement or securing Indebtedness of the Issuer or a Subsidiary permitted under this Agreement, to the extent such encumbrances or restrictions restrict the transfer or encumbrance of the property or assets subject to such mortgages, pledges, charges or other security agreements;

(C)     contained in any trading, netting, operating, construction, service, supply, purchase, sale or other agreement to which the Issuer or any of its Subsidiaries is a party entered into in the ordinary course of business or consistent with past practice;

CONFIDENTIAL                                                                                              Trive_00043038

*provided* that such agreement prohibits the encumbrance of solely the property or assets of the Issuer or such Subsidiary that are subject to such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Issuer or such Subsidiary or the assets or property of another Subsidiary; or

        (D)     pursuant to customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of the Issuer or any Subsidiary;

        (v)     any encumbrance or restriction pursuant to "Purchase Money Obligations" and "Capitalized Lease Obligations" permitted under this Agreement and the Collateral Documents, in each case, that impose encumbrances or restrictions on the property so acquired;

        (vi)     any encumbrance or restriction imposed pursuant to an agreement entered into for the direct or indirect sale or disposition to a Person of all or substantially all the Capital Stock or assets of the Issuer or any Subsidiary (or the property or assets that are subject to such restriction) pending the closing of such sale or disposition;

        (vii)     customary provisions in leases, licenses, equityholder agreements, joint venture agreements, organizational documents and other similar agreements and instruments;

        (viii)     encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order, or required by any regulatory authority;

        (ix)     any encumbrance or restriction on cash or other deposits or net worth imposed by customers under agreements entered into in the ordinary course of business or consistent with past practice;

        (x)     any encumbrance or restriction pursuant to "Hedging Obligations" (as defined in the Credit Agreement, or as substantially similarly defined in any successor credit document);

        (xi)     other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be Incurred or issued subsequent to the Closing Date pursuant to the provisions of Section 7.03 that impose restrictions solely on the Foreign Subsidiaries party thereto or their Subsidiaries;

        (xii)     restrictions created in connection with any Qualified Securitization Financing or Receivables Facility that, in the good faith determination of the Issuer, are necessary or advisable to effect such Securitization Facility or Receivables Facility;

        (xiii)     any encumbrance or restriction arising pursuant to an agreement or instrument (which, if it relates to any Indebtedness, shall only be permitted if such Indebtedness is permitted to be Incurred pursuant to the provisions of Section 7.03 hereof) if (i) the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Purchasers than (a) the encumbrances and restrictions contained in the this Agreement, together with the security documents associated therewith or (b) in comparable financings (as determined in good faith by the Issuer) or (ii) either (a) the Issuer determines at the time of entry into such agreement or instrument that such encumbrances or restrictions will not adversely affect, in any material respect, the Issuer's ability to make principal or interest payments

CONFIDENTIAL         Trive_00043039

on the Secured Obligations or (b) such encumbrance or restriction applies only during the continuance of a default in respect of a payment relating to such agreement or instrument;

(xiv)    any encumbrance or restriction existing by reason of any Lien permitted under Section 7.01 hereof; or

(xv)    any encumbrance or restriction pursuant to an agreement or instrument effecting a refinancing of Indebtedness Incurred pursuant to, or that otherwise refinances, an agreement or instrument referred to in clauses (i) to (xiv) of this Section 7.08(b) or this clause (xv) (an "Initial Agreement") or contained in any amendment, supplement or other modification to an agreement referred to in clauses (i) to (xiv) of this Section 7.08(b) or this clause (xv); *provided, however*, that the encumbrances and restrictions with respect to such Subsidiary contained in any such agreement or instrument are no less favorable in any material respect to the Purchasers taken as a whole than the encumbrances and restrictions contained in the Initial Agreement or Initial Agreements to which such refinancing or amendment, supplement or other modification relates (as determined in good faith by the Issuer).

Section 7.09    Investment Structuring. The Issuer shall not permit any Investment made by, or the proceeds of any Equity Offering received from, a Parent Entity or other direct or indirect equityholder of the Issuer to be made directly in or to any Subsidiary of the Issuer without such Equity Offering or Investment first being made in or to the Issuer, except if any such Investment will be made in the form of broadly syndicated loans or similar credit facilities (including, for the avoidance of doubt and without limitation, Indebtedness under the Credit Agreement), made or held on an arm's-length basis, then such proceeds may be made available directly to HoldCo, Lucky Bucks or a Subsidiary of Lucky Bucks.

Section 7.10    Affiliate Transactions.

(a)    The Issuer shall not, and shall not permit any of its Subsidiaries to enter into or conduct any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of the Issuer (an "Affiliate Transaction") involving aggregate value in excess of the greater of $5,000,000 and 5.0% of LTM EBITDA unless:

(i)    the terms of such Affiliate Transaction taken as a whole are not materially less favorable to the Issuer or such Subsidiary, as the case may be, than those that could be obtained in a comparable transaction at the time of such transaction or the execution of the agreement providing for such transaction in arm's length dealings with a Person who is not such an Affiliate; and

(ii)    in the event such Affiliate Transaction involves an aggregate value in excess of the greater of $1,000,000 and 1.0% of LTM EBITDA, the terms of such transaction have been approved by either (x) all of the members of the Board of Directors or (y) a majority of the Disinterested Directors.

(b)    Section 7.10(a) shall not apply to:

(i)    any Restricted Payment or other transaction permitted to be made or undertaken pursuant to Section 7.06 hereof (including Permitted Payments), or any Permitted Investment;

(ii)    any Management Advances and any waiver or transaction with respect thereto;

CONFIDENTIAL                                                                                        Trive_00043040

(iii)     any transaction between or among the Issuer and any Subsidiary (or entity that becomes a Subsidiary as a result of such transaction), or between or among Subsidiaries;

(iv)     the payment of compensation, fees, costs and expenses to, and indemnities (including under insurance policies) and reimbursements, employment and severance arrangements, and employee benefit and pension expenses provided on behalf of, or for the benefit of, future, current or former employees, directors, officers, managers, contractors, consultants, distributors or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer or any Subsidiary (whether directly or indirectly including through any Person owned or controlled by any of such employees, directors, officers, managers, contractors, consultants, distributors or advisors (or their respective Controlled Investment Affiliates or Immediate Family Members));

(v)     the entry into and performance of obligations of the Issuer or any of its Subsidiaries under the terms of any transaction arising out of, and any payments pursuant to or for purposes of funding, any agreement or instrument in effect as of or on the Closing Date or entered into on or about the Closing Date in connection with the Transactions (*provided* that any such Affiliate Transaction in a principal amount in excess of $2,500,000 is set forth on Schedule 7.10), as these agreements and instruments may be amended, modified, supplemented, extended, renewed or refinanced from time to time in accordance with the other terms of this Section 7.10 or to the extent not more disadvantageous to the Purchasers in any material respect in the reasonable determination of the Issuer when taken as a whole as compared to the applicable agreement as in effect on the Closing Date or when entered into in connection with the Transactions, as applicable;

(vi)     any transaction effected as part of a Qualified Securitization Financing or Receivables Facility, any disposition or acquisition of Securitization Assets, Receivables Assets or related assets in connection with any Qualified Securitization Financing or Receivables Facility;

(vii)     transactions with customers, vendors, clients, joint venture partners, suppliers, contractors, distributors or purchasers or sellers of goods or services, in each case in the ordinary course of business or consistent with past practice, which are fair to the Issuer or the relevant Subsidiary, in the reasonable determination of the Issuer, or are on terms, taken as a whole, that are not materially less favorable as might reasonably have been obtained at such time from an unaffiliated party;

(viii)     [reserved];

(ix)     issuances, sales or transfers of Capital Stock (other than Disqualified Stock or Designated Preferred Stock) of the Issuer or any of the Subsidiaries or options, warrants or other rights to acquire such Capital Stock and the granting of registration and other customary rights (and the performance of the related obligations) in connection therewith or any contribution to capital of the Issuer or any Subsidiary;

(x)     the payment of financial advisory, monitoring, management, consulting, oversight and similar fees (including refinancing, subsequent transaction and termination fees) under any management agreement in an amount not to exceed the greater of $2,500,000 and 2.5% of LTM EBITDA in any fiscal year and expenses and indemnities of the Sponsor and to directors and managers (with no restrictions on the payment of such advisory, monitoring, management, consulting, oversight and similar fees or the payment of such expenses and indemnities);

CONFIDENTIAL

Trive_00043041

(xi)    payment to any Permitted Holder of all out of pocket expenses Incurred by such Permitted Holder in connection with its direct or indirect investment in the Issuer and its Subsidiaries;

(xii)    the Transactions and the payment of all fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) related to the Transactions, including Transaction Expenses;

(xiii)    transactions in which the Issuer or any Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Subsidiary from a financial point of view or meets the requirements of Section 7.10(a)(i) hereof;

(xiv)    the existence of, or the performance by the Issuer or any Subsidiary of its obligations under the terms of, any equityholders, investor rights or similar agreement (including any registration rights agreement or purchase agreements related thereto) to which it is party as of the Closing Date and any similar agreement that it (or any Parent Entity) may enter into thereafter; *provided, however*, that the existence of, or the performance by the Issuer or any Subsidiary (or any Parent Entity) of its obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Closing Date will only be permitted under this clause to the extent that the terms of any such amendment or new agreement are not otherwise, when taken as a whole, more disadvantageous to the Purchasers in any material respect in the reasonable determination of the Issuer than those in effect on the Closing Date;

(xv)    any purchases by the Issuer's Affiliates of Indebtedness or Disqualified Stock of the Issuer or any of the Subsidiaries the majority of which Indebtedness or Disqualified Stock is purchased by Persons who are not the Issuer's Affiliates;

(xvi)    (x) investments by Affiliates in securities or loans of the Issuer or any of its Subsidiaries (and payment of reasonable out-of-pocket expenses incurred by such Affiliates in connection therewith) so long as the investment is being offered by the Issuer or such Subsidiary generally to other non-affiliated third party investors on the same or more favorable terms and (y) payments to Affiliates in respect of securities or loans of the Issuer or any of its Subsidiaries contemplated in the foregoing subclause (x) or that were acquired from Persons other than the Issuer and its Subsidiaries, in each case, in accordance with the terms of such securities or loans;

(xvii)    payments by any Parent Entity, the Issuer and its Subsidiaries pursuant to any tax sharing agreement to the extent permitted by Section 7.06(b)(xxiv);

(xviii)    payments, Indebtedness and Disqualified Stock (and cancellation of any thereof) of the Issuer and its Subsidiaries and Preferred Stock (and cancellation of any thereof) of any Subsidiary to any future, current or former employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Issuer, any of its Subsidiaries or any of its Parent Entities pursuant to any management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement with any such employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) that are, in each case, approved by the Issuer in good faith;

CONFIDENTIAL                                                                Trive_00043042

(xix)    any management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), employment, termination or severance agreement, or any stock subscription or equityholder agreement between the Issuer or its Subsidiaries and any distributor, employee, director, officer, manager, contractor, consultant or advisor (or their respective Controlled Investment Affiliates or Immediate Family Members) approved by the reasonable determination of the Issuer or entered into in connection with the Transactions;

(xx)    any transition services arrangement, supply arrangement or similar arrangement entered into in connection with or in contemplation of the disposition of assets or Capital Stock in any Subsidiary permitted under Section 7.05 hereof or entered into with any Business Successor, in each case, that the Issuer determines in good faith is either fair to the Issuer or otherwise on customary terms for such type of arrangements in connection with similar transactions;

(xxi)    [reserved];

(xxii)    (i) any lease entered into between the Issuer or any Subsidiary, as lessee, and any Affiliate of the Issuer, as lessor and (ii) any operational services arrangement entered into between the Issuer or any Subsidiary and any Affiliate of the Issuer, in each case, which is approved as being on arm's length terms by the reasonable determination of the Issuer;

(xxiii)    any IP Rights licenses or sublicenses or research or development agreements in the ordinary course of business or consistent with past practice;

(xxiv)    the payment of fees, costs and expenses related to registration rights and indemnities provided to equityholders pursuant to equityholders, investor rights, registration rights or similar agreements;

(xxv)    any Permitted Intercompany Activities, Permitted Tax Restructuring, Permitted IPO Reorganization and Intercompany License Agreements; and

(xxvi)    transfer pricing or shared services agreements and intercompany loans in connection therewith.

(c)    In addition, if the Issuer or any of its Subsidiaries (i) purchases or otherwise acquires assets or properties from a Person which is not an Affiliate, the purchase or acquisition by an Affiliate of the Issuer of an interest in all or a portion of the assets or properties acquired shall not be deemed an Affiliate Transaction (or cause such purchase or acquisition by the Issuer or a Subsidiary to be deemed an Affiliate Transaction) or (ii) sells or otherwise disposes of assets or other properties to a Person who is not an Affiliate, the sale or other disposition by an Affiliate of the Issuer of an interest in all or a portion of the assets or properties sold shall not be deemed an Affiliate Transaction (or cause such sale or other disposition by the Issuer or a Subsidiary to be deemed an Affiliate Transaction).

Section 7.11    Amendments of Material Documents. The Issuer shall not amend or modify its organizational documents in a manner that is materially adverse to the Purchasers (in their capacities as such) without obtaining the prior written consent of the Required Purchasers; *provided* that, for the avoidance of doubt, it is understood and agreed that the Issuer may amend or modify its organizational documents to effect a change to its organizational form and/or consummate any other transaction that is permitted under Section 7.04.

CONFIDENTIAL                                                    Trive_00043043

**ARTICLE VIII**

Events of Default and Remedies

Section 8.01    Events of Default. The occurrence and continuance of any of the following events referred to in any of clauses (a) through (j) inclusive of this Section 8.01 shall constitute an "Event of Default":

(a)    Non-Payment. The Issuer fails to pay (i) when and as required to be paid herein, any amount of principal of any Note or (ii) within five (5) Business Days after the same becomes due, any interest on any Note or any other amount payable hereunder or with respect to any other Note Document.

(b)    Specific Covenants. The Issuer fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03(a), 6.04 (solely with respect to the Issuer), or Article VII.

(c)    Other Defaults. The Issuer, HoldCo or Lucky Bucks fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Note Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Issuer of written notice thereof by the Administrative Agent or the Required Purchasers; *provided* that the Administrative Agent and the Required Purchasers shall not be entitled to notify the Issuer of a Default under this Section 8.01(c) for actions taken and reported by the Issuer to the Administrative Agent and the Purchasers pursuant to a notice provided by the Issuer to the Administrative Agent more than two years prior to such notice of Default and no Default or Event of Default can occur as a result thereof; *provided* that such two year limitation shall not apply if (i) any Agent has commenced any remedial action in respect of any such Event of Default or (ii) the Issuer had actual knowledge of such Default or Event of Default and failed to notify to Administrative Agent as required hereby.

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Issuer or any Subsidiary herein, in any other Note Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made and such incorrect or misleading representation, warranty, certification or statement of fact, if capable of being cured, remains so incorrect or misleading for thirty (30) days after the earlier of (x) the Issuer having actual knowledge thereof and (y) the Issuer's receipt of written notice from the Administrative Agent with respect thereto.

(e)    Cross-Default. The Issuer or any Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount exceeding the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than (i) with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and (ii) any event requiring prepayment pursuant to customary asset sale events, insurance and condemnation proceeds events, change of control offers events and excess cash flow and indebtedness sweeps), in each case the effect of which default or other event is to cause the entire principal amount of such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem all such Indebtedness to be made, prior to its scheduled maturity; *provided* that this clause (e)(B) shall not apply to secured Indebtedness that becomes due (or requires an offer to purchase) as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided, further*, that (x) such failure is unremedied and is not waived by the required holders of such Indebtedness and (y) any event or condition

CONFIDENTIAL                                              Trive_00043044

set forth under this paragraph (e) shall not, until the expiration of any applicable grace period or the delivery of notice by the applicable holder or holders of such Indebtedness, constitute a Default or an Event of Default for purposes of this Agreement; *provided, further*, that no such failure with respect to any such Indebtedness that constitutes seller debt, earnouts, holdbacks, deferred acquisition consideration or similar obligations shall result in an Event of Default unless and until expiration of any dispute resolution process and, so long as any judgment rendered against the Issuer or its Subsidiaries has been appealed in good faith and stayed pending such appeal, rendering of a final non-appealable judgment by a court of competent jurisdiction with respect to such failure with respect to such Indebtedness.

(f)     Insolvency Proceedings, Etc.  Except with respect to any dissolution or liquidation of a Subsidiary expressly permitted by Section 7.04 in connection with the consummation of a Permitted IPO Reorganization or Permitted Tax Restructuring, the Issuer or any of the Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or an order for relief is entered in any such proceeding.

(g)     Judgments.  There is entered against the Issuer or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) days after such judgment becomes final.

(h)     Invalidity of Note Documents.  Any material provision of any Note Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or Section 7.05) or as a result of acts by the Administrative Agent in the sole control of the Administrative Agent or, omissions by the Administrative Agent in the sole control of the Administrative Agent (it being understood that the foregoing exception shall not impose any obligations on the Administrative Agent exculpated under Article IX) or the payment in full of all the Secured Obligations and termination of all Commitments, ceases to be in full force and effect or ceases to create a valid and perfected lien on a material portion the Collateral covered thereby other than Collateral having a fair market value not exceeding $5,000,000; or the Issuer contests in writing the validity or enforceability of any material provision of any Collateral Document; or the Issuer denies in writing that it has any or further liability or obligation under any Collateral Document (other than as a result of repayment in full of the Secured Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Collateral Document.

(i)     Change of Control.  There occurs any Change of Control.

(j)     ERISA Event.  An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect.

(k)     Gaming License.  (i) HoldCo or any of its Subsidiaries (except in connection with a disposition permitted under Section 7.04) fails to apply to renew its Master License during the applicable

CONFIDENTIAL                                                                Trive_00043045

period for renewal thereof, and its Master License has lapsed as a result; or (ii) the Master License held by HoldCo or any of its Subsidiaries is surrendered by such Person, or such Person is suspended from receiving revenue under the Master License for more than forty-five (45) consecutive days; or (iii) a determination of the Georgia Lottery Corporation to revoke or not renew the Master License held by HoldCo or any of its Subsidiaries is affirmed in a final and non-appealable decision by a court or other judicial body of competent jurisdiction; or (iv) there shall have been a License Revocation (other than with respect to a Master License) by any Gaming Authority in one or more jurisdictions in which HoldCo or any of its Subsidiaries conducts business, which License Revocation (in the aggregate with any other such License Revocations then in effect) relates to operations of HoldCo and/or any of its Subsidiaries that in the most recent Test Period accounted for twenty percent (20%) or more of the Consolidated EBITDA of HoldCo and its Subsidiaries, provided, however, that such License Revocation continues for at least forty-five (45) consecutive days after the earlier of (x) the date of cessation of the affected operations as a result of such License Revocation and (y) the date that none of HoldCo or any of its Subsidiaries receive the net cash flows generated by any such operations.

Notwithstanding anything to the contrary contained herein, any "Default" under this Section 8.01 will not constitute an "Event of Default" until the Issuer does not cure such "Default" within the time period (if any) specified in the applicable clauses of this Section 8.01 after receipt of any required notice provided for therein to the extent such clauses of Section 8.01 provide for such cure periods; *provided* that the Administrative Agent and other Secured Parties shall not be entitled to assert the occurrence or continuance of a Default or Event of Default and to notify the Issuer of a Default or Event of Default under this Section 8.01 with respect to any action, occurrence or event that occurred at least two (2) years prior to such assertion or notice so long as such action, occurrence or event was disclosed by the Issuer to the Administrative Agent and the Purchasers pursuant to a written notice provided by the Issuer to the Administrative Agent at least two (2) years prior to such assertion or notice of Default and no Default or Event of Default can occur as a result thereof; *provided* that such two (2) year limitation shall not apply if (i) any Agent has commenced any remedial action in respect of any such Event of Default prior to the end of such two (2) year period or (ii) the Issuer had actual knowledge of such Default or Event of Default and failed to notify to Administrative Agent as required hereby.

Section 8.02    Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent may, and shall, at the request of the Required Purchasers, take any or all of the following actions:

(a)    declare the commitment of each Purchaser to purchase Notes to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Notes, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Note Document, as well as the Make-Whole Amount, to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Issuer; and

(c)    exercise on behalf of itself and the Purchasers all rights and remedies available to it and the Purchasers under the Note Documents or applicable Law;

*provided* that upon the occurrence of an Event of Default under Section 8.01(f), the obligation of each Purchaser to purchase Notes shall automatically terminate, the unpaid principal amount of all outstanding Notes and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Purchaser.

CONFIDENTIAL                                    Trive_00043046

Section 8.03    Exclusion of Immaterial Subsidiaries.    Solely for the purpose of determining whether a Default has occurred under clause (f) or (g) of Section 8.01, any reference in any such clause to any Subsidiary shall be deemed not to include any Subsidiary that is an Immaterial Subsidiary or at such time could, upon designation by the Issuer, become an Immaterial Subsidiary affected by any event or circumstances referred to in any such clause unless the Total Assets and portion of LTM EBITDA attributable to such Subsidiary together with the Total Assets and portion of LTM EBITDA, respectively, of, or attributable to, all other Subsidiaries affected by such event or circumstance referred to in such clause, shall exceed 5.0% of the Total Assets and LTM EBITDA, respectively, of the Issuer and its Subsidiaries (in each case of Total Assets measured at the end of the most recent fiscal period for which consolidated financial statements have been or are required to be delivered pursuant to Section 6.01(a) or 6.01(b) on a *pro forma* basis giving effect to any acquisitions or dispositions of companies, division or lines of business since such financial statement date or the start of such four quarter period, as applicable, and on or prior to the date of acquisition of such Subsidiaries).

Section 8.04    Application of Funds.    If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 8.02 (or after the Notes have automatically become immediately due and payable as set forth in the proviso to Section 8.02), or in any bankruptcy or insolvency proceeding, any amounts received on account of the Secured Obligations (and proceeds of Collateral) shall be applied by each Agent, subject to any Customary Intercreditor Agreement then in effect, in each case, in the following order:

First, to payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to each Agent in its capacity as such;

Second, to payment of that portion of the Secured Obligations constituting fees, indemnities, expenses, and other amounts payable to the Purchasers (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Secured Obligations constituting accrued and unpaid interest (including, but not limited to, Post-Petition Interest) and premiums (including the Make-Whole Amount), ratably among the Purchasers in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Secured Obligations constituting unpaid principal ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Secured Obligations that are due and payable to the Agents and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Secured Obligations owing to the Agents and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Secured Obligations have been paid in full (other than contingent indemnification obligations not yet due and payable), to the Issuer or as otherwise required by Law or by a court of competent jurisdiction.

Section 8.05    [Reserved].

Section 8.06    Gaming Requirements.

CONFIDENTIAL                                                                    Trive_00043047

(a) The rights of the Purchasers to assign interests in any Note, Commitment, Obligation, or other interests of the Purchasers hereunder may be subject to the approval of all applicable Gaming Authorities, to the extent required by applicable Gaming Laws.

(b) Upon the occurrence of a Disqualification Event with respect to any Purchaser, the Issuer shall have the right (in its sole discretion) to remove such Purchaser as a party to this Agreement. In the event the Issuer elects to remove such Purchaser, the Issuer shall:

(i) prepay the Notes and other Obligations owing to such Purchaser without premium or penalty (and terminate its Commitments) in accordance with the requirements of this Agreement governing prepayments; or

(ii) require such Purchaser to execute and deliver a Transfer and Acceptance covering such Purchaser's interest in its Notes and other Obligations, and its Commitments, in favor of one or more Eligible Transferees at an aggregate purchase price equal to the amount of the Notes and other Obligations owing to such Purchaser (without a prepayment premium or penalty); *provided, however*, that such Purchaser shall assign its interests at a lower price if the Issuer pays the difference required to make the aggregate purchase price equal to such amount, it being understood that in no event shall any Purchaser be required to assign its interests in the Notes and other Obligations at an aggregate purchase price which is less than the aggregate amount of Notes and other Obligations owing to such Purchaser (without a prepayment premium or penalty); *provided, further*, that in connection with any such assignment, the Issuer, such Purchaser and the Eligible Transferees shall otherwise comply with Section 10.07.

Section 8.07    Restrictions Under Gaming Laws.

(a) Notwithstanding any other provision of this Agreement or any other Note Document to the contrary, all rights, remedies and powers provided in this Agreement and the other Note Documents, including with respect to the Collateral, may be exercised only to the extent, and in the manner, that the exercise thereof does not violate applicable Gaming Laws and only to the extent that all approvals required by applicable Gaming Laws for the exercise thereof, including prior approvals (if any), are obtained from the applicable Gaming Authorities. In addition, all provisions of this Agreement and the other Note Documents, including with respect to the Collateral, are subject to all applicable mandatory provisions of the Gaming Laws and to be limited solely to the extent necessary to not render the provisions of this Agreement and the other Note Documents invalid or unenforceable, in whole or in part. The parties acknowledge and agree that the provisions of this clause (a) shall not be for the benefit of the Issuer or any of its Subsidiaries.

(b) Subject to Section 8.02, the Issuer acknowledges and agrees that, upon the occurrence of an Event of Default:

(i) the Agents and the Purchasers, in furtherance of the exercise of their rights and remedies hereunder, may retain (or may instruct the Issuer to retain, and upon such instruction the Issuer shall retain) Qualified Persons in possession of all licenses, permits and approvals required by applicable Gaming Laws to operate and manage the business of HoldCo;

(ii) any collection of, sale of, foreclosure upon or other action with respect to the Collateral may be made or conducted at the direction of the Collateral Agent by or with the assistance of any such Qualified Person in accordance with the terms and conditions of the Note Documents, all at the expense of the Issuer; *provided* that any such sale or foreclosure shall at all times comply with all applicable Gaming Laws; and

CONFIDENTIAL

Trive_00043048

(iii)     the Issuer shall provide the Collateral Agent with all assistance requested by the Collateral Agent to consummate any sale, foreclosure or assignment of Collateral, and shall immediately pay over to the Collateral Agent any proceeds received by the Issuer in connection with any such sale, foreclosure or assignment, for application pursuant to the terms hereof.

Section 8.08     Make-Whole Amount Payable Upon Acceleration.  Upon any acceleration of the Stated Maturity of the Notes, the Make-Whole Amount on the Notes shall become immediately due and payable, subject to the terms and conditions of this Agreement.

It is understood and agreed that if the Notes are accelerated or otherwise become due prior to their Stated Maturity, in each case, as a result of an Event of Default specified in Section 8.01(f) (including the acceleration of any portion of the Indebtedness evidenced by the Notes by operation of law), the Make-Whole Amount with respect to an optional redemption of the Notes shall also be due and payable as though the Notes had been optionally redeemed on the date of such acceleration and shall constitute part of the Obligations with respect to the Notes, in view of the impracticability and difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Purchaser's lost profits as a result thereof.  If the Make-Whole Amount, becomes due and payable, it shall be deemed to be principal of the Notes and interest shall accrue on the full principal amount of the Notes (including the Make-Whole Amount) from and after the applicable triggering event. Any premium payable pursuant to this paragraph shall be presumed to be liquidated damages sustained by each Purchaser as the result of the acceleration of the Notes and the Issuer agrees that it is reasonable under the circumstances currently existing. The premium shall also be payable in the event the Notes or this Agreement are satisfied, released or discharged through foreclosure, whether by judicial proceeding, deed in lieu of foreclosure or by any other means. THE ISSUER EXPRESSLY WAIVES (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The Issuer expressly agrees (to the fullest extent it may lawfully do so) that:

(a)     the premium is reasonable and is the product of an arm's length transaction between sophisticated business entities, ably represented by counsel;

(b)     the premium shall be payable notwithstanding the then-prevailing market rates at the time acceleration occurs;

(c)     there has been a course of conduct between the Purchasers and the Issuer giving specific consideration in this transaction for such agreement to pay the premium; and

(d)     the Issuer shall be estopped hereafter from claiming differently than as agreed to in this paragraph.  The Issuer expressly acknowledges its agreement to pay the premium.

## ARTICLE IX

### Administrative Agent and Other Agents

Section 9.01     Appointment and Authorization of Agents.

(a)     Each Purchaser hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Note Document and to exercise such powers and perform such duties as are expressly delegated to it

CONFIDENTIAL                                                                    Trive_00043049

by the terms of this Agreement or any other Note Document, together with such powers as are reasonably incidental thereto.

(b)    Each of the Purchasers hereby irrevocably appoints, designates and authorizes the Collateral Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Purchaser for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by the Issuer to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.   Without limiting the generality of the foregoing, the Purchasers hereby expressly authorize the Collateral Agent to (i) execute any and all documents (including releases) with respect to the Collateral (including any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of the Note Documents and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Purchasers and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Secured Parties in their capacity as such, at the direction of the Required Purchasers, which negotiation, enforcement or settlement will be binding upon each Secured Party.

(c)    The duties of each Agent shall be mechanical and administrative in nature. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Note Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(d)    The provisions of this Article IX are solely for the benefit of the Agents, the Purchasers, and the other Secured Parties, and the Issuer shall not have rights as a third party beneficiary of any of such provisions.

Section 9.02    Delegation of Duties.   Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Note Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through any one or more co-agents, sub-agents and attorneys-in-fact appointed by such Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties. Each Agent and any such co-agents, sub-agents and attorneys-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. All provisions of this Article IX and Article X (including Sections 10.04 and 10.05) and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and under the other Note Documents shall apply to any such co-agents, sub-agents and attorneys-in-fact, and to the Agent-Related Persons of such Agent and any such co-agents, sub-agents and attorneys-in-fact. No Agent shall  be responsible for the negligence or misconduct of any such co-agents, sub-agents and attorneys-in-fact except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents and attorneys-in-fact.

Section 9.03    Liability of Agents.

(a)    Notwithstanding any provision to the contrary contained elsewhere herein or in any other Note Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein, nor shall any Agent have or be deemed to have any fiduciary, principal-agency, or trustee relationship with any Purchaser, and no implied covenants, functions, responsibilities, duties, obligations

CONFIDENTIAL                                                                                   Trive_00043050

or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against any Agent. The permissive rights of any Agent to take any actions permitted by this Agreement or any other Note Document shall not be construed as an obligation or duty to do so. Without limiting the generality of the foregoing, each Agent-Related Person:

(i)     shall not be subject to any fiduciary or other implied duties or obligations, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall be fully justified in failing or refusing to take any action under this Agreement or any other Note Document unless it shall first receive such advice or concurrence of Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as such Agent shall believe in good faith shall be necessary) as it deems appropriate; provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose such Agent to liability or that is contrary to any Note Document or applicable law or (ii) be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency, reorganization, or relief of debtors; provided, further, that if such Agent so requests, it shall first be indemnified and provided with adequate security to its sole satisfaction (which may be greater in extent than that contained in the Note Documents and which may include payment in advance) by the Purchasers against any and all cost, loss, liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; provided, further, that such Agent may seek clarification or further direction from the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as such Agent shall believe in good faith shall be necessary) prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided;

(iii)   shall not, except as expressly set forth herein and in the other Note Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuer or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Agent-Related Persons in any capacity;

(iv)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as such Agent shall believe in good faith shall be necessary) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Purchasers, all future holders of the Notes and all other Secured Parties) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and nonappealable judgment (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent and its Agent-Related Persons shall have no liability);

(v)     shall not be responsible or liable for or have any duty to ascertain or inquire into or monitor (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Note Document, (ii) the contents of any certificate, report, statement, or other document referred to, provided for, or delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans, or the occurrence of any Default or Event of Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectibility or sufficiency of this Agreement, any other Note Document or any other agreement, instrument or document, or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien purported to be

CONFIDENTIAL                                                                Trive_00043051

created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, (vi) whether the Collateral exists, is owned by the Issuer, is cared for, protected, or insured or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (vii) the satisfaction of any condition set forth in Article IV or elsewhere, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or the inspection of the properties, books or records of the Issuer or any Affiliate thereof, or (viii) the financial condition or business affairs of the Issuer or any other Person liable for the payment of any Secured Obligations.

(b)     Nothing in this Agreement or any other Note Document shall require any Agent-Related Person to expend or risk their own funds or otherwise incur any financial liability in the performance of any duties, obligations or responsibilities or the exercise of any right, power, authority or discretion hereunder or under the other Note Documents.

(c)     No Agent-Related Person shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Note Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility

(d)     For the avoidance of doubt, and without limiting the other protections set forth in this Article IX, with respect to any determination, designation, or judgment to be made by any Agent herein or in the other Note Documents, such Agent shall be entitled to request that the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as such Agent shall believe in good faith shall be necessary) make or confirm such determination, designation, or judgment.

Section 9.04    Reliance by Agents.

(a)     Each Agent shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, upon any writing, communication, signature, resolution, representation, notice, orders, statement, request, consent, certificate, instrument, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation (including any electronic message, Internet or intranet website posting or other distribution and any statement made orally or by telephone) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons. Each Agent shall be entitled to consult with legal counsel (including counsel to the Issuer), independent accountants and other consultants or experts selected by such Agent and shall be entitled to rely, shall be fully protected in relying, and shall not incur any liability for relying, upon advice and statements of such counsel, accountants, consultants, or experts.

(b)     For purposes of determining compliance with the conditions specified in Section 4.01, each Purchaser that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to such Purchaser unless the Administrative Agent shall have received written notice from such Purchaser prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal and interest required to be paid to the Administrative Agent for the account of the Purchasers, unless such

CONFIDENTIAL                                                                 Trive_00043052

Agent shall have received written notice from a Purchaser or the Issuer referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Purchasers of its receipt of any such notice. Subject to the other provisions of this Article IX(including Section 9.03), each Agent shall take such action with respect to any Event of Default as may be directed by the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as such Agent shall believe in good faith shall be necessary) in accordance with Article VIII; *provided* that unless and until the applicable Agent has received any such direction, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Purchasers.

Section 9.06    Credit Decision; Disclosure of Information by Agents.    Each Purchaser acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent-Related Person hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of the Issuer or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Purchaser as to any matter, including whether any Agent-Related Persons have disclosed material information in their possession. Each Purchaser represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own credit analysis, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Issuer and its Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Issuer hereunder. Each Purchaser also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Note Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Issuer. Except for notices, reports and other documents expressly required to be furnished to the Purchasers by any Agent herein, no Agent-Related Person shall have any duty or responsibility to provide any Purchaser with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Issuer or any of its Affiliates which may come into the possession of any Agent-Related Person. Each Purchaser agrees that it will not assert any claim against any Agent-Related Person based on an alleged breach of fiduciary duty by such Agent-Related Person in connection with this Agreement, the other Note Documents, or the Transactions contemplated hereby or thereby.

Section 9.07    Indemnification of Agents.    Whether or not the transactions contemplated hereby are consummated, the Purchasers shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of the Issuer and without limiting the obligation of the Issuer to do so), *pro rata*, and hold harmless each Agent-Related Person from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Notes) be imposed on, incurred by, or asserted against, such Agent-Related Person in any way relating to or arising out of, the Transactions, this Agreement, any of the other Note Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby, the performance of its duties or exercise of any of its rights or powers hereunder or thereunder, or any action taken or omitted by such Agent-Related Person under or in connection with any of the foregoing; *provided* that no Purchaser shall be liable for the payment to any Agent-Related Person of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final and non-appealable judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Purchasers (or such other number or percentage of the Purchasers as shall be

CONFIDENTIAL    Trive_00043053

necessary, or as any Agent shall believe in good faith shall be necessary) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07. In the case of any investigation, litigation or proceeding giving rise to any such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, fees, costs, expenses or disbursements, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Purchaser or any other Person. Without limitation of the foregoing, each Purchaser shall reimburse each Agent upon demand for its ratable share of any fees, costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Note Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Issuer, *provided* that such reimbursement by the Purchasers shall not affect the Issuer's continuing reimbursement obligations with respect thereto, if any.

Section 9.08    Agents in their Individual Capacities. Alter Domus (US) LLC and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Capital Stock in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Issuer and its Affiliates as though Alter Domus (US) LLC were not an Agent hereunder and without notice to or consent of the Purchasers. The Purchasers acknowledge that, pursuant to such activities, Alter Domus (US) LLC or its Affiliates may receive information regarding the Issuer or any Affiliate of the Issuer (including information that may be subject to confidentiality obligations in favor of the Issuer or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them. With respect to its Notes(if any), Alter Domus (US) LLC shall have the same rights and powers under this Agreement as any other Purchaser and may exercise such rights and powers as though it were not an Agent hereunder, and the terms "Purchaser" and "Purchasers" include Alter Domus (US) LLC in its individual capacity.

Section 9.09    Successor Agents. Each Agent may resign upon ten (10) days' notice to the Issuer and the Purchasers. If an Agent resigns under this Agreement, the Required Purchasers shall appoint a successor Agent for the Purchasers, which appointment of a successor Agent shall require the consent of the Issuer at all times other than during the existence of an Event of Default under Section 8.01(f) or (g) (which consent of the Issuer shall not be unreasonably withheld, conditioned or delayed). If no successor Agent is appointed prior to the effective date of the resignation of the resigning Agent, the resigning Agent may appoint, after consulting with the Issuer and the Purchasers, a successor Agent. Upon the acceptance of its appointment as successor Agent hereunder, the Person acting as such successor Agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Administrative Agent" shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be (and the term "Collateral Agent" shall mean such successor collateral agent and/or supplemental collateral agent, as the case may be), and the retiring Agent's appointment, powers and duties shall be terminated. After the retiring Agent's resignation hereunder, the provisions of this Article IX, Section 10.04 and Section 10.05 and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and the other Note Documents shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent hereunder. If no successor Agent has accepted appointment by the date which is thirty (30) days following the retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Required Purchasers shall perform all of the duties of the retiring Agent hereunder until such time, if any, as the Required Purchasers appoint a successor Agent as provided for above (except that in the case of any collateral security held by the Collateral Agent on behalf of the Purchasers under any of the Note Documents, the retiring Collateral Agent shall continue to hold such collateral security as bailee until such time as a successor Collateral Agent is appointed). Upon the acceptance of any appointment as an Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other security agreements,

CONFIDENTIAL                                                                    Trive_00043054

instruments or notices, as may be necessary or desirable, or as the Required Purchasers may reasonably request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral Requirement is satisfied, the successor Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Agent, and the retiring Agent shall, to the extent not previously discharged as set forth above, be discharged from its duties and obligations under the Note Documents.

Section 9.10    Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Issuer, the Administrative Agent (irrespective of whether the principal of any Note shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Issuer) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Notes and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Purchasers and Agents (including any claim for the reasonable compensation, expenses, disbursements, indemnities, and advances of the Purchasers, the Agents, the Agent-Related Persons and their respective agents and counsel and all other amounts due to the foregoing hereunder) allowed in such judicial proceeding;

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)    any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Purchaser to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Purchasers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements, indemnities, and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under Article III, Section 2.09, Section 10.04, and Section 10.05.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Purchaser any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Purchaser or to authorize the Administrative Agent to vote in respect of the claim of any Purchaser in any such proceeding.

Section 9.11    Collateral Matters. The Purchasers irrevocably agree:

(a)    that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Note Document shall be automatically released (i) upon termination of the Aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred as part of or in connection with any transfer permitted hereunder (including any Asset Disposition permitted hereunder) or under any other Note Document to any Person other than any Subsidiary (*provided* that in the event of a transfer of assets from the Issuer to a Subsidiary organized in a different jurisdiction, the Collateral Agent shall, upon the reasonable request and at the expense of the Issuer, and subject to the last paragraph of this Section, release such Lien if such transferee Subsidiary takes all actions reasonably necessary to grant a Lien in such transferred assets to the Collateral Agent (to the

CONFIDENTIAL                                                    Trive_00043055

extent required by the Collateral Requirement)), or (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Purchasers; and

(b)    subject to the requirements of Section 10.01, to subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Note Document to the holder of any Lien on such property that is a Permitted Lien under clauses (i) or (l) (in the case of clause (l), upon the reasonable request and at the expense of the Issuer, to the extent required by the terms of the agreements governing such Permitted Lien) of the definition thereof.

Notwithstanding anything contained herein to the contrary, upon request by any Agent at any time, the Required Purchasers shall confirm in writing such Agent's authority to release (or, subject to the requirements of Section 10.01, subordinate) its interest in particular types or items of property pursuant to this Section 9.11 (to the extent such release or subordination is permitted hereunder); *provided* that the absence of such confirmation shall not affect in any way the validity of the automatic releases of security interest contemplated by this Agreement. In each case as specified in this Section 9.11, each Agent will promptly (and each Purchaser irrevocably authorizes such Agent to), at the Issuer's expense, execute and deliver to the Issuer such documents as the Issuer may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents (including the filing of termination statements or the return of pledged collateral), in accordance with the terms of the Note Documents and this Section 9.11; *provided* that prior to any such request, the Issuer shall have in each case delivered to such Agent written request therefor and, to the extent requested by such Agent, an Officer's Certificate of the Issuer to the effect that the release or subordination of its Lien in such Collateral is in compliance with the Note Documents; *provided, further,* that no Agent shall be required to execute any document or take any action to evidence such release or subordination on terms that, in such Agent's opinion or the opinion of its counsel, could expose such Agent to liability or create any obligation or, in the case of a release, entail any consequence other than the release of such Lien without recourse to, or representation, or warranty by such Agent. Each of the Purchasers irrevocably authorizes the Administrative Agent to rely on any such Officer's Certificate without independent investigation and release or subordinate its interests in any Collateral pursuant to this Section 9.11 (including, in each case of the foregoing, by filing applicable termination statements and/or returning pledged Collateral); it being acknowledged and agreed by each Secured Party that such Agent, in its capacity as such, shall have no liability with respect to relying on such Officer's Certificate and taking actions to evidence such release or subordination. Any release of Collateral by any Agent shall be without recourse to, or representation, or warranty by such Agent.

Section 9.12    Other Purchasers. None of the Purchasers shall have any obligation, liability, responsibility or duty under this Agreement other than those applicable to all Purchasers as such. Without limiting the foregoing, none of the Purchasers shall have or be deemed to have any fiduciary relationship with any other Purchaser. Each Purchaser acknowledges that it has not relied, and will not rely, on any of the other, Purchasers in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.13    Appointment of Supplemental Agents.

(a)    It is the purpose of this Agreement and the other Note Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations or other Persons to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Note Documents, and in particular in case of the enforcement of any of the Note Documents, or in case any Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Note Documents or take any other action which may be desirable or necessary in connection therewith, such Agent is hereby authorized to appoint an additional individual or institution

CONFIDENTIAL                                                                  Trive_00043056

selected by such Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "Supplemental Agent" and, collectively, as "Supplemental Agents").

(b)     In the event that an Agent appoints a Supplemental Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Note Documents to be exercised by or vested in or conveyed to such Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Agent to the extent, and only to the extent, necessary to enable such Supplemental Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Note Documents and necessary to the exercise or performance thereof by such Supplemental Agent shall run to and be enforceable by either such Agent or such Supplemental Agent, and (ii) the provisions of this Article IX, Section 10.04 and Section 10.05, and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder and under the other Note Documents that refer to such Agent shall inure to the benefit of such Supplemental Agent and all references therein to such Agent shall be deemed to be references to such Agent and/or such Supplemental Agent, as the context may require.

(c)     Should any instrument in writing from the Issuer be required by any Supplemental Agent so appointed by any Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Issuer shall execute, acknowledge and deliver any and all such instruments promptly upon request by such appointing Agent. In case any Supplemental Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by Law, shall vest in and be exercised by the appointing Agent until the appointment of a new Supplemental Agent.

Section 9.14     Withholding Tax.     To the extent required by any applicable Law, the Administrative Agent may deduct or withhold from any payment to any Purchaser under any Note Document an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Purchaser for any reason (including because the appropriate form was not delivered or was not properly executed or because such Purchaser failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective), such Purchaser shall indemnify and hold harmless the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties, additions to Tax or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Purchaser by the Administrative Agent shall be conclusive absent manifest error. Each Purchaser hereby authorizes the Administrative Agent to set off and apply any amounts at any time owing to such Purchaser under this Agreement or any other Note Document against any amount due the Administrative Agent under this Section 9.14. For the avoidance of doubt, this Section 9.14 shall not limit or expand the obligations of the Issuer under Section 3.01 or any other provision of this Agreement.

Section 9.15     Purchaser Direction. Each Purchaser authorizes and directs each Agent to enter into, and agrees to be bound by, this Agreement, the Collateral Documents, and the other Note Documents to which it is a party. Each Purchaser hereby acknowledges and agrees that (x) the foregoing instructed actions constitute an instruction from all the Purchasers under this Section and (y) this Article IX and Section 9.07 and any other rights, privileges, protections, immunities, and indemnities in favor of such

CONFIDENTIAL                                                                    Trive_00043057

Agent hereunder apply to any and all actions taken or not taken by such Agent in accordance with such instruction.

Section 9.16    Certain ERISA Matters.  (a) Each Purchaser (x) represents and warrants, as of the date such Person became a Purchaser party hereto, to, and (y) covenants, from the date such Person became a Purchaser party hereto to the date such Person ceases being a Purchaser party hereto, for the benefit of, the Agents and not, for the avoidance of doubt, to or for the benefit of the Issuer, that at least one of the following is and will be true:

(i)    such Purchaser is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans  with respect to such Purchaser's entrance into, administration of and performance of the Notes, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to such Purchaser's entrance into, administration of and performance of the Notes, the Commitments and this Agreement,

(iii)    (A) such Purchaser is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Purchaser to enter into, administer and perform the Notes, the Commitments and this Agreement, (C) the entrance into, administration of and performance of the Notes, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Purchaser, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Purchaser's entrance into, administration of and performance of the Notes, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Purchaser.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Purchaser or (2) a Purchaser has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Purchaser further (x) represents and warrants, as of the date such Person became a Purchaser party hereto, to, and (y) covenants, from the date such Person became a Purchaser party hereto to the date such Person ceases being a Purchaser party hereto, for the benefit of, the Agents and not, for the avoidance of doubt, to or for the benefit of the Issuer, that no Agent is a fiduciary with respect to the Collateral or the assets of such Purchaser involved in such Purchaser's entrance into, administration of and performance of the Notes, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by any Agent under this Agreement, any Note Document or any documents related hereto or thereto).

Section 9.17    Additional Exculpations.

(a)    In the absence of instructions, any Agent may act (or refrain from acting) as it considers to be in the best interest of the Purchasers.

-139-

CONFIDENTIAL                                                            Trive_00043058

(b)    No Agent shall be obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another party.

(c)    Each Agent may assume (unless it has received notice to the contrary in its capacity as such Agent for the Purchasers) that any right, power, authority or discretion vested in any party or any group of Purchasers has not been exercised.

(d)    Unless a Note Document expressly provides otherwise, any Agent may disclose to any other party any information it reasonably believes it has received as an Agent under this Agreement.

(e)    Without prejudice to the generality of paragraph (b) above, any Agent may disclose and on the written request of the Issuer or the Required Purchasers shall, as soon as reasonably practicable, disclose, the identity of a Defaulting Purchaser to the Issuer and to the other Purchasers.

(f)    Notwithstanding any other provision of any Note Document to the contrary, no Agent-Related Person shall be obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

Section 9.18    Erroneous Payments.

(a)    Each Purchaser hereby agrees that (i) if any Agent notifies such Purchaser that such Agent has determined in its sole discretion that any funds received by such Purchaser from such Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Purchaser (whether or not known to such Purchaser) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Purchaser shall promptly, but in no event later than one Business Day thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Purchaser to the date such amount is repaid to such Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Purchaser shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of any Agent to any Purchaser or under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding clause (a), each Purchaser hereby further agrees that if it receives a payment from any Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by any Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Purchaser otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made, each such Purchaser is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Purchaser shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Purchaser agrees that, in each such case, it shall promptly

CONFIDENTIAL

Trive_00043059

Case 24-50130-KBO Doc 78-2 Filed 03/27/25 Page 148 of 235

(and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Purchaser to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c) The Issuer hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Purchaser that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting any Agent's rights and remedies under this Section 9.18), the Administrative Agent shall be subrogated to all the rights of such Purchaser with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by the Issuer.

(d) In addition to any rights and remedies of each Agent provided by law, each Agent shall have the right, without prior notice to any Purchaser, any such notice being expressly waived by such Purchaser to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 9.18 and which has not been returned to such Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by any Agent or any of its Affiliate, branch or agency thereof to or for the credit or the account of such Purchaser. Each Agent agrees promptly to notify such Purchaser after any such setoff and application made by such Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

Section 9.19    Survival. All rights, privileges, protections, immunities, and indemnities granted to any Agent under this Article IX shall survive the resignation or replacement of any Agent, the termination of the Aggregate Commitments, the repayment, satisfaction or discharge of all Secured Obligations, the termination of this Agreement or any other Note Document and any transfer of rights by or replacement of a Purchaser.

## ARTICLE X

### Miscellaneous

Section 10.01    Amendments, Etc. Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Note Document, and no consent to any departure by the Issuer therefrom, shall be effective unless in writing signed by the Administrative Agent, Required Purchasers and the Issuer, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a) postpone any date scheduled for, or reduce the amount of, or forgive, any payment of principal or interest under Section 2.07 or Section 2.08, fees or other amounts or extend the final maturity or the date for the payment of other interest or fees, without the written consent of each Purchaser directly and adversely affected thereby (it being understood that an amendment, modification or waiver of, or consent to departure from, any condition precedent, covenant, Event of Default or waiver of (or amendment

AMERICAS/2022770253.18                    -141-                    *LB Holdings NPA*

CONFIDENTIAL                                                                Trive_00043060

to the terms of) any mandatory redemption of the Notes shall not constitute a postponement, reduction or forgiveness of any date scheduled for the payment of principal, interest or other fees or amounts or an extension of any maturity date);

(b)   reduce the principal of, or the rate of interest specified herein on, any Note, or (subject to clause (iii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Note Document without the written consent of each Purchaser directly and adversely affected thereby, it being understood that any change to the definition of "Consolidated First Lien Secured Leverage Ratio" or in the component definitions thereof shall not constitute a reduction in the rate of interest or fees;

(c)   change any provision of this Section 10.01 or the definitions of "Required Purchasers" without the written consent of each Purchaser;

(d)   release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Purchaser; *provided* that any transaction permitted under Section 7.04 or Section 7.05 shall not be subject to this clause (e) to the extent such transaction does not result in the release of all or substantially all of the Collateral;

(e)   subordinate the Liens on the Collateral for the benefit of any of the Purchasers (in its capacity as a Secured Party hereunder) in respect of any of its Secured Obligations to any other Lien in respect of any Indebtedness without the prior written consent of each Purchaser adversely affected thereby;

(f)   effectuate any payment subordination with respect to the Secured Obligations owing to any Purchaser without the prior written consent of each Purchaser adversely effected thereby;

(g)   change any provision of Section 8.04 that would alter the payment waterfall provision without the written consent of each Purchaser directly and adversely affected thereby; or

(h)   without the written consent of each Purchaser holding, together with its Affiliates, at least $15,000,000 in aggregate principal amount of Notes, excluding any capitalized principal thereon:

(i)   amend or waive Section 7.06 (or any other provision hereof) in any manner that would permit the Issuer to make additional Restricted Payments not permitted by the terms of this Agreement (as in effect on the Closing Date, as amended from time to time in accordance with this Section 10.01(h)(i));

(ii)   increase, though an amendment, waiver or otherwise, the maximum original principal amount of the Notes that may be issued under this Agreement to more than an aggregate of $250,000,000;

(iii)   amend or waive Section 2.01(b) or Section 4.02(b), or otherwise amend or waive the terms under which any Delayed Issuance of Notes may be made;

(iv)   amend or waive (A) any provision of Section 7.03 (or any other provision hereof) to increase the principal amount of third-party Indebtedness for borrowed money that may be Incurred by Subsidiaries of the Issuer, including by increasing any maximum dollar amounts or maximum leverage ratios or (B) Section 7.03(k) or 7.03(l); or

(v)   (A) amend or waive any provision of Section 2.05(a) (or any other provision hereof) in any manner that would allow the Issuer to voluntarily redeem or otherwise

-142-

CONFIDENTIAL   Trive_00043061

prepay the Notes on a non-ratable basis as among all Purchasers at the time of such redemption or prepayment; or (B) amend any provision of this Agreement to permit or require the conversion of the Notes into, or exchange of the Notes for, any other securities, loans, instruments or obligations without the consent of each Purchaser at such time;

and *provided, further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Purchasers required above, affect the rights or duties of, or any fees or other amounts payable to, such Agent under this Agreement or any other Note Document; and (ii) only the consent of the parties to the Agency Fee Letter shall be required to amend, modify or supplement the terms thereof. Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Purchasers, the Administrative Agent and the Issuer (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Note Documents with the Notes and the accrued interest and fees in respect thereof and (b) to include appropriately the Purchasers holding such credit facilities in any determination of the Required Purchasers.

Notwithstanding anything to the contrary contained in this Section 10.01, any collateral documents, security documents, intercreditor agreements and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Collateral Agent and may be, together with this Agreement, amended, supplemented, modified, terminated or waived with the consent of the Collateral Agent (in its sole discretion) at the request of the Issuer without the need to obtain the consent of any Purchaser if such amendment, supplement or waiver is not, in the reasonable determination of the Collateral Agent, materially adverse to the Purchasers and is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to correct or cure ambiguities, errors, inconsistencies, omissions, mistakes or defects (including to correct or cure incorrect cross references or similar inaccuracies), (iii) to effect administrative changes of a technical or immaterial nature or (iv) to cause such guarantee, collateral document, security document, intercreditor agreement or other document to be consistent with this Agreement and the other Note Documents. Furthermore, with the consent of the Administrative Agent (in its sole discretion) at the request of the Issuer (without the need to obtain any consent of any Purchaser), any Note Document may be amended (x) to correct or cure ambiguities, errors inconsistencies, omissions, mistakes or defects, (y) to effect administrative changes of a technical or immaterial nature or (z) to correct or cure incorrect cross references or similar inaccuracies. The Issuer and the Purchasers hereby expressly indemnify each Agent if it relies on this provision in accordance with the terms of Section 9.07 or Section 10.05, as applicable, in each case, without regard to any exceptions for bad faith, gross negligence or willful misconduct.

Notwithstanding anything to the contrary herein, in connection with any determination as to whether the Required Purchasers have (A) consented (or not consented) to any amendment or waiver of any provision of this Agreement or any other Note Document or any departure by the Issuer therefrom, (B) otherwise acted on any matter related to any Note Document, or (C) directed or required any Agent or any Purchaser to undertake any action (or refrain from taking any action) with respect to or under any Note Document, any Purchaser (including its Affiliates for purposes hereof) that, as a result of its interest in any total return swap, total rate of return swap, credit default swap or other derivative contract (other than any such total return swap, total rate of return swap, credit default swap or other derivative contract entered into pursuant to bona fide market making activities), has a net short position with respect to the Notes (each, a "Net Short Purchaser") shall have no right to vote any of its Notes and shall otherwise be treated as a Disqualified Purchaser. For purposes of determining whether a Purchaser has a "net short position" on any date of determination: (i) derivative contracts with respect to the Notes and such contracts that are the functional equivalent thereof shall be counted at the notional amount thereof in Dollars, (ii) notional amounts in other currencies shall be converted to the dollar equivalent thereof by such Purchaser in a

CONFIDENTIAL                                                                        Trive_00043062

commercially reasonable manner consistent with generally accepted financial practices and based on the prevailing conversion rate (determined on a mid-market basis) on the date of determination, (iii) derivative contracts in respect of an index that includes the Issuer or any instrument issued or guaranteed by the Issuer shall not be deemed to create a short position with respect to the Notes, so long as (x) such index is not created, designed, administered or requested by such Purchaser and (y) the Issuer and any instrument issued or guaranteed by the Issuer shall represent less than 5.0% of the components of such index, (iv) derivative transactions that are documented using either the 2014 ISDA Credit Derivatives Definitions or the 2003 ISDA Credit Derivatives Definitions (collectively, the "ISDA CDS Definitions") shall be deemed to create a short position with respect to the Notes if such Purchaser is a protection buyer or the equivalent thereof for such derivative transaction and (x) the Notes are a "Reference Obligation" under the terms of such derivative transaction (whether specified by name in the related documentation, included as a "Standard Reference Obligation" on the most recent list published by Markit, if "Standard Reference Obligation" is specified as applicable in the relevant documentation or in any other manner), (y) the Notes or the Commitments would be a "Deliverable Obligation" under the terms of such derivative transaction or (z) the Issuer (or its successor) is designated as a "Reference Entity" under the terms of such derivative transactions, and (v) credit derivative transactions or other derivatives transactions not documented using the ISDA CDS Definitions shall be deemed to create a short position with respect to the Notes if such transactions are functionally equivalent to a transaction that offers the Purchaser protection in respect of the Notes or the Commitments, or as to the credit quality of the Issuer other than, in each case, as part of an index so long as (x) such index is not created, designed, administered or requested by such Purchaser and (y) the Issuer and any instrument issued or guaranteed by the Issuer shall represent less than 5.0% of the components of such index. In connection with any such determination, each Purchaser (including its Affiliates for purposes hereof) shall promptly notify the Administrative Agent in writing that it is a Net Short Purchaser, and in the absence of such notice, shall be deemed to have represented and warranted to the Issuer and each Agent that it is not a Net Short Purchaser (it being understood and agreed that each Agent shall be entitled to rely on each such representation and deemed representation and shall have no duty to (x) inquire as to or investigate the accuracy of any such representation or deemed representation or (y) otherwise ascertain or monitor whether any Purchaser, Eligible Transferee or prospective Purchaser or Eligible Transferee is a Net Short Purchaser or make any calculations, investigations or determinations with respect to any derivative contracts and/or net short positions). Without limiting the foregoing, no Agent shall (A) be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to the Net Short Purchasers or otherwise take (or omit to take) any action with respect thereto or (B) have any liability with respect to or arising out of any assignment of Notes to any Net Short Purchaser.

Notwithstanding anything herein to the contrary, no Defaulting Purchaser shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent that by its terms requires the consent of all the Purchasers or each affected Purchaser may be effected with the consent of the applicable Purchasers other than Defaulting Purchasers), except that (x) the maturity of any Defaulting Purchaser's Notes may not be extended, the rate of interest on any of its Notes may not be reduced and the principal amount of any of its Notes may not be forgiven, in each case without the consent of such Defaulting Purchaser and (y) any amendment, waiver or consent requiring the consent of all the Purchasers or each affected Purchaser that by its terms affects any Defaulting Purchaser more adversely than the other affected Purchasers shall require the consent of such Defaulting Purchaser.

Section 10.02    Notices and Other Communications; Facsimile Copies.

(a)    General.    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Note Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable

CONFIDENTIAL                                                    Trive_00043063

address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

      (i)     if to the Issuer or any Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the other parties; and

      (ii)    if to any other Purchaser, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Issuer and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by the receiving party; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(b)), when delivered; *provided* that notices and other communications to any Agent shall not be effective until actually received by such Person during such Agent's normal business hours. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

      (b)    Electronic Communications. Notices and other communications to the Purchasers hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Purchaser pursuant to Article II if such Purchaser has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Issuer may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

      Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

      (c)    The Platform. THE PLATFORM AND THE ISSUER MATERIALS ARE PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE ISSUER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE PLATFORM AND THE ISSUER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT-RELATED PERSON IN CONNECTION WITH THE ISSUER MATERIALS OR THE

CONFIDENTIAL

Trive_00043064

PLATFORM. In no event shall any Agent-Related Person have any liability to the Issuer, any Purchaser or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Issuer's or any Agent's transmission of Issuer Materials through the Internet or the Platform, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent-Related Person; *provided, however*, that in no event shall any Agent-Related Person have any liability to the Issuer, any Purchaser or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages). Each of the Purchasers and the Issuer acknowledges and agrees that the distribution of Issuer Materials through an electronic medium is not necessarily secure, that no Agent is responsible for approving or vetting the representatives or contacts of any Purchaser that are added to the Platform, and that there are confidentiality and other risks associated with such distribution. Each of the Purchasers and the Issuer hereby approves distribution of the Issuer Materials through the Platform and understands and assumes the risks of such distribution.

(d)     Change of Address, Etc. Each of the Issuer and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by written notice to the other parties hereto. Each other Purchaser may change its address, facsimile or telephone number for notices and other communications hereunder by written notice to the Issuer and the Administrative Agent. In addition, each Purchaser agrees to notify the Administrative Agent in writing from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Purchaser. Furthermore, each Public Purchaser agrees to cause at least one individual at or on behalf of such Public Purchaser to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Purchaser or its delegate, in accordance with such Public Purchaser's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Issuer Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Issuer, its Affiliates, or their securities for purposes of United States Federal or state securities laws. In the event that any Public Purchaser has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Purchaser acknowledges that (i) the Agents and other Purchasers may have access to such information and (ii) neither the Issuer nor the Agents or other Purchasers with access to such information shall have (x) any responsibility for such Public Purchaser's decision to limit the scope of information it has obtained in connection with this Agreement and the other Note Documents or (y) any duty to disclose such information to such electing Public Purchaser or to use such information on behalf of such electing Public Purchaser, and shall not be liable for the failure to so disclose or use such information.

(e)     Reliance by Agents and Purchasers. The Administrative Agent and the Purchasers shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Issuer even if (i) notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Issuer shall indemnify each Agent-Related Person and each Purchaser from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Issuer except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such losses, costs, expenses and liabilities resulted from (x) such Agent-Related Person's own gross negligence or willful misconduct, or (y) such Purchaser's own gross negligence, bad faith or willful misconduct.

(f)     [Reserved].

CONFIDENTIAL                                                                                    Trive_00043065

Section 10.03   No Waiver; Cumulative Remedies. No failure by any Purchaser or any Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Note Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Note Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04   Attorney Costs and Expenses. The Issuer agrees (a) if the Closing Date occurs, to pay or reimburse each Agent for all reasonable and documented or invoiced out-of-pocket costs and expenses associated with the syndication of the Notes and the preparation, execution and delivery, administration, amendment, modification, waiver and/or enforcement of this Agreement and the other Note Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), including all reasonable and documented or invoiced Attorney Costs of (i) Kirkland & Ellis LLP (or any successor counsel), as counsel to the Purchasers (taken together) and one local and foreign counsel thereto in each relevant jurisdiction and (ii) Ropes & Gray LLP (or any successor counsel), as counsel to the Administrative Agent and the Collateral Agent (taken together) and one local and foreign counsel thereto in each relevant jurisdiction (and any additional counsel retained with the Issuer's consent (such consent not to be unreasonably withheld, conditioned or delayed)), and (b) to pay or reimburse each Agent and each Purchaser for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Note Documents (including all costs and expenses incurred in connection with any workout or restructuring in respect of the Notes and all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and, in the case of legal fees, limited to all Attorney Costs of (i) Kirkland & Ellis LLP (or any successor counsel), as counsel to the Purchasers (taken together) and one local and foreign counsel thereto in each relevant jurisdiction and (ii) Ropes & Gray LLP (or any successor counsel), as counsel to the Administrative Agent and the Collateral Agent (taken together) and one local and foreign counsel thereto in each relevant jurisdiction (and, in the case of an actual or perceived conflict of interest, where such Person affected by such conflict informs the Issuer of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Person)). The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by any Agent. The agreements in this Section 10.04 shall survive the resignation or replacement of any Agent, the termination of the Aggregate Commitments, the repayment, satisfaction or discharge of all Secured Obligations, the termination of this Agreement or any other Note Document and any transfer of rights by or replacement of a Purchaser. All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Issuer of an invoice relating thereto setting forth such expenses in reasonable detail. If the Issuer fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Note Document, such amount may be paid on behalf of the Issuer by any Agent in its sole discretion.

Section 10.05   Indemnification by the Issuer. Whether or not the transactions contemplated hereby are consummated, the Issuer shall indemnify and hold harmless, without duplication, each Agent-Related Person, each Purchaser and their respective Affiliates, directors, officers, employees, counsel, agents, advisors, and other representatives and successors of any of the foregoing (collectively, the "Indemnitees") from and against any and all losses, liabilities, damages, claims, and reasonable and documented or invoiced out-of-pocket fees and expenses, joint and several (including reasonable and documented or invoiced out-of-pocket Attorney Costs of (i) one counsel for all Indemnitees of the Agents, taken as a whole, and, if necessary, one firm of local counsel in each appropriate jurisdiction for all such Indemnitees taken as a whole (which may include a single special counsel acting in multiple jurisdictions) and (ii) one counsel for all Indemnitees of the Purchasers, taken as a whole, and, if necessary, one firm of

CONFIDENTIAL

Trive_00043066

local counsel in each appropriate jurisdiction for all such Indemnitees taken as a whole (which may include a single special counsel acting in multiple jurisdictions) (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Issuer of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee)) of any such Indemnitee arising out of or relating to any claim, any litigation, any investigation or other proceeding (including any inquiry or investigation of the foregoing) (regardless of whether such Indemnitee is a party thereto and whether or not such proceedings are brought by the Issuer, its equity holders, its Affiliates, creditors or any other third person) that relates to the Note Documents or the Transactions, including the financing contemplated hereby and the use of proceeds of the Notes, of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Note Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment or Note or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, under or from any property currently or to the extent arising from the former ownership or operation of the Issuer or any Subsidiary, formerly owned or operated by the Issuer or any Subsidiary, or any Environmental Liability related in any way to the Issuer or any Subsidiary, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of an Indemnitee; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (w) in the case of an Agent-Related Person or any of its Indemnitees, the gross negligence or willful misconduct of such Agent-Related Person or its Indemnitees (as determined by a court of competent jurisdiction in a final and non-appealable decision), (x) in the case of the Purchasers and their Indemnitees, the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or controlling Persons or any of the officers, directors, employees, agents, advisors, members or other representatives or successors of any of the foregoing, in each case who are involved in or aware of the Transactions (as determined by a court of competent jurisdiction in a final and non-appealable decision), (y) other than respect to the Agent-Related Persons and their Indemnitees, a material breach of the Note Documents by such Indemnitee or one of its Affiliates (as determined by a court of competent jurisdiction in a final and non-appealable decision), or (z) disputes solely between and among such Indemnitees to the extent such disputes do not arise from any act or omission of the Issuer, HoldCo, Lucky Bucks or their Subsidiaries or any of their Affiliates (other than with respect to a claim against an Indemnitee acting in its capacity as an Agent or similar role under the Note Documents, unless such claim arose from the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final and non-appealable decision). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through any Platform or other similar information transmission systems in connection with this Agreement. No Indemnitee nor the Issuer shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Note Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date); *provided* that nothing contained in this sentence shall limit the Issuer's indemnification obligations under the Note Documents to the extent such special, punitive, indirect or consequential damages are included in any third-party claim in connection with which any Indemnitee is entitled to indemnification hereunder. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Issuer, its directors, managers, partners, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Note Documents

CONFIDENTIAL                                                                 Trive_00043067

is consummated. All amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; *provided, however,* that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this Section 10.05. The agreements in this Section 10.05 shall survive the resignation or substitution of any Agent, the termination of the Aggregate Commitments, the repayment, satisfaction or discharge of all Secured Obligations, the termination of this Agreement or any other Note Document and any transfer of rights by or replacement of a Purchaser. For the avoidance of doubt, this Section 10.05 shall not apply to Taxes other than Taxes that represent liabilities, obligations, losses, damages, etc., with respect to a non-Tax claim.

Section 10.06    Payments Set Aside. To the extent that any payment by or on behalf of the Issuer is made to any Agent or any Purchaser, or any Agent or any Purchaser exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Purchaser in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Purchaser severally agrees to pay such Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate *per annum* equal to the Federal Funds Rate.

Section 10.07    Successors and Transferees.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that, except as otherwise provided herein (including without limitation as permitted under Section 7.04), neither the Issuer nor any of its Subsidiaries may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Agent and Purchaser and no Purchaser may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Transferee, (ii) [reserved] or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Purchaser may transfer to one or more transferees ("Transferees") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Notes at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(A)    the Issuer, *provided* that, no consent of the Issuer shall be required for a transfer of any Notes (1) to any other Purchaser, any Affiliate of a Purchaser or any Approved Fund, (2) if a Specified Default has occurred and is continuing, to any Transferee or (3) to any of the Sponsor, Affiliates of the Sponsor, the Issuer or any of its Subsidiaries, to the extent any such transfers are made in accordance with all other applicable terms of this Agreement; *provided, further*, that such consent shall be deemed to have been given if the Issuer has not responded within ten (10) Business Days after notice by the Administrative Agent; and/or

CONFIDENTIAL                                                                    Trive_00043068

(B) the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for a transfer to another Purchaser or an Approved Fund.

(ii) Transfers shall be subject to the following additional conditions:

(A) except in the case of a transfer to a Purchaser or an Affiliate of a Purchaser or an Approved Fund or a transfer of the entire remaining amount of the transferring Purchaser's Notes, the amount of the Notes of the transferring Purchaser subject to each such transfer (determined as of the date the Transfer and Acceptance with respect to such transfer is delivered to the Administrative Agent) shall not be less than $1,000,000 (or an integral multiple of $1,000,000 in excess thereof) unless the Issuer and the Administrative Agent otherwise consents, *provided* that (1) no such consent of the Issuer shall be required if a Specified of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Purchaser and its Affiliates or Approved Funds, if any;

(B) the parties to each transfer shall execute and deliver to the Administrative Agent a Transfer and Acceptance;

(C) the Transferee, if it shall not be a Purchaser, shall deliver to the Administrative Agent an Administrative Questionnaire, all documentation and other information reasonably required under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act and any documentation required by Section 3.01(f);

(D) the Transferee shall not be a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person), a Disqualified Purchaser or, except to the extent permitted pursuant to Section 10.07(k), the Issuer or any of its Subsidiaries; and

(E) the Transferee shall not be a Defaulting Purchaser.

In connection with any transfer of rights and obligations of any Defaulting Purchaser hereunder, no such transfer shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the transfer shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment or other compensating actions, including funding, with the consent of the Issuer and the Administrative Agent, the applicable *pro rata* share of Notes previously requested but not funded by the Defaulting Purchaser, to each of which the applicable transferee and transferor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Purchaser to any Agent or any Purchaser hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Notes in accordance with its *pro rata* share. Notwithstanding the foregoing, in the event that any transfer of rights and obligations of any Defaulting Purchaser hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the transferee of such interest shall be deemed to be a Defaulting Purchaser for all purposes of this Agreement until such compliance occurs.

(c) Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) and receipt by the Administrative Agent from the parties to each transfer of a processing and recordation fee of $3,500 (*provided* that (i) the Administrative Agent may, in its sole discretion, elect

CONFIDENTIAL                                                                    Trive_00043069

to waive such processing and recordation fee in the case of any transfer and (ii) such fee shall not be applicable in the case of a transfer to an Affiliate of the transferring Purchaser), from and after the effective date specified in each Transfer and Acceptance, the Eligible Transferee thereunder shall be a party to this Agreement and, to the extent of the interest transferred by such Transfer and Acceptance, have the rights and obligations of a Purchaser under this Agreement (including, for the avoidance of doubt, any rights and obligations pursuant to Section 3.01), and the transferring Purchaser thereunder shall, to the extent of the interest transferred by such Transfer and Acceptance, be released from its obligations under this Agreement (and, in the case of a Transfer and Acceptance covering all of the transferring Purchaser's rights and obligations under this Agreement, such Purchaser shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.02, 3.03, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such transfer). Upon request, and the surrender by the transferring Purchaser of its Note (if any), the Issuer (at its expense) shall execute and deliver a Note to the transferee Purchaser. For greater certainty, any transfer by a Purchaser pursuant to this Section 10.07 shall not in any way constitute or be deemed to constitute a novation, discharge, recession, extinguishment or substitution of the existing Indebtedness and any Indebtedness so assigned shall continue to be the same obligation and not a new obligations.

(d)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Issuer, shall maintain at one of its offices a copy of each Transfer and Acceptance delivered to it and a register for the recordation of the names and addresses of the Purchasers, and the principal amounts (and stated interest amounts) and currencies of the Notes owing to, each Purchaser pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent demonstrable error, and the Issuer, the Agents and the Purchasers shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Purchaser hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Issuer, any Agent and any Purchaser (but in the case of any Purchaser solely with respect to such Purchaser's outstanding Notes) at any reasonable time and from time to time upon reasonable prior written notice. No transfer shall be effective unless recorded in the Register. The parties hereto agree and intend that the Secured Obligations shall be treated as being in registered form for the purposes of the Code (including Sections 163(f), 871(h)(2), 881(c)(2), and 4701 of the Code and any United States Treasury Regulations or proposed United States Treasury Regulations thereunder).

(e)     [Reserved].

(f)     [Reserved].

(g)     Any Purchaser may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Purchaser, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank; *provided* that no such pledge or assignment shall release such Purchaser from any of its obligations hereunder or substitute any such pledgee or assignee for such Purchaser as a party hereto.

(h)     [Reserved].

(i)     Notwithstanding anything to the contrary contained herein, (1) any Purchaser may in accordance with applicable Law create a security interest in all or any portion of the Notes owing to it and the Note, if any, held by it and (2) any Purchaser that is a Fund may create a security interest in all or any portion of the Notes owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Purchaser in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Purchaser from any of its obligations under the

CONFIDENTIAL                                                                    Trive_00043070

Note Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Purchaser under the Note Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

      (j)     [Reserved].

          (i)     [Reserved].

      (k)     Notwithstanding anything to the contrary contained herein, any Purchaser may, at any time, transfer all or a portion of its rights and obligations under this Agreement in respect of its Notes to any Affiliated Purchaser; *provided* that:

          (i)     no Affiliated Purchaser (other than a Debt Fund Affiliate) shall have any right to (x) attend or participate in (including, in each case, by telephone) any meeting (including "Purchaser only" meetings) or discussions (or portion thereof) among any Agent or any Purchaser to which representatives of the Issuer are not then present or invited thereto, (y) receive any information or material prepared by any Agent or any Purchaser or any communication by or among any Agent and one or more Purchasers or any other material which is "Purchaser only", except to the extent such information or materials have been made available to the Issuer or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Notes required to be delivered to Purchasers pursuant to Article II) or receive any advice of counsel to any Agent or (z) make any challenge to any Agent's or any other Purchaser's attorney-client privilege on the basis of its status as a Purchaser;

          (ii)     except with respect to any amendment, modification, waiver, consent or other action or any plan of reorganization or liquidation (a) that requires the consent of all Purchasers, all Purchasers directly and adversely affected or specifically such Purchaser, (b) that alters the applicable Affiliated Purchaser's *pro rata* share of any payments given to all Purchasers, or (c) affects the applicable Affiliated Purchaser (in its capacity as a Purchaser) in a manner that is disproportionate to the effect on any Purchaser, the Notes held by the applicable Affiliated Purchaser (other than a Debt Fund Affiliate) shall be disregarded in both the numerator and denominator in the calculation of any Required Purchaser vote (and, in the case of a plan of reorganization or liquidation that does not affect the applicable Affiliated Purchaser in a manner that is adverse to such Affiliated Purchaser relative to other Purchasers, such Affiliated Purchaser shall be deemed to have voted its interest in the Notes in the same proportion as the other Purchasers) (and shall be deemed to have been voted in the same percentage as all other applicable Purchasers voted if necessary to give legal effect to this paragraph) (but, in any event, in connection with any amendment, modification, waiver, consent or other action, shall be entitled to any consent fee, calculated as if all of the applicable Affiliated Purchaser's Notes had voted in favor of any matter for which a consent fee or similar payment is offered);

          (iii)     no such acquisition by an Affiliated Purchaser (other than a Debt Fund Affiliate) shall be permitted if, after giving effect to such acquisition, the aggregate principal amount of Notes held by Affiliated Purchasers (other than Debt Fund Affiliates) would exceed 25.0% of the aggregate principal amount of all Notes at the time of such purchase; *provided* that to the extent any transfer to an Affiliated Purchaser (other than a Debt Fund Affiliate) would result in the aggregate principal amount of the applicable Notes held by Affiliated Purchasers (other than Debt Fund Affiliates) exceeding such 25.0% threshold at the time of such purchase, the purchase of such excess amount will be void *ab initio*; and

CONFIDENTIAL          Trive_00043071

(iv)     the transferring Purchaser and the Affiliated Purchaser shall execute and deliver to the Administrative Agent a Transfer and Acceptance in form and substance reasonably satisfactory to the Administrative Agent, which shall clearly identify the Affiliated Purchaser as an "Affiliated Purchaser" and contain a customary "big boy" representation; *provided* that no representation as to the absence of any material non-public information shall be required; *provided, further*, that an Affiliated Purchaser that is a Debt Fund Affiliate will not be subject to the limitations in this clause.

Each Affiliated Purchaser agrees to notify the Administrative Agent promptly (and in any event within ten (10) Business Days) if it acquires any Person who is also a Purchaser, and each Purchaser agrees to notify the Administrative Agent promptly (and in any event within ten (10) Business Days) if it becomes an Affiliated Purchaser.

(l)     Notwithstanding anything in Section 10.01 or the definition of "Required Purchasers" to the contrary, for purposes of determining whether the Required Purchasers have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action (other than a Debt Fund Affiliate) with respect to any of the terms of any Note Document or any departure by the Issuer therefrom, or subject to Section 10.07(l)(ii), any plan of reorganization pursuant to the U.S. Bankruptcy Code, (ii) otherwise acted on any matter related to any Note Document, or (iii) directed or required any Agent or any Purchaser to undertake any action (or refrain from taking any action) with respect to or under any Note Document, no Affiliated Purchaser (other than a Debt Fund Affiliate) shall have any right to consent (or not consent), otherwise act or direct or require any Agent or any Purchaser to take (or refrain from taking) any such action (other than any such amendment, waiver, consent, modification or other action that requires the consent of each Purchaser, each affected Purchaser, affects such Affiliated Purchaser as compared to other Purchasers in a disproportionately adverse manner or that deprives such Affiliated Purchaser of its *pro rata* share of any payments to which it is entitled, as to which items each Affiliated Purchaser shall have the right to vote, consent, act or direct or require the Administrative Agent to take (or refrain from taking) action) and:

(i)     all Notes held by any Affiliated Purchasers (other than a Debt Fund Affiliate) shall be deemed to be not outstanding for all purposes of calculating whether the Required Purchasers have taken any actions; and

(ii)     all Notes held by Affiliated Purchasers (other than a Debt Fund Affiliate) shall be deemed to be not outstanding for all purposes of calculating whether all Purchasers have taken any action unless the action in question affects such Affiliated Purchaser in a disproportionately adverse manner than its effect on other Purchasers.

(m)     Notwithstanding anything in this Agreement or the other Note Documents to the contrary, each Affiliated Purchaser (other than a Debt Fund Affiliate) hereby agrees that if a proceeding under any Debtor Relief Law shall be commenced by or against the Issuer at a time when such Purchaser is an Affiliated Purchaser (other than a Debt Fund Affiliate), such Affiliated Purchaser irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Affiliated Purchaser with respect to the Notes held by such Affiliated Purchaser in any manner in the Administrative Agent's sole discretion, unless the Administrative Agent instructs such Affiliated Purchaser to vote, in which case such Affiliated Purchaser shall vote with respect to the Notes held by it as the Administrative Agent directs; *provided* that such Affiliated Purchaser shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Purchaser in a disproportionately adverse manner to such Affiliated Purchaser than the proposed treatment of similar Obligations held by Purchasers that are not Affiliated Purchasers.

CONFIDENTIAL                                                                    Trive_00043072

(n)    Notwithstanding anything in Section 10.01 or the definition of "Required Purchasers" to the contrary, for purposes of determining whether the Required Purchasers have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Note Document or any departure by the Issuer therefrom, (ii) otherwise acted on any matter related to any Note Document or (iii) directed or required any Agent or any Purchaser to undertake any action (or refrain from taking any action) with respect to or under any Note Document, all Notes held by Debt Fund Affiliates may not account for more than 49.9% (*pro rata* among such Debt Fund Affiliates) of the Notes of consenting Purchasers included in determining whether the Required Purchasers have consented to any action pursuant to Section 10.01.

(o)    Notwithstanding anything to the contrary contained herein, the Sponsor or any non-Debt Fund Affiliate are permitted (but not required) to contribute, directly or indirectly, such Notes to the Issuer or any of its Subsidiaries for purposes of cancellation of such Indebtedness, which shall be deemed to be an equity contribution that builds the amount available under Section 7.06(a)(v)(2) by an amount equal to the fair market value of the Notes so cancelled (but in no event shall such fair market value exceed par); *provided* that if the fair market value of such Notes cannot be ascertained by the Issuer, the fair market value shall be deemed to be the purchase price of such Notes paid by the Sponsor or such non-Debt Fund Affiliate.

Section 10.08    Confidentiality.  Each of the Agents and the Purchasers agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors, auditors, and agents and other Agent-Related Persons, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and on a need-to-know basis); (b) to the extent requested by any Governmental Authority, to any pledgee referred to in Section 10.07(g); (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (in which case such Agent or Purchaser agrees (except with respect to any audit or examination conducted by bank accountants or examiners or any regulatory authority including any self-regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, rule or regulation, to inform the Issuer promptly thereof prior to disclosure and upon the reasonable request of the Issuer cooperate with the Issuer to obtain a protective order or similar confidential treatment); (d) to any other party to this Agreement; (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Issuer), to any pledgee referred to in Section 10.07(i), counterparty to a Swap Contract or Qualified Securitization Financing, Eligible Transferee of, or any prospective Eligible Transferee of, any of its rights or obligations under this Agreement, or any prospective successor Agent; (f) with the written consent of the Issuer; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08; (h) to any Governmental Authority or examiner regulating any Agent or Purchaser; (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Issuer received by it from such Purchaser); or (j) in connection with the exercise of any remedies hereunder or under any other Note Document or any action or proceeding relating to this Agreement or any other Note Document or the enforcement of rights hereunder or thereunder (including for the purpose of establishing a "due diligence" defense).  In addition, the Agents and the Purchasers may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Purchasers in connection with the administration and management of this Agreement, the other Note Documents, the Commitments, and the Issuances.  For the purposes of this Section 10.08, "Information" means all information received from the Issuer or its Affiliates or its Affiliates' directors, managers, officers, employees, trustees, investment advisors or agents, relating to the Issuer or any of its Subsidiaries or their business, including, without

CONFIDENTIAL                                                                                                    Trive_00043073

limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof, other than any such information that is (i) publicly available to any Agent or any Purchaser prior to disclosure by the Issuer other than as a result of a breach of this Section 10.08, (ii) independently developed by any Agent or any Purchaser without the use of any Information and not in breach of this Section 10.08, or (iii) to the extent received from a third party that is not, to the knowledge of any Agent or any Purchaser, subject to contractual or fiduciary confidentiality obligations owed to the Issuer or any Subsidiaries or other Affiliates thereof.

Section 10.09    Setoff.  In addition to any rights and remedies of any Agent or Purchaser provided by Law, upon the occurrence and during the continuance of any Event of Default, each Agent and Purchaser and its Affiliates is authorized at any time and from time to time, without prior notice to the Issuer, any such notice being waived by the Issuer (on its own behalf and on behalf of its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness (in any currency) at any time owing by, such Purchaser and its Affiliates, to or for the credit or the account of the Issuer and its Subsidiaries against any and all Obligations owing to such Agent or Purchaser and its Affiliates hereunder or under any other Note Document, now or hereafter existing, irrespective of whether or not such Agent or such Purchaser or Affiliate shall have made demand under this Agreement or any other Note Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness. Notwithstanding anything to the contrary contained herein, no Purchaser or its Affiliates shall have a right to set off and apply any deposits held or other Indebtedness owing by such Purchaser or its Affiliates, to or for the credit or the account of any Subsidiary that is a Foreign Subsidiary or a FSHCO.  Each Purchaser agrees promptly to notify the Issuer and the Administrative Agent after any such set off and application made by such Purchaser, as the case may be; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Agent and each Purchaser under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that such Agent and such Purchaser may have.

Section 10.10    Counterparts.  This Agreement and each other Note Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Note Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Note Document.  The Agents may also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission.  The words "execution," "signed," "signature," and words of like import in any Note Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.11    Integration.  This Agreement, together with the other Note Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Note Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Agents or the Purchasers in any other Note Document shall not be deemed a conflict with this Agreement.  Each Note

CONFIDENTIAL                                                          Trive_00043074

Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.12    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Note Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Purchaser, regardless of any investigation made by any Agent or any Purchaser or on their behalf and notwithstanding that any Agent or any Purchaser may have had notice or knowledge of any Default at the time of the Issuances, and shall continue in full force and effect as long as any Note or any other Obligation hereunder shall remain unpaid or unsatisfied. The provisions of Sections 10.14 and 10.15 shall continue in full force and effect as long as any Note or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.13    Severability. If any provision of this Agreement or the other Note Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Note Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.13, if and to the extent that the enforceability of any provision in this Agreement relating to Defaulting Purchasers shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.14    GOVERNING LAW, JURISDICTION, SERVICE OF PROCESS.

(a)    THIS AGREEMENT AND EACH OTHER NOTE DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED THEREIN).

(b)    EXCEPT AS SET FORTH IN THE FOLLOWING PARAGRAPH, ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY NOTE DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY NOTE DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE (*PROVIDED* THAT IF NONE OF SUCH COURTS CAN AND WILL EXERCISE SUCH JURISDICTION, SUCH EXCLUSIVITY SHALL NOT APPLY), AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE ISSUER, EACH AGENT AND EACH PURCHASER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS. THE ISSUER, EACH AGENT AND EACH PURCHASER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY NOTE DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

NOTHING IN THIS AGREEMENT OR IN ANY OTHER NOTE DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY AGENT OR ANY PURCHASER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT AGAINST THE ISSUER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION (I) FOR PURPOSES OF ENFORCING A JUDGMENT, (II) IN CONNECTION WITH

CONFIDENTIAL    Trive_00043075

EXERCISING REMEDIES AGAINST THE COLLATERAL IN A JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED, (III) IN CONNECTION WITH ANY PENDING BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDING IN SUCH JURISDICTION OR (IV) TO THE EXTENT THE COURTS REFERRED TO IN THE PREVIOUS PARAGRAPH DO NOT HAVE JURISDICTION OVER SUCH LEGAL ACTION OR PROCEEDING OR THE PARTIES OR PROPERTY SUBJECT THERETO.

Section 10.15   WAIVER OF RIGHT TO TRIAL BY JURY.   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY NOTE DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY NOTE DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.15 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.16   Binding Effect.   Upon the effectiveness of this Agreement, this Agreement shall be binding upon and inure to the benefit of the Issuer, each Agent and each Purchaser and their respective successors and assigns, except that the Issuer shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Agents and the Purchasers except as permitted by Section 7.04.

Section 10.17   Judgment Currency.   If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Note Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.   The obligation of the Issuer in respect of any such sum due from it to the Agents or the Purchasers hereunder or under the other Note Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.   If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Issuer in the Agreement Currency, the Issuer agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.   If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Issuer (or to any other Person who may be entitled thereto under applicable Law).

Section 10.18   Purchaser Action.   Only the Required Purchasers shall have the authority to exercise the rights and remedies hereunder and under the other Note Documents (including with respect to alleging the existence or occurrence of, and exercising rights and remedies as a result of, any Default or Event of Default) with respect to (i) the Notes and (ii) any Collateral, and (ii) any other property of the Issuer. Each Purchaser agrees that it shall not, and hereby waives any right to, take or institute any actions

CONFIDENTIAL                                                                    Trive_00043076

or proceedings, judicial or otherwise, for any such right or remedy under any Note Document against the Issuer or any past, present or future Subsidiary of the Issuer concerning any Collateral, or any other property of the Issuer or any past, present or future Subsidiary other than through the Required Purchasers; *provided* that, for the avoidance of doubt, this sentence may be enforced against any Purchaser by the Required Purchasers, any Agent or the Issuer (or any of its Affiliates) and each Purchaser expressly acknowledges that this sentence shall be available as a defense of any Agent-Related Person or the Issuer (or any of its Affiliates) in any such action, proceeding or remedial procedure. Each Purchaser, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral, to have agreed to the foregoing provisions.

Section 10.19   USA PATRIOT Act. Each Agent and Purchaser hereby notifies the Issuer that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Issuer, which information includes the name and address of the Issuer and other information that will allow such Agent and Purchaser to identify the Issuer in accordance with the USA PATRIOT Act.

Section 10.20   Obligations Absolute.

To the fullest extent permitted by applicable Law, all obligations of the Issuer hereunder shall be absolute and unconditional irrespective of:

(a)      any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of the Issuer;

(b)      any lack of validity or enforceability of any Note Document or any other agreement or instrument relating thereto against the Issuer;

(c)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from any Note Document or any other agreement or instrument relating thereto;

(d)      any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(e)      any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Note Document; or

(f)      any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Issuer.

Section 10.21   No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Note Document), the Issuer acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the services regarding this Agreement provided by each Agent are arm's-length commercial transactions between the Issuer and its Affiliates, on the one hand, and such Agent, on the other hand, (B) the Issuer has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Issuer is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Note Documents; (ii) (A) each Agent and each Purchaser is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting

CONFIDENTIAL                                                                                                          Trive_00043077

as an advisor, agent or fiduciary for the Issuer or any of its Affiliates, or any other Person and (B) neither any Agent nor any Purchaser has any obligation to the Issuer or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Note Documents; and (iii) each Agent and each Purchaser and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Issuer and its Affiliates, and neither any Agent nor any Purchaser has any obligation to disclose any of such interests to the Issuer or any of its Affiliates. To the fullest extent permitted by law, the Issuer hereby waives and releases any claims that it may have against each Agent and each Purchaser with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.22    Acknowledgment and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Note Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Purchaser that is an Affected Financial Institution arising under any Note Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Note Document; or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 10.23    [Reserved].

Section 10.24    [Reserved].

Section 10.25    Gaming Matters. Notwithstanding any other provision of this Agreement, the Issuer expressly authorizes each Agent and each Purchaser to, upon the request of any Gaming Authority (including the Georgia Lottery Corporation) and at the cost of the Issuer, cooperate with such Gaming Authority in connection with the administration of its regulatory jurisdiction over the Issuer and its Subsidiaries, including, without limitation, any applicable legal or regulatory restrictions, the provision of such documents or other information as may be requested by such Gaming Authority in accordance with the Gaming Laws relating to any Agent, any of the Purchasers, the Issuer or the Note Documents. Subject to the foregoing authorization, each Agent and each Purchaser shall provide the Issuer notice of any such request (prior to the release of such documents and other information to the extent reasonably practicable and legally permitted) and shall use commercially reasonable efforts to cooperate with the Issuer and its Subsidiaries (at the sole cost of the Issuer) with respect to any efforts to protect such documents or other information requested from public disclosure under any Open Records Act exceptions, including, but not limited to, those exceptions under O.C.G.A. §50-18-72.

Section 10.26    Purchaser Representations.

CONFIDENTIAL                                                                                   Trive_00043078

(a)     Each Purchaser severally represents that it is purchasing the Notes for its own account or for one or more separate accounts maintained by such Purchaser or for the account of one or more pension or trust funds and not with a view to the distribution thereof, *provided* that the disposition of such Purchaser's or such pension or trust fund's property shall at all times be within such Purchaser's or such pension or trust fund's control. Each Purchaser understands that the Notes have not been and will not be registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Issuer is not required to register the Notes.

(b)     Each Purchaser certifies and represents to the Issuer that such Purchaser is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act acting for its own account or as a fiduciary or agent for another accredited investor.

(c)     Each Purchaser severally represents that at least one of the following statements is an accurate representation as to each source of funds (a "Source") to be used by such Purchaser to pay the purchase price of the Notes to be purchased by such Purchaser hereunder.

(i)     the Source is an "insurance company general account" (as the term is defined in PTE 95-60) in respect of which the reserves and liabilities (as defined by the annual statement for life insurance companies approved by the NAIC (the "NAIC Annual Statement")) for the general account contract(s) held by or on behalf of any employee benefit plan together with the amount of the reserves and liabilities for the general account contract(s) held by or on behalf of any other employee benefit plans maintained by the same employer (or affiliate thereof as defined in PTE 95-60) or by the same employee organization in the general account do not exceed 10% of the total reserves and liabilities of the general account (exclusive of separate account liabilities) plus surplus as set forth in the NAIC Annual Statement filed with such Purchaser's state of domicile; or

(ii)     the Source is a separate account that is maintained solely in connection with such Purchaser's fixed contractual obligations under which the amounts payable, or credited, to any employee benefit plan (or its related trust) that has any interest in such separate account (or to any participant or beneficiary of such plan (including any annuitant)) are not affected in any manner by the investment performance of the separate account; or

(iii)     the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 or (ii) a bank collective investment fund, within the meaning of the PTE 91-38 and, except as disclosed by such Purchaser to the Issuer in writing pursuant to this clause (iii), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than 10% of all assets allocated to such pooled separate account or collective investment fund;

(iv)     the Source constitutes assets of an "investment fund" (within the meaning of Part VI of PTE 84-14 (the "QPAM Exemption")) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part VI of the QPAM Exemption), no employee benefit plan's assets that are managed by the QPAM in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Part VI(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, represent more than 20% of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a person controlling or controlled by the QPAM maintains an ownership interest in the Issuer that would cause the QPAM and the Issuer to be

CONFIDENTIAL                                                                                     Trive_00043079

"related" within the meaning of Part VI(h) of the QPAM Exemption and (i) the identity of such QPAM and (ii) the names of any employee benefit plans whose assets in the investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Part VI(c)(1) of the QPAM Exemption) of such employer or by the same employee organization, represent 10% or more of the assets of such investment fund, have been disclosed to the Issuer in writing pursuant to this clause (iv); or

        (v)    the Source constitutes assets of a "plan(s)" (within the meaning of Part IV(h) of PTE 96-23 (the "INHAM Exemption")) managed by an "in-house asset manager" or "INHAM" (within the meaning of Part IV(a) of the INHAM Exemption), the conditions of Part I(a), (g) and (h) of the INHAM Exemption are satisfied, neither the INHAM nor a person controlling or controlled by the INHAM (applying the definition of "control" in Part IV(d)(3) of the INHAM Exemption) owns a 10% or more interest in the Issuer and (i) the identity of such INHAM and (ii) the name(s) of the employee benefit plan(s) whose assets constitute the Source have been disclosed to the Issuer in writing pursuant to this clause (e); or

        (vi)    the Source is a governmental plan; or

        (vii)    the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Issuer in writing pursuant to this clause (vii); or

        (viii)    the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

As used in this Section 10.26, the terms "employee benefit plan," "governmental plan," and "separate account" shall have the respective meanings assigned to such terms in section 3 of ERISA.

[SIGNATURE PAGES FOLLOW]

CONFIDENTIAL        Trive_00043080

**IN WITNESS WHEREOF**, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first above written.

**Lucky Bucks Holdings LLC,**
**as the Issuer**

By: _____

Name: James Boyden
Title: Manager

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

CONFIDENTIAL                                    Trive_00043081

**BCP Special Opportunities Fund II Originations LP,
as a Purchaser**

By: _____

Name:    Ted Goldthorpe
Title:    Authorized Signatory

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

Trive_00043082

**BCP-Window Secondary Credit Opportunities LP,
as a Purchaser**

By: _____

Name:  Ted Goldthorpe
Title:   Authorized Signatory

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

Trive_00043083

**Hamilton Lane Strategic Opportunities Fund VI (Series 2020) Holdings LP as a Purchaser**

By: Hamilton Lane Strategic Opportunities Fund VI (Series 2020) GP LLC, its general partner

By: _____

Name:  Kristin N. Jumper

Title:   Authorized Person

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

Trive_00043084

**Marathon Centre Street Partnership, L.P. ,
as a Purchaser**

By: _____

Name:  Jeff Jacob

Title:  Authorized Signatory

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

CONFIDENTIAL

Trive_00043085

**MCSP Sub, LLC,**
**as a Purchaser**

By: _____

Name:  Jeff Jacob

Title:  Authorized Signatory

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

CONFIDENTIAL

Trive_00043086

**TRS Credit Fund, LP,**
**as a Purchaser**

By: _____
Name: Jeff Jacob
Title: Authorized Signatory

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

CONFIDENTIAL

**CION Investment Corporation,**
**as a Purchaser**

By: _____

Name:

Title:    Gregg Bresner
          Chief Investment Officer

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

**Alter Domus (US) LLC,**
**as Administrative Agent and Collateral Agent**

By: _____

Name:        Winnalynn N. Kantaris

Title:        Associate General Counsel

[SIGNATURE PAGE TO LB HOLDINGS NOTE PURCHASE AGREEMENT]

CONFIDENTIAL

## Schedule 1.01(A)

Note Documents

1. Note Purchase Agreement
2. Notes
3. Pledge Agreement
4. Agency Fee Letter

CONFIDENTIAL

Trive_00043090

## Schedule 1.01(B)

### Existing Investments

| Debtor/Grantor | Issuer of Instrument | Principal Amount of Instrument | Maturity Date |
|---|---|---|---|
| Lucky Bucks HoldCo, LLC | Southern Star Gaming, LLC | $4,660,264.00 | Payable on demand. |
| Lucky Bucks HoldCo, LLC | Lucky Bucks Ventures, Inc. | $2,055,000.00 | Payable on demand. |
| Lucky Bucks, LLC | Georgia Winner, LLC | $210,882.92 | September 13, 2022 |

Trive_00043091

**Schedule 1.01(C)**

Existing Liens

None.

CONFIDENTIAL

### Schedule 2.01

Commitments

| Purchaser | Commitment | Purchase Price |
|---|---|---|
| BCP Special Opportunities Fund II Originations LP | $72,500,000.00 | 98% |
| BCP-Window Secondary Credit Opportunities LP | $2,500,000.00 | 98% |
| Hamilton Lane Strategic Opportunities Fund VI (Series 2020) Holdings LP | $50,000,000.00 | 98% |
| MCSP Sub, LLC | $5,960,000.00 | 98% |
| Marathon Centre Street Partnership, L.P. | $28,170,000.00 | 98% |
| TRS Credit Fund, LP | $15,870,000.00 | 98% |
| Cion Investment Corporation | $20,000,000 | 100% |
| **TOTAL** | **$195,000,000.00** | |

Trive_00043093

**Schedule 5.06**

Litigation

None.

Trive_00043094

## Schedule 5.11

Subsidiaries

| Issuer/Subsidiaries | Jurisdiction of Incorporation/Formation | Record Owner | Percent of Equity Interests Owned by Record Owner | Pledged as Collateral |
|---|---|---|---|---|
| Lucky Bucks Holdings LLC | Delaware | Southern Star Gaming, LLC | 70% | N/A |
| | | TCFIII Luck SPV LP | 1.7816% | |
| | | TCFIII Luck Acquisition LLC | 3.2184% | |
| | | Lucky Bucks Ventures, Inc. | 25% | |
| Lucky Bucks HoldCo, LLC | Delaware | Lucky Bucks Holdings LLC | 100% | N/A |
| Lucky Bucks, LLC | Georgia | Lucky Bucks HoldCo, LLC | 100% | N/A |

Trive_00043095

## Schedule 5.22

Material Real Property

None.

Trive_00043096

**Schedule 7.03**

Existing Indebtedness

None.

CONFIDENTIAL

**Schedule 7.05(a)**

Asset Dispositions

None.

CONFIDENTIAL

**Schedule 7.07(a)**

Permitted Issuer Contracts

None.

CONFIDENTIAL

Trive_00043099

**Schedule 7.07(b)**

Permitted HoldCo Contracts

| Debtor/Grantor | Issuer of Instrument | Principal Amount of Instrument | Maturity Date |
|---|---|---|---|
| Lucky Bucks HoldCo, LLC | Southern Star Gaming, LLC | $4,660,264.00 | Payable on demand. |
| Lucky Bucks HoldCo, LLC | Lucky Bucks Ventures, Inc. | $2,055,000.00 | Payable on demand. |
| Lucky Bucks, LLC | Georgia Winner, LLC | $210,882.92 | September 13, 2022 |

CONFIDENTIAL

## Schedule 7.10

Affiliate Transactions

Lucky Bucks, LLC is owed $6,740,263.96 from Lucky Bucks HoldCo, LLC as at June 30, 2021. This amount is not documented by a written agreement, but is on the books and records of Lucky Bucks, LLC.

CONFIDENTIAL

## Schedule 10.02

Administrative Agent's Office, Certain Addresses for Notices

### If to Alter Domus (US) LLC as Administrative Agent or Collateral Agent

Alter Domus (US) LLC
225 W. Washington St., 9th Floor
Chicago, Illinois 60606
Attention: Legal Department & CPC Agency
Email: legal@alterdomus.com; cortlandsuccessoragent@alterdomus.com
Fax:     312-376-0751

With a copy (which shall not constitute notice) to:

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Attention: Alyson Gal & Patricia Chen
Phone: 617-951-7000
E-mail: alyson.gal@ropesgray.com; patricia.chen@ropesgray.com

### If to the Issuer:

Lucky Bucks Holdings LLC
5820 Live Oak Parkway, Suite 300
Norcross, GA 30071
Attention: Manu Sekhri
Email: manu@sekhri.ca

with a copy to:

Shearman & Sterling LLP
599 Lexington Avenue, Room 1046
New York, NY 10022
Attention: Michael Steinberg
Phone: (212) 848-8213
Email: michael.steinberg@shearman.com

and a copy to:

Trive Capital Management, LLC
2021 McKinney Avenue, Suite 1200
Dallas, TX 75201
Attention: Shravan Thadani
Email: shravanthadani@trivecapital.com

## EXHIBIT A

## [FORM OF] PURCHASE NOTICE

[DATE]

Alter Domus (US) LLC, as Administrative Agent and
the Purchasers listed in Annex A hereto:

Ladies and Gentlemen:

Reference is hereby made to the Note Purchase Agreement, dated as of November 29, 2021 (as it may be amended, restated, amended and restated, supplemented or otherwise modified, the "Note Purchase Agreement"), by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent, and each purchaser from time to time party thereto.

The undersigned hereby requests a purchase of Notes (the "Note Funding") under the Note Purchase Agreement and notifies the Administrative Agent as follows:

1.      The amount of requested Note Funding is set forth opposite each Purchaser's name on Annex A hereto.

2.      The requested date of Issuance: [          ] (the "Purchase Date").

Location and number of the Issuer's account or any other account agreed upon by the Administrative Agent, the Issuer and the Purchasers listed in Annex A hereto which proceeds of Note Funding are to be disbursed are set forth on Annex B attached hereto.

The undersigned hereby represents and warrants that all conditions precedent to such Note Funding set forth in Section [4.01] [4.02] of the Note Purchase Agreement shall be satisfied on the Purchase Date (or waived by the Agents and the applicable Purchaser(s)).

[Signature Page to Follow]

IN WITNESS WHEREOF, the undersigned officer has executed this Purchase Notice as of the date first written above.

**LUCKY BUCKS HOLDINGS LLC**

By: _____
Name:
Title:

[Signature Page to Purchase Notice]

CONFIDENTIAL

## ANNEX A

| Purchaser | Aggregate Principal Amount of Notes Purchased |
|---|---|
| | $ |
| Total........................................... | $ |

Trive_00043105

**ANNEX B**
**FUNDS FLOW**

(Attached)

Trive_00043106

## EXHIBIT C

## [FORM OF] NOTE

**THIS NOTE WAS ISSUED IN A PRIVATE PLACEMENT, WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED (A) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING THE TRANSFER OR PURSUANT TO AN EXEMPTION FROM REGISTRATION AND (B) EXCEPT IN COMPLIANCE WITH SECTION 10.07 OF THAT CERTAIN NOTE PURCHASE AGREEMENT DATED AS OF NOVEMBER 29, 2021, BY AND AMONG THE ISSUER, THE PURCHASERS, THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT (EACH AS DEFINED BELOW).**

**THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTES BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE ISSUER AT 2021 MCKINNEY AVE, STE 1200, DALLAS TX 75201, ATTN: SHRAVAN THADANI, TELEPHONE NO. 214-451-0162.**

No. [   ]

$[   ]                                                                    [   ], 202[   ]

FOR VALUE RECEIVED, Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), hereby promises to pay to [___] (the "Purchaser") or its registered assigns, at the office of Alter Domus (US) LLC, as administrative agent (in such capacity, the "Administrative Agent") and collateral agent (in such capacity, the "Collateral Agent") under the Note Purchase Agreement (as defined below), the principal sum set forth above, *plus* all amounts added to the principal sum hereof pursuant to the terms of the Note Purchase Agreement (as defined below), in lawful money of the United States of America and in immediately available funds, on the dates provided in the Note Purchase Agreement, and to pay interest on the unpaid principal amount of this Note, at such office, in like money and funds, in the manner provided in the Note Purchase Agreement for the period commencing on the date of the purchase of this Note until this Note shall be paid in full, at the rates per annum and on the dates provided in the Note Purchase Agreement.

This Note is one of the Notes referred to in the Note Purchase Agreement, dated as of November 29, 2021 (such Note Purchase Agreement as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Purchase Agreement"), by and among the Issuer, Alter Domus (US) LLC, as Administrative Agent and Collateral Agent, and each purchaser from time to time party thereto. Capitalized terms used and not otherwise defined in this Note have the respective meanings assigned to them in the Note Purchase Agreement.

This Note is issued pursuant to the Note Purchase Agreement and is entitled to the benefits provided for in the Note Purchase Agreement and the other Note Documents. The Note Purchase Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events, for prepayments of this Note upon the terms and conditions specified therein and other provisions relevant to this Note.

The ownership of an interest in this Note shall be registered in the Register. Notwithstanding anything else in this Note to the contrary, the right to the principal of, and stated interest on, this Note may be transferred only if the transfer is made in accordance with the terms and conditions of the Note Purchase Agreement, is registered in the Register and the transferee is identified as the owner of an interest in the obligation. The Issuer or its agent shall be entitled to treat the registered holder of this Note (as recorded in the Register) as the owner in fact thereof for all purposes and shall not be bound to recognize any equitable or other claim to or interest in this Note on the part of any other person or entity.

Notwithstanding anything to the contrary herein, in the event of any conflict between the terms and conditions of this Note and the terms and conditions of the Note Purchase Agreement, the terms and conditions of the Note Purchase Agreement shall govern and control.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

[*Signature page follows*]

**LUCKY BUCKS HOLDINGS LLC**

By: _____
Name:
Title:

[Signature Page to Note]

Trive_00043109

## EXHIBIT D

## [FORM OF] CLOSING DATE CERTIFICATE

### [ ● ], 2021

This Closing Date Certificate (this "Certificate") is delivered pursuant to Section 4.01(k) of that certain Note Purchase Agreement, dated as of the date hereof (the "Note Purchase Agreement"), by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent and, each Purchaser party thereto. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Note Purchase Agreement.

The undersigned, being a Responsible Officer of the Issuer, solely in such capacity and not in any individual capacity (and without personal liability) hereby certifies on behalf of the Issuer, on the date hereof, as follows:

(a)     Each of the representations and warranties of the Issuer contained in Article V of the Note Purchase Agreement or any other Note Document is true and correct in all material respects on and as of the date hereof; *provided* that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided, further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b)     No Default or Event of Default exists or will exist immediately after giving effect to the Transactions contemplated on the Closing Date.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has signed this Certificate to be effective as of the date first written above.

**LUCKY BUCKS HOLDINGS LLC**,
a Delaware limited liability company

By: _____
      Name:
      Title:

[Signature Page to Closing Date Certificate]

CONFIDENTIAL

**EXHIBIT E**

**[FORM OF] TRANSFER AND ACCEPTANCE**

This Transfer and Acceptance Agreement (the "Agreement") is dated as of the Effective Date set forth below and is entered into by and between *[Insert name of Transferor]* (the "Transferor") and *[Insert name of Transferee]* (the "Transferee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Note Purchase Agreement identified below (as amended, restated, amended and restated, supplemented or otherwise modified, the "Note Purchase Agreement"), receipt of a copy of which is hereby acknowledged by the Transferee.

For an agreed consideration, the Transferor hereby irrevocably sells and assigns to the Transferee, and the Transferee hereby irrevocably purchases and assumes from the Transferor, subject to and in accordance with the terms of the Note Purchase Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Transferor's rights and obligations in its capacity as a Purchaser under the Note Purchase Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Transferor under the Note Purchase Agreement and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Transferor (in its capacity as a Purchaser) against any Person, whether known or unknown, arising under or in connection with the Note Purchase Agreement, any other documents or instruments delivered pursuant thereto or the financing transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Transferred Interest"). Such sale and assignment is without recourse to the Transferor and, except as expressly provided in this Agreement, without representation or warranty by the Transferor.

| | | |
|---|---|---|
| 1. | Transferor: | |
| 2. | Transferee: | |
| 3. | Issuer: | Lucky Bucks Holdings LLC |
| 4. | Administrative Agent | Alter Domus (US) LLC, as Administrative Agent and Collateral Agent under the Note Purchase Agreement |
| 5. | Agreement: | The Note Purchase Agreement dated as of November 29, 2021, by and among the Lucky Bucks Holdings LLC, a Dealaware limited liability company, as the Issuer, Alter Domus (US) LLC, as Administrative Agent and Collateral Agent, and each purchaser from time to time party thereto |

| Date of Issuance of Notes Assigned | Note Number | Amount of Notes Assigned | |
|---|---|---|---|
| | | $ | |

Effective Date: [      ], 202[ ] [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

[Signature Page Follows.]

CONFIDENTIAL

Trive_00043113

The terms set forth in this Agreement are hereby agreed to:

**TRANSFEROR**

[NAME OF TRANSFEROR]


By: _____
Name:
Title:


**TRANSFEREE**

[NAME OF TRANSFEREE]


By: _____
Name:
Title:

Trive_00043114

[Accepted:

Lucky Bucks Holdings LLC, as Issuer

By: _____
Name:
Title:][1]

---

[1] To be included if the consent of the Issuer is required under Section 10.07(b) of the Note Purchase Agreement.

CONFIDENTIAL

[Accepted:

Alter Domus (US) LLC, as Administrative Agent


By: _____
Name:
Title:][2]

---

[2] To be included if the consent of the Issuer is required under Section 10.07(b) of the Note Purchase Agreement.

Trive_00043116

**EXHIBIT F**

**[FORM OF] JOINDER OF ADDITIONAL PURCHASER**

THE NOTES ISSUED PURSUANT TO THE NOTE PURCHASE AGREEMENT (AS DEFINED BELOW) HAVE BEEN (OR WILL BE) ISSUED WITH ORIGINAL ISSUE DISCOUNT (AS DEFINED IN SECTION 1273(a) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, AND U.S. TREASURY REGULATION SECTION 1.1273-1 PROMULGATED THEREUNDER).

[ ], 20[ ]

Reference is made to that certain Note Purchase Agreement, dated as of November 29, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Purchase Agreement") by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent and each Purchaser from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Note Purchase Agreement.

1.    Joinder of New Purchaser

In accordance with the terms of Sections 2.01(b) (The Notes) and 4.02 (Conditions to Delayed Issuances) of the Note Purchase Agreement, [ ] (the "New Purchaser"), by its execution and delivery of this Joinder of Additional Purchaser (this "Joinder"), does hereby agree to become, and does hereby become, a party to the Note Purchase Agreement and bound by the terms and conditions of the Note Purchase Agreement as a Purchaser, effective as of the date hereof, with all of the rights, benefits, obligations and responsibilities of a Purchaser with the Note Purchase Agreement and the other Note Documents. The Note Purchase Agreement is hereby, without any further action, amended and supplemented to add the New Purchaser as a "Purchaser" and signatory to the Note Purchase Agreement.

Upon the satisfaction (or waiver by the New Purchaser) of the conditions precedent set forth in Section 4.02 of the Note Purchase Agreement, the New Purchaser hereby agrees to purchase Notes in an aggregate principal amount set forth on Schedule I hereto opposite such New Purchaser's name under the caption "Commitment", at the purchase price set forth on such Schedule I under the caption "Purchase Price" on or before the 90th date following the Closing Date. Such purchase by the New Purchaser shall constitute a "Delayed Issuance" and an "Issuance", and the Notes purchased by the New Purchaser a "Delayed Issuance Note" and a "Note", each as defined in the Note Purchase Agreement.

2.    New Purchaser Representations

The New Purchaser hereby makes, in its capacity as a Purchaser as of the date hereof, each of the certifications, representations and warranties set forth in Section 10.26 (Purchaser Representations) of the Note Purchase Agreement, which is hereby incorporated by reference as if fully set forth herein, *mutatis mutandis*.

3.    Notices

The address and other notice information of the New Purchaser for purposes of Section 10.02 (Notices) of the Note Purchase Agreement shall be:

[ADDRESS]
Attn: [ ]
Telephone Number: [ ]
E-mail: [ ]

4.    Governing Law

This Joinder shall be governed by, and construed in accordance with, the law of the State of New York.

5.    Miscellaneous

The New Purchaser has delivered to the Administrative Agent a completed Administrative Questionnaire, any tax forms required to be delivered pursuant to Section 3.01 of the Note Purchase Agreement, and all "know your customer" documents requested by the Administrative Agent and Collateral Agent, in form and substance satisfactory to the Administrative Agent and the Collateral Agent, providing such information (including, without limitation, credit contact information and wiring instructions) of the New Purchaser as the Administrative Agent and the Collateral Agent may reasonably require.

Sections 10.10 (Counterparts) and 10.13 (Severability) of the Note Purchase Agreement are hereby incorporated by reference as if fully set forth herein, *mutatis mutandis*.

[*Signature pages follow*]

Trive_00043118

**IN WITNESS WHEREOF**, the New Purchaser has caused this Joinder of Additional Purchaser to be executed on its behalf by a duly authorized officer or agent thereof as of the date first written above.

[●],
as the New Purchaser

By: _____
Name:
Title:

[Signature Page to Joinder]

Trive_00043119

Acknowledged and accepted by:

**LUCKY BUCKS HOLDINGS LLC,**
as Issuer

By: _____
Name:
Title:

[Signature Page to Joinder]

Trive_00043120

Acknowledged and accepted by:

**ALTER DOMUS (US) LLC,**
as Administrative Agent

By: _____
Name:
Title:

[Signature Page to Joinder]

Trive_00043121

## SCHEDULE I

| Purchaser | Commitment | Purchase Price |
|-----------|------------|----------------|
| [ ] | $[ ] | $[ ] |

Schedule I to Joinder

CONFIDENTIAL

Trive_00043122

**EXHIBIT G**

**[FORM OF] PLEDGE AGREEMENT**

PLEDGE AGREEMENT

dated as of

November 29, 2021,

by and among

Lucky Bucks Holdings LLC,
as the Pledgor

and

Alter Domus (US) LLC,
as Collateral Agent

CONFIDENTIAL

Trive_00043123

TABLE OF CONTENTS

Page

ARTICLE I Definitions ................................................................................................................... 1

    SECTION 1.01.    Defined Terms.............................................................................. 1
    SECTION 1.02.    Other Defined Terms.................................................................... 1

ARTICLE II Pledge of Securities .................................................................................................. 3

    SECTION 2.01.    Pledge............................................................................................ 3
    SECTION 2.02.    Delivery of the Pledged Collateral .............................................. 3
    SECTION 2.03.    Representations, Warranties and Covenants ............................... 4
    SECTION 2.04.    Registration in Nominee Name; Denominations.......................... 4
    SECTION 2.05.    Voting Rights; Dividends and Interest ........................................ 5

ARTICLE III [Reserved] ............................................................................................................... 6

ARTICLE IV Remedies.................................................................................................................. 6

    SECTION 4.01.    Remedies upon Declared Default................................................. 6
    SECTION 4.02.    Application of Proceeds ............................................................... 7
    SECTION 4.03.    [Reserved] .................................................................................... 7
    SECTION 4.04.    Securities Act ............................................................................... 7

ARTICLE V Miscellaneous............................................................................................................ 8

    SECTION 5.01.    Notices.......................................................................................... 8
    SECTION 5.02.    Waivers; Amendment.................................................................... 8
    SECTION 5.03.    Collateral Agent's Fees and Expenses; Indemnification.............. 8
    SECTION 5.04.    Successors and Assigns................................................................. 8
    SECTION 5.05.    Survival of Agreement ................................................................. 9
    SECTION 5.06.    Counterparts; Effectiveness; Several Agreement......................... 9
    SECTION 5.07.    Severability................................................................................... 9
    SECTION 5.08.    Subordination ............................................................................... 9
    SECTION 5.09.    Governing Law; Jurisdiction; Consent to Service of Process;
                        Appointment of Service of Process Agent ................................... 9
    SECTION 5.10.    WAIVER OF JURY TRIAL...................................................... 10
    SECTION 5.11.    Headings..................................................................................... 10
    SECTION 5.12.    Security Interest Absolute .......................................................... 10
    SECTION 5.13.    Termination or Release .............................................................. 10
    SECTION 5.14.    Collateral Agent Appointed Attorney-in-Fact............................ 11
    SECTION 5.15.    Intercreditor Agreement Governs............................................... 11
    SECTION 5.16.    [Reserved] .................................................................................. 12
    SECTION 5.17.    Reinstatement ............................................................................. 12
    SECTION 5.18.    English Language........................................................................ 12
    SECTION 5.19.    Rights of the Collateral Agent.................................................... 12
    SECTION 5.20.    No Partnership or Joint Venture.................................................. 12

SCHEDULES

CONFIDENTIAL                                                          Trive_00043124

Schedule I    –    Pledgor; Jurisdiction of Formation; Chief Executive Office

Schedule II    –    Pledged Equity Interests

CONFIDENTIAL

Trive_00043125

## PLEDGE AGREEMENT

This **PLEDGE AGREEMENT**, dated as of November 29, 2021 (this "Agreement"), is made by and between Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Pledgor"), and Alter Domus (US) LLC, not in its individual capacity but solely in its capacity as Collateral Agent under, and as defined in, the Note Purchase Agreement referred to below (in such capacity and together with successors and permitted assigns in such capacity, the "Collateral Agent").

Reference is made to that certain Note Purchase Agreement, dated as of November 29, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Purchase Agreement"), by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent (each as defined therein), and each note purchaser from time to time party thereto (collectively, the "Purchasers" and individually, a "Purchaser"), pursuant to which the Purchasers purchase the Notes. The Pledgor will derive substantial benefits from the Notes issuance pursuant to the Note Purchase Agreement and is willing to execute and deliver this Agreement in order to induce the holders of the Notes to purchase such Notes. Accordingly, the parties hereto agree as follows:

### ARTICLE I
Definitions

SECTION 1.01.    Defined Terms.

(a)    Each capitalized term used but not defined herein shall have the meaning assigned thereto in the Note Purchase Agreement; *provided* that each term defined in the New York UCC (as defined herein) and not defined in this Agreement or the Note Purchase Agreement shall have the meaning specified in the New York UCC.

(b)    The rules of construction specified in Section 1.02 of the Note Purchase Agreement also apply to this Agreement, *mutatis mutandis*.

SECTION 1.02.    Other Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Agreement" has the meaning assigned to such term in the preamble to this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Collateral" means the Pledged Collateral.

"Declared Default" means (a) the delivery of a notice of acceleration pursuant to Section 8.02(b) (Events of Default) of the Note Purchase Agreement that has not been withdrawn, (b) any Event of Default described in clauses (a)(i) or (a)(ii) of Section 8.01 (Events of Default) of the Note Purchase Agreement at the final maturity date of the Notes or (c) any automatic acceleration with respect to the events described in clause (f) of Section 8.01 (Events of Default) of the Note Purchase Agreement has occurred and is continuing.

"Equity Interests" means (i) in the case of a corporation, any shares of its capital stock, (ii) in the case of a limited liability company, any membership interest therein, (iii) in the case of a partnership, any partnership interest (whether general or limited) therein, (iv) in the case of any other business entity, any participation or other interest in the equity thereof, (v) any warrant, option or other right to acquire any Equity Interest described in this definition or (vi) any Security Entitlement in respect of any Equity Interest described in this definition.

"Excluded Equity" means Capital Stock (i) of any Immaterial Subsidiary (except to the extent a Lien thereon can be perfected by the filing of a UCC financing statement (or analogous procedures under applicable Laws in the relevant Covered Jurisdiction)) and/or any non-Wholly Owned Subsidiary (to the extent prohibited by, or creating an enforceable right of termination in favor of any other party thereto (other than the Issuer or any Wholly-Owned Subsidiary of the Issuer) under the terms of any applicable organizational documents, joint venture agreement or

shareholders' agreement), (ii) of any Subsidiary acquired pursuant to a Permitted Investment financed with Indebtedness permitted pursuant to Section 7.03(b)(v)(x) of the Note Purchase Agreement if such Capital Stock is pledged and/or mortgaged as security for such Indebtedness and if and for so long as the terms of such Indebtedness prohibit the creation of any other Lien on such Capital Stock, (iii) that is voting Capital Stock in excess of 65.0% of the issued and outstanding voting Capital Stock of any CFC or any FSHCO (for the avoidance of doubt, no non-voting Capital Stock of any CFC or any FSHCO shall be Excluded Equity), (iv) that is Capital Stock owned by any CFC or any FSHCO, (v) of any Subsidiary with respect to which the Required Purchasers and the Pledgor have determined in their reasonable judgment and agreed in writing that the costs of providing a pledge of such Capital Stock or perfection thereof (including adverse tax consequences) outweighs the benefits to be obtained by the Secured Parties therefrom, (vi) of any not-for-profit subsidiaries, special purpose entities (including any special purpose entity used to effect a Qualified Securitization Financing) and (vii) of any Subsidiary organized outside the United States the pledge of which is prohibited by applicable Laws or which would reasonably be expected to result in a violation or breach of, or conflict with, fiduciary duties of such Subsidiary's officers, directors or managers after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code of any applicable jurisdiction or other applicable law.

"Federal Securities Laws" has the meaning assigned to such term in Section 4.04.

"Georgia Lottery Corporation" means the Georgia Lottery Corporation and any successor or other Governmental Authority that has jurisdiction to regulate the gaming business of the Pledgor and its Subsidiaries.

"GLC License Holder Subsidiary" means any Subsidiary of the Pledgor that is licensed by or holds a Master License issued by the Georgia Lottery Corporation.

"Issuer" has the meaning assigned to such term in the preamble to this Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations or condition (financial or otherwise) of the Issuer, (b) the business, assets, operations or condition (financial or otherwise) of the Issuer and its Subsidiaries, taken as a whole, (c) the material rights and remedies (taken as a whole) of the Administrative Agent, the Collateral Agent or the Purchasers under the Note Documents (other than due to the action or inaction of the Administrative Agent, the Collateral Agent or the Purchasers) or (d) the ability of the Issuer to perform its payment obligations under the Note Documents.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Note Purchase Agreement" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Pledged Collateral" means the collective reference to the following: all of the Pledgor's right, title and interest in, to and under (a) Pledged Equity Interests; (b) all other property that may be delivered to and held by the Collateral Agent pursuant to the terms of Section 2.01 and Section 2.02; (c) subject to Section 2.05, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of, the securities referred to in clauses (a) and (b) above; (d) subject to Section 2.05, all rights and privileges of the Pledgor with respect to the securities and other property referred to in clauses (a), (b), and (c) above; and (e) all Proceeds of any of the foregoing. For the avoidance of doubt, in no event shall the Pledged Collateral include any Excluded Equity.

"Pledged Equity Interests" means the collective reference to the following: all of the Pledgor's right, title and interest in, to and under (a) the shares of capital stock and other Equity Interests owned by the Pledgor, including those listed opposite the name of the Pledgor on Schedule II, (b) any other Equity Interests obtained in the future by the Pledgor and (c) the certificates (if any) representing all such Equity Interests that constitute Certificated Securities; *provided* that the Pledged Equity Interests shall not include any Excluded Equity.

2

"Pledged Securities" means any promissory notes, stock certificates, unit certificates, limited or unlimited liability membership certificates or other securities now or hereafter included in the Pledged Collateral, including all certificates, instruments or other documents representing or evidencing such Pledged Collateral.

"Uniform Commercial Code" or "UCC" means the New York UCC.

## ARTICLE II
### Pledge of Securities

SECTION 2.01.    Pledge.  As security for the payment or performance, as the case may be, in full of all Secured Obligations, the Pledgor hereby assigns and pledges to the Collateral Agent and its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent and its successors and assigns, for the benefit of the Secured Parties a security interest in, the Pledged Collateral. Anything herein to the contrary notwithstanding, any and all such assignments and/or pledges to the Collateral Agent hereunder are made to the Collateral Agent not in its individual capacity but solely in its capacity as Collateral Agent for the benefit of the Secured Parties.

SECTION 2.02.    Delivery of the Pledged Collateral.

(a)    The Pledgor agrees to deliver or cause to be delivered to the Collateral Agent any and all Pledged Securities (other than any uncertificated securities, but only for so long as such securities remain uncertificated) (i) owned by the Pledgor, in each case on the date hereof, and (ii) within 60 days after the acquisition thereof, in the case of any such Pledged Securities acquired by the Pledgor after the date hereof.

(b)    Upon delivery to the Collateral Agent, any certificate or promissory note representing Pledged Securities shall be accompanied by undated stock powers or allonges, as applicable, duly executed in blank or other undated instruments of transfer duly executed in blank as may be necessary to perfect the Collateral Agent's interest in the Pledged Securities or such other instruments and documents as the Collateral Agent may reasonably request. Each delivery of Pledged Securities shall be accompanied by a schedule describing such Pledged Securities, which schedule shall be deemed attached to, and shall supplement, Schedule II and be made a part hereof; *provided* that failure to provide any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities.

(c)    Any equity interest in any limited liability company or limited partnership controlled by the Pledgor and required to be pledged and/or otherwise secured under Section 2.01 shall either (i) be represented by a certificate, shall be a "security" within the meaning of Article 8 of the UCC, and shall be delivered to the Collateral Agent or (ii) not be treated (and the Pledgor shall not have elected to treat such interest) as a "security" within the meaning of Article 8 of the UCC or, if treated as a "security" within the meaning of Article 8 of the UCC, shall not be represented by a certificate. If an interest in any limited liability company or limited partnership controlled by the Pledgor and pledged and/or otherwise secured under Section 2.01 is or becomes a "security" within the meaning of Article 8 of the UCC, (i) if such interest is represented by a certificate, such certificate shall be delivered to the Collateral Agent, pursuant to Section 2.02(a) and (ii) the Pledgor shall fulfill all other requirements under Section 2.02 applicable in respect thereof.

(d)    With respect to any partnership interest or limited liability company interest of the Pledgor (other than a partnership interest or limited liability company interest held by a Clearing Corporation, Securities Intermediary or other financial intermediary of any kind) constituting Pledged Collateral not represented by a certificate and/or which is not a Security for purposes of the UCC, the Pledgor shall not permit any issuer of such partnership interests or limited liability company interests (A) to enter into any agreement with any Person, other than the Collateral Agent, whereby such issuer effectively delivers "control" of such partnership interests or limited liability company interests (as applicable) under the UCC to such Person (*provided* that any control agreement that, contingent upon payment in full in cash of all Secured Obligations, delivers "control" to any other agent or representative shall be permitted), or (B) to allow such partnership interests or limited liability company interests (as applicable) to become Securities unless the Pledgor complies with the procedures set forth herein.

3

(e)    Anything herein to the contrary notwithstanding, any and all delivery of Pledged Securities or other related documents or collateral to the Collateral Agent shall be made to the Collateral Agent not in its individual capacity but solely in its capacity as Collateral Agent for the benefit of the Secured Parties.

SECTION 2.03.    Representations, Warranties and Covenants.    The Pledgor represents, warrants and covenants to and with the Collateral Agent, for the benefit of the Secured Parties, that:

(a)    Schedule II (as supplemented from time to time) sets forth a true and complete list, with respect to the Pledgor, of all the Equity Interests owned by the Pledgor in any Person and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by the Pledgor;

(b)    the Pledged Equity Interests have been duly and validly authorized and issued by the issuers thereof and in the case of Pledged Equity Interests, are fully paid and non-assessable;

(c)    except for the security interests granted hereunder and under any other Note Documents, the Pledgor (i) is and, subject to any transfers made in compliance with the Note Purchase Agreement and the terms hereof, will continue to be, the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule II as owned by the Pledgor, (ii) holds the same free and clear of all Liens, other than Permitted Liens, (iii) will make no further assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, other than Permitted Liens and assignments and transfers made in compliance with the Note Documents, and (iv) will take any and all commercially reasonable actions necessary to defend its title or interest thereto or therein against any and all Liens (other than the Liens created by this Agreement and the other Note Documents and Permitted Liens), however arising, of all Persons whomsoever;

(d)    except for restrictions and limitations imposed by the Note Documents, securities laws or applicable law generally (including, without limitation, the rules and regulations of the Georgia Lottery Corporation), the Pledged Equity Interests are and will continue to be freely transferable and assignable, and none of the Pledged Equity Interests are or will be subject to any option, right of first refusal, shareholders agreement, charter, by-law or other organizational document provisions or contractual restriction of any nature that might prohibit, impair, delay or otherwise affect in any manner adverse to the Secured Parties in any material respect the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder;

(e)    the Pledgor has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated; and

(f)    by virtue of the execution and delivery by the Pledgor of this Agreement, when any Pledged Securities are delivered to the Collateral Agent in the State of New York in accordance with this Agreement, the Collateral Agent will obtain a legal, valid and perfected Lien upon and security interest in such Pledged Securities, free of any adverse claims, under the New York UCC to the extent such Lien and security interest may be created and perfected under the New York UCC, as security for the payment and performance of the Secured Obligations, and such Lien is and shall be prior to any other Lien on the Pledged Securities, other than Permitted Liens.

SECTION 2.04.    Registration in Nominee Name; Denominations.    If a Declared Default shall have occurred and is continuing and the Collateral Agent shall have given the Pledgor at least three (3) Business Days' prior written notice of its intent to exercise such rights, the Collateral Agent, on behalf of the Secured Parties, shall have the right (but not the obligation) (in its sole and absolute discretion) to hold the Pledged Securities in the name of the applicable Pledgor, endorsed or assigned in blank or in favor of the Collateral Agent or in its own name as pledgee or in the name of its nominee (as pledgee or as sub-agent), and the Pledgor will promptly give to the Collateral Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of the Pledgor. If a Declared Default shall have occurred and is continuing and the Collateral Agent shall have given the Pledgor at least three (3) Business Days' prior written notice of its intent to exercise such rights, the Collateral Agent shall at all times have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any reasonable purpose consistent with this Agreement.

4

SECTION 2.05.    Voting Rights; Dividends and Interest.

(a)    Unless and until a Declared Default shall have occurred and is continuing and the Collateral Agent shall have given the Pledgor at least three (3) Business Days' prior written notice that its rights under this Section 2.05 are being suspended:

(i)    the Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement, the Note Purchase Agreement and the other Note Documents;

(ii)    the Collateral Agent shall promptly execute and deliver to the Pledgor, or cause to be promptly executed and delivered to the Pledgor, at the Pledgor's expense, all such proxies, powers of attorney and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section;

(iii)    the Pledgor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and are otherwise paid or distributed in accordance with, the terms and conditions of the Note Purchase Agreement, the other Note Documents and applicable laws; *provided* that any non-cash dividends, interest, principal or other distributions that would constitute Pledged Equity Interests, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests in the issuer of any Pledged Collateral or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral and, if received by the Pledgor, shall be held for the benefit of the Collateral Agent and the other Secured Parties and, to the extent constituting certificates evidencing Equity Interests or promissory notes or instruments evidencing debt securities (except for such as would constitute Excluded Equity), shall be forthwith delivered to the Collateral Agent in the same form as so received (with any necessary endorsements, stock or note powers and other instruments of transfer reasonably requested by the Collateral Agent).

(b)    Upon the occurrence and during the continuance of a Declared Default and, to the extent applicable, after the Collateral Agent shall have given the Pledgor at least three (3) Business Days' prior written notice of the suspension of its rights under paragraph (a)(iii) of this Section 2.05, all rights of the Pledgor to dividends, interest, principal or other distributions that the Pledgor is authorized to receive pursuant to paragraph (a)(iii) of this Section 2.05 shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions. All dividends, interest, principal or other distributions received by the Pledgor contrary to the provisions of this Section 2.05 shall be held for the benefit of the Collateral Agent and the other Secured Parties and shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsements, stock or note powers and other instruments of transfer reasonably requested by the Collateral Agent). Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 4.02. After all Declared Defaults have been cured, waived or withdrawn and the Pledgor has delivered to the Collateral Agent an Officer's Certificate of the Pledgor to that effect, the Collateral Agent shall promptly repay to the Pledgor (without interest) all dividends, interest, principal or other distributions that the Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section 2.05 and that remain in such account.

(c)    Upon the occurrence and during the continuance of a Declared Default and, to the extent applicable, after the Collateral Agent shall have given the Pledgor at least three (3) Business Days' prior written notice of the suspension of its rights under paragraph (a)(i) of this Section 2.05, all rights of the Pledgor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.05, and the obligations of the Collateral Agent under paragraph (a)(ii) of this Section 2.05, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right (but not the obligation)

5

and authority to exercise such voting and consensual rights and powers; *provided* that, unless otherwise directed by the Required Purchasers, the Collateral Agent shall have the right from time to time following and during the continuance of a Declared Default (and prior to delivery of the written notice provided for above) to permit the Pledgor to exercise such rights. After all Declared Defaults have been cured, waived or withdrawn and the Pledgor has delivered to the Collateral Agent an Officer's Certificate of the Pledgor to that effect, all rights vested in the Collateral Agent pursuant to this paragraph (c) shall cease, and the Pledgor shall have the exclusive right to exercise the voting and consensual rights and powers they would otherwise be entitled to exercise pursuant to paragraph (a)(i) of this Section 2.05.

(d)     Any notice given by the Collateral Agent to the Pledgor suspending its rights under paragraph (a) of this Section 2.05 (i) may be given by telephone if promptly confirmed in writing and (ii) may suspend the rights of the Pledgor under paragraph (a)(i) or paragraph (a)(iii) in part without suspending all such rights (as specified by the Collateral Agent as directed by the Required Purchasers) and without waiving or otherwise affecting the Collateral Agent's rights to give additional notices from time to time suspending other rights so long as a Declared Default has occurred and is continuing.

## ARTICLE III
### [Reserved]

## ARTICLE IV
### Remedies

SECTION 4.01.     Remedies upon Declared Default. If a Declared Default shall have occurred and is continuing and the Collateral Agent shall have notified the Pledgor in writing (in the case of rights exercised with respect to Pledged Collateral, at least three (3) Business Days prior to the exercise of such rights) of its intent to exercise such rights, the Pledgor agrees to deliver, on demand, each item of Collateral to the Collateral Agent or any Person designated by the Collateral Agent, and it is agreed that the Collateral Agent shall have the right (but not the obligation), with or without legal process and with or without demand for performance but with notice (which need not be prior notice), to take possession of the Pledged Collateral and without liability for trespass to enter any premises where the Pledged Collateral may be located for the purpose of taking possession of or removing the Pledged Collateral and, generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, the Pledgor agrees that the Collateral Agent shall have the right (but not the obligation), subject to the mandatory requirements of applicable law and the notice requirements described below, to sell or otherwise dispose of all or any part of the Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate. The Collateral Agent shall be authorized at any such sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any sale of Collateral shall hold the property sold absolutely free from any claim or right on the part of the Pledgor, and the Pledgor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal that the Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Collateral Agent shall give the Pledgor no less than 10 calendar days' written notice (which the Pledgor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral or portion thereof will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion with no liability therefor) determine. The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Collateral Agent may,

6

without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent and the other Secured Parties shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of the Pledgor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from the Pledgor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Pledgor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free to carry out such sale pursuant to such agreement and the Pledgor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Declared Defaults shall have been remedied and the Secured Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may (but shall not be obligated to) proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 4.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the New York UCC or its equivalent in other jurisdictions.

In no event shall the Collateral Agent have any obligation, responsibility or duty to take any actions in connection with a Declared Default or otherwise in connection with this Agreement unless it has received such direction, security and indemnity from the Secured Parties as and to the extent required pursuant to the Note Purchase Agreement.

SECTION 4.02.    Application of Proceeds. Subject to any Customary Intercreditor Agreement, the Collateral Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, as provided in Section 8.04 of the Note Purchase Agreement.

The Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof. The Pledgor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral is insufficient to pay all Secured Obligations, including any attorneys' fees and other expenses incurred by the Collateral Agent or any other Secured Party to collect such deficiency.

SECTION 4.03.    Georgia Lottery Corporation. FOR THE AVOIDANCE OF DOUBT, NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE EXERCISE OF RIGHTS AND REMEDIES WITH RESPECT TO ANY PLEDGED COLLATERAL CONSTITUTING EQUITY INTERESTS OF A GLC LICENSE HOLDER SUBSIDIARY (OR OF A PERSON THAT OWNS A GLC LICENSE HOLDER SUBSIDIARY) SHALL REMAIN LIMITED BY, AND SUBJECT TO, THE REQUIREMENTS OF ANY AND ALL APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, THE RULES AND REGULATIONS OF THE GEORGIA LOTTERY CORPORATION).

SECTION 4.04.    Securities Act. In view of the position of the Pledgor in relation to the Pledged Collateral, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Collateral permitted hereunder. The Pledgor understands that compliance with the

7

Federal Securities Laws might very strictly limit the course of conduct of the Collateral Agent if the Collateral Agent were to attempt to dispose of all or any part of the Pledged Collateral, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Collateral could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Collateral Agent in any attempt to dispose of all or part of the Pledged Collateral under applicable blue sky or other state securities laws or similar laws analogous in purpose or effect. The Pledgor recognizes that in light of such restrictions and limitations the Collateral Agent may (but shall not be obligated to), with respect to any sale of the Pledged Collateral, limit the purchasers to those who will agree, among other things, to acquire such Pledged Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that in light of such restrictions and limitations, the Collateral Agent may, in its sole and absolute discretion with no liability therefor and without obligation, (a) proceed to make such a sale whether or not a prospectus or registration statement for the purpose of having a receipt issued with respect to or registering such Pledged Collateral or part thereof shall have been filed under the Federal Securities Laws to the extent the Collateral Agent has determined that such a receipt or registration is not required by any Requirement of Law and (b) approach and negotiate with a limited number of potential purchasers (including a single potential purchaser) to effect such sale. The Pledgor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Collateral Agent and the other Secured Parties shall incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price that the Collateral Agent, in its sole and absolute discretion, may in good faith and on a commercially reasonable efforts basis deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after issuance of a receipt or registration as aforesaid or if more than a limited number of purchasers (or a single purchaser) were approached. The provisions of this Section 4.04 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Collateral Agent sells.

## ARTICLE V
### Miscellaneous

SECTION 5.01.    Notices.    All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of the Note Purchase Agreement.

SECTION 5.02.    Waivers; Amendment.

(a)    No failure or delay by the Collateral Agent or any other Secured Party in exercising any right or power hereunder or under any other Note Document shall operate as a waiver thereof nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Collateral Agent and the other Secured Parties hereunder and under the other Note Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Pledgor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 5.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified (other than pursuant to supplements expressly contemplated hereby) except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Pledgor with respect to which such waiver, amendment or modification is to apply, subject to any consent required pursuant to Section 10.01 of the Note Purchase Agreement.

SECTION 5.03.    Collateral Agent's Fees and Expenses; Indemnification.    The provisions of Sections 10.04 and 10.05 of the Note Purchase Agreement are incorporated herein by reference, *mutatis mutandis*.

SECTION 5.04.    Successors and Assigns.    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and

8

all covenants, promises and agreements by or on behalf of the Pledgor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

SECTION 5.05.  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Pledgor in this Agreement or any other Note Document and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Note Document shall be considered to have been relied upon by the Secured Parties and shall survive the execution and delivery of the Note Documents and the making of any Notes and issuance, regardless of any investigation made by or on behalf of any Secured Party and notwithstanding that the Collateral Agent or any Secured Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended under the Note Purchase Agreement or any other Note Document, and shall continue in full force and effect until the Termination Date.

SECTION 5.06.  Counterparts; Effectiveness; Several Agreement.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (e.g., a "pdf" or "tif") and other electronic signatures (including, without limitation, DocuSign and AdobeSign) shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes. Signatures of the parties hereto transmitted by facsimile or other electronic transmission (e.g., a "pdf" or "tif") and other electronic signatures (including, without limitation, DocuSign and AdobeSign) shall be deemed to be their original signatures for all purposes. The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code. This Agreement shall become effective as to the Pledgor when a counterpart hereof executed by the Pledgor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed by the Collateral Agent, and thereafter shall be binding upon the Pledgor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of the Pledgor, the Collateral Agent and the other Secured Parties and their respective successors and assigns, except that the Pledgor shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly provided in the Note Documents. This Agreement shall be construed as a separate agreement with respect to the Pledgor and may be amended, modified, supplemented, waived or released with respect to the Pledgor.

SECTION 5.07.  Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of such invalid, illegal or unenforceable provisions.

SECTION 5.08.  Subordination.  Notwithstanding any provision of this Agreement or any other Note Document to the contrary, all rights of the Pledgor of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the payment in full in cash of all of the Secured Obligations. No failure on the part of the Pledgor to make any payments required under applicable law or otherwise shall in any respect limit the obligations and liabilities of the Pledgor with respect to its obligations hereunder, and the Pledgor shall remain liable for the full amount of the obligations of the Pledgor hereunder.

SECTION 5.09.  Governing Law; Jurisdiction; Consent to Service of Process; Appointment of Service of Process Agent.

(a)  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

9

(b)     Each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York sitting in New York County, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Note Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Note Document shall affect any right that the Collateral Agent or any Secured Party may otherwise have to bring any action or proceeding relating to this Agreement against the Pledgor or its respective properties in the courts of any jurisdiction.

(c)     Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 5.10.     WAIVER OF JURY TRIAL.     EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE TRANSACTION RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 5.10 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 5.11.     Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.12.     Security Interest Absolute. All rights of the Collateral Agent hereunder, the grant of a security interest in the Pledged Collateral and all obligations of the Pledgor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Note Purchase Agreement, any other Note Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Note Purchase Agreement, any other Note Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee securing or guaranteeing all or any of the Secured Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Secured Obligations or this Agreement.

SECTION 5.13.     Termination or Release.

(a)     This Agreement and all security interests granted hereby shall terminate when payment in full in cash of all the Secured Obligations (other than contingent indemnification obligation not yet accrued and payable) has occurred (such date, the "Termination Date").

10

(b)     All security interests granted hereby shall also terminate and be released at the time or times and in the manners set forth in the Note Purchase Agreement. The Pledgor shall also be released from its obligations under this Agreement at the time or times and in the manners set forth in the Note Purchase Agreement.

(c)     In connection with any termination or release pursuant to paragraph (a) or (b) of this Section, the Collateral Agent shall execute and deliver to the Pledgor, at the Pledgor's expense, all documents that the Pledgor shall prepare and provide to the Collateral Agent for execution and reasonably request to evidence such termination or release; *provided* that prior to any such request, the Pledgor shall have in each case delivered to the Collateral Agent, to the extent requested by the Collateral Agent, an Officer's Certificate of the Pledgor to the effect that such termination or release is in compliance with the Note Documents; *provided, further*, that the Collateral Agent shall not be required to execute any document or take any action to evidence such release on terms that, in the Collateral Agent's opinion or the opinion of its counsel, could expose the Collateral Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse to, or representation, or warranty by the Collateral Agent of any kind. Any execution and delivery of documents by the Collateral Agent pursuant to this Section shall be without recourse to or representation or warranty of any kind by the Collateral Agent.

SECTION 5.14.     Collateral Agent Appointed Attorney-in-Fact. The Pledgor hereby appoints the Collateral Agent the attorney-in-fact of the Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of a Declared Default (and, with respect to actions that require notice to the Pledgor, following notice on such terms provided in this Agreement with respect to such action), which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, the Collateral Agent shall have the right (but not the obligation), but only upon the occurrence and during the continuance of a Declared Default and written notice by the Collateral Agent to the Pledgor (in the case of rights exercised with respect to Pledged Collateral, at least three (3) Business Days prior to the exercise of such rights) of its intent to exercise such rights, with full power of substitution either in the Collateral Agent's name or in the name of the Pledgor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to sign the name of the Pledgor on any invoice or bill of lading relating to any of the Collateral; (d) [reserved]; (e) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (f) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (g) [reserved]; and (h) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; *provided* that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and none of the Collateral Agent, Agent-Related Persons, other Secured Parties or their respective officers, directors, employees or agents shall be responsible to the Pledgor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct or that of any of their respective Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact (as determined by a court of competent jurisdiction in a final and non-appealable judgement).

SECTION 5.15.     Intercreditor Agreement Governs. Each Person that is secured hereunder, by accepting the benefits of the security provided hereby, (i) agrees (or is deemed to agree) that it will be bound by, and will take no actions contrary to, the provisions of any Customary Intercreditor Agreement, and (ii) authorizes (or is deemed to authorize) the Collateral Agent on behalf of such Person to enter into, and perform under, any Customary Intercreditor Agreement. Notwithstanding any other provision contained herein, this Agreement, the Liens created hereby and the rights, remedies, duties and obligations provided for herein are subject in all respects to the provisions of any Customary Intercreditor Agreement. In the event of any conflict or inconsistency between the provisions of this Agreement and any Customary Intercreditor Agreement, the provisions of such Customary Intercreditor Agreement shall control.

11

SECTION 5.16.     [Reserved].

SECTION 5.17.     Reinstatement.  The obligations of the Pledgor under this Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Pledgor in respect of the Secured Obligations is rescinded or must be otherwise restored by any holder of any of the Secured Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.  The provisions of this Section 5.17 shall survive the termination of this Agreement.

SECTION 5.18.     English Language.  All certificates, reports, notices and other documents and communications given or delivered to the Collateral Agent, pursuant to this Agreement, the agreements attached as Exhibits hereto or any other document related hereto shall either be in the English language or accompanied by a certified English translation thereof with the English language version controlling.

SECTION 5.19.     Rights of the Collateral Agent.

(a)     Alter Domus (US) LLC is entering this Agreement not in its individual capacity, but solely in its capacity as Collateral Agent under the Note Purchase Agreement. In connection with this Agreement, to the extent not already provided for herein, the Collateral Agent shall be entitled to the benefit of every provision of the Note Purchase Agreement limiting the liability of or affording rights, privileges, protections, exculpations, immunities, indemnities or other benefits to the Collateral Agent as if they were each expressly set forth herein for the Collateral Agent's benefit *mutatis mutandis*. In the case of a conflict between this Agreement or any other Note Document and the Note Purchase Agreement with respect to the Collateral Agent's rights, privileges, protections, exculpations, immunities, indemnities or other benefits, the Note Purchase Agreement shall control.

(b)     Notwithstanding anything in this Agreement or any other Note Document to the contrary, in the exercise of any power or discretion under this Agreement, the Collateral Agent shall be entitled to seek the direction of the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as the Collateral Agent shall believe in good faith to be necessary) and shall be entitled to refrain from acting (and shall have no liability to any Person for doing so) until it has received such direction accompanied by, if requested, indemnity or security satisfactory to the Collateral Agent and shall have the right to appoint designees, sub-agents, or attorneys-in-fact to exercise any rights and powers conferred on the Collateral Agent hereunder. For the avoidance of doubt, and without limiting the other protections set forth herein, in the Note Purchase Agreement and the other Note Documents, with respect to any approval, determination, designation, or judgment to be made by the Collateral Agent herein, the Collateral Agent shall be entitled to request that the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as the Collateral Agent shall believe in good faith shall be necessary) make or confirm such approval, determination, designation, or judgment.

SECTION 5.20.     No Partnership or Joint Venture.  Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto or constitute any party the agent of any other.  No party shall hold itself out contrary to the terms of this Section and no party shall become liable by any representation, act or omission of the other contrary to the provisions hereof.  This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not.

[*Remainder of Page Intentionally Blank*]

12

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**PLEDGOR:**

Lucky Bucks Holdings LLC

By: _____

      Name:
      Title:

[Signature Page to Pledge Agreement]

CONFIDENTIAL

Alter Domus (US) LLC, not in its individual capacity but solely in its capacity as Collateral Agent

By: _____
Name:
Title:

[Signature Page to Pledge Agreement]

CONFIDENTIAL

Trive_00043139

**Schedule I**
**to Pledge Agreement**

PLEDGOR; JURISDICTION OF FORMATION; CHIEF EXECUTIVE OFFICE

| Name of Pledgor | Form of Organization | Jurisdiction of Formation | Chief Executive Office | Other Legal Names[1] | Other Jurisdictions/Forms[2] |
|---|---|---|---|---|---|
| Lucky Bucks Holdings LLC | Limited liability company | Delaware | 5820 Live Oak Parkway, Suite 300 Norcross, GA 30093 | None | None |

---

[1] Includes (i) all other legal names either used in the last five (5) years or in filings with the IRS and (ii) legal names of predecessors of such entity via merger, amalgamation etc. in the last five (5) years.

[2] Includes any other jurisdictions/form of organization in the last five (5) years.

Schedule I

Trive_00043140

**Schedule II
to Pledge Agreement**

PLEDGED EQUITY INTERESTS

| Pledgor | Issuer | Class of Equity Interest | Certificate No(s) | Number of Shares/Units | Percentage of Outstanding Equity Interest |
|---|---|---|---|---|---|
| Lucky Bucks Holdings LLC | Lucky Bucks HoldCo, LLC | Membership Interests | Uncertificated | 100 | 100% |

Schedule II

## EXHIBIT L-1

### [FORM OF] UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Non-U.S. Purchasers That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Note Purchase Agreement, dated as of November 29, 2021 (as it may be amended, restated, amended and restated, supplemented or otherwise modified, the *"Note Purchase Agreement"),* by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent, and each purchaser from time to time party thereto.

Pursuant to the provisions of Section 3.01(f)(ii)(C) of the Note Purchase Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Note(s) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of the Issuer within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Issuer with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms), as applicable. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform the Issuer and the Administrative Agent, and (ii) the undersigned shall have at all times furnished the Issuer and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Note Purchase Agreement and used herein shall have the meanings given to them in the Note Purchase Agreement.

[NAME OF PURCHASER]

By: _____

    Name:
    Title:
    Date: [      ], 202[ ]

## EXHIBIT L-2

### FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Non-U.S. Purchasers That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Note Purchase Agreement, dated as of November 29, 2021 (as it may be amended, restated, amended and restated, supplemented or otherwise modified, the "Note Purchase Agreement"), by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent, and each purchaser from time to time party thereto.

Pursuant to the provisions of Section 3.01(f)(ii)(D) of the Note Purchase Agreement, the undersigned hereby certifies that (i) it is the sole record of the Note(s) in respect of which it is providing this certificate, (ii) its direct partners/members (or indirect partners/members, to the extent such direct partners/members are themselves partnerships or disregarded entities for U.S. federal income tax purposes) are the sole beneficial owners of such Note(s), (iii) with respect to the extension of credit pursuant to the Note Purchase Agreement or any other Note Document, neither the undersigned nor any of its direct partners/members (or indirect partners/members, to the extent such direct partners/members are themselves partnerships or disregarded entities for U.S. federal income tax purposes) is a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct partners/members (or indirect partners/members, to the extent such direct partners/members are themselves partnerships or disregarded entities for U.S. federal income tax purposes) is a "10 percent shareholder" of the Issuer within the meaning of Section 881(c)(3)(B) of the Code, and (v) none of its direct partners/members (or indirect partners/members, to the extent such direct partners/members are themselves partnerships or disregarded entities for U.S. federal income tax purposes) is a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Issuer with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor form), or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Issuer and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Issuer and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Note Purchase Agreement and used herein shall have the meanings given to them in the Note Purchase Agreement.

[Signature Page Follows.]

Trive_00043143

[NAME OF PURCHASER]

By: _____

    Name:
    Title:
    Date: [        ], 202[ ]

CONFIDENTIAL

## EXHIBIT N

## [FORM OF] SOLVENCY CERTIFICATE

[●], 2021

Reference is made to that certain Note Purchase Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Purchase Agreement") by and among Lucky Bucks Holdings LLC, a Delaware limited liability company (the "Issuer"), Alter Domus (US) LLC, as Administrative Agent and Collateral Agent and each Purchaser from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Note Purchase Agreement.

The undersigned, a manager of the Issuer, in such capacity only and not in an individual capacity (and without personal liability), hereby certifies, and based upon facts and circumstances as they exist as of the date hereof (and disclaiming any responsibility for changes in such fact and circumstances after the date hereof), as follows on behalf of the Issuer:

(a)    I am familiar with the business and financial position of the Issuer and its subsidiaries. The undersigned has reviewed the terms of Section 4.01(l), the definition of the term "Solvent" and the other definitions and provisions contained in the Note Purchase Agreement and the other Note Documents relating thereto, and, in my opinion, have made, or have caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein.

(b)    As of the date hereof and after giving effect to the Transactions and the incurrence of the Indebtedness and Obligations being incurred in connection with the Note Purchase Agreement and use of proceeds thereof, that (a) each of the Fair Value and the Present Fair Salable Value of the assets of the Issuer and its Subsidiaries taken as a whole exceeds their Stated Liabilities and Identified Contingent Liabilities; (b) the Issuer and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (c) the Issuer and its Subsidiaries taken as a whole can pay their Stated Liabilities and Identified Contingent Liabilities as they mature.

For purposes of this Solvency Certificate, the terms "Fair Value", "Present Fair Salable Value", "Stated Liabilities", "Identified Contingent Liabilities", "Can pay their Stated Liabilities and Identified Contingent Liabilities as they mature" and "Do not have Unreasonably Small Capital" shall have the respective meanings ascribed to such terms in the definition of "Solvent" in the Note Purchase Agreement.

[*Signature Pages Follow*]

**LUCKY BUCKS HOLDINGS LLC,**
as Issuer

By: _____
Name:
Title:

[Signature Page to Solvency Certificate]

CONFIDENTIAL

# EXHIBIT O

## KEY PERFORMANCE INDICATOR REPORT

**Lucky Bucks, LLC**
**Key Performance Indicators**

|  | **[Month] 30, 2021** |
| --- | --- |

Monthly KPIs:
*Capital Expenditure*
Maintenance Capex / Replacement Capex
Growth Capex
Total CapEx

*Contracts*
Avg. Residual Contract Term (Yrs)

*WPUD*
WPUD, Pre-GLC Tax ($)
WPUD, Post-GLC Tax ($)

*Acquisitions Completed During Period*
Acquired Locations (#)
Acquired COAMs (#)
Multiple of Revenue
Total Acquisition Price ($mm)
Acquired Revenue ($mm)
Acquired EBITDA ($mm)

*Acquisition Pipeline*

| [ Target 1 ] | [ Status ] | [ Price ] | [ Multiple ] | [ Revenue] |
| --- | --- | --- | --- | --- |
| [ Target 2 ] | [ Status ] | [ Price ] | [ Multiple ] | [ Revenue] |
| [ Target 3 ] | [ Status ] | [ Price ] | [ Multiple ] | [ Revenue] |
| [ Target 4 ] | [ Status ] | [ Price ] | [ Multiple ] | [ Revenue] |
| [ Target 5 ] | [ Status ] | [ Price ] | [ Multiple ] | [ Revenue] |

**Quarterly KPIs:**
*Contracts*
Contracts (End of Period) (#)
Contracts Expiring in NTM (#)
Contracts Contracts Renewed (#)

*Units*
Machines (End of period) (#)

Trive_00043147