## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LUCKY BUCKS HOLDINGS LLC, | Case No.  23-10756 (KBO) |
| Debtor. | |
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of Lucky Bucks Holdings LLC and as assignee, | Adversary Proceeding<br><br>Adv. Proc. No. 24-50130 (KBO) |
| Plaintiff, | |
| v. | |
| TRIVE CAPITAL MANAGEMENT LLC, *et al.*, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## THE DAMANI DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

QUINN EMANUEL URQUHART
   & SULLIVAN LLP
Susheel Kirpalani
Andrew J. Rossman
Matthew R. Scheck
Mario O. Gazzola
Kenneth B. Hershey
295 Fifth Avenue, 9th Floor
New York, New York 10016

WHITEFORD TAYLOR
   & PRESTON LLC
William F. Taylor, Jr. (DE No. 2936)
Bradley P. Lehman (DE No. 5921)
600 North King Street, Suite 300
Wilmington, DE 19801

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................1

SUMMARY OF ARGUMENT ..................................................1

RELEVANT BACKGROUND ..................................................3

    A.    Damani Founds Lucky Bucks And Controls It Until The GLC Ban ......................3

    B.    Damani Is Kept Apprised Of The Notes Marketing Process ...................................4

    C.    The Holdings Distributions Render Holdings Insolvent, And Damani's Wrongdoing Is Revealed To The Noteholders .......................................4

STANDARD OF REVIEW .....................................................5

ARGUMENT .........................................................................6

I.     The Amended Complaint States A Claim For Intentional Fraudulent Transfer .................6

    A.    The Badges Of Fraud Need Not Implicate The Damani Defendants .....................8

    B.    The Remaining Equity Was Worthless .................................................10

II.    The Amended Complaint Plausibly Alleges Constructive Fraudulent Transfer ...............11

    A.    The Dividends Were Issued Without Receipt Of Reasonably Equivalent Value ...............................................................11

    B.    The Trustee Adequately Pleads That Holdings Was Insolvent ...........................12

III.   The Unlawful Dividend Claim Is Adequately Pleaded....................................14

IV.   The Amended Complaint Adequately Alleges Claims Under Georgia's RICO Statute ...............................................................16

    A.    Damani Committed Multiple Predicate Acts .........................................17

        1.    Securities Fraud ...............................................................18

        2.    Wire Fraud .....................................................................20

        3.    Damani's Predicate Acts Proximately Caused Injury To The Plaintiff ...............................................................23

    B.    The Amended Complaint Adequately Alleges Direction Of An Enterprise..........26

    C.    The Amended Complaint Adequately Alleges Damani Conspired To Violate Georgia's RICO Act.......................................................28

V.    Defendants' Remaining Arguments Are Meritless.........................................30

CONCLUSION.......................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) .............................................................................20

*In re AMC Invs., LLC*,
   637 B.R. 43 (Bankr. D. Del. 2022) ........................................................................16

*In re Appleseed's Intermediate Holdings, LLC*,
   470 B.R. 289 (D. Del. 2012) ...................................................................................7

*Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc.*,
   140 F.3d 898 (11th Cir. 1998) .........................................................................24, 25

*In re BMT-NW Acquisition, LLC*,
   582 B.R. 846 (Bankr. D. Del. 2018) ............................................11, 12, 13, 14, 16

*In re Brentwood-Lexford Partners, LLC*,
   292 B.R. 255 (Bankr. N.D. Tex. 2003 ...................................................................12

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ...............................................................................................21

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ...................................................................................27

*Cobb Cnty. v. Jones Grp., P.L.C.*,
   218 Ga. App. 149 (1995) ........................................................................................17

*Cox v. Adm'r U.S. Steel & Carnegie*,
   17 F.3d 1386 (11th Cir. 1994) ................................................................................23

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del 2023) ........................................................................12

*In re Curepoint, LLC*,
   2024 WL 4355525 (Bankr. N.D. Ga. Sept. 30, 2024) ............................................11

*In re DBSI, Inc.*,
   445 B.R. 344 (Bankr. D. Del. 2011) .......................................................................12

*Devon IT, Inc. v. IBM Corp.*,
   805 F. Supp. 2d 110 (E.D. Pa. 2011) .....................................................................21

*DiMare v. MetLife Ins. Co.*,
    369 F. App'x 324 (3d Cir. 2010) .................................................................6

*Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*,
    2023 WL 6938144 (Bankr. D. Del. Oct. 19, 2023) .........................................8, 10

*Eerie World Ent., L.L.C. v. Bergrin*,
    2004 WL 2712197 (S.D.N.Y. Nov. 23, 2004) ........................................16

*Faillace v. Columbus Bank & Trust Co.*,
    269 Ga. App. 866 (2004) ....................................................................17, 27

*First Fin. Sav. & Loan Ass'n v. Title Ins. Co. of Minn.*,
    557 F. Supp. 654 (N.D. Ga. 1982) ...................................................18

*GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.*,
    245 Ga. App. 460 (2000) .......................................................................18

*In re Glencoe Acquisition., Inc.*,
    2015 WL 3777972 (Bankr. D. Del. June 16, 2015).....................................16

*Glock v. Glock*,
    247 F. Supp. 3d 1307 (N.D. Ga. 2017) ...........................................23, 24

*Grant v. Turner*,
    505 F. App'x 107 (3d Cir. 2012) ..........................................................20

*GunBroker.com, LLC v. Tenor Cap. Partners, LLC*,
    2022 WL 103719 (N.D. Ga. Jan. 11, 2022) .......................................18

*Halperin v. Moreno (In re Green Field Energy Servs., Inc.)*,
    2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) ...........................13

*Hansford v. Veal*,
    369 Ga. App. 641 (2023) ......................................................17, 19, 23, 29

*Harris v. Orange S.A.*,
    636 Fed.Appx. 476 (11th Cir. 2015)...................................................24

*Hartig Drug Co. Inc. v. Senju Pharma. Co. Ltd.*,
    836 F.3d 261 (3d Cir. 2016)................................................................5, 10

*In re Hechinger Inv. Co. of Del.*,
    327 B.R. 537 (D. Del. 2005)..................................................................7

*Hill v. Bd. of Regents of the Univ. Sys. of Ga.*,
    351 Ga. App. 455 (2019) ......................................................................6

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ........................................................................27

*Kolar v. Preferred Real Est. Invs., Inc.*,
361 F. App'x 354 (3d Cir. 2010) .................................................................21

*Lechter v. Aprio, LLP*,
565 F. Supp. 3d 1279 (N.D. Ga. 2021) ...............................................18, 24

*In re LendXFinancial, LLC*,
2012 WL 1597394 (Bankr. N.D. Ga. Mar. 19, 2012) ...................................7

*Lum v. Bank of Am.*,
361 F.3d 217 (3d Cir. 2004) ...................................................................22, 23

*In re Lyon*,
644 B.R. 211 (Bankr. D. Or. 2022) ..............................................................30

*In re Mallinckrodt PLC*,
2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) .........................................8

*In re Mediators, Inc.*,
105 F.3d 822 (2d Cir.1997) ..........................................................................16

*In re Midway Games Inc.*,
428 B.R. 303 (Bankr. D. Del. 2010) ..............................................................7

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs
Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
405 B.R. 527 (Bankr. D. Del. 2009) ....................................................6, 7, 9

*In re Opus E., LLC*,
528 B.R. 30 (Bankr. D. Del. 2015) ..............................................................11

*In re Our Alchemy, LLC*,
2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) ....................................13

*In re Our Alchemy, LLC*,
642 B.R. 155 (Bankr. D. Del. 2022) ..............................................................7

*Parm v. Nat'l Bank of California, N.A.*,
242 F. Supp. 3d 1321 (N.D. Ga. 2017) ........................................................27

*Pasha v. State*,
273 Ga. App. 788 (2005) ..............................................................................28

*In re PennySaver USA Publ'g*,
602 B.R. 256 (Bankr. D. Del. 2019) ............................................................12

iv

*Peruto v. Timbertech Ltd.*,
  2015 WL 8664276 (D.N.J. Dec. 10, 2015) ...................................................................14

*Recovery Fund II USA LLC v. Rabobank, Nat'l Ass'n*,
  2020 WL 509166 (D. Del. Jan. 31, 2020) ...........................................................25, 26

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ........................................................................................................27

*Rosen v. Unilever U.S., Inc.*,
  2010 WL 4807100 (N.D. Cal. May 3, 2010) ...........................................................10

*In re SemCrude, L.P.*,
  2013 WL 2490179 (Bankr. D. Del. June 10, 2013), *aff'd sub nom. In re
  SemCrude L.P.*, 648 F. App'x 205 (3d Cir. 2016) ..................................................12

*In re Seven Seas Petroleum, Inc.*,
  522 F.3d 575 (5th Cir. 2008) .......................................................................................26

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
  742 F.2d 786 (3d Cir. 1984) .........................................................................................20

*Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*,
  292 B.R. 255 (Bankr. N.D. Tex. 2003) .....................................................................12

*Turk v. Morris, Manning & Martin, LLP*,
  593 F. Supp. 3d 1258 (N.D. Ga. 2022) ...................................17, 21, 22, 23, 28, 29

*United States v. Yusuf*,
  536 F.3d 178 (3d Cir. 2008) .........................................................................................20

*In re Vill. Red Rest. Corp.*,
  2021 WL 3889793 (Bankr. S.D.N.Y. Aug. 31, 2021) ...........................................12

*Warden v. McLelland*,
  288 F.3d 105 (3d Cir. 2002) .........................................................................................22

*White Winston Select Asset Funds, LLC v. Good Times Restaurants, Inc.*,
  2020 WL 4015327 (D. Del. July 16, 2020) ...............................................................8

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ........................................................................................................29

*Zuber v. Boscov's*,
  871 F.3d 255 (3d Cir. 2017) ...........................................................................................6

## Statutes / Rules

11 U.S.C. § 101(32)(A)................................................................................................12

11 U.S.C. § 548(a)......................................................................................................11

11 U.S.C. § 548(a)(1)(A)..............................................................................................7

11 U.S.C. § 548(a)(1)(B)............................................................................................11

18 U.S.C. § 1961(1)...............................................................................................17, 18

11 U.S.C. § 101...........................................................................................................12

11 U.S.C. § 548.............................................................................................................6

Del. Code Ann. tit. 6 § 1304(a)(2)...............................................................................11

Del. Code Ann. tit. 6 Del. C. § 1304(b)(1)....................................................................7

Del. Code Ann. tit. 6, § 1304(a)(1)..............................................................................11

Del. Code Ann. tit. 6, § 1304(b)................................................................................7, 9

Del. Code Ann. tit. 6, § 18-607...................................................................................16

Fed. R. Civ. P. 9(b)............................................................................6, 14, 20, 21, 23

Ga. Code Ann. § 10-5-50............................................................................................18

Ga. Code Ann. § 16-14-3(5)(A)(iii)............................................................................18

Ga. Code Ann. § 16-14-4.............................................................................................16

Ga. Code Ann. § 16-14-4(a)...................................................................................17, 28

Ga. Code Ann. § 16-14-4(b)...................................................................................26, 27

Ga. Code Ann. § 16-14-4(c).........................................................................................28

Ga. Code Ann. § 18-2-74........................................................................................11, 12

Ga. Code Ann. § 18–2–74(a)(1)....................................................................................7

Ga. Code Ann. § 18–2–74(b).....................................................................................7, 9

OCGA § 16–14–4(b)....................................................................................................27

### Other Authorities

Restatement (Second) of Torts §§ 531-33 ....................................................................18

Restatement (Third) Of Agency § 5.04 cmt. d (2006) (Oct. 2024 update)...................................16

Marc Abrams (the "Trustee" or "Plaintiff"), solely in his capacity as Chapter 7 Trustee of the bankruptcy estate of Lucky Bucks Holdings LLC ("Holdings") and as assignee of causes of action previously belonging to Holdings' creditors, by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to the motion of defendants Lucky Bucks Ventures, Inc. ("LBVI") and Anil Damani (collectively, the "Damani Defendants" or "Damani") to dismiss the First Amended Complaint (the "Motion") [D.I. 74].[1]

## PRELIMINARY STATEMENT[2]

1.    The Amended Complaint lays out how Damani masterminded a scheme to strip Lucky Bucks' assets by, among other things, stealing location contracts from Lucky Bucks, using fake players to pump their EBITDA, and selling them back to Lucky Bucks at inflated prices. This scheme played a central part in tanking Lucky Bucks' performance—and consequently, Holdings' sole asset—all while Management was "accurately model[ing]" and "show[ing] him" how Holdings' financial condition would be affected by the Holdings Distributions.

2.    Damani received a whopping $59 million in distributions via his wholly-owned entity, LBVI.  In his bid to keep his ill-gotten gains, he makes a series of legal arguments that, again and again, either intentionally misstate the law, or simply miss the point.  Damani's motion to dismiss should be denied.

## SUMMARY OF ARGUMENT

3.    ***Intentional Fraudulent Transfer***.  Damani's entire argument to dismiss the fraudulent transfer claims against him is premised on the (incorrect) assertion that the Amended Complaint does not plead *Damani's* fraudulent intent, or badges of fraud that apply to *Damani's*

---

[1]  Citations to "D.I." refer to the docket of this adversary proceeding unless otherwise indicated.

[2]  Capitalized terms not defined in this preliminary statement bear the meanings ascribed below.

conduct.  But even if Damani were an innocent bystander, this argument misses the point entirely. It is black letter law that the only relevant intent is of the debtor, Holdings.  And Damani does not contest (nor can he now on reply) that the Amended Complaint sufficiently alleges the intent of other individuals whose knowledge can be ascribed to Holdings.

4.     Damani also argues the Trustee fails to establish the badge of fraud of insolvency, by arguing, among other things, that because the Georgia Lottery Corporation reported an increase in contributions to the Georgia Lottery for Education Account in 2021, the Trustee's allegations that Lucky Bucks' performance declined significantly cannot be right.  But the Amended Complaint easily meets the low bar for alleging insolvency, including by alleging that in the span of six months, when the capital structure was already distressed, Holdings and Lucky Bucks incurred $450 million of new debt obligations, the proceeds of which went to line the shareholders' pockets while the business failed.  Damani's twisted logic, which requires a series of inferences to be drawn *against* the Trustee based on materials outside the pleadings, should be rejected.

5.     ***Constructive Fraudulent Transfer***.  Damani argues that the Trustee does not state a claim for constructive fraudulent transfer because the *Noteholders* received reasonably equivalent value from the *Note Issuance*.  Once again, this completely misses the point.  Damani presents no argument that *Holdings* received reasonably equivalent value for the *Holdings Distributions—i.e.*, the alleged fraudulent transfers.  Nor can he, as black letter law makes clear that dividends paid to stockholders are made without the exchange of any value.

6.     ***Unlawful Dividend***.  Damani argues that the Trustee does not state a claim because he cannot show insolvency or Damani's knowledge of insolvency.  But for the reasons set forth above, the Amended Complaint alleges Holdings was insolvent at the time of the Holdings

Distributions, and that Damani knew that was the case based on, among other things, the modeled information he was presented by Management.

7.    ***Georgia Statutory Claims***.  Damani argues that the Trustee does not state a Georgia RICO claim based on citing law that largely relates to the *federal* RICO act, without acknowledging the material differences between Georgia and federal law.  The Amended Complaint states a claim under Georgia RICO due to Damani's knowing participation in orchestrating the scheme to strip Lucky Bucks' assets, and accordingly, the other statutory Georgia claims survive as well.

<u>**RELEVANT BACKGROUND**</u>

**A.    Damani Founds Lucky Bucks And Controls It Until The GLC Ban**

8.    Lucky Bucks was a business premised on ownership of coin-operated amusement machines ("<u>COAMs</u>") located in gas stations, convenience stores, and other retail locations in the state of Georgia.  First Amended Complaint [D.I. 58] ("<u>Amended Complaint</u>" or "<u>FAC</u>") ¶¶ 62-64.  Damani sold 51% of his equity in the company in 2016, but remained CEO.  *Id.* ¶¶ 45, 72.

9.    On June 2, 2020, as a result of allegations that Damani offered illegal inducements to a COAM location license holder, the Georgia Lottery Corporation ("<u>GLC</u>"), Lucky Bucks' regulator, barred Damani from participating in Lucky Bucks' operations.  *Id.* ¶¶ 64, 76-79.  After Damani was forced to step back, he exercised his right as minority shareholder to appoint Defendant Shafik "Tony" Kassam as his designee to Lucky Bucks' board.  *Id.* ¶¶ 80, 85.

10.    Even though he was barred from participating in Lucky Bucks' operations, Damani remained involved and kept apprised in several aspects of Lucky Bucks' business, particularly as related to the acquisition of new locations.  FAC ¶¶ 94-95, 169. For example, Damani would both source and offer opinions on potential acquisition targets.  *See, e.g.*, *id.* ¶¶ 94, 169.

**B.      Damani Is Kept Apprised Of The Notes Marketing Process**

11.      In fall 2021, Defendants began marketing Notes in a soon-to-be formed holding company above Lucky Bucks, which ultimately became Lucky Bucks Holdings LLC ("Holdings").      FAC ¶¶ 121-32. As with Lucky Bucks, Damani appointed Kassam as his representative to the Holdings board.  *Id.* ¶ 125.

12.      Damani was kept updated throughout the marketing process, including by Defendant Manu Sekhri and Defendant Shravan Thadani, among others.  *Id.* ¶¶ 152-53.

13.      During the Note marketing process, Thadani and Lucky Bucks management instructed Damani to slow down on M&A activity and explained "how every deal means a smaller dividend for [Damani] between now and when this closes in early August."  *Id.* ¶ 168. The parties also discussed "the status of the distributions post this deal getting done."  *Id.*  In November 2021, Thadani and Lucky Bucks management also included Damani in a conversation regarding reducing acquisitions following the Note issuance.  *Id.* ¶ 169.

14.      The Note marketing process was successful.  In November 2021 and January 2022, Holdings issued $250 million in aggregate principal amount of unsecured notes due 2028 (the "Notes," and the purchasers thereof, the "Noteholders") pursuant to a Note Purchase Agreement dated November 29, 2021 (the "NPA").  *Id.* ¶ 192.

**C.      The Holdings Distributions Render Holdings Insolvent, And Damani's Wrongdoing Is Revealed To The Noteholders**

15.      Shortly after issuing the Notes, Holdings made the Holdings Distributions, approximately $60 million of which went to Damani's entity, Defendant LBVI.  *Id.* ¶ 202. Holdings received no value on account of the Holdings Distributions, and as a result thereof, was rendered insolvent and left with unreasonably small capital to repay the Notes.  *Id.* ¶ 17.  That is because Holdings' only asset—Lucky Bucks—was itself already severely over-levered and in

decline at the time the Holdings Distributions were made, rendering its equity essentially worthless (if it had any value at all) and making it next to impossible that Lucky Bucks would ever generate enough cash to pay back Holdings' debts in addition to its own.  *Id.* ¶¶ 204-10.

16.    As was later revealed in a 2024 lawsuit filed by the post-Chapter 11 successor to Lucky Bucks, during the entire time that Trive was purportedly in control of Lucky Bucks, Damani and Kassam were methodically stripping assets from Lucky Bucks and undermining Lucky Bucks for the benefit of their competing businesses.  *Id.* ¶ 238-40.  Among other things, Damani and Kassam would direct locations with expiring contracts to enter into contracts with their businesses, divert new opportunities away from Lucky Bucks, and sell diverted locations back to Lucky Bucks at inflated prices (based on the use of fake players artificially increasing pre-sale EBITDA).  *Id.* ¶¶ 241-59.  One of Damani's co-conspirators gave extensive deposition testimony about this scheme in October 2022 in arbitration proceedings.  *Id.* ¶ 228.

17.    Damani's misconduct helped send Lucky Bucks and Holdings into a downward spiral, culminating in their chapter 11 filing in June 2023.  *Id.* ¶ 234.  Lucky Bucks emerged in October 2023, but this Court converted Holdings' chapter 11 case to chapter 7 and appointed Plaintiff as Trustee of the Holdings estate.  *Id.* ¶¶ 235-37.  Subsequently, the Noteholders assigned their claims arising out of or in connection with the Notes to the Trustee.  *Id.* ¶ 35.

## STANDARD OF REVIEW

18.    On review of a motion to dismiss for failure to state a claim, "the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant."  *Hartig Drug Co. Inc. v. Senju Pharma. Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016).[3]  Accordingly, dismissal is

---

[3]  Unless otherwise noted, all internal citations, quotation marks, and brackets in case citations are omitted.

proper only when a complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017).

19.     When considering a motion to dismiss under Georgia's Civil Practice Act, the court must accept the allegations in the complaint as true and must resolve all doubts in favor of the plaintiff. *Hill v. Bd. of Regents of the Univ. Sys. of Ga.*, 351 Ga. App. 455 (2019).  A plaintiff need not plead every element for a given cause of action to survive a motion to dismiss, so long as the defendant is put on reasonable notice of the issues it must defend against. *Id.* at 468.  For claims required to meet Rule 9(b)'s standard "a plaintiff must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *DiMare v. MetLife Ins. Co.*, 369 F. App'x 324, 329 (3d Cir. 2010).

## ARGUMENT

### I.     The Amended Complaint States A Claim For Intentional Fraudulent Transfer

20.     The Damani Defendants' argument that the Amended Complaint fails to state a claim for intentional fraudulent transfers against LBVI is predicated on a complete misunderstanding of the elements required for such a claim.  *See* Mot. at 7-15.

21.     Specifically, the Damani Defendants argue that the Trustee's intentional fraudulent transfer claims fail because the Trustee did not plead that the Damani Defendants had the requisite intent to "hinder, delay, or defraud" creditors, and because the Trustee did not apply the badges of fraud to the Damani Defendants.  Mot. at 8.

22.     But that gets the law backwards.  Under Bankruptcy Code section 548, Delaware fraudulent transfer law, and Georgia voidable transfer law, the Trustee is simply required to "show that the transaction was made 'with actual intent to hinder, delay or defraud'" creditors.  *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.*

*(In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (citing *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550 (D. Del. 2005)); *In re Midway Games Inc.*, 428 B.R. 303, 325 n.15 (Bankr. D. Del. 2010) ("Delaware law, 6 Del. C. § 1304(b)(1) contains the same standard for fraudulent transfer as the Code, namely the "actual intent to hinder, delay or defraud."), *on reconsideration in part* (Mar. 19, 2010); *In re LendXFinancial, LLC*, 2012 WL 1597394, at *7 (Bankr. N.D. Ga. Mar. 19, 2012) (finding that the analysis under Ga. Code Ann. § 18–2–74(a)(1) is the same as under 11 U.S.C. § 548(a)(1)(A)). Critically, it is black letter law that "***[t]he only relevant intent is that of the debtor***." *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 300 (D. Del. 2012). The Damani Defendants cite no case law suggesting that a plaintiff must plead that the recipient of a fraudulent transfer also intended to hinder, delay, or defraud creditors.

23.     The Damani Defendants are correct that courts "rely on badges of fraud as circumstantial proof of actual fraudulent intent." *In re Our Alchemy, LLC*, 642 B.R. 155, 164 (Bankr. D. Del. 2022); *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009). Of course, "the presence or absence of any single badge of fraud is not conclusive," and "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Fedders*, 405 B.R. at 545. The Amended Complaint alleges numerous badges including: (1) the transfers were to insiders; (2) no reasonably equivalent value was received in consideration for the transfers; (3) Holdings was or became insolvent upon making the transfers; (4) the transfer was of substantially all of Holdings' assets; (5) the transfers occurred shortly after a substantial debt was incurred. FAC ¶¶ 15, 17, 275-77; *see* Del. Code Ann. tit. 6, § 1304(b); *see also* Ga. Code Ann. § 18–2–74(b). The Damani Defendants do not contest that the Trustee has alleged sufficient badges of fraud regarding the ***Debtors'*** intent, and are thus precluded from doing so for

the first time on reply.  *White Winston Select Asset Funds, LLC v. Good Times Restaurants, Inc.*, 2020 WL 4015327, at *3-4 (D. Del. July 16, 2020) (on a motion to dismiss, "[t]he court will not entertain arguments that were not asserted in the movant's opening brief but reserved for the reply.")

**A.    The Badges Of Fraud Need Not Implicate The Damani Defendants**

24.    It is black letter law that "[t]he intent that matters for fraudulent conveyance law is that of the transferor."  *Drivetrain, LLC v. DDE Partners, LLC (In re Cyber Litig. Inc.)*, 2023 WL 6938144, at *7 (Bankr. D. Del. Oct. 19, 2023).  In fact, even if the Damani Defendants were "perfectly innocent" (they are not), "[a] perfectly innocent transferee that receives a fraudulent conveyance is required to return the property conveyed (or the value thereof)" so long as no reasonably equivalent value was exchanged.  *Id.*  Therefore, it is of no consequence that Damani "had no formal role in approving or leading the Note issuance or Holdings Distributions" (Mot. at 8 (citing FAC ¶ 262)) because the Damani Defendants received approximately $60 million in Holdings Distributions without conveying reasonably equivalent value to Holdings.  FAC ¶¶ 296, 309, 316, 323.

25.    Where, as here, the transferor is a company, the transferor's "intent is determined by imputing the intent of its agents."  *In re Cyber Litig.*, 2023 WL 6938144, at *7; *see also In re Mallinckrodt PLC*, 2024 WL 206682, at *23 n.123 (Bankr. D. Del. Jan. 18, 2024).  This does not mean, however, that the Trustee must state the intent of every corporate agent: one is sufficient. *In re Cyber Litig.*, 2023 WL 6938144, at *8 ("[I]n the fraudulent conveyance context, so long as a corporation's agent had the requisite fraudulent intent … that intent is imputed to the corporation.").

26.    The Trustee adequately pleads—and the Damani Defendants do not contest—that the Trive Defendants and the Management Defendants dominated and controlled Holdings and

had the requisite intent to hinder, delay, or defraud in connection with the Holdings Distributions. *See* Trustee's Opp. to Trive Defendants Mot. ¶ 26; Trustee's Opp. to Management Defendants' Mot. § I.C.  For example, the Amended Complaint alleges that: (1) the transfers were to insiders, FAC ¶¶ 15 n.3, 36, 51, 82-86, 123-28; (2) Holdings received no reasonably equivalent value, *id.* ¶¶ 275, 288, 304, 316;  (3) Holdings was or became insolvent upon making the transfers, *e.g.*, *id.* ¶¶ 204-211;  (4) the transfer was of substantially all of Holdings' assets, *e.g.*, *id.* ¶¶ 122, 209, 289; and (5) the transfers occurred shortly after a substantial debt was incurred, *id.* ¶¶ 14, 192, 200-01. *See* Del. Code Ann. tit. 6, § 1304(b); *see also* Ga. Code Ann. § 18–2–74(b) (listing badges of fraud).  Additionally, the Amended Complaint alleges that both the Trive and Management Defendants made numerous misstatements to the Noteholders to induce them to purchase the Notes used to fund the Holdings Distributions.  FAC ¶¶ 155–90.

27.     Furthermore, and even though not required under the law, the Trustee has also alleged that Damani Defendants were agents of Holdings and had the intent to hinder, delay, or defraud creditors.  The Amended Complaint alleges that Damani held a 25% stake in Holdings' equity, *id.* ¶¶ 44, 338, and installed and controlled one of the three members of Holdings' board, *id.* ¶¶ 48, 125.  The Amended Complaint further alleges that while receiving discussions, updates, and questions in connection with Holdings' marketing of the Notes, including being told that acquisitions directly affected the dividend, *id.* ¶¶ 13, 152-53, 163, 168-69, Damani played a substantial role in the demise of Lucky Bucks' business through his scheme to loot Lucky Bucks of its assets, *id.* ¶¶ 26-27, 29, 33-34, 215, 228-29, 238-59.

28.     The Damani Defendants also argue that the Trustee fails to plausibly allege Holdings' insolvency as a badge of fraud.  Mot. at 10-15.  Notwithstanding this court's recognition that "the presence or absence of any single badge of fraud is not conclusive," *Fedders*,

405 B.R. at 545, for the reasons set forth below, *infra* II.B, the Trustee adequately pleads that the Debtor was insolvent at the time of each of the Holdings Distributions.

**B.      The Remaining Equity Was Worthless**

29.     As set forth in the preceding section, Holdings was insolvent at the time of the Holdings Distributions, due in substantial part to Lucky Bucks' own insolvency.  Given Lucky Bucks' insolvency at the time of the Holdings Distributions, any equity held in Lucky Bucks was effectively "worthless."   *In re Cyber Litig.*, 2023 WL 6938144, at *4 (noting that shares in an insolvent company are worthless).

30.     The Damani Defendants argue that the Trustee does not provide details about "Lucky Bucks' balance sheets, financial statements, or revenue" or provide "factual allegations of the actual numbers" of Lucky Bucks' EBITDA. Mot. at 14.  But as noted below, none of these details are required to be pled in a complaint. *See infra* at ¶¶ 34-35.

31.     The Damani Defendants claim that Lucky Bucks' 2021 revenue must have exhibited an increase because COAM contributions to the Georgia Lottery for Education Account also increased in 2021. Mot. at 14-15.  But this argument requires looking to materials outside the pleadings and using those materials to draw inferences ***against*** the Trustee. *See Hartig*, 836 F.3d at 268 (stating all reasonable inferences must be drawn in favor of plaintiff).  Perhaps more fundamentally, this argument completely defies logic.[4]  That Lucky Bucks was one of Georgia's largest COAM operators in 2021 says nothing about whether its own revenues mimicked those of the Georgia COAM industry as a whole.  It also says nothing about Luck Bucks' profitability during the time period.  To carry the argument to its logical conclusion would be to suggest that

---

[4]   This argument suffers from the fallacy of division. *Rosen v. Unilever U.S., Inc.*, 2010 WL 4807100, at *6 (N.D. Cal. May 3, 2010) ("The 'fallacy of division' is the reverse of the fallacy of composition.  It is committed when one argues that what is true of a whole must also be true of its parts.").

because Lucky Bucks filed for bankruptcy protection in 2023, the entire Georgia COAM industry must have done so as well.

## II.     The Amended Complaint Plausibly Alleges Constructive Fraudulent Transfer

### A.     The Dividends Were Issued Without Receipt Of Reasonably Equivalent Value

32.     The Damani Defendants next argue that the Noteholders received reasonably equivalent value for the Holdings Distributions. Mot. at 16-17. This argument once again demonstrates a fundamental misunderstanding of fraudulent transfer law. In particular, the Damani Defendants argue the Noteholders received reasonably equivalent value in connection with the *note transaction* between the Noteholders and Holdings, Mot. 16-17, but present no argument as to whether Holdings received reasonably equivalent value for the *Holdings Distributions*—*i.e.*, the alleged fraudulent transfers. Under the Bankruptcy Code and Delaware and Georgia state laws,[5] the only transfer for which reasonably equivalent value matters is that between the debtor-transferor and the transferee, i.e., Holdings as transferor and LBVI as initial transferee. *See* 11 U.S.C. § 548(a) (explaining that the trustee may avoid a transfer "if the debtor voluntarily or involuntarily … received less than a reasonably equivalent value in exchange for such transfer or obligation" (emphasis added)); Del. Code Ann. tit. 6, § 1304(a)(1) ("A transfer made or obligation incurred … is fraudulent … if the *debtor* made the transfer or incurred the

---

[5]   The Trustee brought constructive fraudulent transfer claims under 11 U.S.C. § 548(a)(1)(B), Del. Code Ann. tit. 6 § 1304(a)(2), and Ga. Code Ann. § 18-2-74 *et seq.* Courts apply the "same analysis" when reviewing claims brought under each statute. *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 857 (Bankr. D. Del. 2018); *In re Opus E., LLC*, 528 B.R. 30, 82 (Bankr. D. Del. 2015) ("The elements for avoidance of a fraudulent conveyance under Delaware law are essentially identical to those of section 548(a)(1)(B)."); *In re Curepoint, LLC*, 2024 WL 4355525, at *13 (Bankr. N.D. Ga. Sept. 30, 2024) (explaining that the elements for constructive fraudulent transfer are the same under both the Bankruptcy Code and Georgia law).

obligation . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation." (emphasis added)); Ga. Code Ann. § 18-2-74 *et seq.* (same).

33.   The Amended Complaint alleges that the Holdings Distributions were, by their nature, made without the exchange of ***any*** value, much less reasonably equivalent value. FAC ¶¶ 275, 288, 304, 316.  Courts routinely find that dividends by a company to its stockholders provide no value to the company.  *See, e.g., In re SemCrude, L.P.*, 2013 WL 2490179, at *5 (Bankr. D. Del. June 10, 2013) (agreeing with the Trustee that "no value is conferred in equity distributions"), *aff'd sub nom. In re SemCrude L.P.*, 648 F. App'x 205 (3d Cir. 2016); *In re Vill. Red Rest. Corp.*, 2021 WL 3889793, at *10 (Bankr. S.D.N.Y. Aug. 31, 2021) ("[B]y definition dividend payments are payments that are made in respect of equity investments . . . they are not made in exchange for 'fair consideration' or 'reasonably equivalent value.'" (quoting *Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003) (holding that dividends are just distributions to equity holders for which a company does not receive reasonably equivalent value)).  The Damani Defendants' diversions about "gambling" and the potential value of the Notes, Mot. at 16-17, are therefore inapposite.

### B.   The Trustee Adequately Pleads That Holdings Was Insolvent

34.   "[T]o plead adequately a constructive fraud claim 'all that is needed … is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.'"  *In re Cred Inc.*, 650 B.R. 803, 835 (Bankr. D. Del 2023) (quoting *In re PennySaver USA Publ'g*, 602 B.R. 256, 266 (Bankr. D. Del. 2019)).  Section 101 of the Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32)(A). Bankruptcy trustees are "not required to include precise calculations evidencing balance sheet insolvency" in pleadings.  *In re BMT-NW Acquisition*, 582 B.R. at 858-59 (quoting *In re DBSI,*

*Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011)).  A trustee "has met the pleading requirements"

when the trustee "has specifically plead[ed] that the Debtor was insolvent, or was rendered

insolvent at the time of the alleged transfers."  *Id.* at 859; *see Halperin v. Moreno (In re Green

Field Energy Servs., Inc.)*, 2015 WL 5146161 *7 (Bankr. D. Del. Aug. 31, 2015) (finding that the

trustee need not provide detailed valuations at the pleading stage, as long as the complaint

includes factual support for the debtors' financial state.).

35.    Moreover, despite their argument to the contrary, the Damani Defendants' own case

law emphasizes that "a close analysis of insolvency is not necessary at this stage in the

proceeding."  *In re Our Alchemy, LLC*, 2019 WL 4447545, at *6 (Bankr. D. Del. Sept. 16, 2019).

As such, "[i]nsolvency is a factual determination not appropriate for resolution in a motion to

dismiss."  *In re BMT-NW Acquisition*, 582 B.R. at 858.

36.    The Amended Complaint comfortably clears this bar.  The Amended Complaint

alleges that in July 2021, Lucky Bucks incurred $535 million in debt, which shortly thereafter

was increased to $605 million.  FAC ¶¶ 110-16.  $200 million of the proceeds from that financing

was used to pay a dividend to insiders, thus increasing Lucky Bucks' liabilities by that amount

without any offsetting asset.  *See id.* ¶ 113.  The Amended Complaint further alleges that around

the time that transaction was completed, Lucky Bucks was coming under substantial financial

strain due to "higher-than-projected attrition and underperformance of recently acquired

locations."  *Id.* ¶ 117.  The Trive Defendants became desperate to "take cash out of the business"

and accordingly concocted a plan to create a new holding company (Holdings) that could borrow

in excess of the limits imposed by Lucky Bucks' existing credit agreement, under which Lucky

Bucks had already incurred as much debt as it possibly could.  *Id.* ¶¶ 29, 33, 118-22, 202-03.

Holdings had no business or operations of its own and no assets other than an equity stake in

Lucky Bucks, and thus could not pay down its own debts unless Lucky Bucks was able to grow and manage its own substantial liabilities. *Id.* ¶¶ 205, 209-10. To the extent that Lucky Bucks could not do so and also generate sufficient cash to repay the Notes, Holdings would be insolvent. *Id.* ¶ 8. Yet despite these flashing indicators that Lucky Bucks' business was failing and that its business strategy was no longer viable, Holdings incurred $250 million in debt, all of which was structurally subordinated to Lucky Bucks' own considerable indebtedness, and which would require payments of nearly $16 million per year starting in 2024 and up to $22.4 million per year in 2028. *Id.* ¶¶ 14, 209. Thus, in the span of six months, Holdings and Lucky Bucks on a consolidated basis incurred $450 million of new obligations, the proceeds of which did not stay with the business but instead went to line shareholders' pockets at the same time that the underlying business was rapidly failing. *Id.* ¶¶ 9, 19-20, 113, 206-09. Taken together, these allegations demonstrate that Holdings was insolvent (or at the very least rendered insolvent) at the time of each of the Holdings Distributions.

## III.    The Unlawful Dividend Claim Is Adequately Pleaded

37.    The Damani Defendants assert that the Amended Complaint's illegal dividend claim (Count V) should be dismissed because the Amended Complaint does not sufficiently allege that LBVI knew that the Holdings Distributions would render Holdings insolvent. Mot. at 18-19. The Damani Defendants are mistaken.[6] The Amended Complaint adequately pleads that each recipient of the Holdings Distributions had knowledge of Holdings' insolvency, including LBVI. *See* FAC ¶¶ 210-11, 278, 294.

---

[6] Whether a defendant was insolvent—is "a fact-intensive inquiry not properly decided on a motion to dismiss." *In re BMT-NW Acquisition, LLC*, 582 B.R. at 858. Moreover, because knowledge "may be alleged generally" at the pleadings stage, Fed. R. Civ. P. 9(b), a plaintiff need only make a "general averral of knowledge … backed by the circumstantial grounds for such knowledge" as to make its claim "sufficiently plausible" to survive a motion to dismiss. *Peruto v. Timbertech Ltd.*, 2015 WL 8664276, at *4 (D.N.J. Dec. 10, 2015).

38.      Specifically, the Amended Complaint alleges that around the time that the Notes transaction was completed, Lucky Bucks was under substantial financial strain due to higher-than-projected attrition and underperformance of recently-acquired locations.  *Id.* ¶ 117.  The Amended Complaint further alleges that Damani's scheme of stripping assets from Lucky Bucks by stealing COAMs and location contracts, then selling them back to Lucky Bucks at inflated multi-million dollar prices, was a root cause of this financial strain around the time of the Holdings Distribution.  *Id.* ¶¶ 27, 29.  Holdings had no business or operations of its own and no assets other than an equity stake in Lucky Bucks, and thus could not pay down its own debts unless Lucky Bucks was able to grow and manage its own substantial liabilities.  *Id.* ¶¶ 205, 209-10.  To the extent that Lucky Bucks could not do so and also generate sufficient cash to repay the Notes, Holdings would be insolvent.  *Id.* ¶ 8.

39.      Damani and LBVI also cannot claim ignorance about Holdings' financial position or the Notes distribution.  *See* Mot. 19.  In addition to orchestrating the scheme underlying Lucky Bucks' financial troubles, Damani was kept informed by both Thadani and Sekhri on the marketing efforts for the Notes and the impact the Holdings Distributions would have on the business.  FAC ¶¶ 152-53.  Indeed, the Amended Complaint alleges the Management Defendants acknowledged the urgent need on June 29, 2021, to "have a chat with [Damani]" about slowing down acquisitions to support a larger dividend from the Notes sale.  *Id.* ¶ 168.  Sekhri emphasized that Ijaz and Bouskill "need[ed] to discuss with [Damani] the status of the distributions post this deal getting done – ***accurately model this out and show him***."  *Id.* (emphasis added).  The Amended Complaint also alleges that Damani exercised his right to appoint a board member to Holdings by placing his long-time partner Kassam on the board, and that Damani directed Kassam as his board appointee to approve the Note transaction.  *Id.* ¶¶ 125, 356.

40.     In sum, these allegations are sufficient to support a plausible inference that Damani knew, as the Amended Complaint alleges, that "[t]here was no reasonable prospect of Lucky Bucks generating sufficient cash to pay back its debts and $250 million plus accrued interest by the time the Notes came due." *Id.* ¶ 210.  Nothing more is required to allege knowledge of insolvency at the pleadings stage.  *See In re Glencoe Acquisition., Inc.*, 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015) (denying motion to dismiss fraudulent transfer claim where trustee alleged that, as a result of a fraudulent transfer, the debtor "was insolvent or became insolvent...."); *accord In re BMT-NW Acquisition*, 582 B.R. at 858-59; *Eerie World Ent., L.L.C. v. Bergrin*, 2004 WL 2712197, at *2 & n.17 (S.D.N.Y. Nov. 23, 2004) (recognizing that the Bankruptcy Code's insolvency standard applies to illegal dividend claims under Del. Code Ann. tit. 6, § 18-607).  And because Damani wholly owned LBVI at all relevant times, FAC ¶ 44, his knowledge may be imputed to LBVI under basic principles of agency law.  *See In re AMC Invs., LLC*, 637 B.R. 43, 59 (Bankr. D. Del. 2022) ("The general rule is that a director's knowledge is imputed to the corporation because directors have the authority and ability to act on behalf of the corporation."); *see also, In re Mediators, Inc.,* 105 F.3d 822, 827 (2d Cir.1997); Restatement (Third) Of Agency § 5.04 cmt. d (2006) (Oct. 2024 update) ("[I]f the agent controls the principal's decisionmaking, the principal is charged with notice of the agent's wrongdoing.  This rule, often termed the 'sole actor doctrine,' treats principal and agent as one.").

## IV.     The Amended Complaint Adequately Alleges Claims Under Georgia's RICO Statute

41.     The Damani Defendants argue that the Trustee's claims under Georgia's RICO statute, Ga. Code Ann. § 16-14-4 *et seq.*, fail because the complaint fails to plead Damani's participation in Defendants' scheme to defraud the Noteholders into purchasing the Notes.  Mot. at 19.  However, as set forth below, the Amended Complaint clearly alleges—with particularity

where necessary—that Damani, Sekhri, and Trive conspired to defraud the Noteholders and carried out acts in furtherance of this scheme.

42.    As a threshold matter, the Damani Defendants primarily cite federal RICO case law to support their arguments.  However, while federal authority *may* be persuasive in interpreting aspects of the Georgia RICO statute, "the Georgia RICO statute is considerably broader than the federal RICO statute and … federal circuit court opinions regarding the federal statute, while instructive, do not control [the] construction or application of the Georgia RICO statute." *Hansford v. Veal*, 369 Ga. App. 641, 650 (2023) (internal quotations omitted).  Therefore, the Trustee primarily relies on applicable *Georgia* law where requirements to state a Georgia RICO claim and predicate acts subject to Georgia law are at issue, and relies on federal law when discussing the alleged predicate wire fraud under 18 U.S.C. § 1961(1).

### A.    Damani Committed Multiple Predicate Acts

43.    Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."  Ga. Code Ann. § 16-14-4(a).  To establish a "pattern of racketeering activity" under subsection (b), "all [p]laintiffs have to show is 'proof that the defendant committed predicate offenses ... at least twice.'"  *Turk v. Morris, Manning & Martin, LLP*, 593 F. Supp. 3d 1258, 1299 (N.D. Ga. 2022) (quoting *Cobb Cnty. v. Jones Grp., P.L.C.*, 218 Ga. App. 149, 154 (1995)).  Although a RICO claim requires a pattern of racketeering activity made up of at least two predicate acts, each individual defendant need only have participated in *one* predicate act to be liable to the plaintiff.  *Faillace v. Columbus Bank & Trust Co.*, 269 Ga. App. 866, 868 (2004).

44.    The Amended Complaint alleges that Damani and others violated subsection (a) of the RICO Act through a pattern of racketeering activity including multiple instances of securities

fraud and wire fraud. FAC ¶ 350. Securities fraud and wire fraud are both predicate acts, considered "racketeering activity" as defined under Ga. Code Ann. § 16-14-3(5)(A)(iii) and 18 U.S.C. § 1961(1).

### 1. Securities Fraud

45.    To state a claim for securities fraud under Ga. Code Ann. § 10–5–50, plaintiffs must allege "1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.*, 245 Ga. App. 460, 464 (2000). The Amended Complaint pleads that Damani committed securities fraud as it pleads a misstatement or omission of a material act (FAC ¶¶ 252-53, 255), made with scienter (FAC ¶¶ 125, 146, 168-69, 262, 353, 356), reliance (FAC ¶ 356), and injury occurring as a result of the misstatement (FAC ¶¶ 357, 359).

46.    Damani argues that the Amended Complaint does not include any allegations that Damani made any misrepresentation to the Noteholders, Mot. at 22, but Damani misstates and misapplies the applicable law. The Georgia Uniform Securities Act makes it unlawful "for a person, in connection with the offer, sale, or purchase of a security, [to] directly ***or indirectly***" make a fraudulent representation. Ga. Code Ann. § 10-5-50. Under Georgia common law fraud, which requires the same elements as Georgia securities fraud, "[i]ndirect representations may nevertheless be a ground of liability in fraud, so long as it was intended or expected that they would be communicated to and acted upon by the complaining party or by members of the class to which he belongs." *First Fin. Sav. & Loan Ass'n v. Title Ins. Co. of Minn.*, 557 F. Supp. 654, 661 (N.D. Ga. 1982) (citing Restatement (Second) of Torts §§ 531-33); *accord Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1321 (N.D. Ga. 2021); *GunBroker.com, LLC v. Tenor Cap. Partners, LLC*, 2022 WL 103719, at *3 (N.D. Ga. Jan. 11, 2022) (recognizing Georgia courts require same elements for common law and securities fraud). As alleged in the Amended Complaint, Damani

made many indirect and fraudulent representations regarding the value of COAM machines. For example, the Amended Complaint specifically alleges that **Damani** "use[d] the B-Side businesses … to sell locations to Lucky Bucks after falsely inflating their EBITDA using fake players," which "caus[ed] Lucky Bucks to spend over $27 million on acquiring locations from companies owned or controlled by Damani." FAC ¶¶ 252-53, 255. The Amended Complaint also alleges that **Damani** "intended or expected" that these EBITDA numbers would be communicated to the Noteholders through the sales process, which Damani was kept apprised of and which Kassam, Damani's representative on the Holdings board, ultimately approved as a Holdings board member. *Id.* ¶¶ 125, 146, 168-69, 262, 353, 356. The Noteholders relied upon these fraudulently inflated EBITDA and valuation representations to their detriment when they decided to purchase the Notes. *Id.* ¶¶ 190, 356-57. While securities fraud as a predicate act need not be pled with particularity under Georgia law, *Hansford v. Veal*, 369 Ga. App. 641, 651 (2023) ("[T]his Court has specifically held that the federal pleading requirements are only necessary when a plaintiff alleges mail and wire fraud."), the Trustee would still satisfy this more burdensome pleading standard if it were to apply.

47.     Further, Damani's argument that he had no formal role in approving or leading the Note issuance, Mot. at 22, ignores (1) Damani's 25% ownership in Holdings and Lucky Bucks (FAC ¶¶ 44, 338), (2) Damani's appointment of Kassam as one of three Holdings board members (FAC ¶¶ 48, 85, 125), and (3) that Damani was included in discussions, updates, and questions in connection with Holdings' marketing of the Notes (FAC ¶¶ 13, 152-53, 163).[7] Therefore, the

---

[7] Damani incorporates the argument raised in Trive's Memorandum of Law in Support of Trive Defendants' Motion to Dismiss the Amended Complaint that the Georgia RICO claims fail as an extraterritorial application of Georgia law. Mot. at n. 12. In response, the Plaintiff incorporates herein the arguments raised in Plaintiff's Memorandum of Law in Opposition to Trive Defendants' Motion to Dismiss.

Trustee has adequately alleged that Damani committed multiple predicate acts of securities fraud in furtherance of his scheme with Sekhri and Trive to defraud the Noteholders.

### 2.    Wire Fraud

48.    To establish a statutory mail or wire fraud claim, a plaintiff need only show that a defendant (1) intentionally participated in a scheme to defraud another of money or property and (2) used the mails or wires in furtherance of that scheme. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010); *United States v. Yusuf*, 536 F.3d 178, 187 (3d Cir. 2008).  "A scheme to defraud need not contemplate the use of mails as an essential part of the scheme so long as the mailing is incident to an essential part of the scheme."  *Yusuf*, 536 F.3d at 187.  Under Rule 9(b), plaintiffs are required to plead with particularity the "circumstances" of the alleged fraud "in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior."  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984).  Plaintiffs satisfy Rule 9(b) where they "plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means."  *Grant v. Turner*, 505 F. App'x 107, 111 (3d Cir. 2012).

49.    Damani argues that the Trustee failed to adequately allege the predicate act of wire fraud with sufficient specificity.  Mot. at 24-25.  Damani is wrong.  The Amended Complaint expressly alleges that Damani "was directly involved with the scheme to falsify [financial] results of [COAM] locations purchased by Lucky Bucks" by "among other things, causing Lucky Bucks to acquire locations at inflated prices, simultaneously enriching Damani directly through those sales while falsely inflating the Lucky Bucks's [sic] results, making it look more attractive to potential investors."  FAC ¶¶ 353, 356.  The Amended Complaint alleges that Damani "was routinely kept apprised of the proposed Lucky Bucks and Holdings dividend transactions, and

thus knew or should have known that the continued falsely-inflated M&A activity he directed would result in Holdings being able to attract more Note investors." *Id.* ¶ 353.  The Amended Complaint also alleges that Damani "used interstate wires by sending emails *in furtherance of the scheme* on at least … August 17, 2021; September 16, 2021; September 19, 2021; September 23, 2021; [and] November 16, 2021" in the lead up to the Notes issuance on November 29, 2021.  *Id.* ¶ 192, 352 (emphasis added).  This pleading is more than sufficient to meet the standard under Rule 9(b).[8]  *See Turk v. Morris, Manning & Martin, LLP*, 593 F. Supp. 3d 1258, 1303-04 (N.D. Ga. 2022) (holding that investor plaintiffs adequately pleaded predicate wire fraud acts for RICO claim where defendants prepared and sent allegedly inflated appraisals—used in scheme to induce plaintiffs' investment in land development transactions—via mail and wires.); *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 124-25 (E.D. Pa. 2011) (holding that plaintiffs sufficiently alleged mail fraud under Rule 9(b) where complaint alleged defendants "misrepresented the market potential of various products … to induce [p]laintiffs to continue to invest" and "contain[ed] dates and dollar amounts of wire transfers that were caused to be sent in furtherance of the scheme to defraud.").

50.     To the extent that Damani argues the contents of the emails at issue are required to be fraudulent, Mot. at 24-25, his own case law refutes this point.  *Kolar v. Preferred Real Est. Invs., Inc.*, 361 F. App'x 354, 362 (3d Cir. 2010) ("To establish predicate offenses under §§ 1341 or 1343 [mail fraud and wire fraud], it is the scheme that must be fraudulent, not necessarily the particular mail or wire transmissions that constitute the offenses.").  The Amended Complaint

---

[8]  Damani includes in his argument that "how the Noteholders *relied on* those emails to their detriment is never alleged" in the Amended Complaint.  Mot. at 24 (emphasis added).  This argument clearly misunderstands the law.  In *Bridge v. Phoenix Bond & Indem. Co.*, the Supreme Court held that reliance is not an element of a claim of mail or wire fraud.  553 U.S. 639, 649-53 (2008) (observing that nothing in the text of the Federal RICO statute imposed a first-party reliance requirement, and the statute expressly provided a cause of action to "'[a]ny person' injured by the violation," which acknowledges that plaintiffs can be injured by mail or wire fraud even if they did not rely on them).

clearly alleges that the emails were sent "in furtherance of the scheme," and that this scheme was fraudulent.  FAC ¶¶ 13, 152-53, 163, 352-53.[9]

51.    Damani's reliance on *Warden v. McLelland,* 288 F.3d 105 (3d Cir. 2002), is unavailing.  In *McLelland*, the Third Circuit remanded the RICO claims to the district court for "reexamination of the sufficiency of the complaint" because, while the complaint listed several particular communications it alleged were acts of wire fraud, the complaint did not "state clearly how these or any other communications were false or misleading, *or how they contributed to the alleged fraudulent scheme*."  288 F.3d at 114 (emphasis added).  Here, in contrast, the Amended Complaint has clearly alleged that the emails Damani, Sekhri, and Trive sent on particular dates in 2021 were sent "in furtherance of the scheme" to "caus[e] Lucky Bucks to acquire locations at inflated prices" and "enrich[] Damani directly through those sales while falsely inflating [] Lucky Bucks' results, making [them] look more attractive to potential investors."  FAC ¶¶ 352-53.

52.    Damani's reliance on *Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004), is also misplaced.  In *Lum*, the court concluded that the plaintiffs failed to plead mail and wire fraud with particularity because the plaintiffs "d[id] not indicate the date, time, or place of any misrepresentation [or] provide an alternative means of injecting precision and some measure of substantiation into the fraud allegations because they do not identify particular fraudulent financial transactions."  *Id.* at 224 (affirming dismissal of plaintiffs' RICO claims based on allegedly fraudulent credit agreements because plaintiffs' allegation of fraud as to the credit agreements—that the "prime rate" advertised by the banks was not "the lowest rate charged to

---

[9]  Damani's implication that the five emails identified in the Amended Complaint are numerically insufficient, Mot. at 25, is also misguided.  Courts have routinely held that only *two* or more predicate acts are sufficient to allege a claim under Georgia's RICO Act.  *Turk*, 593 F. Supp. 3d at 1299–300 ("[A] pattern of racketeering activity for purposes of subsection (a) means the commission of at least two of these predicate acts, provided that they are interrelated and were done in furtherance of one or more incidents, schemes, or transactions.").

their most creditworthy customers"—was not misrepresentation).  The Third Circuit in *Lum* concluded that the plaintiffs failed to comply with the requirements of Rule 9(b) that "plaintiffs must plead with particularity the circumstances of the alleged fraud in order to place defendant on notice of the precise misconduct with which they are charged." *Id.* 223-24 (internal quotations omitted).  Here, the Amended Complaint has adequately alleged that Damani's email communications on particular dates and times contributed to the clearly pled, fraudulent scheme to defraud the Noteholders, as discussed *supra* at ¶ 49.

### 3.    Damani's Predicate Acts Proximately Caused Injury To The Plaintiff

53.    "To establish a valid civil RICO claim, a plaintiff must show that the defendant violated or conspired to violate Georgia's RICO Act and that the RICO violation proximately caused injury to the plaintiff." *Hansford*, 369 Ga. App. at 648 (2023).  To allege proximate cause, a plaintiff must show that "his injury flowed directly from at least one of the predicate acts." *Id.* "[A] factor is a proximate cause if it is a substantial factor in the sequence of responsible causation." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994); *accord Turk*, 593 F. Supp. 3d at 1309.   The Amended Complaint alleges that the harm suffered by the Noteholders was proximately caused by the Damani Defendants' RICO violation.  FAC ¶ 357, 363.

54.    Damani's argument that injury to the Noteholders is too indirect or derivative under *Glock v. Glock*, 247 F. Supp. 3d 1307 (N.D. Ga. 2017), is mistaken.  First, Damani cites to *Glock* for support regarding the proximate cause element under Georgia's RICO Act, but the portion of the opinion Damani cites to instead addressed whether the plaintiff had standing to prove her injury was *domestic*.  *Id.* at 1315-21.  Even if this portion of the opinion were applicable to determining whether a plaintiff has plausibly alleged proximate cause (it is not), the court in *Glock* held that the plaintiff's injury was not actionable because plaintiff's "only alleged injury [was]

the depreciation of her 1% share in the Parent Company," which was "not separate and distinct from the Parent Company's alleged injury" who was also a co-defendant in the case.  *Id.* at 1319. The court in *Glock* relied on the Eleventh Circuit's holding in *Harris v. Orange S.A.*, 636 Fed.Appx. 476, 481 (11th Cir. 2015), that "losses suffered by a company's stakeholders as a result of racketeering activity against the company do not give them standing under RICO because [s]uch an injury is too indirect or derivative to confer RICO standing."  *Glock*, 247 F. Supp. 3d at 1319.  The court in *Glock* continued on to recognize that "[a] plaintiff's status as a creditor or stockholder ... does not preclude standing for RICO violations *if the plaintiff has alleged an injury proximately caused by the defendants' acts of racketeering that target the plaintiff*."  *Id.* (emphasis added).

55.    Here, the Trustee has clearly alleged that the Damani Defendants' "acts of racketeering … target[ed] the [Noteholders],'" and that this injury was "separate and distinct" from that suffered by Holdings.  *See Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 908 (11th Cir. 1998) (holding that creditor had standing to bring federal RICO claims where the sale of secured asset hotel in bankruptcy proceedings at below-market price "affected creditors in a manner distinct from shareholders, and in a manner sufficiently direct to confer RICO standing on [plaintiff] in his capacity as a creditor."); *accord Lechter*, 565 F. Supp. 3d at 1310 (holding that plaintiffs adequately pled a direct injury proximately caused by the defendants where plaintiffs alleged they were the targets of alleged fraudulent scheme inducing them to invest in company at issue, and injuries were not suffered "only as a result of harm to the corporation.").

56.    Damani's fraudulent conduct directly affected the Noteholders' ability to recover on debts owed by Holdings because Holdings' only asset was ownership of Lucky Bucks shares,

meaning that Holdings' ability to repay the Notes was entirely dependent on the value of Lucky Bucks, FAC ¶ 8, which had been severely overstated and misrepresented to the Noteholders as a direct and proximate result of Damani's conduct. *Id.* ¶¶ 351, 353. And in contrast to Holdings' shareholders, who received dividend payments totaling over $237 million, *Id.* ¶ 201, the Noteholders have yet to receive any value in return for their $250 million investment. *Id.* ¶ 25. Accordingly, the Noteholders' injury was a direct result of Damani's misconduct, and this injury was separate and distinct from any purported injury to Holdings' shareholders. *See Bivens Gardens Off. Bldg.*, 140 F.3d at 908 (finding distinct injury to creditor plaintiff where "[t]he sale of the hotel for a higher price would have directly benefitted major creditors such as [plaintiff], because they would have been able to recover a greater percentage of the debts owed to them. In contrast, the sale of the hotel for a higher price would have little impact on the shareholders and the corporation, since the additional funds from the sale would have been used to satisfy creditors instead of going to shareholders.")

57. For similar reasons, Damani inappropriately relies on *Recovery Fund II USA LLC v. Rabobank, Nat'l Ass'n*. Mot. at 26 (*citing Recovery Fund II USA LLC v. Rabobank, Nat'l Ass'n*, 2020 WL 509166, at *7 (D. Del. Jan. 31, 2020)). In *Recovery Fund II USA*, the plaintiff, a creditor, objected to the payment of a "Bank and Technology Services Fee" to the chapter 7 trustee's banking and technology vendors, but the bankruptcy court approved the fee over the plaintiff's objection. *Recovery Fund II USA LLC v. Rabobank, Nat'l Ass'n*, 2020 WL 509166, at *5 (D. Del. Jan. 31, 2020). In overruling the plaintiff's objection, the court reasoned that "[i]n the bankruptcy context, generally only the trustee can maintain an action for injury to the bankruptcy estate." *Id.* at *7. The court held that the plaintiff lacked RICO standing because its

sole injury stemmed "from the fact that the funds in the bankruptcy estate were decreased as a result of Defendants' actions." *Id.*

This case is easily distinguished from *Recovery Fund II USA*. *First*, the harm here occurred prior to the bankruptcy proceeding, not during the bankruptcy proceeding. *Second*, the Noteholders were harmed directly as a result of Damani's actions, separate and apart from any harm done to the bankruptcy estate. *See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 585-86 (5th Cir. 2008) (holding that injury to unsecured bondholders, who sued secured creditor for providing false estimates regarding debtor's oil reserve assets, was direct and belonged to bondholders where the bondholders relied on the estimates when deciding to invest in debtor, despite overlap with debtor's claims against secured creditor). *Third*, in contrast to *Recovery Fund II USA*, here it is the Trustee who brings these RICO claims as assignee of the Noteholders' claims—not creditors in their individual capacities. Accordingly, Damani's reliance on *Recovery Fund II USA* is unavailing.

### B. The Amended Complaint Adequately Alleges Direction Of An Enterprise

58.     Section 16-14-4(b) requires that a defendant "directly or indirectly" participate in an enterprise's affairs—not that he formally direct them. Ga. Code Ann. § 16-14-4(b). The Amended Complaint satisfies this standard at least three times over by providing specific examples of Damani participating in Holdings' operations.

59.     *First*, Damani participated in Holdings through Kassam, his hand-picked appointee who served on Holdings' board. *See e.g.,* FAC ¶ 33 (alleging at the time of the distributions, "Kassam was directly involved in stripping Lucky Bucks' assets *at Damani's direction*") (emphasis added). *Second*, Damani "present[ed] acquisition targets to Lucky Bucks." *Id.* ¶ 13; *id.* 94-95 (providing an example of Damani evaluating an M&A activity). These M&A activities were critical to Holdings' strategy and value because Lucky Bucks was Holdings' only asset.

*Third*, although "Mr. Damani did not have any formal role in approving or leading the Note issuance," Mot. at 28, he actively participated in the diligence process. *See e.g.,* FAC ¶ 163 (alleging that co-defendants "had easy access to Damani" if they did not feel competent to answer diligence questions). Each of these allegations satisfies *indirect* participation under § 16-14-4(b).

60.     The Damani Defendants argue that the Trustee's pleadings are deficient because he fails to allege that Damani "direct[ed]" the affairs of Holdings. Mot. at 27 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). This argument misreads the Amended Complaint and misinterprets Georgia RICO law. The Amended Complaint alleges that Damani continued to control Lucky Bucks' M&A activity—the backbone of Holdings' value—throughout the Notes sales process, and he did so with the particular aim to maximize the Holdings Distributions the Defendants received as a result of the sale. FAC ¶ 168. The Amended Complaint also alleges that Trive, Sekhri, and Kassam all went out of their way to keep Damani apprised of the Notes sales process, supporting the inference that he continued to exercise control over Holdings' board. *Id.* ¶¶ 152-53. Further, courts interpreting Georgia RICO law have held that "[a]lthough *some participation* in the racketeering activity is clearly required, there is nothing in OCGA § 16–14–4(b) to suggest that each participant must hold a *directorial ... position*." *Faillace*, 269 Ga. App. at 869 (2004) (emphasis added). "In this respect, the Georgia statute is significantly broader than the federal statute on which it was modeled." *Id.* Simply put, it is irrelevant that the federal RICO statute requires that defendants must play "*some* part in directing the enterprise's affairs." *See Reves* 507 U.S. at 179 (emphasis in original).[10]

---

[10]  Section V(C) of Damani's Motion to Dismiss *does not cite a single case applying Georgia RICO law. See Reves*, 507 U.S. at 172 (applying federal RICO law) (cited Mot. at 27); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (applying federal RICO law) (cited Mot. at 27); *Parm v. Nat'l Bank of California, N.A.*, 242 F. Supp. 3d 1321, 1343 (N.D. Ga. 2017) (applying federal RICO law) (cited Mot. at 27).

C.    **The Amended Complaint Adequately Alleges Damani Conspired To Violate Georgia's RICO Act**

61.    The Georgia RICO Act states that it is unlawful for "any person to conspire or endeavor to violate any of the provisions of" Ga. Code Ann. § 16-14-4(a) or (b).  To establish a valid civil RICO conspiracy claim under subsection (c), a plaintiff must show (1) that the defendant conspired to violate subsection (a) or (b) of the RICO Act, and (2) that the RICO violation proximately caused injury to the plaintiff. *Turk*, 593 F. Supp. 3d at 1310.  A defendant may be found liable for violating section 16-14-4(c) if they knowingly and willfully join a conspiracy containing a common plan or purpose to commit two or more predicate acts. *Id*.  "The essence of conspiracy is a common design, and conduct which discloses a common design may give rise to the inference of conspiracy." *Pasha v. State*, 273 Ga. App. 788, 790 (2005).

62.    Damani argues that the Trustee's RICO conspiracy claim in Count Eight fails because he "makes a single conclusory assertion in support" of the claim which is "not sufficient to state a claim for RICO conspiracy."  Mot. at 28-29.  Damani is mistaken.  The Amended Complaint adequately pleads a conspiracy claim as to Damani.  Contrary to Damani's position, the Trustee's allegations, and the reasonable inferences drawn therefrom, clearly describe an agreement between Damani, Sekhri, and Trive to violate the RICO statute by committing multiple fraudulent acts in an attempt to strip cash from Lucky Bucks and Holdings after inducing the Noteholders to fund hundreds of millions of dollars into the company.  Holdings was formed for the specific purpose of taking on additional debt to fund massive dividend payments to Damani, Sekhri, and Trive.  FAC ¶ 121-25, 347, 371.  Prior to and after the formation of Holdings, these three Defendants knowingly and willingly acted in concert to conceal from the Noteholders the fact that the stated value of Lucky Bucks (and Holdings' ownership of Lucky Bucks) was wildly inflated in an attempt to finance Defendants' dividend payments. *Id.* ¶¶ 125, 146, 168-69, 262,

353, 356. *See Turk*, 593 F. Supp. 3d at 1311 (allegations that (i) appraiser defendants allowed enterprise to use appraiser's fraudulent appraisals to pitch potential investors, that (ii) these appraisers were "listed in [promotional materials] as being part of the [team]," and (iii) that these appraisers "collaborated with other Defendants to prepare" promotional materials were sufficient to state a conspiracy claim under Georgia RICO law).

63.    Additionally, as discussed *supra* § IV.A, the Trustee has alleged requisite predicate acts. Damani's assertion that the Trustee "seemingly alleges that a conspiracy to violate RICO was formed when defendants agreed to make fraudulent transfers" Mot. at 29 (citing FAC ¶ 368)) mischaracterizes the allegations in the Amended Complaint. The Trustee does not allege that the fraudulent transfers were a predicate act, as discussed *supra* § IV.A.  Instead, the allegations in the Amended Complaint that Damani committed several predicate acts of securities fraud, FAC ¶¶ 350, 356, 360-61, and wire fraud, *id.* ¶¶ 350, 352-53, as well as the reasonable inferences drawn in favor of the same, are more than sufficient to survive dismissal under the applicable pleading standards. *Hansford*, 369 Ga. App. at 651.

64.    Finally, Damani's argument that the intracorporate conspiracy doctrine bars the RICO conspiracy claim is plainly incorrect. At no point in the Amended Complaint did the Trustee "allege[] that Mr. Damani, Sekhri, and Trive, collectively managed and operated both Lucky Bucks and Holdings" (Mot. at 29-30) such that they were "officers within a single corporate entity .. adopt[ing] a policy for the entity … in the course of their official duties." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). This doctrine is clearly inapplicable to Damani and Trive as they were *not* officers of Holdings. FAC ¶¶ 124-25 (alleging that Holdings' officers were Sekhri, Boyden, and Kassam). Further, no part of the alleged scheme involved "adopt[ing] a policy for [Holdings] … in the course of their official duties. *Ziglar*, 582 U.S. at 153. Instead,

the Amended Complaint clearly alleges that Damani was exercising control over Holdings despite the fact that he did *not* have a formal officer role (and therefore had no official duties).  In fact, Damani was specifically *barred* from holding any official role at Lucky Bucks by the GLC.  Accordingly, this argument has no merit or basis in the law.

**V.    Defendants' Remaining Arguments Are Meritless**

65.    The Trustee has sufficiently pleaded claims for attorney's fees and punitive damages under Georgia law.  A bankruptcy court is entitled to rely on state law in granting attorney's fees and punitive damages where the bankruptcy code does not otherwise provide such measures.  *In re Lyon*, 644 B.R. 211, 214 (Bankr. D. Or. 2022).  The Damani Defendants' request to dismiss these claims hinges on the Damani Defendants' arguments that the claims under Georgia law must be dismissed, but, for reasons set forth above, those claims are properly pleaded.  *See supra* Section III-IV.

<u>**CONCLUSION**</u>

For all the reasons explained above, the Court should deny the Motion.

[*Signature of counsel appears on next page.*]

30

Dated: June 2, 2025           WHITEFORD TAYLOR & PRESTON LLC
      Wilmington, Delaware       By: */s/ Bradley P. Lehman*
                                  William F. Taylor, Jr. (DE No. 2936)
                                  Bradley P. Lehman (DE No. 5921)
                                  600 North King Street, Suite 300
                                  Wilmington, DE 19801
                                  Telephone: (302) 295-5674
                                  Facsimile: (302) 295-5678
                                  Email: wtaylor@whitefordlaw.com
                                          blehman@whitefordlaw.com

                                  -and-

                                  QUINN EMANUEL URQUHART
                                  & SULLIVAN LLP
                                  Susheel Kirpalani
                                  Andrew J. Rossman
                                  Matthew R. Scheck
                                  Mario O. Gazzola
                                  Kenneth B. Hershey
                                  295 Fifth Avenue, 9th Floor
                                  New York, New York 10016
                                  Telephone: (212) 849-7000
                                  Facsimile: (212) 849-7100

                                  *Counsel to the Chapter 7 Trustee*