## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LUCKY BUCKS HOLDINGS LLC, | Case No.  23-10756 (KBO) |
| Debtor. | |
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of Lucky Bucks Holdings LLC and as assignee,<br><br>Plaintiff,<br><br>v.<br><br>TRIVE CAPITAL MANAGEMENT LLC, *et al.*,<br><br>Defendants. | Adversary Proceeding<br><br>Adv. Proc. No. 24-50130 (KBO) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## THE TRIVE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

QUINN EMANUEL URQUHART
  & SULLIVAN LLP
Susheel Kirpalani
Andrew J. Rossman
Matthew R. Scheck
Mario O. Gazzola
Kenneth B. Hershey
295 Fifth Avenue, 9th Floor
New York, New York 10016

WHITEFORD TAYLOR
  & PRESTON LLC
William F. Taylor, Jr. (DE No. 2936)
Bradley P. Lehman (DE No. 5921)
600 North King Street, Suite 300
Wilmington, DE 19801

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF ARGUMENT ..................................................................................3

RELEVANT BACKGROUND ...................................................................................5

    A.    Trive Acquires And Exercises Control Over Lucky Bucks....................................5

    B.    Trive Creates Holdings To "Take Cash Out Of The Business" As Results Decline ...................................................................................................6

    C.    Trive Conceals Lucky Bucks' Decline While Marketing Notes To Fund The Holdings Distributions ...............................................................................7

    D.    The Holdings Distributions Render Holdings Insolvent, and Trive Tries To Cover Up Its Wrongdoing ...........................................................................9

RELEVANT PROCEDURAL BACKGROUND .......................................................10

STANDARD OF REVIEW .....................................................................................11

ARGUMENT ..........................................................................................................11

I.    The Amended Complaint Plausibly Alleges Claims For Intentional And Constructive Fraudulent Transfer ......................................................................11

    A.    The Trustee Has Standing To Bring Fraudulent Transfer Claims In His Capacity As Estate Representative And, In The Alternative, As The Noteholders' Assignee .............................................................................12

    B.    The Fraudulent Transfer Claims Are Not Barred By Consent, Ratification, Estoppel, or Similar Doctrines ..................................................................15

II.    The Unlawful Dividend Claim Is Adequately Pleaded.......................................21

III.    The Statutory Claims Are Not Impermissibly Extraterritorial ..........................26

    A.    The Georgia Statutory Claims Are Not Impermissibly Extraterritorial.................27

    B.    The Delaware Securities Fraud Claim Is Not Impermissibly Extraterritorial ...................................................................................................32

IV.    The Complaint's Statutory And Common Law Claims Are Adequately Pleaded............33

    A.    The Complaint Adequately Alleges Falsity And Justifiable Reliance...................33

        1.    The Alleged Misstatements Were False Statements Of Fact Or Otherwise Actionable Misrepresentations ...................................................33

        2.    The Amended Complaint Adequately Alleges Justifiable Reliance..........40

        3.    The Amended Complaint Sufficiently Alleges That The Trive Defendants Are Liable For Fraud By Omission ..........................................42

        4.    The Amended Complaint's Claim For Negligent Misrepresentation Is Adequately Pleaded.............................................................................43

i

      B.      The Amended Complaint's Fraud Allegations Satisfy Rule 9(b) ..........................44

V.      Defendants' Remaining Arguments Are Meritless ...........................................................45

CONCLUSION ..........................................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.S. Goldman & Go., Inc. v. N.J. Bureau of Stat.*,
  163 F.3d 780 (3d Cir. 1999)..............................................................................27, 28, 29, 31, 32

*ABB Daimler-Benz. Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp.*,
  14 F. Supp. 2d 75 (D.D.C. 1998) ....................................................................................31

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)...............................................................................................29

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
  888 F. Supp. 2d 431 (S.D.N.Y. 2012).............................................................................40

*Allison v. Round Table Inv. Mgmt. Co.*,
  LP, 447 F. App'x 274 (2d Cir. 2012) ..............................................................................41

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982).........................................................................................................35

*Am. Tel. & Tel. Co. v. Winback & Conserve Program,Inc.*,
  42 F.3d 1421 (3d Cir. 1994).............................................................................................37

*In re AMC Invs., LLC*,
  637 B.R. 43 (Bankr. D. Del. 2022) ..................................................................................26

*In re Ampal-Am. Isr. Corp.*,
  648 B.R. 457 (Bankr. S.D.N.Y. 2023)..............................................................................16

*Miller v. Mott*,
  2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ...........................................................36

*Appel v. Berkman*,
  180 A.3d 1055 (Del. Sup. Ct. 2018) ................................................................................38

*Aquino v. Mobis Ala., LLC*,
  739 F. Supp. 3d 1152 (N.D. Ga. 2024) ......................................................................29, 30

*Arwood v. AW Site Servs., LLC*,
  2022 WL 705841 (Del. Ch. Mar. 9, 2022).......................................................................41

*ASARCO LLC v. Ams. Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ....................................................................................17, 18

iii

*Auld v. Forbes*,
    848 S.E.2d 876 (Ga. 2020) ................................................................................................29

*In re Barnett*,
    2015 WL 9581384 (Bankr. S.D.N.Y. Dec. 29, 2015) ........................................................12

*In re BMT-NW Acquisition, LLC*,
    582 B.R. 846 (Bankr. D. Del. 2018) ..................................................................................22

*In re Bos. Generating LLC*,
    617 B.R. 442 (Bankr. S.D.N.Y. 2020) ....................................................................16, 17, 18

*Bos. Trading Grp., Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) ...........................................................................................21

*In re CBI Holding Co.*,
    529 F.3d 432 (2d Cir. 2008) ..............................................................................................12

*In re Color Tile Inc.*,
    475 F.3d 508 (3d Cir. 2007) ..............................................................................................25

*CP Kelco U.S., Inc. v. Pharmacia Corp.*,
    2002 WL 31230816 (D. Del. Oct. 2, 2002) ......................................................................42

*Crum & Forster Indem. Co. v. Sideline Tree Servs., LLC*,
    557 F. Supp. 3d 616 (W.D. Pa. 2021) ...............................................................................13

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
    2024 WL 4008120 (S.D.N.Y. Aug. 30, 2024) ..................................................................30

*DiMare v. MetLife Ins. Co.*,
    369 F. App'x 324 (3d Cir. 2010) ......................................................................................44

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019) ..............................................................................21

*In re Essar Steel Minn. LLC*,
    2019 WL 2246712 (Bankr. D. Del. May 23, 2019) ..........................................................36

*In re Evergreen Energy, Inc.*,
    546 B.R. 549 (Bankr. D. Del. 2016) ..................................................................................41

*In re Extended Stay, Inc.*,
    2020 WL 10762310 (Bankr. S.D.N.Y. 2020) ........................................................15, 16, 19

*FdG Logistics LLC v. A&R Logistics Holdings, Inc.*,
    131 A.3d 842 (Del. Ch. 2016) ...........................................................................................33

*First Bank of Ga. v. Robertson Grading, Inc.*,
   761 S.E.2d 628 (Ga. 2014) ..................................................................44

*Gaffin v. Teledyne, Inc.*,
   661 A.3d 467 (Del. 1992) ..................................................................34

*In re Genesis Health Ventures, Inc.*,
   355 B.R. 438 (Bankr. D. Del. 2006) ..................................................34

*Gerbitz v. ING Bank, FSB*,
   967 F. Supp. 2d 1072 (D. Del. 2013) ................................................45

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
   58 F. Supp. 2d 228 (S.D.N.Y. 1999) ................................................41

*In re Gronczewski*,
   444 B.R. 526 (Bankr. E.D. Pa. 2011) ...............................................13

*Hartig Drug Co. v. Senju Pharma. Co.*,
   836 F.3d 261 (3d Cir. 2016) ..............................................................11

*Higgins v. 120 Riverside Boulevard at Trump Place Condo.*,
   2022 WL 3920044 (S.D.N.Y. Aug. 31, 2022) ..................................41

*Humphrey v. GlaxoSmithKline PLC*,
   905 F.3d 694 (3d Cir. 2018) ..............................................................29

*In re IIG Glob. Trade Fin. Fund Ltd.*,
   666 B.R. 38 (Bankr. S.D.N.Y. 2024) ................................................16

*In re Integrated Agri, Inc.*,
   313 B.R. 419 (Bankr. C.D. Ill. 2004) ...............................................14

*Jackson v. NuVasive, Inc.*,
   2022 WL 610704 (D. Del. Feb. 11, 2022) ........................................45

*Jaurequi v. John Deere Co.*,
   986 F.2d 170 (7th Cir. 1993) ............................................................31

*Kashef v. BNP Paribas SA*,
   2021 WL 1614406 (S.D.N.Y. Apr. 26, 2021) ..................................26

*Kline v. First W. Gov't Sec., Inc.*,
   24 F.3d 480 (3d Cir. 1994) ...............................................................42

*Labyrinth, Inc. v. Urich*,
   2024 WL 295996 (Del. Ch. Jan. 26, 2024) ...............................34, 35, 38, 39, 41

*Lieberman v. BeyondTrust Corp.*,
    2020 WL 1815547 (D. Del. Apr. 9, 2020) ........................................................40, 44

*Luster v. PuraCap Lab'ys., LLC*,
    2021 WL 7209537 (D. Del. Dec. 1, 2021) ..............................................................36

*Marcellus Const. Co., Inc. v. Vill. of Broadalbin*,
    302 A.D.2d 640 (N.Y. App. Div. 3d Dep't 2003) ...................................................44

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) .......................................................................13

*MBIA Ins. Corp. v. Royal Indem. Co.*,
    221 F.R.D. 419 (D. Del. 2004) ...............................................................................45

*In re Millenium Lab Holdings II, LLC*,
    2025 WL 794311 (Bankr. D. Del. Mar. 12, 2025) ..................................................16

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ..........................................................................42

*N. Am. Cath. Educ. Programming Found. Inc. v. Gheewalla*,
    930 A.2d 92 (Del. 2007) .........................................................................................25

*Parker v. Learn the Skills Corp.*,
    2006 WL 759693 (E.D. Pa. Mar. 23, 2006) ...........................................................41

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...............................................................32, 33

*Peruto v. Timbertech Ltd.*,
    2015 WL 8664276 (D.N.J. 2015) ...........................................................................22

*Phage Diagnostics, Inc. v. Corvium, Inc.*,
    2020 WL 1816192 (Del. Sup. Mar. 9, 2020) .........................................................39

*In re Physiotherapy Holdings, Inc.*,
    2016 WL 3611831 (Bankr. D. Del. June 20, 2016) ...........................14, 16, 17, 20

*In re Physiotherapy Holdings, Inc.*,
    2017 WL 6524524 (D. Del. Dec. 21, 2017) ...........................................................17

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ..........................................................................43

*Ruiz v. Sewon Am., Inc.*,
    766 F. Supp. 3d 1251 (N.D. Ga. 2025) ..................................................................30

*Savannah Motorcars, LLC v. Volkswagen Grp. of Am. Inc.*,
   2020 WL 12688368 (S.D. Ga. 2020) .................................................................29

*Scott v. PNC Bank, Nat'l Ass'n*,
   785 F. App'x 916 (3d Cir. 2019) ......................................................................41

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005).................................................................................21

*Singer v. Magnavox Co.*,
   380 A.2d 969 (Del. 1997) ..................................................................................33

*In re Smith*,
   2006 WL 1234965 (Bankr. D.D.C. Feb. 27, 2006) ...........................................13

*Stephenson v. Capano Dev., Inc.*,
   462 A.2d 1069 (Del. 1983) ................................................................................43

*Swipe Acquisition Corp. v. Krauss*,
   2021 WL 282642 (Del. Ch. Jan. 28, 2021).......................................................28

*Tatung Co., Ltd. v. Shu Tze Hsu*,
   217 F. Supp. 3d 1138 (C.D. Cal. 2016) ...........................................................30

*Trascent Mgmt. Consulting, LLC v. Bouri*,
   2018 WL 4293359 (Del. Ch. Sept. 10, 2018) ...................................................35

*In re Tronox Inc.*,
   503 B.R. 239 (S.D.N.Y. 2013)...........................................................................16

*United Gov't Sec. Officers of Am. v. Exelon Nuclear Sec., LLC*,
   2013 WL 5812111 (E.D. Pa. Oct. 24, 2013)................................................13, 15

*W. Valley KB Venture, LLC v. ILKB LLC*,
   2021 WL 4171918 (E.D.N.Y. Sept. 13, 2021) ..................................................43

*Yegiazaryan v. Smagin*,
   599 U.S. 533 (2023).....................................................................................29, 30

*Zuber v. Boscov's*,
   871 F.3d 255 (3d Cir. 2017)...............................................................................11

## Statutes

6 *Del. C.* § 18-607.................................................................................................22

6 *Del. C.* § 73-201...................................................................................27, 32, 33

11 U.S.C. § 546(a) ...................................................................................................14

11 U.S.C. § 544 .......................................................................................................13

11 U.S.C. § 548 .......................................................................................................13

O.C.G.A. § 10-5-1 *et seq.* ......................................................................................27

O.C.G.A. § 10-5-50 *et seq.* ....................................................................................28

Tex. Gov't Code Ann. § 4001.001 *et seq.* .............................................................27

## **Other Authorities**

17 C.F.R. § 240.10b-5(a) .........................................................................................32

Fed. R. Bankr. P. 2004 .............................................................................................11

Fed. R. Civ. P. 12(b)(6) ...........................................................................................11

Fed. R. Civ. P. 8(d) ..................................................................................................13

Fed. R. Civ. P. 9(b) ..................................................................................5, 22, 44, 45

Restatement (Second) of Agency §§ 249, 262 (1957) .............................................35

Marc Abrams (the "Trustee" or "Plaintiff"), solely in his capacity as Chapter 7 Trustee of the bankruptcy estate of Lucky Bucks Holdings LLC ("Holdings") and as assignee of causes of action previously belonging to Holdings' creditors, respectfully submits this memorandum of law in opposition to the motion of defendants Trive Capital Management LLC ("TCM"), Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star Gaming, LLC, and Shravan Thadani (collectively, the "Trive Defendants" or "Trive") to dismiss the First Amended Complaint (the "Motion") [D.I. 69].[1]

## PRELIMINARY STATEMENT[2]

1.      The Amended Complaint sets forth in extensive detail how the Trive Defendants emptied Lucky Bucks' coffers to pay themselves a $110 million dividend and, when still not satisfied, orchestrated a scheme to pilfer yet more money from Lucky Bucks.  The plan was simple. First, the Trive Defendants would create Holdings, a holding company with no operations of its own and whose only asset would be its indirect equity stake in Lucky Bucks.  Next, the Trive Defendants would market Notes to be issued by Holdings that would fund a distribution to Holdings' shareholders, including to three entities owned and controlled by Trive.  Eager to secure a quick payout on its initial investment in Lucky Bucks, the Trive Defendants drafted up marketing materials with the help of investment bank Houlihan Lokey and began looking for buyers.

2.      There was just one problem.  Lucky Bucks' business was cratering at the very time the Trive Defendants were taking the Notes to market.  Rather than shelve their plans and focus on stabilizing and rehabilitating the business, the Trive Defendants plowed forward, resorting to chicanery and deception to ensure a successful marketing process.  Among other things, the Trive

---

[1]  Citations to "D.I." refer to the docket of this adversary proceeding unless otherwise indicated.

[2]  Capitalized terms not defined in this preliminary statement bear the meanings ascribed below.

Defendants touted Lucky Bucks' stable income and prospects for rapid M&A growth, which would allow Lucky Bucks to outgrow its considerable leverage and generate earnings to repay the Notes.  They also highlighted Lucky Bucks' exceedingly low attrition rate, which gave lenders false comfort that they would enjoy a substantial amount of downside protection.  The Trive Defendants emphasized the substantial earnings growth Lucky Bucks was already enjoying from prior acquisitions which, they claimed, suggested that Lucky Bucks' true EBITDA was 15% higher than what appeared on paper.  They affirmed over and over that Lucky Bucks enjoyed a strong, positive relationship with its regulator.  And they assured investors that Holdings—Lucky Bucks' new parent company and the issuer of the Notes—would be solvent and able to service its debts after handing over all of the proceeds raised from the Notes to Holdings' shareholders.

3.      These representations were designed to induce investors to loan money to Holdings for the purpose of making that distribution to shareholders, and they were false.  In reality, Lucky Bucks was already vastly underperforming projections while the Notes were being marketed, so much so that those involved in managing the business began to realize that Lucky Bucks would not be able to pursue additional M&A opportunities after closing.  This was the centerpiece of its business strategy, the success of which was necessary for repayment of the Notes.  This meant that the only asset Holdings could look to for repayment of the Notes—the residual equity in Lucky Bucks, after taking into account the massive leverage Lucky Bucks undertook a few months earlier—was a house of cards.  Rather than show prospective lenders Lucky Bucks' dismal results from the second half of 2021, the Trive Defendants chose to continue using outdated *pro forma* numbers that bore no resemblance to the actual observed performance.  Similarly, the information the Trive Defendants presented to prospective lenders on Lucky Bucks' purportedly low attrition rate was wildly misleading and understated the actual rate of attrition in Lucky Bucks' business

by at least a factor of 10.  Lastly, the Trive Defendants also deceived prospective lenders with false representations that Lucky Bucks enjoyed a positive relationship with its regulator, the Georgia Lottery Corporation.  In reality, even after Lucky Bucks' founder Anil Damani was banned from making decisions for Lucky Bucks, the GLC repeatedly singled the company out for adverse enforcement action, further impairing the business's ability to acquire new locations and grow.

4.     After Lucky Bucks and Holdings filed for bankruptcy, rather than come clean and return their ill-gotten gains, the Trive Defendants and the other insiders tried to walk off with hundreds of millions of dollars in exchange for a slap on the wrist.  They negotiated a Chapter 11 plan, which would have provided a full release from Holdings in return for a mere $15 million payment to split amongst the Noteholders.  So while shareholders would keep more than $200 million in dividends made less than two years before bankruptcy, the creditors who were duped into lending the money would get about a nickel back.  With zero support for the offer, Holdings' case was converted to Chapter 7 so that an independent fiduciary could pursue claims against the Trive Defendants and others for the benefit of the Holdings estate and the Noteholders.

5.     Eager to evade scrutiny over the role they played in defrauding the Noteholders and engineering Holdings' creation and demise, the Trive Defendants have moved to dismiss the Trustee's Amended Complaint.  Their arguments for dismissal are meritless.

## SUMMARY OF ARGUMENT

6.     ***Fraudulent Transfer Claims***.  The Trive Defendants argue that the Trustee lacks standing to bring fraudulent transfer claims in his capacity as assignee of the Noteholders because fraudulent transfer claims may only be asserted by an estate representative until abandoned.  But the Noteholders' fraudulent transfer claims are asserted *in the alternative* to the Trustee's estate claims for fraudulent transfer and are therefore subject to first considering whether the estate claims for fraudulent transfer are viable.  If they are, then the Noteholders' claims will not be

3

considered.  The Noteholders' claims are included now, in the alternative, for efficiency and do not interfere with the Trustee's standing to bring fraudulent transfer claims in his capacity as estate representative.

7.    The Trive Defendants also assert that all of the fraudulent transfer claims fail because the Noteholders ratified the challenged transfers.  In doing so, the Trive Defendants skip over the most important element of ratification, namely, full knowledge of all material facts. The Amended Complaint alleges that the Trive Defendants and others concealed critical facts from the Noteholders about the true financial and operating condition of Lucky Bucks.  There is no authority for finding ratification in the face of these allegations at the pleadings stage.  Nor does the fact that the Noteholders have a fraudulent inducement claim against the Trive Defendants preclude them from also bringing claims for fraudulent transfer.  The claims are not mutually exclusive, and the Amended Complaint adequately alleges both.

8.    *Improper Dividends*.  The Trive Defendants allege that the Amended Complaint fails to plead an improper dividend claim under Delaware law.  But the allegations supporting the claim are straightforward.  The Amended Complaint alleges that Holdings was insolvent at the time it made distributions to three entities controlled by Trive.  It further alleges that the individuals who acted on behalf of those entities were aware of Holdings' insolvency, and their knowledge can be imputed to those entities under basic principles of agency law.  Nothing more is required to state a claim under Delaware's improper dividend statute, and the Trive Defendants' efforts to contest Holdings' insolvency or their knowledge thereof, while unconvincing in any event, invite factual disputes not appropriate for resolution on a motion to dismiss.

9.    *Statutory and Common Law Fraud Claims*.  The Trive Defendants assert that the Trustee's statutory securities fraud and RICO claims under Georgia law and his securities fraud

claim under Delaware law are impermissibly extraterritorial. This ignores the well-pleaded allegations that material aspects of the transactions orchestrated by the Trive Defendants which give rise to those claims occurred in Georgia. Moreover, Delaware's securities fraud statute imposes liability on any actor who employs any device, scheme or artifice to defraud in connection with the purchase or sale of securities. The Amended Complaint alleges that the Trive Defendants created Holdings—a Delaware LLC—for the express purpose of defrauding the Noteholders. The application of Delaware law to such conduct is not extraterritorial.

10.     Finally, the Trive Defendants argue that the Trustee's fraud claims fail to plead falsity and justifiable reliance, and do not satisfy the particularity requirements of Rule 9(b). These arguments simply ignore the Amended Complaint's allegations and misconstrue the legal requirements for pleading fraud. The Amended Complaint sufficiently pleads falsity and reliance for the statutory and common law fraud claims. It does so in dozens of pages of detailed allegations of actionable misrepresentations, which go far beyond particularity requirements of Rule 9(b). The Trive Defendants assert that these statements were either not false at all or are merely "puffery," opinions, or forward-looking statements. But many of the misrepresentations were of actual facts, and even the subset of statements that could be considered opinions or forward-looking statements are actionable because, as alleged in the Amended Complaint, the Trive Defendants made those statements with the intent to deceive.

11.     For these reasons and those set forth below, the Motion should be denied.

## **RELEVANT BACKGROUND**

### **A.     Trive Acquires And Exercises Control Over Lucky Bucks**

12.     Lucky Bucks was a business premised on ownership of coin-operated amusement machines ("COAMs") located in gas stations, convenience stores, and other retail locations in the

state of Georgia.  First Amended Complaint [D.I. 58] ("FAC") ¶¶ 62-71.  Trive acquired a majority

interest in the company in August 2020.  *Id.* ¶¶ 73, 81-82.

13.    In connection with its majority acquisition, Trive obtained the right to appoint two

individuals to Lucky Bucks' three-person board of managers and secured approval rights over

every material aspect of Lucky Bucks' business.  *Id.* ¶¶ 83-88.  It appointed Manu Sekhri and

James Boyden to the board and required them to execute an agreement acknowledging their

obligation to do its bidding.  *Id.* ¶¶ 15, 89.  Sekhri also served as CEO of Lucky Bucks and Southern

Star Gaming LLC ("Southern Star"), another entity in which Trive held a controlling interest.  *Id.*

¶¶ 82, 84.  In addition to its board appointees Sekhri and Boyden, Trive exercised control over

Lucky Bucks through TCM partner Shravan Thadani, who acted on behalf of the Trive Defendants

at all relevant times.  *Id.* ¶¶ 43, 89-90.

14.    Trive remained intimately involved with Lucky Bucks' business, including by

financing and evaluating M&A opportunities, taking the lead on negotiating certain acquisitions,

and holding weekly update calls with the company's management.  *Id.* ¶¶ 92-96.  Trive's co-

Founder and Managing Partner, Conner Searcy, was registered with the Georgia Lottery

Corporation ("GLC")—the regulatory body that oversees COAM operators—as Lucky Bucks'

representative.  *Id.* ¶ 104.  In that capacity, Searcy received live information regarding compliance,

attrition, and renewals of location licenses.  *Id.* ¶¶ 104-108.  Searcy shared this information with

Thadani and members of Lucky Bucks' management team, including Sekhri.  *Id.* ¶ 106.

**B.    Trive Creates Holdings To "Take Cash Out Of The Business" As Results Decline**

15.    As of January 2021, Trive's plan for Lucky Bucks was to hold the company for an

additional "3-5 years" before a "likely exit."  *Id.* ¶ 109.  Eager to recoup its investment in the

business, however, Trive orchestrated a dividend recapitalization of Lucky Bucks in July 2021—

6

less than one year after it acquired its majority stake. *Id.* ¶ 110. To that end, Trive caused Lucky Bucks to incur approximately $535 million in debt and immediately funneled $200 million of the proceeds to Lucky Bucks' shareholders, including over $100 million to affiliates of Trive. *Id.* ¶¶ 110-15. Shortly thereafter, Trive upsized Lucky Bucks' term loan and revolving credit facility such that Lucky Bucks was encumbered by $605 million in debt. *Id.* ¶ 116.

16.     While the transaction proved extremely lucrative for Trive, it came at a time when Lucky Bucks' business was under strain due to higher-than-projected attrition of COAM locations and underperformance of recently acquired locations. *Id.* ¶¶ 115, 117. In the face of those downward trends, Trive began exploring additional ways to "take cash out of the business." *Id.* ¶ 120. But Lucky Bucks was already so heavily indebted that under its credit agreement, it could not incur any additional debt to fund further payments to shareholders. *Id.* ¶ 121. Thadani accordingly came up with a plan to create a "super holdco" on top of Lucky Bucks' existing holding company, which could borrow money against the residual equity value of Lucky Bucks without running afoul of the covenants in existing credit facilities. *Id.* ¶ 122. Holdings would have no operations and no assets other than its equity interest in Lucky Bucks, and thus its ability to service and ultimately repay its debt was entirely dependent on the performance of Lucky Bucks' business. *Id.* As with Lucky Bucks, Trive ensured its control of Holdings by granting itself the right to appoint two of its three board members (again choosing Sekhri and Boyden) and affording itself extensive consent rights in Holdings' LLC Agreement. *Id.* ¶¶ 123-28.

### C.     Trive Conceals Lucky Bucks' Decline While Marketing Notes To Fund The Holdings Distributions

17.     With Holdings in place, Trive turned to executing its plan to issue itself and other insiders another lucrative dividend. It accordingly worked with members of Lucky Bucks' management team as well as investment banking firm Houlihan Lokey to market notes that would

be issued by Holdings for purposes of funding a distribution to Holdings' shareholders (the "Holdings Distributions"). *Id.* ¶¶ 129-30, 200-03.  Trive was intimately involved with and directed the transaction, including by furnishing information to Houlihan Lokey for inclusion in the Confidential Information Memorandum ("CIM") used to market the notes and by having Thadani lead marketing and diligence calls with prospective investors. *Id.* ¶¶ 121, 129-51.

18.    The marketing process was successful.  In November 2021 and January 2022, Holdings issued $250 million in aggregate principal amount of unsecured notes due 2028 (the "Notes," and the purchasers thereof, the "Noteholders") pursuant to a Note Purchase Agreement dated November 29, 2021 (the "NPA").  *Id.* ¶ 192.  The Noteholders' obligation to purchase the Notes and, by extension, their authorization for Holdings to use the Note proceeds to fund the Holdings Distributions, was expressly made contingent upon the accuracy of certain representations and warranties that Trive and Lucky Bucks management caused Holdings to make in the NPA. *Id.* ¶¶ 193, 198.  These included that Holdings was solvent and would remain so after paying out the Holdings Distributions, that the financial statements and other written information furnished to the Noteholders in connection with the transaction was correct in all material respects, and that such information did not omit to state any material facts necessary in order to make the other statements contained therein not materially misleading. *Id.* ¶¶ 179, 196-97.

19.    In the course of marketing the Notes, Trive—generally through Thadani—made numerous material misrepresentations to the Noteholders, including the following:

a.  **Lack of attrition:** Thadani repeatedly touted Lucky Bucks' COAM location renewal rate and pointed to representations in the CIM that implied an attrition rate of less than 1% per year, despite the fact that the actual attrition rate for 2021 was ***over ten times higher***, *id.* ¶¶ 156-59;

b.  **Stability of location contracts:** Thadani repeatedly represented that Lucky Bucks' contracts with location owners were long-term and difficult for location owners to break, despite Trive's real-time knowledge that Lucky Bucks routinely failed to file challenge notices to prevent location owners from switching to other master license

holders, creating the false impression that Lucky Bucks' revenue was stable, *id.* ¶¶ 104, 138, 146, 162-63;

c. **EBITDA growth from prior acquisitions:** Thadani repeatedly represented that recent acquisitions brought Lucky Bucks' run-rate EBITDA to $115 million, despite receiving weekly updates from management indicating that recent acquisitions were already severely underperforming expectations, such that adding the pre-acquisition EBITDA from those locations to Lucky Bucks' EBITDA was misleading, *id.* ¶¶ 140, 165, 188;

d. **Ongoing M&A pipeline:** Thadani repeatedly told potential noteholders that Lucky Bucks would continue to grow (and thus be able to manage its substantial debt load) through its robust M&A pipeline, despite simultaneously telling management that acquisitions would have to stop following the Holdings Distributions due to the company's lack of sufficient capital, *id.* ¶ 169-71;

e. **Lucky Bucks' financial results, estimates, and projections:** Thadani repeatedly touted the pro forma financials and projections in the CIM, despite openly acknowledging that those financials no longer fairly represented Lucky Bucks' anticipated performance and counseling management to avoid sharing Lucky Bucks' actual results in discussions with Noteholders, *id.* ¶¶ 173-76;

f. **Lucky Bucks' relationship with GLC:** Thadani repeatedly touted Lucky Bucks' purportedly strong relationship with GLC despite knowing Lucky Bucks was not in compliance with GLC orders and in fact was viewed unfavorably by the GLC, *id.* ¶¶ 141, 184-86; and

g. **Solvency:** Trive caused Holdings to issue a solvency certificate in connection with the NPA which represented that the certificate's signatory, Holdings board member James Boyden, had "made, or … caused to be made … such examination or investigation as is necessary to enable me to express an informed opinion" as to Holdings' solvency; in fact, Holdings was rendered insolvent upon the issuance of the Notes and no such "examination or investigation" of Holdings' solvency had been undertaken by Boyden or anyone else, *id.* ¶¶ 179-81.

D.     **The Holdings Distributions Render Holdings Insolvent, and Trive Tries To Cover Up Its Wrongdoing**

20.     Shortly after issuing the Notes, Holdings made the Holdings Distributions, approximately $120 million of which went to Trive-affiliated entities. *Id.* ¶ 15. Holdings received no value on account of the Holdings Distributions, and as a result thereof, was rendered insolvent and left with unreasonably small capital to repay the Notes. *Id.* ¶ 17. That is because Holdings' only asset—Lucky Bucks—was itself already severely over-levered and in steep decline at the

time the Holdings Distributions were made, rendering its equity essentially worthless (if it had any value at all) and making it next to impossible that Lucky Bucks would ever generate enough cash to pay back Holdings' debts in addition to its own. *Id.* ¶¶ 204-11.

21.     Following the Holdings Distributions, Thadani directed management to be circumspect with the Noteholders regarding Lucky Bucks' true results, instructed management not to share data with the Noteholders, and skipped Noteholder calls to give management the ability to "punt on some questions." *Id.* ¶¶ 212-24.  When an industry expert expressed his belief to the Noteholders that Lucky Bucks was a criminal enterprise, Thadani tried to discredit the expert network by claiming that they were being used by competitors to undermine Lucky Bucks' business. *Id.* ¶¶ 223-229.  And while Trive now claims ignorance of the criminal enterprise that subsequently came to light (Mot. ¶ 3), at least one of Damani's co-conspirators disclosed the enterprise prior to Thadani's attempted cover-up.  FAC ¶¶ 21, 219.

22.     As was later revealed in a 2024 lawsuit filed by the post-Chapter 11 successor to Lucky Bucks, during the entire time that Trive was in full control of Lucky Bucks, Defendants Anil Damani and Shafik Kassam were stripping assets from Lucky Bucks and undermining Lucky Bucks for their competing businesses. *Id.* ¶ 238-40.  Among other things, Damani and Kassam would direct locations with expiring contracts to enter into contracts with their businesses, divert new opportunities away from Lucky Bucks, and sell diverted locations back to Lucky Bucks at inflated prices (by using fake COAM players to artificially inflate pre-EBITDA). *Id.* ¶¶ 241-59.

23.     Lucky Bucks' and Holdings' downward spiral continued, culminating in their Chapter 11 filing in June 2023. *Id.* ¶ 234.

## RELEVANT PROCEDURAL BACKGROUND

24.     Lucky Bucks emerged from bankruptcy in October 2023, but this Court converted Holdings' Chapter 11 case to Chapter 7 and appointed Plaintiff Trustee of the Holdings estate. *Id.*

¶¶ 235-37.  Subsequent to that appointment, the Noteholders assigned all right, title, and interest in their claims arising out of or in connection with the Notes to the Trustee.  *Id.* ¶ 35.  The Trustee filed the Amended Complaint on January 21, 2025, asserting claims against the Trive Defendants and others both in his capacity as estate representative and as assignee of the Noteholders.  *Id.* ¶¶ 269-408.  The Trustee obtained some Rule 2004 discovery from Trive, though Trive did not complete its production until three months after the Trustee filed the Amended Complaint and produced documents only from two custodians, which did not include key members of Trive's team managing the investment in Lucky Bucks, including Trive Managing Partner Conner Searcy.

## STANDARD OF REVIEW

25.     On review of a motion to dismiss for failure to state a claim, "the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant."  *Hartig Drug Co. v. Senju Pharma. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).[3]  Accordingly, dismissal is proper only when a complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017).

## ARGUMENT

### I.     The Amended Complaint Plausibly Alleges Claims For Intentional And Constructive Fraudulent Transfer

26.     The Trive Defendants do not contest the Trustee's *prima facie* case for intentional and constructive fraudulent transfer.  Instead, the Trive Defendants argue that the Trustee's assigned fraudulent transfer claims fail for lack of standing and that all of the Trustee's fraudulent transfer claims are barred by the affirmative defense of ratification.  Neither defense has merit.

---

[3]  Unless otherwise noted, all internal citations, quotation marks, and brackets in case citations are omitted.

A.   **The Trustee Has Standing To Bring Fraudulent Transfer Claims In His Capacity As Estate Representative And, In The Alternative, As The Noteholders' Assignee**

27.     The Trive Defendants argue that the fraudulent transfer claims the Trustee asserts as assignee of the Noteholders (Counts III and IV) should be dismissed because the Trustee "lack[s] statutory authority" to assert fraudulent transfer claims in that capacity.  Mot. ¶ 27.[4] The Trive Defendants are wrong.  "[A] trustee may assert claims assigned to it by a bankrupt's creditors for the benefit of the estate, because those claims become property of the estate under § 541(a)(7)."  *In re CBI Holding Co.*, 529 F.3d 432, 459 (2d Cir. 2008).  Here, the Noteholders have "irrevocably and unconditionally" assigned "all right, title and interest in … the Assigned Claims and any proceeds therefrom" "to the Trustee on behalf of the Debtor's Estate," and have further agreed that "any monies recovered by the Trustee from the Assigned Claims will be property of the Debtor's estate and subject to the Debtor's Chapter 7 Case."[5]  Pursuant to these terms, which were expressly approved by the Court,[6] "the recovery of damages would inure to the benefit of the bankruptcy estate," and thus the Trustee "has standing to sue on [the] assigned creditors' claims."  *In re Barnett*, 2015 WL 9581384, at *6 (Bankr. S.D.N.Y. Dec. 29, 2015).

28.     The Trive Defendants contend that because the Trustee's authority to assert fraudulent transfer claims is "*exclusive*," the Trustee lacks standing to bring fraudulent transfer claims "in his capacity as assignee" of the Noteholders.  Mot. ¶¶ 27-28.  But the Trive Defendants ignore that the Trustee asserts Counts III and IV solely "to the extent the Trustee does not avoid

---

[4]  Citations to "Mot." refer to the Memorandum of Law in Support of the Trive Defendants' Motion to Dismiss the Amended Complaint, D.I. 69.

[5]  Assignment of Claims and Causes of Action §§ 1, 3, *In re Lucky Bucks Holdings LLC*, Ch. 7 Case No. 23-10756 (Bankr. D. Del. Apr. 8, 2024), D.I. 76-1.

[6]  *See* Order Granting Motion of Chapter 7 Trustee for Entry of an Order (A) Authorizing and Approving an Assignment of Claims and Causes of Action From the PIK Noteholders (B) Approving Adequate Protection to the Noteholders and (C) Granting Related Relief, *In re Lucky Bucks Holdings LLC*, Ch. 7 Case No. 23-10756 (Bankr. D. Del. Apr. 8, 2024), D.I. 76, at 1.

and recover the Holdings Distributions pursuant to Bankruptcy Code sections 544 and 548."
FAC ¶¶ 311, 325.  Accordingly, Counts III and IV are pleaded in the alternative to the Trustee's
estate causes of action for fraudulent transfer under Counts I and II and only become operative if
those Counts fail and, thus, are no longer viable.  As a result, Counts III and IV do not implicate,
let alone impinge upon, the Trustee's "exclusive" standing to bring fraudulent transfer claims
under section 544.[7]

29.    Such conditional, alternative pleading is expressly permitted under the Federal
Rules of Civil Procedure and Third Circuit law.  Rule 8(d) provides that a party "may set out 2 or
more statements of a claim or defense alternatively or hypothetically, either in a single count or
defense or in separate ones."  Courts in the Third Circuit accordingly recognize that "hypothetical
pleading is permitted" when the alternative claim "is asserted in the same lawsuit and *is contingent
on, and will become cognizable upon*, the resolution of the primary claim in a certain matter."
*Crum & Forster Indem. Co. v. Sideline Tree Servs., LLC*, 557 F. Supp. 3d 616, 624 (W.D. Pa.
2021).  That is precisely how the Trustee has pleaded Counts III and IV, and thus the claims
asserted in those Counts can be tested once the merits of Counts I and II have been decided.
*See, e.g.*, *United Gov't Sec. Officers of Am. v. Exelon Nuclear Sec., LLC*, 2013 WL 5812111, at
*6 (E.D. Pa. Oct. 24, 2013) ("[B]ecause Count II is contingent upon a certain outcome under Count
I, Count II is properly pled in the alternative."); *In re Maxus Energy Corp.*, 641 B.R. 467, 566
(Bankr. D. Del. 2022) ("If the Plaintiff's fraudulent transfer claims should fail, the Plaintiff should

---

[7]   *See In re Gronczewski*, 444 B.R. 526, 534 (Bankr. E.D. Pa. 2011) ("[The] trustee's exclusive right to maintain [a]
fraudulent transfer action is not in perpetuity and [an] individual creditor may resume prosecution of actions when the
trustee no longer has a viable cause of action."); *see also In re Smith*, 2006 WL 1234965, at *5 n.13 (Bankr. D.D.C.
Feb. 27, 2006) ("[C]reditors may step in … when the trustee no longer has a viable cause of action.").

be able to maintain its claims for unjust enrichment, its equitable alternative claims – even at the summary judgment phase of the litigation.").[8]

30.    The Trive Defendants' authorities do not show otherwise.  In *In re Wilton Armetale*, the Third Circuit concluded that a trustee's abandonment of the estate's fraudulent transfer claims "returned the power to pursue those claims to the creditor."  968 F.3d 273, 278 (3d Cir. 2020). That conclusion supports, rather than undermines, the Trustee's authority to bring fraudulent transfer claims in his capacity as assignee of the Noteholders to the extent he no longer has a viable estate claim.  In *In re Quorum Health Corp.*, Judge Shannon held that the plaintiff (a litigation trust) could *simultaneously* assert both the estate's fraudulent transfer claims and fraudulent transfer claims that individual creditors had assigned to the trust.  2023 WL 2552399, at *8, n.47 (Bankr. D. Del. Mar. 16, 2023).  Judge Shannon rejected defendants' argument that *Wilton* required abandonment if the litigation trust wanted to assert assigned claims, explaining that "[a]bandonment is not necessary" when both species of claims have been "overtly transferred" to the plaintiff, as is the case here.  *Id.*  And in *In re PWS Holding Corp.*, the Third Circuit concluded that the debtor's *release* of its fraudulent transfer claims pursuant to a confirmed plan of reorganization precluded a creditor from asserting those claims on its own account.  303 F.3d 308, 313-16 (3d Cir. 2002).  Here, the Trustee has not released the Noteholders' fraudulent transfer

---

[8]    The disposition of a trustee's fraudulent transfer claims under the Bankruptcy Code may sometimes dispose of fraudulent transfer claims that creditors could otherwise assert under state law.  But any disposition based on limitations that solely apply to the trustee in its capacity as estate representative would not support that result. For example, the Bankruptcy Code imposes a two-year statute of limitations on a trustee's power to bring fraudulent transfer claims.  11 U.S.C. § 546(a).  But because that limitations period only applies to chapter 5 claims brought by a trustee, creditors "regain[ ] standing to pursue a state law fraudulent conveyance action … once the statute of limitations expires on the bankruptcy trustee's right to bring the claim."  *In re Integrated Agri, Inc.*, 313 B.R. 419, 427-28 (Bankr. C.D. Ill. 2004).  Similarly, courts have held that the section 546(e) safe harbor does not apply to claims brought by creditors under state law.  *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *10 (Bankr. D. Del. June 20, 2016).  Accordingly, should Counts I or II fail for any reason solely applicable to fraudulent transfer claims brought by the Trustee in his capacity as estate representative, that outcome would have no bearing on the viability of Counts III and IV, which the Trustee brings under state law in his capacity as assignee of the Noteholders.

claims and instead seeks to prosecute such claims in the event the estate's claims cannot proceed.[9]

31.    Finally, the Trive Defendants argue that "there are practical reasons too for dismissing the assigned claims," namely that doing so "will avoid any potential disputes" regarding the applicability of the section 546(e) safe harbor to the Noteholders' claims. Mot. ¶ 29. The Trive Defendants thus ask the Court to dismiss Counts III and IV based on an affirmative defense that the Trive Defendants have not asserted, may never assert, and may not even qualify for. It would be improper to dismiss Counts III and IV based on an affirmative defense that has not even been put before the Court. *See Exelon Nuclear Sec.*, 2013 WL 5812111, at *6.

**B.    The Fraudulent Transfer Claims Are Not Barred By Consent, Ratification, Estoppel, or Similar Doctrines**

32.    The Trive Defendants assert that all of the Trustee's fraudulent transfer claims (Counts I-IV) are barred because the Noteholders knew and agreed that the Holdings Distributions would be made to Holdings' shareholders and thus the Noteholders consented to and ratified those transfers.[10] *See* Mot. ¶¶ 30-41. According to the Trive Defendants, the Noteholders' purported ratification of the Holdings Distributions means that the Trustee, standing in the Noteholders' shoes, cannot now seek to unwind the Holdings Distributions as fraudulent transfers. This argument fails. As a matter of law, ratification requires "inten[t] to ratify the wrongful act with full knowledge of all material facts." *In re Extended Stay, Inc.*, 2020 WL 10762310, at *74 (Bankr. S.D.N.Y. 2020). The defense cannot apply where, as here, the plaintiff alleges that the purported ratifiers (*i.e.*, the Noteholders) were misled as to those facts. Nor does the Trive

---

[9]    The Trive Defendants' out-of-circuit authorities (at Mot. ¶ 27 n.7) do not change the analysis. While these cases generally provide that a trustee's standing is exclusive until the trustee abandons its fraudulent transfer claims, none of the cases address whether a trustee may assert creditor claims in the alternative to the estate's causes of action.

[10]    The Trive Defendants do not distinguish between the defenses of consent, waiver, estoppel, and ratification, and assert that these defenses all share the same "underlying point"—*i.e.*, that creditors who authorized a transfer cannot later seek to unwind that transfer as a fraudulent conveyance. *See* Mot. ¶ 33. For the sake of simplicity, this brief refers to all of these defenses as "ratification."

Defendants' argument that the Trustee "assert[s] a fraudulent *inducement* claim in the guise of a fraudulent *transfer* claim" (Mot. ¶ 28) hold water.  To the contrary, the conduct alleged in the Amended Complaint amply supports both claims.

33.    Ratification is an affirmative defense as to which the Trive Defendants bear the burden of proof.  *See In re IIG Glob. Trade Fin. Fund Ltd.*, 666 B.R. 38, 55-56 (Bankr. S.D.N.Y. 2024).  As noted above, it requires "full knowledge of the material facts relating to the transaction." *In re Ampal-Am. Isr. Corp.*, 648 B.R. 457, 475 (Bankr. S.D.N.Y. 2023).  The Trive Defendants try to downplay this essential aspect of the doctrine, portraying it as an outlier position that only "a few decisions" (Mot. ¶ 35) have recognized.  Not so.  The requirement that ratification must be supported by knowledge of all material facts is well-established and widely accepted in the fraudulent transfer context, including by courts in this jurisdiction.  *See, e.g.*, *In re Millenium Lab Holdings II, LLC*, 2025 WL 794311, at *6-7 (Bankr. D. Del. Mar. 12, 2025) (denying summary judgment on intentional fraudulent transfer claim notwithstanding that "the dividend to shareholders was disclosed" because the debtor "was not entirely forthcoming with the information it provided to potential investors about the risks inherent in its business model"); *In re Extended Stay*, 2020 WL 10762310, at *74 ("Courts reject claims that a party has ratified a transaction where that party lacks all the material facts necessary to do so."); *In re Physiotherapy Holdings*, 2016 WL 3611831, at *12 (rejecting ratification defense because there was "a material dispute as to whether or not the Senior Noteholders had knowledge of the material facts surrounding the transaction"); *In re Bos. Generating LLC*, 617 B.R. 442, 494 (Bankr. S.D.N.Y. 2020) (rejecting ratification defense where there was "a material dispute as to whether or not the Lenders had knowledge of the material facts surrounding the Leveraged Recap Transaction"); *In re Tronox Inc.*, 503 B.R. 239, 276 (S.D.N.Y. 2013) ("Defendants, who have the burden on this issue, did not

establish that the bondholders knowingly gave sanction to the fraudulent conveyances complained of in this case."); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 427 (S.D. Tex. 2008) ("The defense of ratification requires a showing that the plaintiff: (i) intended to ratify a wrongful act; and (ii) had full knowledge of all material facts.").

34.     The court's decision in *Physiotherapy* is particularly instructive.  The defendants in that case, just like the Trive Defendants here, asserted that "because the Secured Noteholders were aware that the proceeds from the issuance would be used to cash out the Selling Shareholders," the noteholders were "estopped from seeking to avoid the very transfer they allegedly approved."  2016 WL 3611831, at *12.  The court rejected that position, explaining that "the use of proceeds is simply one piece of the entire fraud alleged in the complaint" and that the defendants' alleged misrepresentations relating to "the borrower's financial health" precluded "a finding of ratification" at the motion to dismiss stage. *Id.*[11]  Similarly, in *In re Boston Generating*, the defendants argued that "because the Lenders were aware that the proceeds from the Credit Facilities would be used to cash out [the holding company's] LLC members," the lenders were "estopped from seeking to avoid" those transfers.  617 B.R. at 493-94.  Relying on *Physiotherapy*, the court declined to make a finding of ratification because the plaintiff trustee had "alleged that the information in, among other things, the Lenders' Presentations, the CIM, and the Tender Offer did not indicate [the borrowers'] true financial condition by omission and misrepresentation." *Id.* at 495.  Because the borrowers' "financial health is likely the most material fact" and the plaintiff alleged that lenders were misled as to that fact, the court declined to find the lenders had ratified the transfers at issue. *Id.* at 494-95.

---

[11]  Following the bankruptcy court's partial denial of their motion to dismiss, the *Physiotherapy* defendants sought leave to appeal to the U.S. District Court for the District of Delaware.  *See In re Physiotherapy Holdings, Inc.*, 2017 WL 6524524 (D. Del. Dec. 21, 2017).  The district court (Stark, J.) denied leave, noting "it appears that the Bankruptcy Court applied well-settled tenets of law" in rejecting the defendants' ratification defense. *Id.* at *11.

35.    The same conclusion is warranted here.  In this case, just as in *Physiotherapy* and *Boston Generating*, the Amended Complaint alleges that the Trive Defendants and others concealed material facts concerning Lucky Bucks' (and therefore Holdings') operational and financial condition from the Noteholders, including the attrition rate and stability of Lucky Bucks' COAMs (FAC ¶¶ 156-63), its EBITDA growth from prior acquisitions (*id.* ¶¶ 164-66), its ability to continue growing through M&A (*id.* ¶¶ 167-71), the accuracy and reliability of Lucky Bucks' projected performance (*id.* ¶¶ 172-78), Lucky Bucks' solvency and the analysis (or lack thereof) undertaken to confirm its solvency (*id.* ¶¶ 179-81, 204-11), and the strength of Lucky Bucks' relationship with its regulator (*id.* ¶¶ 141, 182-86).  In light of these allegations, which must be accepted as true for purposes of this motion, the Trive Defendants cannot "meet [their] burden of proving that [the Noteholders] intended to ratify the [Holdings Distributions] with full knowledge of all material facts."  *ASARCO*, 396 B.R. at 428.

36.    Aware of this infirmity in their defense, the Trive Defendants strain to cabin the misrepresentations alleged in the Amended Complaint to the Noteholders' decision to lend money to Holdings in the first instance, arguing that "[a] borrower's misrepresentations regarding its creditworthiness may support a claim of fraudulent *inducement* that the lender was misled into making the *loan*," but "[o]n a claim of fraudulent *transfer*, … the only knowledge the lender must have possessed to have consented to or ratified the borrower's *transfer* of the loan proceeds is that the borrower was going to *transfer*, not retain, the proceeds."  Mot. ¶ 35.  But separating fraud in connection with the "*loan*" from fraud in connection with the "*transfer*" is not possible where, as here, the loan was advanced specifically to fund the challenged transfers as part of a single integrated transaction.  Under these circumstances, misrepresentations made in connection with the loan were necessarily also made in connection with obtaining lenders' consent to the transfers.

37.    This is true not only as a matter of simple logic, but also in the specific context of the NPA, which conditioned the Noteholders' obligation to purchase the Notes (and thus to fund the Holdings Distributions) on the truthfulness of all material representations (FAC ¶¶ 193-98), and expressly represented that Holdings and its subsidiaries would be solvent "***after giving effect to the Transactions*** and the incurrence of the Indebtedness and Obligations being incurred in connection with the Note Purchase Agreement ***and use of proceeds thereof.***"[12]  The fact that the Noteholders "made their loans knowing that Holdings would use the proceeds to pay its shareholders so that the funds would not be available to repay the Noteholders" (Mot. ¶ 41) does not erase the significance of these representations to the Noteholders' decision to allow their proceeds to be used for that purpose; if anything, it made those representations even more material. To hold otherwise would be tantamount to finding that the Noteholders "knowingly … consented to distributions to equity holders in violation of the loan documents or at a time that the Debtors were insolvent."  *In re Extended Stay, Inc.*, 2020 WL 10762310, at *75.  The Trive Defendants have identified no facts in the Amended Complaint or the documents it incorporates by reference to support such an implausible finding.

38.    The Trive Defendants' related argument that the Trustee has "assert[ed] a fraudulent *inducement* claim in the guise of a fraudulent *transfer* claim" (Mot. ¶ 38) fares no better. The Amended Complaint alleges *both* that the Trive Defendants made misrepresentations to the Noteholders in marketing the Notes (fraudulent inducement) *and* that the proceeds of the Notes were transferred to Holdings' shareholders (i) as part of a scheme to hinder, delay, or defraud creditors (intentional fraudulent transfer) and/or (ii) for less than reasonably equivalent value while

---

[12]  *See* Decl. of Ross E. Firsenbaum in Supp. of Trive Defs.' Mot to Dismiss Pl's Am. Compl. ("<u>Firsenbaum Decl.</u>") Ex. N, D.I. 78-2 at 233 (emphasis added).

Holdings was or would be rendered insolvent thereby (constructive fraudulent transfer).  Had the Holdings Distributions never occurred, the Trive Defendants would have a point.  As it stands, the Amended Complaint alleges that the Trive Defendants made the Holdings Distributions and procured the Noteholders' consent to those transfers through fraud.  The fact that the Noteholders were defrauded twice-over does not reduce the number of claims available to them, nor does the Trive Defendants' disclosure of the Holdings Distributions absolve them of other fraudulent conduct taken in furtherance of those transfers.

39.    The Trive Defendants' authorities—not one of which is from a court in this Circuit—are unpersuasive.  In *In re Lyondell Chem. Co.*, the court concluded that the plaintiff lenders ratified the challenged transfers without even addressing how the lenders' fraud allegations bore on that issue.  503 B.R. 348, 383-85 (Bankr. S.D.N.Y. 2014); *see* Mot. ¶ 36 n.11.  In *Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, the court held *on summary judgment* that the plaintiffs' evidence was too weak to show that they "were misled or defrauded in any material way."  500 B.R. 464, 479 (W.D. Tex. 2013).  In *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, the court uncritically equated the lenders' knowledge of how their proceeds would be used with "full knowledge" of all material aspects of the transaction, 479 B.R. 405, 411 (N.D. Tex. 2012), notwithstanding that "the use of proceeds [was] simply one piece of the entire fraud alleged in the complaint," *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at \*12.  And in *In re Refco, Inc. Sec. Litig.*, the court "inferred that [the lender] knew about [the borrower's] financial situation" (an inference not possible here given the Amended Complaint's allegations) and further found— based on allegations wholly absent here—that the lender was itself "engaged in fraud in arranging the [challenged] transaction" and therefore was not even "a legitimate creditor of the [debtor's]

estate." 2009 WL 7242548, at *10-11 (S.D.N.Y. Nov. 13, 2009).[13]

40.     In sum, the Trive Defendants' cases are either easily distinguishable, contain superficial analysis, or depart from the weight of the authority (including in this Circuit) on whether ratification requires full knowledge of all material facts. The Trive Defendants' argument rests on the false premise, already refuted above, *supra* ¶¶ 36-38, that a creditor cannot sue for fraudulent transfer and can only have a fraudulent inducement claim when the use of its proceeds is disclosed. That limitation cannot be found in the statute or greater weight of case law. As this argument is an offshoot of the Trive Defendants' ratification defense, the Amended Complaint alleges in great detail how the Trive Defendants systematically misled the Noteholders into lending to Holdings and approving the Holdings Distributions. These allegations preclude a finding of ratification at the pleadings stage.

## II.     The Unlawful Dividend Claim Is Adequately Pleaded

41.     The Trive Defendants assert that the Amended Complaint's illegal dividend claim (Count V) should be dismissed because the Amended Complaint (i) does not provide each Trive Defendant with sufficient notice of "the specific part it allegedly played" in the unlawful-dividend scheme (Mot. ¶ 44) and (ii) does not sufficiently allege that the Trive Defendants knew that the Holdings Distributions would render Holdings insolvent (Mot. ¶ 45).

---

[13] The Trive Defendants' reliance on *In re Sharp* and *Boston Trading* as "analogous" (Mot. ¶ 36 n. 12) is likewise misplaced. Those cases involved payments in satisfaction of antecedent debt, not dividends to insiders, and therefore did not involve fraudulent transfers as a matter of law. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("The $12.25 million payment was at most a preference between creditors and did not hinder, delay, or defraud either present or future creditors."); *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) (holding that the repayment of a debt to a creditor was "a preference, which Massachusetts courts (and most courts) have specifically held is *not* a fraudulent conveyance"). And unlike in *In re Sharp* and *Boston Trading*, the Amended Complaint alleges that the Trive Defendants played an integral role in the underlying scheme to inflate the value of Holdings and Lucky Bucks to loot those entities. The Trive Defendants' reliance on *In re Direct Access Partners, LLC*, 602 B.R. 495 (Bankr. S.D.N.Y. 2019) does nothing for them. That decision, rendered *after a trial*, found that "[n]o evidence was offered that would support a finding that any executive or employee of DA Partners acted with an actual intent to hinder, delay, or defraud creditors." *Id.* at 542.

42.     The Trive Defendants' first argument for dismissal is easily dispensed with. Delaware law provides that a limited liability company such as Holdings "shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company … exceed the fair value of the assets of the limited liability company," and further provides that "[a] member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to a limited liability company for the amount of the distribution."  6 *Del. C.* § 18-607(a)-(b).  The Amended Complaint alleges that three Trive-affiliated entities—TCFIII Luck SPV LP, TCFIII Luck Acquistion LLC, and Southern Star Gaming LLC—were members of Holdings and received distributions (*i.e.*, the Holdings Distributions) that rendered Holdings insolvent.  *See* FAC ¶¶ 36, 39-41, 202.

43.     The Amended Complaint also adequately pleads that each recipient of the Holdings Distributions had knowledge of Holdings' insolvency.  As an initial matter, it must be noted that insolvency—as well as whether any defendant had knowledge of insolvency—is "a fact-intensive inquiry not properly decided on a motion to dismiss."  *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 858-59 (Bankr. D. Del. 2018).  Moreover, because knowledge "may be alleged generally" at the pleadings stage, Fed. R. Civ. P. 9(b), a plaintiff need only make a "general averral of knowledge … backed by the circumstantial grounds for such knowledge" as to make its claim "sufficiently plausible" to survive a motion to dismiss.  *Peruto v. Timbertech Ltd.*, 2015 WL 8664276, at *4 (D.N.J. 2015).  The Amended Complaint easily clears this low bar.

44.     The Amended Complaint alleges that in July 2021, Thadani (who acted at all times on behalf of all the Trive Defendants) spearheaded a leveraged dividend that saddled Lucky Bucks with $535 million in debt, which shortly thereafter was increased to $605 million.  FAC ¶¶ 110-

16.  $200 million of the proceeds from that financing was used to pay a dividend to Trive and other insiders, thus increasing Lucky Bucks' liabilities by that amount without any offsetting asset.  *See id.* ¶ 113.  The Amended Complaint further alleges that around the time that transaction was completed, Lucky Bucks was coming under substantial financial strain due to higher-than-projected attrition and underperformance of recently acquired locations.  *Id.* ¶ 117.  Thadani and his cohorts at Trive, who received real-time information showing that Lucky Bucks' business was in steep decline (*id.* ¶ 32),[14] became desperate to "take cash out of the business," and accordingly concocted a plan to create a new holding company (Holdings) that could borrow in excess of the limits imposed by Lucky Bucks' existing credit agreement, under which Lucky Bucks had already incurred as much debt as it possibly could.  *Id.* ¶¶ 29, 33, 118-22, 202-03.  Holdings had no business or operations of its own and no assets other than an equity stake in Lucky Bucks, and thus could not pay down its own debts unless Lucky Bucks was able to grow and manage its own substantial liabilities.  *Id.* ¶¶ 205, 209-10.  To the extent that Lucky Bucks could not do so and also generate sufficient cash to repay the Notes, Holdings would be insolvent.  *Id.* ¶ 8.

45.    The Amended Complaint further alleges that Thadani "knew performance was declining and tried to paper it over by showing only pro forma numbers" while trying to market the Notes in the fall of 2021.  *Id.* ¶¶ 32, 173.  And it also alleges that at this time, Thadani "recognized that growth would need to slow down, given that ***the business was running out of money*** to fund further acquisitions."  *Id.* ¶ 169 (emphasis added).  Indeed, just ten days after the

---

[14]  The Trive Defendants' assertion that the "Amended Complaint alleges only two instances of Trive's supposed receipt of 'real-time information'" is unavailing.  Mot. ¶ 46.  The Amended Complaint alleges that Trive's "Co-Founder and Managing Partner, Conner Searcy, was registered with the GLC" and thus "received live information from the GLC regarding COAM renewals and losses."  FAC ¶ 104.  That the Amended Complaint then also cites two specific examples of Trive receiving such "live information" does not detract from the general allegation that Searcy was registered with GLC and received live updates at all relevant times, which he then shared with Thadani.  *Id.* ¶¶ 106, 108.  Notably, Trive's prior counsel attempted to obfuscate Searcy's involvement in discovery negotiations and did not identify him as a member of the investment team.  *See* ¶ 24, *supra*.

first Notes issuance in November 2021, Thadani confessed that he was "admittedly skittish" about Lucky Bucks' "financial profile" and was concerned about "how lenders and holdco investors are going to respond" when they found out that Lucky Bucks could no longer pursue the growth strategy that was essential to its success. *Id.* ¶ 170. And as CEO of Lucky Bucks, Sekhri was intimately involved in the management of Lucky Bucks' business and was likewise aware of its steep decline as well as its inability to execute its core business strategy. *See* FAC ¶¶ 19, 33, 84, 91, 103-06, 131, 147-52, 156, 164-65, 167-71, 172-76. Yet despite these flashing indicators that Lucky Bucks' business was failing and that its business strategy was no longer viable, Thadani (and Trive's board appointees, Sekhri and Boyden) caused Holdings to incur $250 million in debt, all of which was structurally subordinated to Lucky Bucks' own considerable indebtedness, and which would require payments of nearly $16 million per year starting in 2024 and up to $22.4 million per year in 2028. *Id.* ¶¶ 14, 209. Thus, in the span of six months, Holdings and Lucky Bucks on a consolidated basis incurred $450 million of new obligations, the proceeds of which did not stay with the business but instead went to line shareholders' pockets at the same time that Thadani and Sekhri knew the underlying business was rapidly failing. *Id.* ¶¶ 9, 19-20, 113, 206-09.[15] Notably, Thadani's machinations resulted in Trive pulling ***$450 million*** out of Lucky Bucks, months after Thadani's colleague at Trive noted that they "***need to put capital in.***"[16]

---

[15] The Trive Defendants assert that the Amended Complaint "all but admits that TCM and Mr. Thadani may 'not have known about Lucky Bucks' declining performance." (Mot. ¶ 46). That is a gross mischaracterization of the pleading. In so arguing, the Trive Defendants simply ignore all of the allegations just described setting forth Thadani's knowledge of Lucky Bucks' declining financial performance and the steps he took to cover it up. Incredibly, the Trive Defendants base this supposed "admission" on a single allegation in the Amended Complaint that is expressly stated in the alternative. Specifically, the Amended Complaint alleges, in the alternative, that if Thadani somehow were not aware of Lucky Bucks' declining performance, then his representations as to his and Trive's involvement in the business were materially false. *See* FAC ¶ 189.

[16] *See* Firsenbaum Decl. Ex. T, D.I. 67, at 613.

46.     Taken together, these allegations support a plausible inference that Thadani and Sekhri knew, as the Amended Complaint alleges, that "[t]here was no reasonable prospect of Lucky Bucks generating sufficient cash to pay back its debts and $250 million plus accrued interest by the time the Notes came due." *Id.* ¶ 210.  Nothing more is required to allege knowledge of insolvency at the pleadings stage.  *See N. Am. Cath. Educ. Programming Found. Inc. v. Gheewalla,* 930 A.2d 92, 98 (Del. 2007) (defining insolvency as "(1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business.").[17]

47.     And both Thadani's and Sekhri's knowledge of Holdings' insolvency can be imputed to the Trive Defendants that received the Holdings Distributions under basic principles of agency law.  *See In re Color Tile Inc.*, 475 F.3d 508, 513 (3d Cir. 2007) ("It is a rule of agency that the knowledge of the agent is imputed to the principal in connection with any transaction conducted by the agent in behalf of his principal.").  Per the Amended Complaint, Thadani was the "lead TCM partner on TCM's Lucky Bucks team" and "acted on [the Trive Defendants'] behalf at all relevant times."  FAC ¶ 43.  Sekhri, for his part, was Trive's appointee to Holdings' board of managers, in which capacity he was subject to thorough control by Trive and was required to execute an agreement acknowledging as much.  *See id.* ¶¶ 3, 84-89, 124-25, 127, 338.  Sekhri also

---

[17]  The Trive Defendants claim that Trive's May 2021 valuation of Lucky Bucks, which showed that Lucky Bucks had $352 million in equity value, "strongly undercuts any allegation that the Trive Defendants believed Lucky Bucks was insolvent."  Mot. ¶ 46.  But that valuation was conducted *before* Lucky Bucks and Holdings incurred $450 million of new indebtedness and paid out the proceeds of that financing to shareholders.  Even if the value of Lucky Bucks remained static, these actions would be sufficient to wipe out all of Lucky Bucks' equity value and render both Lucky Bucks and Holdings insolvent.  But the Amended Complaint does not allege that Lucky Bucks' business remained static; to the contrary, it alleges that Lucky Bucks' business materially declined over the course of 2021.  *See, e.g.,* FAC ¶¶ 19, 32.  The Trive Defendants' assertion that Lucky Bucks' value grew over this period because it had "acquired many new COAM locations that had increased its pro forma EBITDA" (Mot. ¶ 74) ignores the Amended Complaint's allegations that those locations were performing far worse than projected and that Lucky Bucks had systematically overpaid for those locations in part due to Damani and Kassam's scheme.  *See* FAC ¶¶ 19, 97, 100, 144, 206, 258.  The Trive Defendants' factual assertions to the contrary must accordingly be disregarded.

approved the Holdings Distributions pursuant to the Trive Defendants' plan and at their behest. *Id.* ¶¶ 14, 338. Finally, Sekhri served as CEO of Southern Star—which received approximately $166 million of the Holdings Distributions—and his knowledge of Holdings' insolvency can be imputed to that entity as well. *See In re AMC Invs., LLC*, 637 B.R. 43, 58 (Bankr. D. Del. 2022) ("It is the general rule that knowledge of an officer or director of a corporation will be imputed to that corporation. This basic principle of agency law applies with equal force to LLCs."). The Amended Complaint thus adequately alleges that the Holdings Distributions rendered Holdings insolvent and that the Trive-affiliated recipients of those distributions (Southern Star, TCFIII Luck SPV LP, and TCFIII Luck Acquisition LLC) had knowledge of such insolvency through Thadani and Sekhri.

48.    Finally, contrary to the Trive Defendants' assertions (Mot. ¶ 44), the Amended Complaint specifically alleges knowledge as to Thadani and Sekhri, and does not merely lump them in with other defendants. That the Amended Complaint alleges that other defendants also had knowledge of Holdings' insolvency does not amount to impermissible "group pleading" or detract from the allegations that are specific as to Thadani and Sekhri and that may be imputed to the Trive entities on whose behalf they acted.[18]

### III.    The Statutory Claims Are Not Impermissibly Extraterritorial

49.    The Trive Defendants argue that the Trustee's claims under Georgia's securities fraud statute, O.C.G.A. § 10-5-1 *et seq.*, Georgia's anti-racketeering ("RICO") statute, *id.* § 16-

---

[18]  The Trive Defendants' assertion that "group pleading" is categorically prohibited (Mot. ¶ 44) is both irrelevant and incorrect. It is irrelevant because the Amended Complaint specifically alleges knowledge on the part of Thadani and Sekhri, and that knowledge may be imputed to the rest of the Trive Defendants for the reasons set forth above. The Trive Defendants' assertion is incorrect because although group pleading "may in many instances be improper," that is not always the case; for example, "if a plaintiff alleges that multiple defendants engaged in the same conduct, the plaintiff may properly make allegations against Defendants' collectively." *Kashef v. BNP Paribas SA*, 2021 WL 1614406, at *2 (S.D.N.Y. Apr. 26, 2021).

14-4, *et seq.*, and the Delaware Securities Act, 6 *Del. C.* § 73-101 *et seq.*, (Counts VI-VIII) fail because the application of these statutes to the Trive Defendants' conduct is impermissibly extraterritorial.  Mot. ¶¶ 47, 56.[19]  But the transactions orchestrated by the Trive Defendants that gave rise to the Trustee's securities fraud and RICO claims occurred substantially in Georgia, and thus Georgia's securities fraud and RICO statutes apply.  The Delaware Securities Act can also be applied to the Trive Defendants without running afoul of any presumption against extraterritoriality.  That statute prohibits employing a "device, scheme or artifice to defraud" in connection with the "offer, sale or purchase of securities."  6 *Del. C.* § 73-201(1).  The Amended Complaint alleges that the Trive Defendants formed Holdings as a Delaware LLC and used it as a device to defraud the Noteholders in connection with the offer or sale of the Notes).  Accordingly, the application of the Delaware Securities Act to the Trive Defendants' conduct is appropriate.

A.    **The Georgia Statutory Claims Are Not Impermissibly Extraterritorial**

50.    Because key elements of the offer, purchase, and sale of the Notes occurred in Georgia, the Trustee's Georgia securities fraud claim is not improperly extraterritorial.  To determine whether application of a law is extraterritorial, courts look at "the territorial scope of the transaction that [the state] has attempted to regulate."  *A.S. Goldman & Go., Inc. v. N.J. Bureau of Stat.*, 163 F.3d 780, 786 (3d Cir. 1999).  As the Trive Defendants' own authority makes clear, a transaction may occur in multiple states.  *Id.* at 787 ("A contract between [an individual] in New Jersey and a buyer in New York does not occur 'wholly outside' New Jersey, just as it does not occur 'wholly outside' New York.").  Accordingly, "[i]t is possible for a transaction to implicate

---

[19]  The Trive Defendants do not argue that the application of Texas's securities fraud statute, Tex. Gov't Code Ann. § 4001.001 *et seq.*, would be improperly extraterritorial.  *See* Mot. ¶ 56.  Accordingly, the Trive Defendants' extraterritoriality arguments, even if credited, provide no basis to dismiss Count VI as applied to the Texas securities law claim.  Similarly, the Trive Defendants have not argued that the application of Delaware's unlawful dividend statute would be extraterritorial, notwithstanding that they do make such an argument as to Delaware securities law.

blue sky laws of multiple states." *Swipe Acquisition Corp. v. Krauss*, 2021 WL 282642, at \*4 n.8 (Del. Ch. Jan. 28, 2021) (noting that application of Delaware's or California's securities law does not necessarily preclude application of the other state's securities law).

51.     Georgia's securities fraud statute, O.C.G.A. § 10-5-50 *et seq.*, prohibits fraud in connection with the "offer, sale, or purchase of securities."  There is nothing extraterritorial about applying that statute on the facts of this case, where key elements of the offer, purchase, and sale of the Notes occurred in Georgia.  The Amended Complaint alleges that Kassam, in his capacity as manager of Holdings, voted to approve the transaction with the Noteholders while in Georgia. FAC ¶ 339.  Kassam while in Georgia executed several critical documents to facilitate the Notes issuance, including a written consent to the NPA and Holdings' Incumbency Certificate. *Id.* ¶ 193. Boyden, Trive's hand-picked appointee to the Holdings Board of Managers, and who signed an agreement acknowledging Trive's near-complete control over Holdings and himself, executed a term sheet setting forth the terms of the Notes with the Noteholders while in Atlanta. *Id.* ¶¶ 15 n.3, 89, 154.  Boyden was also in Georgia from August 23 to September 1, 2021, when multiple diligence calls between the Trive Defendants and Noteholders were held. *Id.* ¶ 154.  Throughout October and November 2021, numerous Defendants conducted business on behalf of Lucky Bucks from Georgia, including the negotiation and execution of the NPA and issuance of the Notes themselves. *See id.*

52.     Notwithstanding the Amended Complaint's robust factual allegations concerning conduct and representations relating to the purchase and sale of the Notes in Georgia, the Trive Defendants argue that it would be improperly extraterritorial to apply Georgia law to their conduct. Mot. ¶ 55.  But unlike personal jurisdiction, extraterritoriality is not about the status of a particular defendant.  Rather, it is a limitation on applying the law to events that occur "wholly outside of

[the state's] borders." *A.S. Goldman & Co.*, 163 F.3d at 784; *see, e.g.*, *Auld v. Forbes*, 848 S.E.2d 876 (Ga. 2020) (declining to apply Georgia's wrongful death statute "for a death that occurred in Belize"). But here, the Trustee is "not seeking extraterritorial application of [a] Georgia [ ] statute." *Savannah Motorcars, LLC v. Volkswagen Grp. of Am. Inc.*, 2020 WL 12688368, at *2 (S.D. Ga. 2020). Rather, the Trustee "seek[s] application of a Georgia statute to a Georgia transaction." *Id.* And indeed, courts have recognized rules against the extraterritorial application of statutes do not require that "each defendant alleged to be involved in a fraudulent scheme" engage in conduct in the jurisdiction at issue. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012). Because key pieces of the Notes issuance occurred in Georgia, and the Trive Defendants participated in that transaction, Georgia securities law may be applied to the Trive Defendants.

53. The same conclusion holds for the Trustee's Georgia RICO claims. Georgia courts look to judicial decisions interpreting the similarly-worded federal RICO statute. *Aquino v. Mobis Ala., LLC*, 739 F. Supp. 3d 1152, 1191 (N.D. Ga. 2024) ("Because the Georgia RICO Act was modeled after the federal statute, [Georgia courts have] found federal authority persuasive in interpreting the Georgia RICO statute."). In analyzing federal RICO claims, the Supreme Court has held that extraterritoriality is "a context-specific inquiry that turns largely on the particular facts alleged in a complaint," including, among other things, the location of "the racketeering activity that directly caused" the injury. *Yegiazaryan v. Smagin*, 599 U.S. 533, 543-44 (2023); *see also Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 707 (3d Cir. 2018) (holding that extraterritoriality inquiry requires "consideration of multiple factors," including "the location of the activities giving rise to the underlying dispute"). In *Yegiazaryan*, the Court held that "[m]uch

of the alleged racketeering activity that caused the injury occurred in the United States," and thus the claims were not extraterritorial.  *Id.* at 545.

54.    Lower federal courts have expressly relied on *Yegiazaryan* in applying both the federal and Georgia RICO statutes.  *See, e.g., Aquino*, 739 F. Supp. 3d  at 1219-20 (finding Georgia RICO statute applicable notwithstanding that injuries occurred while the plaintiffs were still in Mexico where "alleged scheme … was devised, initiated, and carried out through acts and communications initiated in Georgia"); *Ruiz v. Sewon Am., Inc.*, 766 F. Supp. 3d 1251, 1291 (N.D. Ga. 2025) (finding Georgia RICO statute applicable where complaint alleged injury from "racketeering activity either taken in Georgia or directed from Georgia" notwithstanding that injury was also felt abroad); *e.g.,* Tatung *Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1157 (C.D. Cal. 2016) (federal RICO claims were not impermissibly extraterritorial when "many of the actions that constitute part of the RICO scheme took place in California"); *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, 2024 WL 4008120, at *16 (S.D.N.Y. Aug. 30, 2024) (foreign plaintiff adequately alleged a domestic injury because "most of [the] racketeering activities," including the making of fraudulent statements, were alleged to have "occurred in the United States"). Notably, these decisions do not require that *every* act giving rise to plaintiff's RICO claims occur in the United States or Georgia to support the invocation of the applicable RICO statute.

55.    Here, as described above, *supra* ¶ 51, much of the Defendants' racketeering activities occurred in or was centered around Georgia.  Under the guidance provided by the Supreme Court in the federal RICO context, this suffices to support the application of Georgia RICO to the Trive Defendants' conduct.  The Trive Defendants' principal argument against this conclusion is their assertion that "to assert claims under Georgia law against the Trive Defendants (as opposed to other defendants), the Trustee must tie the Trive Defendants themselves (not

merely other defendants) to Georgia." Mot. ¶ 55.  In support of this sweeping proposition, the Trive Defendants drop a footnote (Mot. ¶ 55 n.15) to two out-of-circuit cases, both over 25 years old, and neither of which comes close to supporting this claim.  The first case merely provides that a court "may" apply "[t]he law of different states … to different defendants." *ABB Daimler-Benz. Transp. (N. Am.), Inc. v. Nat'l R.R. Passenger Corp.*, 14 F. Supp. 2d 75, 88 (D.D.C. 1998). It simply does not say, as the Trive Defendants would have it, that a particular defendant's actions must be tied to a specific state for that state's law to apply to that defendant.  The second case concluded that "*Texas choice-of-law rules* mandate a separate conflicts analysis … for each defendant's conduct."  *Jaurequi v. John Deere Co.*, 986 F.2d 170, 173 (7th Cir. 1993).  To state the obvious, this Court is not bound by Texas choice-of-law rules.

56.     At bottom, this case centers around the Trive Defendants' and other Defendants' actions towards and representations concerning Lucky Bucks, a company with its principal place of business in Georgia.  An overwhelming amount of the conduct that gave rise to the Trustee's claims originated in that state.  In light of these realities, it strains credulity that the application of Georgia statutes would somehow be improperly extraterritorial merely because the Trive Defendants are based in Texas.

57.     For similar reasons, the Constitution's Dormant Commerce Clause does not proscribe the application of Georgia law.  While the clause prohibits states from "regulat[ing] commerce that takes place wholly outside of its borders," *A.S. Goldman & Co,* 163 F.3d at 785, the Amended Complaint alleges numerous acts related to the issuance of the Notes and payment of the Holdings Distributions that occurred in Georgia.  *See* ¶ 51, *supra*.  Application of Georgia's statutes thus "regulates the instate portion of an interstate transaction" and furthers Georgia's

"legitimate in-state interests" in enforcing its securities fraud and RICO laws, and thus "does not violate the dormant commerce clause." *Id.* at 789.

**B.      The Delaware Securities Fraud Claim Is Not Impermissibly Extraterritorial**

58.      Application of Delaware law to the Trive Defendants is also permissible. The Delaware Securities Act makes it "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly … [t]o employ any device, scheme or artifice to defraud."  6 *Del. C.* § 73-201.  The statute further provides that "[i]n interpreting this section, courts will be guided by the interpretations given by federal courts to similar language set forth in § 17(a) of the Securities Act of 1933 … and Rule 10b-5 … promulgated under the Securities Exchange Act of 1934."  *Id.*  Accordingly, federal court cases construing the federal securities laws aid in discerning the meaning and scope of the Delaware Securities Act.

59.      Like the Delaware Securities Act, Rule 10b-5 makes it unlawful, "in connection with the purchase or sale of any security," to "employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a).  The U.S. District Court for the Southern District of New York has explained that this provision "impose[s] primary liability on any person who … [uses or employs] a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 502 (S.D.N.Y. 2005).

60.      This federal-court interpretation of Rule 10b-5 makes the proper application of the Delaware Securities Act to the facts of this case straightforward and dispels the Trive Defendants' claim that Delaware securities law cannot regulate their conduct.  The Amended Complaint alleges that the Trive Defendants formed Holdings—a Delaware LLC—"for the specific purpose of issuing the Notes and defrauding the Noteholders into purchasing $250 million of Notes that would be used to line the Defendants' own pockets."  FAC ¶ 371; *see id.* at ¶¶ 35, 341.  Accordingly, the

Amended Complaint alleges that the Trive Defendants created a Delaware LLC and used that LLC as "a manipulative or deceptive device … intended to mislead investors." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 502. That is exactly what the Delaware Securities Act prohibits. There is accordingly nothing extraterritorial about applying the Delaware Securities Act to the Trive Defendants, who violated the Act by choosing Delaware as the place to create an LLC for the purpose of defrauding the Noteholders.[20]

## IV.    The Complaint's Statutory And Common Law Claims Are Adequately Pleaded

### A.    The Complaint Adequately Alleges Falsity And Justifiable Reliance

#### 1.    The Alleged Misstatements Were False Statements Of Fact Or Otherwise Actionable Misrepresentations

61.    The Trive Defendants assert that the Amended Complaint's statutory and common law fraud claims (Counts VI-X) fail "because they rely on statements by the Trive Defendants that either were demonstrably true, or were future, subjective forecasts or mere 'puffery' that … cannot support a claim of misrepresentation." Mot. ¶ 59. But as set forth below, the Amended Complaint alleges numerous representations that are provably false. And even for statements that could be considered opinions, estimates, or projections, the Amended Complaint plausibly alleges that the Trive Defendants made those statements with an intent to deceive, and thus those statements are actionable. *See In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 458 (Bankr. D. Del. 2006)

---

[20]  The Trive Defendants' authorities (at Mot. ¶ 57) are inapposite. Those cases merely stand for the proposition that the Delaware Securities Act does not apply when all of the relevant fraudulent acts occurred outside of Delaware merely because the company that was the subject of the fraud claims happened to be based in Delaware. *See FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 857 (Del. Ch. 2016) (dismissing claim under the Delaware Securities Act because "none of the allegedly underlying fraudulent business practices or violations [was] alleged to have occurred in Delaware"); *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1997) (declining to apply the Delaware Securities Act to "an alleged fraud in Pennsylvania"). Unlike in those cases, the incorporation of Holdings in Delaware is not incidental to the fraud alleged in the Amended Complaint; rather, the Amended Complaint alleges that the Trive Defendants incorporated Holdings in Delaware as a "device, scheme or artifice to defraud" the Noteholders. 6 *Del. C.* § 73-201; *see* FAC ¶¶ 341, 374. The notion that the Delaware Securities Act cannot permissibly be applied to the Trive Defendants in light of these allegations is untenable and would render the Act toothless.

(party may be liable for fraud if it made "false statements with an intent to deceive … regardless of whether the statements expressed opinions, estimates, or projections of the future"); *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *13 (Del. Ch. Jan. 26, 2024) ("False forecasts cannot be considered mere puffery or future predictions if they were made with an intent to deceive, even if the statements were presented as opinions, estimates or projections."). This is precisely the type of deceptive conduct alleged in the Amended Complaint. The Trive Defendants cannot escape liability by ignoring these basic legal precepts.

62.     ***First, Trive misrepresented the lack of attrition and stability of Lucky Bucks' location contracts.*** The Amended Complaint alleges that Thadani caused Houlihan Lokey to misrepresent Lucky Bucks' attrition rate in the CIM. FAC ¶ 131. Specifically, because the CIM represented that Lucky Bucks had an 86% contract renewal rate and that just 4% of its contracts were up for renewal in 2021, the CIM (and Thadani's presentation thereof) left Noteholders with the impression that Lucky Bucks would lose approximately 1% of its locations in 2021, even though the then-known true attrition rate was many times higher. *Id.* ¶¶ 24, 148, 159. Thadani also represented that Lucky Bucks' revenue would be stable because its location contracts were long-term and difficult to get out of, notwithstanding Thadani's knowledge that Lucky Bucks would routinely file "no challenge" notices, allowing location owners to quickly switch to competing license holders. *Id.* ¶¶ 104, 138, 146, 163.

63.     The Trive Defendants assert that because the "historical data" included in the CIM was not false, the "implied" attrition rate is not actionable. Mot. ¶ 63. This argument ignores that "fraud does not consist merely of overt misrepresentations, but may also occur through the deliberate concealment of facts, or by silence in the face of a duty to speak." *Gaffin v. Teledyne, Inc.*, 661 A.3d 467, 472 (Del. 1992). Such a duty exists when a statement, though "facially true,"

nevertheless creates "a false impression as to the true state of affairs." *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *15 (Del. Ch. Sept. 10, 2018). In such circumstances, the statement is "an actionable misrepresentation" unless the speaker "provide[s] qualifying information to cure the mistaken belief." *Id.* Because Thadani did not provide any such "qualifying information," the CIM's implied attrition rate was misleading and is actionable. The Trive Defendants' other argument that the attrition rate was "at most, a *prediction about the future*" (Mot. ¶ 63) is also unavailing because "[t]he uncertain nature of a future projection does not excuse a knowingly false projection, where it is reasonably conceivable that the [speaker] made the false projection with an intent to deceive." *Labyrinth*, 2024 WL 295996, at *13. That is exactly what the Amended Complaint alleges. *See* FAC ¶ 9.[21]

64. **Second, Trive used pro forma EBITDA figures to conceal Lucky Bucks' declining performance.** The Amended Complaint details how Thadani touted Lucky Bucks' *pro forma* EBITDA numbers "intentionally to hide [Lucky Bucks'] poor performance in the second half of 2021" from the Noteholders. *Id.* ¶¶ 9, 30(d), 32, 140, 173, 176. In other words, when marketing the Notes in the fall of 2021 and January of 2022, Thadani deliberately showed Noteholders only Lucky Bucks' *pro forma* EBITDA for the period ending March 31, 2021, even

---

[21] The Trive Defendants' attempt to shift blame for the misrepresentations in the CIM to Houlihan Lokey is a non-starter. Setting aside the fact that the Amended Complaint alleges that Houlihan prepared the CIM "at the direction and with the assistance of the Trive entities," including Thadani, and that it relied "exclusively on what it was fed by insiders, including Thadani [and] Sekhri" (FAC ¶¶ 9, 131), it is black-letter law that "a principal is liable for an agent's misrepresentation that cause[s] pecuniary loss to a third party, when the agent acts within the scope of [its] apparent authority." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) (citing Restatement (Second) of Agency §§ 249, 262 (1957)). Here there can be no doubt that Houlihan, which Trive engaged to prepare the CIM and market the Notes, was Trive's agent and acting in its apparent authority when presenting to investors. Even if it were not, the Amended Complaint alleges that Thadani adopted the misrepresentations in the CIM when presenting to investors, and that Sekhri also "supported Thadani's narrative" on calls with investors. *See, e.g.*, FAC ¶¶ 148, 150. The Trive Defendants' other argument that the Trustee is suggesting that Trive "compel[lled]" Houlihan Lokey to commit fraud (Mot. ¶ 62) is a transparent straw-man. Financial advisors routinely rely on management or private equity sponsors to furnish truthful information for presentations. The Trustee is not alleging that Trive somehow "compel[lled]" Houlihan Lokey to commit fraud, but rather that Trive, through its edits to and direction of the preparation of the CIM, ensured that it included misleading information.

though he knew that based on more recent results, the *pro forma* EBITDA figure no longer presented an accurate picture of the business.  The fact that the figure was labeled "*pro forma*" and may have been represented as such (Mot. ¶ 65) does not make Thadani's statements inactionable, provided that it "cause[d] a false impression as to the true state of affairs," as the Amended Complaint alleges.  *Luster v. PuraCap Lab'ys., LLC*, 2021 WL 7209537, at \*6 (D. Del. Dec. 1, 2021).  The same is true of Thadani's misrepresentations of Lucky Bucks' purported "run-rate" EBITDA of $115 million, which was "materially overstated due to incorporating pre-acquisition EBITDA of locations that failed to perform."  FAC ¶¶ 164-65.[22]

65.    ***Third, Trive misrepresented Holdings' solvency and Boyden's investigation into its solvency.***  As set forth above, the Amended Complaint adequately alleges that the Holdings Distributions rendered Holdings insolvent.  *See* ¶¶ 44-46, *supra*; *cf.* FAC ¶¶ 204-211, *with In re Essar Steel Minn. LLC*, 2019 WL 2246712, at \*6 (Bankr. D. Del. May 23, 2019), *and Miller v. Mott*, 2023 WL 6467368, at \*6 (Bankr. D. Del. Oct. 4, 2023).  The Amended Complaint further alleges that the Trive Defendants caused Holdings to issue the Notes and to falsely represent in the NPA that Holdings was and would remain solvent following the Holdings Distributions.  FAC ¶¶ 14, 179.  Separate from the underlying misrepresentation as to Holdings' solvency, the Amended Complaint alleges that Boyden—a Trive-appointed member of Holdings' Board of Managers—signed a solvency certificate attesting that he had made, or caused to be made, "such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein," yet never conducted or requested any such examination or

---

[22]  In relation to their misleading use of pro forma numbers, the Trive Defendants assert that the Amended Complaint mischaracterizes an email from Trive employee Connor Anderson to himself, in which he wrote: "Current financials [*sic*] (bs) … Overview of why we need to put capital in."  *See* Decl. of Ross E. Firsenbaum in Supp. of Trive Defs.' Mot. to Dismiss Pl's Amended Complaint at Ex. T, D.I. 67.  Whether Mr. Anderson's note "(bs)" reflected his belief that Lucky Bucks' financials were "bullshit" or was, as the Trive Defendants claim, merely an abbreviation for "balance sheet" is clearly a fact question that cannot be resolved on the pleadings.

investigation.  *Id.* ¶¶ 179-80.  The Trive Defendants assert that the Trustee "alleges no facts showing that this statement is false."  Mot. ¶ 68.  But the Amended Complaint cites emails from Lucky Bucks management strongly supporting an inference that ***no solvency analysis of any kind*** was undertaken.  *See* FAC ¶ 180.  As such, Boyden's representation that he had performed, or caused to be performed, an "examination or investigation" that enabled him to express an "informed opinion" on Holdings' solvency was clearly false.  Trive's other argument that the Amended Complaint "does not allege that [the Trive Defendants] employed (or otherwise controlled) [Boyden]" (Mot. ¶ 68) ignores that the Amended Complaint alleges that Trive placed Boyden on the board of Holdings, required him to execute an agreement acknowledging Trive's control over all material transactions, and that he approved the issuance of the Notes at Trive's direction.  *See* FAC ¶¶ 49, 89, 356.  Boyden was acting at Trive's direction and in pursuit of its interests when he falsely certified Holdings' solvency, so Trive is responsible for his misrepresentation.  *See Am. Tel. & Tel. Co. v. Winback & Conserve Program,Inc.*, 42 F.3d 1421, 1437-38 (3d Cir. 1994).

66.     ***Fourth, Trive misrepresented Lucky Bucks' relationship with the GLC.***  In the CIM and in diligence calls with investors, Thadani and Sekhri touted Lucky Bucks' purportedly "strong relationship" with the GLC and that the GLC saw Lucky Bucks as a "model COAM operator from the State's perspective."  *Id.* ¶¶ 141-42, 182.  Thadani and Sekhri further represented that Lucky Bucks was in compliance with all GLC orders and regulations, and as such could even benefit from increased enforcement by the GLC, which would disproportionately harm its competitors.  *Id.* ¶¶ 182-83.

67.     These representations were false.  The GLC was closely watching Lucky Bucks due to prior regulatory violations by its founder, Anil Damani, who was banned from having any

formal position or operational control over the business by the GLC in 2020.[23]  *Id.* ¶ 184.

Notwithstanding that ban, Damani maintained his grip on Lucky Bucks by actively directing the

company's M&A activity—a fact of which Thadani and Sekhri were well aware and actively

facilitated.  *Id.* ¶¶ 13, 45.  Meanwhile, members of Lucky Bucks' management (with whom

Thadani was in constant communication) stated in February 2021 that the GLC regulatory attorney

responsible for overseeing Lucky Bucks disliked the company and was "starting to stack the deck

to drop a bomb on us" when Lucky Bucks' COAM master licenses were up for renewal.  *Id.* ¶ 184.

Indeed, in November 2021, while the Notes were being marketed, Lucky Bucks management even

tried to arrange a call with the Georgia governor's office to express concerns about selective

enforcement *against* Lucky Bucks by the GLC.  *Id.* ¶ 185.  Around the same time, Lucky Bucks

management privately acknowledged that the GLC "just hates us" and "is not happy with us"—

belying Thadani's and Sekhri's repeated representations that the company had a "strong

relationship" with the GLC and could even benefit from increased enforcement.  *Id.* ¶¶ 182, 186.

68.    Trive downplays these blatant misrepresentations about Lucky Bucks' relationship

with the GLC as "inactionable puffery."  Mot. ¶ 72.  But even "[s]tatements that are opinions" are

"actionable under the securities laws … if the speaker does not genuinely or reasonably believe

them."  *Appel v. Berkman*, 180 A.3d 1055, 1060 n.25 (Del. 2018).  And similarly, "statements [ ]

presented as opinions" "cannot be considered mere puffery … if they were made with an intent to

deceive."  *Labyrinth*, 2024 WL 295996, at *13.  The facts alleged in the Amended Complaint

about Lucky Bucks' failure to comply with the GLC's order banning Damani from exercising

control over the business, its being singled out for adverse enforcement action by the GLC, and

---

[23]  Contrary to the Trive Defendants' assertion (Mot. ¶ 69), this broad prohibition went beyond merely prohibiting
Damani from serving as an officer of the company.  *See* FAC ¶ 78.

management's acknowledgement that the GLC "just hates us" and "is not happy with us" (FAC ¶¶ 184-86) are more than sufficient to support a reasonable inference that Thadani and Sekhri cannot possibly have genuinely believed that Lucky Bucks had a "strong relationship" with the GLC, was in compliance with all of its orders, and could only benefit from increased enforcement. Moreover, the Amended Complaint expressly alleges that Thadani and Sekhri made these statements with the intention of misleading the Noteholders. *See id.* ¶¶ 12, 187. Thadani's and Sekhri's misrepresentations as to Lucky Bucks' relationship with the GLC accordingly are actionable even if "presented as opinions." *Labyrinth*, 2024 WL 295996, at *13.

69.     ***Fifth, Trive misrepresented the strength of Lucky Bucks' "farm team."*** Thadani's and Sekhri's statements about the professionalism, experience, and integrity of its "farm team" are actionable for similar reasons. While Thadani and Sekhri presented the farm team as legitimate and experienced sales people who would drive the company's future M&A group, they were in fact relatives and friends of Damani—who was supposed to have no involvement in Lucky Bucks' operations—and management. *See* FAC ¶¶ 10, 165, 265-67. Members of the farm team were also involved in Damani and Kassam's scheme to strip Lucky Bucks of its assets and cause it to purchase COAM locations at inflated valuations and thus, far from facilitating the company's growth, were actively abetting its demise. *See id.* ¶¶ 27, 146, 267. These allegations, at a minimum, raise a question of fact as to whether Thadani and Sekhri genuinely believed that the farm team was, as they represented it, a group of seasoned professionals that would drive Lucky Bucks' growth, making dismissal at the pleadings stage improper. *See, e.g.*, *Phage Diagnostics, Inc. v. Corvium, Inc.*, 2020 WL 1816192, at *7 (Del. Super. Mar. 9, 2020) ("Viewing the facts under the light most favorable to Plaintiff, the Court concludes that there exists, at a minimum, a

question of fact as to whether Defendant's statements were affirmative statements or mere puffery.").

70. ***Sixth, Trive misrepresented Lucky Bucks' ability to continue growing through M&A activity***.  The Amended Complaint alleges Thadani misrepresented the strength of Lucky Bucks' M&A pipeline on investor calls on August 24, November 2, and November 22, 2021.  FAC ¶¶ 139-40.  It also alleges that Thadani knew these statements were false when he made them because Thadani knew that Lucky Bucks was "running out of money to fund further acquisitions" and thus "growth would need to slow."  *Id.* ¶ 169-70.  Whether these statements were "predictions about future revenues" (Mot. ¶ 73) is beside the point because, as explained, "predictions [that] were knowingly false when made" are actionable.  *Lieberman v. BeyondTrust Corp.*, 2020 WL 1815547, at *3 (D. Del. Apr. 9, 2020).  Because Thadani knew that Lucky Bucks would be severely restricted in pursuing future M&A opportunities while representing otherwise to the Noteholders, his predictions of future M&A activity fueling growth were "knowingly false when made."  *Id.*

### 2.     The Amended Complaint Adequately Alleges Justifiable Reliance

71.     In an attempt to shift blame to the victims of their fraud, the Trive Defendants next argue that even if the above misrepresentations were actionable, the Noteholders could not have reasonably relied on them.  Mot. ¶¶ 76-78.  This argument fails procedurally and substantively.

72.     As a threshold matter, "reasonable reliance is often a question of fact for the jury rather than a question of law for the court" and therefore is not suitable for resolution on a motion to dismiss.  *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 444-45 (S.D.N.Y. 2012) (cited at Mot. ¶ 77).  Such is the case here, where the Amended Complaint explains how and why each of the Noteholders relied on the Trive Defendants' representations and alleges that "there was no way diligence would have revealed material adverse information to any investor, including because management, TCM, and Holdings' bankers were attempting to dodge

40

diligence requests and hide harmful information."  FAC ¶¶ 132, 190.  Allegations of this nature

preclude a finding that the plaintiff could not have justifiably relied on the defendant's

misrepresentations.  *See, e.g.*, *Labyrinth*, 2024 WL 295996, at *19 (finding that "it would be

improper to dismiss reliance-based claims at this stage" where plaintiff alleged that its "failure to

uncover the fraud during its due diligence review was not unreasonable, as the fraud was … hidden

from [plaintiff] when its due diligence team went looking.").[24]

73.    The Trive Defendants' contention that the Noteholders should have conducted

more thorough due diligence also misconstrues reliance doctrine and ignores the Amended

Complaint's allegations.  "A failure to discover [ ] fraud through due diligence does not excuse it"

because "[t]here is no defense of contributory negligence to an intentional tort, including fraud."

*Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *24 (Del. Ch. Mar. 9, 2022).  Accordingly,

"the victim of a deliberate fraud is barred only if he has notice of the fraud, and so he need only

avoid *deliberate* or *reckless* risk taking."  *Id.*  The Amended Complaint in no way affirms the

Noteholders' awareness of the Trive Defendants fraud, and indeed describes in detail the Trive

Defendants' efforts to prevent the Noteholders from learning the truth.  FAC ¶¶ 132, 173-76, 385.

---

[24]  The Trive Defendants' authorities (at Mot. ¶ 77 n.25) show only that courts sometimes dismiss claims for lack of justifiable reliance at the pleadings stage when the complaint either fails to make *any* allegations supporting a plausible inference of justifiable reliance or includes allegations that directly undermine any such inference, neither of which is the case here.  *See Scott v. PNC Bank, Nat'l Ass'n*, 785 F. App'x 916, 921 (3d Cir. 2019) (plaintiff implied that "she knew" defendants' alleged misstatements were false); *Allison v. Round Table Inv. Mgmt. Co.*, LP, 447 F. App'x 274, 276 (2d Cir. 2012) (plaintiff offered no "plausible reason" why it was reasonable to rely entirely on a single oral representation); *Higgins v. 120 Riverside Boulevard at Trump Place Condo.*, 2022 WL 3920044, at *34 (S.D.N.Y. Aug. 31, 2022) (plaintiff "found evidence of a leak" yet "chose to rely on representations that there had been no recent or active leaks"); *Parker v. Learn the Skills Corp.*, 2006 WL 759693, at *7 (E.D. Pa. Mar. 23, 2006) (plaintiff failed to allege "any detrimental reliance on the representations made by [defendant]"); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 58 F. Supp. 2d 228, 258 (S.D.N.Y. 1999) (plaintiff "never venture[d] to actually plead facts that underlie [its] reliance"); *In re Evergreen Energy, Inc.*, 546 B.R. 549, 559 (Bankr. D. Del. 2016) (finding that plaintiff's "conduct, as alleged in the Complaint, was *inconsistent* with a claim of reliance").

74.     The Trive Defendants' attempt to point to the CIM's boilerplate disclaimers to defeat reliance (at Mot. ¶ 78) also fail.  To bar a fraud claim, a disclaimer "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiff[ ] challenge[s]."  *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d Cir. 1994). The CIM's generic, non-specific disclaimers (at Mot. ¶ 12) do not clear this bar.  The disclaimers "merely recited that the [Noteholders] were to conduct an independent evaluation of [Lucky Bucks]" and "provided no indication that there was existing information in [the Trive Defendants'] possession, but concealed from the [Noteholders], that contradicted the information that was provided."  *CP Kelco U.S., Inc. v. Pharmacia Corp.*, 2002 WL 31230816, at *8 (D. Del. Oct. 2, 2002).  These are precisely the kind of "vague or blanket (boilerplate) disclaimer[s]" consistently found to be insufficient to defeat reliance as a matter of law because they do not specifically address the particular misrepresentations at issue.  *Kline*, 24 F.3d at 489; *see In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) ("A cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil.").

### 3.     The Amended Complaint Sufficiently Alleges That The Trive Defendants Are Liable For Fraud By Omission

75.     The Trive Defendants claim that the Amended Complaint fails to identify with particularity what "omissions" made by the Trive Defendants were materially misleading and that, in any event, the Trive Defendants cannot be liable for fraud by omission because they owed no "duty to disclose" to the Noteholders.  Mot. ¶¶ 79-80.  Neither assertion is correct.  The Amended Complaint alleges that the CIM, and Thadani's presentation of the CIM, concealed Lucky Bucks' actual performance through the use of outdated and inflated EBITDA figures, as well as exceedingly low COAM attrition rates that were inconsistent with then-known information.  *See, e.g.*, FAC ¶¶ 9, 24, 32, 173, 206.  Although these statements were materially misleading in

themselves, they also misled through omission because Thadani failed to provide the Noteholders information relating to Lucky Bucks' current and more recent financial performance that would have corrected misperceptions based on the information provided.

76.     Under these circumstances, a duty to disclose exists.  The Trive Defendants simply ignore the well-established principle that a party has a "duty to disclose" any information necessary "to prevent statements actually made from being misleading." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *see W. Valley KB Venture, LLC v. ILKB LLC*, 2021 WL 4171918, at *7 (E.D.N.Y. Sept. 13, 2021) ("[O]nce a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").  And even the predicates for a duty posited by the Trive Defendants (at Mot. ¶ 80) are plainly satisfied here, as the the Trive Defendants (i) had superior knowledge of Lucky Bucks' business (as insiders familiar with its day-to-day operations and financials), (ii) that the information necessary to correct Thadani's misleading representations was not readily available to the Noteholders (because it was non-public and the Trive Defendants chose not to share it), and (iii) that the Trive Defendants knew that the Noteholders were acting on the basis of mistaken knowledge (because they chose not to disclose the information to procure the Noteholders' investment).

### 4.     The Amended Complaint's Claim For Negligent Misrepresentation Is Adequately Pleaded

77.     The Trive Defendants similarly argue that the Trustee's claim for negligent misrepresentation (Count X) fails because Trive had no duty to the Noteholders.  According to the Trive Defendants, such a duty only exists when the defendant is a fiduciary of the plaintiff or is in

the business of providing information for the guidance of others.  Mot. ¶ 81.  That is not the law.

Delaware law imposes a "pecuniary duty to provide accurate information" whenever "the

information provider expects to profit from the course of conduct in which he provides the

information." *Lieberman*, 2020 WL 1815547, at *4.  As such, "representations made by a party

in the course of a business transaction in which that party has a pecuniary interest often form the

basis of negligent misrepresentation claims." *Id.* at *5.  Georgia law likewise does not restrict

negligent-misrepresentation claims in the manner the Trive Defendants claim, and in fact has no

duty element at all.  *See First Bank of Ga. v. Robertson Grading, Inc.*, 761 S.E.2d 628, 638 (Ga.

2014).  And under New York law, a party may be liable for negligent misrepresentation if it has

"an awareness … that [its statement] is to be used for a particular purpose," "reliance by a known

party on the statement in furtherance of that purpose," and "some conduct by the maker of the

statement linking it to the relying party and evidencing its understanding of that reliance."

*Marcellus Const. Co., Inc. v. Vill. of Broadalbin*, 302 A.D.2d 640 (N.Y. App. Div. 3d Dep't

2003).[25]  All of these elements are clearly satisfied with respect to the Trive Defendants' furnishing

of information to the Noteholders for the express purpose of extending credit to Holdings.

### B.      The Amended Complaint's Fraud Allegations Satisfy Rule 9(b)

78.      The Trive Defendants' last-ditch argument that the Amended Complaint's detailed

allegations somehow fail to satisfy the particularity requirements of Rule 9(b) falls short.

"To satisfy Rule 9(b), a plaintiff must state the circumstances of the alleged fraud with sufficient

particularity to place the defendant on notice of the precise misconduct with which it is charged."

*DiMare v. MetLife Ins. Co.*, 369 F. App'x 324, 329 (3d Cir. 2010).  The Amended Complaint

---

[25]   This authority confirms that the Amended Complaint states a claim for negligent misrepresentation even if New York law were to apply, as the Trive Defendants assert it might.

unquestionably does so—it alleges that Thadani and Sekhri, acting on behalf of the Trive Defendants—made specific misrepresentations about Lucky Bucks in the CIM furnished to Noteholders and on due diligence calls that occurred on August 24, 2021, August 24, 2021, November 2, 2021, and November 22, 2021.  FAC ¶¶ 138-41, 143-44, 146-48.  The Amended Complaint's allegations about specific misrepresentations made by Thadani and Sekhri do not amount to impermissible "group pleading," because the Trustee "alleges sufficiently particularized allegations," against each Defendant.  *MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004).[26]

## V.    Defendants' Remaining Arguments Are Meritless

79.    The Trive Defendants' assertion that the Trustee's claims for attorneys' fees and punitive damages should be dismissed rests on the assumption that the Trustee has no claim under Georgia law against the Trive Defendants.  As stated, the Trustee has alleged viable causes of action against the Trive Defendants, including for intentional and constructive fraudulent transfer, securities fraud, and common law fraud.  Whether those claims arise under Georgia law requires a fact-intensive choice-of-law analysis that should not be undertaken at this stage.  *See Jackson v. NuVasive, Inc.*, 2022 WL 610704, at *5 (D. Del. Feb. 11, 2022) ("When confronted with a choice of law issue at the motion to dismiss stage, courts within the Third Circuit have concluded it is more appropriate to address the issue at a later stage in the proceedings.").  Accordingly, dismissal of the Trustee's Georgia law claims for attorneys' fees and punitive damages would be premature.

---

[26]   The Trive Defendants provide no support for their assertion (at Mot. ¶ 86) that these allegations fail to satisfy Rule 9(b) merely because the Amended Complaint does not specify which of the Noteholders attended these calls. The Amended Complaint's detailed allegations about the diligence calls and the specific misrepresentations that Thadani and Sekhri made on them have clearly given the Trive Defendants "notice of the precise misconduct with which they are charged."  *Gerbitz v. ING Bank, FSB*, 967 F. Supp. 2d 1072, 1076 (D. Del. 2013).  The Trive Defendants' complaints about the emails and calls predicating the Trustee's RICO claims are just as spurious. The Amended Complaint specifically identifies Thadani and Sekhri as the senders of the relevant emails and participants on the calls, the dates of the emails and calls, the subjects of the emails and calls, and the connection between them and the fraud charged in the Amended Complaint.  *See* FAC ¶¶ 352, 354-56.

## <u>CONCLUSION</u>

For all the reasons explained above, the Court should deny the Motion.

Dated: June 2, 2025
       Wilmington, Delaware

WHITEFORD TAYLOR & PRESTON LLC

By: */s/ Bradley P. Lehman*

William F. Taylor, Jr. (DE No. 2936)
Bradley P. Lehman (DE No. 5921)
600 North King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 295-5674
Facsimile: (302) 295-5678

-and-

QUINN EMANUEL URQUHART
& SULLIVAN LLP
Susheel Kirpalani
Andrew J. Rossman
Matthew R. Scheck
Mario O. Gazzola
Kenneth B. Hershey
295 Fifth Avenue, 9th Floor
New York, New York 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Counsel to the Chapter 7 Trustee*