## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LUCKY BUCKS HOLDINGS LLC, | Case No.  23-10756 (KBO) |
| Debtor. | |
| | |
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of Lucky<br>Bucks Holdings LLC and as assignee, | Adversary Proceeding |
| Plaintiff, | Adv.  Proc.  No.  24-50130 (KBO) |
| v. | |
| TRIVE CAPITAL MANAGEMENT LLC, *et al.*, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MANAGEMENT DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

QUINN EMANUEL URQUHART
   & SULLIVAN LLP
Susheel Kirpalani
Andrew J. Rossman
Matthew R. Scheck
Mario O. Gazzola
Kenneth B. Hershey
295 Fifth Avenue, 9th Floor
New York, New York 10016

WHITEFORD TAYLOR
   & PRESTON LLC
William F. Taylor, Jr. (DE No. 2936)
Bradley P. Lehman (DE No. 5921)
600 North King Street, Suite 300
Wilmington, DE 19801

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

SUMMARY OF ARGUMENT .............................................................................. 2

RELEVANT BACKGROUND .............................................................................. 3

    A.   The Management Defendants Begin Running Lucky Bucks And Agree To Do Trive's Bidding............................................................................................................. 3

    B.   Trive Creates A Plan To "Take Cash Out Of The Business," Enlists Management To Assist, And Rewards Them Handsomely ................................................................... 4

    C.   The Management Defendants Receive Over $56 Million In Fraudulent Transfers And Help Trive Cover Up The Wrongdoing............................................................ 7

STANDARD OF REVIEW ................................................................................. 9

ARGUMENT ........................................................................................................ 9

I.    The Amended Complaint Plausibly Alleges Claims For Intentional And Constructive Fraudulent Transfer................................................................................. 9

    A.   The Trustee Has Standing To Bring Fraudulent Transfer Claims In His Capacity As Estate Representative And, In The Alternative, As The Noteholders' Assignee ................ 9

    B.   The Fraudulent Transfer Claims Are Not Barred By Consent, Ratification, Estoppel, or Similar Doctrines ..................................................................................... 10

    C.   The Trustee Adequately Pleads Holdings Intended To Hinder, Delay, Or Defraud Its Creditors.................................................................................................... 12

II.    The Statutory Claims Are Not Impermissibly Extraterritorial ............................. 15

    A.   The Georgia Securities Fraud Claim Is Not Impermissibly Extraterritorial.................... 15

    B.   The Georgia RICO Claim Is Not Impermissibly Extraterritorial ..................................... 17

III.    The Amended Complaint Adequately Pleads Common Law Fraud and Negligent Misrepresentation Against the Management Defendants ............................................ 18

    A.   The Amended Complaint Alleges Actionable Misrepresentations and Omissions by the Management Defendants ....................................................................... 18

    B.   The Trustee Has Pled Negligent Misrepresentation, in the Alternative .......................... 29

    C.   The Management Defendants' Remaining Arguments Are Meritless.............................. 29

IV.    The Amended Complaint Adequately Pleads Claims For Attorneys' Fees and Punitive Damages.................................................................................................. 30

CONCLUSION.................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
    163 F.3d 780 (3d Cir. 1999)...................................................................................15

*In re AgFeed USA, LLC*,
    546 B.R. 318 (Bankr. D. Del. 2016) ....................................................................11

*Appel v. Berkman*,
    180 A.3d 1055 (Del. 2018) ...................................................................................26

*Aquino v. Mobis Ala., LLC*,
    739 F. Supp. 3d 1152 (N.D. Ga. 2024) ................................................................17

*Clark v. Davenport*,
    2019 WL 3230928 (Del. Ch. July 18, 2019)........................................................23

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
    2024 WL 4008120 (S.D.N.Y. Aug. 30, 2024) .....................................................18

*DiMare v. MetLife Ins. Co.*,
    369 F. App'x 324 (3d Cir. 2010) ..........................................................................25

*In re Essar Steel Minn. LLC*,
    2019 WL 2246712 (D. Del. May 23, 2019)..........................................................26

*In re Extended Stay, Inc.*,
    2020 WL 10762310 (Bankr. S.D.N.Y. 2020) ......................................................10

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................13, 14

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*,
    751 F.3d 150 (3d Cir. 2014).................................................................................29

*Gaffin v. Teledyne, Inc.*,
    611 A.2d 467 (Del. 1992) .....................................................................................23

*In re Genesis Health Ventures, Inc.*,
    355 B.R. 438 (Bankr. D. Del. 2006) .....................................................................25

*Hartig Drug Co. v. Senju Pharma. Co.*,
    836 F.3d 261 (3d Cir. 2016)...................................................................................9

*Humphrey v. GlaxoSmithKline PLC*,
905 F.3d 694 (3d Cir. 2018) ................................................................... 17

*Labyrinth, Inc. v. Urich*,
2024 WL 295996 (Del. Ch. Jan. 26, 2024) ...................................... 26, 27

*In re Liberty State Benefits of Del., Inc.*,
541 B.R. 219 (Bankr. D. Del. 2015) ........................................................ 13

*Lieberman v. BeyondTrust Corp.*,
2020 WL 1815547 (D. Del. Apr. 9, 2020) .............................................. 29

*In re Med. Wind Down Holdings III, Inc.*,
332 B.R. 98 (Bankr. D. Del. 2005) .......................................................... 29

*In re Millennium Lab Holdings II, LLC*,
2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ................................ 14

*Miller v. Mott*,
2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ................................... 26

*OpenGate Cap. Grp. LLC v. Thermo Fisher Scientific Inc.*,
2014 WL 3367675 (D. Del. July 8, 2014) ............................................... 24

*In re Our Alchemy, LLC*,
642 B.R. 155 (Bankr. D. Del. 2022) ........................................................ 13

*In re Pearson*,
2010 WL 3956762 (Bankr. M.D. Pa. Oct. 7, 2010) ................................ 14

*Phage Diagnostics, Inc. v. Corvium, Inc.*,
2020 WL 1816192 (Del. Super. Mar. 9, 2020) ....................................... 27

*In re Physiotherapy Holdings, Inc.*,
2016 WL 3611831 (Bankr. D. Del. June 20, 2016) ........................... 10, 11

*In re Physiotherapy Holdings, Inc.*,
2019 WL 3916536 (D. Del. July 2, 2019) ............................................... 30

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ............................................................ 28

*Ruiz v. Sewon Am., Inc.*,
766 F. Supp. 3d 1251 (N.D. Ga. 2025) ................................................... 18

*Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*,
739 F. Supp. 2d 686 (D. Del. 2010) ........................................................ 28

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983) ..............................................................................28

*Swipe Acquisition Corp. v. Krauss*,
    2021 WL 282642 (Del. Ch. Jan. 28, 2021) ......................................................15

*Tatung Co. v. Shu Tze Hsu*,
    217 F. Supp. 3d 1138 (C.D. Cal. 2016) ...........................................................18

*Trascent Mgmt. Consulting, LLC v. Bouri*,
    2018 WL 4293359 (Del. Ch. Sept. 10, 2018) .............................................23, 24

*U.S. Express Lines Ltd. v. Higgins*,
    281 F.3d 383 (3d Cir. 2002).............................................................................29

*In re Vaso Active Pharms., Inc.*,
    2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) ............................................14

*In re Vill. Red Rest. Corp.*,
    2021 WL 3889793 (Bankr. S.D.N.Y. Aug. 31, 2021) .......................................14

*W. Valley KB Venture, LLC v. ILKB LLC*,
    2021 WL 4171918 (E.D.N.Y. Sept. 13, 2021) ..................................................28

*Williams v. Netflix, Inc.*,
    2023 WL 3478568 (D. Del. May 16, 2023).......................................................29

*Yegiazaryan v. Smagin*,
    599 U.S. 533 (2023)..........................................................................................17

*In re Zohar III, Corp.*,
    631 B.R. 133 (Bankr. D. Del. 2021) .................................................................13

*Zuber v. Boscov's*,
    871 F.3d 255 (3d Cir. 2017)................................................................................9

## Rules / Statutes

11 U.S.C. § 101(2) ....................................................................................................14

11 U.S.C. § 101(31)(B)..............................................................................................14

11 U.S.C. § 101(31)(B)(i)..........................................................................................14

11 U.S.C. § 101(31)(E)..............................................................................................14

11 U.S.C. § 546(e) .....................................................................................................10

11 U.S.C. § 550(a)(2) ................................................................................................6

O.C.G.A. § 10-5-1 *et seq.* ........................................................................................15

O.C.G.A. § 10-5-50 *et seq.* ......................................................................................16

O.C.G.A. § 13-6-11 .................................................................................................30

O.C.G.A. § 16-14-4 .................................................................................................15

O.C.G.A. § 51-12-5.1 ..............................................................................................30

## Other Authorities

Fed. R. Civ. P. 9(b) ......................................................................................3, 13, 24, 25

Fed. R. Bankr. P. 2004 ..............................................................................................8

Marc Abrams (the "<u>Trustee</u>" or "<u>Plaintiff</u>"), solely in his capacity as Chapter 7 Trustee of the bankruptcy estate of Lucky Bucks Holdings LLC ("<u>Holdings</u>") and as assignee of causes of action previously belonging to Holdings' creditors, respectfully submits this memorandum of law in opposition to the motion of defendants Manu Sekhri, James Boyden, Ryan Bouskill, Ryan C. Bouskill Professional Corporation, Hassan Ijaz, 2786692 Ontario Inc., and Stephanie Lippa (collectively, the "<u>Management Defendants</u>") to dismiss the First Amended Complaint (the "<u>Motion</u>") [D.I. 72].[1]

## <u>PRELIMINARY STATEMENT</u>[2]

1.      The Amended Complaint lays out the role the Management Defendants played in misrepresenting Lucky Bucks' and Holdings' financial conditions, hiding the truth from the Noteholders, and approving the Holdings Distributions that are the subject of the Trustee's claims. For their role in the misconduct, they were handsomely rewarded tens of millions of dollars.

2.      The central theme of the Management Defendants' Motion is to hide behind the fact that there were many wrongdoers, assert the Trustee is merely "su[ing] everyone for everything," and alternatively suggest that because they were simply following the Trive Defendants' orders when they defrauded the Noteholders, they should get to keep the $56 million in unlawful distributions they collectively received.  But that is not how the law works.

3.      To be sure, the Amended Complaint explains how Sekhri, Boyden, Bouskill, and Ijaz each played key roles in defrauding the Noteholders, approving the Note transactions, executing the fraudulent transfers, and covering up the wrongdoing.  And Lippa, for her part, received proceeds of a fraudulent transfer that she is not entitled to keep.

---

[1]   Citations to "D.I." refer to the docket of this adversary proceeding unless otherwise indicated.

[2]   Capitalized terms not defined in this preliminary statement bear the meanings ascribed below.

4.      Whether they were driving the decisions or not, given their active roles in the wrongdoing and receipt of millions in proceeds, the Management Defendants cannot avoid liability simply by pointing the finger at the Trive Defendants or Damani.  Accordingly, their arguments for dismissal are meritless.

## SUMMARY OF ARGUMENT

5.      ***Fraudulent Transfer Claims***.  The Management Defendants argue that the Trustee lacks standing to bring fraudulent transfer claims in his capacity as assignee of the Noteholders because fraudulent transfer claims may only be asserted by an estate representative until abandoned.  But the Noteholders' fraudulent transfer claims are asserted *in the alternative* to the Trustee's estate claims for fraudulent transfer and are therefore subject to first considering whether the estate claims for fraudulent transfer are viable.  If they are, then the Noteholders' claims will not be considered.  The Noteholders' claims are included now, in the alternative, for efficiency and do not interfere with the Trustee's standing to bring fraudulent transfer claims in his capacity as estate representative.

6.      The Management Defendants also assert that all of the fraudulent transfer claims fail because the Noteholders ratified the challenged transfers.  In doing so, the Management Defendants ignore the most important element of ratification, namely, full knowledge of all material facts.  The Amended Complaint alleges that the Management Defendants and others concealed critical facts from the Noteholders about the true financial and operating condition of Lucky Bucks.  There is no authority for finding ratification in the face of these allegations at the pleadings stage.  Nor can the Management Defendants' conclusory assertion that the Amended Complaint fails to plead actual fraud withstand scrutiny.

7.      ***Statutory and Common Law Fraud Claims***.  The Management Defendants assert that the Trustee's statutory securities fraud and RICO claims under Georgia law and his securities

fraud claim under Delaware law are impermissibly extraterritorial.  This ignores the well-pleaded allegations that material aspects of the transactions orchestrated by the Trive Defendants, which give rise to those claims, occurred in Georgia.  Moreover, Delaware's securities fraud statute imposes liability on any actor who employs any device, scheme or artifice to defraud in connection with the purchase or sale of securities.  The Amended Complaint alleges that Defendants Sekhri and Boyden cooperated with the Trive Defendants in using Holdings—a Delaware LLC—for the express purpose of defrauding the Noteholders.

8.     Finally, the Management Defendants argue that the Trustee's fraud claims fail to plead any false statements or fraudulent intent by the Management Defendants, or any justifiable reliance by the Noteholders.  These arguments simply ignore the Amended Complaint's allegations and misconstrue the legal requirements for pleading fraud.  The Amended Complaint sufficiently pleads falsity and reliance for the statutory and common law fraud claims.  It does so in dozens of pages of detailed allegations of actionable misrepresentations, which go far beyond the particularity requirements of Rule 9(b).  The Management Defendants assert that these statements were either not false at all or are merely "puffery," opinions, or forward-looking statements.  But many of the misrepresentations were of actual facts, and even the subset of statements that could be considered opinions or forward-looking statements are actionable because, as alleged in the Amended Complaint, the Management Defendants made those statements with the intent to deceive.  The Motion should be denied.

## RELEVANT BACKGROUND

### A.     The Management Defendants Begin Running Lucky Bucks And Agree To Do Trive's Bidding

9.     Lucky Bucks was a business premised on ownership of coin-operated amusement machines ("COAMs") located in gas stations, convenience stores, and other retail businesses in

the state of Georgia.  First Amended Complaint [D.I. 58] ("<u>FAC</u>") ¶¶ 62-70.  In 2016, Lucky Bucks' founder, Defendant Anil Damani, sold a 51% stake in the Company to Southern Star Gaming LLC ("<u>Southern Star</u>"), which became Lucky Bucks' majority owner.  FAC ¶¶ 71-72. Defendant Manu Sekhri was the CEO of Southern Star Gaming LLC, and together with Defendants Anil Damani (until 2020), Shafik "Tony" Kassam, James Boyden, Ryan Bouskill, Hassan Ijaz, and Stephanie Lippa, managed Lucky Bucks.  FAC ¶¶ 41-54.

10.    Trive Capital Management LLC and certain of its affiliated funds (collectively, "<u>Trive</u>") acquired majority control of Lucky Bucks in August 2020, at which point Trive immediately elevated the Management Defendants to their positions as Lucky Bucks' executive team and board of managers.  FAC ¶ 82.  Trive appointed Sekhri and Boyden to Lucky Bucks' three-person board of managers, and required them to execute an agreement acknowledging Trive's consent rights over major transactions.  *Id.* ¶¶ 84, 86.

**B.    Trive Creates A Plan To "Take Cash Out Of The Business," Enlists Management To Assist, And Rewards Them Handsomely**

11.    In July 2021, Trive orchestrated a dividend recapitalization of Lucky Bucks (in which it paid out funds to itself and to the Management Defendants), *id.* ¶ 110, and then shortly thereafter, in the face of declining results at Lucky Bucks, began exploring additional ways it could "***take cash out of the business***," including through additional "unrestricted dividends," *id.* ¶ 120.  There was only one problem:  Lucky Bucks was already so heavily indebted that it could not raise additional debt to fund additional payments to shareholders.  *Id.* ¶ 121.  Trive accordingly came up with a plan to create a "super holdco"—Lucky Bucks Holdings LLC ("<u>Holdings</u>")—which could incur still more debt, and purportedly without violating the covenants in Lucky Bucks' existing credit facilities.  *Id.* ¶ 122.  Holdings would have no operations and no assets other than its equity interest in Lucky Bucks, and thus Holdings' ability to service and

ultimately repay its debt was entirely dependent on the performance of Lucky Bucks' business. *Id.* As with Lucky Bucks, Trive appointed Sekhri and Boyden to the board of Holdings and required them to execute an agreement acknowledging Trive's consent rights. *Id.* ¶ 84, 86.

12.     The Management Defendants worked together with Trive and investment banking firm Houlihan Lokey ("Houlihan") to market an investment in notes that would be issued by Holdings for purposes of funding a distribution to Holdings' shareholders (the "Holdings Distributions"). *Id.* ¶¶ 129-30, 200-03. As is typical in these engagements, while Houlihan prepared the Confidential Information Memorandum ("CIM") used to market the notes and Trive led the process, the Management Defendants were intimately involved in furnishing information for the CIM, participating in calls with potential noteholders, compiling responses to diligence requests, and effecting the transactions by approving and executing key documents. *See, e.g.*, *id.* ¶ 130 (Ijaz and Bouskill prepared offering materials including the CIM); *id.* ¶ 131 (Houlihan relied on information fed by Sekhri, Ijaz, Bouskill, and Boyden and did little itself to vet that information); *id.* ¶ 137 (Bouskill and Ijaz took the lead on responding to written diligence inquiries, and enlisted Boyden to help craft responses); *id.* ¶ 142 (Sekhri made misrepresentations regarding Lucky Bucks' "farm team" in August 27, November 21, and November 22 calls); *id.* ¶ 147 (Sekhri and Boyden made misrepresentations during diligence calls, and Ijaz and Bouskill made similar misrepresentations in preparing diligence responses); *id* ¶ 150 (Sekhri and Boyden supported Trive Capital Management partner Shavran Thadani's false narratives on diligence calls, and Ijaz and Bouskill prepared talking points and information for same); *id.* ¶ 156 (same regarding misrepresentations on high attrition and stability of location contracts); *id.* ¶ 164 (same); *id.* ¶ 167-68 (Sekhri made misrepresentations on calls in summer and fall of 2021 touting Lucky Bucks' strong M&A pipeline despite knowledge that it was dry); *id.* ¶ 173 (Sekhri,

5

Bouskill, and Ijaz put together materials where M&A pipeline is used to conceal declining results); *id.* ¶ 174 (Ijaz, Bouskill, Sekhri discuss how to hide true declining results from Noteholders in response to diligence requests); *id.* ¶ 179 (Boyden executes solvency certificate that falsely certified a necessary examination was conducted); *id.* ¶ 182 (Sekhri and Boyden make misrepresentations on diligence calls regarding Lucky Bucks' relationship with the GLC and compliance with its regulations); *id.* ¶ 191 (Boyden executed term sheet on October 22, 2021); *id.* ¶ 192 (Boyden executed NPA on November 29, 2021).

13.   The Management Defendants were not just actively participating in the marketing process—they each made actionable misrepresentations of their own.[3]

a.   **Lack of attrition:** Sekhri, Ijaz, Bouskill, and Boyden all prepared materials for the CIM which implied that Lucky Bucks' COAM attrition rate was less than 1% per year, *id.* ¶¶ 130-31, 156, despite the fact that the actual attrition rate for 2021 was ***over ten times higher***, *id.* ¶¶ 156-59;

b.   **Stability of location contracts:** Sekhri and Boyden on calls and Ijaz and Bouskill in preparing written materials misrepresented the stability of location contracts, *id.* ¶ 156, even though Sekhri, Bouskill, and Boyden received real-time information about non-renewals, *id.* ¶¶ 104-06, and Sekhri and Boyden had access to information showing the revenue streams of Lucky Bucks were anything but "highly predictable," *id.* ¶ 163;

c.   **EBITDA growth from prior acquisitions:** Sekhri and Boyden on calls and Ijaz and Bouskill in preparing written materials misrepresented the EBITDA growth from prior acquisitions, *id.* ¶ 164, and Bouskill and Ijaz prepared diligence responses that misrepresented Lucky Bucks' EBITDA, *id.* ¶ 137, even though they knew that EBITDA was materially overstated due to underperformance, *id.* ¶ 165, because many acquired locations were underperforming, sometimes by up to 63%, *id.* ¶¶ 97-102;

d.   **Ongoing M&A pipeline:** Sekhri asserted in diligence calls that the M&A pipeline would continue to drive growth, *id.* ¶ 167, and Bouskill and Ijaz prepared diligence responses that misrepresented the M&A pipeline as being strong, *id.* ¶ 137, despite Ijaz, Sekhri, Bouskill, simultaneously discussing with Thadani the exact opposite: that

---

[3]   The Management Defendants take umbrage at the Trustee's supposedly "egregious" "fraud claims" against Defendant Lippa, who worked as Sekhri's assistant and is not alleged to have made any misrepresentations to the Noteholders. Mot. ¶¶ 5, 63. But the Trustee did not name Lippa as a defendant to his claims for securities fraud, common law fraud, or negligent misrepresentation. Instead, Lippa is sued solely in her capacity as a recipient of subsequent transfers made from the Holdings Distributions. *See* FAC ¶ 202-03. Because the Bankruptcy Code empowers the Trustee to "recover, for the benefit of the estate, the property transferred … from … any immediate or mediate transferee of [an] initial transferee," that is entirely appropriate. 11 U.S.C. § 550(a)(2).

acquisitions would have to stop following the Holdings Distributions due to Lucky Bucks' strained financial position, *id.* ¶ 168-70;

e. **Lucky Bucks' financial results, estimates, and projections:** Sekhri, Ijaz, Bouskill, and Boyden all prepared materials for the CIM, *id.* ¶ 130-31, 141, which masked the Company's declining performance by using pro forma numbers, *id.* ¶ 172. In response to Noteholder questions about more recent financial results, Sekhri, Bouskill, and Ijaz prepared materials designed to mislead the Noteholders by offsetting declining results with inflated acquisition data of the nature discussed above, *id.* ¶ 173. Similarly, in July 2021, Ijaz, Bouskill, and Sekhri agreed amongst themselves to "hide behind the availability of the [GLC] portal data" to avoid answering questions from prospective lenders about "revenue … on a full twelve month basis." *Id.* ¶¶ 174 (emphasis omitted). Sekhri did the same thing in January 2022, when he instructed his team to keep using pro forma numbers in a different marketing process to hide bad 2021 results, *id.* ¶¶ 19, 176;

f. **Solvency certificate:** Boyden signed and delivered a solvency certificate on November 29, 2021, falsely certifying that he had "made, or ha[d] caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein," *id.* ¶ 179, despite having never run a calculation to make sure that was true, as Bouskill and Ijaz recognized, *id.* ¶ 180.

g. **Lucky Bucks' relationship with GLC:** On diligence calls, Sekhri repeatedly touted Lucky Bucks' purportedly "strong relationship with the GLC," and Sekhri, Ijaz, Bouskill, and Boyden all prepared materials for the CIM, *id.* ¶ 130-31, which falsely indicated that Lucky Bucks "has proven to be a model COAM operator from the State's perspective," *id.* ¶ 182, even though Sekhri, Bouskill, and Boyden were aware GLC inspectors were investigating several Lucky Bucks transactions, *id.* ¶ 103; and Ijaz, Bouskill, Boyden, Sekhri, and Bouskill were all concerned about GLC's selective enforcement against Lucky Bucks in November 2021, *id.* ¶¶ 184-86.

14.    In addition to making their own misrepresentations, Sekhri and Boyden joined and supported Thadani's misleading narrative to Noteholders on calls, while Ijaz and Bouskill would prepare the talking points and information that Thadani and Sekhri would use to mislead the Noteholders. *Id.* ¶ 150. Despite knowing Thadani and Trive's representations to Noteholders were false (for reasons set forth above) none of Sekhri, Boyden, Bouskill, or Ijaz ever corrected those false statements, whether on calls or in preparing written materials for the Noteholders.

**C.    The Management Defendants Receive Over $56 Million In Fraudulent Transfers And Help Trive Cover Up The Wrongdoing**

15.    The marketing process was successful. In November 2021 and January 2022,

Holdings issued $250 million in aggregate principal amount of unsecured notes due 2028 (the "Notes," and the purchasers thereof, the "Noteholders") pursuant to a Note Purchase Agreement dated November 29, 2021 (the "NPA"). *Id.* ¶ 192. Immediately upon issuing the Notes, Holdings made the Holdings Distributions, approximately $56 million of which went to the Management Defendants. *Id.* ¶ 203.[4] Holdings received no value on account of the Holdings Distributions, and as a result thereof, was both rendered insolvent and left with unreasonably small capital to repay the Notes. *Id.* ¶ 17. That is because Holdings' only asset—Lucky Bucks— was itself already severely over-levered and its finances were in steep decline at the time the Holdings Distributions were made rendering its equity essentially worthless (if it had any value at all) and making it next to impossible that Lucky Bucks would ever generate enough cash to pay back Holdings' debts in addition to its own. *Id.* ¶¶ 204-11.

16.     Following the Notes issuance, the Management Defendants worked to cover up the wrongdoing. When fourth quarter 2021 results were released, Sekhri provided a false narrative that weakness was due to regulatory/tax environment changes, Sekhri instructed management to avoid presenting unhelpful numbers to investors, management intentionally punted on Noteholders' questions at Thadani's direction, and Ijaz appears to have deleted his entire inbox before Lucky Bucks emerged from Chapter 11 under new ownership.[5] *Id.* ¶¶ 214-24.

17.     Ultimately, Lucky Bucks and Holdings filed Chapter 11 petitions in June 2023. *Id.* ¶ 234. Lucky Bucks emerged from bankruptcy in October 2023, but this Court converted

---

[4]  Sekhri received over $43 million, Boyden received over $3 million, Bouskill received over $5.2 million (through a P.C.), Ijaz received over $4.1 million (through a corporation), and Lippa received $1.3 million. FAC ¶ 203.

[5]  In a classic example of premature celebration, the Management Defendants boast that reorganized Lucky Bucks' Georgia lawsuit did not assert claims against them. Mot. ¶ 34 n.7. But as reorganized Lucky Bucks has since made clear, following its own Rule 2004 investigation, it will imminently assert claims against the Management Defendants, including for intentional fraudulent transfer. *In re Lucky Bucks, LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del) [D.I. 403] ¶ 10. Notably, reorganized Lucky Bucks' claims are based "in substantial part" on information obtained through Rule 2004 discovery—which was granted *over the Management Defendants' objection*. *Id.* ¶¶ 9-10.

Holdings' Chapter 11 case to Chapter 7 and appointed the Trustee after the Noteholders rejected a proposed settlement in which the Management Defendants (along with other parties) would have received full releases in return for a meager payment of $15 million.  *Id.* ¶¶ 235-37.

## STANDARD OF REVIEW

18.    On review of a motion to dismiss for failure to state a claim, "the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Hartig Drug Co. v. Senju Pharma. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).[6]  Accordingly, dismissal is proper only when a complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017).

## ARGUMENT

I.    **The Amended Complaint Plausibly Alleges Claims For Intentional And Constructive Fraudulent Transfer**

19.    The Management Defendants argue that the assigned fraudulent transfer claims (Counts III and IV) should be dismissed because the Trustee lacks standing to assert those claims in his capacity as assignee,[7] that all of the fraudulent transfer claims (Counts I-IV) are barred by the affirmative defense of ratification, and that the intentional fraudulent transfer claims (Counts I and III) fail because the Trustee does not adequately plead fraudulent intent.  All defenses fail.

A.    **The Trustee Has Standing To Bring Fraudulent Transfer Claims In His Capacity As Estate Representative And, In The Alternative, As The Noteholders' Assignee**

20.    As with the Trive Defendants, the Management Defendants argue that the fraudulent transfer claims the Trustee asserts in his capacity as assignee of the Noteholders under

---

[6]   Unless otherwise noted, all internal citations, quotation marks, and brackets in case citations are omitted.

[7]   Citations to "Mot." refer to the Brief in Support of Management Defendants' Motion to Dismiss The First Amended Complaint, D.I. 72.

Counts III and IV of the Amended Complaint should be dismissed because the Trustee "lack[s] statutory authority" to assert fraudulent transfer claims in that capacity. Mot. ¶ 41. As explained in Plaintiff's Memorandum of Law in Opposition to the Trive Defendants' Motion to Dismiss The Amended Complaint ("Trive Opp."), filed contemporaneously herewith, that position is wrong because Counts III and IV are expressly pleaded in the alternative to Counts I and II and will only become operative to the extent the estate no longer has a viable cause of action for fraudulent transfer. *See* Trive Opp. ¶¶ 27-31.[8] Counts III and IV accordingly neither implicate nor interfere with the estate's fraudulent transfer claims, and will only survive if those claims fail for reasons that are uniquely applicable to the Trustee in his capacity as estate representative, such as the section 546(e) safe harbor. *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *10 (Bankr. D. Del. June 20, 2016) ("[T]he Court concludes that the safe harbor does not bar the litigation trust from asserting its state law fraudulent transfer claims on behalf of the Senior Noteholders.").

### B. The Fraudulent Transfer Claims Are Not Barred By Consent, Ratification, Estoppel, or Similar Doctrines

21. The Management Defendants further argue that the Trustee's fraudulent transfer claims are barred because the Noteholders knew about and purportedly consented to the Holdings Distributions. *See* Mot. ¶¶ 42-45. As explained in the Trustee's opposition to the Trive Defendants' motion to dismiss, this defense fails at the pleadings stage because ratification (or consent) requires "full knowledge of all material facts." *In re Extended Stay, Inc.*, 2020 WL 10762310, at *74 (Bankr. S.D.N.Y. 2020); *see* Trive Opp. ¶¶ 32-40.[9] Simply put, one cannot

---

[8] The Trustee hereby incorporates these arguments by reference.

[9] The Trustee hereby incorporates these arguments by reference, and writes separately here to emphasize certain points and address authorities cited by the Management Defendants.

"consent" to a transaction if he or she was defrauded in that transaction. Numerous authorities—including two high profile and recent cases from this court—have expressly found that ratification cannot apply where, as here, the plaintiff alleges that it was misled as to material aspects of the transaction.[10] *See* Trive Opp. ¶ 33-34.

22.     Like the Trive Defendants, the Management Defendants incorrectly assert (at Mot. ¶ 45) that these decisions improperly conflate fraudulent inducement with fraudulent transfer. This argument simply ignores the fact that the Amended Complaint alleges *both* that the Noteholders were fraudulently induced into lending to Holdings *and* that Holdings transferred their proceeds under circumstances giving rise to claims for intentional and constructive fraudulent transfer.   The allegations that Holdings transferred the Noteholders' proceeds with intent to defraud the Noteholders and that the transfers were not made for reasonably equivalent value and rendered Holdings insolvent are sufficient to support the Trustee's claims for intentional and constructive fraudulent transfer notwithstanding that the Trustee also alleges that the Noteholders were misled into lending money to Holdings in the first instance.   The disclosure of how the Noteholders' proceeds would be used does not obviate the Amended Complaint's intentional fraudulent transfer claims because "the use of proceeds is simply one piece of the entire fraud alleged in the complaint." *In re Physiotherapy Holdings*, 2016 WL 3611831, at *12.[11]

---

[10]    Specifically, the Amended Complaint alleges that the Noteholders were misled as to, among other things, the attrition rate and stability of Lucky Bucks' COAMs (FAC ¶¶ 156-63), its EBITDA growth from prior acquisitions (*id.* ¶¶ 164-71), the accuracy and reliability of Lucky Bucks' projected performance (*id.* ¶¶ 172-76), Lucky Bucks' solvency and the analysis (or lack thereof) undertaken to confirm its solvency (*id.* ¶¶ 179-81, 204-11), the strength of Lucky Bucks' relationship with its regulator (*id.* ¶¶ 141, 182-86), and the legitimacy and professionalism of its farm team (*id.* ¶¶ 265-66).   The Amended Complaint also explains why these misrepresentations were material.   *See id.* ¶¶ 161, 166, 171, 178, 181, 187, 266.

[11]    Moreover, such disclosure is clearly irrelevant to the Trustee's claims for constructive fraudulent transfer.   *See In re AgFeed USA, LLC*, 546 B.R. 318, 336 (Bankr. D. Del. 2016) ("A claim of constructive fraud … need not allege the common variety of deceit, misrepresentation, or fraud in the inducement … because the transaction is presumptively fraudulent and all that need be alleged is that the conveyance was made without fair consideration while the debtor was functionally insolvent.").

23.     The non-binding authorities the Management Defendants cite in support of their position (Mot. ¶ 45) are not on point.  In *Boston Trading Grp.*, the First Circuit noted that fraudulent conveyance law "is not ordinarily concerned with how [ ] debts were created" in the context of holding that the debtor's repayment of an antecedent debt was at most a preference, not a fraudulent transfer.  835 F.2d at 1510-11 (1st Cir. 1987).  Its analysis also presupposed that the transferee "*did not participate in* [the transferor's] dishonesty," *id.* at 1510, which is incompatible with the allegations of the Amended Complaint.  Similarly, in *In re Sharp Int'l Corp.*, the Second Circuit found no fraudulent transfer where "the payment was on account of an antecedent debt, was made to an outsider, and there is no admission of subjective bad faith"—a fact pattern that bears no resemblance to the circumstances alleged in the Amended Complaint.  403 F.3d 43, 55 (2d Cir. 2005).  And the Supreme Court's decision in *Husky Int'l Elec., Inc. v. Ritz* merely held that "fraudulent conveyance schemes … can be effected without a false representation."  578 U.S. 355, 359 (2016).  The Court did not hold that the presence of such misrepresentations *precludes* a claim for fraudulent transfer.[12]

## C.     The Trustee Adequately Pleads Holdings Intended To Hinder, Delay, Or Defraud Its Creditors

24.     The Management Defendants next argue that the Trustee's claims for intentional

---

[12]   The Management Defendants' other authorities range from the merely unavailing to the wildly inapposite.  In *In re Lyondell Chem. Co.*, the court concluded that creditors had no grounds to complain about the transfers at issue without so much as addressing the creditors' allegations that they were defrauded.  503 B.R. 348, 383-85 (Bankr. S.D.N.Y. 2014).  Taken to its logical conclusion, the holding in *Lyondell* would mean that a leveraged buyout can never be a fraudulent transfer—even if undertaken to enrich shareholders at the expense of creditors, and even if the transaction left the borrower deeply insolvent—provided that the lenders knew that they were "lending for the purpose of financing an LBO."  *Id.* at 384-85.  In *In re Adelphia*, the court concluded that the lender *did not* ratify the transaction at issue.  634 F.3d 678, 694 (2d Cir. 2011).  In *Lane v. Eggleston*—a Fifth Circuit case from the 1920s—the court held that a bankruptcy trustee could not avoid a security interest that was lawful and approved of by all creditors and which, if avoided, would be to the detriment of creditors.  284 F.3d 743, 745 (5th Cir. 1922).  In *In re Dunn*, the court held that *the debtor* lacked standing to avoid a transfer which *the debtor* had made with the intention of defrauding its creditors.  2006 WL 6810930, at *8 (B.A.P. 9th Cir. Oct. 31, 2006).  The equitable principle that a party cannot avoid its own fraudulent transfer has no application to a case such as this one, in which creditors allege that *they* were defrauded by the transfers at issue.  And the cited decision from *In re Tribune Co. Fraudulent Conveyance Litig.* does not concern or address ratification at all.  2017 WL 82391, at *15 (S.D.N.Y. Jan. 6, 2017).

fraudulent transfer should be dismissed because the Amended Complaint "does not come close to pleading fraudulent intent." Mot. ¶¶ 46-48.   In support of their argument, the Management Defendants dwell at length on the applicable pleading standards and, forgoing any analysis of the Amended Complaint's supposed deficiencies, conclusorily assert that it does not allege any badges of fraud in connection with the transfers.  This gambit fails.

25.    Regardless of whether a relaxed form of Rule 9(b) applies,[13] "[d]etermining whether a transfer was made with fraudulent intent is a fact intensive inquiry rarely susceptible to resolution at the pleading stage." *In re Our Alchemy, LLC*, 642 B.R. 155, 164 (Bankr. D. Del. 2022).  As such, "[i]n general, a fraudulent transfer claim will withstand dismissal if it alleges, *inter alia*, the transferor, the transferee, the amount of the transfer, and relevant date." *In re Zohar III, Corp.*, 631 B.R. 133, 170 (Bankr. D. Del. 2021) (Owens, J.).  The Amended Complaint easily clears this bar and then some—it alleges numerous badges of fraud and other circumstantial evidence that plainly satisfy Rule 9(b).

26.    In analyzing the badges of fraud for purposes of an intentional fraudulent transfer claim, "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *In re Fedders N. Am.*, 405 B.R. at 545.  Moreover, "the confluence of several [badges] in one transaction generally provides ***conclusive evidence*** of an actual intent to defraud." *Id.* (emphasis added).  Badges of fraud include, among other things, "the relationship between the debtor and the transferee," "consideration for the conveyance," "insolvency or indebtedness of

---

[13]    The Management Defendants' acknowledge that "the requirements of Rule 9(b) are relaxed and interpreted liberally where a trustee … is asserting the fraudulent transfer claims." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).  They argue however that the Court should not take this approach because the Trustee had access to pre-suit discovery.  *See* Mot. ¶ 46 n.12.  But as this court has recognized, pre-suit discovery if anything supports the opposite conclusion because "the purpose of the heightened pleading standard is to protect a defendant from the burdens of discovery associated with a fraud claim," and thus "courts have relaxed this standard in cases where discovery ha[s] already been completed." *In re Liberty State Benefits of Del., Inc.*, 541 B.R. 219, 233 (Bankr. D. Del. 2015) (finding "this policy concern to be particularly relevant" where "the Trustee has already conducted some discovery relating to the [ ] transactions").

the debtors," and "how much of the debtor's estate was transferred." *Id.*

27.    The Amended Complaint alleges that Holdings transferred approximately $250 million to insiders, including entities that owned all of Holdings' membership interests and had total control over Holdings.  FAC ¶¶ 36, 38, 84, 86-87, 89, 202.[14]  The Amended Complaint alleges that the Holding Distributions were dividends, *id.* ¶¶ 275, 288, 304, 316, which "by definition … are payments in respect of equity investments … [that] are not made in exchange for fair consideration or reasonably equivalent value," *In re Vill. Red Rest. Corp.*, 2021 WL 3889793, at *10 (Bankr. S.D.N.Y. Aug. 31, 2021).  And it alleges that the Holdings Distributions rendered Holdings insolvent and that Holdings transferred essentially all of its estate, leaving behind only its worthless (or near-worthless) equity in Lucky Bucks.  *See id.* ¶¶ 122, 204-11, 289.

28.    Standing alone, these badges of fraud would support a strong inference of fraudulent intent.  But the Amended Complaint goes much further, detailing extensively how the Management Defendants and Trive conspired to mislead the Noteholders into lending to Holdings and approving the Holdings Distributions.  *Supra* ¶¶ 12-14.  The Management Defendants' argument (at Mot. ¶ 48) that these allegations are relevant to only the Trustee's fraudulent inducement claims but not to fraudulent transfer makes no sense because the Notes issuance and funding of the Holdings Distributions was a single integrated transaction, and thus fraud committed in connection with inducing the Noteholders to lend was also committed in connection with transferring the proceeds.  *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, 2019 WL

---

[14]  *See* 11 U.S.C. § 101(31)(E) (defining an "insider" of the debtor as, among other things, an "affiliate"); *id.* § 101(2) (defining "affiliate" to include an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *id.* § 101(31)(B) (stating that persons "in control of" debtor corporation are insiders); *In re Pearson*, 2010 WL 3956762, at *3 (Bankr. M.D. Pa. Oct. 7, 2010) ("LLC is analogous to a corporation for determination of insider status."); *see also In re Vaso Active Pharms., Inc.*, 2012 WL 4793241, at *10 (Bankr. D. Del. Oct. 9, 2012) ("One badge of fraud is that the transfer in question was made to an insider.").  Subsequent distributions were made to Sekhri, Kassam, and Boyden, who also were insiders of Holdings by virtue of their positions as managers of Holdings.  *See* 11 U.S.C. § 101(31)(B)(i); FAC ¶¶ 15 n.3, 203.

1005657, at *4 (Bankr. D. Del. Feb. 28, 2019) (concluding that failure to "disclose … challenges to [debtor's] business model" and allegations that "information disseminated in connection with the loan … was untruthful" supported claim for intentional fraudulent transfer).[15]

## II.     The Statutory Claims Are Not Impermissibly Extraterritorial

29.    The Management Defendants argue that Plaintiff's claims under Georgia's securities fraud statute, O.C.G.A. § 10-5-1 *et seq.* and Georgia's anti-racketeering ("RICO") statute, *id.* § 16-14-4 *et seq.*, (Counts VI-VIII) fail because the application of these statutes to the Management Defendants' conduct is extraterritorial. Mot. ¶¶ 49, 53 n.13. This is incorrect. The Amended Complaint pleads that many of the key communications and events related to the offer, sale, and purchase of the Notes occurred in Georgia and/or were directed from Georgia, and thus Georgia law may be applied to the Notes transaction.

### A.     The Georgia Securities Fraud Claim Is Not Impermissibly Extraterritorial

30.    Because key elements of the offer, purchase, and sale of the Notes occurred in Georgia, the Trustee's Georgia securities fraud claim is not improperly extraterritorial. To determine whether application of a law is extraterritorial, courts look at "the territorial scope of the transaction that [the state] has attempted to regulate." *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786 (3d Cir. 1999). A transaction may occur in multiple states. *Id.* at 787. "A contract between [an individual] in New Jersey and a buyer in New York does not occur 'wholly outside' New Jersey, just as it does not occur wholly outside New York." Accordingly, "[i]t is possible for a transaction to implicate blue sky laws of multiple states." *Swipe Acquisition Corp. v. Krauss*, 2021 WL 282642, at *4 & n.8 (Del. Ch. Jan. 28, 2021) (holding that application

---

[15] The Management Defendants' cases (at Mot. ¶ 48) are just examples of decisions in which courts found that the pleadings at issue failed to adequately allege fraudulent intent. The Management Defendants make no attempt to explain how the Amended Complaint's robust fraud allegations resemble those found deficient in the cases they cite.

of Delaware's or California's securities law would not preclude application of the other state's securities law).

31.    Georgia's securities fraud statute, O.C.G.A. § 10-5-50 *et seq.*, prohibits fraud in connection with the "offer, sale, or purchase of a security."  There is nothing extraterritorial about applying that statute on the facts of this case, where key elements of the offer, purchase, and sale of the Notes occurred in Georgia.  The Amended Complaint alleges that Kassam, in his capacity as manager of Holdings, voted to approve the transaction with the Noteholders while in Georgia. FAC ¶ 339.  Kassam, while in Georgia, executed several critical documents to facilitate the Notes issuance, including a written consent to the NPA and Holdings' Incumbency Certificate.  *Id.* ¶ 193.  Boyden, Trive's hand-picked appointee to the Holdings Board of Managers, and who signed an agreement acknowledging Trive's near-complete control over Holdings and himself, executed a term sheet for the Notes with the Noteholders on behalf of Holdings while in Atlanta.  *Id.* ¶¶ 15 n.3, 89, 154.  Boyden was also in Georgia from August 23 to September 1, 2021, when multiple diligence calls between the Trive Defendants, the Management Defendants, and the Noteholders were held.  *Id.* ¶ 154.  Ijaz similarly traveled frequently to Georgia and was there from August 23–27, October 28–30, November 2–6, and November 22–25.  *Id.*  Throughout October and November 2021, numerous Defendants conducted business on behalf of Lucky Bucks from Georgia, including the negotiation and execution of the NPA and issuance of the Notes themselves.  *See id.*  Thus, because key events and communications related to the offer, sale, and purchase of the Notes occurred in Georgia and/or were directed from Georgia, the Trustee's securities fraud claim is not impermissibly extraterritorial.[16]

---

[16]   The Management Defendants make no argument why application of the Delaware Securities Act to their conduct would be extraterritorial, arguing only that "[a]s to Delaware, the FAC fails to plead a claim because … the Trustee fails to allege that any Management Defendant made any misrepresentations relied upon by any Noteholder."  Mot.

### B.    The Georgia RICO Claim Is Not Impermissibly Extraterritorial

32.    The same conclusion holds for the Trustee's Georgia RICO claims.  Georgia courts look to judicial decisions interpreting the similarly-worded federal RICO statute.  *Aquino v. Mobis Ala., LLC*, 739 F. Supp. 3d 1152, 1191 (N.D. Ga. 2024) ("Because the Georgia RICO Act was modeled after the federal statute, [Georgia courts have] found federal authority persuasive in interpreting the Georgia RICO statute.").  In analyzing federal RICO claims, the Supreme Court has held that extraterritoriality is "a context-specific inquiry that turns largely on the particular facts alleged in a complaint," including, among other things, the location of "the racketeering activity that directly caused" the injury.  *Yegiazaryan v. Smagin*, 599 U.S. 533, 543-44 (2023); *see also Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 707 (3d Cir. 2018) (holding that extraterritoriality inquiry requires "consideration of multiple factors," including "the location of the activities giving rise to the underlying dispute").  In *Yegiazaryan*, the Court held that "[m]uch of the alleged racketeering activity that caused the injury occurred in the United States," and thus the claims were not extraterritorial.  *Yegiazaryan*, 599 U.S. at 545.

33.    Federal district courts have relied on *Yegiazaryan* in interpreting the scope of the federal and Georgia RICO statutes.  These district courts have found that the Georgia RICO statue applies to transactions where material communications related to the transaction were initiated or carried out in Georgia or directed from Georgia.  *See, e.g.*, *Aquino*, 739 F. Supp. 3d at 1219-20 (finding Georgia RICO statute applicable notwithstanding that injuries occurred while the plaintiffs were still in Mexico where "alleged scheme … was devised, initiated, and carried out

---

¶ 53 n.13.  As explained below, *infra* ¶¶ 36-54, that is incorrect.  Moreover, the Amended Complaint alleges that Defendants Sekhri and Boyden served on the board of an LLC formed in Delaware expressly for the purpose of defrauding the Noteholders, and in which capacity they personally approved fraudulent transfers (*i.e.*, the Holdings Distributions).  *See* FAC ¶¶ 14, 35, 341, 371.  That is sufficient to support the application of Delaware law.  *See* Trive Opp. ¶¶ 58-60.

through acts and communications initiated in Georgia"); *Ruiz v. Sewon Am., Inc.*, 766 F. Supp. 3d 1251, 1291 (N.D. Ga. 2025) (finding Georgia RICO statute applicable where complaint alleged injury from "racketeering activity either taken in Georgia or directed from Georgia" notwithstanding that injury was also felt abroad).  Notably, these decisions do not require that *every* act giving rise to plaintiff's RICO claims occur in the United States or Georgia to support the invocation of the applicable RICO statute.  *See, e.g., Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1157 (C.D. Cal. 2016) (federal RICO claims were not impermissibly extraterritorial when "many of the actions that constitute part of the RICO scheme took place in California"); *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, 2024 WL 4008120, at *16 (S.D.N.Y. Aug. 30, 2024) (foreign plaintiff adequately alleged a domestic injury because "most of [the] racketeering activities," including the making of fraudulent statements, were alleged to have "occurred in the United States").

34.    Here, as described above, *supra* ¶ 31, much of the Defendants' racketeering activity occurred in or was centered around Georgia.  Furthermore, at bottom, this case centers around the Management Defendants' and other Defendants' actions toward and representations concerning Lucky Bucks, a company with its principal place of business in Georgia. Under the guidance provided by the Supreme Court in the federal RICO context, these allegations strongly support the application of the Georgia RICO statute to the Management Defendants' conduct.

## III.    The Amended Complaint Adequately Pleads Common Law Fraud and Negligent Misrepresentation Against the Management Defendants

### A.    The Amended Complaint Alleges Actionable Misrepresentations and Omissions by the Management Defendants

35.    The Management Defendants argue that the common law fraud claims against them (Counts IX and X) should be dismissed because the Amended Complaint fails to plead that the Management Defendants made false representations to the Noteholders that the Noteholders

justifiably relied upon.  Mot. ¶¶ 54-57.  To the contrary, the Amended Complaint sufficiently alleges that the Management Defendants (with the exception of Lippa, discussed above, *supra* n.3) made actionable misrepresentations to the Noteholders.

36.     ***First, Sekhri, Boyden, Bouskill, and Ijaz falsely represented Lucky Bucks' lack of attrition and the stability of Lucky Bucks' location contracts.***  On calls to Noteholders on August 24, 2021, November 2, 2021, and November 22, 2021, Sekhri and Boyden told Noteholders that location owner contracts remained stable, long-term, and difficult to terminate due to GLC regulations.  FAC ¶¶ 9, 156.  Ijaz and Bouskill furnished information for use on the calls and in the CIM that supported these points, including that Lucky Bucks had an 86% contract renewal rate and that just 4% of its contracts were up for renewal in 2021.  *Id.* ¶¶ 24, 148-50, 156-59.  These representations left Noteholders with the impression that Lucky Bucks would lose approximately 1% of its locations in 2021, even though the then-known true attrition rate was many times higher.  *Id.*  Although these statements were materially misleading in themselves, they also misled through omission because the Management Defendants failed to provide the Noteholders information relating to Lucky Bucks' current and more recent financial performance that would have corrected misperceptions based on the information provided.  The Management Defendants knew, or were reckless in making these representations because they had access to real-time information contradicting these representations.  *Id.* ¶ 104.  The Noteholders relied on these false assurances of long-term stable income when deciding to invest.  *Id.* ¶ 161.

37.     ***Second, Sekhri, Boyden, Bouskill, and Ijaz falsely represented the EBITDA generated by Lucky Bucks' prior M&A activity.***  During investor calls on August 24, 2021, November 2, 2021, and November 22, 2021, Sekhri and Boyden falsely characterized the success of Lucky Bucks' acquisitions.  *Id.* ¶ 164.  Ijaz and Bouskill prepared and directed the preparation

of written materials (including the CIM) that also contained these misrepresentations.  *Id.*  Each Management Defendant knew these representations were false because they had direct knowledge that certain acquired locations underperformed pre-acquisition projections by 50-63% and management had acquired at least $22 million worth of such locations leading up to the Note issuance. *Id.* ¶ 165.  The Noteholders relied on these representations of Lucky Bucks' M&A track record as evidence of future growth potential.  *Id.* ¶ 166; *see also id.* ¶¶ 190 (a)-(f).

38.    ***Third, Sekhri falsely represented Lucky Bucks' ability to continue growing through M&A activity.***  During diligence calls on August 24, 2021, November 2, 2021, and November 22, 2021, Sekhri misrepresented the strength of Lucky Bucks' M&A pipeline.  *Id.* ¶ 167.  Sekhri knew this claim was false because he knew Lucky Bucks did not have enough cash to continue funding new acquisitions after the planned dividends.  *Id.* ¶ 168-69.  He also knew that Lucky Bucks could not secure additional financing for acquisitions due to its massive leverage.  *Id.*  Sekhri admitted this in an email to Ijaz.  *Id.* ¶ 168.  These misrepresentations led the Noteholders to believe there was imminent M&A activity that would enable Holdings to service its debt.  *Id.* ¶ 171; *see also id.* ¶¶ 190(a)-(f).

39.    ***Fourth, Sekhri, Ijaz and Bouskill falsely represented the accuracy of Lucky Bucks' financials, estimates, and projections.***  The August 2021 CIM—prepared by Houlihan using information provided by Sekhri, Bouskill, and Ijaz—intentionally concealed Lucky Bucks' poor performance in the second half of 2021 through the use of misleading pro forma financials. *Id.* ¶¶ 173-76.  When marketing the Notes in the fall of 2021 and January of 2022, Sekhri, Bouskill, and Ijaz—at Thadani's request—showed Noteholders only Lucky Bucks' pro forma EBITDA for the period ending March 31, 2021, even though they knew that based on more recent results, the pro forma EBITDA figure no longer presented an accurate picture of the business.

*See id.*  These financial misrepresentations were key to the Noteholders' understanding of Lucky Bucks' financial strength and thus their investment thesis.  *Id.* ¶ 172; *see also id.* ¶¶ 190 (a)-(f).

40.    ***Fifth, Boyden falsely represented that Holdings was solvent and that Boyden had conducted an investigation to assess that it was.***  On November 29, 2021, Boyden signed and delivered a solvency certificate attesting that Holdings was and would remain solvent after paying the Holdings Distributions.  *Id.* ¶ 179.  Boyden certified he "made, or ha[d] caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion."  *Id.*  But the Amended Complaint cites emails from Bouskill and Ijaz strongly supporting an inference that ***no solvency analysis of any kind*** was undertaken.  *See id.* ¶ 180.  The Noteholders relied on Boyden's fraudulent certification and surely would not have invested had they known the Company would be rendered insolvent (or left with unreasonably small capital) as a result of the Notes issuance.  *Id.* ¶ 181; *see also id.* ¶¶ 190(a)-(f).

41.    ***Sixth, Sekhri, Boyden, Bouskill, and Ijaz falsely represented Lucky Bucks' relationship with the GLC.***  During diligence calls, on August 24, 2021, November 2, 2021, and November 22, 2021, Sekhri and Boyden touted Lucky Bucks' purportedly "strong relationship" with the GLC.  *Id.* ¶¶ 141-42, 182.  They further represented that Lucky Bucks was in compliance with all GLC orders and regulations, and as such could even benefit from increased enforcement by the GLC, which would disproportionately harm its competitors.  *Id.* ¶¶ 182-83.  Likewise, Bouskill and Ijaz furnished information for the CIM which represented that that Lucky Bucks "has proven to be a model COAM operator from the State's perspective."  *Id.* ¶ 182.  These representations were false.  The GLC was closely watching Lucky Bucks due to prior regulatory violations by its founder, Anil Damani, who was banned from having any formal position or operational control over the business by the GLC in 2020.  *Id.* ¶ 184.  Notwithstanding that ban,

Damani maintained his grip on Lucky Bucks by actively directing the company's M&A activity—a fact of which Sekhri was well aware and actively facilitated. *Id.* ¶¶ 13, 45. Meanwhile, Ijaz and Bouskill discussed in February 2021 that the GLC regulatory attorney responsible for overseeing Lucky Bucks disliked the company and was "starting to stack the deck to drop a bomb on us" when Lucky Bucks' COAM master licenses were up for renewal. *Id.* ¶ 184. And in November 2021, while the Notes were being marketed, Sekhri, Boyden, and Bouskill tried to arrange a call with the Georgia governor's office to express concerns about selective enforcement *against* Lucky Bucks by the GLC. *Id.* ¶ 185. Around the same time, Ijaz privately acknowledged to Bouskill that the GLC "just hates us" and "is not happy with us"—belying their repeated representations that the company had a "strong relationship" with the GLC and could even benefit from increased enforcement. *Id.* ¶¶ 182, 186. The Management Defendants' misstatements regarding the GLC were because a gaming business like Lucky Bucks is only worth as much as its relationship with its regulator. *Id.* ¶ 187; *see also id.* ¶¶ 190 (a)-(f).[17]

42.     ***Seventh, Sekhri falsely represented the strength of Lucky Bucks' "farm team" which turned out to be a sham operation run by insiders' family members.*** During diligence calls on August 27, November 21, and November 22, 2021, Sekhri presented the farm team as legitimate and experienced sales people who would drive the company's future M&A growth, while they were in fact relatives and friends of Damani—who was supposed to have no involvement in Lucky Bucks' operations—and management. *See id.* ¶¶ 10, 141-42, 165, 265-67. Members of the farm team were also involved in Damani and Kassam's scheme to strip Lucky Bucks of its assets and cause it to purchase COAM locations at inflated valuations and thus, far

---

[17] The Management Defendants argue that their communications about the views of "*a particular GLC official*" does not render their representations about Lucky Bucks' relationship with the GLC false. Mot. ¶ 77. But the Amended Complaint's allegations do not concern some random "GLC official," but rather "the GLC regulatory attorney ***responsible for overseeing Lucky Bucks***." FAC ¶ 184 (emphasis added).

from facilitating the company's growth, were actively abetting its demise.  *See id.* ¶¶ 27, 146, 267.  Because growing through M&A was key to Lucky Bucks' ability to pay its (and Holdings') debts, the Noteholders relied on these false representations as to the strength of Lucky Bucks' farm team.  *Id.* ¶¶ 190(e)-(f); *see also id.* ¶¶ 190(a)-(d).

43.    ***Defendants Bouskill and Ijaz.***  The Management Defendants argue that the Trustee "does not cite a single meeting, phone call, email, or other communication" between Bouskill or Ijaz and any Noteholder.  Mot. ¶ 64.  But a defendant can be held liable for a false statement made to a third party if the defendant "intends or has reason to expect" that the statement will be "communicated to the [plaintiff], and that it will influence his conduct in the transaction.'"  *Clark v. Davenport*, 2019 WL 3230928, at \*13 (Del. Ch. July 18, 2019).  The Amended Complaint alleges that Bouskill and Ijaz, through their edits to and direction of the preparation of the CIM, ensured that it contained misrepresentations.  FAC ¶¶ 9, 131.  And they of course had reason to expect that Noteholders would rely on the misrepresentations in the CIM in deciding whether to invest.  *See id.* ¶ 9.  Bouskill and Ijaz accordingly are liable for misrepresentations in the CIM even if they did not personally interface with the Noteholders.

44.    The Management Defendants assert that "the Complaint does not actually plead that any statements in the CIM were false."  Mot. ¶ 65.  But "fraud does not consist merely of overt misrepresentations, but may also occur through the deliberate concealment of facts, or by silence in the face of a duty to speak."  *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).  Such a duty exists when a statement, though "facially true," nevertheless creates "a false impression as to the true state of affairs."  *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at \*15 (Del. Ch. Sept. 10, 2018).  In such circumstances, the statement is "an actionable misrepresentation" unless the speaker "provide[s] qualifying information to cure the mistaken

belief." *Id.* Because the CIM represented that Lucky Bucks had an 86% contract renewal rate and that just 4% of its contracts were up for renewal in 2021, the CIM left Noteholders with the impression that Lucky Bucks would lose approximately 1% of its locations in 2021, even though the then-known true attrition rate was vastly higher. FAC ¶¶ 148, 159. The implied attrition rate was misleading and actionable because neither Bouskill nor Ijaz—who received real-time data, *see, e.g.*, *id.* ¶ 104-06—qualified the CIM's misleading representations.[18]

45. The Amended Complaint also details how Bouskill and Ijaz touted Lucky Bucks' pro forma EBITDA numbers "intentionally to hide [Lucky Bucks'] poor performance in the second half of 2021" from the Noteholders. *Id.* ¶¶ 9, 30(d), 32, 140, 164, 173, 176. In other words, Bouskill and Ijaz deliberately showed Noteholders only Lucky Bucks' *pro forma* EBITDA for the period ending March 31, 2021, even though they knew that based on more recent results, the *pro forma* EBITDA figure no longer presented an accurate picture of the business. The fact that the figure was labeled "*pro forma*" does not make these statements inactionable, provided that, as the Amended Complaint alleges, these figures "cause[d] a false impression as to the true state of affairs." *OpenGate*, 2014 WL 3367675, at *11.

46. Finally, the Management Defendants last-ditch argument that the Trustee fails to identify the "specific input" that Bouskill and Ijaz provided in the CIM falls short. Mot. ¶ 65. "[T]o satisfy Rule 9(b), a plaintiff must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged."

---

[18] The Management Defendants argue that the CIM's misrepresentations as to Lucky Bucks' attrition rate are not actionable because "[t]he Company was not required to disclose every single business development in real time." Mot. ¶ 65 n.17. But the Trustee's fraud claim does not presuppose that Lucky Bucks (or the Management Defendants) were subject to such an obligation. Rather, the Trustee's claim only presupposes that, in soliciting a *new* investment from the Noteholders, the Management Defendants were not permitted to mislead the Noteholders by creating "a false impression as to the true state of affairs," and failing "to provide qualifying information to cure the mistaken belief." *OpenGate Cap. Grp. LLC v. Thermo Fisher Scientific Inc.*, 2014 WL 3367675, at *11 (D. Del. July 8, 2014).

*DiMare v. MetLife Ins. Co.*, 369 F. App'x 324, 329 (3d Cir. 2010).  The Amended Complaint alleges that Houlihan—an outsider to Lucky Bucks' business—"rel[ied] exclusively on what it was fed by insiders," including Bouskill and Ijaz, to prepare the CIM.  FAC ¶ 131.  The Amended Complaint further alleges that the CIM contained specific representations about Lucky Bucks' attrition rate and financial performance that they knew were false.  To the extent the Management Defendants argue that these allegations amount to "group pleading," this argument fails. "[P]rovided a plaintiff alleges sufficiently particularized allegations, there is no per se rule that group pleading cannot satisfy Rule 9(b)."  *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 455 (Bankr. D. Del. 2006).  Here, the Amended Complaint specifically alleges what the alleged misrepresentations are, why they were false and misleading, where they appeared, who they were transmitted to, and who contributed to the document containing them (*i.e.*, Thadani, Sekhri, Bouskill, Ijaz, and Boyden).  These allegations are plainly sufficient to put Bouskill and Ijaz "on notice of the precise misconduct" with which they are charged.  *DiMare*, 369 F. App'x at 329.[19]

47.    ***Defendant Boyden.***    The Management Defendants ignore the Amended Complaint's allegations against Boyden, arguing that the only false representation he is charged with is his certification of Holdings' solvency.  *See* Mot. ¶ 68.  However, the Amended Complaint alleges that Boyden also made misrepresentations to the Noteholders about Lucky Bucks' lack of attrition and the stability of its location contracts, the EBITDA generated from Lucky Bucks' M&A activity, and Lucky Bucks' relationship with the GLC.  *See supra* ¶¶ 37-38, 41-42.  For the reasons provided above, these misrepresentations are sufficiently particularized and actionable.

48.    In addition, Boyden executed a solvency certificate on behalf of Holdings certifying

---

[19]    The Management Defendants argue that misrepresentations in the CIM are not attributable to Bouskill and Ijaz because the Amended Complaint "admits that Houlihan Lokey prepared it."  Mot. ¶ 65.  In fact, the Amended Complaint actually alleges that Trive "worked together with Houlihan and certain Lucky Bucks insiders—***Ijaz and Bouskill***—to prepare offering materials for the Notes Issuance, including the CIM."  FAC ¶ 130 (emphasis added).

that Holdings was and would remain solvent following the Holdings Distributions and that Boyden "made, or ha[d] caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred herein." FAC ¶ 179. Internal communications from Bouskill and Ijaz suggest that no such "examination or investigation" was undertaken at all, *id.* ¶ 179-80, and thus Boyden's representation that he "made" or "caused to be made" such investigation as "necessary to enable [him] to express an informed opinion" as to Holdings' solvency was false.[20]

49. ***Defendant Sekhri.*** The Amended Complaint alleges that Sekhri made material misrepresentations to the Noteholders regarding Lucky Bucks' attrition rate, financial performance, and ability to grow through further M&A activity. *See supra* ¶¶ 36-39. These misrepresentations were false and actionable for the reasons provided above. *See id.* The Management Defendants mischaracterize Sekhri's misrepresentations about Lucky Bucks' relationship with the GLC and the strength of its farm team as "classic examples" of puffery. Mot. ¶ 73. That is wrong. Sekhri's representations about Lucky Bucks' relationship with the GLC are actionable, even if considered opinions, because purported opinions are "actionable under the securities laws … if the speaker does not genuinely or reasonably believe them." *Appel v. Berkman*, 180 A.3d 1055, 1060 n.25 (Del. 2018). Similarly, "statements [ ] presented as opinions" "cannot be considered mere puffery … if they were made with an intent to deceive." *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *13 (Del. Ch. Jan. 26, 2024). The facts alleged in

---

[20] The Management Defendants assert that the Amended Complaint fails to adequately plead insolvency and thus "cannot plausibly show the certification was false to begin with." Mot. ¶ 68. First, for the reasons set forth above, the Amended Complaint plausibly alleges that Boyden's representation that he conducted an investigation to verify Holdings' solvency was false, which is true whether or not Holdings was in fact insolvent. Second, while insolvency is a fact issue not suitable for resolution at the pleadings stage, the Amended Complaint more than adequately pleads it in any event. *See* FAC ¶¶ 204-11; *In re Essar Steel Minn. LLC*, 2019 WL 2246712, at *6 (D. Del. May 23, 2019); *Miller v. Mott*, 2023 WL 6467368, at *6 (Bankr. D. Del. Oct. 4, 2023); *see also* Trive Opp. ¶ 65.

the Amended Complaint—*e.g.*, Lucky Bucks' failure to comply with the GLC's order banning Damani from exercising control over the business, its being singled out for adverse enforcement action by the GLC, and management's acknowledgement that the GLC "just hates us" and "is not happy with us" (FAC ¶¶ 184-86)—are more than sufficient to support a reasonable inference that Sekhri cannot possibly have genuinely believed that Lucky Bucks had a "strong relationship" with the GLC, was in compliance with all of its orders, and could only benefit from increased enforcement.   Sekhri's misrepresentations as to Lucky Bucks' relationship with the GLC accordingly are actionable even if "presented as opinions." *Labyrinth*, 2024 WL 295996, at *13.

50.     Sekhri's statements about the professionalism, experience, and integrity of its "farm team" are actionable for the same reasons.   While Sekhri presented the farm team as legitimate and experienced sales people who would drive the company's future M&A growth, they were in fact relatives and friends of Damani—who was supposed to have no involvement in Lucky Bucks' operations—and management.   *See* FAC ¶¶ 10, 165, 265-67.   Members of the farm team were also involved in Damani and Kassam's scheme to strip Lucky Bucks of its assets and cause it to purchase COAM locations at inflated valuations and thus, far from facilitating the company's growth, were actively abetting its demise.   *See id.* ¶¶ 27, 146, 267.   These allegations, at a minimum, raise a question of fact as to whether Sekhri genuinely believed that the farm team was, as he represented it, a group of seasoned professionals that would drive Lucky Bucks' growth, making dismissal at the pleadings stage improper.   *See*, *e.g.*, *Phage Diagnostics, Inc. v. Corvium, Inc.*, 2020 WL 1816192, at *7 (Del. Super. Mar. 9, 2020) ("Viewing the facts under the light most favorable to Plaintiff, the Court concludes that there exists, at a minimum, a question of fact as to whether Defendant's statements were affirmative statements or mere puffery.").

51.     ***Each of the Management Defendants are also liable for fraud by omission.***   As

set forth above, the Amended Complaint alleges that the Management Defendants concealed Lucky Bucks' actual performance through the use of outdated and inflated EBITDA figures, as well as exceedingly low COAM attrition rates that were inconsistent with then-known information. *See*, *e.g.*, FAC ¶¶ 9, 24, 32, 173, 206. Although these statements were materially misleading in themselves, they also misled through omission because the Management Defendants failed to provide the Noteholders information relating to Lucky Bucks' current and more recent financial performance that would have corrected misperceptions based on the information provided. Sekhri, Boyden, Bouskill, and Ijaz—who attended Noteholder calls with Thadani, contributed to the CIM, and helped prepare answers to diligence questions—sat idly by knowing that misrepresentations and misleading half-truths were being used to market the Notes.

52. Under these circumstances, a duty to disclose exists because a party has a "duty to disclose" any information necessary "to prevent statements actually made from being misleading." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *see W. Valley KB Venture, LLC v. ILKB LLC*, 2021 WL 4171918, at *7 (E.D.N.Y. Sept. 13, 2021) ("[O]nce a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."). The Management Defendants accordingly may also be held liable for fraud by omission. *See*, *e.g.*, *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 708-09 (D. Del. 2010) (plaintiff stated claim for fraud by omission against officer where officer approved the transaction but failed to disclose material facts that would have prevented seller's misrepresentations from inducing plaintiff to enter the transaction).

**B.**     **The Trustee Has Pled Negligent Misrepresentation, in the Alternative**

53.     The Management Defendants fail to make any independent arguments for why the Trustee's claim for negligent misrepresentation (Count X) fails.  The claim survives for the same reasons as Plaintiffs' common law fraud claims: "negligent misrepresentation requires the same elements" as fraud, "except the plaintiff need not demonstrate that the misrepresentation was made knowingly or recklessly."  *In re Med. Wind Down Holdings III, Inc.*, 332 B.R. 98, 102 (Bankr. D. Del. 2005); *see also Lieberman v. BeyondTrust Corp.*, 2020 WL 1815547, at *5 (D. Del. Apr. 9, 2020) (explaining that "representations made by a party in the course of a business transaction in which that party has a pecuniary interest often form the basis of negligent misrepresentation claims").  Accordingly, to the extent that the Management Defendants were merely negligent in making the misrepresentations and omissions described above, they are liable (in the alternative) for negligent misrepresentation.[21]

**C.**     **The Management Defendants' Remaining Arguments Are Meritless**

54.     In the penultimate section of their brief (Mot. ¶¶ 75-79), the Management Defendants offer their interpretation of certain evidence cited in the Amended Complaint. The Management Defendants' interpretation of that evidence is tendentious at best and, more importantly, ignores that on review of a motion to dismiss, "courts accept as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiffs." *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). Thus, for example, the Management Defendants assert that the Amended Complaint

---

[21]     Because the Management Defendants did not dispute the legal sufficiency of the Trustee's claim for negligent misrepresentation other than by denying that any of the Management Defendants made actionable misrepresentations, they should not be permitted to make new arguments against this claim on reply.  *See Williams v. Netflix, Inc.*, 2023 WL 3478568, at *2 (D. Del. May 16, 2023); *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 751 F.3d 150, 157 (3d Cir. 2014) ("We have consistently held that an issue is waived unless a party raises it in its opening brief.").

"mischaracteriz[es]" an email from Sekhri in which he said "we should somehow just show [prospective lenders] Yearly numbers" and avoid showing actual Q4 results. Mot. ¶ 78. The Management Defendants claim there was nothing untoward about this communication, notwithstanding that Sekhri specifically advocated this approach because withholding Q4 results ensured the presentation would misleadingly "show tremendous growth over the PF 2020A." FAC ¶ 19. Similarly, the Management Defendants contend there was nothing improper about Sekhri encouraging his colleagues to "hide behind the availability of the [GLC] portal data" so that they could avoid giving honest answers to prospective lenders. Mot. ¶ 78 n.22. The Management Defendants will have the opportunity to offer their version of events. For purposes of this Motion, however, their favored interpretation of the evidence must be disregarded.[22]

## IV.   The Amended Complaint Adequately Pleads Claims For Attorneys' Fees and Punitive Damages

55.   Finally, the Amended Complaint states claims for attorneys' fees and punitive damages under Georgia Law (Counts XI and XII). The Management Defendants' only arguments against such relief are that the substantive claims under Georgia law fail. *See* Mot. ¶ 80. But for the reasons set forth above, the Amended Complaint plausibly alleges claims for fraudulent transfer, securities fraud, common law fraud, and negligent misrepresentation under Georgia law. The Trustee is accordingly entitled to such relief. *See* O.C.G.A. § 13-6-11; *id.* § 51-12-5.1.

### CONCLUSION

56.   For all the reasons explained above, the Court should deny the Motion.

---

[22]   The Management Defendants argue that these communications are irrelevant because they did not relate to the Notes issuance or occurred after the Notes were issued. Mot. ¶ 78 & n.22. But the Amended Complaint does not allege that Noteholders relied on these specific representations to their detriment. Rather, it includes these communications because they are illustrative of the broader pattern of deception that the Management Defendants were engaged in and, in any event, are probative of fraudulent intent. *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, 2019 WL 3916536, at *2 (D. Del. July 2, 2019) ("Post-transaction conduct is often admitted to show pre-transaction intent.").

Dated: June 2, 2025                          WHITEFORD TAYLOR & PRESTON LLC
     Wilmington, Delaware        By: */s/  Bradley P. Lehman*
                                       William F. Taylor, Jr. (DE No. 2936)
                                       Bradley P. Lehman (DE No. 5921)
                                       600 North King Street, Suite 300
                                       Wilmington, DE 19801
                                       Telephone: (302) 295-5674
                                       Facsimile: (302) 295-5678

                                       -and-

                                       QUINN EMANUEL URQUHART
                                       & SULLIVAN LLP
                                       Susheel Kirpalani
                                       Andrew J. Rossman
                                       Matthew R. Scheck
                                       Mario O. Gazzola
                                       Kenneth B. Hershey
                                       295 Fifth Avenue, 9th Floor
                                       New York, New York 10016
                                       Telephone: (212) 849-7000
                                       Facsimile: (212) 849-7100

                                       *Counsel to the Chapter 7 Trustee*