## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| LUCKY BUCKS HOLDINGS LLC, | No. 23-10756 (KBO) |
| *Debtor*. | |
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of Lucky Bucks Holdings LLC and as assignee, | Adversary Proceeding |
| *Plaintiff*, | No. 24-50130 (KBO) |
| v. | |
| TRIVE CAPITAL MANAGEMENT LLC, *et al.*, | |
| *Defendants*. | |

## REPLY MEMORANDUM IN SUPPORT OF TRIVE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

PACHULSKI STANG ZIEHL
   & JONES LLP

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400

WILMER CUTLER PICKERING
   HALE AND DORR LLP

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Charles C. Bridge (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363

Dated: July 2, 2025

# TABLE OF CONTENTS

I.    THE FRAUDULENT TRANSFER CLAIMS SHOULD BE DISMISSED ...........................................1

    A.    The Fraudulent Transfer Claims Purportedly Assigned By The Noteholders Fail Because The Noteholders Had No Authority To Bring Those Claims (Counts III, IV) ....................................................1

    B.    All Fraudulent Transfer Claims Fail Because The Noteholders Consented To And Ratified Holdings' Transfer Of The Notes Proceeds To Its Shareholders (Counts I-IV) ...........................................3

II.   THE OTHER STATUTORY AND COMMON-LAW CLAIMS SHOULD BE DISMISSED .................7

    A.    The Improper-Dividends Claim Should Be Dismissed (Count V) .........................7

    B.    The Georgia And Delaware Statutory Claims Are Impermissibly Extraterritorial (Counts VI-VIII) ...........................................10

        1.    The alleged transactions did not occur within Georgia. ...........................12

        2.    The alleged transactions did not occur within Delaware. .........................14

    C.    The State-Law Statutory And Common-Law Claims Also Fail For Lack of Falsity And/Or Justifiable Reliance (Counts VI-X) ...........................................15

        1.    Most of the alleged misstatements were not false statements of fact ........15

        2.    The remaining alleged misstatements were non-actionable puffery, predictions, or projections........................................18

        3.    The Noteholders did not justifiably rely on the alleged misrepresentations and omissions...........................................19

        4.    The Trive Defendants are not liable for fraud by omission because they owed the Noteholders no duty to disclose .........................................20

        5.    The Negligent Misrepresentation claim fails because the Trive Defendants did not owe any duty of care to the Noteholders...................21

    D.    The Claims Sounding In Fraud Lack The Particularity Required By Rule 9(b) (Counts VI-X) ...........................................22

III.  THE CLAIMS FOR ATTORNEY'S FEES AND PUNITIVE DAMAGES SHOULD BE DISMISSED ...........................................23

IV.   THE COURT SHOULD DISMISS WITH PREJUDICE .............................................23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
163 F.3d 780 (3d Cir. 1999).............................................................................10

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)...........................................................................12, 13

*Accelerant Twister, LLC v. Marjo, LLC*,
2023 WL 4457422 (D. Del. July 11, 2023) .........................................................16

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994)...............................................................................18

*Arwood v. AW Site Services, LLC*,
2022 WL 705841 (Del. Ch. Mar. 9, 2022)..........................................................20

*ASARCO LLC v. Ams. Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) .............................................................................4

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
57 F.3d 146 (2d Cir. 1995)..................................................................................21

*Crescent Res. Litig. Tr. v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex. 2013)............................................................................4

*Crigger v. Fahnestock & Co.*,
443 F.3d 230 (2d Cir. 2006)...............................................................................20

*Crum & Forster Indem. Co. v. Sidelines Tree Serv., LLC*,
557 F. Supp. 3d 616 (W.D. Pa. 2021).................................................................2

*Daughtry v. Silver Fern Chem., Inc.*,
2024 WL 2211005 (E.D. Tex. May 16, 2024)......................................................20

*Donahue v. Dauphin Cnty.*,
2020 WL 5200391 (M.D. Pa. May 14, 2020)......................................................17

*Eberhard v. Marcu*,
530 F.3d 122 (2d Cir. 2008).................................................................................6

*Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*,
251 A.3d 212 (Del. Ch. 2021)..............................................................................9

*First Bank of Georgia v. Robertson Grading, Inc.*,
761 S.E.2d 628 (Ga. Ct. App. 2014)...................................................................22

*Getzler v. River Run Foods (DE), LLC*,
  2024 WL 3273430 (Del. Super. Ct. July 1, 2024) ............................................................20

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989) .................................................................................................10, 12

*In re Ampal-Am. Isr. Corp.*,
  648 B.R. 457 (Bankr. S.D.N.Y. 2023) ...........................................................................4

*In re Barnett*,
  2015 WL 9581384 (Bankr. S.D.N.Y. Dec. 29, 2015) ......................................................2

*In re Bos. Generating LLC*,
  617 B.R. 442 (Bankr. S.D.N.Y. 2020) .........................................................................4, 5

*In re CBI Holding Co.*,
  529 F.3d 432 (2d Cir. 2008) ...........................................................................................2

*In re Dura Medic Holdings, Inc. Consol. Litig.*,
  331 A.3d 796 (Del. Ch. 2025) .........................................................................................9

*In re Extended Stay, Inc.*,
  2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) ......................................................4

*In re Honeywell Int'l Inc. Consol. S'holder Litig.*,
  2024 WL 492392 (D. Del. Feb. 8, 2024) ............................................................16, 21, 23

*In re IIG Glob. Trade Fin. Fund Ltd.*,
  666 B.R. 38 (Bankr. S.D.N.Y. 2024) ...............................................................................4

*In re Lyondell Chemical Co.*,
  503 B.R. 348 (Bankr. S.D.N.Y. 2014) .....................................................................4, 6, 7

*In re Maxus Energy Corp.*,
  641 B.R. 467 (Bankr. D. Del. 2022) ...............................................................................2

*In re Millennium Lab Holdings II, LLC*,
  2025 WL 794311 (Bankr. D. Del. Mar. 12, 2025) ...........................................................4

*In re Our Alchemy, LLC*,
  642 B.R. 155 (Bankr. D. Del. 2022) .............................................................................16

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...........................................................................15

*In re Physiotherapy Holdings, Inc.*,
  2016 WL 3611831 (Bankr. D. Del. June 20, 2016) .................................................3, 4, 5

*In re Pinktoe Tarantula Ltd.*,
    2023 WL 2960894 (Bankr. D. Del. Apr. 14, 2023) ........................................................8

*In re PWS Holding Corp.*,
    303 F.3d 308 (3d Cir. 2002) ...........................................................................................2

*In re Quorum Health Corp.*,
    2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) ................................................1, 2, 3

*In re Resorts Int'l, Inc.*,
    181 F.3d 505 (3d Cir. 1999) ...........................................................................................3

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002) .........................................................................................23

*In re Trib. Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019) .....................................................................................1, 2, 3

*In re Trinsum Grp., Inc.*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ............................................................................8

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ............................................................................4

*In re Washington Mut. Inc.*,
    741 F. App'x 88 (3d Cir. 2018) ....................................................................................17

*In re Wilton Armetale, Inc.*,
    968 F.3d 273 (3d Cir. 2020) .......................................................................................1, 2

*In re Zohar III, Corp.*,
    2021 WL 3124298 (Bankr. D. Del. July 23, 2021) ......................................................18

*Labyrinth, Inc. v. Urich*,
    2024 WL 295996 (Del. Ch. Jan. 26, 2024) ..................................................................20

*Lieberman v. BeyondTrust Corp.*,
    2020 WL 1815547 (D. Del. Apr. 9, 2020) ....................................................................22

*Lilliston v. Regions Bank*,
    653 S.E.2d 306 (Ga. Ct. App. 2007) ............................................................................22

*Marcellus Constr. Co. v. Village of Broadalbin*,
    755 N.Y.S.2d 474 (App. Div. 2003) .............................................................................22

*Mosiman v. Madison Cos.*,
    2019 WL 203126 (D. Del. Jan. 15, 2019) ....................................................................23

        ACTIVEUS 210430675v.13

*Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*,
    710 F. Supp. 2d 458 (D. Del. 2010)................................................................23

*Peruto v. Timbertech Ltd.*,
    2015 WL 8664276 (D.N.J. Dec. 10, 2015)..........................................................8

*RJR Nabisco v. Eur. Cmty.*,
    579 U.S. 325 (2016)......................................................................................13

*Ruiz v. Sewon Am., Inc.*,
    766 F. Supp. 3d 1251 (N.D. Ga. 2025) .............................................................14

*Singer v. Magnavox Co.*,
    380 A.2d 969 (Del. 1977) .........................................................................14, 15

*Smith v. BCE Inc.*,
    225 F. App'x 212 (5th Cir. 2007) (per curiam) ................................................21

*Solutia Inc. v. FMC Corp.*,
    456 F. Supp. 2d 429 (S.D.N.Y. 2006).............................................................21

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983) ..........................................................................21

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,
    479 B.R. 405 (N.D. Tex. 2012)...............................................................5, 6, 7

*United Gov't Sec. Officers of Am. v. Exelon Nuclear Sec., LLC*,
    2013 WL 5812111 (E.D. Pa. Oct. 24, 2013)......................................................2

*Wang v. Zymergen Inc.*,
    744 F. Supp. 3d 995 (N.D. Cal. 2024) ........................................................ 17-18

*West Valley KB Venture, LLC v. ILKB LLC*,
    2021 WL 4171918 (E.D.N.Y. Sept. 13, 2021) ..............................................20, 21

*William Goldberg & Co. v. Cohen*,
    466 S.E.2d 872 (Ga. Ct. App. 1995)...............................................................20

*Yegiazaryan v. Smagin*,
    599 U.S. 533 (2023)......................................................................................13

## STATUTES

11 U.S.C.
    § 544.....................................................................................................1, 2, 3
    § 546........................................................................................................2, 3

Del. Code Ann. tit. 6, § 18-607.............................................................................8

The Trustee's opposition ("<u>Opposition</u>" or "<u>Opp.</u>") hopscotches between misdirection, inapposite case law, and improper attempts to amend, yet again, his Amended Complaint. What the Opposition does *not* do is identify any valid claim for relief that the Trustee has properly pled. The Amended Complaint should be dismissed with prejudice.[1]

## I.   THE FRAUDULENT TRANSFER CLAIMS SHOULD BE DISMISSED

### A.   The Fraudulent Transfer Claims Purportedly Assigned By The Noteholders Fail Because The Noteholders Had No Authority To Bring Those Claims (Counts III, IV)

1.   Counts III and IV fail because the Noteholders have no statutory authority to bring the fraudulent transfer claims that they purported to assign to the Trustee. *See* Mot. ¶¶ 27-28. It is well settled that once a debtor files for bankruptcy, the trustee obtains the *exclusive* authority to bring any fraudulent transfer claims under the Bankruptcy Code, and creditors can no longer pursue any such claims under state law applicable outside of bankruptcy. *See* 11 U.S.C. § 544(b). As the Third Circuit has instructed, "[b]ankruptcy … deprive[s] [creditors] of the statutory authority to bring [claw-back] claims," including "claims for … fraudulent transfer," and "transfer[s] that power to the trustee." *In re Wilton Armetale, Inc.*, 968 F.3d 273, 281-85 (3d Cir. 2020); *see also In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 86 (2d Cir. 2019) ("trustee['s] powers under [§] 544 are exclusive"); Mot. ¶ 27 & n.7. Fraudulent transfer claims are accordingly "the exclusive province of the trustee, not a creditor," to prosecute. *Wilton*, 968 F.3d at 282-84. And, because the Noteholders could not now bring fraudulent transfer claims, their assignee (the Trustee) cannot bring those claims either.[2] *See* Mot. ¶¶ 27-28.

---

[1] Capitalized terms not defined in this Reply Brief have the meanings set forth in the motion to dismiss. References to filings (i) in this adversary proceeding are cited as "D.I."; (ii) in the bankruptcy case, Case No. 23-10756, as "Bankr. D.I."; and (iii) on unrelated dockets as "ECF No.".

[2] Contrary to the Trustee's contention (Opp. ¶ 30), *Quorum* supports this result. Although *Quorum* read a confirmed Chapter 11 plan to permit a litigation trust to assert fraudulent transfer claims under § 544 and as creditor assignee, *Quorum* acknowledged that in "a chapter 7 case"—like this one—controlling Third Circuit law requires "that the trustee must overtly abandon an estate cause of action during the bankruptcy case before the right to pursue that action

2.      The Trustee concedes that he cannot sue as the Noteholders' assignee on state-law fraudulent transfer claims while also asserting those claims under § 544(b).  Opp. ¶ 28, 30 n.9.  But he contends that he can plead Counts III and IV "in the alternative," if Counts I and II "fail."  Opp. ¶ 28.  That is wrong.  If Counts I and II fail, nothing will remain to bring "in the alternative."

3.      This, too, is settled law.  The disposition of the Trustee's § 544(b) claims will "extinguish[] all potential fraudulent transfer claims" and "preclude[] [the Noteholders] from … prosecuting those claims" under state law.  *In re PWS Holding Corp.*, 303 F.3d 308, 311, 314-15 (3d Cir. 2002); *Trib.*, 946 F.3d at 83 ("A disposition of this federal law claim [under § 544(b)] extinguishes the right of creditors to bring state law, fraudulent conveyance claims").  The Trustee therefore cannot plead Counts III and IV in the alternative because they will not become viable if the primary § 544(b) claim fails; just the opposite, they will be "extinguish[ed]."[3]

4.      Indeed, given that § 544(b) already grants the Trustee the authority to bring whatever fraudulent transfer claims the Noteholders could have brought under state law but subject to the limitations set forth in the Bankruptcy Code, the *only* possible reason the Trustee also seeks to bring those claims as assignee is to circumvent the Code's limitations.  The Trustee admits as much.  He urges, for example, that if his § 544(b) claims fail under § 546(e)'s safe harbor, he can nonetheless bring the same barred claims as the Noteholders' assignee under state law, purportedly

---

would revert to a creditor."  *In re Quorum Health Corp.*, 2023 WL 2552399, at *8 n.47 (Bankr. D. Del. Mar. 16, 2023) (citing *Wilton*, 968 F.3d at 284).  No such reversion can occur here, where the Trustee has assumed the authority to prosecute, not abandon, the Noteholders' fraudulent transfer claims.  The Trustee's other cases (Opp. ¶ 27) merely permit trustees to bring assigned *tort or contract* claims, not *fraudulent transfer* claims.  *In re CBI Holding Co.*, 529 F.3d 432, 459 (2d Cir. 2008); *In re Barnett*, 2015 WL 9581384, at *6-7 (Bankr. S.D.N.Y. Dec. 29, 2015).

[3] The Trustee's own authorities either support this conclusion, because they too dismissed claims pled in the alternative, or are inapposite because they did not concern fraudulent transfer claims that Congress provided only a trustee could bring and only under § 544.  *See Crum & Forster Indem. Co. v. Sidelines Tree Serv., LLC*, 557 F. Supp. 3d 616, 625-26 (W.D. Pa. 2021) (dismissing subrogation claim pled in alternative because it could not proceed even if primary claim to rescind insurance policies failed); *In re Maxus Energy Corp.*, 641 B.R. 467, 566 (Bankr. D. Del. 2022) (equitable remedy of unjust enrichment pled in alternative to legal remedy of fraudulent transfer); *United Gov't Sec. Officers of Am. v. Exelon Nuclear Sec., LLC*, 2013 WL 5812111, at *6 (E.D. Pa. Oct. 24, 2013) (arbitrability under regulations pled in alternative to arbitrability under contract).

free of the safe harbor. Opp. ¶ 29 n.8.[4]  Courts have rejected that very argument. *See Trib.*, 946

F.3d at 90-97 (§ 546(e) preempted creditors' fraudulent-transfer claims); *Quorum*, 2023 WL

2552399, at *8-11 (§ 546(e)'s bar of estate's § 544(b) claims also barred fraudulent-transfer claims

trustee asserted as noteholders' assignee).[5]

5.     The Bankruptcy Code is not optional.  Congress placed fraudulent transfer claims

in the hands of a trustee in bankruptcy, and then limited those claims in furtherance of competing

federal policies, including the need to protect the securities markets. *See In re Resorts Int'l, Inc.*,

181 F.3d 505, 515 (3d Cir. 1999) (explaining that § 546(e) reflects Congress' balancing of

competing policies, including those fostering the securities markets), *abrogated in part on other*

*grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018).  The Trustee can

no more opt out of these statutory limitations than any party can elect to disregard any law.  The

Trustee must accept the Code's burdens as well as its benefits.  Counts III and IV fail.

**B.     All Fraudulent Transfer Claims Fail Because The Noteholders Consented To And Ratified Holdings' Transfer Of The Notes Proceeds To Its Shareholders (Counts I-IV)**

6.     The Noteholders expressly authorized and directed Holdings to use the Notes

proceeds to fund the Holdings Distributions.  Mot. ¶¶ 30-41.  As a matter of law, that consent

estops the Trustee, standing in the Noteholders' shoes, from seeking to recover (as supposed

fraudulent transfers) the very transfers that the Noteholders agreed would be made. *Id.*

---

[4]  While Trive has not moved to dismiss on this ground because of the need for the development of a factual record on certain points, Trive reserves all rights to assert the § 546(e) safe harbor if any of the Trustee's claims survive this Motion.  The Holdings Distributions were made pursuant to a securities contract, the Note Purchase Agreement.
[5]  As *Quorum* explained, the Trustee's sole contrary authority, *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *5-10 (Bankr. D. Del. June 20, 2016), is unpersuasive. *See* 2023 WL 2552399, at *8-11.  The Trustee's remaining cases (Opp. ¶¶ 28-29 nn.7-8) merely suggest that where, unlike here, a trustee effectively abandons the estate's fraudulent transfer claims by failing to sue before the Code's statute of limitations expires or the bankruptcy case is closed, creditors might regain the authority to bring them.

7.      The Trustee responds that ratification requires full knowledge of all material facts and asserts that the Noteholders did not have such knowledge—even though he concedes they knew the Notes proceeds would be used to fund the Holdings Distributions—because the Noteholders were allegedly misled about Holdings' financial condition and creditworthiness.  Opp. ¶¶ 32-40.  But as courts have recognized, that argument conflates the law of fraudulent *inducement* with the law of fraudulent *transfer*.  Mot. ¶¶ 35-38.  The defense of consent or ratification does require knowledge of all material facts.  But the relevant question is *which* facts are material for purposes of the claim at hand.  On a claim for *fraud* alleging that the Noteholders were fraudulently *induced* to make a *loan* to Holdings, the Noteholders' alleged lack of knowledge of facts regarding Holdings' creditworthiness might indeed preclude a ratification defense.  But on a claim for fraudulent *transfer*, the only material fact that the Noteholders needed to know to have ratified Holdings' *transfer* of the Notes proceeds was that Holdings would *transfer* the Notes proceeds, not retain them.  The Noteholders undisputedly were not misled about that fact in any way.

8.      To be sure, as the Trive Defendants have acknowledged, there is a split in the case law on this issue.  *See* Mot. ¶¶ 35-36 & n.12.  The Trustee urges the Court to follow the two cases on the side of that split that support his position—*Physiotherapy* and *Boston Generating*.[6]  But those decisions are unpersuasive.  Although the lenders in those cases had agreed to the very

---

[6] The other decisions the Trustee cites do not address the issue.  *See In re Millennium Lab Holdings II, LLC*, 2025 WL 794311, *5-7 (Bankr. D. Del. Mar. 12, 2025) (no ratification defense raised or addressed); *In re IIG Glob. Trade Fin. Fund Ltd.*, 666 B.R. 38, 81-82 (Bankr. S.D.N.Y. 2024) (denying ratification defense because, unlike here, creditors did not know debtor would make challenged transfers); *In re Ampal-Am. Isr. Corp.*, 648 B.R. 457, 475-81 (Bankr. S.D.N.Y. 2023) (upholding verdict that debtor ratified payment of fee in non-fraudulent-transfer case); *In re Extended Stay, Inc.*, 2020 WL 10762310, at *72, *74-75 (Bankr. S.D.N.Y. Aug. 8, 2020) (denying ratification defense because lenders' mere agreement to cash-management agreement's "waterfall" provisions did not establish consent to future dividends that debtors later unlawfully chose to pay, and distinguishing *Lyondell* and *Crescent Resources* on that basis); *In re Tronox Inc.*, 503 B.R. 239, 252-53, 258-59, 271-72, 276, 284 (Bankr. S.D.N.Y. 2013) (denying ratification defense where, unlike here, there was no indication that bondholders knew of or consented to (i) debtor's eventual transfer to parent of proceeds from the bonds, bank loans, and debtor's IPO or (ii) affiliate's transfers of oil and gas assets years earlier, which "were not meaningfully disclosed"); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 427-28 (S.D. Tex. 2008) (noting lack of argument "that ASARCO's creditors ratified the challenged transaction" by which debtor transferred stock without consent of unpaid environmental, tort, and other creditors).

transfers that were alleged to be avoidable, the courts rejected the defendants' ratification defenses because the lenders were allegedly misled to *lend* to the borrowers without full knowledge of all material facts. *See Physiotherapy Holdings*, 2016 WL 3611831, at *12-13 ("With respect to a *bond issuance*, the borrower's financial health may be the most material fact" "to a reasonable investor's *decision to lend money to a company*"; "the Senior Noteholders may have been *misled into lending money*" (emphasis added)); *In re Bos. Generating LLC*, 617 B.R. 442, 494-95 (Bankr. S.D.N.Y. 2020) ("With respect to *the loans* … [the borrower's] financial health is likely the most material fact"; "the Lenders … may have made the decision to *loan money* based on material misstatements"), *aff'd on other grounds sub nom. Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021), *aff'd sub nom. In re Bos. Generating, LLC*, 2024 WL 4234886 (2d Cir. Sept. 19, 2024).

9.      As the better-reasoned cases on the other side of the split explain, that reasoning improperly applies the law of fraudulent *inducement* to an entirely different claim, one of fraudulent *transfer*. For example, in *U.S. Bank National Association v. Verizon Communications, Inc.*, 479 B.R. 405 (N.D. Tex. 2012), the plaintiff made substantially the same argument that the Trustee advances here: that "even if the banks and bondholders did know about the transfers, they were still 'duped' or 'tricked' about the substance of [the borrower] Idearc and the spin-off," and therefore "they did not actually ratify the transfer from Idearc to Verizon because they lacked 'full knowledge' of the nature of the spin-off." *Id.* at 411. The court rejected that argument as "irrelevant," explaining that "[t]he plaintiff's claims are for fraudulent transfers, not for fraud." *Id.* Because "[f]raudulent transfers are not voidable where the benefit would run to a creditor that ratified the transfer," "a creditor cannot avoid a transfer after he has voluntarily assented to it." *Id.* (alterations and quotation marks omitted).

10.    *Lyondell* similarly dismissed fraudulent transfer claims brought for the benefit of lenders that knew the debtor would use the loan proceeds to pay its shareholders.  *See In re Lyondell Chemical Co.*, 503 B.R. 348, 384-85 (Bankr. S.D.N.Y. 2014), *abrogated on other grounds by In re Trib. Co. Fraudulent Conv. Litig.*, 818 F.3d 98 (2d Cir. 2016).  The court so held even though the plaintiff alleged the borrower's earnings had been "inflated," causing the lenders to make their loans.  *See id.* at 389 & n.201, 390-92 (citing allegations that "the earnings projections upon which the Merger financial case was being based were unsupportable").  "While more nuanced knowledge might be necessary to establish ratification *in other contexts*," the court explained, it was "more than sufficient" in the context of a fraudulent-transfer claim "for the [] lenders to have known … that they were lending for the purposes of an LBO, and that the proceeds of their loans were going to stockholders."  *Id.* at 385 (emphasis added).

11.    *Verizon* and *Lyondell* got it right.  Common law fraud (or fraudulent inducement) claims and fraudulent transfer claims are distinct causes of action.  The legal wrong that fraudulent transfer law addresses is a debtor's transfer of assets that creditors expected the debtor to retain to repay the creditors' claims.  *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) (fraudulent transfer law is a creditor remedy "whose object … is to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment" (quotation marks omitted)).  A fraudulent transfer claim simply cannot lie where, as here, the creditors authorized the debtor to transfer assets and knew that those assets would be unavailable to repay their claims.  *See* Mot. ¶¶ 30-34 & n.10, ¶ 41.

12.    The Trustee responds that the alleged fraud in connection with the loan cannot be separated from the transfer because the Noteholders made their loans to fund the transfer.  Opp. ¶¶ 35-37.  But that was also the case in both *Verizon* and *Lyondell*.  There, as here, the lenders made loans for the express purpose of funding the challenged transfers, yet despite allegations that

the borrower's financial health had been misrepresented, the courts held that the lenders' consent to the transfers precluded them from bringing fraudulent transfer claims. *Verizon*, 479 B.R. at 410-11; *Lyondell*, 503 B.R. at 385, 389 & n.201, 390-92. The alleged wrong in this case is not that Holdings transferred the Notes proceeds; the express purpose for the issuance of the Notes was to finance the Holdings Distributions to the Holdings shareholders, and the Noteholders accordingly knew full well that Holdings would not retain the proceeds and the Noteholders would not be able to look to those proceeds for repayment. Rather, if the Noteholders have been wronged at all, it is that they were supposedly induced by allegedly fraudulent misrepresentations to provide the financing in the first place.[7]

13.    The remedy for any alleged misrepresentations about Lucky Bucks's value that induced the Noteholders to extend credit to Holdings is a claim for fraudulent inducement. The Trustee has brought such a claim here (Count IX) as the Noteholders' assignee, as well as statutory claims sounding in fraud (Counts VI-VIII)—but, critically, to prevail on those claims, he will have to prove each required element, including material misrepresentations, scienter, and justifiable reliance. The Trustee cannot circumvent those requirements simply by dressing up a fraud claim as a purported fraudulent transfer claim to claw back funds that the Noteholders *agreed* Holdings would transfer to its shareholders and *knew* would therefore be unavailable to satisfy their claims.

## II.    THE OTHER STATUTORY AND COMMON-LAW CLAIMS SHOULD BE DISMISSED

### A.    The Improper-Dividends Claim Should Be Dismissed (Count V)

14.    The Amended Complaint fails to plead any facts plausibly alleging that Holdings was rendered insolvent by the Holdings Distribution, let alone that any Trive Defendant "knew at

---

[7] Indeed, the Note Purchase Agreement provisions cited by the Trustee made the truth of the representations about the company's financial health a condition of the Noteholders' "obligation … to purchase [the] Notes"—i.e., their decision to lend money to Holdings—not a condition of Holdings' transfer of the loaned funds to its shareholders. *See* Note Purchase Agreement §§ 4.01(h), (*l*), 4.02(g), Ex. N (attached as Ex. B to Decl. of Ross E. Firsenbaum in Supp. of Trive Defs.' Mot. to Dismiss Pls.' Am. Compl., D.I. 78-2).

the time" of such insolvency.  Del. Code Ann. tit. 6, § 18-607(a)-(b); *see* Mot. ¶¶ 42-46.  Contrary to the Trustee's contention, that failure is dispositive.  *See In re Pinktoe Tarantula Ltd.*, 2023 WL 2960894, at *9-10 (Bankr. D. Del. Apr. 14, 2023) (dismissing claim for failure to plead insolvency); *In re Trinsum Grp., Inc.*, 460 B.R. 379, 392-93 (Bankr. S.D.N.Y. 2011) (same). Similarly, the Trustee's own authorities emphasize that he "may not rest upon conclusory statements to generally allege knowledge and intent" and must instead plead facts establishing "circumstantial grounds" that make it "sufficiently plausible" the defendant had such knowledge. *Peruto v. Timbertech Ltd.*, 2015 WL 8664276, at *3-4 (D.N.J. Dec. 10, 2015).

15.     The Amended Complaint fails to do so.  Most of the allegations the Trustee cites merely (i) describe the transactions in which Lucky Bucks and Holdings borrowed money to pay dividends or (ii) allege that Lucky Bucks's business was, at the time, supposedly "declining."  Opp. ¶¶ 44-45.  Merely alleging that Holdings incurred debt or that Lucky Bucks's business was somehow "declining" does not create a plausible inference that Holdings was rendered insolvent (i.e., that its asserts had declined so much that they were now worth less than its debts)—much less that the Trive knew it was.  *Trinsum*, 460 B.R. at 392-93 (alleging decreasing revenues and increasing debt "insufficient … to determine whether the Debtors were insolvent").

16.     Also insufficient is the passive-voice allegation that it "was known" that Holdings could not repay the Notes, without detailing *who* supposedly "knew" that.  Am. Compl. ¶ 210; *see* Opp. ¶ 46.  The Trive Defendants raised this same deficiency in the Trustee's initial complaint. *See* D.I. 29 ¶¶ 19, 51.  The Amended Complaint's failure even to try to cure the defect—and allege in the active voice that *the Trive Defendants* had such knowledge—is all the more telling.

17.     To show that the Trive Defendants supposedly "knew" that Holdings was insolvent, the Trustee points only to allegations of (i) Mr. Thadani's and Mr. Searcy's alleged "real time"

receipt of information from the GLC regarding COAM attrition, and (ii) a snippet from a statement Mr. Thadani allegedly made after the issuance of the Notes.  Opp. ¶¶ 44-45 & n.14 (citing Am. Compl. ¶¶ 32, 104, 106, 108, 170).  As for the former, aside from conclusory allegations, the Trustee cites only two concrete examples of the supposed "real time" information:  two stale notices received between 9 and 12 months before the Notes were issued, indicating merely that certain COAMs were then due for renewal and that other COAMs at a single location were being cancelled.  *See* Mot. ¶ 46.  Those allegations do not remotely establish that the Trive Defendants knew, nearly a year later, that Lucky Bucks was losing a material amount of COAMs—much less that they "knew" any such attrition was so drastic as to render Holdings insolvent.  And as for the snippet, the Amended Complaint merely alleges (¶ 170) that Mr. Thadani suggested postponing one acquisition for a short period.[8]

18.     The Trustee's efforts (Opp. ¶¶ 46-48) to impute Mr. Sekhri's knowledge to the Trive Defendants fare no better.  It is simply wrong that Trive's appointment of Mr. Sekhri to Holdings' board made him an agent, whose knowledge can be imputed to his principal (Trive); on the contrary, it is well settled that directors are not agents of the company's shareholders.[9]  In any event, the Amended Complaint all but admits that the Trive Defendants were "not involved in the criminal enterprise of Damani and Kassam," since that enterprise was "reveal[ed] for the first time" years later in Arc Gaming's 2024 lawsuit.  Am. Compl. ¶¶ 26, 33.

19.     In fact, the Amended Complaint itself belies any notion that the Trive Defendants believed the company was insolvent, by citing Trive's May 2021 valuation of Lucky Bucks's

---

[8] Indeed, the Trustee is unable to allege as a fact that Mr. Thadani and the Trive Defendants were even aware that Lucky Bucks's business was (supposedly) declining *at all*—much less declining so badly as to render the company insolvent—and thus pleads in the alternative that even if the Trive Defendants may "not have known about Lucky Bucks's declining performance in the second half of 2021," the Trustee can still purportedly bring his separate claim for fraud for allegedly misrepresenting the level of Trive's oversight. Am. Compl. ¶ 189.

[9] *See, e.g.*, *In re Dura Medic Holdings, Inc. Consol. Litig.*, 331 A.3d 796, 820 n.21 (Del. Ch. 2025); *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 286 (Del. Ch. 2021).

*equity* at more than $352 million.  The Trustee responds (Opp. ¶ 46 n.17) that Lucky Bucks and Holdings subsequently increased their debt by $450 million—but, before it did so, Lucky Bucks had acquired numerous additional locations that substantially increased its earning power and corresponding value.  Mot. ¶¶ 73-74.  The Trustee posits that those locations were overvalued "due to Damani and Kassam's scheme," Opp. ¶ 46 n.17, but he does not allege that the *Trive Defendants* had any knowledge of that supposed scheme.

### B.    The Georgia And Delaware Statutory Claims Are Impermissibly Extraterritorial (Counts VI-VIII)

20.    The Georgia and Delaware statutory securities-fraud and RICO claims fail because the allegedly fraudulent transactions involving the Trive Defendants did not take place in Georgia or Delaware and those states' statutes cannot be applied extraterritorially.  Mot. ¶¶ 47-58.  The Trustee concedes the latter point.  He nowhere disputes that, as a matter of state law, Georgia and Delaware each provides that its respective statutes may not be applied extraterritorially.  Nor does he dispute that federal law mandates the same result under the U.S. Constitution's Dormant Commerce Clause, which protects against "the projection of one state regulatory regime into the jurisdiction of another State."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336-37 (1989).

21.    Instead, the Trustee argues only that the Amended Complaint adequately alleges acts in Georgia and Delaware that support his claims against the Trive Defendants.  But the Amended Complaint does nothing of the kind.  None of its allegations establish an in-state connection to Georgia or Delaware that is sufficient, under the U.S. Constitution and even state law, to permit application of the Georgia and Delaware statutes to the Trive Defendants here.

22.    A securities transaction "occurs within" a state—and may therefore be regulated by that state—only when at least one party to the transaction executes the transaction from within the state. *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 786-87 (3d Cir. 1999); *see* Mot.

¶¶ 51-54. To be sure, a transaction can span multiple states. But as to the Trive Defendants' alleged wrongdoing in connection with the Notes transactions, those states are not Georgia or Delaware; they are Texas (where Trive and Mr. Thadani are based, and from where the Trive Defendants allegedly "made misstatements," Am. Compl. ¶ 340) and New York (where many Noteholders are located, and whose law governs the Notes, *see* Mot. ¶ 48).

23.     The Trustee does not dispute that the Notes transactions were executed entirely outside of Georgia and Delaware. None of the signatories was located in either state at the time of execution, none of the Trive Defendants is alleged to have resided in or operated from either state, and no purported misrepresentations by the Trive Defendants are alleged to have been made from (or directed to) Georgia or Delaware. Nor are the Trive Defendants even alleged to have set foot in either state in connection with the Notes transactions. *See* Mot. ¶¶ 53-55. These undisputed facts are dispositive. Courts routinely dismiss claims brought under state securities statutes where, as here, the underlying transactions bear no such connection to the state in question. *Id.* ¶ 52. And the Trustee cites no case in which a court applied a state's securities or anti-racketeering statute to defendants who, like the Trive Defendants here, did not engage in *any* conduct in that state.

24.     The constitutional problem is particularly significant because applying Georgia's and Delaware's statutes would displace the statutory regimes of other, more relevant states that would foreclose the Trustee's claims. The Trustee does not contest (and therefore concedes) that New York provides no private causes of action for securities fraud and anti-racketeering and Texas provides no private causes of action for anti-racketeering. Mot. ¶ 48. Applying Georgia or Delaware law here would thus do exactly what the Dormant Commerce Clause is meant to prohibit: displacing those states' policy choices to bar such private suits, effectively "project[ing] … one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336-37.

1.     <u>The alleged transactions did not occur within Georgia.</u>

25.     The Notes transactions were not executed in Georgia. And no Trive Defendant is alleged to have made any supposed misrepresentations in, from, or directed to Georgia. Mot. ¶¶ 53-55. Instead, the Trustee alleges only that *other defendants*—Mr. Boyden and Mr. Kassam— engaged in acts in Georgia. Opp. ¶ 51. Even if those allegations were sufficient to support the Trustee's Georgia claims against those defendants (and they are not, at least as to Mr. Boyden[10]), they are certainly insufficient to support the Georgia claims against the Trive Defendants. The Trustee does not (and cannot) allege any agency relationship between Boyden or Kassam and the Trive Defendants with respect to the conduct at issue. *See* Mot. ¶ 68 (noting this with respect to Boyden).[11] The Trustee merely asserts that Boyden was "Trive's hand-picked appointee to the Holdings Board," Opp. ¶ 51, and that Kassam was "a [Board] designee for Damani," Am. Compl. ¶ 48. As discussed (*supra* ¶ 18), a company's directors are not its shareholders' agents.

26.     Lacking any allegations whatsoever to situate the Trive Defendants and the Notes transactions in Georgia, the Trustee is forced to argue that it does not matter where the transactions occurred, or whether the Trive Defendants themselves "engage[d] in conduct in" Georgia, so long as "key pieces" of the broader "'fraudulent scheme'" allegedly took place there. Opp. ¶ 52 (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012)). That argument has the law backwards. What matters is not whether ancillary aspects of the alleged

---

[10] The Amended Complaint does not tie Toronto-based Boyden to Georgia. For instance, the Trustee alleges that Boyden was in Georgia on short trips during calls between the Trive Defendants (presumably located in Texas) and Noteholders (presumably located in New York), but does not allege that Boyden participated in those calls or that his presence in Georgia was in any way related to his role on the Holdings Board. Although the Trustee cites an initial term sheet that Mr. Boyden allegedly signed on a Georgia trip, the Trustee does not allege that Boyden was in Georgia when he executed the Agreement on behalf of Holdings. *See* Mot. ¶ 55. As for Mr. Kassam, though the Trustee argues that he was based in Georgia, the Amended Complaint fails to allege that he played a material role in the sale of the Notes to the Noteholders. Am. Compl. ¶¶ 193, 339 (alleging only that Mr. Kassam participated in an internal corporate approval of the transaction and signed two ancillary closing documents).

[11] The Trustee vaguely alleges that Trive required board appointees "to execute an agreement acknowledging their obligation to do Trive's bidding," Am. Compl. ¶ 89, but he does not allege that Mr. Boyden executed such an agreement, and he does not allege whether (or to what extent) that agreement related to the conduct at issue here.

scheme occurred in Georgia, but whether the transactions at the heart of the state statutory claims *against the Trive Defendants*—here, the Trive Defendants' alleged fraudulent inducement of the Noteholders' purchase of the Notes, *see, e.g.*, Am. Compl. ¶¶ 355—are alleged to have taken place, in whole or in part, in Georgia. *See supra* ¶ 23. No such allegations are present here.[12]

27. Because the Georgia statutory securities-fraud claims fail, the Georgia anti-racketeering claims must also be dismissed for lack of a statutory predicate.[13] And even if the anti-racketeering claims could somehow proceed without such a predicate (they cannot), they would still violate established principles of extraterritoriality. The Trustee contends that not "*every* act giving rise to [a] plaintiff's RICO claims" must "occur in the United States or Georgia." Opp. ¶ 54. But his cited cases mostly address the *federal* RICO statute—which has limited utility as an analogue in analyzing whether *Georgia's* RICO statute may be applied extraterritorially, since there is no Dormant Commerce Clause limitation on the application of federal law. And even when it comes to applying federal RICO, the dispositive question is where the *core* conduct that "directly caused" the alleged injury occurred. *Yegiazaryan v. Smagin*, 599 U.S. 533, 543-44 (2023). Here, the core conduct underlying the Trustee's claims against the Trive Defendants is the Notes' execution, supposedly induced by the Trive Defendants' alleged misrepresentations—and neither the execution nor the alleged misrepresentations occurred in Georgia. By contrast, the

---

[12] The Trustee's reliance (Opp. ¶ 52) on *Absolute Activist* is misplaced. That case did not address the application of state law to acts that occurred outside the state; it addressed whether transactions involving foreign parties qualified as "domestic purchases or sales" under *federal* securities law. 677 F.3d at 67. Even in that fundamentally different statutory context, *Absolute Activist* makes clear that the critical inquiry is where a "securities transaction" is "carr[ied] out." *Id.* at 69. Because the transactions there were executed "within the United States," the federal Exchange Act could apply to a foreign defendant that facilitated those domestic transactions from abroad—even though it had not personally engaged in "conduct in the United States." *Id.* The same analysis produces the opposite conclusion in this case because neither the Notes transactions nor the Trive Defendants' alleged misrepresentations occurred in Georgia.

[13] The Georgia anti-racketeering claims depend on the viability of the Georgia securities-fraud claims, which the Trustee acknowledges are necessary predicates of the anti-racketeering claims. *See* Am. Compl. ¶¶ 362, 376; *cf. RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 339 (2016) (federal RICO applies to foreign racketeering activity "only to the extent that the predicates alleged in a particular case themselves apply extraterritorially").

Trustee's cases (Opp. ¶ 54) involved *plaintiffs* located *outside* Georgia (or the United States) who incurred injuries caused by *defendants* that, unlike the Trive Defendants, were located *within* Georgia (or the United States). *See, e.g.*, *Ruiz v. Sewon Am., Inc.*, 766 F. Supp. 3d 1251, 1260-61 (N.D. Ga. 2025) (Mexican plaintiffs brought Georgia anti-racketeering claims against owner of auto plant located in Georgia, based on fraudulent activity in Georgia). These cases do not permit Georgia's anti-racketeering statute to be applied to the Trive Defendants, who are not alleged to have engaged in fraudulent transactions (or any other conduct) in Georgia.

2. <u>The alleged transactions did not occur within Delaware.</u>

28. The lack of any basis to apply the Delaware statute is even clearer. As the Trustee concedes, the sole connection to Delaware is that Holdings is incorporated there. And Delaware law holds that incorporation alone does not establish a sufficient nexus. *See* Mot. ¶¶ 57-58.[14]

29. In all events, Delaware law forecloses the Trustee's claim. *See Singer v. Magnavox Co.*, 380 A.2d 969 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701, 703-04 (Del. 1983). In *Singer*, plaintiffs alleged that a merger of Delaware-chartered corporations was "fraudulent" and invoked the Delaware Securities Act because defendants had "incorporated [a new Delaware entity] for the purpose of making a tender offer." *Id.* at 971-72. Yet the Delaware Supreme Court held that incorporation in Delaware, fraudulent or not, was insufficient to apply Delaware law because the plaintiffs were "residents of Pennsylvania and were

---

[14] In response, the Trustee contends that Holdings was allegedly formed as a "device, scheme or artifice to defraud" the Noteholders in violation of the Delaware securities-fraud statute. Opp. ¶¶ 59-60. But the fraud the Trustee alleges had nothing to do with the formation of Holdings as a legal entity. The Noteholders knew they were investing in a newly created parent company whose only asset would be its equity in Lucky Bucks, and that they would be structurally subordinated to Lucky Bucks's creditors. The alleged fraud, instead, was that the Noteholders were induced to invest based on alleged misrepresentations about the value of *Lucky Bucks's* underlying business—a fraud about the business value of a different entity altogether.

not solicited" in Delaware, and the pre-merger contracts involved in the fraud had been executed

outside the state. *Id.* at 981. The same analysis applies here.[15]

### C.   The State-Law Statutory And Common-Law Claims Also Fail For Lack of Falsity And/Or Justifiable Reliance (Counts VI-X)

30.   The Trustee's securities-fraud and racketeering claims (Counts VI-VIII) and his

common-law fraud and negligent misrepresentation claims (Counts IX-X) should be dismissed

because (i) the challenged statements were either true or inactionable and (ii) the Trustee has not

pled justifiable reliance. Mot. ¶¶ 59-82. The Opposition fails to rebut these arguments.

### 1.   Most of the alleged misstatements were not false statements of fact

31.   ***The CIM's Implied Attrition Rate.*** The Trustee does not dispute that the facts

stated in the CIM regarding attrition—that 20 locations contracts would expire in 2020 and that

the contract renewal rate in 2020 had been 86%—were entirely true. And he acknowledges that if

those accurate historical numbers "implied" anything about the future rate of attrition, that was a

"future projection," not an actionably false statement of present-day fact. Opp. ¶ 63; Mot. ¶¶ 62-

64. Nonetheless, the Trustee argues that this "implied" prediction about the future is actionable

under the narrow exception for knowingly false projections made with intent to deceive because

Mr. Thadani supposedly knew that the actual rate of attrition would be higher in the future. Opp.

¶ 63. But the Amended Complaint points only to a presentation given nearly *two years later* (in

2023) not by Mr. Thadani, but by Lucky Bucks's restructuring advisors, which allegedly showed

higher attrition in the second half of 2021 (a period ending well after the CIM's issuance). Am.

Compl. ¶¶ 24, 148, 159. And the "no challenge" notices that allegedly contributed to attrition were

---

[15] The Trustee's sole authority (Opp. ¶ 59) is a 20-year-old out-of-circuit district court case addressing federal rather than Delaware law. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 502 (S.D.N.Y. 2005). And in any event, that case involved substantial activity occurring within the United States and thus did not squarely address the threshold extraterritoriality question—one paralleling the state-level extraterritoriality issue here—of whether the creation of a sham entity in the United States, when all other relevant conduct occurred outside the United States, is sufficient to trigger the application of federal securities law.

only "later revealed" to have been filed at the direction of Mr. Kassam "to facilitate his and Damani's asset-stripping scheme"—an alleged "criminal enterprise" that the Amended Complaint admits did not include Mr. Thadani. *See id.* ¶¶ 33, 146, 163; *Accelerant Twister, LLC v. Marjo, LLC*, 2023 WL 4457422, at *7 (D. Del. July 11, 2023) (plaintiffs must "allege sufficient facts" to permit court to infer both that statements were false and "that *defendants were in a position to know it*" (emphasis added) (citations and quotation marks omitted)).

32.     ***Pro Forma EBITDA Figures***.  The Opposition does not dispute—and therefore concedes[16]—that the pro forma data provided in the CIM for the period ending March 2021 was completely accurate.  *See* Mot. ¶ 65; Opp. ¶ 64.  The Trustee contends only that showing those numbers misled the Noteholders by "hiding" Lucky Bucks's supposedly poor performance in the second half of 2021.  Opp. ¶ 64.  But the Trustee acknowledges that the Noteholders were seasoned investors who conducted their own diligence, including requesting whatever information they wished  "about developments since those 'pro forma' numbers."  Am. Compl. ¶ 173.  There is no allegation that any Noteholder requested any data about Lucky Bucks's performance in the second half of 2021, requested any other information they were refused, or were provided any information in response to any request they actually made that was false.  Mot. ¶ 67.[17]

33.     As to the Amended Complaint's mischaracterization of Connor Anderson's July 7, 2021 email to himself—in which he used the well-accepted acronym "(bs)" in place of "balance sheet" when describing the "current financieals" to "[g]et … in front of the partners" with an

---

[16] *In re Honeywell Int'l Inc. Consol. S'holder Litig.*, 2024 WL 492392, at *3 n.1 (D. Del. Feb. 8, 2024); *see also In re Our Alchemy, LLC*, 642 B.R. 155, 163 n.10 (Bankr. D. Del. 2022) (holding that trustee "abandoned [his] claim by failing to respond" to arguments for dismissal).

[17] The same logic applies to the "incorporat[ion] [of] pre-acquisition EBITDA" into the total run-rate EBITDA in the CIM, Opp. ¶ 64, which the CIM disclosed, *see* Ex. A at 13 & note, and that Mr. Thadani cited.  The Noteholders could have made (and presumably did make) whatever inquiries about the run rate they believed were necessary for them to evaluate the investment opportunity in their own diligence.  *See* Mot. ¶ 67.  And to the extent the Amended Complaint alleges that use of pre-acquisition EBITDA overstated the run rate, it alleges only that "*management* knew" that—not Mr. Thadani.  Am. Compl. ¶¶ 164-165 (emphasis added).

"[o]verview of why we need to put capital in," *see* Mot. ¶¶ 6, 46—the Opposition claims that there is a "fact question" as to whether Mr. Anderson meant "bs" as shorthand for "bullshit," rather than "balance sheet."  Opp. ¶ 64 n.22.  That assertion, relegated to a footnote, cannot save the day for the Trustee, because the Court need not "credit factual allegations contradicted by" the referenced document.  *Donahue v. Dauphin Cnty.*, 2020 WL 5200391, at *2 (M.D. Pa. May 14, 2020) (citing *In re Washington Mut. Inc.*, 741 F. App'x 88, 91 n.2 (3d Cir. 2018)), *R&R adopted,* 2020 WL 5110628 (M.D. Pa. Aug. 31, 2020).  Here, context leaves no doubt whatsoever that "bs" meant "balance sheet"; the Trustee's sheepish assertion to the contrary is not remotely plausible.

34.     ***Mr. Boyden's Statements in the Solvency Certificate.***  The Trustee alleges no facts suggesting that the Trive Defendants knew that Holdings was (supposedly) insolvent, that Mr. Boyden's conduct can be imputed to the Trive Defendants, or that Mr. Boyden's statements in the Solvency Certificate were false or misleading.  *See* Mot. ¶ 68; *supra* ¶ 18.  As to Mr. Boyden's statement that he had performed (or caused to be performed) a solvency investigation, the Trustee points only to a single exchange between Mr. Bouskill and Mr. Ijaz—*before* the Solvency Certificate was issued—indicating that *they* had (at that time) not performed such an investigation.  Am. Compl. ¶ 180.  From that alone, nothing can be inferred about steps taken by *Mr. Boyden* (or even by Mr. Bouskill and Mr. Ijaz, subsequent to their exchange) to perform such an investigation.  In any event, there is no allegation that *the Trive Defendants* were aware of the exchange.

35.     Moreover, any false statement in the Solvency Certificate was made by Mr. Boyden and cannot be attributed to the Trive Defendants.  A shareholder is not liable for misrepresentations by a director—even one it appointed—who, as here, was neither the shareholder's employee nor controlled by the shareholder.  *See* Mot. ¶ 68 (citing *Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995,

1012 (N.D. Cal. 2024)).[18]  The Trustee responds (Opp. ¶ 65) that Trive "controlled" Mr. Boyden. But aside from conclusory allegations, the Amended Complaint alleges only that company charter documents and related director acknowledgements gave Trive approval rights over certain major transactions—not control over the issuance of a solvency certificate.  Am. Compl. ¶¶ 86, 89, 127.

> 2.  <u>The remaining alleged misstatements were non-actionable puffery, predictions, or projections</u>

36.    The Trustee does not dispute that alleged misstatements concerning Lucky Bucks's relationship with the GLC, its "farm team," and its M&A activity are not actionable to the extent that they were either puffery or subjective assessments and projections.  *See* Mot. ¶¶ 72-75. Instead, he claims such statements are actionable as opinions because they were supposedly made with an "intent to deceive," or were not "reasonably" or "genuinely" believed.  Opp. ¶ 68.  Not so.

37.    ***Lucky Bucks's Relationship with the GLC.***  The Amended Complaint fails to allege facts showing that Mr. Thadani and Trive did not genuinely believe Lucky Bucks had a strong relationship with the GLC.  Rather, it alleges that "management knew" the GLC was supposedly watching Lucky Bucks and points to a few instances in which certain Management Defendants allegedly expressed concerns.  Am. Compl. ¶¶ 184-86.  Those allegations amount to improper "group pleading"; they neither establish any Trive Defendant's knowledge nor provide a basis for imputing management's knowledge to Trive.  *In re Zohar III, Corp.*, 2021 WL 3124298, at *12 (Bankr. D. Del. July 23, 2021).  Likewise, Mr. Thadani's alleged knowledge that Mr. Damani had identified potential M&A opportunities to the Management Defendants (and Mr. Thadani) does not undermine his alleged stated belief that Lucky Bucks was in compliance with

---

[18]  The Trustee's authority, *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994), is inapposite; it addressed whether a principal was liable for the acts of an independent contractor.

GLC orders—which required only that Mr. Damani relinquish "operational control," not that Mr. Damani never again speak with anyone from Lucky Bucks. *See* Mot. ¶ 69; Am. Compl. ¶ 13.[19]

38.     ***Lucky Bucks's M&A Activity.***     The Trustee fares no better in his allegations concerning Mr. Thadani's stated confidence in the strength of Lucky Bucks's M&A pipeline. Those allegations cite only an alleged suggestion by Mr. Thadani to briefly postpone one acquisition until after a lender call given Lucky Bucks's "temporary" financial profile at the time, and an observation—not by Mr. Thadani, but by Mr. Ijaz, in a request to other Management Defendants—to discuss acquisitions, that new financing might not be raised in the "near term." *See* Opp. ¶ 70 (quoting Am. Compl. ¶¶ 169-70).   Those alleged facts say nothing about Mr. Thadani's view of Lucky Buck's long-term outlook, much less remotely suggest that he somehow believed Lucky Bucks had "run[] out of money to fund further acquisitions." Am. Compl. ¶ 169.

3.      The Noteholders did not justifiably rely on the alleged misrepresentations and omissions

39.     Even if the Trustee had pled an actionable misstatement (he has not), his claims would fail for an additional reason:  He alleges no facts showing that the Noteholders justifiably relied on the Trive Defendants' purported misrepresentations.  The Opposition does not dispute that Lucky Bucks was a risky investment—nor that, as sophisticated investors, the Noteholders could have tested the Trive Defendants' alleged representations in diligence. *See* Mot. ¶ 78.  Nor does the Opposition engage with the extensive case law establishing that a plaintiff "cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment"—and that

---

[19] Similarly, the Trustee alleges that the "farm team" members were actually "active participants in Damani's and Kassam's misconduct" in the alleged B-Side fraud.  Opp. ¶ 69 (citing Am. Compl. ¶¶ 10, 165, 265-67).  But as noted, he does not allege the Trive Defendants had any knowledge of or involvement in that scheme. *Id.* ¶ 33.

"the greater the sophistication of the investor, the more inquiry that is required." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234-35 (2d Cir. 2006); *see also* Mot. ¶¶ 77-78.[20]

40.     Far from helping the Trustee's cause (*see* Opp. ¶¶ 61, 63, 68, 72), *Labyrinth, Inc. v. Urich*, 2024 WL 295996 (Del. Ch. Jan. 26, 2024), supports dismissal.[21]  In *Labyrinth*, the buyer had justifiably relied on statements because it had "made efforts to verify Seller's collections representations" but the "Seller [had] obstructed" those efforts. *Id.* at \*19.  Here, by contrast, there are no allegations the Noteholders were denied any information they saw fit to request.[22]

4.     <u>The Trive Defendants are not liable for fraud by omission because they owed the Noteholders no duty to disclose</u>

41.     A duty to disclose arises only in a narrow set of circumstances not applicable here, and no such duty arises where, as here, sophisticated parties deal at arm's length. *See* Mot. ¶ 80. Instead of addressing the Motion's case law, the Trustee cites inapposite cases. *West Valley KB Venture, LLC v. ILKB LLC* recognizes that a duty to disclose exists in situations where a party possesses "superior knowledge, *not readily available to the other*, and *knows that the other is acting on the basis of mistaken knowledge*." 2021 WL 4171918, at \*7 (E.D.N.Y. Sept. 13, 2021) (emphasis added) (citation and quotation marks).  That Lucky Bucks was not a public company

---

[20] *See also Getzler v. River Run Foods (DE), LLC*, 2024 WL 3273430, at \*5 (Del. Super. Ct. July 1, 2024) ("Even if the record supported this allegation [regarding an alleged misstatement], [Plaintiff], a *sophisticated businessperson, could have inquired about the agreement . . . . [I]t is insufficient for a plaintiff to rely upon blanket trust of a known associate when engaging in such transactions.*" (emphasis added)); *William Goldberg & Co. v. Cohen*, 466 S.E.2d 872, 877 (Ga. Ct. App. 1995) (recognizing plaintiff was "a sophisticated businessman from whom greater diligence is required before reliance upon representations may be considered justified."); *Daughtry v. Silver Fern Chem., Inc.*, 2024 WL 2211005, at \*16-17 (E.D. Tex. May 16, 2024) ("a party cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations." (quotation marks omitted)).

[21] The Trustee claims that questions of reliance are not suitable for resolution on a motion to dismiss, Opp. ¶ 72, but then concedes that courts may dismiss claims like his on justifiable-reliance grounds, *see* Opp. ¶ 73 n.24.

[22] The Trustee's reliance on *Arwood v. AW Site Services, LLC*, 2022 WL 705841, at \*24 (Del. Ch. Mar. 9, 2022), is equally misguided.  The Trive Defendants do not argue that the Noteholders were "contributorily negligent," but instead, that the Amended Complaint fails to plead justifiable reliance, an indispensable element of its claims. *See* Mot. ¶ 75.  Moreover, *Arwood* found that plaintiff had failed to establish justifiable reliance where the "source of the fraud stared them in the face." 2022 WL 705841, at \*25.  Here, too, the CIM prominently displayed the information that the Trustee now claims was false, and it invited further inquiry by the Noteholders.

and therefore did not issue public financial statements (Opp. ¶ 76) is beside the point.  The "more sophisticated the buyer, the less accessible the information must be to be considered within the seller's peculiar knowledge."  *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 448 (S.D.N.Y. 2006).  The Noteholders were highly sophisticated investors, *see* Mot. ¶¶ 14, 67, who knowingly invested in Notes issued by Holdings, a privately held holding company, after supposedly performing "extensive" diligence on both Lucky Bucks and Holdings, Am. Compl. ¶ 190(a).  As for the Trive Defendants, the Trustee does not (and cannot) allege that they were aware of the B-side fraud allegedly perpetrated by management, leaving no plausible allegations that they had material "superior" or "peculiar" knowledge to that of the Noteholders about Lucky Bucks's financial condition.  While in some instances a defendant who states a "half truth" has a duty to disclose additional information, *West Valley*, 2021 WL 4171918, at *7, the Trustee fails to plausibly allege that any of the alleged statements in the CIM (even if any were properly attributable to Trive—and none are) were "half-truths."  *See supra* ¶¶ 30-38. [23]

5.   The Negligent Misrepresentation claim fails because the Trive Defendants did not owe any duty of care to the Noteholders

42.   The Trustee does not respond to the argument that, if Texas law applied to Plaintiff's negligent misrepresentation claim, it would be time-barred.  Mot. ¶ 82.  That point is thus conceded.  *Honeywell*, 2024 WL 492392, at *3 n.1.  And even if a different state's law applied, "no extra-contractual duty of disclosure exists" "[i]n the case of arm's length negotiations or transactions between sophisticated financial institutions" like those involved here.  *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995); *accord Smith v. BCE Inc.*, 225 F. App'x 212, 217-18 (5th Cir. 2007) (per curiam); *see also* Mot. ¶ 81.

---

[23] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983) simply notes that disclosure may be needed to prevent an affirmative statement from being misleading.  As discussed, the Amended Complaint fails to allege any actionable misstatements.

43.     The Opposition ignores this case law altogether and instead cites cases that are off

point. *Marcellus Construction Co. v. Village of Broadalbin*, 755 N.Y.S.2d 474 (App. Div. 2003),

states that a negligent misrepresentation claim requires "a showing that there was either actual

privity of contract between the parties or a relationship so close as to approach that of privity." *Id.*

at 475.   Here, the Trustee does not and cannot allege that the Noteholders were in "actual

contractual privity" with the Trive Defendants in connection with the NPA, which was executed

by Holdings, not the Trive Defendants.  Nor has he alleged a "relationship so close as to approach

that of privity" between the Noteholders and the Trive Defendants.  There are no allegations that

the Trive Defendants "evinc[ed]" their awareness and "understanding" that the Noteholders would

rely on any such alleged representations.  *Id.* at 475-76.[24]  On the contrary, the CIM expressly

warned against any such reliance. *See* Mot. ¶ 12.

## D.     The Claims Sounding In Fraud Lack The Particularity Required By Rule 9(b) (Counts VI-X)

44.     The Opposition provides no answer to another fatal flaw in the Amended

Complaint: it repeatedly engages in impermissible group pleading by attributing statements to

"Trive and "management" collectively—even though management is alleged to have engaged,

without Trive's involvement, in a scheme to defraud the company.  *See* Mot. ¶ 85.  These

allegations do not put the Trive Defendants on notice of the specific misconduct of which *they* are

accused—exactly the problem that Rule 9(b) is meant to address.  And even the few allegations

regarding Mr. Thadani's alleged calls with the Noteholders, *see* Opp. ¶ 78, lack details about what

---

[24] The Trustee's reliance on cases applying Delaware and Georgia law, which are inapplicable here, is also misguided. *First Bank of Georgia v. Robertson Grading, Inc.*, 761 S.E.2d 628, 638 (Ga. Ct. App. 2014), never addressed the question at issue here—whether statements made by counterparties in an arm's length negotiation can support a negligent misrepresentation claim.  Georgia law is clear that, "absent a confidential relationship, no duty to disclose exists between parties engaged in arms-length business transactions." *Lilliston v. Regions Bank*, 653 S.E.2d 306, 309 (Ga. Ct. App. 2007).  *Lieberman v. BeyondTrust Corp.*, 2020 WL 1815547 (D. Del. Apr. 9, 2020), is irrelevant because there are no allegations that Trive knew that any statements made in the CIM were false or misleading.

statements were made on which of those calls, and "to whom the misrepresentations were communicated"—leaving the Trive Defendants to guess which (if any) of the Noteholders purportedly relied on such purported statements. *Mosiman v. Madison Cos.*, 2019 WL 203126, at *3 (D. Del. Jan. 15, 2019). Finally, the Trustee fails to explain how the Amended Complaint's allegations concerning RICO predicate acts of wire fraud allege with any specificity the "who, what, when, where and how" required by Rule 9(b). *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002); *see also* Mot. ¶ 87.

## III.    THE CLAIMS FOR ATTORNEY'S FEES AND PUNITIVE DAMAGES SHOULD BE DISMISSED

45.    The Trustee concedes that his purported Georgia-law claims for attorney's fees (Count XI) and punitive damages (Count XII) are not *independent* causes of action, but rather requests for relief that require an underlying substantive Georgia-law claim. *See* Mot. ¶ 88; Opp. ¶ 79. No viable underlying cause of action exists. *See supra* §§ II.B, II.C. The two states plausibly having the "most significant relationship" to the claims against the Trive Defendants are New York and Texas—not Georgia. *See* Mot. ¶ 60 & nn.16-17; *see also, e.g.*, *Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 475 (D. Del. 2010) (choosing New York law at pleading stage because, among other reasons, plaintiff "relied on [the] alleged misrepresentations" in New York and "application of New York law better comport[ed] with" parties' "justified expectations"). Finally, the Opposition "fails to contest" Trive's argument that, in any event, neither attorney's fees nor punitive damages is available (even in Georgia) on a claim of negligent misrepresentation, thereby waiving any opposition on that issue. *Honeywell*, 2024 WL 492392, at *3 n.1.

## IV.    THE COURT SHOULD DISMISS WITH PREJUDICE

46.    The Court should dismiss the Amended Complaint with prejudice. A *third* attempt to plead claims against the Trive Defendants would be futile. Mot. ¶ 89. By not contesting this issue, the Trustee has waived any opposition. *Honeywell*, 2024 WL 492392, at *3 n.1.

Dated: July 2, 2025
        Wilmington, Delaware

Respectfully submitted,

**WILMER CUTLER PICKERING
    HALE AND DORR LLP**

**PACHULSKI STANG ZIEHL
    & JONES LLP**

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Charles C. Bridge (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
philip.anker@wilmerhale.com
ross.firsenbaum@wilmerhale.com
charles.bridge@wilmerhale.com

By: */s/ Laura Davis Jones*

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400
ljones@pszjlaw.com
pkeane@pszjlaw.com

*Attorneys for Defendants Trive Capital
Management LLC, Trive Capital Fund III LP,
Trive Capital Fund III-A LP, TCFIII LUCK
LP, TCFIII Luck SPV LP, TCFIII Luck
Acquisition LLC, Southern Star Gaming,
LLC, and Shravan Thadani*

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363
joel.millar@wilmerhale.com

*Attorneys for Defendants Trive Capital
Management LLC, Trive Capital Fund III LP,
Trive Capital Fund III-A LP, TCFIII LUCK
LP, TCFIII Luck SPV LP, TCFIII Luck
Acquisition LLC, Southern Star Gaming,
LLC, and Shravan Thadani*