# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> LUCKY BUCKS HOLDINGS LLC, <br><br> *Debtor*. | Chapter 7 <br><br> Case No. 23-10756 (KBO) |
| MARC ABRAMS, <br> In his capacity as Chapter 7 Trustee of Lucky Bucks Holdings LLC and as assignee, <br><br> *Plaintiff*, <br><br> v. <br><br> TRIVE CAPITAL MANAGEMENT LLC, TRIVE CAPITAL FUND III LP, TRIVE CAPITAL FUND III-A LP, TCFIII LUCK LP, TCFIII LUCK SPV LP, TCFIII LUCK ACQUISITION LLC, SHRAVAN THADANI, LUCKY BUCKS VENTURES, INC., ANIL DAMANI, SOUTHERN STAR GAMING LLC, SHAFIK KASSAM, JAMES BOYDEN, RYAN BOUSKILL, RYAN C BOUSKILL PROFESSIONAL CORPORATION, 2786692 ONTARIO INC., MANU SEKHRI, STEPHANIE LIPPA, and HASSAN IJAZ, <br><br> *Defendants*. | Adversary Proceeding <br><br> Adv. Proc. No. 24-50130 (KBO) |

## REPLY IN FURTHER SUPPORT OF
## MANAGEMENT DEFENDANTS' MOTION TO DISMISS

POTTER ANDERSON & CORROON LLP
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone: (302) 984-6026

ALLEN OVERY SHEARMAN STERLING US LLP
C. Luckey McDowell (*pro hac vice*)
Ian E. Roberts (*pro hac vice*)
Jacob Fields (*pro hac vice*)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone: (214) 271-5777

-and-

Samuel Cooper (*pro hac vice*)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone: (713) 354-4838

Dated: July 2, 2025

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...................................................................................................................................2

    I.    The Trustee Fails to Rebut the Dispositive Deficiencies in the Fraudulent-Transfer Claims (Counts 1-4) ...................................................................................2

        A.    An Authorized Transfer Cannot be a "Fraudulent" Transfer.......................2

        B.    Lack of Standing to Assert Assigned Noteholder Claims. ..........................3

        C.    The Trustee Cites No Relevant Fraud Allegations with Respect to the Authorized Transfers. ..................................................................................4

    II.    The Trustee's Georgia Statutory Claims (Counts 6-8) Are Inapplicable ................5

    III.    The Trustee's Opposition Cannot Rescue the Common-Law Fraud Claims (Counts 9-10) .............................................................................................................7

        A.    The Trustee Doubles Down on Group Pleading .........................................7

        B.    The Trustee Does Not Refute the Lack of Any Misrepresentations by Management Defendants. ............................................................................9

        C.    The Trustee's Newly Emphasized "Omission" Theory Also Fails. ..........12

CONCLUSION ..............................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.S. Goldmen & Co. v. N.J. Bureau of Sec.*,
   163 F.3d 780 (3d Cir. 1999) ...................................................................................................6

*Aquino v. Mobis Ala., LLC*,
   739 F. Supp. 3d 1152 (N.D. Ga. 2024) ................................................................................ 5-6

*Boston Trading Group, Inc. v. Burnazos*,
   835 F.2d 1504 (1st Cir. 1987) ...................................................................................................3

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) .................................................................................................13

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
   836 F.2d 173 (3d Cir. 1988) .....................................................................................................8

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024) ................................4

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ..................................................................................................................3

*DiMare v. MetLife Ins. Co.*,
   369 F. App'x 324 (3d Cir. 2010) ..............................................................................................9

*Husky Int'l Elecs., Inc. v. Ritz*,
   578 U.S. 356 (2016) ..................................................................................................................2

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ................................................................................................................11

*In re Physiotherapy Holdings, Inc.*,
   2016 WL 3611831 (Bankr. D. Del. June 20, 2016) .................................................................4

*Vichi v. Koninklijke Philips Elecs., N.V.*,
   85 A.3d 725 (Del. Ch. 2014) ..................................................................................................12

*In re Wilton Armetale, Inc.*,
   968 F.3d 273 (3d Cir. 2020) .....................................................................................................3

*Zucker v. Quasha*,
   891 F. Supp. 1010 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996) .....................................10

**STATUTES**

11 U.S.C. § 544(b) ..................................................................................................................3

11 U.S.C. § 548(a)(1)(A) .........................................................................................................4

O.C.G.A. § 10-5-1 et seq. .........................................................................................................5

O.C.G.A. § 16-14-4 et seq. .......................................................................................................5

**OTHER AUTHORITIES**

FED. R. BANKR. P. 7012(b) ......................................................................................................1

FED. R. CIV. P. 12(b)(6) ...........................................................................................................1

FED. R. CIV. P. 9(b) ..............................................................................................................7, 9

Defendants Manu Sekhri, James Boyden, Ryan Bouskill, Ryan C. Bouskill Professional Corporation, Hassan Ijaz, 2786692 Ontario Inc., and Stephanie Lippa (collectively, the "Management Defendants") respectfully submit this reply in further support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b), to dismiss the First Amended Complaint ("FAC"). For the reasons explained below, the Trustee's opposition ("Opp.") [D.I. 91] confirms—rather than refutes—the legal and factual deficiencies that warrant dismissal of the claims against the Management Defendants.

## PRELIMINARY STATEMENT

1. The Trustee's Opposition elevates the very problems exposed in the Management Defendants' Motion to Dismiss ("MTD") [D.I. 72]. Rather than substantively addressing those core arguments, the Trustee attempts to sidestep numerous dispositive legal flaws and continues to rely on impermissible group pleading and fraud-by-association. In doing so, the Trustee shifts to an omissions-based theory of fraud that contradicts the FAC's own allegations. Most importantly, the Trustee tries to frame the FAC's deficiencies as questions of fact while all but conceding that no actionable misstatement by any Management Defendant is actually identified.

2. Because the Trustee fails to rehabilitate its claims under the fraudulent-transfer laws, the Georgia statutes, or common-law fraud, all claims against the Management Defendants should be dismissed with prejudice.

**ARGUMENT**

I.   **The Trustee Fails to Rebut the Dispositive Deficiencies in the Fraudulent-Transfer Claims (Counts 1-4)**

    A.   <u>An Authorized Transfer Cannot be a "Fraudulent" Transfer.</u>

    3.   The MTD demonstrated that the Noteholders expressly *authorized* the very distributions the Trustee now seeks to label fraudulent, defeating Counts 1-4 as a matter of law. *See* MTD ¶¶ 42-45.  The Opposition does not dispute this authorization but argues that the Court should ignore its legal effect.  Instead, the Trustee tries to refocus attention to allegations that the Noteholders were misled into *purchasing* the Notes in the first place and argues that "one cannot 'consent' to a transaction if he or she was defrauded in that transaction." Opp. ¶ 21.  But the law does not allow conflating two distinct events in this context.  As explained in the MTD, by collapsing the purchase of the Notes with the subsequent distribution into a single event, the Trustee renders meaningless the distinction between fraudulent inducement and fraudulent transfer.

    4.   Fraudulent-transfer claims focus only on whether fraud was present (either actually or constructively) in connection with the *transfer* the plaintiff seeks to avoid—here, the Holdings Distributions.  *See, e.g.*, *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 361 (2016) ("As a basic point, fraudulent conveyances are not an inducement-based fraud," and "the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt."). Whether a plaintiff *also* alleges that it was fraudulently induced to become a creditor in the first place may be relevant to other fraud-based claims—but it is not relevant to avoiding the subsequent transfer as fraudulent.  If it were otherwise, then Counts 1-4 would completely overlap with the Trustee's traditional fraud-based

claims. *See, e.g.*, *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1511 (1st Cir. 1987) ("[T]here is no need to expand fraudulent conveyance law in this way, for the cheated creditor . . . could recover his money from . . . the transferee . . . under other principles of law.").

      B.      <u>Lack of Standing to Assert Assigned Noteholder Claims.</u>

      5.      Counts 3 and 4 purport to assert state-law fraudulent-transfer claims allegedly assigned by Noteholders to the Trustee. Yet, once Holdings filed for bankruptcy, only the Trustee had standing to pursue such claims. The Noteholders themselves lost that authority, rendering their claims unenforceable notwithstanding their purported assignment to the Trustee. *See* 11 U.S.C. § 544(b); *In re Wilton Armetale, Inc.*, 968 F.3d 273, 282-85 (3d Cir. 2020) (creditor's fraudulent-transfer claims became "the exclusive province of the trustee, not a creditor," "to prosecute" because "[t]he bankruptcy … deprived [the creditor] of the statutory authority to bring those claims, transferring that power to the trustee"). "[T]his transfer of statutory authority takes away a creditor's 'standing'" under the Bankruptcy Code to assert such claims. *Id.* at 278.

      6.      The Trustee does not contest this rule but merely argues that these assigned claims "are expressly pleaded in the alternative" to the direct claims (Counts 1 and 2) and "will only become operative to the extent the estate no longer has a viable cause of action for fraudulent transfer." Opp. ¶ 20. Of course, standing is a prerequisite to a party's ability to assert a claim, and plaintiff bears the burden to establish his standing to sue on a claim-by-claim basis. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The Trustee cites no authority allowing a standing defect to be overlooked merely by characterizing the claims as alternate forms

of relief.[1]  Because the Trustee has not shown any valid assignment of enforceable claims, or his standing to assert them, Counts 3 and 4 must be dismissed.

        C.      <u>The Trustee Cites No Relevant Fraud Allegations with Respect to the Authorized Transfers.</u>

        7.      Despite invoking 11 U.S.C. § 548(a)(1)(A) and comparable state fraudulent-transfer statutes, the Trustee offers no particularized facts suggesting Holdings—or the Management Defendants—executed transfers with actual intent to hinder, delay, or defraud creditors.

        8.      Here, the FAC's alleged "badges of fraud" pertain to alleged misrepresentations made to the Noteholders to convince them to enter into the Notes transaction, not to the transfers themselves.  *See* FAC ¶ 275(c)-(e), (i), (j).  But, again, allegations that investors were fraudulently induced to acquire the Notes are irrelevant to the fraudulent transfer claims because the Trustee is seeking to avoid Holdings' distributions to the Defendants—not the Note purchases.  The FAC does not and cannot plead any fraud tied to those distributions because they were pre-authorized by the Noteholders.  *See, e.g., In re Cred Inc.*, 650 B.R. 803 (Bankr. D. Del. 2023), aff'd, 658 B.R. 783 (D. Del. 2024) (dismissing actual fraudulent transfer claim for failure to plead intent to defraud).  Counts 1 and 3 thus remain deficient.

---

[1] The sole case cited by the Trustee on this point is *In re Physiotherapy Holdings, Inc.*, 2016 WL 3611831, at *10 (Bankr. D. Del. June 20, 2016).  But that case did not involve a challenge to the Trustee's standing—rather, the dispute concerned the pre-emptive effect of Section 546 safe harbor vis-à-vis state law fraudulent-transfer claims.

## II.  The Trustee's Georgia Statutory Claims (Counts 6-8) Are Inapplicable

9. Georgia's securities-fraud statute (O.C.G.A. § 10-5-1 *et seq.*) applies to intrastate securities transactions, and Georgia's RICO statute (O.C.G.A. § 16-14-4 *et seq.*) targets in-state racketeering. Courts require specific factual allegations tying the alleged misconduct to the forum state. *See Aquino v. Mobis Ala., LLC*, 739 F. Supp. 3d 1152, 1219-20 (N.D. Ga. 2024). The MTD explained at length that the relevant conduct underlying the Trustee's claims occurred outside of Georgia: Holdings is a Delaware LLC with no operations, employees, or presence in Georgia; the Noteholders were not in Georgia, and no alleged roadshows or meetings occurred in Georgia. MTD ¶¶ 50-52. Most importantly, each of the Management Defendants lives and works in Canada (FAC ¶¶ 47-55), and none is alleged to have made a single misrepresentation to or from Georgia.

10. The Opposition offers no meaningful response, relying instead on conclusory assertions that "key events" occurred in Georgia without identifying a single misrepresentation—or any other allegedly fraudulent act—by any Management Defendant from within that state. Indeed, the Opposition spells out the FAC's only alleged connections between the Management Defendants and Georgia:

- Boyden "executed a term sheet for the Notes with the Noteholders on behalf of Holdings while in Atlanta." Opp. ¶ 31.

- "Boyden was also in Georgia from August 23 to September 1, 2021, which coincided with multiple calls between Trive, the Management Defendants, and the Noteholders." *Id*.

- "Ijaz similarly traveled frequently to Georgia and was there from August 23–27, October 28–30, November 2–6, and November 22–25." *Id*.

11. These cursory allegations allege travel only by Defendants Boyden and Ijaz—neither of whom are even subjects of the Trustee's Georgia RICO claims. More to the point, the Trustee does not and cannot refute that there are no allegations that Boyden or Ijaz made any misrepresentations or committed other tortious acts during these purported trips. To the contrary, the FAC states that the trips were made "to manage the business" of the operating company and merely "coincided" with calls between Trive and the Noteholders. *Id.*

12. Faced with the lack of any alleged wrongdoing or injuries occurring in Georgia, the Trustee retreats to the argument that the Georgia statutes should apply because "at bottom, this case centers around [Defendants'] actions toward and representations concerning Lucky Bucks, a company with its principal place of business in Georgia." Opp. ¶ 34. But he cites no authority supporting the notion that this is remotely sufficient to invoke Georgia law in the absence of any allegations of wrongdoing or injury within the state. Indeed, each of the cases he cites demonstrates that the location of alleged misconduct, as well as the alleged injury, is what matters. *A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999) (looking to location where "an offer is made . . . and accepted" and thus "the elements of the transaction have occurred"); *Aquino v. Mobis Alabama, LLC*, 739 F. Supp. 3d 1152, 1223 (N.D. Ga. 2024) (federal RICO statute applied to claims of plaintiffs injured in Mexico where the scheme "was devised, initiated, and carried out the through acts and communications initiated in Georgia"). The alleged Georgia ties above do not meet this mark.

**III.     The Trustee's Opposition Cannot Rescue the Common-Law Fraud Claims (Counts 9-10)**

13.     To state a claim for common law fraud (Count 9) or negligent misrepresentation (Count 10), the Trustee must plead with specificity that each Management Defendant *individually* made a specific misrepresentation to a Noteholder, with fraudulent intent, which was justifiably relied on by the Noteholder.  As explained in the MTD, the FAC fails to plead any one of these core elements.  MTD ¶¶ 54-79.  The Trustee's Opposition only underscores these defects, any one of which compels dismissal.

   A.     <u>The Trustee Doubles Down on Group Pleading</u>

14.     The FAC attributes virtually all alleged misstatements to Trive and unspecified "insiders" or "managers."  As to the latter category, the FAC does not even attempt to tie particular statements to any specific dates, locations, or recipients.  The MTD explained at length why such allegations of collective responsibility do not satisfy Rule 9(b).  *See* MTD ¶¶ 59-61.  The Opposition doubles down by citing, in summary fashion, to dozens of allegations impermissibly aimed at "managers" or "insiders."  But instead of reciting the allegations he actually pleaded, the Trustee simply reinvents them.

15.     For example, the Opposition purports to have alleged that, "[o]n calls to Noteholders on August 24, 2021, November 2, 2021, and November 22, 2021, Sekhri and Boyden told Noteholders that location owner contracts remained stable, long-term, and difficult to terminate due to GLC regulations."  Opp. ¶ 36 (citing FAC ¶¶ 9, 156).  But the cited allegation does not say that.  In fact, the FAC *nowhere* alleges that Boyden participated in any calls with

Noteholders on these dates or any other specific occasions.[2]  And while Sekhri was allegedly present on two of the calls (the ones in November), the FAC specifically attributes statements about attrition to *Thadani*—not Sekhri.[3]

16. Likewise, the Opposition purports that the Trustee has pleaded "Ijaz and Bouskill furnished information for use on the calls and in the CIM that supported these points, including that Lucky Bucks had an 86% contract renewal rate and that just 4% of its contracts were up for renewal in 2021." *Id*. (citing FAC ¶¶ 24, 148-50, 156-59).  But, again, the FAC contains no allegations that either Bouskill or Ijaz furnished any information for calls on these dates or for this specific topic.  Rather, the FAC simply alleges that "Ijaz and Bouskill, for their part, would help prepare [unspecified] talking points and compile [unspecified] information to be presented to the [unidentified] Noteholders at Thadani's and Sekhri's request" on unspecified occasions.  FAC ¶ 150.  These are just examples, and the other allegations highlighted in the Opposition are equally misleading.  The Court should reject the Trustee's attempt to rectify the FAC's lack of specificity through gross mischaracterizations.

17. In the same vein, a substantial part of the Trustee's case is based on alleged omissions contained in the 52-page CIM, the contents of which is broadly and collectively attributed to Houlihan, Thadani, Sekhri, Bouskill, Ijaz, and Boyden.  Neither the FAC nor the

---

[2] At most, the FAC alleges, without any explanation, that Boyden was "present and supporting Thadani's narrative" on certain unidentified calls with unidentified Noteholders.  FAC ¶ 150.

[3] While these allegations are themselves insufficient, they also cannot be considered because the Trustee cannot amend the FAC through briefing. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation and internal quotations omitted).

Opposition even pretends to identify what information was contributed or witheld by any particular defendant. The Opposition has no explanation for this deficiency; instead, the Trustee simply tries to retreat from the legal standard, arguing "there is no per se rule that group pleading cannot satisfy Rule 9(b)." Opp. ¶ 46 (citing *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 455 (Bankr. D. Del. 2006)). But that is only the case where the allegations are sufficiently particularized "to place the defendant on notice of the precise misconduct with which it is charged." *DiMare v. MetLife Ins. Co.*, 369 F. App'x 324, 329 (3d Cir. 2010).

### B. The Trustee Does Not Refute the Lack of Any Misrepresentations by Management Defendants.

18. As explained in the MTD, for all its bluster, the FAC does not identify a single misstatement of fact made by any Management Defendant to any Noteholder. MTD ¶¶ 54-79. The Trustee does not refute this position, nor does he refute that, other than Messrs. Sekhri and Boyden, the Management Defendants are not alleged to have had *any* direct interactions with Noteholders whatsoever. Instead, he asks the Court to indulge inference after inference—none of which are factually supported—to countenance theories based on "implied" facts and supposedly insincere opinions. None of the allegations cited by the Opposition supports a claim.

19. ***Defendants Bouskill and Ijaz.*** The Opposition's concessions as to Bouskill and Ijaz leave no doubt that the fraud claims against them are baseless. First, the Trustee acknowledges that the FAC *does not cite a single communication* between Bouskill or Ijaz and any Noteholder. Opp. ¶ 43. Instead, he argues that Bouskill and Ijaz "are liable for misrepresentations in the CIM even if they did not personally interface with the Noteholders" because they had "reason to expect . . . that the statement will be communicated to the [plaintiff], and that it will influence his conduct

9

in the transaction." *Id*. (quoting *Clark v. Davenport*, 2019 WL 3230928, at *13 (Del. Ch. July 18, 2019)). But that rule presumes a plaintiff has specifically alleged a misrepresentation by the defendant in the first place—something the FAC does not do because it (1) does not actually identify any false statements in the CIM, and (2) never identifies what specific "input" within the 52-page CIM was supposedly provided by Messrs. Bouskill and Ijaz, much less that it was false or misleading, or that it was ever even viewed by any Noteholders.

20. Indeed, the Opposition concedes that the FAC never "actually plead[s] that any statements in the CIM were false." Opp. ¶ 44 (quoting MTD ¶ 65). Nonetheless, it argues that the CIM was fraudulent because its "implied attrition rate" and use of pro forma figures "left Noteholders with the impression" that turned out to be wrong. *Id*. (citing *Gaffin v. Teledyne, Inc*., 611 A.2d 467, 472 (Del. 1992). Thus, the Trustee argues that, even though nothing in the CIM was actually false, the totality of the document "cause[d] a false impression as to the true state of affairs." *Id*. at 24. But the law does not impose a "duty to disclose a negative trend" in real time simply because a transaction is on the table. *Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D.N.J. 1995), aff'd, 82 F.3d 408 (3d Cir. 1996), nor does the Trustee allege—as he must to make this assertion—that the Management Defendants controlled the contents of the CIM. For the reasons described in the MTD, the Trustee's position does not plead a claim.

21. ***Defendant Boyden.*** The Trustee's entire case against Mr. Boyden rests on a solvency certificate supposedly disproven by an innocuous email from weeks beforehand between Bouskill and Ijaz. Noticeably, the Opposition does not even quote the cited email, but simply asserts that it "strongly support[s] an inference that no solvency analysis of any kind was undertaken." Opp. ¶ 40. That is baseless on its face. The certificate itself states only that Boyden

undertook "such examination as necessary" to support his opinion. The Opposition cites no allegations plausibly showing that (a) the opinion was objectively incorrect, or (b) Boyden knew it to be so at the time. Absent such allegations, the certificate cannot sustain any fraud claim. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015) (opinion statements actionable only if not honestly held or objectively false).

22.     ***Defendant Sekhri.***  The FAC attributes just two oblique statements to Mr. Sekhri during the marketing process made "in calls" on August 27, November 21, and November 22, 2021, neither of which is actionable.  First, the FAC states that "Thadani and management, including Sekhri" touted Lucky Bucks's "strong relationship with the GLC" to unspecified Noteholders. FAC ¶¶ 182-87.  Second, together with Thadani, Sekhri allegedly touted "the strength of Lucky Bucks's 'farm team'"−the team of salespeople that scoped out and assembled valuable locations for acquisitions (*id.* ¶ 10) and described Lucky Bucks as "a higher moral compass player" (*id.* ¶¶ 142, 265).  As explained in the MTD, these are quintessential subjective statements—not the kind of representations that are actionable as "fraud," especially for sophisticated arms-length counterparties.

23.     The Trustee tries to rebut this by arguing that such puffery can be actionable "if the speaker does not genuinely or reasonably believe" it. Opp. ¶ 49 (quoting *Appel v. Berkman*, 180 A.3d 1055, 1060 n.25 (Del. 2018)).  But the Trustee cites no authorities finding an analogous statement to be actionable in the circumstances here, namely where the recipient was a sophisticated businessperson negotiating an arms-length transaction for hundreds of millions of dollars.  To the contrary, "[u]nder Delaware law, to establish a claim of fraud or negligent misrepresentation, the plaintiff must demonstrate *justifiable reliance* on false representations

made by the defendant. In that regard, the misrepresentation forming the basis for the fraud or negligent misrepresentation claim must be material, and the plaintiff generally cannot rely, for example, on puffery, [or] expressions of mere opinion . . . ." *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014) (emphasis in original).

24. In any event, the Opposition does not point to any allegations plausibly showing that Sekhri did not believe these statements when he allegedly made them. As to the Company's relationship with the GLC, the Trustee merely cites an email in which Ijaz told Bouskill, "I think [a GLC regulatory attorney] just hates us given the history" and that her "tone shows the GLC is not happy with us." Opp. ¶ 49. But the Trustee does not explain how Ijaz's beliefs about a particular GLC official—which were sent nine months earlier—could bear on Sekhri's subjective beliefs about the Company's overall relationship with regulators. Similarly, the Opposition argues that Sekhri couldn't have believed in the quality of Lucky Bucks's "farm team" because they were "involved in Damani and Kassam's scheme to strip Lucky Bucks of its assets and cause it to purchase COAM locations at inflated valuations . . ." *Id.* ¶ 50. But, again, the Trustee does not explain how this is relevant to Sekhri's intent, when the FAC does not allege (or even suggest) that Sekhri was aware of the alleged scheme.

C. <u>The Trustee's Newly Emphasized "Omission" Theory Also Fails.</u>

25. In the absence of any allegedly false statements, the Opposition pivots to an omissions theory—asserting that Management Defendants "hid" the true state of the business by supplying pro forma EBITDA (again, which is not alleged to have been false), by not updating the CIM's purported "implied attrition rate," or by "failing to correct" statements made during phone calls by Thadani or Trive. However, fraud by omission requires a duty to speak arising from a

fiduciary or special relationship. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1431-33 (3d Cir. 1997) ("duty to update . . . arises only under special circumstances" and is not triggered by "the voluntary disclosure of an ordinary earnings forecast"). The Trustee nowhere alleges, nor can he, that the Management Defendants owed such a duty to sophisticated, arms-length Noteholders who expressly disclaimed reliance on extra-contractual statements in the Note Purchase Agreement. Indeed, the FAC's sole allegation even approaching this topic is the conclusory assertion that "[e]ach of Defendants had a duty of care to, and special relationship with, the Noteholders," and "[e]ach Defendant developed a special degree of trust with the Noteholders in making their investment decision…." FAC ¶¶ 396-97. This is insufficient on its face.

26. Not only are there no allegations giving rise to a duty, but the FAC does not even allege the Management Defendants controlled the content of the CIM or were in a position to correct any "misimpressions" in the first place. Rather, the FAC states that the Management Defendants provided certain information (though never specifically identified) allegedly used in the CIM and during unspecified "diligence calls" with Trive and Thadani. There is no allegation that the Management Defendants were, or even could have been, aware of the total mix of information going over the transom in a process allegedly spearheaded by Trive. *See* MTD ¶¶ 21-24. The Trustee noticeably cites no authorities recognizing a fraud claim in such circumstances. For this reason, the omissions theory equally fails.

## CONCLUSION

For the reasons above, the Management Defendants respectfully request that the Court dismiss the claims against them with prejudice.

| | |
|---|---|
| Dated: July 2, 2025 | **POTTER ANDERSON & CORROON LLP** |

/s/ *M. Blake Cleary*
M. Blake Cleary (No. 3614)
Jesse L. Noa (No. 5973)
James R. Risener (No. 7334)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Phone:  (302) 984-6026
Email:  bcleary@potteranderson.com
            jnoa@potteranderson.com
            jrisener@potteranderson.com

-and-

**ALLEN OVERY SHEARMAN STERLING US LLP**
C. Luckey McDowell (*pro hac vice* application pending)
Ian E. Roberts (*pro hac vice* application pending)
Jacob Fields (*pro hac vice* application pending)
2601 Olive St 17th Floor
Dallas, TX 75201
Phone:  (214) 271-5777
Email:  luckey.mcdowell@aoshearman.com
            ian.roberts@aoshearman.com
            jacob.fields@aoshearman.com

-and-

Samuel Cooper (*pro hac vice* application pending)
800 Capitol Street, Suite 2200
Houston, Texas, 77002
Phone:  (713) 354-4838
Email:   samuel.cooper@aoshearman.com

*Counsel for Manu Sekhri, James Boyden, Ryan Bouskill, Stephanie Lippa, and Hassan Ijaz*