**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MARC ABRAMS,<br>In his capacity as Chapter 7 Trustee of Lucky Bucks Holdings LLC and as assignee,<br><br>*Plaintiff*,<br><br>v.<br><br>TRIVE CAPITAL MANAGEMENT LLC, *et al.*,<br><br>*Defendants*. | Adversary Proceeding<br><br>No. 24-50130 (KBO) |

**MEMORANDUM OF LAW**
**IN SUPPORT OF THE TRIVE DEFENDANTS' CROSS-MOTION TO COMPEL**
**AND IN OPPOSITION TO THE TRUSTEE'S MOTION TO COMPEL [D.I. 208]**

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400

**WILMER CUTLER PICKERING HALE AND DORR LLP**

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Charles C. Bridge (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363

Dated: June 18, 2026

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 5

A. The Trive Defendants Produce Broad Rule 2004 Discovery ..... 5

B. The Complaint And The Amended Complaint ..... 5

C. The Trive Defendants Produce Additional Discovery ..... 6

D. The Noteholders Do Not Produce Any Documents For Over Ten Months ..... 8

E. The Noteholders Refuse To Produce From Multiple Custodians Who Have Knowledge And Information That Is Critical To The Case ..... 9

F. Multiple Noteholders Fail To Produce Responsive Chat Messages ..... 17

ARGUMENT ..... 17

I. THE COURT SHOULD ORDER THE TRUSTEE TO INCLUDE TED GOLDTHORPE, MIKE TERWILLIGER, AND CLARE KIM AS NOTEHOLDER DOCUMENT CUSTODIANS ..... 18

A. Ted Goldthorpe Has Information Critical To This Case And His Phone Should Be Collected, Reviewed, And Produced—Like The Phone Of Every Trive Defendant Custodian In This Case ..... 18

B. Mike Terwilliger And Clare Kim Should Be Custodians ..... 21

II. THE COURT SHOULD ORDER THE TRUSTEE TO PRODUCE ALL NOTEHOLDER CHAT AND TEXT MESSAGES ..... 22

III. THE COURT SHOULD DENY AS MOOT THE TRUSTEE'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM CONNER SEARCY ..... 23

IV. THE COURT SHOULD DENY THE TRUSTEE'S MOTION TO COMPEL DISCLOSURE OF THE IDENTITIES OF EXTERNAL INVESTORS IN THE TRIVE FUNDS ..... 23

CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Boston Scientific Corporation v. Nevro Corporation*,
2020 WL 5095447 (D. Del. Aug. 21, 2020) ..... 17, 18

*Brewer v. BNSF Railway Company*,
2015 WL 13883901 (D. Mont. Nov. 20, 2015) ..... 21

*Butterworth v. Laboratory Corporation of America Holdings*,
2010 WL 11470894 (M.D. Fla. June 15, 2010) ..... 21

*Cardinal Health 200, LLC v. Cellex, Inc.*,
2025 WL 2426338 (S.D. Ohio Aug. 22, 2025) ..... 20

*Chervon (HK) Limited v. One World Technologies, Inc.*,
2025 WL 2638959 (D. Del. Jan. 14, 2025) ..... 23

*Crawford-El v. Britton*,
523 U.S. 574 (1998) ..... 18

*Doe LS 340 v. Uber Technologies, Inc.*,
710 F. Supp. 3d 794 (N.D. Cal. 2024) ..... 21

*Dymarkowski v. Iland Green Technologies, Inc.* (*In re Xunlight Corporation)*,
2016 Bankr. LEXIS 4279 (Bankr. N.D. Ohio Dec. 14, 2016) ..... 26

*Garcia Ramirez v. United States Immigration & Customs Enforcement*,
331 F.R.D. 194 (D.D.C. 2019) ..... 21, 22

*Goodman v. Burlington Coat Factory Warehouse Corporation*,
292 F.R.D. 230 (D.N.J. 2013) ..... 18, 24

*Heredia v. Sunrise Senior Living LLC*,
2020 WL 12584277 (C.D. Cal. July 20, 2020) ..... 18

*In re Blackjewel, L.L.C.*,
2020 WL 6948815 (Bankr. S.D. W. Va. July 14, 2020) ..... 29

*In re Cyber Litigation Inc.*,
2021 WL 2655312 (Bankr. D. Del. June 28, 2021) ..... 28

*In re Enron Corporation*,
281 B.R. 836 (Bankr. S.D.N.Y. 2002) ..... 29

*In re Millennium Lab Holdings II, LLC*,
562 B.R. 614 (Bankr. D. Del. 2016) ..... 28

*In re Washington Mutual, Inc.*,
408 B.R. 45 (Bankr. D. Del. 2009) ........................................................................29

*Israel v. Pierce*,
235 F. Supp. 3d 598 (D. Del. 2017)........................................................................23

*LifeScan, Inc. v. Smith*,
2024 WL 3823488 (D.N.J. July 11, 2024)...............................................................20

*Motivo Engineering, LLC v. Black Gold Farms*,
2023 WL 2628687 (C.D. Cal. Feb. 10, 2023)...........................................................24

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978)................................................................................................30

*Pacific Century International, Ltd. v. Does 1-37*,
282 F.R.D. 189 (N.D. Ill. 2012)..............................................................................30

*Pegley v. Roles*,
2018 WL 572093 (W.D. Pa. Jan. 26, 2018)...............................................................18, 19

*Simms v. Deutsche Bank National Trust Company (In re Simms)*,
2012 WL 2930048 (Bankr. N.D. Ga. May 11, 2012) ...................................................29

*Thomas v. City of New York*,
336 F.R.D. 1 (E.D.N.Y. 2020)...............................................................................22, 24

*Thompson-El v. Greater Dover Boys & Girls Club*,
2022 WL 606700 (D. Del. Jan. 28, 2022).................................................................17

## STATUTES, RULES, AND REGULATIONS

11 U.S.C. § 550...........................................................................................25, 27

Fed. R. Bankr. P.
2004.....................................................................................3, 5, 6, 9, 25, 28, 29
7026.......................................................................................................17
7054.......................................................................................................24

Fed. R. Civ. P.
16.........................................................................................................23
26...............................................................................................17, 18, 24, 28
54.........................................................................................................24

Local Bankruptcy Rule 2004-1 ...................................................................................5

## OTHER AUTHORITIES

Motion for Stay Pending Appeal, Exhibit D (March 1, 2024 Hearing Transcript), *Byju's Alpha, Inc. v. Camshaft Capital Fund, LP (In re Byju's Alpha, Inc.)*, No. 24-50013 (JTD) (Bankr. D. Del. Mar. 27, 2024), ECF No. 100-4 ....................27

The Trive Defendants[1] respectfully submit this memorandum of law (1) in support of their cross-motion (the "Cross-Motion") to compel the Trustee to produce documents responsive to the *Trive Defendants' First Set of Document Requests to the Plaintiff* (the "Trive Defendants' RFPs"); and (2) in opposition to the Trustee's motion to compel [D.I. 208, 209] (the "Trustee's Motion" or "Tr. Mot.").

## PRELIMINARY STATEMENT

1. The Trustee has brought claims in this adversary proceeding not only on behalf of the Debtor's bankruptcy estate, but also as assignee of ***six*** separate Noteholders—BC Partners, CION, First Trust, Hamilton Lane, Marathon, and Monarch—each a sophisticated asset manager that manages billions of dollars in investments. The Noteholders' claims are premised on allegations that the Trive Defendants supposedly made false statements to the Noteholders about the November 2021 and January 2022 Notes transactions at issue during calls and meetings as well as in writing. Yet, amazingly, the Trustee has refused to collect documents and communications from Noteholder deal-team members who were on these calls, who attended these meetings, and who wrote and received key communications about the Noteholders' decision to participate in the Notes transaction—and who therefore have critical, firsthand knowledge of what was said and when, and by whom, and to whom, and what was not said by the Trive Defendants at all. One of those custodians is Ted Goldthorpe, Head of Credit for BC Partners—the Noteholder with the largest participation in the Notes transactions—who made the decision to invest in the Notes and

[1] Capitalized terms not defined herein have the same meaning ascribed to them as in the *Memorandum of Law in Support of Trive Defendants' Motion to Dismiss Plaintiff's Amended Complaint*, D.I. 69. Citations to "Ex." are to exhibits attached to the Declaration of Ross E. Firsenbaum, dated June 18, 2026 (the "Firsenbaum Declaration" or "Firsenbaum Decl."), filed herewith. Also filed herewith is the Declaration of Shravan Thadani, dated June 18, 2026 (the "Thadani Declaration" or "Thadani Decl.").

who, the Trive Defendants have recently learned, became aware of the so-called "B-Side Fraud" months before anyone informed this Court about it. This Court should require the Trustee to produce documents from Mr. Goldthorpe and two other critical BC Partners custodians (Mike Terwilliger and Clare Kim), including from their personal devices, as the Trustee demanded of the Trive Defendants' custodians (and as the Trive Defendants have agreed to produce in response to such requests). This Court should also require the Trustee to produce all Noteholder chats and text messages—including BC Partners' Microsoft Teams chats and Hamilton Lane's Slack chats, none of which the Trustee has produced (despite the passage of the June 2, 2026 Court-ordered deadline for the substantial completion of document production).

2. The Trustee's Motion accuses the Trive Defendants of a "pattern of avoidance," employing "bad-faith discovery tactics," and "slow-walk[ing] responses" to the Trustee's document requests. Tr. Mot. ¶¶ 1-2, 4. These accusations are false—indeed, so demonstrably false that they call into question whether the Trustee's counsel appreciates its duty of candor to the Court. The accusations are especially brazen when one considers that it is *the Trustee*, not the Trive Defendants, whose conduct could more aptly be described as "avoidance" and "slow-walking," from the moment he received the Trive Defendants' RFPs. The Trive Defendants would have preferred not to burden the Court with this dispute. But because the Trustee has short-circuited negotiations and unreasonably refused to agree to produce several categories of Noteholder documents that are plainly relevant and important to the case, the Trive Defendants now cross-move to compel—while also responding in opposition to the Trustee's Motion.

3. The Trustee's Motion makes much of a supposed imbalance in the discovery burdens between the Trive Defendants and the Trustee. But he fails to inform the Court of the relevant context. To start, the Trustee inflates the volume of discovery he has produced. After one

subtracts the 240,000 documents that the Trustee received in Rule 2004 discovery from non-parties and merely re-produced to the Trive Defendants without further effort on his part, the Trustee has produced only 28,347 documents from the Noteholders' files. (The Trustee claims to have produced approximately 31,000 documents, *see* Tr. Mot. ¶ 2, but that assertion is inaccurate.) This is hardly a remarkable number, given that the Trustee is assignee of claims from six sophisticated Noteholders that claim to have conducted substantial diligence on the Notes transaction, as it amounts to an average of under 5,000 documents per Noteholder. With six discrete Noteholders (the assignors) in the case, and only one set of Trive Defendants, it is not unfair or surprising that the Trustee may collectively need to produce more responsive documents than the Trive Defendants, who have now produced themselves 24,000 documents, nearly five times the average production-per-Noteholder by the Trustee.

4. The Trustee also tries to lead the Court astray by attempting to characterize the Noteholders as "mere lenders" whose conduct, in the Trustee's view, somehow has little relevance compared to the conduct of the Trive Defendants. Tr. Mot. ¶ 3. In fact, the Noteholders' conduct and knowledge are at the heart of this case—for the Trustee's own claims and for the Trive Defendants' defenses. As just one example, the Trustee's claim for common-law fraud requires the Trustee to prove that each Noteholder relied on a material misstatement made by the Trive Defendants, and that such reliance was reasonable. Thus, what (if anything) each Noteholder learned from the Trive Defendants, and what each knew from other sources, is highly relevant to that claim.

5. With this context in mind, it is clear that the real discovery failures in this case are by the Trustee and the Noteholder assignors—not by the Trive Defendants. The Trustee has refused to add relevant custodians from BC Partners, the lead investor in the Notes transactions,

despite being confronted with a litany of evidence that these custodians were deeply involved in diligence on the Notes transactions. He inexplicably refuses to search the personal device(s) of one such custodian, Ted Goldthorpe, without offering a valid reason why—raising the concern that Mr. Goldthorpe failed to preserve relevant communications, a concern that the Trustee has failed to alleviate by refusing consistently to answer questions about the scope and timing of litigation holds (if any) implemented by BC Partners and the other Noteholders. And the Trustee does not appear to have produced any Microsoft Teams chat messages from BC Partners or Slack chat messages from Hamilton Lane, even though productions made to date indicate that these channels were used to discuss the Notes transactions.

6. Finally, the Trustee's Motion should be denied. As it relates to Conner Searcy, the Managing Partner of Trive Capital Management LLC ("TCM"), the motion should be denied as moot, because the Trive Defendants have now produced Mr. Searcy's documents and communications—as the Trive Defendants told the Trustee they would do if the Trustee would do the same for Mr. Goldthorpe. The Trive Defendants have now held up their end of that reasonable compromise offer and respectfully ask that, in turn, the Court order the Trustee to produce documents and communications from Mr. Goldthorpe (and others). The remainder of the Trustee's Motion, relating to the disclosure of the identities of external investors in certain Trive Defendants (on the theory that these external investors are purported subsequent transferees), should be denied on the merits. This is highly sensitive and proprietary information that the Trustee has no need to access; he has not shown (nor could he) that the Trive Defendants and their insurers are somehow unable to satisfy an adverse judgment in the case. Rather, the Trustee evidently hopes to strongarm or harass the Trive Defendants into an excessive settlement by pursuing burdensome discovery

that threatens both the Trive Defendants' relationships with their investors and those investors' own privacy interests.

## BACKGROUND

### A. The Trive Defendants Produce Broad Rule 2004 Discovery

7. On March 7, 2024, pursuant to Federal Rule of Bankruptcy Procedure 2004 and a stipulation under Local Bankruptcy Rule 2004-1(a), the Trustee served the Trive Defendants with 19 broadly framed document requests lacking any time-period limitation. Ex. 1 at 3-8. By their terms, those requests appeared to require the Trive Defendants to search not only the files of TCM and other institutional defendants, but also the personal devices (*e.g.*, cell phones) of individual custodians who worked at TCM. *See id.* at 6 ¶ 13. In response, the Trive Defendants agreed to conduct a reasonable search of the files of the two individuals with greatest responsibility for the Trive Defendants' investment in Lucky Bucks (Shravan Thadani and Connor Anderson), including their personal devices, as well as of TCM's deal file for its Lucky Bucks investment, which spanned a multi-year period.

8. Following this search, the Trive Defendants produced over 21,000 documents (including over 11,000 documents before the Trustee filed his initial Complaint in this adversary proceeding, and over 9,700 additional documents by February 27, 2025) and multiple privilege logs. *See* Ex. 2 at 2 (2/27/25 letter).

### B. The Complaint And The Amended Complaint

9. The Trustee filed his initial Complaint on September 13, 2024. D.I. 1. After the Trive Defendants moved to dismiss, the Trustee filed an Amended Complaint on January 21, 2025. D.I. 58 (the "<u>Amended Complaint</u>" or "<u>Am. Compl.</u>").

10. As this Court knows, this case concerns Holdings' issuance of Notes in November 2021 and January 2022. The Trustee asserts claims both in his capacity as trustee of Holdings'

bankruptcy estate and as assignee of the Noteholders—*i.e.*, standing in the Noteholders' shoes. Am. Compl. ¶ 1. He purports to assert federal and state fraudulent-transfer claims against the Trive Defendants both on behalf of Holdings' estate and on behalf of the Noteholders, as well as state statutory and common-law claims on behalf of the Noteholders. *Id.* ¶¶ 269-401. In support of most (if not all) of his claims, the Trustee alleges that the Trive Defendants made false and misleading statements to the Noteholders when marketing the Notes, and that the Noteholders supposedly relied on such statements to invest in Holdings. *See, e.g.*, *id.* ¶¶ 129-149, 190.

**C. The Trive Defendants Produce Additional Discovery**

11. On April 11, 2025, the Trustee served a *First Set of Requests for Production of Documents Propounded to Trive Defendants*, which constituted 33 wide-sweeping requests spanning a more-than-five-year (and perpetual) time period of January 1, 2020 to the present, and which sought, in effect, all documents relating to Lucky Bucks. D.I. 210-3. On May 12, 2025, the Trive Defendants served responses and objections indicating that they believed that their Rule 2004 production had satisfied most of these requests, but that they were willing to meet-and-confer to discuss what additional searches, if any, the Trustee believed were necessary in light of the Trive Defendants' prior production of over 21,000 documents. D.I. 210-4.

12. On June 25, 2025, notwithstanding that he had already initiated this adversary proceeding, and notwithstanding ongoing meet-and-confers about their initial document requests, the Trustee served the Trive Defendants with a second set of Rule 2004 discovery requests, which consisted of six requests seeking identification of, and additional information regarding, investors in Trive Capital Fund III LP ("Fund III") and/or Trive Capital Fund III-A LP ("Fund III-A" and, together with Fund III, the "Trive Funds"). D.I. 210-5.

13. On August 1, 2025, the Trustee served yet more document requests: a *Second Set of Requests for Production of Documents Propounded to Trive Defendants*, which constituted

another six requests spanning from January 1, 2020 to the present, and sought, among other things, "All Documents and Communications relating to or regarding [the Trive Defendants'] investment in or ownership of Lucky Bucks LLC, Lucky Bucks HoldCo LLC, or Lucky Bucks Holdings LLC." D.I. 210-6 at 8 (RFP 35). Once again, the Trive Defendants offered to meet-and-confer to discuss what additional searches, if any, the Trustee believed were necessary, in light of the Trive Defendants' prior production of over 21,000 documents. D.I. 210-7.

14. Not satisfied, on April 10, 2026, the Trustee served his *Third Set of Requests for Production of Documents Propounded to Trive Defendants*, which included three more requests spanning from January 1, 2020 to the present. Ex. 3. For each request, the Trive Defendants agreed to conduct a reasonable search for additional documents and communications (to the extent they had not already been produced) and produce them. Ex. 4.

15. After several meet-and-confers, the Trive Defendants agreed to run additional search terms on their custodians' emails and personal-device data and to produce certain additional categories of documents. *See, e.g.*, Tr. Mot. ¶ 8 (obliquely acknowledging Trive Defendants' use of "additional search" terms); Ex. 5 at 1 (5/1/26 production letter).

16. One additional category of documents that the Trive Defendants agreed to produce, and did produce, was a set of redacted bank statements for the period spanning November 2021 through February 2022, which were "sufficient to identify any transfers of Holdings Distributions proceeds made prior to March 31, 2024 by TCFIII Luck LP, TCFIII Luck SPV LP, and TCFIII Luck Acquisition LLC," and reflected any transfers of proceeds of the Holdings Distributions proceeds to Fund III and/or Fund III-A before March 31, 2024, as the Trustee requested. Ex. 6 at 1; *see* Ex. 7 at 1. The Trive Defendants redacted the bank statements to conceal the identities of

the external investors in the Trive Funds because such information was highly sensitive, and not relevant or proportional.

17. By the Court's June 2, 2026 deadline for the substantial completion of document discovery, the Trive Defendants had produced 23,552 documents to the Trustee. That number has now risen to 24,199 documents, which includes Mr. Searcy's custodial documents (and a metadata file reflecting Mr. Searcy's custodianship of already-produced documents), as well as a modest additional clean-up production of documents resulting from the Trive Defendants' finalization of their privilege log. *See* Ex. 8.[2]

**D. The Noteholders Do Not Produce Any Documents For Over Ten Months**

18. The contrast with how the Trustee and the Noteholders in whose shoes he stands have acted in responding to discovery served on them is palpable.

19. On March 5, 2025, the Trive Defendants served the Trustee with the Trive Defendants' RFPs. D.I. 117-2. The requests sought, among other documents, all documents from the Noteholders regarding their purchase of the Notes. *Id.* at 10-11 ¶ 3. On April 4, 2025, the Trustee served responses and objections but did not produce any documents. D.I. 117-3.

20. On December 8, 2025—nearly ten months after the Trive Defendants served the Trive Defendants' RFPs—the Trustee made his first production of 4,224 documents from the Noteholders' files.

21. The Trustee made a second production of Noteholder documents (7,002 documents) on December 31, 2025, and a third production of Noteholder documents (13,779 documents) on March 20, 2026. Thus, the Trustee produced more than half of its production of Noteholder documents more than a year after receiving the Trive Defendants' RFPs. In addition,

[2] The parties agreed to exchange privilege logs by June 16, 2026.

the Trustee made much smaller, redaction-heavy productions of Noteholder documents on April 17 and June 2, 2026 (2,862 and 480 documents, respectively), and re-produced new versions of some already-produced documents on June 8, 2026.

22. In total, the Trustee has produced a total of 28,347 documents from the Noteholders' files. With six Noteholders, this equates to an average of around 4,725 documents per Noteholder. (Even if the Court credits the Trustee's misstatement that he has produced 31,000 Noteholder documents, that would come out to around 5,150 documents per Noteholder.) While the Trustee tries to focus the Court on the number 270,000 (Tr. Mot. ¶ 2), he ignores that 240,000 of those documents are (by the Trustee's admission) ones that third parties produced to the Trustee in response to Rule 2004 discovery and of which the Trustee merely sent copies to the Trive Defendants.

**E. The Noteholders Refuse To Produce From Multiple Custodians Who Have Knowledge And Information That Is Critical To The Case**

23. Not only did it take the Trustee more than ten months to produce documents from the Noteholders; he also failed to collect documents from Noteholder personnel with information critical to the claims and defenses in this adversary proceeding.

24. At a meet-and-confer on April 28, 2025, about eight months before the Trive Defendants received any Noteholder documents, the Trustee proposed custodians for each Noteholder. *See* D.I. 117-5 at 2-3. For BC Partners, the lead investor in the Notes, the Trustee's proposed custodians were (a) Ivelin Dimitrov, a Partner in Credit, and (b) Jason Young, then an Associate (now a Principal) in Credit. *Id.* at 2. The Trustee's proposed custodians for BC Partners did not include (a) Ted Goldthorpe, a Partner and Head of Credit; (b) Mike Terwilliger, a Managing Director in Credit; or (c) Clare Kim, then an Associate (now a Director) in Credit. *Id.*

25. In a letter dated May 2, 2025, the Trive Defendants requested additional information about several potential custodians for each Noteholder to better assess the Trustee's proposal. *See* D.I. 117-5 at 2-3. In the same letter, the Trive Defendants expressly "request[ed] that Ms. Kim be added as a custodian" and "reserve[d] all rights to request collection of documents from additional custodians." *Id.* at 2-3 (emphasis omitted). In response, the Trustee claimed that Ms. Kim "was not a core member of the diligence team and was purely involved with legal documentation." D.I. 117-6 at 3. "Based on that representation, [the Trive Defendants] agree[d] for now not to pursue searches of her custodial documents" but "reserve[d] the right to request that Ms. Kim be added as a custodian, including in the event discovery or further investigation shows that such representation is inaccurate." D.I. 117-7 at 8.

26. Once the Trustee (finally) began producing documents from the Noteholders' files and the Trive Defendants had the chance to review them, it became clear that Mr. Goldthorpe, Mr. Terwilliger, and Ms. Kim have material information regarding the Notes transactions and should have been included as custodians.

27. <u>Ted Goldthorpe</u>. Documents that the Trustee began producing in December 2025 reveal that Mr. Goldthorpe directed BC Partners' negotiations concerning the Notes offering from start to finish, often discussing granular details of the deal terms with his colleagues. For example, on August 28, 2021, Mr. Goldthorpe wrote to his colleagues that he "would take penny warrants" and that BC Partners "need[ed] to have a cap on debt ahead of us and something that makes them [*i.e.*, Lucky Bucks] delever." Ex. 9 at -3665. As another example, on September 14, 2021, Mr. Goldthorpe opined that "0.5pt on oid [*i.e.*, Original Issue Discount] shouldn't make us walk away and call pro[tection] is decent if there is a near term exit." Ex. 10 at -3919. And on January 7, 2022, Mr. Goldthorpe stated that he "would be open to selling another 10-15mm to Monarch," but

"[b]efore we do that is there something we can get from them? At a minimum, I think the message should be that if they really want it to have one of their head guys call me or someone else here at least we log the favor. Isn't it also important that we maintain 50% of the tranche? So post upsize 125mm between us and HL [*i.e.*, Hamilton Lane]? Otherwise Marathon or these guys can hold us up." Ex. 11 at -628.

28. In addition to meeting with colleagues internally,[3] Mr. Goldthorpe attended—indeed, *insisted* on attending—the November 2, 2021 in-person meeting in New York with members of Lucky Bucks's management and Mr. Thadani underlying many of the Trustee's allegations and causes of action: "As discussed I want to be there." Ex. 12 at -11222; *see also* Ex. 13 at -11416 (11/2/21 email: "That was a great meeting."); *cf.* Am. Compl. ¶¶ 138, 140, 142-144, 146, 355 (sometimes inaccurately describing this meeting as a "call"). Mr. Goldthorpe also communicated with other investors about the syndication of the Notes, including fellow Noteholder Hamilton Lane.[4]

29. After the Notes transactions, Mr. Goldthorpe remained closely engaged in monitoring and making decisions regarding Lucky Bucks.[5] Notably, on March 24, 2023, Mr. Goldthorpe directed BC Partners to retain a private-investigatory firm called B2G Global Strategies ("B2G") to prepare a June 2023 report about Anil Damani and members of Lucky Bucks's management (but *not* the Trive Defendants).[6] This was more than nine and six months,

---

[3] *See, e.g.*, Ex. 14 at -3303 (9/2/21 investment-committee meeting focusing on Lucky Bucks); Ex. 15 at -9764 (11/18/21 investment-committee meeting focusing on Lucky Bucks).

[4] *See, e.g.*, Ex. 16 at -8733 (Hamilton Lane); Ex. 15 at -9764 (BMO); Ex. 17 at -441 (Fortress); Ex. 18 at -216181 (Wafra).

[5] *See, e.g.*, Ex. 19 at -50021; Ex. 20 at -27402 to -27404.

[6] *See* Ex. 21 at -220334 (draft B2G engagement letter addressed to Mr. Goldthorpe); *see also* Ex. 22 at -219663 (6/12/23 letter to Georgia Lottery Commission attaching B2G investigative

respectively, before the January 2024 filing of a lawsuit in Georgia that (as the Trustee later asserted to this Court) supposedly "reveal[ed] for the first time … that Damani, Kassam, and other insiders engaged in extensive misconduct when running Lucky Bucks." Am. Compl. ¶ 26.

30. Mike Terwillinger. Mr. Terwilliger also appears to have played a substantial role on BC Partners' deal team for the Notes transactions. As a member of the deal team, Mr. Terwilliger regularly conferred with his colleagues about the details of negotiations of deal terms. For example, in an August 28, 2021 email to BC Partners colleagues, Mr. Terwilliger explained that "[w]e expect PIK in year one" and that "[t]he existing Term Loan credit agreement has good debt incurrence and ECF language (75% with step-downs). We will look for ways to improve both." Ex. 9 at -3664. In that same email, Mr. Terwilliger noted that "[t]he company has identified roughly $90mn of acquisitions to close over the next 3 to 4 months, which will consume the balance of their liquidity." *Id.* Three days later, Mr. Terwilliger wrote: "Personally, I would be in favor of buying equity. ACEL would kill for this asset. I feel like we would milk M&A for 1-2 years and then flip to them." Ex. 24 at -3155.

31. In addition, Mr. Terwilliger drafted diligence questions for (and may have attended) the November 2, 2021 meeting in New York with management and Mr. Thadani.[7] He communicated with [redacted] about a wide range of topics, and he spoke with third-party experts to assist BC Partners' evaluation of the Notes transactions.[8] He also communicated with

report); Ex. 23 at -17450 (7/17/23 email evidencing that five Noteholders (all except First Trust) were responsible for "pro rata share[s]" of B2G invoice).

[7] *See* Ex. 25 at -11408.

[8] *See, e.g.*, [redacted] Ex. 27 at -3574 (expert); Ex. 28 at -8193 to -8205 (same); Ex. 29 at -9207 (same).

other investors about the syndication of the Notes, including fellow Noteholder Hamilton Lane.[9] After the Notes transactions, Mr. Terwilliger remained closely engaged in monitoring and managing BC Partners' investment in Lucky Bucks.[10] Notably, on October 13, 2022 (long before anyone informed this Court of the so-called B-Side Fraud), Mr. Terwilliger emailed BC Partners' "Credit Investment Team" listserv (presumably including Mr. Goldthorpe, BC Partners' Head of Credit) that "Monarch is taking the view that there is 'widespread fraud' in the Lucky Bucks network." Ex. 35 at -216334. Mr. Terwilliger also appears to have been one of the BC Partners people who was most involved in B2G's investigation, as evidenced in part by email threads (produced by other Noteholders) where Mr. Terwilliger is the sole BC Partners person included.[11]

32. Clare Kim. The documents produced to date also contradict the Trustee's representation that Ms. Kim "was not a core member of the diligence team and was purely involved with legal documentation." D.I. 117-6 at 3. Ms. Kim attended and took notes at the November 2, 2021 meeting in New York City. *See* Ex. 37 at -216226 to -216227 (File Name: "Lucky Bucks Management Meeting (11022021) vCK.docx"). As a member of the deal team, Ms. Kim conferred with colleagues at BC Partners about the substance of the deal terms.[12] Ms. Kim also communicated with [redacted] and third-party experts to assist BC Partners' evaluation of the Notes transactions, and with other investors about involvement in the syndication.[13] Notably, the Trive Defendants have received documents from other Noteholders and non-parties in response

[9] *See, e.g.*, Ex. 16 at -8732 (Hamilton Lane); Ex. 30 at -8870 to -8871 (same); Ex. 31 at -3893 (GCM Grosvenor); Ex. 32 at -5600 (Wafra); Ex. 33 at -33257 (Fortress).

[10] *See, e.g.*, Ex. 20 at -27402 to -27404; Ex. 34 at -51720.

[11] *See, e.g.*, Ex. 36 at -27848; Ex. 23 at -17450.

[12] *See, e.g.*, Ex. 38 at -7177 to -7178; Ex. 39 at -10833; Ex. 40 at -145741.

[13] *See, e.g.*, [redacted] Ex. 41 at -4255 to -4256 (expert); Ex. 42 at -9731 (same); Ex. 43 at -12015 to -12018 (same); Ex. 44 at -8311 to -8313 (Siguler Guff).

to subpoenas revealing that Ms. Kim had relevant communications with them about the Notes offering in which no other BC Partners custodian was included, suggesting that she had unique communications that are not captured by BC Partners' productions to date.[14]

33. On March 20, 2026, after reviewing the Trustee's first two productions of Noteholder documents, the Trive Defendants recognized the importance of Mr. Goldthorpe. Accordingly, the Trive Defendants offered to narrow the issues in dispute by agreeing to add Mr. Searcy as a custodian if the Trustee would add Mr. Goldthorpe as a custodian. Ex. 49 at 13.

34. The Trustee refused to agree. In a response sent on March 27, 2026, the Trustee refused to add Mr. Goldthorpe as a custodian—claiming that Mr. Goldthorpe "was not involved in the Lucky Bucks deal" and merely received "update[s] on the progress of the Lucky Bucks deal"—and offered to meet-and-confer. Ex. 49 at 12.

35. In a letter dated April 2, 2026, the Trive Defendants agreed to meet-and-confer and explained that the ongoing review of BC Partners documents—including documents produced several hours after the March 20, 2026 email was sent—showed that Mr. Terwilliger and Ms. Kim were also significantly involved in the Notes transaction and likely possessed relevant documents, such that they should be custodians. Ex. 50 at 1-3. The Trive Defendants cited dozens of documents evidencing Mr. Terwilliger's and Ms. Kim's involvement in events relevant to the Notes offering. *See id.*

36. During a meet-and-confer on April 8, 2026, the Trustee finally agreed to provide hit reports for Mr. Goldthorpe and Mr. Terwilliger (but not Ms. Kim). Ex. 49 at 7. Yet, despite multiple follow-up emails by the Trive Defendants, the Trustee did not provide the promised hit

---

[14] *See, e.g.*, Ex. 45 at -3442 (Marathon); Ex. 46 at -13537 (same); [redacted]

reports until May 8, 2026—a full month later. *See id.* at 5-7. Later on May 8, 2026, the Trive Defendants responded by reiterating the request that Mr. Goldthorpe, Mr. Terwilliger, and Ms. Kim be custodians while also offering to cut six sets of search terms to mitigate any marginal burden on the Trustee of reviewing these custodians' hits. *See id.* at 4-5.

37. Two weeks later, on May 22, 2026, the Trustee finally responded that he would "agree to produce Mr. Goldthorpe's documents in exchange for Trive producing documents from Mr. Searcy, with the limitations to the search terms that [the Trive Defendants] suggested." Ex. 49 at 3. But, even then, the Trustee added a critical limitation, stating that his lawyers would "not collect Mr. Goldthorpe's personal device." *Id.* The Trustee offered no valid explanation as to why Mr. Goldthorpe should not have to conduct the same search of his personal device that the Trustee had requested (and obtained) from the Trive Defendants' custodians (now also including Mr. Searcy), arguing only that "Mr. Goldthorpe will be the Trustee's fifteenth custodian." *Id.* (emphasis omitted).

38. In the same email, and although the Trustee had materially all of the Trive Defendants' productions for almost 15 months by that point (since February 27, 2025, *see supra* ¶ 8), the Trustee stated that he sought documents from four additional Trive Defendant custodians: (a) a former Associate who left TCM in June 2021—i.e., two months before the Trive Defendants allegedly "devised [the] 'super holdco' plan" "in August 2021" (Am. Compl. ¶ 7); (b) a former Senior Associate who left TCM in May 2020; (c) a former CFO of TCM; and (d) the current CFO of TCM. Ex. 49 at 3-4. The only proffered basis for seeking a full-blown review of the former and current CFOs' custodial documents was that those individuals might have had "access to documents detailing the wiring of distributions from Lucky Bucks to Trive and vice versa." *Id.* at 4. The Trustee added that "[i]f Trive agrees to produce documents from these additional

custodians, the Trustee will *consider* adding Mr. Terwilliger and Ms. Kim as custodians." *Id.* (emphasis added).

39. On May 29, 2026, the Trive Defendants requested that the Trustee explain the basis for treating Mr. Goldthorpe differently from all of the Trive Defendants' custodians by not collecting and searching Mr. Goldthorpe's personal device. Ex. 49 at 1. The Trive Defendants noted that "because the Trustee has thus far refused to provide information about his document-collection and document-preservation efforts, including whether appropriate litigation holds were timely implemented by each of the Noteholders, the Trive Defendants are concerned about spoliation—*i.e.*, concerned that the refusal to collect and search Mr. Goldthorpe's personal device(s) reflects the fact that the information on such device(s) was not properly preserved and has been lost." *Id.* As for the Trustee's new demand for four more custodians, the Trive Defendants requested that the Trustee "identif[y] specific documents showing that there is a reasonable basis for thinking these individuals are likely to have relevant, non-cumulative information," precisely what the Trive Defendants did when requesting the addition of Mr. Goldthorpe, Mr. Terwilliger, and Ms. Kim as custodians. *Id.* at 1-2. To date, the Trustee has not responded to the May 29, 2026 email.

40. The deadline for the substantial completion of document production was June 2, 2026. D.I. 145 ¶ 3(c). In a production letter sent that day, the Trive Defendants certified that "[t]he productions that the Trive Defendants have agreed to make to date in response to the Trustee's document requests are now substantially complete." Ex. 51 at 1.

41. Yet, two days later, the Trustee filed his motion to compel. D.I. 208, 209. The Trustee made clear that he would not entertain further discussions about Mr. Goldthorpe's personal device: "If Trive believes Mr. Goldthorpe's texts would be relevant and proportional … , then the

proper course is for Trive to file a motion to compel those texts." Tr. Mot. ¶ 50. And the Trustee has still not identified any documents justifying his transparently tit-for-tat, eleventh-hour request for four additional Trive Defendant custodians.

**F. Multiple Noteholders Fail To Produce Responsive Chat Messages**

42. An email included in BC Partners' production shows that members of the BC Partners deal team used Microsoft Teams chat in connection with the Notes transactions, including a Lucky Bucks-specific group thread. *See* Ex. 52 at -2793. Similarly, Hamilton Lane's production includes emails showing that its deal team used Slack in connection with the Notes transaction. *See, e.g.*, Ex. 53 at -10228; Ex. 54 at -10199; Ex. 55 at -30946.

43. At the parties' meet-and-confer on April 8, 2026, the Trustee represented that the Noteholders' Teams and Slack messages "should have been collected" and that the Trustee would timely produce responsive Teams and Slack messages (as well as responsive documents from custodians' personal devices). Ex. 49 at 7.

44. The deadline for the substantial completion of document production came and went on June 2, 2026. D.I. 145 ¶ 3(c). Yet, the Trustee has still not produced a single Microsoft Teams message from BC Partners or Slack message for Hamilton Lane.

**ARGUMENT**

45. Generally, a party may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *see* Fed. R. Bankr. P. 7026. "Discovery is relevant if used to 'flesh out a pattern of facts already known to a party relating to an issue necessarily in the case.'" *Bos. Sci. Corp. v. Nevro Corp.*, 2020 WL 5095447, at *2 (D. Del. Aug. 21, 2020).

46. "A party moving to compel discovery bears the initial burden of establishing the relevance of the requested information," *Thompson-El v. Greater Dover Boys & Girls Club*, 2022

WL 606700, at *2 (D. Del. Jan. 28, 2022), and "discovery requests that seek irrelevant information are inherently unduly burdensome," *Heredia v. Sunrise Senior Living LLC*, 2020 WL 12584277, at *1 (C.D. Cal. July 20, 2020). But once the party seeking discovery makes a sufficient threshold showing of relevance, the burden shifts to the party resisting discovery to "show why discovery, even if relevant, should not be permitted." *Bos. Sci.*, 2020 WL 5095447, at *2.

47. As to proportionality, "[t]he Court has 'broad discretion to tailor discovery narrowly' to meet the needs of each case." *Goodman v. Burlington Coat Factory Warehouse Corp.*, 292 F.R.D. 230, 232 (D.N.J. 2013) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)). Rule 26's "rule of proportionality 'is intended to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry.'" *Id.*

48. The Trive Defendants' requests for documents from Noteholder custodians who attended the key meetings and calls at issue in this case easily meet the applicable standard: that the discovery sought "is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The Trustee's requests for the identities of non-party external investors in the Trive Funds do not.

## I. THE COURT SHOULD ORDER THE TRUSTEE TO INCLUDE TED GOLDTHORPE, MIKE TERWILLIGER, AND CLARE KIM AS NOTEHOLDER DOCUMENT CUSTODIANS

### A. Ted Goldthorpe Has Information Critical To This Case And His Phone Should Be Collected, Reviewed, And Produced—Like The Phone Of Every Trive Defendant Custodian In This Case

49. The documents cited and discussed above (*supra* ¶¶ 27-29) "plainly demonstrate that [Mr. Goldthorpe] possesses personal knowledge of the facts underlying this litigation," and that he therefore should be a document custodian in this case. *Pegley v. Roles*, 2018 WL 572093, at *3 (W.D. Pa. Jan. 26, 2018) (requiring deposition of corporate executive). For example,

regardless of which state's law applies (*cf.* D.I. 69 ¶ 60), the Trustee's claims for common-law fraud and negligent misrepresentation require proof that (as the Trustee alleges in the Amended Complaint) "[t]he Noteholders reasonably and justifiably relied on [alleged] misrepresentations and omissions." Am. Compl. ¶ 389; *see also id.* ¶ 398. Given his material involvement in the decision-making process at BC Partners, Mr. Goldthorpe's documents should speak to whether the Trive Defendants made any misrepresentations to the Noteholders, whether the Noteholders relied on any such misrepresentations, and whether such reliance was reasonable. Similarly, the allegation that, after the Notes offering, "[t]he Noteholders specifically and actually relied on [the alleged] misrepresentations in not investigating Lucky Bucks's poor performance" (*id.* ¶ 390; *see also id.* ¶ 399) is fair game for discovery, and the fact that Mr. Goldthorpe authorized and oversaw the B2G investigation resulting in the June 2023 report shows that he is reasonably likely to have information relevant to the Noteholders' investigation of Lucky Bucks. The Trive Defendants are also entitled to seek discovery in support of their affirmative defenses, several of which implicate the Noteholders' knowledge and conduct. *See, e.g.*, D.I. 146 (the "Answer") at 90 ¶ 3 (consent, estoppel, ratification, waiver); *id.* at 92 ¶ 14 (causation).

50. Belatedly acknowledging the importance of Mr. Goldthorpe to this case, the Trustee now says that he "will produce documents from Mr. Goldthorpe's email" at an unspecified future date. Tr. Mot. ¶ 50; *see also* Ex. 49 at 3. Yet not only has the deadline for substantial completion of document discovery already passed, but also the Trustee continues to refuse to collect, search, and produce documents from Mr. Goldthorpe's personal devices, even though the Trive Defendants have done exactly that in response to the Trustee's requests and have produced hundreds of text threads and attachments.

51. The Trustee's only basis for resisting production from Mr. Goldthorpe's personal device is that the total number of Noteholder custodians exceeds the number of Trive Defendants custodians. Ex. 49 at 3; Tr. Mot. ¶ 29. This is irrelevant and cannot justify the Trustee's refusal to search Mr. Goldthorpe's personal device for multiple reasons.

52. *First*, the number of custodians is irrelevant to what sources should be searched. As noted, the Trustee demanded that the Trive Defendants search personal devices and the Trive Defendants complied. The Trustee should be held to his own standard.

53. *Second*, as explained, this case involves the claims of six entirely separate Noteholders brought against a single set of Trive Defendants, so it is unremarkable that the total number of Noteholder custodians exceeds the number of Trive Defendants custodians. Indeed, the average number of custodians per Noteholder is less than three and the Trive Defendants have produced documents from three of their own custodians (including Mr. Searcy).

54. *Third*, the Trustee has produced text threads from other BC Partners custodians. Thus, while the Trustee claims in his Motion that BC Partners had a "prohibition on employees using their personal phones for work" (Tr. Mot. ¶ 29), the facts apparently show that BC Partners' employees did not follow that purported firm policy.

55. *Finally*, the Trustee's refusal to search Mr. Goldthorpe's phone calls into question whether the Trustee failed to preserve relevant information on the phone. The Trustee has repeatedly refused to provide basic, non-privileged information to the Trive Defendants about his preservation (or lack thereof) in this case.[15] Relevant here, he has refused to confirm when a

[15] The basic details about a litigation hold—such as "when a litigation hold was implemented, who received the litigation hold, what categories of ESI the recipients were instructed to preserve and collect[,] and what specific actions the recipients were instructed to take"—are not protected by the attorney-client privilege or the work-product doctrine. *LifeScan, Inc. v. Smith*, 2024 WL 3823488, at *5 (D.N.J. July 11, 2024) (collecting cases); *accord Cardinal*

litigation hold was distributed to BC Partners (if at all), whether that hold included Mr. Goldthorpe, and, if so, whether it included Mr. Goldthorpe's personal phone. *Compare* D.I. 210-12 at 2-3, *and* Ex. 56 at 2-3, *with* Ex. 57 at 2. The Trustee's silence on these issues speaks volumes.

**B. Mike Terwilliger And Clare Kim Should Be Custodians**

56. Mr. Terwilliger and Ms. Kim should be custodians as well. They were two of the four members of the BC Partners deal team for the Notes transactions. *See* Ex. 58 at -112498. Given their substantial involvement in the Notes transactions and subsequent events, Mr. Terwilliger's and Ms. Kim's custodial documents "would likely 'provide unique relevant information not already obtained.'" *Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, 331 F.R.D. 194, 198 (D.D.C. 2019) (emphasis omitted).

57. In prior correspondence, the Trustee has argued (with respect to Mr. Goldthorpe) that additional custodians are unnecessary because the documents cited by the Trive Defendants to show people's involvement were "communications … with Ivelin Dimitrov or Jason Young, both of whom are custodians." Ex. 49 at 12. This premise is flawed for three reasons.

58. *First*, BC Partners' own documents—including the memorandum provided to the investment committee, *see* Ex. 58 at -112498—list Mr. Terwilliger and Ms. Kim as two of the four members of its deal team for the Notes offering. Documents produced to date show that they attended key meetings and calls and took notes at such meetings and during such calls. *See supra* ¶¶ 30-32. They are reasonably likely to have relevant documents—whether they be initial notes, contemporaneous communications, or other documents. The fact that the Trive Defendants have

---

*Health 200, LLC v. Cellex, Inc.*, 2025 WL 2426338, at *11 (S.D. Ohio Aug. 22, 2025) (collecting cases); *Doe LS 340 v. Uber Techs., Inc.*, 710 F. Supp. 3d 794, 802 (N.D. Cal. 2024); *Brewer v. BNSF Ry. Co.*, 2015 WL 13883901, at *6 (D. Mont. Nov. 20, 2015); *Butterworth v. Lab'y Corp. of Am. Holdings*, 2010 WL 11470894, at *6 (M.D. Fla. June 15, 2010).

largely pointed to the custodial documents from only Mr. Dimitrov and Mr. Young to date does not suggest otherwise—that is a result of the fact that the Trustee has collected and produced documents from only those custodians so far.

59. *Second*, documents produced from non-parties show that Mr. Terwilliger and Ms. Kim communicated with them and, critically, did so without other BC Partners custodians on those emails. *See supra* ¶¶ 31-32. While other documents show that Mr. Terwilliger and Ms. Kim sometimes later forwarded some emails to other BC Partners custodians, there is a reasonable basis to believe that they had other non-duplicative communications regarding the Notes offering.

60. *Third*, "even if an email was produced from one witness's custodial inbox, producing the same email from another witness's inbox establishes that the second witness received the email (and helps counter any suggestion that he or she lacked knowledge of or did not receive the email in question)." *Thomas v. City of New York*, 336 F.R.D. 1, 3 (E.D.N.Y. 2020). That is especially important here given that much of this case depends on what people knew and when they knew it. Moreover, it is likely that "'de-dupe' technology would resolve any duplication issue" by excluding already-reviewed documents from the review process. *Garcia Ramirez*, 331 F.R.D. at 198.

## II. THE COURT SHOULD ORDER THE TRUSTEE TO PRODUCE ALL NOTEHOLDER CHAT AND TEXT MESSAGES

61. The Court should order BC Partners and Hamilton Lane to produce all chat messages (or explain in writing why none have been produced). Sixteen days (and counting) after the June 2, 2026 deadline for the substantial completion of document production, the Trustee still has not produced *any* Microsoft Teams chat messages from BC Partners or Slack chat messages from Hamilton Lane, even though emails produced (and called to the Trustee's attention months ago, *see* Ex. 50 at 3-4) show that these Noteholders used these communications channels to discuss

Lucky Bucks and the Notes transactions. This unexplained and unexcused failure to produce these chat messages is a violation of the Court's scheduling order. *See* D.I. 145 ¶ 3(c); *Chervon (HK) Ltd. v. One World Techs., Inc.*, 2025 WL 2638959, at *4 (D. Del. Jan. 14, 2025) ("As Rule 16 recognizes, scheduling orders are at the heart of case management. If they can be disregarded without a specific showing of good cause, their utility will be severely impaired.").

62. The Trustee's failure to produce chats for BC Partners and Hamilton Lane is especially concerning as it (like the Trustee's refusal to search Mr. Goldthorpe's personal device) calls into question whether BC Partners and Hamilton Lane preserved relevant messages (which, again, could explain the Trustee's refusal to provide basic information about his and the Noteholders' preservation efforts).

## III. The Court Should Deny As Moot The Trustee's Motion To Compel Production of Documents From Conner Searcy

63. Although the Trustee has refused to reciprocate, the Trive Defendants have now produced responsive, non-privileged documents from Conner Searcy, following a reasonable search of Mr. Searcy's email communications and mobile-phone data. The Trive Defendants performed the search using the same parameters and time period that Trive Defendants used for the documents and communications of their other document custodians, Mr. Thadani and Mr. Anderson. Because the Trustee has now received the discovery from Mr. Searcy that he sought, the Court should deny as moot the Trustee's Motion insofar as it concerns Mr. Searcy. *See Israel v. Pierce*, 235 F. Supp. 3d 598, 602 (D. Del. 2017) (denying motion to compel as moot).

## IV. The Court Should Deny The Trustee's Motion To Compel Disclosure Of The Identities Of External Investors In The Trive Funds

64. The Trustee's Motion also seeks "discovery concerning subsequent transfers of the Holdings Distributions made by Trive, even before [the Trustee] obtains a final judgment avoiding those distributions." Tr. Mot. ¶ 52; *see generally id.* ¶¶ 10-11, 31-33, 52-61. The Court should

deny the motion as the information sought is not relevant, let alone proportional to the needs of the case. Such a denial could, of course, be without prejudice to the Trustee's re-raising the issue if he develops evidence showing a substantial likelihood that he is likely to prevail on the merits and that the Trive Defendants will not be able to satisfy a judgment against them. *See also* Fed. R. Civ. P. 54(b) (interlocutory order "may be revised at any time before the entry of" final judgment); Fed. R. Bankr. P. 7054. But, absent such a showing, which the Trustee has not made and cannot make, the Trustee has no justification to obtain the discovery he seeks about external investors in the Trive Funds.

65. "The Court has 'broad discretion to tailor discovery narrowly,'" and Rule 26's "rule of proportionality 'is intended to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry.'" *Goodman*, 292 F.R.D. at 232; *see also Motivo Eng'g, LLC v. Black Gold Farms*, 2023 WL 2628687, at *6 (C.D. Cal. Feb. 10, 2023) (authorizing, "[a]s an accommodation to [d]efendant's confidentiality concerns," redaction of "the identity of any third parties with whom [defendant] ha[d] R&D agreements/arrangements").

66. The information the Trustee seeks is not relevant to any pending claim against any defendant, and the Trustee's requests are, at best, premature. As he admits, those requests are part of an effort to investigate potential *new* claims against *new* defendants (potential subsequent transferees), and not the "claim[s] or defense[s]" that the parties have actually pleaded in this adversary proceeding. Fed. R. Civ. P. 26(b)(1); *see* Tr. Mot. ¶ 56 (disclosing that Trustee hopes to use this discovery on alleged subsequent transfers to "amend to add" new claims and defendants). At this time, any such new claims are contingent and hypothetical. Any alleged subsequent transferees the Trustee identifies might be liable only if (1) the Trustee obtains a

judgment against a Trive Defendant in this adversary proceeding, and (2) that Trive Defendant is unable to satisfy such a judgment. *See* 11 U.S.C. § 550.[16]

67. The contingent nature of the hypothetical new claims is important. Although the Bankruptcy Code permits a trustee to recover an avoidable transfer from a "subsequent transferee," it does so only where necessary for the trustee to recover the amount of the transfer—not where such recovery would give the trustee a windfall. Indeed, in the very same section of the Code stating that an avoidable transfer may be recovered from either the initial transferee or (in some circumstances) a subsequent transferee, the Code makes clear that "[t]he trustee is entitled to only a single satisfaction." 11 U.S.C. § 550(d). Thus, even if the Trustee someday prevails on his avoidance claims—though the Trive Defendants are confident that he will not—he will be entitled to recover from any *subsequent* transferee(s) only if (1) the statutory requirements for such a recovery are met (the subsequent transferees did not take in good faith, without knowledge of the avoidability of the transfers, and for value, *see id.* § 550(b)); and (2) the Trive Defendants cannot repay the avoided transfers.

68. There is no doubt that the Trive Defendants have the capacity to satisfy any judgment against them in this proceeding. TCM is a private-equity firm and is the management company for Fund III and Fund III-A. Thadani Decl. ¶ 3. TCM's most recently filed Form ADV,

[16] The Trustee's argument that "information pertaining to subsequent transfers … is directly relevant to the Trustee's claims against Trive" is a red herring. Tr. Mot. ¶ 57. The Trustee argues that the timing of alleged subsequent transfers is relevant, speculating that "if Trive's regular practice [were] only to pay out proceeds to its investors at the end of the life cycle of one of its funds, but Trive rushed to pay out proceeds from the Holdings Distributions either right after they were received, before filing Holdings for bankruptcy, or after receiving Rule 2004 subpoenas, the out-of-the ordinary timing of those transfers could be evidence of guilty conscience." But the redacted bank statements that the Trive Defendants produced long ago to the Trustee provide the precise date on which each transaction occurred. *See supra* ¶ 16; Ex. 6. Disclosing the identities of Trive's external investors would shed no further light on timing.

dated April 27, 2026, which is a publicly available document, reflects that: (a) TCM has over $8 billion in regulatory assets under management; (b) Fund III has a gross asset value of over $660 million; and (c) Fund III-A has a gross asset value of over $354 million. *Id.* Further, the Trive Defendants have insurance policies applicable to this litigation with an aggregate $43 million in coverage (though defense costs go against those limits), as the Trustee knows from the Trive Defendants' initial disclosures and document productions. *See id.* ¶ 6. Even if the Trustee somehow achieved total victory in this proceeding—an unlikely scenario to say the least, given the factual record developed thus far—TCM and the other Trive Defendants would be more than capable of satisfying a judgment against them, in a proceeding where the aggregate amount of proceeds of the Holdings Distributions received by the Trive Defendants, net of expenses, was $119,047,461.46, of which Fund III and Fund III-A ultimately received $76,640,183.93 and $42,407,277.53, respectively. *See id.* ¶ 2; Am. Compl. ¶¶ 44, 47-53, 202-203; Answer ¶¶ 44, 47-53, 202-203.[17]

69. The Trustee's cited cases involved strikingly different scenarios, in which it was far from clear whether recovery from an initial transferee would be possible. The discovery in *Dymarkowski*, for example, was tied to unresolved issues about the location, disposition, and value of the underlying collateral asset. *See Dymarkowski v. Iland Green Techs., Inc.* (*In re Xunlight Corp.)*, 2016 Bankr. LEXIS 4279, at *6-7 (Bankr. N.D. Ohio Dec. 14, 2016). There, the trustee sought discovery specifically to determine "the location and status of the Collateral" and "whether

[17] In addition, and consistent with industry-wide practice, the limited-partnership agreements for each of the Trive Funds includes provisions pursuant to which the Trive Funds' limited partners would be obligated to return certain distributions previously made by the applicable Trive Fund to such limited partners, including in circumstances where the Trive Fund incurs a liability or obligation and does not have sufficient available funds to satisfy any such liability or obligation. *See* Thadani Decl. ¶ 4. The availability of that mechanism further confirms that the Trive Defendants could satisfy a judgment if found liable in this proceeding.

the Collateral has been sold or transferred, and if so, to whom," because that information would inform whether recovery should be in kind or for value under Section 550. *Id.* The court thus held that discovery about alleged subsequent transfers was relevant because it bore directly on "the value of the Collateral for purposes of recovery" and thus the remedy itself. *Id.* No similar dispute exists here, as the amount of the alleged fraudulent transfers (*i.e.*, the Holdings Distributions) is undisputed and the ability of the Trive Defendants to satisfy a money judgment is clear, including based solely on publicly available information.

70. *Byju's Alpha* (Tr. Mot. ¶¶ 54-55, 61) is inapposite for similar reasons. *See* Motion for Stay Pending Appeal, Ex. D (Mar. 1, 2024 Hr'g Tr.), *Byju's Alpha, Inc. v. Camshaft Cap. Fund, LP (In re Byju's Alpha, Inc.)*, No. 24-50013 (JTD) (Bankr. D. Del. Mar. 27, 2024), ECF No. 100-4. There, Judge Dorsey's ruling was premised on acute uncertainty about the whereabouts of funds; the defendants asserted that they had been a "mere conduit" for the alleged fraudulent transfers, *id.* at 8, and Judge Dorsey thus emphasized that the requested discovery was warranted because "I don't know where the money is," *id.* at 4. Here, in contrast, the Trive Defendants have produced line-item bank statements spelling out exactly when the Holdings Distributions were received, and what transactions subsequently occurred. That production provides visibility into the relevant transfers, omitting only the identities of non-party external investors whose identities the Trustee would need to know only if he somehow could not recover from one or more of the Trive Defendants.

71. While the Trustee's need for the information he seeks is exceedingly low (if not non-existent), the commercial and confidentiality interests at stake are weighty. The Trive Funds consider the identities of their third-party limited partners—*i.e.*, the external investors who have entrusted their capital to the Trive Funds to manage and invest—to be highly sensitive, proprietary

information, and the Trive Funds treat such information as trade secrets. *See* Thadani Decl. ¶ 7. This is so for two reasons. First, the Trive Funds themselves have a commercial interest in confidentiality. If the identities of the Trive Funds' external investors became publicly known, TCM and its funds would be subject to business risks from competitors, including the poaching of its limited partners. *Id.* Second, the Trive Funds' limited partners have their own interests in privacy and confidentiality, and, in some cases, have contractually restricted the Trive Funds' ability to disclose their identities. *Id.* These limited partners include pensions and retirement plans, hospital systems, university endowments, philanthropic foundations, and private investors. *Id.* Moreover, the Trive Funds have a vested business interest in protecting these third-party limited partners from, among other things, harassment. *Id.*

72. Finally, the Trustee argues that the information he seeks should be produced in response to his supplemental Rule 2004 subpoena. Tr. Mot. ¶¶ 60-61. But that subpoena is barred by the pending-proceeding rule, and the Trustee is mistaken that Bankruptcy Rule 2004 permits him to perform an end-run around the limitations that Rule 26(b) places on discovery in an adversary proceeding. *See* Fed. R. Bankr. P. 2004; Fed. R. Civ. P. 26(b).

73. A Rule 2004 examination is generally "not available" where, as here, "an adversary proceeding or contested matter has been commenced; at that point, discovery is made pursuant to the Federal Rules of Bankruptcy Procedure." *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016). Because the Trustee chose to bring an adversary proceeding, he "is entitled to make use of the tools of discovery" in the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure—but those tools have "replace[d] the use of Rule 2004 as the means to establish [his] case." *In re Cyber Litig. Inc.*, 2021 WL 2655312, at *4 (Bankr. D. Del. June 28, 2021). Like many adversary-proceeding litigants, the Trustee "would undoubtedly

prefer to obtain further discovery under Rule 2004" to the extent he is not entitled to it under the Federal Rules. *Id.* But bankruptcy courts have consistently disapproved of exactly the gambit the Trustee is attempting here: using Rule 2004 examinations "as a tactic to circumvent the safeguards" of the Federal Rules. *In re Enron Corp.*, 281 B.R. 836, 841 (Bankr. S.D.N.Y. 2002); *accord, e.g.*, *In re Blackjewel, L.L.C.*, 2020 WL 6948815, at *6 (Bankr. S.D. W. Va. July 14, 2020); *Simms v. Deutsche Bank Nat'l Tr. Co. (In re Simms)*, 2012 WL 2930048, at *1 (Bankr. N.D. Ga. May 11, 2012); *In re Wash. Mut., Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009).

74. To be sure, as recognized in *Washington Mutual*, courts sometimes recognize an exception to the pending-proceeding rule and permit "Rule 2004 examinations on matters wholly unrelated to the pending proceeding." 408 B.R. at 51. But the information the Trustee seeks is not "wholly unrelated" to the pending adversary proceeding. On the contrary, it is explicitly tied to the allegedly fraudulent transfers at the heart of the Amended Complaint. It is possible for matters to be outside the scope of permissible discovery in a proceeding under the Federal Rules (for example, as irrelevant or disproportionate or duplicative) without being "wholly unrelated" to the proceeding. Construing those two categories as always non-overlapping, logical opposites would render the pending-proceeding rule a nullity that provided no practical protection to litigants—precisely the opposite of the law.

75. *Washington Mutual* also makes clear that Rule 2004 discovery, though broad, is not unlimited. In particular, Rule 2004 examinations "may not be used for 'purposes of abuse or harassment.'" 408 B.R. at 50; *accord Blackjewel*, 2020 WL 6948815, at *6. Given the hypothetical (at best) relevance of the information on external investors' identities that the Trustee is seeking, one can only conclude that the Trustee's pursuit of this information is motivated by a desire to exert pressure on the Trive Defendants by threatening their legitimate interest in

maintaining the confidence of their dealings with their own investors—rather than by a bona fide intent to pursue claims on behalf of the Holdings estate. "In deciding whether a request comes within the discovery rules, a court is not required to blind itself to the purpose for which a party seeks information," and a request motivated by an improper purpose, such as "harass[ing] the person from whom he seeks discovery," "properly is denied." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978); *see id.* at 352-353 (denying plaintiffs' request for discovery of non-parties' identities because plaintiffs did "not seek this information for any bearing that it might have on issues in the case"); *Pac. Century Int'l, Ltd. v. Does 1-37*, 282 F.R.D. 189, 194-196 (N.D. Ill. 2012) (denying plaintiffs' requests for discovery of identities of non-party individuals connected with certain IP addresses because plaintiffs were "not seeking information about the non-party IP addresses for the purpose of litigating their current claims," but instead "intend[ed] to either sue the individuals whose identity they uncover or, more likely, to negotiate a settlement with those individuals"). So too here, given the Trustee's evidently improper purpose in seeking information about the identities of the Trive Funds' non-party external investors.

## CONCLUSION

76. For the foregoing reasons, the Court should grant the Trive Defendants' Cross-Motion,[18] deny as moot the Trustee's Motion as it pertains to Conner Searcy's documents, and deny without prejudice the Trustee's Motion as it pertains to the identities of the Trive Funds' non-party external investors.

[18] The Trive Defendants request that, if the Court grants the Trive Defendants' Cross-Motion, the Court orders the Trustee to produce all such requested documents and communications within 28 days of the entry of the Court's order.

Dated: June 18, 2026
Wilmington, Delaware

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

Philip D. Anker (admitted *pro hac vice*)
Ross E. Firsenbaum (admitted *pro hac vice*)
Charles C. Bridge (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
philip.anker@wilmerhale.com
ross.firsenbaum@wilmerhale.com
charles.bridge@wilmerhale.com

Joel Millar (admitted *pro hac vice*)
2100 Pennsylvania Avenue NW
Washington, DC 20037
(t) (202) 663-6000
(f) (202) 663-6363
joel.millar@wilmerhale.com

*Attorneys for Defendants Trive Capital Management LLC, Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star Gaming, LLC, and Shravan Thadani*

**PACHULSKI STANG ZIEHL & JONES LLP**

By: */s/ Laura Davis Jones*

Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
(t) (302) 652-4100
(f) (302) 652-4400
ljones@pszjlaw.com
pkeane@pszjlaw.com

*Attorneys for Defendants Trive Capital Management LLC, Trive Capital Fund III LP, Trive Capital Fund III-A LP, TCFIII Luck LP, TCFIII Luck SPV LP, TCFIII Luck Acquisition LLC, Southern Star Gaming, LLC, and Shravan Thadani*

**CERTIFICATION OF COUNSEL PURSUANT TO LOCAL RULE 7026-1(d)**

Between April 18, 2025, and April 8, 2026, counsel to the Trive Defendants met and conferred with counsel to the Trustee. Counsel to the Trive Defendants have made a reasonable effort to reach agreement with the Trustee with respect to the disputes set forth in the Motion. However, these attempts were unsuccessful.